Mark Titch
B-89549, Fl-04-227
P.O. Box 799001
San Diego, Ca   92179-9001

Petitioner, Pro Se

FILED

2008 APR 10  PM 3: 53

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

MARK TITCH,
Petitioner, Pro Se

vs.

ROBERT J. HERNANDEZ,
Warden, RJDCF et.al.

                    Respondents

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. '08. CV 0654  J  WMc

LODGEMENT OF DOCUMENTS IN SUPPORT OF
PETITION FOR WRIT OF HABEAS CORPUS
(EXHIBITS - VOLUME I)

      Petitioner, Mark Titch, represented pro se, hereby lodges with this court

**EXHIBITS - VOLUME I**, consisting of Exhibits 1 through 38.   These documents are

necessary to support the Grounds and Claims which petitioner has raised in his

Petition For Writ Of Habeas Corpus and are pursuant to Federal and Local rules

of court.

DATED: __4/8/08__                    Respectfully Submitted,


                                     _____
                                     Mark Titch,
                                     Petitioner, Pro Se

<u>**DECLARATION OF SERVICE BY MAIL**</u>

I <u>Charles LeGros</u>, am a resident of the Richard J. Donovan Correctional Facility, in the county of San Diego, in the state of California. I am over the age of eighteen (18) years, and I am not a party to the enclosed action. My state prison address is

Charles LeGros
J-27329, Fl-4-227
P.O. Box 799001
San Diego, Ca  92179-9001

On <u>4-8-08</u>, I served the foregoing <u>**DOCUMENTS IN**</u> <u>**SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS (Exhibits – Volume I)**</u> on the parties named herein below by placing a true copy thereof, enclosed in a sealed envelope, with the postage thereon fully paid, in the United States mail in a deposit box so provided at the prison facility, addressed as follows:

United States District Court
Office of the Clerk
880 Front Street, Suite 4290
San Diego, Ca  92101-8900

I declare under penalty of perjury of both state and federal law that the foregoing is true and correct and that this declaration was executed on_____ <u>4-8-08</u> at San Diego, California.

/s/ Charles LeGros

Mark Titch
B-89549, Fl-04-227
P.O. Box 799001
San Diego, Ca  92179-9001

Petitioner, Pro Se

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

MARK TITCH,
Petitioner, Pro Se

vs.

ROBERT J. HERNANDEZ,
Warden, RJDCF et.al.

Respondents

Case No. _____

DOCUMENTS IN SUPPORT OF PETITION
FOR WRIT OF HABEAS CORPUS

EXHIBITS - VOLUME I

# TABLE OF EXHIBITS

**Page(s)**

**Volume I:**

EXHIBIT  1:  California Code of Regulations, Title 15, Division 2         1-9
              (selected relevant sections)

EXHIBIT  2:  Orange County Information Sheet (Indictment)                1-6

EXHIBIT  3:  Sentencing Transcript                                       1-29

EXHIBIT  4:  Abstract of Judgement                                       1-7

EXHIBIT  5:  CYA Referral Document                                       1-18

EXHIBIT  6:  CDC Cumulative Case Summary                                 1-14

EXHIBIT  7:  Orange County D.A.'s 1203.01 Statement                      1-2

EXHIBIT  8:  Letter From Lt. Cross, Anaheim Police Department            1-2

EXHIBIT  9:  San Diego Police Officer's Report                           1

EXHIBIT 10:  CDC 128-G Classification Chrono                             1

EXHIBIT 11:  Excerpts From 2001 Board Hearing                            1-5

EXHIBIT 12:  FBI Arrest and Conviction Record                            1-3

EXHIBIT 13:  2006 Life Prisoner Evaluation Report                        1-12

EXHIBIT 14:  2003 Life Prisoner Evaluation Report                        1-8

EXHIBIT 15:  2000 Life Prisoner Evaluation Report                        1-12

EXHIBIT 16:  1998 Life Prisoner Evaluation Report                        1-8

EXHIBIT 17:  Board's Response to Petitioner's 1040 BPT Appeal of         1-15
              his 2003 Parole Hearing

EXHIBIT 18:  CDC 602 Appeal of Petitioner's 2003 Life Prisoner           1-10
              Evaluation Report

EXHIBIT 19:  2006 Mental Health Evaluation                               1-6

EXHIBIT 20:  2000 Mental Health Evaluation                               1-8

EXHIBIT 21:  1998 Mental Health Evaluation                               1-3

EXHIBIT 22:  1995 Mental Health Evaluation (Dr. Smith)                   1-2

EXHIBIT 23:  1995 Mental Health Evaluation (Dr. Jenesky)                 1-2

# TABLE OF EXHIBITS

**Volume I:**                                                                    **Page(s)**

EXHIBIT 24:  1992 Mental Health Evaluation          1-2

EXHIBIT 25:  1989 Mental Health Evaluation          1-2

EXHIBIT 26:  1986 Mental Health Evaluation          1-2

EXHIBIT 27:  1983 Mental Health Evaluation          1-2

EXHIBIT 28:  2003 Parole Hearing Decision           1-14

EXHIBIT 29:  2001 Parole Hearing Decision           1-13

EXHIBIT 30:  1998 Parole Hearing Decision           1-6

EXHIBIT 31:  1995 Parole Hearing Decision           1-6

EXHIBIT 32:  1992 Parole Hearing Decision           1-8

EXHIBIT 33:  1989 Parole Hearing Decision           1-10

EXHIBIT 34:  1986 Parole Hearing Decision           1-10

EXHIBIT 35:  1983 Parole Hearing Decision           1-17

EXHIBIT 36:  Achievements                           1-5

EXHIBIT 37:  Laudatory Memorandums and Chronos      1-6

EXHIBIT 38:  Resume of Employment Skills (Job Queries and    1-18
             Information)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## DECLARATION OF RECORDS

2

3    I _Mark Titch_ , do hereby declare the following:

4    The attached documents, titled **"Exhibits - Volume I"**, and consisting of

5    Exhibits 1 through 38, are true and correct copies of the original documents.

6    Where the documents were given to petitioner by another person, petitioner

7    believes them to be true, accurate, and correct copies.

8

9

10

11    I declare under penalty of perjury of both state and federal laws that

12    the foregoing is true and correct and that this declaration was executed on

13    _4/8/08_____ at San Diego, California.

14

15

16

17

18

19    /S/ _Mark Titch_
      Mark Titch,

20    Petitioner, Pro Se

21

22

23

24

25

26

27

28

**EXHIBIT 1**

California Code of Regulations, Title 15, Division 2
(Selected Relevant Sections)



*Barclays Official*

# CALIFORNIA
# CODE OF
# REGULATIONS

# Title 15.   Crime Prevention and Corrections

## Division 2.   Board of Prison Terms

**THOMSON**

**WEST**

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
50 California Street • Nineteenth Floor • San Francisco, CA 94111
800–888–3600

# Division 2.   Board of Prison Terms

## Chapter 1.   General

### Article 1.   Rules of Construction and Definitions

**§ 2000.  Rules of Construction and Definitions.**

(a) Rules of Construction. The following rules of construction apply to the regulations contained in this division, except as otherwise noted:

(1) The enumeration of some criteria for the making of discretionary decisions does not prohibit the application of other criteria reasonably related to the decision being made.

(2) The order in which criteria are listed does not indicate their relative weight or importance.

(3) "Inmate," "prisoner," or "parolee" applies to any person who is or has been committed to the custody of the Director of Corrections, including inmates, residents, parolees, and dischargees, regardless of that person's present status.

(4) "Regulation" means rule or regulation.

(5) "Shall" is mandatory, "should" is advisory, and "may" is permissive.

(6) The past, present, or future tense includes the others.

(7) The masculine gender includes the feminine gender; the singular includes the plural.

(8) The symbol § refers only to board rules contained in this division.

(9) The time limits specified in these rules do not create a right to have the specified action taken within the time limits. The time limits are directory, and the failure to meet them does not preclude taking the specified action beyond the time limits.

(b) Definitions. For the purpose of the regulations contained in this division the definitions below shall have the following meanings:

(1) ISL Prisoner. A person sentenced to prison for a crime committed on or before June 30, 1977, who would have been sentenced under Penal Code section 1170 if he had committed the crime on or after July 1, 1977.

(2) DSL Prisoner. A person sentenced to prison under Penal Code section 1170 for a crime committed on or after July 1, 1977. For the purpose of these rules, once an ISL prisoner has received a retroactively calculated DSL release date all rules applying to DSL prisoners apply to the ISL prisoner's DSL release date and parole.

(3) Life Prisoner. A prisoner serving a sentence of life with the possibility of parole. The parole date is determined by the board. Life sentences may be imposed for the following crimes or conspiracy to commit any of the following crimes:

(A) First degree murder (Penal Code section 187).

(B) Second degree murder (Penal Code section 187) committed on or after November 8, 1978.

(C) Kidnapping for extortion or ransom, with bodily harm to the victim (before September 22, 1951) and without bodily harm to the victim (since September 22, 1951); and kidnapping for robbery (Penal Code section 209).

(D) Train wrecking not resulting in death or bodily harm (Penal Code section 219).

(E) Sabotage resulting in death or great bodily harm (former Military and Veterans Code section 1672a).

(F) Certain forms of aggravated assault by a prisoner serving a sentence of life imprisonment (Penal Code section 4500).

(G) Exploding a destructive device causing mayhem or great bodily injury (Penal Code section 12310).

(H) Attempt to murder a government official in retaliation for or prevention of his performance of official duties. (Penal Code section 217.1).

(I) Habitual Sex Offender, Penal Code section 667.51(c): A party who has violated Penal Code section 288 (committing lewd or lascivious acts or crimes against children) and who has served two or more prison terms as defined in Section 667.5 as punishment for violation of an offense listed in subdivision (b), including commission to the state hospital.

(J) Habitual Offender, Penal Code section 667.7: Any party convicted of a felony involving or likely to involve infliction of great bodily harm, and who has served two or more prior prison terms as per Section 667.5 for crimes of murder, mayhem, rape, etc. or any felony punishable by death or life imprisonment, with or without possibility of parole.

(K) Attempted willful, deliberate, and premeditated murder as defined in Penal Code Section 189 (Penal Code Sections 187, 664).

(L) Aggravated mayhem (Penal Code Section 205).

(M) A new conviction or violation of any of specified controlled substance provisions where the person has served two separate prior prison terms upon conviction of any of the specified provisions (Penal Code Section 667.75).

(4) Adjusted Maximum DSL Date. This date is computed by adding any at large time to the unadjusted maximum DSL date.

(5) Agent. See Parole Agent.

(6) Asylum State. The state other than California in which a parolee-at-large (PAL) is in custody.

(7) Battered Woman Syndrome. Evidence of the effects of physical, emotional, or mental abuse upon the beliefs, perceptions, or behavior of victims of domestic violence where it appears the criminal behavior was the result of that victimization.

(8) Board. See Board of Prison Terms.

(9) Board Action. An official decision of the board in an individual case.

(10) Board of Prison Terms (BPT). The administrative board responsible for setting parole dates, establishing parole length and conditions, discharging sentences for certain prisoners and parolees; granting, rescinding, suspending, postponing, or revoking paroles; conducting disparate sentence reviews; advising on clemency matters; and handling miscellaneous other statutory duties. Persons under the board's jurisdiction are all adult felons committed by superior courts to the Director of Corrections under Penal Code sections 1168 and 1170 and all adult felons sentenced under the Indeterminate Sentence Law.

(11) Briggs Initiative: Proposition 7, November 7, 1978 general election, specifying new minimum eligible parole release dates for first and second degree murders, effective November 8, 1978.

(12) C&PR. Classification and Parole Representative: the department employee at each prison who has been designated to be that prison's liaison with the board. Such designation shall be made by the Director of Corrections after consultation with the board.

(13) California Agency Parolee. A felon released from confinement in a California prison to supervision in a California community who subsequently is within the custody of any agency of the State of California or any subdivision thereof except the Department of Corrections.

(14) California Agency Prisoner. A prisoner who has been transferred from the custody of the Director of Corrections to the custody of any agency of the State of California or any subdivision thereof.

(15) California Concurrent Parolee. A prisoner on parole from a California sentence and a sentence of another jurisdiction who is being supervised in a California community pursuant to the Uniform Act for Out-of-State Parole Supervision (Penal Code sections 11175–11179).

(16) Case Conference. A documented conference between a parole agent and his supervisor to discuss a parolee's behavior.

(17) Central File. A master file maintained by the department containing records regarding each person committed to its jurisdiction. This file is maintained by the institution or parole region to which the person is assigned. See department regulations for the specific contents of this file.

(18) Central Office. The board office in Sacramento.

(19) Central Office Calendar. The central office calendar is composed of commissioners or deputy commissioners as designated by the chair

NOTE: Authority cited: Section 5076.2, Penal Code.—Reference: Sections 1170.2 and 3041, Penal Code.
HISTORY
1. New section filed 6–11–79; effective thirtieth day thereafter (Register 79, No. 24).

## Article 5. Parole Consideration Criteria and Guidelines for Life Prisoners

### § 2280. General.

A life prisoner shall be considered for parole for the first time at the initial parole consideration hearing. At this hearing, a parole date shall be denied if the prisoner is found to be unsuitable for parole under § 2281(c). A parole date shall be set if the prisoner is found to be suitable for parole under § 2281(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude in respect to the threat to the public. In setting the parole date, the panel shall consider the Sentencing Rules for the Superior Courts as they specifically relate to life prisoners. The panel shall also consider the criteria and guidelines set forth in this article for determining the suitability for parole and the setting of parole dates, considering the number of victims of the crime for which the prisoner was sentenced and any other circumstances in mitigation or aggravation.

NOTE: Authority cited for Article 5 (Sections 2280–2292): Section 5076.2, Penal Code. Reference: Section 3041, Penal Code.
HISTORY
1. Repealer of Article 5 (Sections 2280–2297) and new Article 5 (Sections 2280–2292) filed 7–31–78 as an emergency; effective upon filing. Certificate of Compliance included (Register 78, No. 31). For history of former Article 8, see Registers 78, No. 14, and 77, No. 44.
2. Amendment filed 6–11–79; effective thirtieth day thereafter (Register 79, No. 24).

### § 2281. Determination of Suitability.

(a) General. The panel shall first determine whether a prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

(b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's: social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

(c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

(d) Circumstances Tending to Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or the prisoner has given indications that he understands the nature and magnitude of the offense.

(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress had built over a long period of time.

(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

(7) Age. The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

NOTE: Authority cited: Sections 3041, 3052 and 5076.2, Penal Code. Reference: Sections 3041 and 4801, Penal Code.
HISTORY
1. Amendment of subsection (c) filed 6–28–79; effective thirtieth day thereafter (Register 79, No. 26).
2. Amendment of subsection (d)(7) filed 5–1–80; effective thirtieth day thereafter (Register 80, No. 18).
3. New subsection (d)(5), subsection renumbering, and amendment of NOTE filed 3–16–2001 as an emergency; operative 3–16–2001 (Register 2001, No. 11). A Certificate of Compliance must be transmitted to OAL by 7–16–2001 or emergency language will be repealed by operation of law on the following day.
4. Certificate of Compliance as to 3–16–2001 order transmitted to OAL 7–16–2001 and filed 8–20–2001 (Register 2001, No. 34).

### § 2282. Base Term.

(a) General. The panel shall set a base term for each life prisoner who is found suitable for parole. The base term shall be established solely on the gravity of the base offense, taking into account all of the circumstances of that crime. The base offense is the most serious of all life offenses for which the prisoner has been committed to prison.

Register 2003, No. 25; 6–20–2003

3

The base term shall be established by utilizing the appropriate matrix base terms provided in this section for the base offense of which the prisoner was convicted. The panel shall determine the category most closely related to the circumstances of the crime. The panel shall impose the middle base term reflected in the matrix unless the panel finds circumstances in aggravation or mitigation.

If the panel finds circumstances in aggravation or in mitigation as provided in § 2283 or 2284, the panel may impose the upper or lower base term provided in the matrix, stating the specific reason for imposing such a term. A base term other than the upper, middle or lower base term provided in the matrix may be imposed by the panel if justified by the particular facts of the individual case.

(b) Matrix of Base Terms for First Degree Murder.

**CIRCUMSTANCES**

| 2282 (b) FIRST DEGREE MURDER Penal Code § 189 (in years and does not include post conviction credit as provided in § 2290) | A. Indirect Victim died of causes related to the act of the prisoner but was not directly assaulted by prisoner with deadly force; e.g., shock producing heart attack; a crime partner actually did the killing. | B. Direct or Victim Contribution Death was almost immediate or resulted at least partially from contributing factors from the victim; e.g., victim initiated struggle or had goaded the prisoner. This does not include victim acting in defense of self or property. | C. Severe Trauma Death resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim. | D. Torture Victim was subjected to the prolonged infliction of physical pain through the use of nondeadly force prior to act resulting in death. |
|---|---|---|---|---|
| I. Participating Victim Victim was accomplice or otherwise implicated in a criminal act with the prisoner during which or as a result of which the death occurred; e.g., crime partner, drug dealer, etc. | 8-10-12 | 10-12-14 | 11-13-15 | 13-15-17 |
| II. Prior Relationship Victim was involved in a personal relationship with prisoner (spouse, family member, friend, etc.) which contributed to the motivation for the act resulting in death. If victim had a personal relationship but prisoner hired and/or paid a person to commit the offense, see Category IV. | 10-12-14 | 12-14-16 | 13-15-17 | 15-17-19 |
| III. No Prior Relationship Victim had little or no personal relationship with prisoner; or motivation for act resulting in death was related to the accomplishment of another crime; e.g., death of victim during robbery, rape, or other felony. | 11-13-15 | 13-15-17 | 14-16-18 | 16-18-20 |
| IV. Threat to Public Order or Murder for Hire The act resulting in the victim's death constituted a threat to the public order include the murder of a police officer, prison guard, public official, fellow patient or prisoner, any killing within an institution, or any killing where the prisoner hired and/or paid another person to commit the offense. | 13-15-17 | 15-17-19 | 16-18-20 | 18-20-22 |

(The V I C T I M label appears vertically along the left margin of rows I–IV.)

**SUGGESTED BASE TERM**

(c) Matrix for Kidnapping for Robbery or Ransom.

**CIRCUMSTANCES**

| 2282 (c) KIDNAP FOR ROBBERY OR RANSOM Penal Code § 209 (in years and does not include post conviction credit provided in § 2290) | A. Minor Movement Movement was of short duration and resultant location would not substantially increase risk of harm. | B. Extensive Movement Movement was of lengthy duration or resultant location would substantially increase risk of harm. | C. Hostage Victim was taken as hostage. | D. Planning The crime involved intricate prior planning. |
|---|---|---|---|---|
| I. Minor Injury Victim unharmed or received minor injury. | 8-10-12 | 9-11-13 | 10-12-14 | 11-13-15 |
| II. Victim Assaulted Victim was sexually assaulted or otherwise seriously injured or assaulted. | 9-11-13 | 10-12-14 | 11-13-15 | 12-14-16 |
| III. Major Injury Victim's major injuries required extensive treatment or the victim was seriously disabled. | 10-12-14 | 11-13-15 | 12-14-16 | 13-15-17 |
| IV. Death Victim died. | Use matrix provided in Section 2282(b). | | | |

(The V I C T I M label appears vertically along the left margin of rows I–IV.)

**SUGGESTED BASE TERMS**

Register 2003, No. 25; 6–20–2003

(d) Matrix for Other Life Crimes.

In considering crimes for which no matrix is provided, the panel shall impose a base term by comparison to offenses of similar gravity and magnitude in respect to the threat to the public, and shall consider any relevant Judicial Council rules and sentencing information as well as any circumstances in aggravation or mitigation of the crime.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Section 3041, Penal Code.

HISTORY

1. Amendment of subsection (b), Categories II and IV, filed 5–1–80; effective thirtieth day thereafter (Register 80, No. 18).

§ 2283.  Circumstances in Aggravation of the Base Term.

(a) General. The panel shall impose the upper base term or another term longer than the middle base term upon a finding of aggravating circumstances. Circumstances in aggravation of the base term for any life crime include:

(1) The crime involved some factors described in the appropriate matrix in a category higher on either axis than the categories chosen as most closely related to the crime;

(2) The victim was particularly vulnerable due to age or physical or mental condition;

(3) The prisoner occupied a position of leadership or dominance over other participants in the commission of the crime, or the prisoner induced others to participate in the commission of the crime;

(4) The prisoner has a history of criminal behavior for which the term is not being enhanced under Section 2286;

(5) During the commission of the crime the prisoner had a clear opportunity to cease but instead continued;

(6) The prisoner has engaged in other reliably documented criminal conduct which was an integral part of the crime for which the prisoner is currently committed to prison;

(7) The prisoner had a special relationship of confidence and trust with the victim, such as that of employee–employer;

(8) The manner in which the crime was committed created a potential for serious injury to persons other than the victim of the crime;

(9) The prisoner was on probation or parole or was in custody or had escaped from custody at the time the crime was committed.

(b) Specific Circumstances in Aggravation of First Degree Murder (Penal Code Section 187) Include:

(1) The murder was wanton and apparently senseless in that it was committed after another crime occurred and served no purpose in completing that crime;

(2) The corpse was abused, mutilated or defiled;

(3) The prisoner went to great lengths to hide the body or to avoid detection;

(4) The murder was committed to preclude testimony of potential or actual witnesses during a trial or criminal investigation;

(5) The murder was committed to prevent discovery of another crime;

(6) The murder was committed by a destructive device or explosive;

(7) There were multiple victims for which the term is not being enhanced under § 2286;

(c) Specific Circumstances in Aggravation of Kidnapping for Robbery or Ransom (Penal Code Section 209) Include:

(1) The incident involved multiple victims;

(2) The property or ransom taken or which the prisoner attempted to take had a value of $25,000 or more;

(3) The kidnapping posed a threat to the public order, such as victim was a public official;

(d) Specific Circumstances in Aggravation of Other Life Crimes. The hearing panel shall consider any specific factors in aggravation, including those established by the Judicial Council, as they may pertain to setting parole dates for these offenses.

§ 2284.  Circumstances in Mitigation of the Base Term.

(a) General. The panel shall impose the lower base term or another term shorter than the middle base term upon a finding of mitigating cir-

cumstances. Circumstances in mitigation of the base term for any life crime include:

(1) The crime involved some factors described in the appropriate matrix in a category lower on either axis than the categories chosen as most closely related to the crime;

(2) The prisoner participated in the crime under partially excusable circumstances which do not amount to a legal defense;

(3) The prisoner had no apparent predisposition to commit the crime but was induced by others to participate in its commission;

(4) The prisoner tried to help the victim or sought aid after the commission of the crime or tried to dissuade the crime partner from committing other offenses;

(5) The prisoner has a minimal or no history of criminal behavior;

(6) The prisoner was a passive participant or played a minor role in the commission of the crime;

(7) The crime was committed during or due to an unusual situation unlikely to reoccur;

(8) The crime was committed during a brief period of extreme mental or emotional trauma.

(9) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(b) Specific Circumstances in Mitigation of Life Crimes. The hearing panel shall consider any specific factors in mitigation, including those established by the Judicial Council, as they may pertain to setting parole dates for these offenses.

NOTE: Authority cited: Sections 3041, 3052 and 5076.2, Penal Code. Reference: Sections 3041 and 4801, Penal Code.

HISTORY

1. New subsection (a)(9) and new NOTE filed 3–16–2001 as an emergency; operative 3–16–2001 (Register 2001, No. 11). A Certificate of Compliance must be transmitted to OAL by 7–16–2001 or emergency language will be repealed by operation of law on the following day.

2. Certificate of Compliance as to 3–16–2001 order transmitted to OAL 7–16–2001 and filed 8–20–2001 (Register 2001, No. 34).

§ 2285.  Additional Term for the Use of a Firearm.

The panel shall impose a specific enhancement of two years if the prisoner personally used a firearm in the commission of any life crime unless the panel states specific reasons for not adding the enhancement.

§ 2286.  Additional Terms for Other Offenses.

(a) General. The panel shall impose enhancements as provided in this section.

If the panel finds circumstances in aggravation or mitigation as provided in §§ 2287 or 2288, the panel may impose a higher or lower enhancement, or may impose no enhancement, if the panel states the specific reasons for doing so.

(b) Multiple Commitments. An enhancement should be added to the base term if the prisoner has been committed to prison for more than one offense, regardless of whether the sentences are to be served concurrently or consecutively with the life sentence or each other.

(1) Nonlife Offenses. Except as provided in (3) below, in adding enhancements for nonlife offenses, the panel should be guided by Penal Code Section 1170.1. The panel shall select a principal term and subordinate terms based on the nonlife offenses and add the total term to the term established for the life offense. The term for the nonlife offense shall be the term in effect at the time the prisoner committed the offense.

(2) Life Sentence Offenses. The enhancement for each life sentence offense in addition to the base term should be seven years.

(3) Nonlife 1168 Offenses. The enhancement for each nonlife 1168 offense should be six months.

(c) Prior Felony Convictions. An enhancement should be added to the base term for prior felony convictions as specified in this subsection, regardless of whether the prior felony conviction or prison term was pled and proven. The panel may add less than the determinate enhancement if the prior felony conviction or prison term was not pled and proven. In adding enhancements under this subsection, the panel should consider

date of the prior conviction and the length of time between release on custody and subsequent convictions if the prisoner has never been :ed in custody. The period of confinement shall not be increased for victions or prior prison terms resulting from convictions that have n reversed in court or pardoned by the executive.

1) Prior Prison Terms. In adding enhancements for prior prison terms panel should be guided by the determinate enhancements for prior on terms.

2) Prior Felony Convictions With Probation. An enhancement of six nths should be added for each prior felony conviction for which the oner was granted probation.

d) Additional Term for Disciplinary Offenses. The panel may impose pecific enhancement for serious disciplinary offenses which occurred :e arrival in prison but before a parole date is granted. Only disciplin-e offenses which might have resulted in rescission proceedings after a ole date had been granted as specified in § 2451 may be considered enhancing the total period of confinement. Serious disciplinaries ich occur after a parole date has been granted may increase the total iod of confinement only after rescission proceedings (see Chapter 4). TE: Authority cited: Section 5076.2, Penal Code. Reference: Section 3041, Pe-Code.

### HISTORY

New subsection (c) filed 8–18–78 as an emergency; designated effective -21–78. Filed in the week of Register 78, No. 33, this amendment is printed n Register 78, No. 41 for technical reasons (Register 78, No. 41).

Certificate of Compliance filed 10–27–78 (Register 78, No. 43).

Amendment of Footnote 2 in subsection (b) filed 1–25–79; effective thirtieth day thereafter (Register 79, No. 4).

Amendment filed 6–11–79; effective thirtieth day thereafter (Register 79, No. 24).

Amendment of subsections (b) and (c) filed 2–8–80; effective thirtieth day thereafter (Register 80, No. 6).

## 2287.    Circumstances in Aggravation of the Additional Term for Other Crimes.

Circumstances which may justify imposition of a term for another ime higher than that suggested in Section 2286 include:

(a) Pattern of Violence. A victim was seriously injured or killed in the urse of the other crime, or there was a substantial likelihood of serious jury or death resulting from the acts of the prisoner.

(b) Numerous Crimes. The other crime was part of a series of crimes hich occurred during a single period of time, show a pattern of similar nduct, and resulted in convictions, but have not resulted in enhance-ent under Section 2286.

(c) Crimes of Increasing Seriousness. The other crime, when consid-ed with the principal crime, indicates a significant pattern of increas-gly serious criminal conduct.

(d) Independent Criminal Activity. The other crime and its objective ere independent of the life crime or the other crime was committed at-different time and place, indicating a significant pattern of criminal be-avior rather than a single period of aberrant behavior.

(e) Status. The prisoner was on probation or parole or was in custody r had escaped from custody when the crime was committed.

(f) Other. The other crime involved any of the circumstances in aggra-ation enumerated in the Sentencing Rules for the Superior Courts.

## 2288.    Circumstances in Mitigation of the Additional Term for Other Crimes.

Circumstances which may justify imposition of a term for another rime lower than that suggested in Section 2286, or which may justify im-osition of no enhancement, include:

(a) Minor Punishment for Other Crime. The period of incarceration mposed for the other crime as a condition of probation or as the sentence or the other crime is equal to or less than the additional term provided y Section 2286.

(b) Successful Completion of Probation or Parole. The prisoner's per-ormance on probation or parole for the other crime was good, and the risoner was free of criminal convictions for a reasonable period of time ollowing probation or parole.

(c) Insignificant Prior Record. The other crime is unrelated to the prin-cipal offense in time, or in the kind of criminal conduct involved, or in the apparent motivation or cause of the criminal conduct indicating an in-significant pattern of criminal behavior.

(d) Probation. The prisoner was granted probation after conviction of the other offense.

(e) Other. The other crime involved any of the circumstances in miti-gation enumerated in the Sentencing Rules for the Superior Courts.

## § 2289.    Fixing a Parole Date: Computation.

The terms set for the life crime, specific enhancements, and other crimes shall be added together resulting in a total life term. Any preprison credit shall be deducted (see Sections 2342–2344) from and any time at large shall be added to the total life term. The adjusted life term shall be added to the reception date for the life crime.

The reception date is the date the prisoner was received for the life crime under Penal Code Section 2900 or 1203.2a. If the prisoner was serving a nonlife term at the time of sentencing for the life crime the re-ception date is the date the prisoner was returned from court with the new life term. If the prisoner was serving a life term at the time of sentencing for another life crime, the reception date is the date the prisoner was re-ceived for the original life crime under Penal Code Section 2900 or 1203.2a.

If the time already served by the prisoner exceeds the term set pursuant to this article, the panel's order shall read "Prisoner to be released upon time already served," and the prisoner shall be released in accordance with Article 9 of this chapter.

## § 2290.    Postconviction Credit.

(a) General. Life prisoners may earn postconviction credit for each year spent in state prison. Postconviction credit for time served prior to the hearing at which a parole date is established shall be considered at that parole consideration hearing. Thereafter, postconviction credit for time served since the last hearing shall be considered at progressive hearings. In no case may postconviction credit advance a release date earlier than the minimum eligible parole date. Provided, however, postconviction credits which would advance the parole release date to less than 180 days from the date of the hearing shall not be granted *unless or until the parole review authority of the Governor is exercised pursuant to Penal Code section 3041.1.*

(b) Amount of Credit. Postconviction credit shall be granted to life prisoners in a manner which allows similar amounts of time to prisoners in similar circumstances.

The suggested amount of postconviction credit is 4 months for each year served since the date the life term started. The board may grant more or less than 4 months annual postconviction credit when the prisoner's performance, participation or behavior warrants such adjustment of cred-it. Less than 4 months credit may be granted if the prisoner fails to meet the general expectations set forth in Section 2290(c). More than 4 months credit may be granted if the prisoner demonstrates exceptional perform-ance in a work assignment, exceptional participation in self-help or reha-bilitative programs,or other exemplary conduct. If a panel grants more than 4 months of postconviction credit at an annual hearing, the case shall be reviewed as provided in Sections 2041–2043.

(c) Criteria. In determining the amount of postconviction credit to be granted, the panel shall consider the following:

(1) Performance in Institutional Work Assignments. All life prisoners are presumed to work and to perform satisfactorily in work assignments (see CDC Rules 3040 and 3041). Lack of a work assignment shall not necessarily prevent the granting of postconviction credit. The panel shall consider the nature and availability of work assignments at the institu-tion, the prisoner's custody status, and any other impediments to the pris-oner's receiving a work assignment.

(2) Participation in Self-help and Rehabilitative Programs. All life prisoners are presumed to participate in programs for self development (refer to CDC Rules 3040 and 3041). Lack of program participation shall not necessarily prevent the granting of postconviction credit. The panel

shall consider the nature and availability of programs at the institution, the prisoner's custody-status, and any other impediments to the prisoner's participation in programs.

(3) Behavior in the Institutional Setting. All life prisoners are presumed to behave in a disciplinary–free manner, in accordance with state law and departmental regulations (refer to CDC Rules 3000–3021). However, a minor disciplinary offense shall not necessarily prevent the granting of postconviction credit.

(d) Credit Not Granted. No annual postconviction credit shall be granted in the case of any prisoner who commits serious or numerous infractions of departmental regulations, violates any state law, or engages in other conduct which could result in rescission of a parole date (see Section 2451), unless the panel finds evidence in mitigation and supports such finding with a statement of its reasoning. Consistent unsatisfactory performance in work assignments, consistent failure to engage in program participation, or consistent overall negative behavior demonstrated by numerous minor disciplinary reports may, individually or cumulatively, justify the withholding of annual postconviction credit which otherwise could have been granted.

(e) Change in Parole Date. Once postconviction credit is granted for a particular year of imprisonment, the credit shall be applied to any new term established after rescission or reconviction after a reversal.

NOTE: Authority cited: Sections 3052 and 5076.2, Penal Code. Reference: Section 3041, Penal Code. *In re Stanley*, 54 Cal.App.3d 1030 (1976).

HISTORY
1. Amendment of subsection (a) filed 8–18–78 as an emergency; designated effective 8–21–78. Filed in the week of Register 78, No. 33, this amendment is printed in Register 78, No. 41 for technical reasons (Register 78, No. 41).
2. Certificate of Compliance filed 10–27–78 (Register 78, No. 43).
3. Editorial correction in placement of history notes (Register 78, No. 43).
4. Repealer of subsection (a)(1) and amendment of subsection (b)(1) filed 1–25–79; effective thirtieth day thereafter (Register 79, No. 4).
5. New subsection (e) filed 6–11–79; effective thirtieth day thereafter (Register 79, No. 24).
6. Amendment of subsections (a) and (b) filed 8–12–82; effective thirtieth day thereafter (Register 82, No. 33).
7. Amendment of subsection (d) filed 1–20–88; operative 2–19–88 (Register 88, No. 5).
8. Amendment of subsection (a) and NOTE filed 12–20–93; operative 1–19–94 (Register 93, No. 52).
9. Editorial correction of subsection (e) (Register 95, No. 45).

### § 2291.  New Crimes.

New crimes committed by the prisoner shall be dealt with in accordance with Section 2286.

### § 2292.  Retroactivity.

(a) General. All life prisoners committed to state prison for crime(s) committed prior to July 1, 1977 shall be heard in accordance with rules in effect prior to 7/1/77. All life prisoners heard after the effective date of these regulations, who have been committed to state prison for crime(s) committed after 7/1/77, shall be heard in accordance with this article.

(b) No Parole Date Was Set Prior to July 1, 1977. The hearing panel shall deny parole or set a parole date as provided in Sections 2281–2290.

(c) Parole Date Was Set Prior to July 1, 1977. The hearing panel shall deny parole or set a parole date as provided in Sections 2281–2290 as though no parole date had been set previously. If the parole date is earlier than a parole date set before the effective date of these regulations, the date set under these regulations is the controlling parole date. If the parole date is later than the previous date, the previous date is the controlling parole date.

Postconviction Credit. In determining the amount of postconviction credit appropriate for a prisoner's conduct during a specified period of time, the panel shall apply the guidelines under which the parole date was originally established. For example, a life prisoner who had a parole date established under guidelines in effect prior to July 1, 1977 shall be considered for postconviction credit under the guidelines in effect prior to July 1, 1977. Any credit granted under those guidelines shall advance the parole date established under those guidelines. If a prisoner also has a parole date established under Section 2282 the panel shall determine the amount of credit applicable under Section 2290, and that credit shall be deducted from the parole date established under Section 2282.

(d) Parole Violators. Life prisoners whose paroles were revoked prior to July 1, 1977, shall have parole dates set as provided in subsections (1) and (2) of this section:

(1) Returned to Finish Term. The hearing panel shall set a parole date as provided in Sections 2281–2290. The life crime shall be the base crime. The parole violation that resulted in the return to prison shall be considered as an adjustment for postconviction factors and may increase the period of confinement for the life crime by an amount of time the hearing panel determines to be appropriate for the particular violation. If, after application of preprison credit and at–large time, the base period of confinement life term expires prior to commission of the offenses resulting in the violation, the prisoner will be paroled effective 60 days after the hearing.

(2) With New Term.

(A) Life Sentence. If the new term includes a life sentence, the hearing panel should discharge the original life term and deny parole or set a parole date for the new life sentence adding time for any nonlife commitments as multiple commitment offenses pursuant to Sections 2281–2290. The action to discharge the original term shall be to set a parole date on the original life term effective 60 days after the date of the hearing and to waive parole on the original life term.

(B) Nonlife Sentence. If the new term includes only nonlife sentences the hearing panel shall first consider whether to discharge the original life sentence. In making this determination the panel shall consider: the date on which the prisoner was originally received on the life crime, the length of time the prisoner served prior to parole on the life crime, the length of the term for the new nonlife commitments, the length of time the prisoner served on parole prior to committing the new crime and the prisoner's parole adjustment. If the prisoner served a lengthy term prior to release or parole or has a new nonlife term that will extend three or more years beyond the period of confinement that could be set for the life crime the panel may discharge the original life term by setting a parole date on the life crime to be sixty days after the hearing and waiving parole on the life crime. The prisoner will then have a 1170.2(a) DSL release date calculated and ISL parole hearings.

If the panel determines that the original life sentence should not be discharged, the panel shall set a parole date and may use the life crime as the base crime and making adjustments for the new crimes. In determining an appropriate adjustment for the new crime the panel shall follow the suggested terms in Section 2286. If, after the application of pre–prison credit, the term on the life crime expires prior to the commission of the new crimes, the decision at the parole hearing will be deemed a discharge on the original life term, effective 60 days after the hearing and the prisoner will have an 1170.2(a) DSL release date calculated and ISL parole hearings on the ISL crimes. If the term on the life crime does not expire prior to the commission of the new crimes, the prisoner remains a life prisoner and the parole date set at the parole hearing shall be the parole date as provided in subsections (b) and (c) above.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 1170.2 and 3041, Penal Code; *In re Stanley*, 54 Cal. App. 3d 1030 (1976); and *In re Stanworth*, 33 Cal. App. 3d 176 (1976).

HISTORY
1. Amendment filed 6–11–79; effective thirtieth day thereafter (Register 79, No. 24).
2. New subsection (e) filed 5–1–80; effective thirtieth day thereafter (Register 80, No. 18).
3. Amendment of subsection (c) and repealer of subsection (e) filed 8–12–82; effective thirtieth day thereafter 82, No. 33).
4. Amendment of subsection (a) filed 11–13–85; effective thirtieth day thereafter (Register 85, No. 46).

# Article 6. Parole Consideration Procedures for ISL Prisoners

## 2300. General.

All ISL prisoners shall be considered for parole pursuant to the procedures in this article. ISL prisoners with new criminal or disciplinary charges pending shall be scheduled as provided in Section 2307. ISL prisoners with changes in legal status shall be scheduled as provided in Section 2308.

ISL prisoners shall also have a DSL release date calculated as provided in Chapter 2, Article 3. Actual release on parole shall occur on the ISL parole date as calculated in this article or the DSL release date, whichever occurs first. Until actual release, the prisoner is entitled to the ISL parole consideration hearings described in this article.

## 2301. Information Considered.

At all parole consideration hearings described in this article, the hearing panel shall consider the information described in Sections 2232-2235.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 3041 and 5076.1, Penal Code.

### HISTORY

1. Amendment filed 11-13-85; effective thirtieth day thereafter (Register 85, No. 46).

## 2302. Panel Composition.

### HISTORY

1. Repealer filed 12-22-82 by OAL pursuant to Government Code Section 11349.7(j) (Register 82, No. 52).

## § 2303. Prisoner Rights.

At all parole consideration hearings described in this article the prisoner shall have the rights specified in Sections 2245-2255. The record of the hearing shall be a tape recording.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Section 1170.2 (c), Penal Code.

### HISTORY

1. Amendment filed 6-11-79; effective thirtieth day thereafter (Register 79, No. 24).

2. Amendment filed 8-12-82; effective thirtieth day thereafter (Register 82, No. 33).

## § 2304. Initial Parole Hearing.

(a) General. At this hearing the prisoner shall be considered for parole for the first time. The hearing panel shall first determine whether the prisoner is unsuitable for parole under the criteria in Section 2316. If the prisoner is found unsuitable, parole shall be denied, and a written statement of the specific factual reasons for the denial shall be given to the prisoner. The hearing panel may recommend to the prisoner what steps may be undertaken to enhance the possibility of a grant of parole at a future hearing.

If a prisoner is found suitable for parole, a tentative parole date shall be set as provided in Sections 2318-2328 utilizing the factors of Section 2317 and the ranges of Section 2329.

(b) Scheduling. The initial parole hearing shall be scheduled as follows:

(1) MEPD within 120 days.

A prisoner whose MEPD is within 120 days of reception shall be scheduled within 120 days of reception.

(2) MEPD over 120 Days.

A prisoner whose MEPD is more than 120 days after reception shall be scheduled one month before the MEPD.

## § 2305. Progress Hearing.

(a) General. At this hearing the hearing panel shall determine whether a previously set parole date should be advanced due to the prisoner's conduct in prison or any change in circumstances as provided in § 2324(b).

The reasons for advancing or not advancing the parole date shall be documented by the hearing panel.

(b) Scheduling. The hearing shall be scheduled by department staff according to the following schedule:

(1) If the parole date is within 9 months of the date of the last parole consideration hearing, no progress hearing shall be scheduled.

(2) If the parole date is between 10 and 14 months of the date of the last parole consideration hearing, this hearing shall be scheduled during the fourth month prior to the parole date.

(3) If the parole date is 15 months or more of the date of the last parole consideration hearing, this hearing shall be scheduled at the twelfth month after the hearing at which the parole date was set and annually thereafter.

(4) Any time department staff feels an earlier parole date would be appropriate, department staff shall place the case on the institutional miscellaneous proceedings calendar with documentation of the reasons for requesting the progress hearing. The board may deny the department request or may order a progress hearing.

(5) A progress hearing shall not be scheduled for a prisoner with an ISL parole date which is later than a confirmed DSL release date if the maximum advancement that could be granted at the progress hearing (4 months per year) plus a 60-day advancement would not result in advancing the ISL parole date to a date earlier than the DSL release date.

If department staff believes that the prisoner may warrant an advancement of more than 4 months, the case may be placed on the miscellaneous proceedings calendar for review.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: In re Stanley, 54 Cal.App.3d 1030 (1976) and Section 1170.2, Penal Code.

### HISTORY

1. Amendment of subsection (a) filed 6-11-79; effective thirtieth day thereafter (Register 79, No. 24).

2. New subsection (b)(5) filed 10-25-79; effective thirtieth day thereafter (Register 79, No. 43).

3. Amendment of subsection (b) filed 5-1-80; effective thirtieth day thereafter (Register 80, No. 18).

## § 2306. Subsequent Parole Hearing.

(a) General. At this hearing each prisoner who was previously denied parole shall be reconsidered for parole in the same manner as at the initial parole hearing. The hearing panel shall consider the information developed since the last hearing applying the criteria of Sections 2316-2317.

(b) Scheduling. This hearing shall be scheduled 12 months after the most recent hearing and annually thereafter.

### HISTORY

1. Amendment of section title filed 10-27-77 as an emergency; effective upon filing. Certificate of Compliance included (Register 77, No. 44).

## § 2307. Hearing for Prisoners with New Criminal or Disciplinary Charges Pending.

Department staff shall postpone the parole consideration hearing of any prisoner who has new criminal or serious disciplinary charges (see Director's Rule 3315) pending immediately prior to a regularly scheduled hearing. Department staff shall place the case on the miscellaneous proceedings calendar every 90 days from the date of the originally scheduled hearing including a report of the status of the case. Following conclusion of the criminal or disciplinary charges, the case shall be scheduled for the next regular calendar.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Section 1170.2, Penal Code.

### HISTORY

1. Amendment of subsection (b) filed 10-27-77 as an emergency; effective upon filing. Certificate of Compliance included (Register 77, No. 44).

2. Amendment filed 2-8-80; effective thirtieth day thereafter (Register 80, No. 6).

## § 2308. Hearings for Prisoners with Changes in Legal Status.

Changes in legal status include: a final court decision altering the prisoner's commitment status, modification of the judgment or abstract of judgment, and new commitments.

(a) Before Initial Parole Hearing. If a prisoner's legal status changes before the initial parole hearing, the change in legal status shall be considered at the initial parole hearing as regularly scheduled or as would be scheduled considering the change in legal status.

(b) After Initial Parole Hearing. If a prisoner's legal status changes after the initial parole hearing, department staff shall immediately schedule the prisoner for a progress or subsequent parole-hearing as appropriate.

(c) New Commitment. If a prisoner with a previously established parole date receives a new commitment to state prison the parole date shall be rescinded. No hearing or other board action is required. The department shall record the rescission of the parole date on the grounds that the prisoner has received a new commitment. The prisoner may appeal the rescission only on the grounds that he is not the person sentenced to state prison by the new judgment.

If the new commitment is for a life sentence, the prisoner shall be scheduled for a documentation hearing during the 36th month after commencement of the life term (§ 2269.1) and a parole consideration hearing during the 13th month prior to the new minimum eligible parole date (§ 2268(c)).

If the new commitment is for an indeterminate sentence, the prisoner shall be scheduled for a parole consideration hearing one month before the minimum eligible parole date for the new commitment offense or within 120 days if the M.E.P.D. is within 120 days of receipt of the new commitment (§ 2304).

If the new commitment is for a determinate term, the parole consideration hearing shall be conducted within 60 days of receipt of the new commitment unless no parole consideration hearing is required under § 2310.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 1170.2 and 3041, Penal Code.

HISTORY
1. New subsection (c) filed 1–25–79; effective thirtieth day thereafter (Register 79, No. 4).
2. Amendment of subsection (c) filed 5–28–81; effective thirtieth day thereafter (Register 81, No. 22).
3. Amendment of subsection (c) filed 6–17–2003; operative 7–17–2003 (Register 2003, No. 25).

### § 2309.    Hearings for Prisoners with Confirmed 1170.2 Release Dates.

Any ISL prisoner who has a confirmed 1170.2(a) release date which will occur less than 60 days after a scheduled ISL parole hearing will be removed from the ISL calendar and released on this 1170.2(a) release date. An 1170.2(a) release date is confirmed when the calculation of the determinate term has been signed by three commissioners or deputy commissioners of the board.

If the prisoner may have a special or particular parole plan which could warrant the advancement of the ISL date to a date earlier than his DSL date the case shall be placed on the miscellaneous proceedings calendar. The board will review the case to determine if a progress hearing is warranted.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 1170.2, 5075 and 5076.1, Penal Code.

HISTORY
1. New section filed 4–4–78; effective thirtieth day thereafter (Register 78, No. 14).
2. Amendment filed 1–20–88; operative 2–19–88 (Register 88, No. 5).

### § 2310.    Hearings for Prisoners Serving ISL and DSL Terms.

(a) General. Prisoners serving both ISL and DSL terms shall have an ISL parole consideration hearing only if the board could set an ISL parole date that would result in a release earlier than the release date calculated under Penal Code Section 1170.2. If an ISL parole consideration hearing is required, it shall be held as provided in Section 2304. At the ISL parole consideration hearing the panel will set a period of confinement for the ISL sentence only, disregarding any crimes for which the prisoner received a determinate sentence.

(b) Concurrent ISL and DSL Terms. A prisoner serving concurrent ISL and DSL terms shall be scheduled for an ISL parole consideration hearing only if the minimum DSL release date on the ISL term is:

(1) later than the DSL release date on the DSL term and

(2) more than sixty days later than the MEPD on the ISL term.

(c) Consecutive ISL and DSL Terms. A prisoner serving consecutive ISL and DSL terms shall be scheduled for an ISL parole consideration hearing only if the minimum DSL release date on the combined ISL and DSL terms is:

(1) later than the DSL release date on the DSL term considered alone (as if it were concurrent) and

(2) more than 60 days later than the earliest eligible parole date computed by adding the MEPD on the ISL term and the minimum DSL on the DSL term standing alone.

If a prisoner who was not scheduled for a hearing loses good time credit the earliest eligible release date, combined DSL release date and DSL release date on the DSL term shall be recalculated. The prisoner shall be scheduled for a hearing only if the requirements of (1) and (2) above are met. The hearing shall be held within two months of the loss of good time credit.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Section 1170.2, Penal Code.

HISTORY
1. New section filed 4–4–78; effective thirtieth day thereafter (Register 78, No. 14).
2. Amendment of subsection (a) filed 10–25–79; effective thirtieth day thereafter (Register 79, No. 43).

## Article 7.    Parole Consideration Criteria and Guidelines for ISL Prisoners

### § 2315.    General.

In considering an ISL prisoner for parole, the hearing panel shall consider the criteria and be guided by the ranges suggested in this article in setting a parole date.

Applying the criteria in 2316, the hearing panel shall first determine whether the prisoner is unsuitable for parole. If the prisoner is found unsuitable, parole shall be denied.

If the prisoner is found suitable for parole, the hearing panel shall consider the criteria in 2317 to determine the total period of confinement. The hearing panel shall determine the period of confinement following the procedures in 2318–2328.

### § 2316.    Unsuitability Criteria.

In determining whether an ISL prisoner is unsuitable for parole the hearing panel shall consider factors which affect the severity of the offense and the risk of danger to society if the prisoner were released. Examples of factors indicating the prisoner is unsuitable for parole include:

(a) A history of violent attacks.

(b) A history of forcible sexual attacks on others.

(c) A persistent pattern of criminal behavior and a failure to demonstrate evidence of a substantial change for the better.

(d) The presence of a psychiatric or psychological condition related to the prisoner's criminality which creates a high likelihood that new serious crimes will be committed if released.

### § 2317.    Fixing a Parole Date: Criteria.

(a) General. If the prisoner is found suitable for parole, in setting a parole date the hearing panel shall consider the seriousness of the offense and any relevant criteria described in the sentencing rules the Judicial Council may issue.

(b) Specific Aggravating Factors. Aggravating circumstances are those which relate solely to the commitment offense and tend to increase the seriousness of the offense. Examples of specific aggravating circumstances by offense include:

(1) Homicide.

(A) Multiple victims.

**EXHIBIT 2**

Orange County Information Sheet (Indictment)

Filed in open Court of the State
of California, in and for the County
of Orange, on motion of the District
Attorney of said Orange County, this
12th day of April      1977

W. E. ST JOHN, COUNTY CLERK

BY:  RICHARD W. JOY        Deputy Clerk

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ORANGE

THE PEOPLE OF THE STATE OF CALIFORNIA    )
                                         )
                          Plaintiff      )    NO. C-37693
                                         )
              vs.                        )
                                         )    I N F O R M A T I O N
                                         )
BRETT THOMAS                             )
                                         )
    and                                  )
                                         )
MARK WAYNE TITCH                         )
                                         )
                          Defendant      )

COUNT I.  The District Attorney of the County of Orange, by
this Information, hereby accuses MARK WAYNE TITCH of a felony,
to-wit:  Violation of Section 459 of the Penal Code of the State
California, (BURGLARY) in that on or about the 20th day of Nove
1976, in the County of Orange, State of California, the said MA
WAYNE TITCH did willfully, unlawfully and feloniously enter a
residence located at 2516 Chanticleer Road, Anaheim, with inten
to commit theft.

It is further alleged that at the time of the commission c
the offense alleged in Count I of this Information, the defenda
MARK WAYNE TITCH used a firearm, to-wit:  a handgun, as proscri
by Penal Code Section 12022.5.

COUNT II:  And the said MARK WAYNE TITCH is hereby accused
by the District Attorney of the County of Orange, by this secon
count of this Information, of a felony, to-wit:  Violation of
Section 211 of the Penal Code of the State of California, (ROBE
in that on or about the 20th day of November, 1976, in the Coun
of Orange, State of California, the said MARK WAYNE TITCH did
willfully, unlawfully and feloniously rob John Simons and Irene
Simons of personal property by means of force and fear.

1   It is further alleged that at the time of the commission of
the offense alleged in Count II of this Information, the defendant
2   MARK WAYNE TITCH used a firearm, to-wit:  a handgun, as proscribed
by Penal Code Section 12022.5.

3

4   COUNT III:  And the said MARK WAYNE TITCH is hereby accused
by the District Attorney of the County of Orange, by this third
count of this Information, of a felony, to-wit:  Violation of
5   Section 459 of the Penal Code of the State of California, (BURGLARY)
in that on or about the 14th day of December, 1976, in the County
6   of Orange, State of California, the said MARK WAYNE TITCH did
willfully, unlawfully and feloniously enter a residence located at
7   1412 South Sherill St., Anaheim, with intent to commit theft.

8   It is further alleged that at the time of the commission of
the offense alleged in Count III of this Information, the defendant
9   MARK WAYNE TITCH used a firearm, to-wit:  a handgun, as proscribed
by Penal Code Section 12022.5.

10

11   COUNT IV:  And the said MARK WAYNE TITCH is hereby accused
by the District Attorney of the County of Orange, by this fourth
count of this Information, of a felony, to-wit:  Violation of
12   Section 211 of the Penal Code of the State of California, (ROBBERY)
in that on or about the 14th day of December, 1976, in the County
13   of Orange, State of California, the said MARK WAYNE TITCH did
willfully, unlawfully and feloniously rob Debra Bradley, Alvin
14   Bradley and Eleanor Bradley of money by means of force and fear.

15   It is further alleged that at the time of the commission of
the offense alleged in Count IV of this Information, the defendant
16   MARK WAYNE TITCH used a firearm, to-wit:  a handgun, as proscribed
by Penal Code Section 12022.5.

17

18   COUNT V:  And the said MARK WAYNE TITCH is hereby accused
by the District Attorney of the County of Orange, by this fifth
count of this Information, of a felony, to-wit:  Violation of
19   Section 459 of the Penal Code of the State of California, (BURGLARY)
in that on or about the 18th day of December, 1976, in the County
20   of Orange, State of California, the said MARK WAYNE TITCH did
willfully, unlawfully and feloniously enter a residence located at
21   2462 Chanticleer Road, Anaheim, with intent to commit theft.

22   It is further alleged that at the time of the commission of
the offense alleged in Count V of this Information, the defendant
23   MARK WAYNE TITCH used a firearm, to-wit:  a handgun, as proscribed
by Penal Code Section 12022.5.

24

25   COUNT VI:  And the said MARK WAYNE TITCH is hereby accused
by the District Attorney of the County of Orange, by this sixth
count of this Information, of a felony, to-wit:  Violation of
26   Section 211 of the Penal Code of the State of California, (ROBBERY)
in that on or about the 18th day of December, 1976, in the County
27   of Orange, State of California, the said MARK WAYNE TITCH did
willfully, unlawfully and feloniously rob Glenn Dittrich and Mary
28   Dittrich of personal property by means of force and fear.

-2-

2

1    It is further alleged that at the time of the commission of
the offense alleged in Count VI of the Information, the defend
2  MARK WAYNE TITCH used a firearm, to-wit:  a handgun, as proscrib
by Penal Code Section 12022.5.

3

4    COUNT VII:  And the said MARK WAYNE TITCH is hereby accused
by the District Attorney of the County of Orange, by this seventh
5  count of this Information, of a felony, to-wit:  Violation of
Section 211 of the Penal Code of the State of California, (ROBBER
in that on or about the 21st day of December, 1976, in the Count
6  of Orange, State of California, the said MARK WAYNE TITCH did
willfully, unlawfully and feloniously rob Kathy Charest of money
7  by means of force and fear.

8    It is further alleged that at the time of the commission of
the offense alleged in Count VII of this Information, the defend
9  MARK WAYNE TITCH used a firearm, to-wit:  a handgun, as proscrib
by Penal Code Section 12022.5.

10

11    COUNT VIII:  And the said MARK WAYNE TITCH is hereby accuse
by the District Attorney of the County of Orange, by this eighth
12  count of this Information, of a felony, to-wit:  Violation of
Section 459 of the Penal Code of the State of California, (BURGL
in that on or about the 27th day of December, 1976, in the Count
13  of Orange, State of California, the said MARK WAYNE TITCH did
willfully, unlawfully and feloniously enter a residence located
14  8632 Harriet Lane, Stanton, with intent to commit theft.

15    It is further alleged that at the time of the commission c
the offense alleged in Count VIII of this Information, the defen
16  MARK WAYNE TITCH used a firearm, to-wit:  a handgun, as proscri
by Penal Code Section 12022.5.

17

18    COUNT IX:  And the said MARK WAYNE TITCH is hereby accused
by the District Attorney of the County of Orange, by this ninth
19  count of this Information, of a felony, to-wit:  Violation of
Section 211 of the Penal Code of the State of California, (ROBBE
in that on or about the 27th day of December, 1976, in the Coun
20  of Orange, State of California, the said MARK WAYNE TITCH did
willfully, unlawfully and feloniously rob Lowell Gray and Shirle
21  Gray of personal property by means of force and fear.

22    It is further alleged that at the time of the commission o
the offense alleged in Count IX of this Information, the defend
23  MARK WAYNE TITCH used a firearm, to-wit:  a handgun, as proscri
by Penal Code Section 12022.5.

24

25    COUNT X:  And the said MARK WAYNE TITCH is hereby accused
by the District Attorney of the County of Orange, by this tenth
26  count of this Information, of a felony, to-wit:  Violation of
Section 459 of the Penal Code of the State of California, (BURGL
in that on or about the 16th day of January, 1977, in the Count
27  of Orange, State of California, the said MARK WAYNE TITCH did
willfully, unlawfully and feloniously enter a residence located
28  1813 W. Palais St., Anaheim, with intent to commit theft.

-3-

3

1    COUNT( . . )nd the said MARK W. . . .TCH is hereby accused
by the Distri    Attorney of the Coun. . .    Orange, by this elevent
2    count of this Information, of a felony, to-wit:  Violation of
Section 459 of the Penal Code of the State of California,(BURGLAR
3    in that on or about the 19th day of January, 1977, in the County
of Orange, State of California, the said MARK WAYNE TITCH did
4    willfully, unlawfully and feloniously enter a residence located a
2475 W. Cerritos, Anaheim, with intent to commit theft.

5    COUNT XII:  And the said BRETT THOMAS and MARK WAYNE TITCH a
6    hereby accused by the District Attorney of the County of Orange,
by this twelfth count of this Information, of a felony, to-wit:
7    Violation of Section 209 of the Penal Code of the State of Califo
(KIDNAP FOR RANSOM AND ROBBERY), in that on or about the 21st day
8    of January, 1977, in the County of Orange, State of California,
said BRETT THOMAS and MARK WAYNE TITCH did willfully, unlawfully
9    and feloniously seize, confine, entice, decoy, abduct, conceal,
kidnap and carry away Laura Anne Stoughton, for the purpose of
10    committing robbery.

11    It is further alleged that at the time of the commission of
the offense alleged in Count XII of this Information, the defend
12    BRETT THOMAS and MARK WAYNE TITCH used a firearm, to-wit:  rifle
as proscribed by Penal Code Section 12022.5.

13

14    COUNT XIII:  And the said BRETT THOMAS and MARK WAYNE TITCE
are hereby accused by the District Attorney of the County of
15    Orange, by this thirteenth count of this Information, of a felor
to-wit:  Violation of Section 187 of the Penal Code of the State
16    of California,(MURDER), in that on or about the 21st day of
January, 1977, in the County of Orange, State of California, the
17    said BRETT THOMAS and MARK WAYNE TITCH did willfully, unlawfully
feloniously and with malice aforethought, kill Laura Anne Stough
a human being.

18

19    It is further alleged that at the time of the commission o
the offense alleged in Count XIII of this Information, the
20    defendants BRETT THOMAS and MARK WAYNE TITCH used a firearm, to
rifles, as proscribed by Penal Code Section 12022.5.

21    It is further alleged that at the time of the commission o
the offense alleged in Count XIII of this Information, the
22    defendants BRETT THOMAS and MARK WAYNE TITCH were armed with a
deadly weapon, to-wit:  rifles, as proscribed by Penal Code Sec
23    12022 and 3024.

24    COUNT XIV:  And the said BRETT THOMAS and MARK WAYNE TITCE
are hereby accused by the District Attorney of the County of
25    Orange, by this fourteenth count of this Information, of a felc
to-wit:  Violation of Section 187 of the Penal Code of the Stat
26    of California, (MURDER), in that on or about the 24th day of
January, 1977, in the County of Orange, State of California, tl
27    said BRETT THOMAS and MARK WAYNE TITCH did willfully, unlawful
feloniously and with malice aforethought, kill Ephraim Christi
28    a human being.

4

1    It is further alleged that at the time of the commission of
the offense alleged in Count XIV of this Information, the
2  defendant BRETT THOMAS was armed with a deadly weapon, to-wit:
rifle, as proscribed by Penal Code Sections 12022 and 3024.

3

4    It is further alleged that at the time of the commission of
the offense alleged in Count XIV of this Information, the
defendant BRETT THOMAS used a firearm, to-wit:  a rifle, as
5  proscribed by Penal Code Section 12022.5.

6    COUNT XV:  And the said MARK WAYNE TITCH is hereby accused
by the District Attorney of the County of Orange, by this
7  fifteenth count of this Information, of a felony, to-wit: Violat
of Section 459 of the Penal Code of the State of California,
8  (BURGLARY), in that on or about the 27th day of January, 1977, i
the County of Orange, State of California, the said MARK WAYNE
9  TITCH did willfully, unlawfully and feloniously enter a residenc
located at 9541 Dewey, Garden Grove, with intent to commit theft

10

11   COUNT XVI:  And the said BRETT THOMAS and MARK WAYNE TITCH
are hereby accused by the District Attorney of the County of Ora
12 by this sixteenth count of this Information, of a felony, to-wi
Violation of Section 187 of the Penal Code of the State of
13 California, (MURDER), in that on or about the 29th day of Janua
1977, in the County of Orange, State of California, the said
14 BRETT THOMAS and MARK WAYNE TITCH did willfully, unlawfully,
feloniously and with malice aforethought, kill Aubrey Duncan, a
human being.

15

16   It is further alleged that at the time of the commission c
the offense alleged in Count XVI of this Information, the
17 defendant BRETT THOMAS was armed with a deadly weapon, to-wit:
rifle, as proscribed by Penal Code Sections 12022 and 3024.

18   It is further alleged that at the time of the commission c
the offense alleged in Count XVI of this Information, the
19 defendant BRETT THOMAS used a firearm, to-wit:  a rifle, as
proscribed by Penal Code Section 12022.5.

20

21   COUNT XVII:  And the said BRETT THOMAS and MARK WAYNE TITC
are hereby accused by the District Attorney of the County of
22 Orange, by this seventeenth count of this Information, of a fel
to-wit:  Violation of Section 187 of the Penal Code of the Stat
23 California, (ATTEMPT MURDER), in that on or about the 29th day o
January, 1977, in the County of Orange, State of California, t
24 said BRETT THOMAS and MARK WAYNE TITCH did willfully, unlawfull
feloniously and with malice aforethought, attempt to kill Mrs.
25 Duncan, a human being.

26   It is further alleged that at the time of the commission c
the offense alleged in Count XVII of this Information, the
27 defendant BRETT THOMAS was armed with a deadly weapon, to-wit:
rifle and a shotgun, as proscribed by Penal Code Sections 12022
and 3024.

28

-5-

5

1    It is _____ _____ alleged that at t__ ___ of the commission of
the offense alleged in Count XVII of ___ ___formation, the
2   defendant BRETT THOMAS used a firearm, to-wit:  a rifle and a
shotgun, as proscribed by Penal Code Section 12022.5.

3

COUNT XVIII:  And the said BRETT THOMAS and MARK WAYNE TITCH
4   are hereby accused by the District Attorney of the County of
Orange, by this eighteenth count of this Information, of a felony
5   to-wit:  Violation of Section 187 of the Penal Code of the State
of California, (MURDER) in that on or about the 29th day of
6   January, 1977, in the County of Orange, State of California, the
said BRETT THOMAS and MARK WAYNE TITCH did willfully, unlawfully,
7   feloniously and with malice aforethought, kill Denise Duncan,
a human being.

8
It is further alleged that at the time of the commission of
9   the offense alleged in Count XVIII of this Information, the
defendant BRETT THOMAS used a firearm, to-wit:  a rifle and a
10  shotgun, as proscribed by Penal Code Section 12022.5.

11      Contrary to the form, force and effect of the Statute in su_
cases made and provided, and against the peace and dignity of the
12  People of the State of California.

13      DATED:  April 12, 1977

14

15                          CECIL HICKS, DISTRICT ATTORNEY
                            COUNTY OF ORANGE, STATE OF CALIFORN_

16

17                      BY: _____
                            Deputy District Attorney

18

19

20

21

22

23

24

25

26

27

28
ay

-6-

6

**EXHIBIT 3**

Sentencing Transcript

'78 FEB 23

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE

DEPARTMENT 24

**FILED**

FEB 22 1978

WILLIAM E. ST JOHN, County Clerk

By_____ Deputy

1

2

3

4

5   THE PEOPLE OF THE

6   STATE OF CALIFORNIA, )

7                    PLAINTIFF, )

8        VS.                    )        C-37693

9   MARK WAYNE TITCH,          )

10                   DEFENDANT. )

11

12

13        HONORABLE JAMES K. TURNER, JUDGE PRESIDING

14

15            REPORTER'S TRANSCRIPT

16            OCTOBER 17, 1977

17            JANUARY 6, 1978

18

19   APPEARANCES OF COUNSEL:

20    FOR THE PEOPLE:              ROBERT CHATTERTON
                                   DEPUTY DISTRICT ATTORNEY
21
     FOR THE DEFENDANT:           JAMES A. STOTLER
22                                 ATTORNEY AT LAW

23

24

25                                 CAROLYN B. KNIGHT,
                                   C.S.R. NO. C-1913
26                                 OFFICIAL COURT REPORTER

2

1          SANTA ANA, CALIFORNIA - MONDAY, OCTOBER 17, 1977

2                          AFTERNOON SESSION

3

4      THE COURT:        PEOPLE VERSUS TITCH.   MR. CHATTERTON,

5   I'LL GIVE YOU THE TAHL FORM.  WHY DON'T YOU GO AHEAD.

6

7                          EXAMINATION

8   BY MR. CHATTERTON:

9      Q    MR. TITCH, IT HAS COME TO THE COURT'S ATTENTION

10  THAT YOU ARE GOING TO WITHDRAW YOUR PLEA OF NOT GUILTY ON

11  11 COUNTS THAT ARE CONTAINED WITHIN THE INFORMATION; IS THAT

12  CORRECT?

13     A    YES, SIR.

14     Q    OF THOSE 11 COUNTS, FOUR OF THEM INVOLVE FIRST

15  DEGREE ROBBERY AT RESIDENCES WHILE YOU USED A FIREARM; DO

16  YOU UNDERSTAND THAT?

17     MR. STOTLER:    I THINK THAT IS FIVE COUNTS.

18     MR. CHATTERTON:  FOUR RESIDENTIAL ROBBERIES.  ONE OF

19  THEM INVOLVED --

20     THE COURT:     I DIDN'T HEAR YOU.  DID YOU UNDERSTAND

21  WHAT MR. CHATTERTON JUST SAID?

22     DEFENDANT TITCH:  YES, SIR, I GOT IT.

23     MR. CHATTERTON:  WE'LL HAVE A CHANCE TO GO THROUGH

24  THEM INDIVIDUALLY, MR. TITCH, BEFORE YOU FINALLY ENTER YOUR

25  PLEA.  THIS IS SUMMARY NOW.  I KNOW YOU AND I ARE TALKING

26  ABOUT THE SAME THING.  THE FIFTH COUNT YOU ARE GOING TO

2

3

1    IS A ROBBERY INVOLVING THEO'S BURGERS IN ANAHEIM, I BELIEVE

2    IT IS; DO YOU UNDERSTAND THAT?

3        DEFENDANT TITCH:  YES, SIR.

4    BY MR. CHATTERTON:

5        Q        THEN YOU ARE GOING TO PLEAD GUILTY TO THREE

6    COUNTS OF BURGLARY THAT INVOLVE THREE LOCATIONS, ONE IN

7    GARDEN GROVE, I THINK TWO IN ANAHEIM; DO YOU UNDERSTAND THAT?

8        A        YES, SIR.

9        Q        THEN IN ADDITION YOU ARE GOING TO PLEAD GUILTY

10   TO A VIOLATION OF SECTION 209, WHICH IS KIDNAPPING FOR

11   ROBBERY, OF LAURA STOUGHTON.

12       THE COURT:        EXCUSE ME.  MR. MERWIN, BEFORE YOU

13   LEAVE, I AM GOING TO ADVISE BOTH THE DEFENDANTS OF THEIR

14   APPELLATE RIGHTS.  YOU CAN BE ABSENT.

15       MR. MERWIN:        I AM GOING TO REMAIN.

16   BY MR. CHATTERTON:

17       Q        YOU ARE GOING TO PLEAD GUILTY TO THE KIDNAP

18   FOR PURPOSES OF ROBBERY OF LAURA STOUGHTON ON JANUARY THE 21ST,

19   1977; IS THAT CORRECT?

20       A        YES, SIR.

21       Q        YOU ARE GOING TO PLEAD GUILTY TO THE FIRST DEGREE

22   MURDER OF LAURA STOUGHTON ON THAT SAME DATE?

23       A        YES, SIR.

24       Q        YOU ARE GOING TO PLEAD GUILTY TO THE FIRST DEGREE

25   MURDER OF AUBREY DUNCAN ON JANUARY THE 29TH, 1977; IS THAT

26   CORRECT?

4

1      A     YES, SIR.

2      Q     YOU UNDERSTAND YOU ARE GOING TO BE PLEADING TO

3  EACH OF THOSE, RIGHT?

4      A     YES, SIR.

5      Q     NOW, AS WITH MR. THOMAS -- I KNOW YOU WERE

6  PRESENT -- IT IS OUR OBLIGATION TO MAKE SURE YOU UNDERSTAND

7  EACH OF THE CONSTITUTIONAL RIGHTS THAT THE LAW GIVES YOU

8  AND THAT YOU UNDERSTAND YOU ARE WAIVING EACH OF THOSE

9  CONSTITUTIONAL RIGHTS BY ENTERING A PLEA OF GUILTY.  SO BEAR

10  WITH ME.

11      IF YOU DON'T UNDERSTAND ANYTHING I AM SAYING,

12  INTERRUPT AND WE CAN SPEND THE TIME TO TALK ABOUT IT.  AND

13  FOR SAKE OF BREVITY, EACH OF THE CONSTITUTIONAL RIGHTS THAT

14  I AM NOW GOING TO DISCUSS WITH YOU IS A RIGHT YOU WOULD HAVE

15  AS TO EACH COUNT YOU ARE GOING TO ENTER A PLEA OF GUILTY TO;

16  DO YOU UNDERSTAND THAT?

17      A     YES, SIR.

18      Q     NOW, YOU UNDERSTAND THAT YOU HAVE THE RIGHT TO

19  BE REPRESENTED BY AN ATTORNEY AT ALL STAGES OF THE

20  PROCEEDINGS; AND IF YOU CAN'T AFFORD AN ATTORNEY, THE COURT

21  APPOINTS ONE FREE OF CHARGE TO YOU, RIGHT?

22      A     YES, SIR.

23      Q     THAT MEANS THAT YOU WOULD HAVE A RIGHT TO AN

24  ATTORNEY, AS YOU HAVE UP TO NOW, BUT CONTINUING FROM NOW

25  THROUGH A TRIAL AND THROUGH SENTENCING AND FINAL JUDGMENT;

26  DO YOU UNDERSTAND THAT?

5

1          A      YES, SIR.

2          Q      BY ENTERING YOUR PLEA OF GUILTY NOW, YOU ARE

3    GOING TO BE GIVING UP YOUR RIGHT TO AN ATTORNEY BEYOND THIS

4    PERIOD OF TIME?

5          A      YES, SIR.

6          Q      AT LEAST FOR THE PROCEEDINGS IN THE SUPERIOR

7    COURT OF ORANGE COUNTY?

8          A      YES, SIR.

9          Q      DO YOU UNDERSTAND THAT?    IS THAT WHAT YOU WOULD

10.  LIKE TO DO, GIVE UP THAT RIGHT TO AN ATTORNEY?

11         A      YES.

12         Q      DO YOU UNDERSTAND, MR. TITCH, THAT YOU HAVE THE

13   RIGHT TO A TRIAL EITHER BY COURT OR BY JURY ON EACH OF THESE

14   MATTERS, WHICH YOU INTEND TO PLEAD GUILTY TO?

15         A      I HAVE THE WHAT?

16         Q      YOU HAVE A RIGHT TO A TRIAL, EITHER BY THE JUDGE

17   OR BY A JURY, AS TO EACH OF THE CHARGES THAT YOU ARE GOING

18   TO BE ENTERING A PLEA OF GUILTY TO; DO YOU UNDERSTAND THAT?

19         A      YES.

20         Q      AND DO YOU UNDERSTAND THAT A TRIAL BY JURY

21   MEANS THAT 12 JURORS MUST UNANIMOUSLY AGREE THAT THE EVIDENCE

22   SHOWS BEYOND A REASONABLE DOUBT THAT YOU ARE GUILTY OF EACH

23   OF THE OFFENSES; DO YOU UNDERSTAND THAT?

24         A      YES, SIR.

25         Q      THEN DO YOU UNDERSTAND THAT BY ENTERING A PLEA,

26   YOU ARE GIVING UP YOUR RIGHT TO A JURY OR COURT TRIAL?

6

1     A    YES, SIR.

2     Q    YOU ARE GIVING UP YOUR RIGHT TO THAT UNANIMOUS

3 VERDICT?

4     A    YES, SIR.

5     Q    IS THAT WHAT YOU WANT TO DO?

6     A    YES, SIR.

7     Q    YOU ARE WILLING TO GIVE UP THE RIGHT TO A JURY

8 TRIAL AND A COURT TRIAL?

9     A    YES, SIR.

10    Q    DO YOU UNDERSTAND, MR. TITCH, THAT AT ANY TRIAL,

11 YOU HAVE THE RIGHT TO BE CONFRONTED BY THE WITNESSES WHO WOULD

12 TESTIFY AGAINST YOU?

13    A    YES, SIR.

14    Q    AND THE RIGHT TO HAVE THOSE WITNESSES CROSS

15 EXAMINED EITHER BY YOURSELF OR THROUGH YOUR ATTORNEY?

16    A    YES, SIR.

17    Q    ARE YOU WILLING THEN TO GIVE UP YOUR RIGHT TO

18 CONFRONT THE WITNESSES AND CROSS EXAMINE THEM AND ENTER

19 YOUR PLEA OF GUILTY?

20    A    YES, SIR.

21    Q    YOU WANT TO GIVE UP THAT RIGHT?

22    A    YES, SIR.

23    Q    DO YOU UNDERSTAND THAT IN A TRIAL YOU COULD NOT

24 BE COMPELLED OR FORCED TO GET ON THE WITNESS STAND AND

25 TESTIFY AGAINST YOURSELF?

26    A    YES, SIR.

6

7

1         Q      DO YOU UNDERSTAND THAT THE BURDEN OF PROVING

2 YOUR GUILT IS UPON THE STATE AND YOU DON'T HAVE TO

3 CONTRIBUTE TO OUR PROOF?

4         A      YES.

5         Q      SO IF WE HAD A TRIAL, YOU COULD SIT BACK, WAIT

6 AND SEE IF WE PRESENTED ENOUGH EVIDENCE TO CONVICT YOU, AND

7 NEVER HAVE TO TAKE THE WITNESS STAND UNLESS YOU WANTED TO

8 DO SO?

9         A      YES, SIR.

10         Q      DO YOU UNDERSTAND THAT IF YOU WANTED TO TESTIFY,

11 YOU COULD?

12         A      YES, SIR.

13         Q      ARE YOU GOING TO GIVE UP YOUR RIGHT AGAINST

14 SELF-INCRIMINATION?

15         A      YES, SIR.

16         Q      YOU UNDERSTAND THAT YOU ARE ALSO GIVING UP THAT

17 RIGHT AGAINST SELF-INCRIMINATION WHEN YOU ENTER A PLEA OF

18 GUILTY?

19         A      YES, SIR.

20         Q      SO THAT AS TO EACH OF THE 11 COUNTS YOU ARE GOING

21 TO BE PLEADING GUILTY TO, YOU ARE GIVING UP YOUR RIGHT TO

22 SELF-INCRIMINATION AND THAT IS WHAT YOU WOULD LIKE TO DO?

23         A      YES, SIR.

24         Q      DO YOU UNDERSTAND THAT DURING THE COURSE OF ANY

25 TRIAL, YOU HAVE THE RIGHT TO COMPULSORY PROCESS OF THE

26 COURT, THE SUBPOENA POWER, TO HAVE WITNESSES SERVED SUBPOENAS

1     AND COME TO COURT TO TESTIFY ON YOUR BEHALF?

2          A     YES, SIR.

3          Q     AND THAT BY GIVING UP YOUR RIGHT TO A TRIAL, YOU

4     ARE ALSO GIVING UP YOUR RIGHT TO HAVE THE WITNESSES

5     SUBPOENAED AND COME IN AND TESTIFY FOR YOU?

6          A     YES, SIR.

7          Q     AND YOU WOULD LIKE TO GIVE UP THAT RIGHT?

8          A     YES, SIR.

9          Q     DO YOU UNDERSTAND WHAT YOUR SENTENCE IS GOING TO

10    BE?

11         A     YES, SIR.

12         Q     WHAT DO YOU THINK THE SENTENCE WILL BE?

13         A     LIFE.

14         Q     AND DO YOU UNDERSTAND WHAT THE MINIMUM

15    ELIGIBILITY FOR PAROLE WILL BE?

16         A     SEVEN YEARS.

17         Q     HAS ANYBODY TOLD YOU ANYTHING CONTRARY TO THAT,

18    THAT YOU MIGHT GET OUT ANY SOONER THAN SEVEN YEARS?

19         A     NO, SIR.

20         Q     AS A MATTER OF FACT, YOU EXPECT TO BE THERE

21    LONGER THAN SEVEN YEARS, DO YOU NOT?

22         A     YES, SIR.

23         Q     HAVE ANY THREATS BEEN MADE TO YOU OR TO ANY MEMBER

24    OF YOUR FAMILY IN ORDER TO GET YOU TO ENTER A PLEA?

25         A     NO, SIR.

26         Q     HAVE ANY PROMISES BEEN MADE TO YOU OF LENIENCY OR

B

ANYTHING IN ORDER TO GET YOU TO ENTER A PLEA OF GUILTY?

    A    NO, SIR.

    Q    ARE THERE ANY QUESTIONS THAT YOU HAVE ABOUT WHAT WE ARE DOING HERE TODAY OR THE CONSEQUENCES THAT YOU ARE GOING TO BE FACING?

    A    NO, SIR.

MR. STOTLER:    I HAD ONE THING I WANTED TO SAY. I DID NOT INDICATE TO MR. TITCH, I SHOULD DO SO ON THE RECORD, EVEN THOUGH THIS IS A SECTION 209 PLEA AS TO ONE OF THE COUNTS, THAT IS TO SAY KIDNAPPING FOR ROBBERY, EVEN THOUGH THERE WAS A DEATH INVOLVED IN THAT PARTICULAR COUNT, THIS IS NOT A PLEA TO KIDNAPPING FOR ROBBERY WITH BODILY INJURY, WHICH WOULD BE LIFE WITHOUT POSSIBILITY OF PAROLE.

    MR. TITCH UNDERSTANDS THAT UNDER SECTION 209 AS ALLEGED IN THIS CASE, WITHOUT A BODILY INJURY ALLEGATION, HE IS ELIGIBLE FOR PAROLE IN SEVEN YEARS.

    IF IT TURNS OUT ANYTHING TO THE CONTRARY, THAT IS TO SAY THAT THE DEPARTMENT OF CORRECTIONS CONSIDERS THIS AS LIFE WITHOUT POSSIBILITY OF PAROLE, I THINK MR. TITCH'S DESIRE OBVIOUSLY IS TO WITHDRAW HIS PLEA.

THE COURT:    RECORD WILL SO INDICATE.

MR. CHATTERTON: I MIGHT STATE FOR THE RECORD, SO THAT IT IS PROBABLY CLEAR TO ALL OF US, I INTENTIONALLY ALLEGED IT THE WAY IT IS IN THE INFORMATION BECAUSE THE LAW CHANGED AS OF JULY 1ST, AND I DON'T THINK MR. TITCH, EVEN WITH THE PROPER ALLEGATION, COULD BE SENTENCED TO LIFE WITHOUT PAROLE

10

1  BECAUSE OF THE CHANGE IN THE LAW.  THAT INURES TO HIS

2  BENEFIT.

3      MR. STOTLER:    I WOULD LIKE IT CLEAR ON THE ABSTRACT

4  OF JUDGMENT IN THE EVENT HE IS SENTENCED TO STATE PRISON  .

5  THAT THIS IS A LIFE COMMITMENT WITH POSSIBILITY OF PAROLE

6  ON THE 209.

7      THE COURT:    MADAM CLERK, UPON THE COURT'S TAKING

8  OF THE PLEAS IN THIS CASE, WHEN YOU PREPARE YOUR PAPERS, SHOW

9  ON THE KIDNAPPING COUNT IT IS LIFE WITH POSSIBILITY OF

10  PAROLE.

11      MR. STOTLER:    THANK YOU, YOUR HONOR.

12  BY MR. CHATTERTON:

13      Q    OTHER THAN THE DISCUSSIONS THAT WE HAVE HAD

14  RIGHT HERE, MR. TITCH, IN OPEN COURT, HAD ANY PROMISES BEEN

15  MADE TO YOU CONCERNING EITHER YOUR PLEAS OR THE SENTENCE

16  YOU ARE TO RECEIVE?

17      A    NO, SIR.

18      Q    IS THIS PLEA FREE AND VOLUNTARY TO THE BEST OF

19  YOUR KNOWLEDGE AND BELIEF?

20      A    YES, SIR.

21      MR. CHATTERTON:  I AM WILLING NOW, IF THE COURT WOULD

22  LIKE TO BEGIN GOING THROUGH EACH COUNT, TO OBTAIN A FACTUAL

23  BASIS.

24      THE COURT:    OKAY.

25  BY MR. CHATTERTON:

26      Q    FIRST OF ALL, I WANT TO DIRECT YOUR ATTENTION TO

1  THE ALLEGATIONS IN COUNT II, WHICH ALLEGE THAT ON NOVEMBER

2  THE 20TH, 1976, YOU DID ROB BY MEANS OF FORCE AND FEAR

3  JOHN SIMONS?

4          A    YES, SIR.

5          Q    DO YOU RECALL THAT INCIDENT?

6          A    YES, SIR.

7          Q    AND IT TOOK PLACE AT 2516 WEST CHANTICLEER

8  IN THE CITY OF ANAHEIM?

9          A    YES, SIR.

10         Q    YOU'LL RECALL THAT THAT IS THE ONE THAT YOU

11 OBTAINED A .32 SEMIAUTOMATIC HANDGUN FROM?

12         A    YES, SIR.

13         Q    DID YOU IN FACT TAKE THE PROPERTY OF MR. SIMONS

14 BY FORCE AND FEAR?

15         A    YES, SIR.

16         Q    AND DID YOU ALSO IN THAT CONNECTION USE A

17 FIREARM IN ORDER TO TAKE THE PROPERTY?

18         A    YES, SIR.

19         Q    WAS A .38?

20         A    YES, SIR.

21     MR. CHATTERTON:  DID THE COURT WANT ME TO FINISH

22 FACTUAL BASES ON EACH OF THE INCIDENTS AND THEN GO BACK?

23     THE COURT:       THAT IS WHAT I WOULD PREFER.

24 BY MR. CHATTERTON:

25         Q    THEN LET ME DIRECT YOUR ATTENTION NEXT TO

26 COUNT IV OF THE INFORMATION, WHICH ALLEGES THAT ON THE

12

1      14TH OF DECEMBER, 1976, YOU DID ROB DEBRA BRADLEY, ALVIN

2   BRADLEY, AND ELEANOR BRADLEY OF MONEY BY MEANS OF FORCE

3   AND FEAR?

4           A      YES, SIR.

5           Q      DID YOU DO THAT?   —

6           A      YES, SIR.

7           Q      AND WAS THAT AT 1412 SHERILL IN THE CITY OF

8   ANAHEIM?

9           A      THAT IS STANTON?

10          Q      I BELIEVE IT IS ANAHEIM.

11          A      YES, SIR.

12          Q      AND DID YOU IN THAT CONNECTION USE A FIREARM

13   IN ORDER TO ACCOMPLISH THE TAKING OF THEIR PROPERTY?

14          A      YES, SIR.

15          Q      AND WAS THAT IN FACT A .32 BERRETTA YOU GOT

16   FROM MR. SIMONS?

17          A      YES, SIR.

18          Q      LET ME DIRECT YOUR ATTENTION NEXT TO COUNT VI

19   OF THE INFORMATION, WHICH ALLEGES THAT ON THE 18TH DAY OF

20   DECEMBER, 1976, YOU DID ROB THE PERSONAL PROPERTY OF GLENN

21   AND MARGOT DITTRICH BY MEANS OF FORCE AND FEAR; DID YOU DO

22   THAT?

23          A      YES, SIR.

24          Q      AND IN THAT CONNECTION DID YOU USE A FIREARM?

25          A      YES, SIR.

26          Q      WAS THAT ALSO A .32 SEMIAUTOMATIC?

12

1         A      YES, SIR.

2         Q      AND DID THAT OCCUR AT 2462 WEST CHANTICLEER

3  IN THE CITY OF ANAHEIM?

4         A      YES, SIR.

5         Q      DIRECTING YOUR ATTENTION NOW TO COUNT VII OF

6  THE INFORMATION, ON DECEMBER THE 21ST, 1976, DID YOU GO TO

7  THEO'S BURGERS AND ROB THE ATTENDANT, KATHY CHAREST, BY

8  MEANS OF FORCE AND FEAR?

9         A      YES, SIR.

10        Q      IS THAT LOCATED AT 1256 SOUTH MAGNOLIA IN THE

11  CITY OF ANAHEIM?

12        A      YES, SIR.

13        Q      AND DID YOU IN CONNECTION WITH THAT ROBBERY

14  USE A HANDGUN?

15        A      YES, SIR.

16        Q      DIRECTING YOUR ATTENTION NOW TO COUNT IX OF THE

17  INFORMATION, DID YOU ON DECEMBER THE 27TH, 1976, ENTER THE

18  RESIDENCE OF LOWELL AND SHIRLEY GRAY AT 8632 HARRIET LANE

19  IN GARDEN GROVE AND TAKE THEIR PERSONAL PROPERTY BY MEANS

20  OF FORCE AND FEAR?

21        A      YES, SIR.

22        Q      AND THAT PROPERTY INCLUDED MONEY AND AN

23  AUTOMOBILE?

24        A      YES, SIR.

25        Q      A WHITE CHRYSLER NEWPORTER?

26        A      YES, SIR.

1    Q    AND IN THAT CONNECTION DID YOU USE A FIREARM?

2    A    YES, SIR.

3    Q    A HANDGUN?

4    A    YES, SIR.

5    Q    AS A MATTER OF FACT, IT WAS THE .32, WAS IT NOT?

6    A    YES, SIR.

7    Q    NOW, DIRECTING YOUR ATTENTION TO JANUARY THE 16TH,

8    1977, DID YOU ENTER THE RESIDENCE OF MR. GOMEZ AT 1813 WEST

9    PALAIS STREET IN ANAHEIM FOR THE PURPOSES OF COMMITTING

10    THEFT?

11    A    YES, SIR.

12    Q    AND WAS THAT NOT IN FACT THE 1976 CHEVROLET

13    MONTE CARLO?

14    A    YES, SIR.

15    Q    LICENSE NUMBER OLG 829 THAT YOU STOLE?

16    A    YES.

17    Q    DIRECTING YOUR ATTENTION TO COUNT XI THAT

18    ALLEGES ON JANUARY THE 19TH, 1977, YOU ENTERED THE RESIDENCE

19    OF A MYRTLE AND GERALD KING AT 2475 WEST CERRITOS IN THE

20    CITY OF ANAHEIM WITH INTENT TO COMMIT THEFT?

21    A    YES.

22    Q    DID YOU DO THAT?

23    A    YES, SIR.

24    Q    AND WAS IT NOT IN FACT AT THAT LOCATION THAT

25    YOU OBTAINED THE .22 RIFLE AND THE 303 RIFLE THAT WERE LATER

26    FOUND IN THE OLG 829 AUTOMOBILE?

1    A    YES, SIR.

2    Q    DIRECTING YOUR ATTENTION TO COUNT XII OF THE

3  INFORMATION, IS IT TRUE THAT ON JANUARY THE 21ST, 1977, YOU

4  KIDNAPPED LAURA STOUGHTON AT HER RESIDENCE IN GARDEN GROVE?

5    A    YES, SIR.

6    Q    DO YOU RECALL THAT THAT WAS ON SEACREST CIRCLE?

7    A    I DON'T KNOW THE NAME OF THE STREET BUT --

8    Q    DO YOU RECALL THAT SHE HAD ARRIVED HOME IN A

9  VOLKSWAGEN?

10    A    YES, SIR.

11    Q    AND THAT YOU AT GUNPOINT TOOK HER FROM THE

12  FRONT OF HER HOUSE AND OVER TO AN AUTOMOBILE?

13    A    YES, SIR.

14    Q    THE MONTE CARLO AGAIN?

15    A    YES, SIR.

16    Q    AND PUT HER IN THAT VEHICLE AND SHE WAS

17  TRANSPORTED UP TO ANAHEIM HILLS?

18    A    YES, SIR.

19    Q    IS THAT CORRECT, AGAINST HER WILL?

20    A    YES, SIR.

21    Q    AND YOUR PURPOSE FOR DOING THAT WAS TO ROB HER,

22  WAS IT NOT?

23    A    YES, SIR.

24    Q    DIRECTING YOUR ATTENTION TO COUNT XIII OF THE

25  INFORMATION, IS IT TRUE THAT ALSO ON THE 21ST DAY OF

26  JANUARY, 1977, THAT YOU DID KILL LAURA STOUGHTON?

15

16

1    A    YES, SIR.

2    Q    AND WAS THAT IN CONNECTION WITH THE ROBBERY?

3    A    YES, SIR.

4    Q    THAT IS, SHE WAS THE ONE THAT YOU WERE TRYING TO

5    ROB AND DURING THE ATTEMPT TO ROB HER YOU KILLED HER?

6    A    YES, SIR.

7    Q    WITH A RIFLE?

8    A    YES, SIR.

9    Q    A .22?

10    A    YES, SIR.

11    Q    DIRECTING YOUR ATTENTION TO COUNT XVI, IS IT

12    TRUE THAT ON JANUARY THE 29TH, 1977, YOU FOLLOWED AUBREY

13    DUNCAN FROM HIS POOL HALL AT THE CUE AND CUSHION ON

14    CERRITOS TO HIS RESIDENCE AT 925 SOUTH VELARE IN THE CITY

15    OF ANAHEIM?

16    A    YES, SIR.

17    Q    AND THAT IT WAS YOUR PURPOSE IN FOLLOWING HIM

18    TO OBTAIN FROM HIM HIS KEYS SO THAT YOU COULD RETURN TO THE

19    POOL HALL AND TAKE HIS PROPERTY?

20    A    YES, SIR.

21    Q    AND THAT YOU WERE ARMED — STRIKE THAT.  THAT

22    IN THE COURSE OF TRYING TO GET THE KEYS, MR. DUNCAN WAS

23    SHOT TO DEATH?

24    A    YES, SIR.

25    Q    BY SOMEBODY ELSE?

26    A    YES, SIR.

1    Q    AND THAT SOMEBODY ELSE WAS WITH YOU IN THE

2  ATTEMPT TO TAKE THE KEYS FROM MR. DUNCAN; THAT IS, THAT WAS

3  YOUR AGREEMENT?

4    A    YES, SIR.

5    MR. CHATTERTON:  I THINK THAT IS IT.

6    THE COURT:    ALL RIGHT.  MR. GLOVER, WOULD YOU

7  SHOW MR. TITCH THE GUILTY PLEA FORM FOR A MINUTE, BOTH

8  SHEETS.

9    MR. TITCH, I WANT YOU TO TAKE A LOOK AT, FIRST

10  OF ALL, THE PAGE 1 OF THE GUILTY PLEA FORM, AND DOWN AT THE

11  BOTTOM, IS THAT YOUR SIGNATURE THAT APPEARS ON THE FORM?

12    DEFENDANT TITCH:  YES, SIR.

13    THE COURT:    ON THOSE BOXES ON YOUR LEFT-HAND

14  SIDE OF THE FORM, ARE THOSE YOUR INITIALS?

15    DEFENDANT TITCH:  YES, SIR.

16    THE COURT:    WOULD YOU LOOK AT THE YELLOW PIECE

17  OF PAPER ATTACHED TO PAGE 1; IS THAT YOUR SIGNATURE ON THAT

18  PIECE OF PAPER?

19    DEFENDANT TITCH:  YES, SIR.

20    THE COURT:    COURT WILL FIND A FACTUAL BASIS FOR

21  THE CHARGE, INTELLIGENT WAIVER OF RIGHTS.

22    MR. TITCH, TO THE ALLEGATIONS CONTAINED IN

23  COUNT II OF THE INFORMATION, HOW DO YOU PLEAD?

24    DEFENDANT TITCH:  GUILTY.

25    THE COURT:    COUNT IV?

26    DEFENDANT TITCH:  GUILTY.

18

1      MR. CHATTERTON:   EXCUSE ME.  YOU ARE GOING TO HAVE

2  TO TAKE AN ADMISSION OF THE ALLEGATION THAT FOLLOWS EACH OF

3  SOME OF THESE.

4      THE COURT:     I DON'T HAVE THE INFORMATION IN FRONT

5  OF ME.

6      MR. STOTLER:    I THINK THE YELLOW EIGHT AND A HALF

7  BY ELEVEN SETS OUT --

8      THE COURT:     DOES THAT SET ALL THE ALLEGATIONS

9  OUT, TOO?

10          LET'S START AGAIN, MR. TITCH.

11          TO THE CHARGE OF FIRST DEGREE ROBBERY AS

12  CONTAINED IN COUNT II OF THE INFORMATION, PLUS THE ALLEGATION,

13  USE OF A FIREARM, HOW DO  YOU PLEAD?

14      DEFENDANT TITCH:  GUILTY.

15      THE COURT:     YOU ADMIT THE USE OF A FIREARM?

16      DEFENDANT TITCH:  YES, SIR.

17      THE COURT:     AS TO COUNT IV OF THE INFORMATION,

18  ROBBERY IN THE FIRST DEGREE, AGAIN PLUS THE USE OF A FIREARM,

19  TO THE ROBBERY CHARGE HOW DO YOU PLEAD?

20      DEFENDANT TITCH:  GUILTY.

21      THE COURT:     DO YOU ADMIT THE USE OF A FIREARM

22  CONTAINED IN THE ALLEGATION?

23      DEFENDANT TITCH:  YES.

24      THE COURT:     AS TO COUNT VI OF THE INFORMATION,

25  ROBBERY IN THE FIRST DEGREE, AND AGAIN PLUS AN ALLEGATION

26  OF USE OF A FIREARM, TO THE ROBBERY HOW DO YOU PLEAD?

18

1    DEFENDANT TITCH:  GUILTY.

2    THE COURT:    AND TO THE ALLEGATION OF USE OF A

3    FIREARM IN THAT COUNT HOW DO YOU PLEAD?

4    DEFENDANT TITCH:  GUILTY.

5    THE COURT:    AS TO COUNT VII, ROBBERY IN THE

6    FIRST DEGREE, PLUS USE OF A FIREARM, HOW DO YOU PLEAD TO

7    THE ROBBERY?

8    DEFENDANT TITCH:  YES.

9    THE COURT:    DO YOU ADMIT THE USE OF A FIREARM

10   IN THAT ROBBERY?

11   DEFENDANT TITCH:  YES.

12   THE COURT:    AS TO COUNT IX OF THE INFORMATION,

13   ROBBERY IN THE FIRST DEGREE, HOW DO YOU PLEAD?

14   DEFENDANT TITCH:  GUILTY.

15   THE COURT:    DO YOU ADMIT THE USE OF A FIREARM IN

16   THAT ROBBERY?

17   DEFENDANT TITCH:  YES, SIR.

18   THE COURT:    AS TO COUNT X OF THE INFORMATION,

19   BURGLARY IN THE SECOND DEGREE, HOW DO YOU PLEAD?

20   DEFENDANT TITCH:  GUILTY.

21   THE COURT:    AS TO COUNT XI OF THE INFORMATION,

22   BURGLARY IN THE SECOND DEGREE, HOW DO YOU PLEAD?

23   DEFENDANT TITCH:  GUILTY.

24   THE COURT:    AS TO COUNT XII, KIDNAPPING FOR

25   ROBBERY, AGAIN ALSO ALLEGING THAT YOU USED A FIREARM ON THE

26   KIDNAPPING FOR ROBBERY, HOW DO YOU PLEAD?

1    DEFENDANT TITCH:  GUILTY.

2    THE COURT:    DO YOU ADMIT THE USE OF A FIREARM IN

3  THAT KIDNAPPING FOR ROBBERY?

4    DEFENDANT TITCH:  YES, SIR.

5    THE COURT:    AS TO COUNT XIII, MURDER IN THE FIRST

6  DEGREE, HOW DO YOU PLEAD?

7    DEFENDANT TITCH:  GUILTY.

8    THE COURT:    COUNT XV, BURGLARY IN THE SECOND

9  DEGREE, HOW DO YOU PLEAD?

10    DEFENDANT TITCH:  GUILTY.

11    THE COURT:    AND COUNT XVI, MURDER IN THE SECOND

12  DEGREE, HOW DO YOU PLEAD?

13    MR. CHATTERTON:  FIRST.

14    THE COURT:    DID I SAY SECOND?  LET'S GO OVER THAT

15  AGAIN.

16    AS TO COUNT XVI, MURDER IN THE FIRST DEGREE,

17  HOW DO YOU PLEAD?

18    DEFENDANT TITCH:  GUILTY.

19    THE COURT:    PLEAS TO ALL THE COUNTS PLUS THE

20  ADMISSION OF THE USE ALLEGATIONS WILL BE ACCEPTED.

21    MR. CHATTERTON:  MOVE TO DISMISS ALL REMAINING COUNTS

22  AND ALLEGATIONS, YOUR HONOR.

23    THE COURT:    MOTION GRANTED.

24    MR. STOTLER, WHAT IS MR. TITCH'S DESIRE AS FAR

25  AS SENTENCING?

26    MR. STOTLER:    I THINK UNDER THE LAW, IF I AM NOT

1   MISTAKEN, HE HAS TO BE REFERRED TO THE CALIFORNIA YOUTH

2   AUTHORITY, ALTHOUGH I UNDERSTAND THERE IS AN ATTORNEY

3   GENERAL OPINION THAT INDICATES THE YOUTH AUTHORITY SHOULD

4   NOT TAKE AN INDIVIDUAL FOR A CRIME OF FIRST DEGREE MURDER,

5   BUT I THINK UNDER THE WELFARE AND INSTITUTIONS CODE, I DON'T

6   HAVE THE SECTION RIGHT AWAY, I COULD FIND IT, I THINK HE

7   HAS TO BE INITIALLY REFERRED TO CYA.

8           THE COURT:        HE WAS A JUVENILE?

9           MR. STOTLER:      HE WAS CERTIFIED FOR ADULT TREATMENT.

10          THE COURT:        I AM NOT FAMILIAR WITH THAT SECTION.

11  MR. CHATTERTON, ARE YOU FAMILIAR WITH THAT?

12          MR. CHATTERTON:  NO, I AM NOT, YOUR HONOR.  I HAD NOT

13  EVEN CONTEMPLATED THE POSSIBILITY OF CYA.

14          MR. STOTLER:     I DON'T THINK HERE IS ANY

15  POSSIBLE WAY HE IS GOING TO GO TO CYA.  I THINK HE HAS TO BE

16  REFERRED UNDER THE LAW.

17              I TALKED TO A GENTLEMAN FROM THE CALIFORNIA

18  YOUTH AUTHORITY DURING THE 707 HEARING, AND HE WAS THE ONE

19  THAT INDICATED THERE WAS AN ATTORNEY GENERAL OPINION THAT

20  INDICATED THAT THE CALIFORNIA YOUTH AUTHORITY EITHER SHOULD

21  NOT OR COULD NOT TAKE AN INDIVIDUAL ON A FIRST DEGREE MURDER

22  CASE.

23          THE COURT:        I WOULD LIKE TO TAKE A LOOK AT THE

24  CODE BEFORE WE GO ANY FURTHER, BECAUSE I AM SURE

25  MR. CHATTERTON WASN'T APPRISED.  MAYBE I SHOULD HAVE KNOWN

26  IT.

22

1    DEFENDANT TITCH:  I WAIVE MY RIGHT FOR THAT.

2    MR. STOTLER:    I DON'T KNOW IF YOU CAN WAIVE THAT.

3    DEFENDANT TITCH:  BECAUSE THE INVESTIGATING PAROLE

4 OFFICER CAME DOWN AND SIGNED THE PAPERS.

5    MR. CHATTERTON:  HE IS 18 NOW.

6    THE COURT:    COURT WILL BE IN BRIEF RECESS.  I'LL

7 ASK COUNSEL TO COME BACK TO CHAMBERS WITH ME AND SHOW ME

8 THE SECTION.

9

10                (RECESS.)

11    THE COURT:    BACK ON THE RECORD ON PEOPLE VERSUS

12 TITCH.  THE DEFENDANT IS PRESENT, COUNSEL ARE PRESENT.

13        MR. TITCH, MR. STOTLER BROUGHT THIS WELFARE

14 AND INSTITUTIONS CODE TO THE COURT'S ATTENTION.  IT IS A NEW

15 SECTION, AND I HEARD YOU SAY SOMETHING BEFORE WE TOOK OUR

16 RECESS THAT YOU WANTED TO WAIVE YOUR RIGHT TO HAVE A CYA

17 REFERRAL.

18        I WANT TO READ THIS SECTION TO YOU, BECAUSE THE

19 COURT HAS NO DISCRETION BUT TO REFER YOU TO CYA FOR AN

20 EVALUATION REPORT.

21        NOW, I AM NOT DUTYBOUND TO FOLLOW THE REPORT;

22 AND EVEN IF THEY SHOULD RECOMMEND CYA FOR YOU, I CAN TELL

23 YOU IN ADVANCE, UNLESS THERE IS SOMETHING REMARKABLE THAT

24 I DON'T KNOW ANYTHING IN THE WORLD ABOUT RIGHT NOW, I AM

25 NOT GOING TO SEND YOU TO CYA FOR THE RECORD, AND ANYBODY

26 THAT WONDERS WHY IN THIS TYPE OF CASE YOU ARE BEING REFERRED

22

1  TO THE CALIFORNIA YOUTH AUTHORITY, THE SECTION READS IN

2  PART:

3                  "NO MINOR, WHO IS UNDER THE AGE

4                OF 18 YEARS WHEN HE COMMITTED ANY

5                CRIMINAL OFFENSE AND WHO HAS BEEN

6                FOUND NOT A FIT AND PROPER SUBJECT

7                TO BE DEALT WITH UNDER THE JUVENILE

8                COURT LAW, SHALL BE SENTENCED TO THE

9                STATE PRISON -- SHALL BE SENTENCED

10               TO THE STATE PRISON UNLESS HE HAS

11               FIRST BEEN REMANDED TO THE CUSTODY

12               OF THE CALIFORNIA YOUTH AUTHORITY FOR

13               EVALUATION AND REPORT PURSUANT TO THIS

14               SECTION AND THE COURT FINDS AFTER

15               HAVING READ AND CONSIDERED THE REPORT

16               SUBMITTED BY THE YOUTH AUTHORITY THAT

17               THE MINOR IS NOT A SUITABLE SUBJECT

18               FOR THE COMMITMENT TO THE YOUTH

19               AUTHORITY."

20         SO I HAVE TO REFER YOU FOR THAT REPORT, WHICH IS

21 GOING TO DELAY THE PROCEEDINGS.  THERE IS NOTHING I CAN

22 DO.

23         SO I THINK, MR. STOTLER, RATHER THAN PASSING

24 SENTENCE AT THIS TIME, PURSUANT TO SECTION 707.2 OF THE

25 WELFARE AND INSTITUTIONS CODE, THE COURT WILL REFER

26 MR. TITCH TO THE CALIFORNIA YOUTH AUTHORITY FOR A REPORT AND

1   WILL SET A DATE FOR HEARING ON THAT REPORT AND FORMAL

2   SENTENCING 30 DAYS HENCE.  CAN I HAVE A CONVENIENT DAY?

3       THE CLERK:       THE 18TH IS A FRIDAY.

4       THE COURT:       MR. CHATTERTON, IS THAT CONVENIENT,

5   NOVEMBER 18TH?

6       MR. CHATTERTON:  YES, YOUR HONOR.

7       THE COURT:       ONE OTHER THOUGHT STRIKES MY MIND.

8   WILL COUNSEL APPROACH THE BENCH?

9       MR. STOTLER:     WILL THAT BE 9:00 O'CLOCK?

10      THE COURT:       WE'LL SET A TIME IN A MINUTE.

11

12          (DISCUSSION BETWEEN COURT AND COUNSEL AT THE

13  BENCH OUT OF THE HEARING OF THE REPORTER.)

14      MR. STOTLER:     MR. TITCH, YOU UNDERSTAND YOU HAVE

15  A RIGHT TO BE SENTENCED WITHIN 21 DAYS OF THIS DATE; AND

16  IF THE COURT REFERS YOU TO THE CALIFORNIA YOUTH AUTHORITY,

17  YOU'LL HAVE TO WAIVE THAT PARTICULAR RIGHT; IS THAT YOUR

18  DESIRE?

19      DEFENDANT TITCH:  YES.

20      THE COURT:       VERY WELL.  YOU JOIN IN THAT TIME

21  WAIVER, MR. STOTLER?

22      MR. STOTLER:     YES, I DO.

23      THE COURT:       NOVEMBER 18TH, 1977.  I PREFER IT IN

24  THE MORNING, MR. STOTLER, IF THAT IS CONVENIENT WITH YOUR

25  AND MR. CHATTERTON'S CALENDAR.  9:00 A.M.

26      MR. STOTLER:     I DON'T THINK MR. MERWIN MENTIONED IT

25

1  WITH RESPECT TO MR. THOMAS, I KNOW THE APPELLATE RIGHTS

2  HAVEN'T BEEN READ YET.    THERE SHOULD SOME SHOWING ON THE

3  ABSTRACT AS TO THE CREDIT FOR TIME SERVED.    EACH DEFENDANT

4  HAS BEEN IN CUSTODY SINCE FEBRUARY 1ST, 1977.    I THINK

5  TIME SERVED IS MANDATORY.    THAT SHOULD BE ON THE ABSTRACT

6  OF JUDGMENT.

7        THE COURT:        IS THAT YOUR UNDERSTANDING OF THE

8  TIME?

9        MR. CHATTERTON:  I'M SURE THAT'S CORRECT.

10        THE COURT:        AS FAR AS MR. THOMAS IS CONCERNED,

11  HE'LL BE GIVEN CREDIT FOR TIME SERVED FROM FEBRUARY 1ST,

12  1977.  I'M NOT FORMALLY PASSING SENTENCE ON MR. TITCH AT

13  THIS TIME.  WE'LL TAKE CARE OF THAT WHEN THAT TIME COMES.

14

            (OTHER MATTERS.)

15

16        MR. CHATTERTON:  NOW, THERE WAS ONE OTHER MATTER.  IN

17  CONNECTION WITH THE MOTION TO SUPPRESS THE CONFESSION BY

18  MR. TITCH, COUNSEL WERE GOING TO GET TOGETHER AND ATTEMPT TO

19  CLARIFY A TRANSCRIPT BY INCLUDING WITHIN IT THINGS THAT WE

20  COULD HEAR ON THE TAPE THAT AREN'T ALREADY ON THE TRANSCRIPT.

21        IT IS MY UNDERSTANDING THAT THERE CAN BE NO

22  APPEAL OR AT LEAST THERE IS NO INTENTION TO HAVE ANY

23  APPEAL FROM THE DENIAL OF THE MOTION TO SUPPRESS THE

24  CONFESSION, AND IN LIGHT OF THAT DOES THE COURT SEE ANY NEED

25  FOR US TO GET TOGETHER AND GO OVER THE TRANSCRIPT ANY LONGER?

26        MR. STOTLER:        I DON'T SEE ANY NEED FOR IT.

1    THE COURT:          FOR THE RECORD, MR. STOTLER, AS

2  MR. TITCH'S ATTORNEY, YOU DO NOT PLAN TO PURSUE AN APPELLATE

3  REVIEW OF THIS COURT'S RULING ON THE MOTION TO SUPPRESS

4  MR. TITCH'S CONFESSION?

5    MR. STOTLER:       AS A MATTER OF FACT, YOUR HONOR, I

6  RESEARCHED THAT ISSUE  UNDER THE SUPREME COURT CASE OF

7  PEOPLE VERSUS DE VAUGHN.  UPON A PLEA OF GUILTY, A DEFENDANT

8  CANNOT RAISE ON APPEAL VIA A CERTIFICATE OF PROBABLE CAUSE

9  THE ADMISSIBILITY OF A CONFESSION ON A PRETRIAL RULING.

10  THEY TRIED TO DO THAT IN DE VAUGHN.  THEY TRIED TO PRESERVE

11  THE ISSUE OF ADMISSIBILITY OF A CONFESSION VIA A

12  CERTIFICATE OF PROBABLE CAUSE AND THE SUPREME COURT OF

13  CALIFORNIA SAYS YOU CAN'T DO IT.  IT GOES TO JURISDICTIONAL

14  MATTERS AND OTHER MATTERS THAT ARE DEFINED IN THE STATUTE

15  DEALING WITH CERTIFICATES OF PROBABLE CAUSE, WHICH IS

16  1237.5 OF THE PENAL CODE.

17    I HAVE INFORMED MR. TITCH THAT BY ENTERING HIS

18  PLEA OF GUILTY TO THESE MULTIPLE COUNTS, THAT HE CANNOT

19  RAISE THE ADMISSIBILITY OF HIS CONFESSION ON THE VOLUNTARINESS

20  ISSUE AND MIRANDA ISSUE, AND ALL OF THOSE ISSUES HEARD BEFORE

21  THIS COURT.

22    BOTH DEFENDANTS UNDERSTAND THAT THEY CAN RAISE

23  THE VALIDITY OF THEIR ARRESTS AND SEARCHES AND SEIZURES OUT

24  OF VICTORVILLE VIA AN APPEAL OFF OF THE 1538.5.

25    MR. CHATTERTON:  THERE IS ONE THING THAT SHOULD BE

26  STATED.  IT WAS MY BELIEF THAT EVEN HAD THEY HAD THE RIGHT TO

27

1   APPEAL THE MIRANDA OR VOLUNTARINESS ISSUE, IT WAS

2   REPRESENTED AS PART OF THE NEGOTIATIONS THEY WOULD NOT BE

3   DOING THAT.

4        MR. STOTLER:    THAT'S CORRECT.

5        THE COURT:    RECORD WILL SHOW THEN, SO WE ARE

6   ALL CLEAR, THAT A PART OF THE NEGOTIATED PLEA ON THIS MATTER

7   WAS THAT THE RULING OF THIS COURT IN DENYING THE MOTION TO

8   SUPPRESS MR. TITCH'S CONFESSION WOULD NOT BE RAISED ON

9   APPEAL; IS THAT CORRECT, MR. TITCH?

10        DEFENDANT TITCH:  YES.

11        THE COURT:    I THINK THAT DOES IT FOR NOW.

12        MR. STOTLER:    I WANT TO CLARIFY ONE THING.  THE

13  RECORD MAY NOT BE TOO CLEAR.  THERE WAS AN ATTACK MADE VIA

14  THE 1538.5 HEARING ON THE ARREST, THE SEARCH AND SEIZURE,

15  AND THE CONFESSION ON A POISON TREE THEORY.  THAT IS TO

16  SAY THE DEFENDANT TITCH AND DEFENDANT THOMAS WERE ILLEGALLY

17  ARRESTED AND THE FRUITS OF THE ILLEGAL ARREST WERE THE

18  CONFESSION, AND I'M SURE MR. TITCH DOES INTEND TO PURSUE THAT

19  ASPECT OF THE CASE BUT ONLY THROUGH THE 1538.5 APPEAL.

20        THE COURT:    WHEN I REFER TO THIS COURT AND MOTION

21  TO SUPPRESS THE CONFESSION, I WAS REFERRING TO THAT PRETRIAL

22  MOTION THAT TOOK PLACE IN DEPARTMENT 24 LAST WEEK ONLY AND

23  NOTHING TO DO WITH THE MOTION TO SUPPRESS IN SOME OTHER

24  COURT OR DEPARTMENT OF THIS COURT.

25        MR. STOTLER:    THANK YOU, YOUR HONOR.  IF MR. THOMAS

26  COULD REMAIN FOR TEN MINUTES.

        THE COURT:    YES.

                    (ADJOURNMENT.)

27

28

1        SANTA ANA, CALIFORNIA – FRIDAY, JANUARY 6, 1978

2                      MORNING SESSION

3

4        THE COURT:       PEOPLE VERSUS TITCH.

5        MR. STOTLER:     MR. TITCH IS PRESENT WITH COUNSEL

6    JAMES A. STOTLER.

7        MR. CHATTERTON:  ROBERT CHATTERTON FOR THE PEOPLE.

8        THE COURT:       AS YOU KNOW, THE REPORT CAME BACK

9    FROM THE CALIFORNIA YOUTH AUTHORITY WITH THEIR REFUSING TO

10   ACCEPT MR. TITCH AS BEING AMENABLE TO CYA COMMITMENT,

11   PARTICULARLY IN VIEW OF THE FACT THAT HE HAS PLED GUILTY TO

12   A LIFE SENTENCE.

13                SO AT THIS TIME, UNLESS THERE IS ANY REASON

14   NOT TO, WHY I AM PREPARED TO GO AHEAD WITH SENTENCING OF

15   MR. TITCH.

16       MR. STOTLER:     WE ARE READY FOR SENTENCING.

17       THE COURT:       WAIVE FURTHER ARRAIGNMENT, NO LEGAL

18   CAUSE?

19       MR. STOTLER:     YES.

20       THE COURT:       MR. TITCH, YOU ARE SENTENCED TO THE

21   STATE PRISON FOR THE TERM PRESCRIBED BY LAW ON ALL COUNTS

22   THAT YOU PLED GUILTY TO.

23

24

25

26

28

29

1

2              REPORTER'S CERTIFICATE

3

4        I, CAROLYN B. KNIGHT, C.S.R., DO HEREBY CERTIFY THAT

5   THE FOREGOING REPORTER'S TRANSCRIPT IS A FULL, TRUE AND

6   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES THEREOF, AND A

7   FULL, TRUE AND CORRECT STATEMENT OF THE PROCEEDINGS HAD IN

8   SAID CAUSE.

9

10

11                              C.S.R. NO. C-1913
                                OFFICIAL COURT REPORTER

12

13   DATED: _____

14

15

16                                    THIS INSTRUMENT IS A CORRECT COPY OF THE ORIGINAL ON
                                      FILE IN THIS OFFICE
                                      FEB 22 1978

17               WILLIAM E. ST JOHN
                                     County Clerk and Clerk of the
18                                   Superior Court of the State of California in and for
                                     the County of Orange

19

20

21

22

23

24

25

26

29

**EXHIBIT 4**

Abstract of Judgement

SUPERIOR COURT OF CALIFORNIA, COUNTY OF _____

700 Civic Center Drive West
Santa Ana, CA. 92701

**FILED**

MAR - 7 1979

LEE A. BRANCH, County Clerk

By _____ HD _____ Deputy

CASE NUMBER:

C-37693

PEOPLE OF THE STATE OF CALIFORNIA

DEFENDANT: Mark Layne ZITCH     [X] Present     [ ] Not Present

**AMENDED**

[X] JUDGMENT OF COMMITMENT TO:     [X] STATE PRISON     [ ] COUNTY JAIL
[ ] ORDER GRANTING PROBATION     [ ] AND MINUTE ORDER

| Date of hearing: January 6, 1979 | Dept. No.: 24 | Judge: | Clerk: L. Drummond | Reporter: Carolyn Knight |
|---|---|---|---|---|
| Counsel for People: Robert Chatterton, Dep.DA | | Counsel for defendant: James Stobler | | Probation Officer: |

1. Defendant was convicted of the commission of the following crime on (Date): October 17, 1977

| Count | Code Section | Crime | Degree | By Jury, Court or Plea (Specify) |
|---|---|---|---|---|
| 2,4,6,7,9 | P.C.211 | Robbery | 1st | Plea |
| 10,11,15 | P.C.459 | Burglary | 2nd | Plea |
| 12 | P.C.209 | Kidnap for Robbery | | Plea |
| 13,16 | P.C.187 | Murder | 1st | Plea |

2. Defendant [ ] was arraigned [X] waived arraignment for judgment.

3. The court, having read and considered the probation report and no legal cause having been shown why judgment should not be pronounced
   a. [X] Sentences defendant to State Prison for the term prescribed by law.
   b. [ ] Specifies, pursuant to Pen. C. 1202b, the minimum term of imprisonment shall be six months as to count: _____
   c. [ ] Sentences defendant to County Jail for the period of (Specify number of days): _____
   d. [ ] Suspends imposition of sentence and defendant is placed on probation for the period of: _____
      [ ] upon conditions set forth in attachment 3d.

4. [X] Defendant, convicted of more than one count, shall
   a. [X] serve the sentence as to each count as follows:

| Count | Consecutive With | Concurrent with |
|---|---|---|
| 13 | | 2,4,6,7,9,10,11,12,15,16 |

   b. [ ] serve the counts made consecutive in the following order:

5. Defendant shall serve this sentence with respect to any prior uncompleted sentence   a. [X] concurrently.   [ ] consecutively.
   c. [ ] as set forth below or in attachment 5c.

6. Execution of sentence is
   a. [ ] stayed on the following count: _____ pending appeal, with the stay to become permanent when the sentence is completed as to count: _____
   b. [ ] suspended and defendant is placed on probation for the period of: _____
      [ ] upon conditions set forth in attachment 6b.

7. [ ] No allegation to enhance punishment was made in count: _____

8. [X] It was alleged
   a. [X] Defendant was armed with a deadly weapon at the time of the commission or attempted commission of the crime charged in count: 13   [X] and allegation stricken as to count: 13

(Continued on reverse side)

This form satisfies the requirements of Penal Code 1213.5 (Abstract of Judgment and Commitment). Singular includes the plural. This form is to be used in judgments other than death. A copy of probation report shall accompany this form pursuant to Penal Code 1203c and a copy of any supplementary probation report shall be transmitted to the Department of Corrections. Attachments may be used but must be incorporated by reference.

12-432 (R 7/76)

RECEIVED CENTRAL FACILITY
MAR 9 3 PH '79
CORRECTIONAL TRAINING FACILITY

b. ☐ Defendant used a firearm in count: _____ and allegation stricken as to count: _____

c. ☐ Defendant was armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024 and allegation stricken.

d. ☐ Other (Specify and indicate if stricken): _____

9. ☒ The Court finds the defendant

a. ☐ was armed at the time of commission or attempted commission of the crime with a deadly weapon within the meaning of

   (1) ☐ Pen. C. 3024 as to count: _____ but strikes the finding as to count: _____

   (2) ☐ Pen. C. 12022 as to count: _____ but strikes the finding as to count: _____

   (3) ☐ Pen. C. 1203 (Specify weapon): _____
     as to count: _____ but strikes the finding as to count: _____

b. ☐ was not armed at the time of commission or attempted commission of the crime within the meaning of

   (1) ☐ Pen. C. 3024 as to count: _____

   (2) ☐ Pen. C. 12022 as to count: _____

   (3) ☐ Pen. C. 1203 as to count: _____

c. ☒ did use a firearm as to count: 2,4,6,7,9,12 _____ but strikes the finding as to count: _____ The additional penalty shall

   (1) ☐ The use was one use for the following counts: _____
     run consecutively to the sentence on the last count to be served.

d. ☐ did not use a firearm as to count: _____

e. ☐ was armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024 ☐ but strikes
   the finding.

f. ☐ was not armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024.

g. ☐ Other (Specify and indicate if stricken): _____

10. ☐ Prior convictions which affect defendant's sentence were alleged and disposed of ☐ as follows ☐ as set forth in attachment 10.

| Conviction date | Jurisdiction | Crime and code Section | Applies to Count | Disposition |
|---|---|---|---|---|

11. The court finds defendant a. ☐ is ☒ is not an habitual criminal under Pen. C. 644a.
                     b. ☐ is ☒ is not an habitual criminal under Pen. C. 644b.

12. The court pronounced sentence on (Date): January 6, 1976 and defendant was held in custody, through and including the date of pronouncement of sentence for (Total no. of days): 337 as follows

| Count | Time other than Dept. of Corrections | Dept. of Corrections Time |
|---|---|---|
| 2,4,6,7,9,10,11,12,13,15,16 | 337 | |

13. Defendant is remanded to the custody of the Sheriff

a. ☐ For the period of (Specify no. of days): _____ upon conditions and recommendations set forth in attachment 13a

b. ☒ To be delivered ☐ at the earliest convenient time ☐ after 48 hours, excluding Saturdays, Sundays and holidays
   [Pen. C. 1203c] into the custody of the Director of Corrections at

   (1) ☐ California Institution for Women—Frontera      (3) ☒ California Institution for Men—Chino

   (2) ☐ California Men's Facility—Vacaville         (4) ☐ Other:

14. ☐ The court requests a copy of the diagnostic study and recommendations as provided in Pen. C. 1168.

15. The court advised defendant of all appeal rights as required in CRC Rule 250 and defendant acknowledged understanding them.

16. ☐ Other (See attachment 16)

Dated: March 7, 1976.

(Type or print name)           JAMES K. TURNER
                                (Signature of Judge of the Superior Court)

TOTAL NO. attached: _____ 17

**CLERK'S CERTIFICATE**

I hereby certify that the foregoing is a correct copy of the original on file in my office.

Clerk of the Superior Court

[Seal]

By _Herrick L. Dobson_ Deputy

2

15-89544
TITCH

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ORANGE

Dept. 39 30

Court convened at _____ M. _____ 22 November _____ 19 78, pre

Hon. JAMES K. TURNER _____, Judge; Natalie Drummond _____, Deputy C

No _____, Deputy Sheriff; No _____, Repo

and the following proceedings were had:

C-37693  PEOPLE OF THE STATE OF CALIFORNIA VS TITCH, MARK WAYNE

No appearances.  It appears due to inadvertance and clerical error,
the minutes of 6 January 1978 do not properly reflect the order of
this Court.  The minutes of 6 January 1978 shall now stand corrected
nunc pro tunc as of 6 January 1978 as follows:  Violation of 209 of
the Penal Code, kidnap for robbery as charged in Count 12 of the
Information.  ENTERED 11-22-78

THIS INSTRUMENT IS A CORRECT COPY OF THE ORIGINAL
ON FILE IN THIS OFFICE

NOV 22 1978

WILLIAM E. ST. JOHN
County Clerk and Clerk of the
Superior Court of the State of California in and for
the County of Orange

BY _____, Deputy

| Statistical Code Use Only | 1. | 2. | 3. | 4. | 5. | 6. | 7. | 8. | 9. | 10. | 11. | 12. | 13. | 14. | 15. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | 3 |

Insert name of court, branch court, if any, and m         address

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** _____ORANGE_____
700 Civic Center Drive
Santa Ana, California 92701

FOR COURT USE ONLY

# F I L E D

**JAN 12 1978**

WILLIAM E. ST JOHN, County Clerk

By _____ Deputy

**PEOPLE OF THE STATE OF CALIFORNIA**

**DEFENDANT:** Mark Wayne TITCH    [X] Present    [ ] Not Present

[X] **JUDGMENT OF COMMITMENT TO:** [XX] STATE PRISON    [ ] COUNTY JAIL
[ ] **ORDER GRANTING PROBATION** [ ] **AND MINUTE ORDER**

CASE NUMBER:
C-37693

| Date of hearing: 6 January 1978 | Dept. No.: 24 | Judge: J.K. TURNER | Clerk: N.Drummond | Reporter: Carolyn Knight |
|---|---|---|---|---|
| Counsel for People: Robert Chatterton, Dep DA | | Counsel for defendant: James Stotler | | Probation Officer: |

1. Defendant was convicted of the commission of the following crime on (Date): _17 October 1977_

| Count | Code Section | Crime | Degree | By Jury, Court or Plea (Specify) |
|---|---|---|---|---|
| 2,4,6,7,9 | P.C.211 | Robbery | 1st | Plea |
| 10,11,15 | P.C.459 | Burglary | 2nd | Plea |
| 12 | P.C.209 | Kidnap for Ransom | | Plea |
| 13,16 | P.C.187 | Murder | 1st | Plea |

2. Defendant [ ] was arraigned [X] waived arraignment for judgment.

3. The court, having read and considered the probation report and no legal cause having been shown why judgment should not be pronounced

  a. [XX] Sentences defendant to State Prison for the term prescribed by law.

  b. [ ] Specifies, pursuant to Pen. C. 1202b, the minimum term of imprisonment shall be six months as to count: _____

  c. [ ] Sentences defendant to County Jail for the period of (Specify number of days): _____

  d. [ ] Suspends imposition of sentence and defendant is placed on probation for the period of: _____
      [ ] upon conditions set forth in attachment 3d.

4. [XX] Defendant, convicted of more than one count, shall

  a. [XX] serve the sentence as to each count as follows:

| Count | Consecutive With | Concurrent with |
|---|---|---|
| 13 | | 2,4,6,7,9,10,11,12,15,16 |

  b. [ ] serve the counts made consecutive in the following order:

5. Defendant shall serve this sentence with respect to any prior uncompleted sentence    a. [X] concurrently.    [ ] consecutively.

  c. [ ] as set forth below or in attachment 5c.

6. Execution of sentence is

  a. [ ] stayed on the following count: _____ pending appeal, with the stay to become permanent when the sentence is completed as to count: _____

  b. [ ] suspended and defendant is placed on probation for the period of: _____
      [ ] upon conditions set forth in attachment 6b.

7. [ ] No allegation to enhance punishment was made in count: _____

8. [XX] It was alleged

  a. [X] Defendant was armed with a deadly weapon at the time of the commission or attempted commission of the crime charged in count: _13_    [X] and allegation stricken as to count: _13_

**(Continued on reverse side)**

This form satisfies the requirements of Penal Code 1213.5 (Abstract of Judgment and Commitment). Singular includes the plural. This form is to be used in judgments other than death. A copy of probation report shall accompany this form pursuant to Penal Code 1203c and a copy of any supplementary probation report shall be transmitted to the Department of Corrections. Attachments may be used but must be incorporated by reference.

0182-432 (R 7/76)

Form Approved by the
Judicial Council of California

_See Amended_

JUDGMENT COMMITMENT

Pen C 644, 969c, 969d, 1203 1213.5

4

b. ☒ Defendant used a firearm in count: 2,4,6,7,9,12 and allegation stricken as to count: _____

c. ☐ Defendant was armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024

☐ and allegation stricken.

d. ☐ Other (Specify and indicate if stricken): _____

9. ☒ The Court finds the defendant

a. ☐ was armed at the time of commission or attempted commission of the crime with a deadly weapon within the meaning of

(1) ☐ Pen C. 3024 as to count: _____ ☐ but strikes the finding as to count: _____

(2) ☐ Pen C. 12022 as to count: _____ ☐ but strikes the finding as to count: _____

(3) ☐ Pen C. 1203 (Specify weapon): _____

as to count: _____ ☐ but strikes the finding as to count: _____

b. ☐ was *not* armed at the time of commission or attempted commission of the crime within the meaning of

(1) ☐ Pen C. 3024 as to count: _____

(2) ☐ Pen C. 12022 as to count: _____

(3) ☐ Pen C. 1203 as to count: _____

c. ☒ *did* use a firearm as to count: 2,4,6,7,9,12 _____ ☐ but strikes the finding as to count: _____

(1) ☐ The use was one use for the following counts: _____ The additional penalty shall run consecutively to the sentence on the last count to be served.

d. ☐ *did not* use a firearm as to count: _____

e. ☐ *was* armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024 ☐ but strikes the finding.

f. ☐ was *not* armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024.

g. ☐ Other (Specify and indicate if stricken):

10. ☐ Prior convictions which affect defendant's sentence were alleged and disposed of ☐ as follows ☐ as set forth in attachment 10.

| Conviction date | Jurisdiction | Crime and code Section | Applies to Count | Disposition |
|---|---|---|---|---|
| | | | | |

11. The court finds defendant   a. ☐ is ☒ is not an habitual criminal under Pen C. 644a.

b. ☐ is ☒ is not an habitual criminal under Pen C. 644b.

12. The court pronounced sentence on (Date): 6 January 1978 . and defendant was held in custody, through and including the date of pronouncement of sentence for (Total no. of days): 337 as follows

| Count | Time other than Dept. of Corrections | Dept. of Corrections Time |
|---|---|---|
| 2,4,6,7,9,10,11,12,13,15, 16 | 337 | |

13. Defendant is remanded to the custody of the Sheriff

a. ☐ For the period of (Specify no. of days). _____ ☐ upon conditions and recommendations set forth in attachment 13a.

b. ☒ To be delivered ☐ at the earliest convenient time ☐ after 48 hours, excluding Saturdays, Sundays and holidays [Pen C. 1203c] into the custody of the Director of Corrections at

(1) ☐ California Institution for Women—Frontera   (3) ☒ California Institution for Men—Chino

(2) ☐ California Men's Facility—Vacaville   (4) ☐ Other:

14. ☐ The court requests a copy of the diagnostic study and recommendations as provided in Pen C. 1168.

15. The court advised defendant of all appeal rights as required in CRC Rule 250 and defendant acknowledged understanding them.

16. ☐ Other (See attachment 16)

Dated:
9 January 1978

James K. Turner
(Type or print name)

*James K. Turner*
(Signature of Judge of the Superior Court)

TOTAL NO. of boxes checked: 17

**CLERK'S CERTIFICATE**

I hereby certify that the foregoing is a correct copy of the original on file in my office.

Clerk of the superior Court

By _____ Deputy

5

FORM CR 291

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **ORANGE**
BRANCH

COURT ID.
**3 0**
(D.P. USE ONLY)

FOR COURT USE ONLY

**FILED**

**JAN 12 1978**

**WILLIAM E. ST JOHN,** County Clerk

By _____ Deputy

PEOPLE OF THE STATE OF CALIFORNIA    versus
DEFENDANT: **TITCH, Mark Wayne**    ☒☒ Present   ☐ Not Present
AKA:

REPORT TO JUDICIAL COUNCIL OF: ☒ INDETERMINATE SENTENCE TO STATE PRISON
☐ SENTENCE CHOICE OTHER THAN STATE PRISON    CASE NUMBER: **C-37693**

Hearing **01/06/78** Dept. No. **24**   Judge **James K. Turner**   Clerk **Natalie Drummond**
Reporter **Carolyn Knight**   Counsel for People **Robert Chatterton, Deputy DA**
Counsel for Defendant **James Stotler**   Probation Number or Probation Officer **none**

1. Defendant was convicted of the commission of the following crimes:
   ☒☒ Additional counts are listed on attachment 1.a.

| Count | Code Section | Crime and Degree | Date of Conviction Mo, Day, Yr. | Conviction by: Jury Trial | Court Trial | Plea | Enhancements Charged and Found PC§ 2022 | PC§ 12022.5 | PC§ 2022.6 | PC§ 2022.7 | Additional term stricken due to circumstances in mitigation PC§ 2022 | PC§ 12022.5 | PC§ 2022.6 | PC§ 2022.7 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | PC211* | Robbery - first | 10/17/77 | | x | | x | | | | | | | |
| 4 | PC211* | Robbery - first | 10/17/77 | | x | | x | | | | | | | |
| 6 | PC211* | Robbery - first | 10/17/77 | | x | | x | | | | | | | |
| 7 | PC211* | Robbery - first | 10/17/77 | | x | | x | | | | | | | |
| 9 | PC211* | Robbery - first | 10/17/77 | | x | | x | | | | | | | |

2. The defendant was charged and found to have served prior prison terms: **0** terms for violent felonies; **0** terms for other felonies.

3. ☒ Defendant was sentenced to State Prison for the term prescribed by law on counts **2, 4, 6, 7, 9, 10, 11, 15, 12, 13 & 16**

4. ☐ Counts ___, ___, ___, ___, were deemed misdemeanors.
   A. ☐ Defendant sentenced to _____ days in county jail for all counts.
      Number
      (1) Execution of _____ days suspended.
          Number
   B. ☐ Defendant fined in sum of $_____.

5. ☐ For counts ___, ___, ___, the defendant was placed on probation.
   A. (1) ☐ Sentence pronounced and execution of sentence was suspended; or
      (2) ☐ Imposition of sentence was suspended.
   B. Conditions of probation included ☐ Jail Time _____ days   ☐ Fine

6. Other dispositions
   A. ☐ Defendant was committed to California Youth Authority.
   B. ☐ Proceedings suspended, and defendant was committed to California Rehabilitation Center.
   C. ☐ Proceedings suspended, and defendant was committed as a Mentally Disordered Sex Offender.
   D. ☐ Proceedings suspended, and defendant was committed as mentally incompetent.
   E. ☐ Other (Specify)_____

NOTE: PURSUANT TO ARTICLE VI, SECTION 6 OF THE CALIFORNIA CONSTITUTION AND SECTION 68505 OF THE GOVERNMENT CODE, THE CHIEF JUSTICE REQUIRES THAT EACH SUPERIOR COURT SHALL COMPLETE THIS FORM FOR EACH INDETERMINATE SENTENCE TO STATE PRISON OR SENTENCE CHOICE OTHER THAN STATE PRISON. THE REPORTS IMPLEMENT SECTION 1170.4 OF THE PENAL CODE AND SHALL BE MAILED TO: ADMINISTRATIVE OFFICE OF THE COURTS, 4200 STATE BUILDING, SAN FRANCISCO, CALIFORNIA 94102

DATE **1-12-78**   SIGNATURE OF CLERK _____

Form Adopted by the
Judicial Council of California
Effective July 1, 1977

White copy to Administrative Office of the Courts

REPORT—INDETERMINATE SENTENCE,
OTHER SENTENCE CHOICE
FORM CR 291 (7/1/77)

Const., Art. VI, § 6
Pen C. 1170.4, 1170.6

6

FORM CR 291

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ___**ORANGE**___

BRANCH _____

**FOR COURT USE ONLY**

# FILED
## JAN 12 1978
WILLIAM E. ST JOHN, County Clerk

By _____ Deputy

| COURT ID. |
|---|
| 3 0 |
| (D.P. USE ONLY) |

**ATTACHMENT 1.a**

PEOPLE OF THE STATE OF CALIFORNIA        versus
DEFENDANT: **TITCH, Mark Wayne**        ☒ Present   ☐ Not Present
AKA: _____

REPORT TO JUDICIAL COUNCIL OF: ☒ INDETERMINATE SENTENCE TO STATE PRISON
☐ SENTENCE CHOICE OTHER THAN STATE PRISON   CASE NUMBER: **C-37693**

Hearing ____ MO. DAY YR. ____ Dept. No. _____ Judge _____ Clerk _____
Reporter _____ Counsel for People _____
Counsel for Defendant _____ Probation Number or Probation Officer _____

1. Defendant was convicted of the commission of the following crimes:
   ☐ Additional counts are listed on attachment 1.a.

| Count | Code Section | Crime and Degree | Date of Conviction Mo. Day Yr. | Conviction by: Jury Trial | Court Trial | Plea | Enhancements Charged and Found PC § 12022 | PC § 12022.5 | PC § 12022.6 | Additional term stricken due to circumstances in mitigation PC § 12022 | PC § 12022.5 | PC § 12022.6 | PC § 12022.7 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 | PC211 459** | Burglary - second | 10/17/77 | | | x | | | | | | | |
| 11 | PC459** | Burglary - second | 10/17/77 | | | x | | | | | | | |
| 15 | PC459** | Burglary - second | 10/17/77 | | | x | | | | | | | |
| 12 | PC209 | Kidnap for ransom | 10/17/77 | | | x | x | | | | | | |
| 13 | PC187* | Murder - first | 10/17/77 | | | x | | | | | | | |
| 16 | PC187* | Murder - first | 10/17/77 | | | x | | | | | | | |

2. The defendant was charged and found to have served prior prison terms: _____ terms for violent felonies; _____ terms for other felonies.

3. ☐ Defendant was sentenced to State Prison for the term prescribed by law on counts ___, ___, ___, ___.

4. ☐ Counts ___, ___, ___, ___, were deemed misdemeanors.
   A. ☐ Defendant sentenced to _____ days in county jail for all counts.
                    Number
      (1) Execution of _____ days suspended.
                    Number
   B. ☐ Defendant fined in sum of $_____.

5. ☐ For counts ___, ___, ___, ___ the defendant was placed on probation.
   A. (1) ☐ Sentence pronounced and execution of sentence was suspended; or
      (2) ☐ Imposition of sentence was suspended.
   B. Conditions of probation included ☐ Jail Time _____ days   ☐ Fine

6. Other dispositions
   A. ☐ Defendant was committed to California Youth Authority.
   B. ☐ Proceedings suspended, and defendant was committed to California Rehabilitation Center.
   C. ☐ Proceedings suspended, and defendant was committed as a Mentally Disordered Sex Offender.
   D. ☐ Proceedings suspended, and defendant was committed as mentally incompetent.
   E. ☐ Other (Specify) _____

NOTE: PURSUANT TO ARTICLE VI, SECTION 6 OF THE CALIFORNIA CONSTITUTION AND SECTION 68505 OF THE GOVERNMENT CODE, THE CHIEF JUSTICE REQUIRES THAT EACH SUPERIOR COURT SHALL COMPLETE THIS FORM FOR EACH INDETERMINATE SENTENCE TO STATE PRISON OR SENTENCE CHOICE OTHER THAN STATE PRISON. THE REPORTS IMPLEMENT SECTION 1170.4 OF THE PENAL CODE AND SHALL BE MAILED TO: ADMINISTRATIVE OFFICE OF THE COURTS, 4200 STATE BUILDING, SAN FRANCISCO, CALIFORNIA 94102

DATE _1-12 78_    SIGNATURE OF CLERK _Linda Jo Gie_

Form Adopted by the
Judicial Council of California
Effective July 1, 1977

White copy to Administrative Office of the Courts

REPORT—INDETERMINATE SENTENCE,
OTHER SENTENCE CHOICE
FORM CR 291 (7/1/77)

Const., Art. VI, § 6
Pen C. 1170.4, 1170.6

7

**EXHIBIT 5**

CYA Referral Document

STATE OF CALIFORNIA
DEPARTMENT OF THE YOUTH AUTHORITY

**REFERRAL DOCUMENT**

PLEASE TYPE

FA.1.465-11(76)    IF ADDITIONAL SPACE IS REQUIRED ATTACH SEPARATE SHEET

FOR YA USE ONLY
YA NUMBER
DP# 0173

| NAME (LAST – FIRST – MIDDLE) | OTHER NAME(S) (ALIASES) | BIRTHDATE | SOCIAL SECURITY NUMBER |
|---|---|---|---|
| TITCH, Mark Wayne | – | 7-31-59 | - - |

| LAST ADDRESS (NUMBER – STREET – CITY – STATE) | BIRTHPLACE | SEX | CII NUMBER |
|---|---|---|---|
| , | California | ☒ M  ☐ F | - - |

ETHNIC IDENTIFICATION

☒ WHITE  ☐ SPANISH SPEAKING/SURNAMED  ☐ BLACK  ☐ ASIAN  ☐ NATIVE AMERICAN  ☐ FILIPINO  ☐ OTHER

| US CITIZEN | COMMITMENT DATE |
|---|---|
| ☒ YES  ☐ NO | 10-11-77 |

| COUNTY OF COMMITMENT | PROBATION NUMBER | COURT NUMBER | RELIGION | MARITAL STATUS |
|---|---|---|---|---|
| Orange | | C57895 | None | Single |

COMMITTING COURT

☐ JUVENILE  ☒ CRIMINAL  ☐ MUNICIPAL  ☐ JUSTICE    ☐ PAROLE REVOCATION

| | PRIOR YA NUMBER |
|---|---|
| | 06077 - - |

COMMITTING OFFENSE (DO NOT INCLUDE CODE AND SECTION FOR JUVENILE COURT COMMITMENTS)

187 PC: Murder, first degree, two counts
459 PC: Burglary, second degree, three counts
209 PC: Kidnapping for Robbery     211 PC: Robbery, first degree, five counts

OFFENSE ☐ MISDEMEANOR ☒ FELONY

**FOR YA DATA PROCESSING USE ONLY**

**FAMILY RELATIONSHIPS (Include significant relationships-Siblings-Children-Legal Guardian(s))**

| RELATION | AGE | NAME (LAST  FIRST  MIDDLE) | ADDRESS(NUMBER-STREET-CITY-STATE-ZIP CODE) | TELEPHONE NUMBER |
|---|---|---|---|---|
| FATHER | | TITCH, Walter | New Mexico | |
| MOTHER | | TITCH, Magdeline | Huntington Beach, CA | |
| Sister | 24 | TITCH, Debbie | 12692 Morningside #2, Garden Grove, CA | |
| Sister | 21 | TITCH, Becky | Fullerton, CA | |
| Sister | 12 | TITCH, Candy | As Father | |
| Brother | 19 | TITCH, Walter | Patton State Hospital, CA | |
| Brother | 11 | TITCH, Joseph | As Father | |

| CO-OFFENDERS (LAST NAME  FIRST  MIDDLE) | AGE | DISPOSITION |
|---|---|---|
| THOMAS, Brett M. | 18 | Plead Guilty to 5 counts 187 PC (Murder, first degree). Three concurrent life terms. CRB release date not determined. |

| DOES COUNTY HOLD MONEY FOR WARD | IS FEMALE WARD PREGNANT | | WARD HAS HISTORY OF MENTAL ILLNESS |
|---|---|---|---|
| ☐ NO  ☒ YES | ☐ NO  ☐ YES | ☐ NO. OF MONTHS | ☒ NO  ☐ YES (SUBMIT REPORT(S)) |

WARD HAS COMMUNICABLE/CHRONIC DISEASE/PHYSICAL HANDICAP    SCHOOL LAST ATTENDED    GRADE    DATE LAST ATTENDED
☒ NO  ☐ YES (SUBMIT MEDICAL REPORT(S))

| SIGNATURE OF PROBATION OFFICER PREPARING REPORT | NAME (TYPED) | DATE |
|---|---|---|
| | Linda J. Gill | - - |

**FOR YOUTH AUTHORITY USE ONLY**

| ACTION | REFERRAL STATUS | EXPIRATION DATE | AGE AT EXPIRATION |
|---|---|---|---|
| ☐ ACCEPT  ☐ REJECT | ☒ DIAGNOSTIC  ☐ FEDERAL  ☐ OUT OF STATE | | |

| DELIVER TO | DELIVERY DATE |
|---|---|
| ☐ NRCC  ☐ SRCC  ☐ VRCC  ☐ YTS  ☐ OTHER (SPECIFY) | 11-30-77 |

PAROLE SUPERVISOR AND OFFICE TO COMPLETE INITIAL HOME VISIT REPORT

REGISTRATION REQUIRED
☐ DRUG 11590 H&S    ☐ SEX 290 PC    ☐ A

| COMMENTS OR SUPPLEMENTARY INFORMATION | STATUS |
|---|---|
| | ☐ NEW COMMITMENT    ☐ ADDITIONAL COMMITMENT    ☐ RE-COMMITMENT |

| | NAME OF CLASSIFICATION SPECIALIST | DATE OF ACTION |
|---|---|---|
| | McHale | 11-11-7 |

**FOR RECEPTION CENTER AND CLINIC USE ONLY**

IDENTIFYING MARKS: TATTOOS: #13 between thumb and index finger on left hand.

| HEIGHT | WEIGHT | EYES | HAIR | COMPLEXION | DATE RECEIVED | CLINIC SUMMARY FACE SHEET |
|---|---|---|---|---|---|---|

PRIOR RECORD:

| Date | Offense | Action/Disposition |
|------|---------|--------------------|
| 2-11-72 | Truancy | Six months to 8-11-72 |
| 6-20-72 | Malicious mischief, throw trash on highway, curfew, throw substance at vehicle beyond control | Continue ward;continued Juvenile Hall Released 12-14-72 |
| 2-16-73 | Runaway | Continue |
| 3-2-73 | Burglary | Continue ward(mother has custody) Commit to Rancho Potrero |
| 3-21-73 | Escape | Committed to Manchester Drive |
| 4-20-73 | Escape | |
| 5-15-73 | Burglary | Committed to Manchester Drive |
| 10-16-73 | Assault with intent to commit murder, burglary(22) | Filed on direct. Released to Juvenile Hall. Disposition unknown |
| 10-28-73 | Threat of assault on counselor at Juvenile Hall | Isolated from group and counseled |
| 11-12-73 | Burglary, three counts | These matters were tried in Superior Court for the Orange County Juvenile Court on 12-6-73 |
| 12-20-73 | Armed robbery | Armed robbery was sustained;other five counts dismissed on motion by lawyer L. Mark. Committed CYA 12-7-73 |
| 12-28-75 | Vehicle theft | Re-committed CYA 1-6-76 |
| 9-10-76 | Burglary; auto theft | 11-5-76 escaped San Diego Juvenile Hall |
| 12-26-76 | Robbery, Assault with a deadly weapon | Case pending |

MOST RECENT OFFENSE:

On October 17, 1977, Mark Wayne Titch and his co-offender, Brett Matthew Paul Thomas, appeared in the Superior Court of the State of California in and for the County of Orange. At this time, Mark Titch entered a plea of guilty to eleven counts of an original sixteen-count indictment. He pled guilty to two counts of 187 PC, murder. He pled guilty to three counts of 459 PC, burglary. He pled guilty to five counts of 211 PC, robbery. He pled guilty to one count of 209 PC, kidnapping for robbery. Under Section 707.2 of the Welfare and Institutions Code, the Court referred Mark to the California Youth Authority for evaluation and report. The following portion of this Diagnostic Report will concern itself with the circumstances surrounding the sixteen-count indictment mentioned above.

Portion of indictment dealing with violation of Section 187 PC, murder, four counts: On January 21, 1977, at about noon, a motorcyclist riding through a vacant field in the hilly portion of Orange County (City of Orange) indicated he had observed a female Caucasian subject lying on the knoll of that hill. Police responded to that location and observed the body lying on its right side with the head in a northeasterly direction. A large quantity of blood was observed on the face of deceased and the head was lying in a rather large puddle of blood with the blood flowing in a westerly direction for approximately two-and-one-half to three feet on the ground. It was also noted that approximately three feet east of the victim's head was a second comparatively large puddle of coagulated blood approximately eighteen inches across.

According to the police report, the deceased was set into an upright position by the coroner's investigators and it was noted that she had a rosary clutched in her right hand. The right hand was clutching the rosary against her chest between her breasts.

## MOST RECENT OFFENSE - Continued:

It was also noted that the left arm was extremely loose and somewhat dangling in appearance from the shoulder area and was somewhat twisted lying beneath the body. Preliminary examinations indicated that there were two possible gunshot wounds in the mouth area of the victim. Police discovered a .22 calibre bullet that had fatty material on it and was partially flattened, lying on the blanket next to the victim's left shoulder. Several other .22 calibre casings were located as well as a spent 30.06 military type brass casing. There did not appear to be a struggle in the area.

According to reports, attempts were made to ascertain the identification of the victim. It was indicated that at approximately 9:00 p.m. police were contacted by the Garden Grove Police Department who stated that a report had been received from a Mr. Joseph Stoughton who lived in Garden Grove. It was indicated that Mr. Stoughton stated that his daughter had been missing since approximately 1:30 a.m. on January 21 1977. He had contacted all of her friends, her place of employment, and no one had heard from her; also, the Orange County Jail and local hospitals provided negative results. He further indicated that his daughter's car was at her residence. Subsequently Mr. Stoughton and his daughter, Mary Stoughton, arrived at the University of California at Irvine Medical Center and identified the victim as their daughter and sister, Laura Anne Stoughton.

On January 24, 1977, at about 7:35 p.m., officers were dispatched to a Rockview Dairy on Katella Street in Anaheim in response to an attempted robbery which had just occur and a clerk who had been shot. According to the police report, the victim, later identified as Ephraim Jacob Christian, was lying on the floor on his back with his head pointed in a southward direction toward the cooler inside the dairy. It was not that there was a large amount of blood around the victim's head and around the floor where he was lying and there were no vital signs.

Police subsequently talked with John Jonathan Christian who stated that he and the victim were partners in the dairy. John stated that he had gone back into the cooler area to clean it up and left his partner outside in the cash register area. He stated that he had been there for about ten minutes and he heard a car pull up through the drive-in portion. He stated that at that time he suddenly heard two or three shots and he became extremely frightened and laid down on the floor area of the cooler to remain unseen. He stated he then heard the suspect pushing the keys on the cash register attempting to open it, saying; "Which keys, which keys?" He stated that he assumed the suspect was talking to a partner; however, did not hear any reply.

According to the police, subsequent witness Lorrie Reed contacted them and stated that she had observed a vehicle in the drive-in area, heard the gunshots and then observed a suspect run from the passenger side of the vehicle into the dairy. She stated that she believed that something was transpiring and she did not want to get involved so she continued eastbound on Katella. Mr. Ephraim Christian expired at the scene.

On January 29, 1977, at about 3:56 a.m. police were contacted by Mrs. Nadine Duncan, South Volare Street. The police responded, code three, to possible murder scene. When they arrived it was noted that a victim identified as Aubrey Duncan was lying in front of the house with his feet facing west and his head down toward the east. It was noted that he had visible facial injuries and a pool of blood could be seen beneath him. A second victim, a female Caucasian identified as Denise Duncan, age eighteen, was lying in the entrance hall. It was noted that the door was open and a trail of blood was leading to the third victim identified as Mrs. Nadine Duncan who had contacted the police.

TITCH Mark        DP 0173        7 TS Clinic        12-23-77        CASE CONFERENCE        3

MOST RECENT OFFENSE - Continued:

According to the report, Mrs. Duncan appeared to be bleeding from the lower extremities. There was a laceration three inches long along the left ribcage area and other unidentified injuries. Mrs. Duncan indicated to police that she had heard a loud noise outside and she and her daughter had come to the door to investigate the sounds. She stated that her husband had just got home from work and immediately upon opening the door she heard a loud blast and was pushed back to the kitchen door, at which time she contacted the police. Mrs. Duncan indicated to them that she did not recall whether or not she had seen anyone; however, she heard a car leave.

According to the police, Aubrey Duncan was pronounced dead at the scene. Denise Duncan was transported to West Anaheim Community Hospital at 4:20 a.m. on that date. All attempts to save her life failed and she was pronounced dead at 5:00 a.m. January 29, 1977. Mrs. Duncan was transported to the Anaheim Memorial Hospital at 4:30 a.m.

It was indicated by the police that there were numerous bullet holes in the stucco outer walls near the porch, inside the residence, along the south and west walls; and bullet holes were also present in the screen and the front wooden door.

Reports from the Anaheim Police stated that on Wednesday, February 2, 1977, they were contacted by the California Highway Patrol, Victorville office, who stated that they had Brett Matthew Paul Thomas and Matthew Laphoon (later identified as Mark Wayne Titch) in custody for suspicion of grand theft auto. It was noted that the vehicle was stolen from the Anaheim area. On February 3, 1977, two officers were sent to Victorville to pick up the above listed suspects. Upon return to the Anaheim Police Department, Matthew Laphoon was positively identified as Mark Wayne Titch. He stated at that time, "You mother-fucking pigs, I don't want to talk to you. Send me to Juvenile Hall."

According to the police report, they first discussed the auto theft and burglary with Titch's companion, Brett Thomas, as well as involvement in residential burglaries. Due to conversations, both with Titch and Thomas, the following remaining counts of the Information (circumstances of each) were ascertained:

On November 19, 1976, at about 3:00 a.m., Mr. John Simons and his wife were awakened at their residence in Anaheim. Mrs. Simons saw a subject in the bedroom doorway who stated, "Don't move or I'll blow your head off." The subject then went through the dresser drawers, cut the phone cord, took the keys to their car, house and business, and left in the victim's 1975 Chevrolet Monte Carlo. Items missing from the home included about $280 cash, one .32 calibre Baretta handgun, and a box of ammunition.

On December 14, 1976, at about 4:20 a.m. Almir and Eleanor Bradley, their daughter and son were asleep in their residence in Anaheim when a subject entered the bedroom of Debra Bradley, placed a handgun to her head and asked her for money. It was indicated he took eleven dollars from her and then took her to the bedroom of her parents where he woke them with the gun at their daughter's head. It was indicated that he got two one-dollar bills, asked about guns and valuables and left via the front door. Latent prints taken from a window at the Bradley residence were later positively identified as those of Mark Wayne Titch.

3

MOST RECENT OFFENSE - Continued:

On December 18, 1976, at about 2:30 a.m., two subjects entered the bedroom of Mr. and Mrs. Glen Dittrich at their residence in Anaheim. The subjects had one handgun between them which they used to threaten the victims. It was indicated that they took approximately twenty-seven dollars from the victims' purse and wallet, the telephone wires were cut and both subjects left the house.

On December 21, 1976, at about 5:30 p.m., a subject went to the service window of Theo's Restaurant on South Magnolia in Anaheim, showed a handgun and demanded all of the clerk's money. The clerk complied and gave the subject about sixty dollars, and the subject fled the area on a bicycle.

On December 21, 1976, at about 6:30 p.m., a subject approached a clerk at the U-Tote Em Market on South Brookhurst in Anaheim, pulled a handgun from his belt area and demanded money. The clerk complied by giving him all the paper money and the tray containing all of the change. It was indicated that the subject left the area on foot.

On December 27, 1976, at about 4:00 a.m., a subject burglarized the home of Mr. and Mrs. Lowell Gray of Stanton. Items removed included car keys and the victims' 1976 Chrysler automobile.

On January 16, 1977, at about 9:00 a.m., Mr. Armando Jones returned to his residence in Anaheim and discovered that someone had entered his residence through a window, taken car keys from the dining room table and driven away in his 1976 Chevrolet Monte Carlo. It was noted that this is the same vehicle that Mark Titch and Brett Thomas were driving when arrested by the California Highway Patrol in Victorville.

On January 19, 1977, at about 11:00 a.m., victim Myrtle Irene King returned to her residence in Anaheim and found that someone had broken a large window to her kitchen door in order to gain entry to her home. The house had been ransacked and the following items taken: thirty-five dollars in coins, a Ruger model 10-22 carbine rifle, one British Enfield .303 carbine, two soft-sided rifle cases, two military .50 calibre ammunition cans containing approximately one thousand rounds of .22 calibre cartridges and approximately nine hundred rounds of military-type .303 ammunition.

The above offenses were consolidated in an Information filed on February 7, 1977. The original Information alleged four counts of violation of Section 187 of the California Penal Code, murder, a felony, and one count of violation of Section 277 CPC, attempted murder, a felony. The additional remaining offenses of burglary and robbery were added in an amended petition following investigation by police. As previously noted, a sixteen-count indictment was handed down and Mark Wayne Titch on October 17, 1977, entered pleas of guilty to two counts of 187 PC, murder, three counts of 459 PC, burglary, five counts of 211 PC, robbery, and one count of 209 PC, kidnapping for robbery.

CO-OFFENDERS:

Brett Matthew Paul Thomas, age eighteen. Convicted of three counts of 187 PC, murder. Sentenced to three life terms to be served concurrently. Presently, a tentative release date has not been set by the Community Release Board. (This information received from California Institution for Men, Records Section, on December 13, 1977.

TITCH, Mark        DP 0173        YTS Clinic        12-23-77        CASE CONFERENCE

5

WARD'S VERSION:

Mark admits his involvement in the instant offenses as listed above. He states that in some of the offenses and some that were never filed, he committed burglaries without the aid of Brett Thomas. However, the information contained above is basically factual. Mark states that only on one occasion did he "pull the trigger on anyone." This refers to the death of Laura Stoughton when both he and Thomas fired rifle shells into her body as she knelt with a crucifix. He states that any other shooting that was done either at the Duncan residence or the dairy was done by Brett Thomas.

PRESENTING PROBLEMS:

Mark Wayne Titch is an 18.5 year-old Caucasian youth who has been referred by the Court for a diagnostic study, pursuant to Section 707.2 of the Welfare and Institution Code. As mentioned above, Mark entered pleas of guilty to murder, robbery, burglary and kidnapping for purpose of robbery.

Mark's prior arrest record dates back to February 11, 1972, when he was first contacted for the offense of truancy. Subsequent entries include burglary, two escapes, assault with intent to commit murder, and property offenses numbering at least four. On a number of occasions Mark was ordered by the Court to be placed suitably. He was at Rancho Portrero for a short time in 1973 and finally committed to the Manchester Program (Orange County Juvenile Hall) in May of 1973. In December of 1973, Mark entered a plea of guilty to one count of armed robbery, the remaining counts numbering five being dismissed on the motion of his attorney. He was ordered committed to the California Youth Authority on December 7, 1973. Following his commitment to the CYA, Mark was placed at the Fred C. Nelles School where he had numerous adjustment problems. These adjustment problems were basically involved with attempted A.W.O.L.s. He was also noted to have been involved in several escape plots while at the Nelles facility. Consequently, he received an additional three months added time and his case was continued until April of 1975. Parole proposed objectives focused upon his obtaining part-time employment and school enrollment. A special condition of parole was that he not associate with co-offenders or friends in his old neighborhood. He was referred to parole on February 2, 1975, and parole in actuality on March 1, 1975. Upon his release he took up residence with his father in Anaheim and was enrolled in continuation school.

Collateral data indicates that due to unacceptable behavior such as failure to follow his father's instructions, Mark was arrested on June 25, 1975, and placed in the Orange County Juvenile Hall. He apparently was then released and returned to his father's residence but on July 9, 1975, the ward's father via telephonic conversation, reported to Mark's parole agent that Mark had run away, broken several of his father's flower pots, and put holes in the wall consisting of approximately $15 damage. At this point in time the parole agent indicates he attempted to intervene by having a conversation with Mark and his father. Furthermore, Mark was instructed that behavior of this type would result in his parole being violated.

On November 5, 1975, Mark was once again detained on a parole violation alleging possession of paraphernalia and possession of two huge keyrings. Due to the suspicious location of the keys which were stuffed into the toe of some tennis shoes underneath his bed, it was strongly believed that he may have been involved in some type of burglaries. Purportedly, while at the Southern Reception Center and Clinic of the CYA, Mark did admit to participation in one burglary, but denied involvement in other theft activities.

TITCH, Mark          DP 0175          YTS Clinic          12-23-77          CASE CONFERENCE

6

PRESENTING PROBLEMS - Continued:

On December 28, 1975, Mark was involved in the unlawful taking of a motor vehicle. On January 6, 1976, he was ordered recommitted to the California Youth Authority for this offense. Once again Mark was placed at the Fred C. Nelles School and follow a period of time was subsequently released to the Park Centre Halfway-House, operated by the CYA in San Diego. He had a violation hearing on April 1, 1976 by the Youth Authority Board as his adjustment was considered to be marginal.

On September 10, 1976, a petition was filed on behalf of Mark under Section 602 WIC in San Diego Juvenile Court, alleging one count of burglary and a separate count of auto theft. It was indicated that on October 12, 1976, Mark left Park Centre without permission, and on October 19, 1976, he was again arrested for burglary and auto theft. Finally, it was indicated that on November 5, 1976, he escaped from San Diego County Juvenile Hall. He was on escape status from the Park Centre Halfway-House at the time the instant offenses were committed.

Mark has had numerous opportunities for rehabilitative progress. He has been committ to at least three county institutions as noted, has had the services of psychologists and psychiatrists, and intensive supervision in the community. All of these techniques have resulted in apparent failure. It has also been noted that he is an extreme escape risk, having escaped both from county facilities and the CYA halfway house in San Diego. When this writer discussed Mark's history with him during the clinic interview, he stated that his family situation has been very poor and chaotic for about the past seven years. It was about seven years ago that the parents separated and later divorced and Mark states that he and most of his siblings have fluctuated from living with one parent to living with the other with minimal success. He further states that his involvement in the instant offenses was basically to provide himself with some adventure as well as monetary gain. He states that it was kind of a "fantasy" and his own little world. This writer questioned whether co-offender Thomas was any less culpable concerning the instant offenses, and Mark stated that "We were both just about equally guilty." Outbursts of temper have frequently been noted in assessing Mark's overall behavior, both in the community and while incarcerated. In March of 1976, he appeared to be unwilling to cooperate with his father or his parole agent and had several temper outbursts with a defiant attitude toward his father until he had to be taken into custody. The parole agent who was supervising Mark after he was first released in 1975 prior to recommitment indicated that his objectives appeared to be to do as he pleased. It was indicated that at that time Mark seemed to feel that he could come and go as he pleased, mouth-off, destroy other people's property if he got angry. It was also indicated that his other siblings took care of their fair share of maintaining the home, whereas Mark completely rejected his responsibility for contributing anything to the household. It should further be noted at this time that there is an outstanding Court case pending in San Diego concerning a robbery which occurred on December 26, 1975, where Mark fired five shots at a police officer, hitting him on each occasion. The officer did not expire; however, robbery and assault with a deadly weapon charges are pending, pursua to the outcome of this diagnostic study and the Court's perusal of same.

In summarizing this section of the diagnostic report, it should be noted that at the present time Mark appears to show little remorse for his involvement in the instant offenses. He did state to this writer that he sometimes feels bad concerning the victims, but at times does not really believe that the offenses are as serious as society may believe. A psychiatric diagnosis done in 1974 by the CYA indicated tha he possessed remarkably poor judgment for an individual of his age and intelligence and possibly would tend to act out more than an individual with the same characteris tics and same age. The diagnosis was that of adjustment reaction of early adolescen

| TITCH Mark | DP 0173 | YTS Clinic | 12-23-77 | CASE CONFERENCE | 7 |

<u>PRESENTING PROBLEMS - Continued</u>:

characterized by runaway and unsocialized aggressive action, depressive reaction, chronic, mild with some passive-aggressive and sociopathic personality traits. The Court is referred for its own consideration to a psychiatric diagnostic report prepared by Alayne Yates, M.D. at the Youth Training School Clinic. This report is attached to the overall clinic summary for the Court's consideration.

<u>CASE EVALUATION</u>:

Mark is the fourth of six children born to Walter and Magdeline Titch. The parents were divorced in 1968 and the father has had custody of Mark legally since that time. It should be noted that Mark has characteristically fluctuated in placement between the parents and various Court-ordered placements. He also has a stepfather and stepmother, respectively having married the mother and father. He has had some problems with the stepmother, Mrs. Blanche Titch, and she as well as the natural father were in concert with the recommendation prior to trial that Mark be tried as an adult for the instant offenses. None of the other siblings has been involved with law enforcement with the exception of Walter Titch, now age nineteen, who has had emotional problems resulting in at least two State Hospitalizations, one at Camarillo and one at Patton. However, criminal activities appear to have been in Mark's realm only, as the other siblings have not been involved, other than Debbie, age twenty-four, who apparently may have been peripherally involved by knowing something about the instant offenses. Nowhere in the record does it state that she was prosecuted or was any Information filed in her behalf. In discussing the possible criminality of his siblings, Mark feels that eleven-year-old Joseph may be going through the same type of problems that Mark encountered with his father. The father apparently is a strict disciplinarian and he and Mark have never gotten along. Mark feels that if his brother is indeed undergoing such an adolescent type of existence in the family home, that criminal activity could be "just around the corner for him.

In summarizing the family's attitude toward Mark, it should be noted that all quotes favored treatment at the adult level. Mr. Titch, Mark's father, stated that a long term of imprisonment or perhaps even capital punishment, if that were still in effect would be sufficient payment for the deeds which Mark has committed.

Educationally, Mark tests at the bright-normal level. He is apparently very close to averaging a tenth-grade score in his total battery of index tests taken at the Youth Training School Clinic. It should also be noted that unlike the adjustment problems which he encountered at the various placements, including Fred C. Nelles, his educational prowess was always seen as above average in his group. He did attend continuation school for a time while on his initial parole experience, but states that since his parole experience was so bleak and he became involved with other criminal activity, that his education has taken a back seat. If possible, Mark is interested in attending classes in both vocational and educational areas while incarcerated.

Mark's vocational history is practically non-existent. He admits to having worked on only one occasion and he can't remember exactly for how long this was. Suffice it to say his parole experiences, which now number two, plus the escape status, have not revealed any employment other than criminal activity. To reiterate, Mark is interested in improving himself; however, due to the phase in which the Court proceedings are presently hinged, i.e., this diagnostic study and the Court's later action, Mark's interest is in what is going to happen to him as far as incarceration rather than future goals concerning education and vocational trades.

## CASE EVALUATION - Continued:

Regarding drug usage, Mark states that he does not feel that drugs in any way contributed to his involvement in the instant offenses. He states that he has been a casual smoker of marijuana for a few years, but has not experimented on any type of regular basis with other drugs. He also states that he is a non-drinker as "liquor isn't good for your liver."

In summary, this young man comes for a diagnostic work-up following what can only be described as incredibly alarming instant offenses. In truth, this case is the most serious that this particular writer has ever come across in Youth Authority experience. This young man appears to adjust well in the ITS Clinic situation; however, only supposition could provide an answer to his total adjustment possibility concerning a CYA commitment. It is this writer's opinion that any type of incarceration which may provide treatment and training could well be negated by the callousness and apparent non-remorseful nature of this youth's character at the present time. The natural maturing process to the contrary, this writer sees a bleak future for rehabilitation in any realm in this case.

## I-LEVEL DIAGNOSIS:

Jesness Inventory and Behavior Checklist primary classification I-3, subtype Mp. Secondary classification I-4, subtype Na.

## MEDICAL EVALUATION:

No significant physical abnormalities. Ward is physically fit for CYA programs.

> I. Louis Hoffman, M.D.
> Chief Medical Officer

## PLACEMENT ALTERNATIVES:

Mark Wayne Titch was referred by Superior Court, County of Orange, for the purpose of a diagnostic study pursuant to Section 707.2 of the Welfare and Institutions Code. The case was staffed on December 29, 1977 and the following recommendation was agreed upon by the Staffing Committee in Mark's presence.

## RECOMMENDATION:

Mark Wayne Titch is not considered amenable to treatment programs offered by the California Youth Authority.

## REASONS FOR RECOMMENDATION:

(1)  The two counts of the indictment concerning 187 PC (Murder, first degree) preclude a recommitment to the California Youth Authority. This is a legal interpretation utilized in such cases.

(2)  Mark has been involved in California Youth Authority programs since age fourteen with no discernable change in his pattern of criminality; rather, his danger to society has escalated to extreme proportions.

(3)  Psychiatric material connotes the following:

    (a)  Although self-insight is present, motivation for change is virtually non-existent.

9

REASONS FOR RECOMMENDATION - Continued:

(b) Due to this lack of motivation for change, Mark is not seen as a candidate for psychotherapy.

(c) The psychiatric diagnosis of sociopathic personality (severe) with homicidal tendencies precludes any remediation that can presently be offered by the California Youth Authority.

STAFFING COMMITTEE:

Louis R. Hernandez, Acting Program Manager
James F. Valante, Parole Agent I
Janet A. White, Staff Psychologist (Clinical)
Timothy Murphy, Instructor
Robert Jager, Senior Youth Counselor

Dictated by:  James F. Valante
Parole Agent I

JFV:lkd

TITCH, Mark    DP# 0173    YTS Clinic    12/23/77    CASE CONFERENCE    10

PSYCHIATRIC EVALUATION

TITCH, Mark
DP0173

## REASON FOR REFERRAL:

Mark is an 18 year-old Caucasian male seen for psychiatric evaluation for determination of suitability of Youth Authority program. His charges include murder, burglary, robbery, and kidnapping for robbery. He has admitted to the murder of an unarmed girl who he had abducted from her home. In addition there is another case pending which charges him with having shot a fleeing policeman in the back five times. His prior record dates back to 1972, and shows a steady escalation of severity of offense. In 1973 he was charged with assault with intent to commit murder and burglary, later with threat of assault on counselor in juvenile hall, and later still in 1973 armed robbery. At that time he was committed to the Youth Authority where he was placed at Nelles. He was recommitted at the Youth Authority in 1975 for vehicle theft and has several similar charges since that time.

In the court report an interview with Mark's mother is described. She stated that Mark never showed any particular remorse for anything he had done in the past. Father indicated that Mark could charm people when he wished and that he is a different person when released from custody. Father also related that Mark had stolen a neighbor's gun and another child's bicycle at the age of fourteen. Mark subsequently fired at the other boy with the intent to kill him, but missed. He felt that Mark would just as easily have killed him and his wife and in fact had received a letter from Mark making just such a statement.

Apparently Mark was seen by a psychiatrist in 1973 while at Orange County juvenile hall. There it was noted that he readily projected all blame for his antisocial activity onto his parents. Both passive aggressive and sociopathic personality traits were noted. A parole agent who was supervising Mark after his first release in 1975 indicated that Mark was quite irresponsible and not loath to destroy other people's property when angry. The other siblings were caring for their share of maintaining the home, but not Mark. However he was getting high grades in school although attendance has always been sporadic.

## INTERVIEW MATERIAL:

Mark appeared as a rather pale, thin young man who was quite cooperative within the interview except that he did not wish to discuss the details of the crimes. However he did accept full responsibility and was quite candid in response to any direct question. Prevailing affect was a mixture of hostility and depression, the hostility chiefly indicated by the amount of emotional distance maintained throughout the interview. The depression seemed chronic and unremitting, accompanied by feelings of hopelessness, alienation, and dehumanization. He was able to verbalize this and see it in perspective. Although he showed

/1

TITCH, Mark
    DPO173

-2-

suprising amount of insight, there seemed to be no motivation toward making a
commitment to change. He appeared of above average intelligence with no in-
dication of organic brain disease nor psychotic process. Certainly reality
testing was intact as far as his assessment of his crime, current situation
view of the immediate future. He tended to isolate the murder from the rest of
his personality, seeing it as "not me". However he did see all of his other
activities as quite consistent with his life style.

Mark described the commitment offense as the worst that ever happened to him
because he had always gotten himself out of trouble before. At present he
absolutely will not think about what happened and is not troubled by anxiety.
His appetite remains good and he does not experience insomnia or nightmares.
However he does see his act in retrospect as stupid and wrong. Although he
guards against feeling anything he did say that at first he felt bad about what
he did. Yet he felt unable to change not only what happened in the past, but
the current pattern of his life. He has wondered what made him do something
like that, but has come up with no answers. He assumes that he "just graduated"
from lesser activities to more serious ones. He describes his pattern as one
of initially feeling hopeful when he forms a relationship, but he later becomes
depressed, no longer cares, and gives up. This is the junction on which antisocial
activities take place.

Following the time when he left Park Center Halfway House he traveled to live with
his sister in Anaheim. There he supported himself through dealing in drugs
and in robberies. He thought that he did not want to get his sister in trouble
and so he moved out of her house to an apartment close by where he lived with
a friend of his sister: He began to associate with one of her boyfriends, who
became his co-partner. The two girls at that apartment both developed strongly
ambivalent relationships with Mark. He assessed his girlfriend as one who had
never really told him the truth but who stuck by him in spite of her cognizance
of all his antisocial activities. In fact they only dissolved the relationship
approximately one week prior to his being sent to the Youth Authority for ev-
aluation. He talked long hours with the other girl in that residence whom he describ
as "like a sister". However there seemed to be little genuine closeness, and
at times    violent activities within the group. Mark was generally aimless,
without long range plans, just living "one day at a time". He was not attempting
to find a job and had no motivation toward schooling.

Mark would like eventually to be a long distance truck driver. He feels that -
if he did have a good, well paying job that he would not resort to crime. He
indicates that he has never had a chance for vocational training although he
did have some school experience at Nelles which he tends to devalue. He did
enjoy a brief stay at continuation school after release from Nelles when he
apparently had a job as well. However this was terminated when his father searched
his room and found keys to a stolen car. Father called the parole officer but
did not level with Mark about who had found the keys. Following that incident,
Mark didn't try to find a job or return to school. Mark sees himself as able

12

TITCH, Mark         DPO173        YRS filing    12/21/00        PSYCHIATRIC EVALUATION

TITCH, Mark
DP0173

to handle most situations, such as Youth Training School. However he is not sure whether he will be able to make it or not in a state prison. He wonders if he could withstand a gang of others intent upon homosexual rape.

Overall achievement in school or vocation has been quite small. He did apparently show good potential and the ability to master subject matter while in high school. He was only suspended once for fighting, and that never reoccurred. He did admit to ditching and has never received a driver's license.

Mark speaks favorably of a relationship which he had in San Diego with a counselor. However he never talked about past life and maintained a certain superficiality. This has been quite characteristic of his relationships with all people although he is increasingly of the opinion that "people are dogs". He feels that he can never trust nor should he ask for help from others, but only depend upon himself. He often feels exploited and in fact tends to select individuals who are likely to exploit him. Once he perceives the slightest hint of dishonesty he tends to break off the relationship. His perceptions may change rapidly so that his behavior appears erratic. He has really never had a long term girlfriend or one that he could really trust.

FAMILY HISTORY:

Mark was raised as the fourth of six children. He often felt allied with his oldest sister, Debbie, and used by his next older sister, Brenda. Oldest sister was closest to mother although they would often battle physically together, breaking furniture and glassware indiscriminately. This oldest sister also had fist fights with father and was soon in and out of the house. Older sister Brenda was father's favorite and has recently taken over father's maintenance business. She was characterized as a liar who would blame things on him which father always believed. Father punished him more and more severely until finally Mark began to run away. Father never punished him after he was returned home from runaway episodes but would only talk to him. This began the "graduation process" or continued alienation. Since that time he has not made meaningful relationships and feels generally empty and depressed. He dates much of his problem back to the age of eleven when father told mother to leave the family. He saw this as completely justified as were many beatings of mother by father. Mother was stealing money from father, whose credit was good, by forging checks on his account. In addition mother was apparently unfaithful and father had beaten up her boyfriend on at least one occasion. Even after mother was out of the house, she would return to stay for periods of time when father would be elsewhere. However there was no meaningful relationship between Mark and mother. He described her as coming to visit him when he was at Nelles where she brought him expensive presents. She also gossiped to him, undercutting both his father and sister in order to impress her new boyfriend whom she subsequently married. When Mark was little mother was described as having an explosive temper and she would beat with a belt. He portrayed himself as more responsible than other children and not as likely to be beaten. He thought that he and Becky had done most of the work, but that Becky had

DP0173    YTS Clinic    12/20/77    PSYCHIATRIC EVALUATION

TITCH, Mark
DP0173

-4-

exploited him for her own benefit. In the early years father placed him on restriction most of the time. Father also had a fifth of vodka in the garage and was frequently intoxicated at which time he was irritable, nagging, and would yell and hit at the children. The policemen were often at the house because of fights and family problems. Father no longer hit Mark after Mark hit back and gave father a bloody nose.

Mark described his closest relationship with his oldest sister whose boyfriend was the co-partner in crime. This sister also sheltered him from the police. His next closest relationship within the family was with his little brother. The two would play football in the house which was quite destructive to the furnishings. This little brother has already begun a pattern similar to Mark's in that he steals whatever is available. The two roomed together, and little brother would often try to steal Mark's money. Marks attitude towards this was one of amusement and pleasure. Both of them maintained an avid interest in the old gangster stories and movies. They watched "Bonnie and Clyde" and other such epics. The little brother was called "Pretty Boy Floyd" while Mark called himself "Dillinger".

### SUMMARY:

Mark appeared as an extremely distrustful and emotionally barren young man who in fact has no reason not to kill. At any given point in time he most likely does not intend to become involved in unusally violent crime, but has no motivation not to do so. Thus he can be easily motivated in that direction depending upon minor circumstances. The end product is immense disregard for the feelings or rights of others. Mark has been unable to make meaningful relationships and has probably never been able to do so. However there has been a progressive deterioration and distancing over the past seven years. Beneath this and as a consequence of it, is an underlying depression best characterized as emptiness. He perceives his environment as dangerous, unpredictable, destructive, and as exploiting him. Etiological factors are difficult to assess because of the degree of projection which is most likely involved in the history. However it seems highly probable that paternal alcoholism, maternal dishonesty, and habitual violence were part and parcel of Mark's early life.

In spite of these severe characterological problems, Mark does show excellent intelligence and is able to be both self-critical, somewhat insightful, and straightforward. Unfortunately he does not have the motivation to apply these strengths constructively and is highly likely to utilize them in the service of manipulating circumstances to his own advantage. He shows an extremely high and continued potential for violence which is unlikely to change. In fact the potential may be expected to increase over the foreseeable future consquent to the environment custody. He does not show the motivation for characterolcgical change so that he is not a candidate for psychotherapy.

### DIAGNOSIS:

Sociopathic personality disorder (severe) with homicidal potential.

-14-

TITCH, Mark          -5-
   DF0173

RECOMMENDATIONS:

The Youth Authority cannot offer Mark suitable remediation.

Alayne Yates, M.D.
Consulting Psychiatrist

AY:amc
12/20/77

15

LAST GRADE PLACEMENT:

| GRADE LEVEL | 1-6 | (7) | 8 | 9 | 10 | 11 | 12 | H.S. Grad. | Col-lege | |
|---|---|---|---|---|---|---|---|---|---|---|
| | ☐ | _____ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ (40) |
| D.P. CODE (39) | (1) | Specify (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | |

TEST

TAKEN: (Level and form___D-1___) 12-5-77   GRADE PLACEMENT
                          (date)

| | | |
|---|---|---|
| Reading Vocabulary | 10.0 (41-43) | 9.7 |
| Reading Comprehension | 9.3 (44-46) | |
| Arithmetic Reasoning | 6.5 (47-49) | 7.0 |
| Arithmetic Fundamentals | 7.9 (50-52) | |
| Mechanics of English | 9.1 (53-55) | 9.5 |
| Spelling | 10.4 (56-58) | |
| | TB | 8.5 |

WECHSLER:_____          I.Q. SCORES
         (date)

| | | |
|---|---|---|
| Verbal I.Q. | _____ | (59-61) |
| Non-verbal I.Q. | _____ | (62-64) |
| Full-scale I.Q. | _____ | (65-67) |

GATB: 12-8-77          APTITUDE SCORES
      (date)

| | | | | | | |
|---|---|---|---|---|---|---|
| G | General | 120 | (39-41) | P | Form perception | 126 (51-53 |
| V | Verbal aptitude | 112 | (42-44) | Q | Clerical perception | 71 (54-56 |
| N | Numerical aptitude | 119 | (45-47) | K | Motor coordination | 90 (57-59 |
| S | Spatial aptitude | 125 | (48-50) | F | Finger dexterity | 89 (60-62 |
| | | | | M | Manual dexterity | 109 (63-65 |

SUPPLEMENTAL TESTS (current and past):

| NAME OF TEST | DATE GIVEN | SCORES |
|---|---|---|
| esness Inventory and Behavior Checklist | 12-2-77 | |

COMMENTS: Steady Worker. Very high scores on GATB except mechanical scores.
          R-5
          A-3

     R

    TITCH, Mark                DP0173              YOUTH TRAINING SCHOOL CL
       NAME                   YA NUMBER
      (12-36)                  (7-11)                CLINIC TEST

YA 1.622 Rev. 9 (1-75)                        12-8-77        ___16

## GROUP LIVING:

Mark has not had any problems adjusting to the Youth Training School Clinic program since his arrival. Mark has been in the system before and knows how to manipulate to get what he wants. Since he has been at the Clinic he has not shown any signs of violent tendencies but has a negative attitude towards the the system.

Mark follows directions of staff and company rules. He has volunteered for work details and was a member of the Christmas Decoration Committee. Mark gets along with his own ethnic group. He participates in company recreation activities.

Due to Mark's physical stature and maturity, he will find it hard to adjust to the Department of Corrections.

F. D. Pitassi
Youth Counselor

FDP:jg

**For D.P. Use Only**

| RELIG. | | MARITAL | C | S | REGIS. | DEPEND. |
|---|---|---|---|---|---|---|
| 0 1 2 3 4 9 | | 0 1 2 3 | | | 0 1 2 3 4 | 0 1 2 3 9 |

| DLQ | DATE/DLQ | COMMITS. | DATE/COMMIT. |
|---|---|---|---|
| | | 0 1 2 3 4 5 9 | |

| ESCAPE | CO-OFF. | I-LEV. | P/H | S/R |
|---|---|---|---|---|
| 0 1 2 3 4 9 | 0 1 2 3 4 5 9 | | | |

| O | D | S | H | M | D/O | W/O | ALC | A/O | MAR | NEED |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

---

DRUG ABUSE (check one or more)

_____ Unknown (0)

_____ None (1)     _____ Stimulants (2)

_____ Opiates (2)   _____ Hallucinogens (2)

_____ Depressants (2)  X Marijuana (2)

WERE DRUGS ASSOCIATED WITH OFFENSE

_____ Unknown (0)

  X  No (1)

_____ Yes (2)

WERE WEAPONS ASSOCIATED WITH OFFENSE

_____ Unknown (0)

_____ No (1)

  X  Yes (2)

OVERALL ALCOHOL USAGE

_____ Unknown (0)

  X  None (1)

_____ Slight to moderate (2)

_____ Excessive (3)

WAS ALCOHOL ASSOCIATED WITH OFFENSE

_____ Unknown (0)

  X  No (1)

_____ Yes (2)

MARITAL STATUS OF PARENTS

_____ Unknown (0)

_____ Never married (1)

_____ Presently married (2)

  X  Divorced/separated/decsn (3)

---

PROGRAM NEED

Place a "1" in the category of the most urgent program need. Place a "2" for the next most urgent program need (optional).

_____ DRUG AND ALCOHOL TREATMENT (A)

_____ PSYCHIATRIC TREATMENT (B)

_____ INTENSIVE COUNSELING (C)

_____ SUPPORTIVE ENVIRONMENT (D)

_____ DEVELOPMENTAL (E)

_____ HIGHLY STRUCTURED (F)

_____ SEXUAL REORIENTATION (G)

_____ FORESTRY CAMP (H)

_____ VOCATIONAL-WORK EXPERIENCE (I)

_____ HIGHER EDUCATION (J)

_____ SHORT-TERM REENTRY (K)

_____ "REGULAR" PROGRAM (L)

_____ OTHER (X) _____

---

TITCH, Mark     DP 0173     YTS Clinic     12-23-77     SIGNIFICANT INFORMATION

10

**EXHIBIT 6**

CDC Cumulative Case Summary

CUMULATIVE CASE SUMMARY
LEGAL STATUS

| COMMITMENT NAME | | DOB | AGE | BIRTHPLACE | AGE |
|---|---|---|---|---|---|
| TITCH, Mark Wayne | | 7-7-59 | 19 | California | Whit |

| RECEIVED (DATE) | COUNTY | | JUDGE | | CASE NUMBER |
|---|---|---|---|---|---|
| 1-18-78 | Orange | | J.K. Turner | | C-37693 |

SENTENCING DATA

CT 2: ROBBERY 1ST W/USE F'ARM (211/12022.5 PC) 5-LIFE & APO 5-LIFE CS
CT 4: ROBB 1ST W/USE F'ARM (211/12022.5 PC) 5-LIFE & APO 5-LIFE CS
CT 6: ROBB 1ST W/USE F'ARM (211/12022.5 PC) 5-LIFE & APO 5-LIFE CS
CT 7: ROBB 1ST W/USE F'ARM (211/12022.5 PC) 5-LIFE & APO 5-LIFE CS
CT 9: ROBB 1ST W/USE F'ARM (211/12022.5 PC) 5-LIFE & APO 5-LIFE CS
CT 10: BURG 2ND (459 PC) 1-15 YEARS
CT 11: BURG 2ND (459 PC) 1-15 YEARS
CT 12: KIDNAP FOR RANSOM W/USE F'ARM (209/12022.5 PC) LIFE & APO 5-LIFE CS
                              Robbery
CT 13: MURDER 1ST (187 PC) LIFE
       DEFENSE ATTORNEY: JAMES STOLTER
       INVESTIGATING AGENCY: S.O.
CT 15: BURG 2ND (459 PC) 1-15 YEARS
CT 16: MURDER 1ST (187 PC) LIFE     ALL COUNTS CC
       DEFENSE ATTORNEY:  JAMES STOLTER
       INVESTIGATING AGENCY:  S.O.

| ISL | DSL |
|---|---|
| MINIMUM TERM   Life | TOTAL TERM |
| MINIMUM ELIGIBLE PAROLE DATE   7 Years (·2-4-84) | MAXIMUM RELEASE DATE |
| FIRST BOARD APPEARANCE   10/78 | TOTAL GOOD TIME CREDITS AVAILABLE (DAYS) |
| WEAPON   22 Rifle | MINIMUM RELEASE DATE WITH FULL GOOD TIME CREDITS |
| PRIOR FELONY   None P&P | MINIMUM RELEASE DATE ADJUSTED BY GOOD TIME CREDITS LOST (pencil only) |
| CRIME PARTNER | DISPARATE REVIEW |
| THOMAS, Brett; B-87334 | PRECONFINEMENT CREDITS   337 Days Per 2900.5 PC   11 Days Postsentence   0-11-14  TOTAL CREDITS |

Amended Abstract Dated 3-7-79 Changes Kidnap for Ransom to Kidnap for Robbery.

TITCH     B-89549          RC-C        MLK/ec      3-2-78     Page 1



| RECEIVED (DATE) | COUNTY | | JUDGE | | CASE NUMBER |
|---|---|---|---|---|---|
| 4-5-78 | San Diego | | B.W. Hamrick | | CR-42845 |

**ENTERING DATA**

CT 2: ADW ON A PEACE OFFICER W/USE OF F'ARM (245b/12022.5 PC)
    6 MO-LIFE & APO 5-LIFE CS & CCWPT

| ISL     See Case #C37693 | DSL |
|---|---|
| MINIMUM TERM
6 Mo + APO 5 yrs CS = 5 yrs, 6 mos. | TOTAL TERM |
| MINIMUM ELIGIBLE PAROLE DATE | MAXIMUM RELEASE DATE |
| FIRST BOARD APPEARANCE | TOTAL GOOD TIME CREDITS AVAILABLE (DAYS) |
| WEAPON | MINIMUM RELEASE DATE WITH FULL GOOD TIME CREDITS |
| PRIOR FELONY | MINIMUM RELEASE DATE ADJUSTED BY GOOD TIME CREDITS LOST (pencil only) |
| CRIME PARTNER | DISPARATE REVIEW |
|  | PRECONFINEMENT CREDITS |

55 Days Per 2900.5 PC
8 Days Postsentence
63 Days (0-2-4)  TOTAL CREDITS

HAUPU, William B-84412

TITCH    B-89549        RC-C    MLK/dc    4-14-78    Page 1a

-2-

## CIRCUMSTANCES OF OFFENSE

COUNT 2,4,6,7,9: ROBB 1ST W/USE F'ARM, COUNT 10,11: BURG 2ND
COUNT 12: KIDNAP FOR RANSOM W/USE F'ARM, COUNT 13: MURDER 1ST,
COUNT 15: BURG 2ND, COUNT 16: MURDER 1ST - ORANGE - C-37695

FACTS:
CYA Diagnostic Report:          "...Count 2: On 11-19-76...victim and
his wife were awakened at their residence in Anaheim. Victim saw
Titch in the bedroom doorway who stated, "Don't move or I'll blow
your head off. I have a gun." Titch then went through the dresser
drawers, cut the phone cord, took the keys to their car, house and
business, and left in the victim's 1975 Chevrolet Monte Carlo. Items
missing from the home included about $280 cash, one .32 calibre
Baretta handgun, and a box of ammunition...

Count 4: On 12-14-76...Victims, their daughter and son were asleep
in their residence in Anaheim when Titch entered the bedroom of
daughter, placed a handgun to her head and asked her for money. It
was indicated he took eleven dollars from her and then took her to
the bedroom of her parents where he woke them with the gun at their
daughter's head. It was indicated that he got two one-dollar bills,
asked about guns and valuables and left via the front door. Latent
prints taken from a window at the victim's residence were later posi-
tively identified as those of Mark Wayne Titch...

Count 6:  On 12-18-76...Titch & Thomas entered the bedroom of victims
at their residence in Anaheim. Titch & Thomas had one handgun be-
tween them which they used to threaten the victims. It was indicated
that they took approximately twenty-seven dollars from the victims'
purse and wallet; the telephone wires were cut and they left the
house...

Count 7: On 12-21-76...Titch went to the service window of Theo's
Restaurant...in Anaheim, showed a handgun and demanded all of the
clerk's money. The clerk complied and gave the subject about
sixty dollars, and the subject fled the area on a bicycle...

Count 9: On 12-27-76...Titch burglarized the home of victims of
Stanton. Items removed included car keys and the victims' 1976
Chrysler automobile.

Count 10: On 1-16-77...Victim returned to his residence in Anaheim
and discovered that someone had entered his residence through a
window, taken car keys from the dining room table and driven away
in his 1976 Chevrolet...This is the same vehicle that Mark Titch
and Brett Thomas were driving when arrested by the California High-
way Patrol...

TITCH      B-89549           RC-C       MLK/dc     3-2-78    Page 2

3

Count 11: On 1-19-77...victim...returned to her residence in Ana-
heim and found that someone had broken a large window to her kitchen
door in order to gain entry to her home. The house had been ran-
sacked and the following items taken; thirty-five dollars in coins,
a Ruger model 10-22 carbine rifle, one British Enfield .303 carbine,
two soft-sided rifle cases, two military .50 calibre ammunition cans
containing approximately one thousand rounds of .22 calibre cartridges
and approximately nine hundred rounds of military-type .303 ammunition...

Count 12 & 13: On 1-21-77...a motorcyclist riding through a vacant
field...City of Orange...observed a female Caucasian subject lying
on the knoll of that hill. Police responded to that location and ob-
served the body lying on its right side with the head in a northeasterly
direction. A large quantity of blood was observed on the face of
deceased and the head was lying in a rather large puddle of blood...
Approximately three feet east of the victim's head was a second com-
paratively large puddle of coagulated blood approximately eighteen
inches across...

...the deceased was set into an upright position by the coroner's
investigators and it was noted that she had a rosary clutched in her
right hand. The right hand was clutching the rosary against her
chest between her breasts...The left arm was extremely loose and
somewhat dangling in appearance from the shoulder area and was some-
what twisted lying beneath the body...Preliminary examinations
indicated that there were two possible gunshot wounds in the mouth
area of the victim...There did not appear to be a struggle in the
area...

D.A.'s
203.01
statement

Titch and Thomas were at the side of the victim's residence trying
to gain entry when victim drove up in her driveway. She was abducted
by Titch and Thomas and put into the trunk of their car. She was
taken into a remote area of the county. There, she was directed up
a hill. At that location, Thomas told the police, Titch tried to
rape victim but couldn't because she was a virgin. Then, the two
decided to jointly execute her. Thomas' gun jammed, Titch's did
not. Victim was shot in the shoulder and went down. She was pray-
ing for her life. Titch & Thomas discussed in her presence that
she would be killed to prevent her from later identifying them.
Titch shot her twice in the mouth...

Count 16: On 1-29-77...police responded...to possible murder scene.
When they arrived...victim #1...was lying in front of the house with
his feet facing west and his head down toward the east. It was noted
that he had visible facial injuries and a pool of blood could be
seen beneath him. A second victim, a female Caucasian...was lying
in the entrance hall...the third victim...had contacted the police...
Victim #3 indicated to police that she had heard a loud noise out-
side and she and her daughter had come to the door to investigate
the sounds. She stated that her husband had just got home from

TITCH    B-89549         RC-C        MLK/dc    3-2-78    Page 5

4

work and immediately upon opening the door she heard a loud blast and was pushed back to the kitchen door, at which time she contacted the police...

After following victim #1 home from work, Titch, the driver, stopped the car in front of victim's home. Victim went to the front door to unlock it. Thomas pointed the .22 caliber rifle from the passenger's seat. Titch was supposed to put the car in neutral and run the engine so as to muffle the gun shots. Instead, he got it in gear and the car went forward. He backed the car up. Thomas shot victim #1 several times with the rifle. This noise awoke victim #3 and her daughter. They went to the front door. Victim #3 opened the door and stepped onto the porch - seeing her husband dead. She was then shot twice with the .22 caliber rifle - causing loss of a portion of her breast. She fell to the porch. She called to her daughter - Denise was unconscious from being shot three times - who subsequently also died. Then, victim #3 was shot by Thomas with a shotgun. Mr. Thomas had run out of ammunition for the .22 caliber rifle (10 shots).. She then crawled over the body of daughter and went to the phone to call the police..."

ADDITIONAL INFORMATION:
RECOMMENDATION OF PROBATION OFFICER: "No probation officer report."

VIEWS OF JUDGE:
1203.01 STATEMENT: "I can add little to the statement of the District Attorney other than that I concur in it completely. In my view, to ever release this man would be tantamount to authorizing multiple murders upon his release."

VIEWS OF D.A.:
1203.01 STATEMENT: "I have been a Deputy District Attorney for ten years. I tried my first death penalty case seven years ago and have been trying them regularly since then. For the last four years, I have supervised the Orange County District Attorney Homicide Unit. I have never seen any one more deserving of the death penalty than Titch or Thomas. They should never be released from custody. Titch plead guilty to 209, 187, first degree - two counts, five P.C. 211 with use of firearms and three burglaries. If I thought taking this case to trial would have caused Titch or Thomas to serve even one more year in custody, I would have done it gladly. The victims lives should never be demeaned by the release of either Titch or Thomas."

INMATE'S VERSION: "None in file to date."

COUNT 2: ADW ON A PEACE OFFICER W/USE OF F'ARM - SAN DIEGO - CR-42845

FACTS:
PROBATION OFFICER'S REPORT: "...On 12-26-76, Titch and...Haupu, arrived in San Diego...on 12-27-76...they drove to...the Base Liquor Store...National Avenue...

Titch, armed with a .32 caliber automatic Beretta, proceeded to the open business and contacted the clerk inside and made demands for money. The clerk did not speak English and the conversation was interrupted by the owner of the business who also observed the defendant armed with a .32 caliber weapon tucked in his waistband. Upon the demand for money...the owner placed the money from the cash register into a brown paper bag and handed it to Titch... $450 was taken from the store.

As Titch exited the front of Base Liquor, he was observed by an officer...who was on patrol in a marked police unit...the officer pursued Titch...in the direction where his accomplice and the vehicle were waiting...He ordered Titch to stop and walk back to his location...Titch started walking toward the officer and drew a weapon and told the officer to "freeze". As the officer attempted to take cover behind his parked vehicle, Titch fired one time, striking the officer in the back. As the officer continued to find cover by moving along the side and toward the front of his parked vehicle, he was pursued by Titch who fired eight or nine times at the officer, striking him with five slugs. Titch then fled south and jumped into his waiting vehicle which was driven from the scene rapidly by... Haupu.

On 2-1-77, Titch was taken into custody by the CHP in the area of Victorville, California..."

ADDITIONAL INFORMATION:
RECOMMENDATION OF PROBATION OFFICER: "Criminal proceedings be suspended pursuant to 707.2 W&I."

VIEWS OF JUDGE:


VIEWS OF D.A.:


TITCH    B-89549                    RC-C        MLK/dc    4-14-78    Page 4a

6

# CASE SUMMARY

**PARENTS:**

| | | Occupation | Address |
|---|---|---|---|
| Father: | Walter Titch | 55 Music shop owner | Demming, N.M. |
| Mother: | Magdeline (Mitchell) Nicks-39-factory worker | Heil St., Westminster, CA |

**SIBLINGS:** Subject-18-C/L companion

| | | | |
|---|---|---|---|
| 1. Debbie Titch | 24 | Welfare recipient | Garden Grove, CA |
| 2. Becky Titch | 22 | Unknown | Fullerton, CA |
| 3. Walter Titch | 19 | None. | Fullerton, CA |
| 4. Candy Titch | 12 | Student | New Mexico, |
| 5. Joe Titch | 11 | Student | New Mexico |
| 6. | | | |
| 7. | | | |

**MARRIAGES:**

| | Age | Place | Date | Outcome |
|---|---|---|---|---|
| 1. States none. | | | | |
| 2. | | | | |
| 1. Greta Mc Millan (Not Legalized) | 18 | Anaheim, CA | 10/76 | Separated 6/77 |
| 2. | | | | |

**CHILDREN:**

| | Age | Support | Residing |
|---|---|---|---|
| 1. States None. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |

**FAMILY ARREST HISTORY:** States (bro) Walter - mal. misch.
(E)                        (sis) Becky - truancy

**RESIDENTIAL PATTERN:** Born and reared in Urban Southern California.
(K)

**RELIGION:** Subject: Athiest    Spouse:    Parents: Catholic

**EDUCATION:** Age Left School: 17  Claimed Grade: 10  Measured Grade: 8.5  Verify: No

**INTELLIGENCE LEVEL:** Average.

**JOBS:** Firm    Address    Title    Length    Veri

| | |
|---|---|
| 1. States has never held full time employment | |
| 2. | |
| 3. | Union: None. |

**Disability:** States none.

**S.S. No.:** Unknown    **Occupation:** (H) None.

**FINANCIAL:** States no assets or liabilities

**MILITARY:** Service Branch:    Rank:    Verify:    Serial No.

States none.
Date Entered:    Date Discharge:    Type Discharge:

Disciplinary:    Duties:    Disability:

| Time in State Before Comm. Offense: Native | Age 1st Arrest: 12 | Age 1st Comm. 12 |
|---|---|---|

**Offense and Inst. of 1st Commitment:** Burglary - county juvenile camp    11/76 Juv. Hall

**Escape History:** 3/73 J.H.; 4/73 J.H.; states Camp Potrero-2('73);10/76 CYA Halfway H

**DELINQUENCY HISTORY:** 13 prior juvenile arrests include escapes (3), burgs (4),
(G)  GTA (2), armed rob., aslt w/I commit murder, & threat of aslt on juv. h
States N/R.

**ALCOHOL:** (F) States social drinker

**NARCOTICS and DRUGS:** Addicted: None.; User: Marij., hashish, PCP, peyote.,
Exper: LSD.

None____ Heroin____ Other Opiate____ Addict____ User____ Suspect____ Marijuana____ Amphetamines____

**First Used in:**    Rate of use:

**COMMENTS:** (A)    (L)

(C)

*counselor atarting age 12.

| No. B-89549 | Name TITCH | RCC | 4/24/78 | ws | Page 5 |
|---|---|---|---|---|---|

GA-2 (Rev. 8-75)

7

PSYCHOLOGICAL REPORT

TESTS ADMINISTERED:  Army General Classification Test, Shipley-Hartford, California Achievement Test, Minnesota Clerical, Minnesota Paper Form Board, DAT Mechanical Reasoning, C.O.P.S., Minnesota Multiphasic Personality Inventory, Sentence Completion, Draw-A-Person, Who-Are-You, Personal Information, Diagnostic Interview.

INTRODUCTORY STATEMENT:  Subject is an eighteen year old Caucasian man imprisoned at this institution for Counts II, IV, VI, VII, and IX, all for Robbery First Degree with Use of Firearm, violation of Section 211/12022.5 P.C; Counts X, XII, and XV, each count for violation of Section 459 P.C., Burglary Second Degree; and Count XII, Kidnap for Ransom with Use of Firearm, violation of Section 209/12022.5 P.C.; and Counts XIII and XVI, each count for violation of Section 187 P.C., Murder First Degree.  Subject went out to court on February 1, 1973, to face charges for assault on peace officer.  A transcript from this hearing has been received.  It was stated in the transcript that the actual charge is Assault with a Deadly Weapon Upon a Peace Officer with a Firearm, 12022.5 P.C.  It was added that the Code Section is still 245b P.C.  The disposition of that offense was a state prison sentence.

Subject's arrest history appears to date from February, 1972, with a charge for truancy.  Between June, 1972, and September, 1976, Subject was arrested for the following offenses with dispositions shown for them.  The dispositions included commitments to Rancho Potrero, Manchester Drive, juvenile hall and California Youth Authority.  The arrests were for malicious mischief, throw trash on highway, curfew, throw substance at vehicle, and beyond control; runaway; burglary; escape (from Rancho); escape (from Manchester Drive); burglary; assault with intent to commit murder, burglary; threat of assault on counselor at juvenile hall; burglary, three counts; armed robbery (CYA); vehicle theft (CYA); burglary, auto theft; (escaped from San Diego Juvenile Hall) and the case was pending for an arrest for robbery and assault with a deadly weapon in December, 1976.

PREVIOUS PSYCHOLOGICAL AND PSYCHIATRIC REPORTS:  Subject was referred to the Youth Authority following the present offenses.  The report is in Subject's file.  The diagnosis was sociopathic personality disorder (severe) with homicidal potential.

INTELLECTUAL AND EMOTIONAL RESOURCES:  The test productions of this inmate indicate that he is able to achieve a score in the average range of intelligence with an AGCT equivalent I.Q. of 104.  He appeared to be in contact with reality and appropriately oriented at the time of the interview.  Conversation was relevant and coherent.  There was no evidence of a disturbance of thought processes.  There was nothing noted in the test results nor interview to indicate psychosis.  No signs of organic brain damage were noted.

PERSONALITY EVALUATION:  When Subject was asked about the present offense he replied that he did not want to talk about it.  Subject was asked

TITCH      B-89549              RCC              4/14/73      1pk      page 6

questions about other topics. After these questions were answered,
Subject was told that the interview was concluded. Subject reopened
the topic of the discussion of his offenses. The purpose of the
interview was explained to him. He repeated his statements that he
could see no reason why he should talk about the offenses. His state-
ment was accepted and there was no argument. Subject decided to talk
about one of the charges. He said that he and the codefendant went
to a house to rob the people. He said that he knew that the people
were in the house and as they were ready to go in, the girl drove
into the driveway. They threatened her and forced her into their car
and drove away. He said that there was a place where they planned to
take her but that place was boarded up. He said that they drove to
a distant place in the hills and took her up in the hills. He said
that his crime partner was worried because he had recently been photo-
graphed by the Garden Grove police. He said that they were afraid that
the girl might identify them. He reported that they took her up into
the hills and each one fired at her. Subject stated that his crime
partner's gun misfired and the fatal shot was from Subject's gun.

A probation officer's report was not prepared for this man. Subject
was referred to the Youth Authority and the information describing the
offenses was comprehensive in that report. The district attorney pre-
pared a statement which was stamped January 30, 1973. Some additions
and clarifications were in the statement in addition to the district
attorney's comments regarding Subject. The crimes involved killing
four people and seriously injuring two other people. It was reported
that the victims were terrorized during the course of robberies and
burglaries. The additional charge of assault on peace officer while
armed took place in San Diego. It was reported that Subject was stopped
in a stolen car. It was reported that Subject committed an armed robbery
and as he was leaving, he was stopped by the police officer. It was
stated that Subject used a gun stolen from one of the victims in a
prior offense and shot the policeman six times, most of them in the
back. It was stated that the officer did not draw his weapon. It
was reported that Subject attempted to rape the victim in the offense
which he related to the undersigned. It was also reported that the
victim had a rosary clutched in her right hand. It was stated that the
right hand was clutching the rosary against her chest between her breasts.

Subject's personality structure is characterized by the pathological
inadequacy frequently seen in persons who act out their resentment in-
stead of making some effort to modify their behavior patterns. This
resentment is precipitated by the lack of acceptance by peers and
others because of the objectionable personality characteristics and
the undesirable behavior. The paranoid features of such a personality
structure are noteworthy. The hate and hostility which result from the
lack of acceptance are vented in acts to reflect dominance and omnipo-
tence. These acts are generalized and not necessarily perpetrated
toward the persons who rejected. This personality structure is a
character disorder and persons with this type of character disorder

TITCH    B-89549              RCC           4/14/78    lpk    page 7

9

do not respond to treatment nor rehabilitative attempts.  The personality structure is closely knit and such persons are extremely defensive. Information from all sources corroborated the hostile and retributive attitude.

The description of Subject's behavior in the offenses and the offenses, per se, reflect the cold unfeeling attitude which made it possible for him to terrorize, torture, and take the lives of so many people. The prognosis for such persons is extremely poor.  The only way society can be protected from this man would be to prevent him from entering society.

DIAGNOSTIC IMPRESSION:  Antisocial personality, severe, with paranoid features; with homicidal potential.

RECOMMENDATION:  Subject's record reflects recent escape or escape attempt DVI.  He is considered a custody and management problem.  It is recommended that his housing and institutional placement be kept separate from that of his crime partner, Brett Thomas, B-87334.

4/11/73                    Leisla M. Howell, Senior Psychologist
                           Licensed Psychologist No: PL 183

10

## INSTITUTION PROGRAMMING SUMMARY

**SOURCES FOR REPORT:** Predicated upon personal interview, probation report, and attached CYA diagnostic report, and psychological, educational, and vocational test results prepared at this facility.

**CONFIDENTIAL INFORMATION:** (See Confidential Folder.)

**TO BE VERIFIED/COMPLETED:**

**Holds/Detainers:** None.

**Records/Transcripts:** None.

**Crime Reports:** None.

**Casework Follow-up:** None.

**INSTITUTION PROGRAMMING RECOMMENDATIONS:**

**Medical:** Full duty and camp.

**Dental:** Class 2.

**Psychiatric:** Antisocial personality, severe, with paranoid features; with homicidal potential. Leisla M. Howell, Senior Psychologist.

**Counseling:** History of drug use, denies addiction. States social drinker.

**Education:** Reception Center-Central test results indicate possesses intelligence in average range with an 8.5 GPL. A claimed 11th grade dropout who states pursued education in CYA facilities and is presently twenty units short of completing high school diploma requirements. Interested in achieving this goal and subsequently matriculating to college level studies.

**Vocational Training:** Negligible work history. Currently, undecided with regard to vocational plans.

**Work Assignment:** Institutional convenience. Expresses no placement preference.

**Criminal History:** No CII Record available at time of dictation. However, CYA Record attached to probation report contains 13 prior arrest entries which include escapes (3), burglaries (4), GTA (2), armed robbery, assault with intent to commit murder, and threat of assault on juvenile hall counselor starting at age 12.

//

Subject is currently convicted of eleven crimes in Orange County composed of two first degree murder offenses, five first degree robbery with use of firearm offenses, one kidnap for ransom with use of firearm offense, and three second degree offenses.  In addition, he also has a commitment for assault with a deadly weapon on a police officer with use of a firearm from San Diego County.  He was apprehended in the present matter on February 1, 1977.  With regard to his present convictions, Subject admits culpability.

With regard to his assault with a deadly weapon on a police officer with use of a firearm, his victim, ex-police officer Robb, indicates he was retired from duty on disability as a result of this incident. He advises that his injuries resulted in medical and hospital bills of approximately $15,000.  The victim related that he still lacks feeling in both legs, has arthritis in both knees, suffers headaches, and still has one bullet lodged in his right collarbone.  The victim indicates that his body carries ten scars as a result of having been shot six times by Titch in this incident.

Evaluation:  Titch states he was born in Brea, California, and is one of six children resulting from the married union of his parents.  Subject reports they separated when he was approximately ten years of age because his mother was unfaithful and stole money from his father who beat her as a result.  Both parents subsequently remarried.  Titch indicates that he has never been close to either of his parents, and his greatest rapport has been with his oldest sister Debbie, whose boyfriend is one of his present crime partners, and his youngest brother Joe.  He says that only his brother Walter, described as having been hospitalized in state facilities due to emotional disturbances, is the only other member of the family who has been arrested.  He characterizes his father as having been a strict disciplinarian. Background information reveals that Subject had once threatened his father's life by letter at age 14.  Titch recounts he terminated his public education in the 11th grade at the age of 17 while attending a continuation school as a result of having been committed to CYA for auto theft.  He reports that he continued his studies as a CYA ward and presently is approximately twenty units short of completing high school diploma requirements.  Titch relates that he has never married nor fathered any children.  During October, 1976, Subject states he entered into a common-law relationship with Greta Mc Millan, an 18 year old married woman with one child separated from her husband. He advises they separated in June, 1977, while he was in county jail awaiting adjudication in the present matter.  Titch reports that he has never held any full time employment.  Titch indicates his introduction into drugs began with marijuana, hashish, and peyote at age 13. Subsequently, he relates he has used PCP and LSD, the latter drug on an experimental basis only.  He denies ever having been addicted to any illegal form of drugs or narcotics.  With regard to the consumption of alcohol, he describes himself as a social drinker.

12

Titch is an 18 year old first termer with an extensive prior arrest record dating back to age 12 which reflects a pattern of escape and crimes against property and persons. Noted is the fact he was on escape status when apprehended for his present commitments. With regard to this series of offenses, Titch admits guilt but claims his assault on a peace officer with use of firearm conviction was a matter of self-defense because the officer began drawing his weapon. He states that he committed the robberies for excitement and the burglaries in order to obtain money and guns. With regard to his two murder convictions, Titch states that he killed only one of these victims, Laura Stoddard. Titch says that the basis for taking her life was to prevent her from subsequently identifying them because up to that point their actions against her constituted a robbery and kidnap. However, he vehemently denies that he attempted to rape the victim prior to her death. Currently, Titch states he "did wrong" but is not going to "mope around about it because that would be stupid." He advises that he is "not bothered" by his present sentence because he is confident that he will eventually be granted a reduction in time and released. He explains his actions as a result of "bitter anger," says his actions in the present matter "satisfied his rage," and states at the time he "didn't give a fuck." He attributes his callous behavior to early conditioning as a result of his placement at various juvenile correctional facilities beginning in early adolescence. Titch is viewed as a sociopathic individual which renders him insensitive to the suffering of others. As a result of his own twisted values, he seems to feel justified in taking out his frustrations on mankind in terms of murdering, maiming, and stealing from others. Apparently, this antisocial behavior on his part satisfies his own needs which involve deep feelings of inadequacy and hostility.

RE-ENTRY PROGRAM:

Parole Location:  None.

Residence:  None.

Employment:  None.

Resources:  None.

Parole Conditions:  None.

TRANSFER:

Institution:  DVI for security needs in view of age, nature of convictions, and sentencing time factor.  Alternative:  CTF-N.

Custody:  Close/max.  (See Confidential file).

During 1973 Subject was cited for threat of assault on a juvenile hall counselor.  According to CYA Records he was previously involved in numerous adjustment problems including AWOLs and escape attempts.

Camp Potential:   Group D.

Crime Partners:   Brett.Thomas B-87334 - DVI.
                  William Haupu B-84412 - DVI.

ENDORSEMENTS:

CC I:                      C.D. Goes, CC I - 4/21/78

Supervisor:   C/P's at DVI.  Recommend CTF placement.  Long commitment.
Murder 1st.

4/25/78                    L. Robertson, CC II

CSR:  CTF endorsed.  Case discussed at length with CCS, H.G. Eakles.
Basis for CTF is separation from C.P. who is considered enemy at DVI.
See confidential file for further.

4/26/78                    M.M. May, CSR

14

**EXHIBIT 7**

Orange County D.A.'s 1203.01 Statement

Enclosed please find a referral report from CYA as it is helpful to evaluating Mark Titch's history of criminality. A couple of additions should be made.

Concerning the deaths of Aubrey and Denise Duncan (15), the following correction is based on the evidence, sworn testimony of Nadine Duncan and the taped confessions of Mark Titch and Brett Thomas. After following Mr. Duncan home from work, Mr. Titch, the driver, stopped the car in front of Mr. Duncan's home. Mr. Duncan went to the front door to unlock it. Mr. Thomas pointed the .22 caliber rifle from the passenger's seat. Mr. Titch was supposed to put the car in neutral and run the engine so as to muffle the gun shots. Instead, he got it in gear and the car went forward. He backed the car up. Mr. Thomas shot Mr. Duncan several times with the rifle. This noise awoke Mrs. Duncan and her daughter. They went to the front door. Mrs. Duncan opened the door and stepped onto the porch - seeing her husband dead. She was then shot twice with the .22 caliber rifle - causing loss of a portion of her breast. She fell to the porch. She called to her daughter Denise - Denise was unconscious from being shot three times - who subsequently also died. Then, Mrs. Duncan was shot by Mr. Thomas with a shotgun. Mr. Thomas had run out of ammunition for the .22 caliber rifle (10 shots). Mrs. Duncan then crawled over the body of Denise and went to the phone to call the police.

Concerning the death of Laura Stoughton:

Mr. Titch and Mr. Thomas were at the side of the Stoughton residence trying to gain entry when Miss Stoughton drove up in her driveway. She was abducted by Titch and Thomas and put into the trunk of their car. She was taken into a remote area of the county. There, she was directed up a hill. At that location, Mr. Thomas told the police, Mr. Titch tried to rape Miss Stoughton but couldn't because she was a virgin. Then, the two defendants decided to jointly execute her. Mr. Thomas' gun jammed, Mr. Titch's did not. Miss Stoughton was shot in the shoulder and went down. She was praying for her life. The two defendants discussed in her presence that she would be killed to prevent her from later

identifying them. _Mr. Titch shot her twice in the mouth.

    Insert on page four that on December 27, 1976, Mr. Titch took
the Chrysler he had stolen to San Diego.  There he committed an armed
robbery.  As he was leaving, he was stopped by a police officer.
He used the 32 Baretta stolen from Mr. Simons on November 19, 1976, to
shoot the San Diego policeman six times - most of them in the back.
The officer never drew his weapon.

    I have been a Deputy District Attorney for ten years.  I tried
my first death penalty case seven years ago and have been trying
them regularly since then.  For the last four years, I have supervised
the Orange County District Attorney Homicide Unit.  I have never
seen any one more deserving of the death penalty than Titch or
Thomas.  They should never be released from custody.  Titch plead
guilty to 209, 187, first degree - two counts, five P.C. 211 with
use of firearms and three burglaries.  If I thought taking this case
to trial would have caused Titch or Thomas to serve even one
more year in custody, I would have done it gladly.  The victims
lives should never be demeaned by the release of either Titch or
Thomas.

Sincerely,

ROBERT D. CHATTERTON
Deputy District Attorney

RDC:ca

THIS INSTRUMENT IS A CORRECT COPY OF THE ORIGINAL ON
FILE IN THIS OFFICE

ATTEST:    JAN 3 0 1978        19
WILLIAM E. ST JOHN
County Clerk
Superior Court of the County of Orange

**EXHIBIT 8**

Letter From Lt. Cross, Anaheim Police Department



CITY OF ANAHEIM, CALIFORNIA

Police Department

March 9, 1992

P. J. O'Connor, CCII
Life Hearing Coordinator
California Men's Colony – East
P.O. Box 8101
San Luis Obispo, California 93409

Dear Mr. O'Connor,

My name is John Cross. I participated in the investigation of the series of crimes committed by Mark Titch and his crime partner, Brett Thomas.

You may, or may not, be aware of all the crimes Mark Titch was involved in, so I will list them. He has admitted to these crimes by the way.

He and Thomas planned to rob Aubrey Duncan. Titch drove the car as he and Thomas followed Mr. Duncan home from his place of business. Titch stopped the car in front of Mr. Duncan's house and Thomas shot and killed Mr. Duncan and his daughter Denise. Mrs. Duncan was also wounded in the shooting. Titch then ran to Mr. Duncan and ripped a ring of keys from his belt loop. The keys were supposed to allow Titch and Thomas entry to Mr. Duncan's business where they thought they would find a large sum of money.

Titch admitted kidnapping Laura Stroughton from the City of Garden Grove and ⁄ing her to a remote area of Orange. He shot and killed her with a rifle and then ⁄ok her purse. Thomas assisted Titch in this crime.

Titch was driving the car when Thomas shot and killed Ephraim Christian during the attempted robbery of a business in Garden Grove. Titch tried to open the cash register after Christian was dead, but he was unsuccessful.

Titch admitted to shooting a police officer in San Diego, while fleeing from the scene of an armed robbery.

Titch admitted committing three residential armed robberies in Anaheim and one in the City of Stanton. He also committed two armed commercial robberies in Anaheim.

Lastly, Titch admitted committing several residential burglaries in Anaheim, which netted him the car and the weapons used in the subsequent armed robberies and murders.

All of these crimes were committed in a very short period of time.

Titch never showed any remorse for these crimes and was not affected by them. He has shown no concern for others lives and has stated that when released from jail he would probably start stealing again.

I have enclosed excerpts from taped conversations between Titch and various investigators questioning him regarding various crimes. The questions and answers will give you some insight about the crimes he committed and what he thought at the time.

My personal recommendation is that Mark Titch remain in prison for as long as legally possible.

Sincerely,

LIEUTENANT JOHN CROSS
CRIMES PERSONS BUREAU COMMANDER

JNC/ds
4826S

2

**EXHIBIT 9**

San Diego Police Officer's Report

DATE (occurr.):    December 27, 1977

TIME (occurr.):    0855 hours

LOCATION.    1000 Block South 32nd Street

SUBJECT:    664/187 P.C., Attempt Murder. Police Shooting.

VICTIM:    ROBB, James N., I.D. 2203
    Police Officer, City of San Diego
    801 West Market Street, San Diego, California

SUSPECT:    TITCH, Mark Wayne, WMJ (17 years) DOB 8/31/59
    9171 Cerritos Avenue, Stanton, California
    6'1", 145 pounds, brown hair, brown eyes.

*2 days after arrest.*

TAPED INTERVIEW WITH SUSPECT.

Detective SANDERS: The date is February 4, 1977. The time is 10:25 A.M. We are presently in the Anaheim Police Department, Anaheim, California, Interview Room. Those present:

    (A) Mark Wayne TITCH, WM, DOB 7/31/59
    (D) Detective Fred DREIS, San Diego Police Department
    (Q) Detective James SANDERS, San Diego Police Department.

Q: Mark, we are going to discuss with you an incident which occurred in San Diego December 27th at about 8:55 in the morning in the 1000 block of South 32nd Street. This incident involved a robbery and the subsequent shooting of a police officer. Approximately five minutes ago you were admonished of your constitutional rights and you agreed to talk with us and discuss this. Now, would you tell us in your own words what took place that particular morning?

A: We had a car and we drove down to San Diego in a stolen car. It was a Chrysler. I can't remember the name. And we turned off the freeway onto National Avenue, went down National about, I think, 32nd Street and we seen a junior market on the corner there so we decided that was the place we were going to rob. So, my partner, he parked the car down the street and I got out and I had a red ski beanie on, and a .32 automatic, and went over to the junior market and there was a woman behind the counter. I pulled the gun on her. I guess she didn't know how to speak English and she told another man and a mother man came over and told me that she didn't know how to speak English, and he got out a little brown paper sack and put the money in there and I went to the doorway of this store and put the gun away. I had the paper sack in my left hand and I ran out and went across 32nd Street and a police officer pulled in at that time and I got down about half a block, maybe a block, and I was going across a (unintelligible) corner and the police officer pulled over to the side and got out of his car and came along the rear and he said, "Come here" and I started walking back, I pulled out my gun and I said, "Freeze" and he started running around his car to the side of it and he fell down. I ran around the rear and said, "Freeze" again and he got back up, so I run around the front and I noticed he was going for his gun and all I remember, I was just standing there with an empty gun.

Reporting Officer _____    Badge_____  Division _____

Approved By _____  Date of this report_____  Time _____

PD-153A (7-74)

**EXHIBIT 10**

CDC 128-G Classification Chrono

PAGE 1                                                                    CDC-128G
CDC NO:   B-89549   **NAME:**   TITCH, B.          **HOUSING:**   F1-02-132U
**CUSTODY:**   MED-A   **CS:**   0   **WG:**   A1   **PG:** A   **ASSIGNMENT:**   "R" SUFFIX
**RELEASE DATE:**   MEPD:   02/04/84          REVIEW/REMOVE "R" SUFFIX
**ANNUAL REVIEW:**   09/00

Inmate Titch made a personal appearance before the Institution
Classification Committee/General Population (ICC/GP) for the purpose of an
"R" Suffix Review. Inmate Titch stated he was in good health. In
reviewing inmate's case, ICC notes that inmate's case was seen by UCC on
12/21/99, in which UCC reviewed inmate's case for an "R" Suffix based on
2nd Level Appeal #99-17. It was UCC's recommendation to retain the "R"
Suffix. Committee notes this "R" Suffix is a result of circumstances
noted in his commitment offense from Anaheim PD on 01/21/77, counts 12 and
13 noting that inmate's crime partner, "Thomas" told the police that
Inmate Titch tried to rape the victim but was unable to do so. It is also
noted in inmate's appeal Log #99-17, that he claims there is new
information contained in a memorandum from the City of Anaheim dated
03/09/92, located in the miscellaneous section of the C-file. Committee
notes on 09/15/83, Initial Classification Committee at CMC-E placed the
"R" Suffix on inmate's case based on his commitment offense. On 04/26/89,
ICC at CMC-E retained the "R" Suffix and refers to the POR, page 6 noting
the crime partner statement. After a thorough review of all case factors,
the Committee elected to remove the "R" Suffix due to the following: 1)
Lack of information to substantiate the rape noting there were no charges;
2) There are no other similar acts that have occurred; and 3) It has
been well over 22 years. Inmate actively participated in today's hearing
and concurred with the Committee's decision. Next scheduled
classification review is 09/2000, for an Annual Review. There are no
other case concerns at this time. Inmate was advised of his right to
appeal.
**COMMITTEE MEMBERS:** D. M. BARNES, CDW (A); P. MAGEE, AW;
R. MILLSPAUGH, ASST. C&PR

_____          _____
D. M. BARNES, CDW (A),   CHAIRPERSON     R. MILLSPAUGH, ASST. C&PR, RECORDER
**DATE:**   01/06/00   (lg)          **CLASSIFICATION:**   ICC/GP          **INST:**   RJDCF

ASUSHCSR

**EXHIBIT 11**

Excerpts From 2001 Board Hearing

# SUBSEQUENT PAROLE CONSIDERATION HEARING

## STATE OF CALIFORNIA

## BOARD OF PRISON TERMS

In the matter of the Life ) 
Term Parole Consideration )     CDC Number B-89549
Hearing of: )
)
MARK TITCH )
_____)



### RICHARD J. DONOVAN CORRECTIONAL FACILITY

### SAN DIEGO, CALIFORNIA

### JUNE 26, 2001

### 9:05 A.M.

PANEL PRESENT:

BOOKER T. WELCH, JR., Presiding Commissioner
BRETT GRANLUND, Commissioner
LISA TORRES, Deputy Commissioner

OTHERS PRESENT:

MARK TITCH, Inmate
DANIEL KORYN, Attorney for Inmate
TOM CROWFOOT, Deputy District Attorney

CORRECTIONS TO THE DECISION HAVE BEEN MADE

            No
      ✓    Yes           See Errata Sheet

**Debbie Owens, Capitol Electronic Reporting**

**RECORDS COPY**



28

1        PRESIDING COMMISSIONER WELCH:  Okay, anything

2    else about the commitment offense, your prior criminal

3    history or your social factors that you'd like to discuss?

4        INMATE TITCH:  Yeah.  You know, there's a

5    question of a rape that was brought up on this case of

6    Laura Stouthton.

7        PRESIDING COMMISSIONER WELCH:  I didn't see a

8    rape on there.

9        INMATE TITCH:  Oh, okay.  Well, I had a --

10        PRESIDING COMMISSIONER WELCH:  Did you see it?

11        ATTORNEY KORYN:  No need to clarify it then.

12        COMMISSIONER GRANLUND:  It's not on the record.

13    It's in a prior transcript.

14        PRESIDING COMMISSIONER WELCH:  Okay.

15        COMMISSIONER GRANLUND:  Is that what you're

16    talking about?  In a prior hearing there was some

17    discussion about it and there was the belief left -- the

18.    opinion that you had raped her.

19        INMATE TITCH:  Do I need to clarify that?

20        ATTORNEY KORYN:  Sure if you want.

21        COMMISSIONER GRANLUND:  It's up to you and your

22    counsel.

23        INMATE TITCH:  Well, there was no rape.  I don't

24    know why people are talking about a rape.  This was a

25    robbery.  There was no evidence of a rape ever.  I was

26    never charged with a rape.  I didn't plea bargain out of a

27    rape.  There was no evidence.  If there would have been

2

29

1    evidence I'd of been charged with a rape.

2            PRESIDING COMMISSIONER WELCH:  Did you know the

3    young lady?

4            INMATE TITCH:  No.

5            PRESIDING COMMISSIONER WELCH:  When you -- At the

6    time of the offense how long of an encounter had you had

7    with her?

8            INMATE TITCH:  Probably about 35-40 minutes

9    maybe.  I don't know.  30 minutes, probably closer to 30

10   minutes.

11           PRESIDING COMMISSIONER WELCH:  Why did you hold

12   her for 30 minutes?

13           INMATE TITCH:  Because we picked her up from her

14   house and drove through my old neighborhood.  We looked

15   through her purse, found out that she didn't have no money

16   and at that point I suggested that we drop her off in a

17   secluded area.

18           PRESIDING COMMISSIONER WELCH:  Yeah.

19           INMATE TITCH:  And when we got to that secluded

20   area there was a fence around it and we couldn't drive in

21   there so we ended up going to another area which was

22   secluded and between there and then is when we talked

23   about the murder.

24           PRESIDING COMMISSIONER WELCH:  You actually

25   discussed the murder before you committed it?

26           INMATE TITCH:  Yes.

27           ATTORNEY KORYN:  For the record the information

3

30

1  filed on April 12th, 1977 which is in the file does not

2  contain any charging allegation of rape.

3       PRESIDING COMMISSIONER WELCH:  I didn't see it

4  when I went through the file but anything else you want to

5  clarify regarding that?

6       INMATE TITCH:  Well, I think everything else is

7  in my inmate version that I seen --

8       PRESIDING COMMISSIONER WELCH:  It says here

9  that --

10      INMATE TITCH:  Oh, yeah, the report that

11  you're -- You were referring to my counselor's report when

12  you were reading all that?

13      PRESIDING COMMISSIONER WELCH:  Yeah.

14      INMATE TITCH:  Okay, because you know there

15  wasn't a probation officer's report written in my case.

16      PRESIDING COMMISSIONER WELCH:  I understand that.

17      INMATE TITCH:  All right.

18      PRESIDING COMMISSIONER WELCH:  But here's

19  something that says inmate Titch was housed at RJD and

20  this is something that Ms. Torres is going to go over that

21  you appeared before UCC --

22      INMATE TITCH:  Um-hm.

23      PRESIDING COMMISSIONER WELCH:  -- for the purpose

24  of review for 'R' suffix.

25      INMATE TITCH:  Right.

26      PRESIDING COMMISSIONER WELCH:  And the committee

27  acted to retain the 'R' suffix pending ICC confirmation.

4

31

1          INMATE TITCH:  Right.

2          PRESIDING COMMISSIONER WELCH:  Then on 1/6, 2000

3    ICC elected to remove the 'R' suffix after thorough review

4    and they reduced your custody so they removed the 'R'

5    suffix and let the record reflect --

6          ATTORNEY KORYN:  Thank you.

7          PRESIDING COMMISSIONER WELCH:  -- an 'R' suffix

8    indicates that a person has sexual behavior, sexual

9    predator or he's a threat because of -- And the

10   institution, ICC, removed that --

11         INMATE TITCH:  Right.

12         PRESIDING COMMISSIONER WELCH:  -- from your

13   custody.

14         INMATE TITCH:  Right.

15         PRESIDING COMMISSIONER WELCH:  They didn't have

16   cause to place an 'R' suffix --

17         INMATE TITCH:  Right.

18         PRESIDING COMMISSIONER WELCH:  -- so, I guess, I

19   just read that so any other -- anything else you want to

20   clarify for the record before we move on.

21         INMATE TITCH:  No, thank you.

22         PRESIDING COMMISSIONER WELCH:  Okay, we'll go to

23   post-conviction.

24         DEPUTY COMMISSIONER TORRES:  Thank you,

25   Mr. Chairman.  In regards to the period to be covered for

26   this review we note that Mr. Titch has had a last Board

27   appearance on 5/6 of '98.  That was his subsequent hearing

5

**EXHIBIT 12**

FBI Arrest and Conviction Record

CIEC 89517

CHS TRANSCRIPT  CII/A05075149  04/26/78  16:56:39    REQUESTED FOR CASCORR CHINO    MNEMONIC - CFF
REQUESTED BY CA0349401

STATE OF CALIFORNIA    ******    DEPARTMENT OF JUSTICE    ******    BUREAU OF IDENTIFICATION
CII NUMBER A05075149                                                                PAGE 1

****** THE FOLLOWING RECORD IS FOR OFFICIAL USE ONLY ******

| DATE OF THIS REPORT | NAME | SEX | DOB | RAC | HGT | WGT | HAI | EYE | SKN | POB |
|---|---|---|---|---|---|---|---|---|---|---|
| 04/26/78 | TITCH,MARK WAYNE | M | 073159 | W | 601 | 145 | BRO | BRO | LGT | CA |

FPC HENRY              FPC NCIC                FBI        OLN    SOC
O 32 = MOI 16          POPMPOPIPOPIPAPIPOPM    348394R2
I 32 = OIO -

OCCUPATIONS:    STUDENT          LABORER          FACTORY WORK

SCARS=MARKS=TATTOOS:  TAT L HND    TAT L FGR    SC FHD

MISC NUMBERS:  DB-070759

ALIASES:  02  TITCH,MARK          03  LAPHON,MATTHEW
          04  LAPHON,MATTHEW

CRIME SUMMARY

| | A/D | CONV | DLA | | AGENCY | AGENCY FILE NO. |
|---|---|---|---|---|---|---|
| ASSAULT | YES | NO | 020178 | | CASOSAN DIEGO | 942 010 |
| BURGLARY | YES | YES | 020277 | | CAPDANAHEIM | 53783 |
| ROBBERY | YES | YES | 020178 | | CASOSAN DIEGO | 942 010 |
| STOLEN VEHICLE | YES | YES | 020277 | | CAPDANAHEIM | 53783 |
| JUVENILE OFFENSE | NO | YES | 020277 | | CAPDANAHEIM | 53783 |
| HOMICIDE/MANSLAUGHTER | YES | YES | 020178 | | CASOSAN DIEGO | 942 010 |
| WEAPON OFFENSE | NO | | | | | |
| KIDNAPPING | YES | | | | | |

| CYC SEQ | AGENCY/FILE NO. | DOB | NMC | ACH | ACTIONS/DISPOSITIONS | |
|---|---|---|---|---|---|---|
| 1 1 | CAPDANAHEIM | 101673 | 1 | 1 | ARREST/DETAIN | JUVENIL |
| | 53783 | | | | | 217 PC-ASSAULT WITH INTENT TO MURDER |
| | | | | | | FILED ON DIRECT |
| | | | | | DISPOSITION: | JUVENIL |
| 2 | | | | | ARREST/DETAIN | 459 PC-BURGLARY |
| | | | | | | FILED ON DIRECT |
| | | | | | DISPOSITION: | |
| 2 1 | CAYANORWALK | 122073 | 1 | 1 | INITIAL CUSTODY | ARMED ROBBERY |

CHS TRANSCRIPT  CII/A05075149  04/26/78  16:56:39   REQUESTED FOR CASDCORR CHINO      MNEMONIC - CFF
                                                     REQUESTED BY CA0349401

STATE OF CALIFORNIA  ******   DEPARTMENT OF JUSTICE  ******    BUREAU OF IDENTIFICATION
CII NUMBER A05075149                                                          PAGE 2

| CYC | SEQ | AGENCY/FILE NO. | DOE | NMC | ACH | ACTIONS/DISPOSITIONS | |
|---|---|---|---|---|---|---|---|
| | 2 | 06077 | | | | DISPOSITION | 030175 PAROLED |
| | | | | | | COMMENT | SEN FROM ORANGE CO |
| 3 | 1 | CAYANORWALK | 012076 | 1 | | INITIAL CUSTODY | UNLAWFUL TAKING VEHICLE |
| | | 06077 | | | | DISPOSITION | 081276 PAROLED |
| | 2 | | | | | COMMENT | SEN FROM ORANGE CO |
| 4 | 1 | CAPDANAHEIM | 020277 | 1 | | ARREST/DETAIN | 459 PC-BURGLARY |
| | | 53783 | | | | DISPOSITION | FILED ON DIRECT |
| | 2 | | | | | ARREST/DETAIN | 10851 VC-UNLAWFUL TAKING VEHICLE |
| | | | | | | DISPOSITION | FILED ON DIRECT |
| | 3 | | | | | ARREST/DETAIN | 602 W&I-FAIL TO OBEY ORDER OF JUV |
| | | | | | | | COURT |
| | | | | | | | FILED ON DIRECT |
| | 4 | | | | | DISPOSITION | FILED ON DIRECT |
| | | | | | | ARREST/DETAIN | 187 PC-MURDER |
| | | | | | | DISPOSITION | FILED ON DIRECT |
| 5 | 1 | CASDCORR CHINO | 011878 | 1 | | INITIAL CUSTODY | 211 PC-ROBBERY,FIRST DEGREE |
| | | B-B0549 | | | | SENTENCE | .5 YR TO LIFE, |
| | | | | | | COMMENT | CHRG-4 ADD CNTS 211 PC 191 |
| | 2 | | | | | | DISPO-5 YR TO LIFE EACH CNT ALL CC |
| | 3 | | | | | INITIAL CUSTODY | 12022.5 PC-WITH USE OF FIREARM |
| | | | | | | SENTENCE | .5 YR TO LIFE,CS W/CNT 1 |
| | | | | | | COMMENT | CHRG-4 ADD CNT 12022.5 PC |
| | 4 | | | | | COMMENT | DISPO-5 YR TO LIFE EACH CNT CS W/211 |
| | | | | | | | PC CHRGS |
| | 5 | | | | | INITIAL CUSTODY | 459 PC-BURGLARY,SECOND DEGREE |
| | | | | | | SENTENCE | .1 YR TO 15 YR, |
| | 6 | | | | | INITIAL CUSTODY | 459 PC-BURGLARY,SECOND DEGREE |
| | | | | | | SENTENCE | .1 YR TO 15 YR, |
| | 7 | | | | | INITIAL CUSTODY | 209 PC-KIDNAPPING FOR RANSOM |
| | | | | | | SENTENCE | .LIFE, |
| | 8 | | | | | INITIAL CUSTODY | 12022.5 PC-WITH USE OF FIREARM |
| | | | | | | SENTENCE | .5 YR TO LIFE,CS W/CNT 13 |
| | 9 | | | | | INITIAL CUSTODY | 187 PC-MURDER,FIRST DEGREE |
| | | | | | | SENTENCE | .LIFE, |

2

```
CHS TRANSCRIPT  CII/A05075149  04/26/78  16:56:59   REQUESTED FOR CASDCORR CHINO        MNEMONIC - CFF
                                                    REQUESTED BY  CA0340401
STATE OF CALIFORNIA    *******    DEPARTMENT OF JUSTICE        *******     BUREAU OF IDENTIFICATION
CII NUMBER A05075149                                                                          PAGE 3

CYC SEQ AGENCY/FILE NO.    DOE  NMC ACH  ACTIONS/DISPOSITIONS
```

```
                                    8    INITIAL CUSTODY   459 PC-BURGLARY,SECOND DEGREE
                                         SENTENCE:         .1 YR TO 15 YR.
                                    9    INITIAL CUSTODY   187 PC-MURDER,FIRST DEGREE
                                         DISPOSITION:  020178  OUT TO COURT
                                         SENTENCE:         .LIFE,ALL CNTS CC
                                         COMMENT           SEN FROM ORANGE CO
```

```
   10
```

```
   11
```

```
   12
```

```
6  1  CASOSAN DIEGO      020178  1    1    ARREST/DETAIN     ATTEMPT
      942 010                                                MURDER
                                    2    ARREST/DETAIN     211 PC-ROBBERY
                                    3    ARREST/DETAIN     245(B) PC-ADW PEACE OFFICER/FIREMAN
```

```
7  1  CASDCORR CHINO     040578  1    1    INITIAL CUSTODY   MIN/COURT ORDER RETURNEE
      B-89549
                                    2    INITIAL CUSTODY   245 PC-ASSAULT WITH DEADLY WEAPON
                                    3    INITIAL CUSTODY   12022.5 PC-WITH USE OF FIREARM
                                         SENTENCE:         .6 MO TO LIFE.
```

```
                                                                            03065

END OF TRANSCRIPT
```

3

**EXHIBIT 13**

2006 Life Prisoner Evaluation Report

**LIFER PRISONER EVALUATION REPORT**
**SUBSEQUENT PAROLE CONSIDERATION HEARING #8**
**JULY 2006 CALENDAR**


**TITCH, MARK**          **CDC# B-89549**


I.  **COMMITMENT FACTORS:**

A.  **LIFE CRIME:** Murder 1st, PC 187 two (2) Counts. Weapon: .22 Caliber rifle/gun. Orange County, Case #C-37693. Victims: Laura Stoughton, age 21; Denise Duncan, age 18; Aubrey Duncan, age unknown. Titch also received an additional commitment of Assault with a Deadly Weapon upon a Peace Officer, (PC 245b/12022.5). San Diego County, Case #CR-42845. Sentence: 7-years to life. Minimum Eligible Parole Date (MEPD): 2/4/84.

**Summary of Crime:** Offense Summary taken from cumulative case summary, dated 3/2/78, and Probation Officer's Report (POR), dated 3/27/78. Controlling Counts: Count XII: Kidnap for Robbery/Use of firearm, PC 209/12022.5 and Count XIII: Murder, PC 187.

On January 21, 1977, a motorcyclist riding through a vacant field in the City of Orange reported that he had observed a female Caucasian subject lying on the knoll of the hill. Police responded and found the deceased, later identified as victim Laura Ann Stouthton, 21 years old. The coroner's investigation set the body in the upright position and it was noted that in her right hand, she was clutching a rosary against her chest. Additionally, investigators noticed that the victim had sustained two possible gunshot wounds in the mouth area an one gunshot wound in the shoulder area. Police discover a .22 caliber bullet lying on a blanket next to the victim's left shoulder. Investigator indicated that there did not appear to be a struggle in the area.

Count XVI: PC 187, Murder 1st. On January 29, 1977, at approximately 3:56 a.m., Titch and Thomas (co-defendant), followed Aubery Duncan home from work. Titch stopped the car he was driving in front of the victim's home. As Aubrey Duncan went to the front door to unlock it, Thomas, who was in the passenger seat, shot Duncan several times with a .22 caliber rifle.

Nadine Duncan and her daughter Denise, heard the loud noise and went to the front door. As Nadine Duncan opened the door and stepped onto the porch seeing her husband dead, she was shot twice with a .22 caliber rifle and fell to the porch. Her daughter Denise was shot three times, unconscious, and subsequently died at the hospital. Nadine Duncan was shot by Thomas with a shotgun because he ran out of ammunition for the

.22 caliber rifle. She crawled over the body of her daughter to get to the phone to call the police.

**B.**   **MULTIPLE CRIME:** Count II-PC 211, Robbery 1st w/Use of firearm. On 11/19/76, at about 3:00 a.m. the victim John and Irene Simmions, were awaken at their residence. Titch stated, "Don't move or 'll blow your head off, I have a gun." Titch cut the phone cord. Went through the dresser drawers, took the keys to their car, house and business, and left in the victims' 1975 Chevrolet Monte Carlo. Items missing from the home included about $280 cash, one .32 caliber beretta handgun, and a box of ammunition.

Count IV-PC 211, Robbery 1st w/Use of firearm. On 12/14/76, at about 4:20 a.m., Titch entered the bedroom of Debra Bradley, placed a handgun to her head and asked her for money. He took eleven dollars from her. He took her to her parents bedroom. He woke Alvin and Eleanor Bradley with the gun at their daughter's head. He got two one-dollar bills, asked about guns and valuables and left via the front door.

Count VI-PC 211, Robbery 1st w/Use of firearm. On 12/18/76, at about 2:30 a.m., Titch and Thomas, (co-defendant) entered the bedroom of the victims with a handgun which they used to threaten them. They took approximately 27 dollars from the victim's purse and wallet. The telephone wire was cut and they left the house.

Count VII-PC 211, Robbery 1st w/Use of firearm. On 12/21/76, at about 5:30 p.m., Titch went to the service window of Theo's Restaurant, showed a handgun and demanded all of the clerk's money. The clerk gave Titch about sixty dollars and fled the area on a bicycle.

Count IX-PC 211, Robbery 1st w/Use of firearm. On 12/27/76, at about 4:00 a.m., Titch burglarized the home of Mr. and Mrs Lowell Gray. Items removed included car keys and the victim's 1976 Chrysler automobile.

Count X-PC 459, Burglary 2nd. On 1/16/77, at about 9:00 a.m., Mr. Armando Gomez returned to his residence and discovered that someone entered his residence through the window, taken the car keys from the dinning room table and driven away in his 1976 Chevrolet Monte Carlo.

Count XI-Burglary 2nd, P459. On 1/19/77, at about 11:00 a.m., Myrtle Irene King returned to her residence and found that someone had broken a large window to her kitchen door to gain entry to her home. The house had been ransacked and the following items were taken: thirty-five dollars in coins, a roger model 10-22 carbine rifle, one British Enfield .303 carbine, two military .50 caliber ammunition cans containing approximately one thousand rounds of .22 caliber cartridges and approximately nine hundred pounds of military type .303 ammunition.

2

Count II- Assault w/ Deadly Weapon on a Peace Officer, PC 2456/12022.5. POR dated 3/27/78, pages 2,3, & 6. On 12/27/76, at approximately 8:50 a.m. Mark Titch and his accomplice, William Hauper, committed armed robbery at the Base Liquor Store. Titch walked out with approximately $450. Officer Robb observed Titch exiting the store and ordered Titch to stop walking. Titch started walking toward the officer, drew his weapon and ordered the officer to freeze. As Officer Robb attempted to take cover behind his parked vehicle, Titch fired approximately 8 to 9 rounds and the officer was struck 5 times. The officer did not draw his weapon. Titch fled in a waiting vehicle driven by William Hauper. Officer Robb sustained severe injuries to his legs and collar bone and is now retired based on his medical disabilities.

2.   **Prisoner's Version:**  I am sincerely sorry for the crimes I committed in 1976 and January 1977, and I regret all the pain and suffering that I brought to so many people's lives. I don't make any excuses for my past actions because, regardless of what deprivations or abuses I experienced as a youth, it doesn't justify robbing and murdering innocent people or depriving them of their property.

I truly wish with all my heart that I would have better decision. If there were any way that I could go back and undo the harm that I perpetrated, or any way that I Could make amends, I would without hesitation. The crimes I committed will always be a heavy burden for me to live with and will Always fill me with tremendous sadness and regret.

CLARIFICATION.CORRECTIONS:  In reviewing my 2003 Life Prisoner Evaluation Report and other documents contained in my prison file, I have discovered and would like to correct some significant factual errors. Although these factual corrections in no way mitigate the severity of my offense, I don't believe a thorough or informed evaluation is possible unless these clarifications are made. These corrections/clarifications are as f follows:

I.     My Cumulative Case Summary erroneously incorporates the Orange County District Attorney's PC 1203.01 statement under "Facts": CYA diagnostic Report...", when it should be listed under "D.A.'s view".

II.    The D.A. 's PC 1203.01 statement insinuates, or claims as fact, that A) I stepped on the gas to muffle gun shots during the Duncan robbery/murder; b) I attempted to rape Laura Stoughton in her presence and made her aware that she was about to be killed; and d) I was aware Ms. Stoughton was clutching a Rosary and praying for her life. These statements presented as facts are false, or misleading, and  there is no sworn testimony or evidence that supports them.

III.   The CYA Report makes the statement that my crime partner and I fired rifle shells into Laura Stoughton's body as she knelt with a

3

crucifix which is completely untrue. Furthermore, the CYA Report lists assault w/intent to commit murder, threat of assault on juvenile hall counselor, robbery/assault, with deadly weapon, and other charges as my "Prior Record" which is also untrue. Many of the charges listed are arrests , not convictions, and the assault with a deadly weapon is part of my current offense, not my prior record.

IV.    With respect to the Orange County commitment, my records are unclear about what my role was in the three robberies which resulted in murder. With respect to the robbery/murder of Laura Stoughton, I was the sole perpetrator. I had no predisposition to commit this crime but was induced by my crime partner into believing that killing Laura Stoughton would prevent us from being apprehended for the kidnapping which was a life offense. With respect to the other robbery/murders, I was an accomplice to what I thought would only be robbery, not murder. I didn't use a firearm in either of those incidents, even though one was available, and my participation in those events was only with great reluctance.

**3.    Aggravating/Mitigating Circumstances:**

**a) Aggravating Factors:**
1. Prisoner had the opportunity to cease but continued with the crime.
2. Circumstances of crime created potential for serious injury to others.
3. Murder was senseless and served no purpose in completing the crime.
4. Murder was committed to prevent detection of another crime.
5. Multiple victims.
6. Prisoner has a history of criminal behavior.
7. Use of weapon: .22 caliber Rifle, handgun.
8. Nature of crime exhibited cruelty and callousness.

**b) Mitigating Factors:** None noted.

## II.    PRECONVICTION FACTORS:

**A.    JUVENILE RECORD:**

| Date | Offense | Disposition |
|------|---------|-------------|
| 2/11/72 | Truancy | Probation six-months |
| 6/20/72 | Malicious Mischief | Continued Ward, Juvenile Hall released 12/14/72. |
| 1/16/73 | Runaway | Continued Ward. |
| 3/2/73 | Burglary | Continued Ward. Committed to Rancho Portrero. |
| 3/21/73 | Escape | Committed to Manchester program (Juvenile placement) |
| 4/20/73 | Escape | Returned to placement (Manchester) |

4

| | | |
|---|---|---|
| 5/15/73 | Burglary | Returned to placement (Manchester) |
| 10/16/73 | Assault w/Intent to commit murder/burglary | Released to Juvenile Hall. Dispo: N/A |
| 10/28/73 | Threat of assault on Counselor | Isolated from group/counseled |
| 11/12/73 | Burglary (3cts.) | Tried Orange County Superior Court 12/6/73 Dispo: N/A |
| 12/20/73 | Armed Robbery | Committed to CYA, 12/7/73 |
| 12/28/75 | Vehicle Theft | Return to CYA, 1/6/76 |
| 9/10/76 | Burglary/Auto Theft | |
| 11/5/76 | Escape | SD County Juvenile Hall |
| 12/26/76 | Robbery/Assault w/DW | Pled to other charges/Instant Offense |

**B.    ADULT CONVICTIONS AND ARRESTS:**  Records indicate present offense only.

**C.    PERSONAL FACTORS :**  Mark Titch was born on July 31, 1959, to Magdeline and Walter Titch and raised in Anaheim, California. He is the fourth of six children, three boys and three girls. At the age of eleven, Mark's parents divorced, leaving the father with legal custody of Mark. Mark has fluctuated in placement between the parents and various court-ordered placements. None of the other siblings have been involved with law enforcement with the exception of Walter Titch, brother, who has had Emotional problems. His father was a strict disciplinarian, mentally abusive and an alcoholic. The police were often at the house because of family fights and family problems. Due to a dysfunctional family and mental abuse, he began to runaway. He admits to having work on only one occasion. He was a casual smoker of marijuana for a few years and has experimented with other drugs.

**III.    POSTCONVICTIONS FACTORS:**

**A.    SPECIAL PROGRAMMING/ACCOMMODATIONS:** No special programming/accommodations noted.

**B.    CUSTODY HISTORY:** During the three year period since his last Subsequent Parole Considerations Hearing on 7-24-03, Titch has remained at RJDCF working for IDL and currently as the Facility 1 Lt. Clerk. He has received above average and average and satisfactory work performance reports. He has maintained MED-A custody except between 4-1-04 to 11-3-04 where he was MAX custody. He has maintained a Classification Score of Zero points.

**C.    THERAPY AND SELF-HELP ACTIVITIES:** None noted.

**D.    DISCIPLINARY HISTORY:** No CDC 115's and one 128-A for Window Coverings. Prior disciplinary includes CDC 115's:

| | |
|---|---|
| 7/27/79 | Assault altercation with Inmate Belton. Guilty: 15-days LOC |
| 3/31/80 | Physical altercation with Inmate Belton. |

5

| | | |
|---|---|---|
| 5/15/85 | Force and Violence | |
| | Guilty: 2-weekends CTQ | |
| 7/13/85 | Inmate Manufactured Alcohol | |
| | Guilty: 5-weekends CTQ | |
| 2/23/86 | Force and Violence | |
| | Guilty: 5-days disciplinary detention | |

CDC 128A:
6/15/85    Horseplay

E. **OTHER:**    Inmate Titch was seen by the Board of Prison Terms (BPT) on 7-29-03, for his Subsequent Parole Consideration Hearing #&. He was denied parole three years. BPT made the following recommendations: 1) Receive new Psych Report 2) Remain disciplinary free, 3) Participate in self-help and therapy programs. He was placed on the 7/2006 Calendar.

## IV.  FUTURE PAROLE PLANS:

A. **RESIDENCE:** Inmate would  like to parole to San Diego where he can reside with friend Lenona Carlburg, and be surrounded by many loving and caring friends who will provide him with a positive support group. (See support letters from Lenona Carlburg and Paul Mullen).

B. **EMPLOYMENT:** I/M has excellent employable skills in bookkeeping/accounting, offset printing, welding and construction as well as many contacts for securing a good paying job. At some point after being re-established in the community, he also plans to go back to college and finish his Bachelor's degree in Business Administration and perhaps even go on to earn a Master's degree.

C. **ASSESSMENT:** Inmate is not married. No employment support letters noted at this time.

## V.  USINS STATUS: No USINS holds noted.

## VI.  SUMMARY:

A.    Prior to release, the prisoner could benefit from: Maintaining disciplinary free behavior and participate in self-help and therapy groups when available.

B.    This Board Report is based on a four hour interview, incidental contact on the yard and housing unit, and review of inmate's Central File.

C.   Prisoner was afforded an opportunity to examine his central file on 3-29-06 and examined his file per CDC 128B dated 3-24-06.

D.   No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan for effective communication.

**Prepared by,**                                    **Reviewed by,**

J. A. ORTIZ, CC-I                                   D. TAPIA, CC-II

7

### INMATE VERSION

I am sincerely sorry for the crimes I committed in 1976 and January 1977, and I regret all the pain and suffering that I brought to so many people's lives. I don't make any excuses for my past actions because, regardless of what deprivations or abuses I experienced as a youth, it doesn't justify robbing and murdering innocent people or depriving them of their property.

I truly wish with all my heart that I would have made better decisions. If there were any way that I could go back and undo the harm that I perpetrated, or any way that I could make ammends, I would without hestitation. The crimes I committed will always be a heavy burden for me to live with and will always fill me with tremendous sadness and regret.

## CLARIFICATION/CORRECTIONS:

In reviewing my 2003 Life Prisoner Evaluation Report and other documents contained in my prison file, I have discovered and would like to correct some significant factual errors. Although these factual corrections in no way mitigate the severity of my offense, I don't believe a thorough or informed evaluation is possible unless these corrections are made. These corrections/clarifications are as follows:

I.   My Cumulative Case Summary erroneously incorporates the Orange County District Attorney's PC 1203.01 statement under "FACTS: CYA Diagnostic Report...", when it should be listed under "D.A.'s VIEWS".

II.  The D.A.'s PC 1203.01 statement insinuates, or claims as fact, that a) I stepped on the gas to muffle gun shots during the Duncan robbery/murder; b) I attempted to rape Laura Stoughton; c) My crime partner and I discussed killing Laura Stoughton in her presence and made her aware that she was about to be killed; and d) I was aware Ms. Stoughton was clutching a Rosary and praying for her life. These statements presented as facts are false, or misleading, and there is no sworn testimony or evidence that supports them.

III. The CYA Report makes the statement that my crime partner and I fired rifle shells into Laura Stoughton's body as she knelt with a crucifix which is completely untrue. Furthermore, the CYA Report lists assault w/intent to commit murder, threat of assault on juvenile hall counselor, robbery/assualt with deadly weapon, and other charges as my "Prior Record" which is also untrue. Many of the charges listed are arrests, not convictions, and the assault with a deadly weapon is part of my current offense, not my prior record.

IV.  With respect to the Orange County commitment, my records are unclear about what my role was in the three robberies which resulted in murder. With respect to the robbery/murder of Laura Stoughton, I was the sole perpetrator. I had no predisposition to commit this crime but was induced by my crime partner into believing that killing Laura Stoughton would prevent us from being apprehended for the kidnapping which was a life offense. With respect to the other robbery/murders, I was an accomplice to what I thought would only be robbery, not murder. I didn't use a firearm in either of those incidents, even though one was available, and my participation in *some of the* *elements of* those events was only with great reluctance.

B

BOARD OF PRISON TERMS                                                                                    STATE OF CALIFORNIA

# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

**INSTRUCTIONS:**
TO CDC STAFF:    DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF:    EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
                 ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT.  SEE BPT §§ 2290-2292, 2410 AND 2439.

| POST CONVICTION REPORT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASON |
| 7-29-03<br>to<br>1-17-04 | | | **PLACEMENT:** Remained at RJDCF in the general population. Maintained a Classification Score of Zero points.<br><br>**CUSTODY:** MED-A.<br><br>**VOCATIONAL TRAINING:** None noted during this review period.<br><br>**ACADEMICS:** None noted during this review period.<br><br>**WORK RECORD:** Continued assignment with IDL. CDC 101 Work Supervisors Report 1-12-04.<br><br>**GROUPS ACTIVITES:** None noted during this review period.<br><br>**PSYCHIATRIC TREATMENT:** None noted during this review period.<br><br>**PRISON BEHAVIOR:** None noted during this review period.<br><br>**OTHER:** Participated in "Hands of Peace" on 11-7-03. |

| CORRECTIONAL COUNSELOR SIGNATURE | | DATE 5-27-06 |
|---|---|---|
| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
| TITCH, MARK | b-89549 | RJDCF | JULY 2006 | 7-19-06 |

BPT 1004 (REV 11/02)                                    **PAGE 1 OF 4**

9

BOARD OF PRISON TERMS                                                STATE OF CALIFORNIA
## CONTINUATION SHEET:  POSTCONVICTION PROGRESS REPORT

| POST CONVICTION REPORT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASON |
| 1-18-04 TO 1-17-05 | | | **PLACEMENT:** Remained at RJDCF in the general population. Maintained a Classification Score of Zero points. |

**CUSTODY:** MED-A until 8-31-04, MAX from 9-1-04 to 11-3-04, MED-A from 11-4-4 for remainder of this review period.

**VOCATIONAL TRAINING:**  None noted during this review period.

**ACADEMICS:**  None noted during this review period.

**WORK RECORD:**  Continued assignment with IDL. CDC 101 work supervisors report on 4-1-04 and 1-1-05.

**GROUP ACTIVITIES:**  Participated and received 128B chrono for Alcoholics Anonymous on 6-30-04 and 8-30-04.

**PSYCHIATRIC TREATMENT:**  None noted during this review period.

**PRISON BEHAVIOR:**  None noted during this review period.

**OTHER:**  Laudatory chrono's for participation in "Hands of Peace" on 6-1-04 and "Purpose Driven Life" on 7-22-04.

**ORDER:**

☐ BPT date advanced by _____ months.     ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.     ☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

☐ Previously imposed conditions affirmed.

☐ Add or modify

_____

_____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| TITCH, MARK | B-89549 | RJDCF | JULY 2006 | 7/19/2006 |

10

BPT 1004 (REV 11/02)                                          **PAGE 2 OF 4**                                        **PERMANENT**
**ADDENDA** BOARD OF PRISON TERMS                                                                                    STATE OF
CALIFORNIA

## CONTINUATION SHEET: POSTCONVICTION PROGRESS REPORT

| POST CONVICTION REPORT | | | |
|---|---|---|---|
| **YEAR** | **BPT** | **PBR** | **REASON** |
| 1-18-05 TO 1-17-06 | | | **PLACEMENT:** Remained at RJDCF in the general population. Maintained a Classification Score of Zero points. |
| | | | **CUSTODY:** MED-A. |
| | | | **VOCATIONAL TRAINING:** None noted during this review period. |
| | | | **ACADEMICS:** None noted during this review period. |
| | | | **WORK RECORD:** Job change from IDL to Facility 1 Lieutenant Clerk on 11-23-05. CDC work supervisor's report on 9-5-05 and 4-1-05. |
| | | | **GROUP ACTIVITIES:** Participated and received 128B chrono for Alcoholics Anonymous on 3-31-05, 6-30-05, 8-30-05, and 12-31-05. |
| | | | **PSYCHIATRIC TREATMENT:** None noted during this review period. |
| | | | **PRISON BEHAVIOR:** Received CDC 128 A on 6-7-05 for Window Covering. |
| | | | **OTHER:** Laudatory chrono for participation in "Biblical Counseling Foundation" on 5-29-05. |

**ORDER:**

☐ BPT date advanced by _____ months.          ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.          ☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

☐ Previously imposed conditions affirmed.

☐ Add or modify

_____

_____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| TITCH, MARK  B-89549 | RJDCF | JULY 2006 | 7/19/2006 | |

BPT 1004 (REV 11/02)                                                            **PERMANENT  ADDENDA**

## Page 3 of 4

**CONTINUATION SHEET: POSTCONVICTION PROGRESS REPORT**

| POST CONVICTION REPORT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASON |
| 1-18-06 TO present | | | **PLACEMENT:** Remained at RJDCF in the general population. Maintained a Classification Score of Zero points. |

**PLACEMENT:** Remained at RJDCF in the general population. Maintained a Classification Score of Zero points.

**CUSTODY:** MED-A.

**VOCATIONAL TRAINING:** None noted during this review period.

**ACADEMICS:** None noted during this review period.

**WORK RECORD:** Continues assignment as the Facility 1 Lieutenant Clerk.

**GROUP ACTIVITIES:** Participated and received 128B chrono for Alcoholics Anonymous and Narcotics Anonymous on 3-31-06.

**PSYCHIATRIC TREATMENT:** None noted during this review period.

**PRISON BEHAVIOR:** None noted during this review period.

**OTHER:** Received a Laudatory memo from Brent Young, Utility Shop Supervisor, on 1-23-06.

Prepared by,                          Reviewed by,

J. A. Ortiz, CCI (A)                   D. Tapia, CCII

**ORDER:**

☐ BPT date advanced by _____ months.     ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.     ☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

☐ Previously imposed conditions affirmed.

☐ Add or modify

_____

_____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| TITCH, MARK | B-89549 | RJDCF | JULY 2006 | 7/19/2006 |
| BPT 1004 (REV 11/02) | | PAGE 4 OF 4 | | PERMANENT ADDENDA |

12

**EXHIBIT 14**

2003 Life Prisoner Evaluation Report

# LIFE PRISONER EVALUATION REPORT
## SUBSEQUENT PAROLE CONSIDERATION HEARING #7
### JUNE 2003 CALENDAR

**TITCH, MARK**          **B-89549**

## I.   COMMITMENT FACTORS:

**A.   LIFE CRIME:** Murder 1st, PC 187, two (2) Counts. Weapon: .22 Caliber rifle/gun. Orange County, Case #C-37693. Victims: Laura Stoughton, age 21; Denise Duncan, age 18; Aubrey Duncan, age unknown. Titch also received an additional commitment of Assault with a Deadly Weapon upon a Peace Officer, (PC 245b/12022.5). San Diego County, Case #CR-42845. Sentence: 7-years to life. Minimum Eligible Parole Date (MEPD): 2/4/84.

**1.   Summary of Crime:** Offense Summary taken from cumulative case summary, dated 3/2/78, and Probation Officer's Report (POR), dated 3/27/78.
Controlling Counts:
Count XII: Kidnap for Robbery/Use of firearm, PC 209/12022.5 and Count XIII: Murder, PC 187.

On January 21, 1977, a motorcyclist riding through a vacant field reported that he saw a female Caucasian subject lying on a hill. The victim was identified as Laura Ann Stoughton, age 21. Mark Titch and Brett Thomas (co-defendant), abducted the victim when she drove up in her driveway. She was put into the trunk of their car and taken to a remote area. She was taken up a hill where Titch tried to rape her but couldn't because she was a virgin. Titch and Thomas decided to jointly execute her. Thomas' gun jammed and Titch shot the victim in the shoulder. She was praying for her life. Titch and Thomas discussed in her presence that she would be killed to prevent her from later identifying them. Titch shot her twice in the mouth. She was found clutching a rosary in her right hand against her chest. Her left arm appeared to be dangling from the shoulder and her head was lying in a large puddle of blood. There did not appear to be a struggle in the area.

Count XVI: PC 187, Murder 1st. On January 29, 1977, at approximately 3:56 a.m., Titch and Thomas (co-defendant), followed Aubrey Duncan home from work. Titch stopped the car he was driving in front of the victim's home. As Aubrey Duncan went to the front door to unlock it, Thomas, who was in the passenger seat, shot Duncan several times with a .22 caliber rifle.



Nadine Duncan and her daughter Denise, heard the loud noise and went to the front door. As Nadine Duncan opened the door and stepped onto the porch seeing her husband dead, she was shot twice with a .22 caliber rifle and fell to the porch. Her daughter Denise was shot three times, unconscious, and subsequently died at the hospital. Nadine Duncan was shot by Thomas with a shotgun because he ran out of ammunition for the .22 caliber rifle. She crawled over the body of her daughter to get to the phone to call the police.

**B.** **MULTIPLE CRIMES:** Count II – PC 211, Robbery 1st w/Use of firearm. On 11/19/76, at about 3:00 a.m. the victims John and Irene Simmons, were awaken at their residence. Titch stated, "Don't move or I'll blow your head off, I have a gun." Titch cut the phone cord, went through the dresser drawers, took the keys to their car, house and business, and left in the victims' 1975 chevrolet monte carlo. Items missing from the home included about $280 cash, one .32 caliber beretta handgun, and a box of ammunition.

Count IV – PC 211, Robbery 1st w/Use of firearm. On 12/14/76, at about 4:20 a.m., Titch entered the bedroom of Debra Bradley, placed a handgun to her head and asked her for money. He took eleven dollars from her. He took her to her parents bedroom. He woke Alvin and Eleanor Bradley with the gun at their daughter's head. He got two one-dollar bills, asked about guns and valuables and left via the front door.

Count VI – PC 211, Robbery 1st w/Use of firearm. On 12/18/76, at about 2:30 a.m., Titch and Thomas, (co-defendant) entered the bedroom of the victims with a handgun which they used to threaten them. They took approximately 27 dollars from the victims' purse and wallet. The telephone wire was cut and they left the house.

Count VII – PC 211, Robbery 1st w/Use of firearm. On 12/21/76, at about 5:30 p.m., Titch went to the service window of Theo's Restaurant, showed a handgun and demanded all of the clerk's money. The clerk gave Titch about sixty dollars and fled the area on a bicycle.

Count IX – PC 211, Robbery 1st w/Use of firearm. On 12/27/76, at about 4:00 a.m., Titch burglarized the home of Mr. and Mrs. Lowell Gray. Items removed included car keys and the victims' 1976 Chrysler automobile.

Count X – PC 459, Burglary 2nd. On 1/16/77, at about 9:00 a.m., Mr. Armando Gomez returned to his residence and discovered that someone entered his residence through a window, taken the car keys from the dinning room table and driven away in his 1976 Chevrolet Monte Carlo.

Titch, Mark B-89549
Page 3

Count XI – Burglary 2nd, P459.  On 1/19/77, at about 11:00 a.m., Myrtle Irene King returned to her residence and found that someone had broken a large window to her kitchen door to gain entry to her home.  The house had been ransacked and the following items were taken: thirty-five dollars in coins, a roger model 10-22 carbine rifle, one British Enfield .303 carbine, two military .50 caliber ammunition cans containing approximately one thousand rounds of .22 caliber cartridges and approximately nine hundred pounds of military type .303 ammunition.

Count II – Assault w/Deadly Weapon on a Peace Officer, PC 2456/12022.5.  POR dated 3/27/78, pages 2, 3, & 6.  On 12/27/76, at approximately 8:50 a.m. Mark Titch and his accomplice, William Hauper, committed armed robbery at the Base Liquor Store.  Titch walked out with approximately $450.  Officer Robb observed Titch exiting the store and ordered Titch to stop walking.  Titch started walking toward the officer, drew his weapon and ordered the officer to freeze.  As Officer Robb attempted to take cover behind his parked vehicle, Titch fired approximately 8 to 9 rounds and the officer was struck 5 times.  The officer did not draw his weapon. Titch fled in a waiting vehicle driven by William Hauper.  Officer Robb sustained severe injuries to his legs and collar bone and is now retired based on his medical disabilities.

**2.  Prisoner's Version:** "I am truly very sorry for the crimes I committed in 1976, and January 1977.  I was a very young, lost individual, and I truly regret all the pain and suffering that I brought to so many people's lives.  If there were any way that I could go back and undo the many harms that I perpetrated, or any way that I could make amends, I would without hesitation.  The crimes I committed will always be a heavy burden for me to live with and will always fill me with tremendous sadness and regret."

**3.  Aggravating Circumstances:**

    a.  Prisoner had opportunity to cease but continued with the crime.
    b.  Circumstances of crime created potential for serious injury to others.
    c.  Murder was senseless and served no purpose in completing the crime.
    d.  Murder was committed to prevent detection of another crime.
    e.  Multiple victims.
    f.  Prisoner has a history of criminal behavior.
    g.  Use of weapon: .22 caliber Rifle, handgun.
    h.  Nature of crime exhibited cruelty and callousness.

**4.  Mitigating Circumstances:**  None noted.

3



Titch, Mark B-89549
Page 4

## II.   PRECONVICTION FACTORS:

### A. JUVENILE RECORD:

| Date | Offense | Disposition |
|------|---------|-------------|
| 2/11/72 | Truancy | Probation six-months |
| 6/20/72 | Malicious Mischief | Continued Ward, Juvenile Hall released 12/14/72 |
| 1/16/73 | Runaway | Continued Ward |
| 3/2/73 | Burglary | Continued Ward.Committed to Rancho Portrero |
| 3/21/73 | Escape | Committed to Manchester program (Juvenile placement) |
| 4/20/73 | Escape | Returned to placement (Manchester) |
| 5/15/73 | Burglary | Returned to placement (Manchester) |
| 10/16/73 | Assault w/Intent to commit murder/burglary | Released to Juvenile Hall.Dispo: N/A |
| 10/28/73 | Threat of assault on Counselor | Isolated from group/counseled |
| 11/12/73 | Burglary (3 cts.) | Tried Orange County Superior Court 12/6/73. Dispo. N/A |
| 12/20/73 | Armed Robbery | Committed to CYA, 12/7/73 |
| 12/28/75 | Vehicle Theft | Return to CYA, 1/6/76 |
| 9/10/76 | Burglary/Auto Theft | |
| 11/5/76 | Escape | SD County Juvenile Hall |
| 12/26/76 | Robbery/Assault w/DW | Pled to other charges/Instant offense |

### B. ADULT CONVICTIONS: Records indicate present offense only.

### C. PERSONAL FACTORS: Mark Titch was born on July 31, 1959, to Magdeline and Walter Titch and raised in Anaheim, California. He is the fourth of six children, three boys and three girls. At the age of eleven, Mark's parents divorced, leaving the father with legal custody of Mark. Mark has fluctuated in placement between the parents and various court-ordered placements. None of the other siblings have been involved with law enforcement with the exception of Walter Titch, brother, who has had emotional problems. His father was a strict disciplinarian, mentally abusive and an alcoholic. The police were often at the house because of family fights and family problems. Due to a dysfunctional family and mental abuse, he began to runaway. He admits to having work on only one occasion. He was a casual smoker of marijuana for a few years and has experimented with other drugs.

## III.   POSTCONVICTION FACTORS:

### A. SPECIAL PROGRAMMING/ACCOMMODATION:   
No special programming/accommodations noted.

4

Titch, Mark B-89549
Page 5

**B. CUSTODY HISTORY:** During the two year period since his last Subsequent Parole Consideration Hearing on 6/26/01, Titch has remained at RJDCF working for Inmate Day Labor (IDL) and has received above average and satisfactory work performance reports. He has maintained Medium-A custody and classification score of zero points.

**C. THERAPY AND SELF-HELP ACTIVITIES:** None noted.

**D. DISCIPLINARY HISTORY:** No CDC 115's or CDC 128A's since last hearing. Prior disciplinary includes CDC 115's:

| | |
|---|---|
| 7/27/79 | Assaultive altercation with Inmate Belton. |
| | Guilty: 15-days LOC |
| 3/31/80 | Physical altercation with Inmate Rucker. |
| | Guilty: 10-days CTQ, 10-hours extra duty |
| 5/15/85 | Force and Violence |
| | Guilty: 2-weekends CTQ |
| 7/13/85 | Inmate Manufactured Alcohol |
| | Guilty: 5-weekends CTQ |
| 2/23/86 | Force and Violence |
| | Guilty: 5-days disciplinary detention |

CDC 128A:
6/15/85     Horseplay

**E. OTHER:** Inmate Titch was seen by the Board of Prison Terms (BPT) on 6/26/01, for his Subsequent Parole Consideration Hearing #6. He was denied parole two years. BPT made the following recommendations: 1.) Remain disciplinary free, 2.) Participate in self-help and therapy programs. He was placed on the 6/2003 calendar.

**IV.   FUTURE PAROLE PLANS:**

**A. RESIDENCE:** I/M would like to parole to San Diego where he can reside with friend Lenona Carlburg, and be surrounded by many loving and caring friends who will provide him with a positive support group. (See support letters from Lenona Carlburg and Paul Mullen).

**B. EMPLOYMENT:** I/M has excellent employable skills in bookkeeping/accounting, offset printing, welding and construction as well as many contacts for securing a good paying job. At some point after being re-established in the community, he also plans to go back to college and finish his Bachelor's degree in Business Administration and perhaps even go on to earn a Master's degree.

5

Titch, Mark B-89549
Page 6

**C. ASSESSMENT:** Inmate is not married.  No employment support letters noted at this time.

**V.     USINS STATUS:** No USINS holds noted.

**VI.     SUMMARY:**

A.     Considering the Commitment Offense, prior criminal record and prison adjustment, and the brief time I have known this prisoner, this writer believes that the prisoner would probably pose a high degree of threat to the public at this time if released from prison.

B.     Prior to release, the prisoner could benefit from: maintaining disciplinary free behavior and participation in self-help and therapy groups when available.

C.     This Board Report was based on an interview with the prisoner on 3/5/03, and 4/8/03, lasting approximately one hour and a complete review of the central file lasting five hours.

D.     Prisoner was afforded an opportunity to examine his central file on 3/3/03, and examined his file per CDC 128B dated 2/10/03.

E.     No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan for effective communication.

Prepared by,                                Reviewed by,

**A. Nanquil**                              **J. Moyer**
**CC-I**                                    **CC-II**

6

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA
## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS:
TO CDC STAFF:   DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF:   EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT.  SEE BPT §§ 2290-2292, 2410 AND 2439.

| POST CONVICTION REPORT | | | |
| --- | --- | --- | --- |
| YEAR | BPT | PBR | REASON |
| 6/27/01 TO 6/26/02 | | | **PLACEMENT:** I/M Titch remained at RJDCF in the general population. On 7/10/01, seen by Unit Classification Committee (UCC) for Post-Board Review. UCC elected to continue present program. On 4/23/02, seen by UCC for Annual Review. Maintained classification score of zero points and UCC elected to continue present program. <br><br>**CUSTODY:** MED-A. <br><br>**VOCATIONAL TRAINING:** None noted during this period. <br><br>**ACADEMICS:** None noted during this period. <br><br>**WORK RECORD:** Continues assignment with Inmate Day Labor (IDL). CDC 101's Work Supervisor's Reports, for 12/2001, 3/2002, and 6/2002, reflects satisfactory and above average work performance. <br><br>**GROUP ACTIVITIES:** None noted during this period. <br><br>**PSYCHIATRIC TREATMENT:** None noted during this period. <br><br>**PRISON BEHAVIOR:** None noted during this period. <br><br>**OTHER:** No CDC 115's or 128A's noted this period. |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
| --- | --- | --- | --- | --- |
| **Titch, Mark** | **B-89549** | **RJDCF** | **6/2003** | **June 19, 2003** |

BPT 1004 (REV 11/02)                              **PAGE 1 of 2**

7

BOARD OF PRISON TERMS                        STATE OF CALIFORNIA

**CONTINUATION SHEET: POSTCONVICTION PROGRESS REPORT**

| POST CONVICTION REPORT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASON |
| 6/27/02 TO PRESENT | | | **PLACEMENT:** I/M Titch remained at RJDCF in the general population with zero points.<br><br>**CUSTODY:** MED-A.<br><br>**VOCATIONAL TRAINING:** None noted during this period.<br><br>**ACADEMICS:** None noted during this period.<br><br>**WORK RECORD:** Continues assignment with Inmate Day Labor (IDL). CDC 101, Work Supervisor's Report dated 9/30/02, reflects above average work performance.<br><br>**GROUP ACTIVITIES:** None noted during this period.<br><br>**PSYCHIATRIC TREATMENT:** None noted during this period.<br><br>**PRISON BEHAVIOR:** No CDC 115's of CDC 128A's noted this period.<br><br>**OTHER:** None noted during this period.<br><br>Prepared by,          Reviewed by,<br><br>A. Nanquil          J. Moyer<br>CC-I                CC-II |

**ORDER:**

☐ BPT date advanced by _____ months.      ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.      ☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

☐ Previously imposed conditions affirmed.

☐ Add or modify

_____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| **Titch, Mark** | **B-89549** | **RJDCF** | **6/2003** | **June 19, 2003** |

BPT 1004 (REV 11/02)                **PAGE 2 OF 2**             **PERMANENT ADDENDA**

~~_____, _____~~       ℬ

**EXHIBIT 15**

2000 Life Prisoner Evaluation Report


# LIFE PRISONER EVALUATION REPORT
## SUBSEQUENT PAROLE CONSIDERATION HEARING #6
## SEPTEMBER 2000 CALENDAR

**TITCH, MARK**       **B-89549**

## I.   Commitment Factors:

**A.**   **Life Crime:** Murder 1st, PC 187, two counts; from Orange County Superior Court case #C-37693. Titch received an additional commitment of Assault with Deadly Weapon upon Peace Officer, PC 245(b); from San Diego County Court; case #CR-42845. Sentence- Life plus seven years. Minimum Eligible Parole Date (MEPD) 2/4/84.

   **1.**   **Offense Summary:** Offense Summary is taken from the Probation Officer's Report (POR), dated 3/27/78.
   **Controlling Counts:**

   ### Count XIII
   ### PC 187, Murder 1st

On January 21, 1977, a motorcyclist riding through a vacant field in the City of Orange reported that he had observed a female Caucasian subject lying on the knoll of the hill. Police responded and found the deceased, later identified as victim Laura Ann Stouthton, 21 years old. The coroner's investigation set the body in the upright position and it was noted that in her right hand, she was clutching a rosary against her chest. Additionally, investigators noticed that the victim had sustained two possible gunshot wounds in the mouth area an one gunshot wound in the shoulder area. Police discovered a .22 caliber bullet lying on a blanket next to the victim's left shoulder. Investigators indicated that there did not appear to be a struggle in the area.

   ### Count XVI
   ### PC 187, Murder 1st

On January 29, 1977, at approximately 3:56 a.m., Anaheim police were contacted by Mrs. Nadine Duncan reporting a possible homicide at her residence. As police investigators arrived on scene, they found the deceased victim, later identified as Aubrey Duncan, lying in the front of the house, lying in a pool of blood, with visible facial injuries. The second victim, identified as Denise Duncan, 18 years of age, was found lying in the entrance hall of the residence. Ms. Denise Duncan was transported to West Anaheim Community Hospital at 4:20 a.m. and expired from the injuries at approximately 5:00 a.m. Mrs. Nadine Duncan was transported to Anaheim Memorial Hospital at approximately 4:30 a.m.

INMATE COPY

1

Subsequent Parole Consideration Hearing #6
September 2000 Calendar
Titch, Mark            B-89549
Page 2

On February 2, 1977, Anaheim police were contacted by a Highway Patrol
Officer, from the Victorville area, who stated that the two suspects in
custody identified as Brett Thomas and Mathew Taphoon who was later
identified as Mark Wayne Titch, were in custody for suspicion of Grand Theft
Auto. The vehicle was discovered to have been stolen from the Anaheim
area. Titch said," You mother fucking pigs, I don't want to talk to you. Send
me to Juvenile Hall."

**Multiple Crimes:**

### Count II
### PC211, Robbery 1st

Per the Deputy District Attorney's Report dated 4/12/77. On or about
November 20, 1976, in Orange County, Mark Wayne Titch willfully,
unlawfully, and feloniously entered the residence of John and Irene
Simmons, located at 2516 Chanticleer Road, Anaheim, Ca., with the intent
to commit theft with the use of a firearm.

### Count IV
### PC 211, Robbery 1st

On or about December 14, 1976, in Orange County, Mark Wayne Titch
willfully, unlawfully, and feloniously entered the residence of Debra Bradley,
Alvin and Eleanor Bradley, located at 1412 South Sherill Street, Anaheim,
Ca., with the intent to commit theft with the use of a firearm.

### Count VI
### PC 211, Robbery 1st

On or about December 18, 1976, in Orange County, Mark Wayne Titch,
willfully, unlawfully, and feloniously entered the residence of Glen and
Margaret Dittrich, located at 2462 Chanticleer Rd., Anaheim, Ca., with the
intent to commit theft with the use of a firearm.

### Count VII
### PC 211, Robbery 1st

On or about November 21, 1976, Mark Wayne Titch did willfully, unlawfully,
and feloniously robbed Kathy Charest with the use of a firearm by means of
force and fear.

INMATE COPY

2

Subsequent Parole Consideration Hearing #6
September 2000 Calendar
Titch, Mark          B-89549
Page 3

## Count IX
## PC 211, Robbery 1st

On or about December 27, 1976, in Orange county, Mark Wayne Titch did willfully, unlawfully, and feloniously enter the residence of Powell and Shriley Gray, located at 8632 Harriet Lane, Ca., with the intent to commit theft with the use of a firearm and rob them of their personal property by means of force and fear.

## Count X
## PC 459, Burglary 2nd

On or about January 16, 1976, in Orange County, Mark Wayne Titch did willfully, unlawfully, and feloniously enter the residence located at 1813 W. Palais Street, Anaheim, Ca.

## Count XI
## PC 459, Burglary 2nd

On or about January 19, 1976, in Orange County, Mark Wayne Titch did willfully, unlawfully, and feloniously enter the residence located at 2475 W. Cerritos, Anaheim, Ca., with the intent to commit theft.

## Count XII
## PC 209, Kidnap for Robbery

On or about January 21, 1977, in Orange County, Brett Thomas and Mark Wayne Titch did willfully, unlawfully, and feloniously seized, continued, enticed, decoyed, abducted, concealed, kidnapped, and carried away Laura Anne Stouthton for the purpose of committing robbery.

## Count II
## PC 245B, Assault w/Deadly Weapon on a Peace Officer

The POR dated 3/27/78, page 2, 3,and 6, indicates that on December 26, 1976, Mark Wayne Titch and his accomplice, William Hauper, drove to San Diego from Anaheim in a stolen 1976 Chrysler Newport Sedan. On 12/27/76, at approximately 8:50 a.m., they committed an armed robbery of the Base Liquor Store, located at 3201 National Avenue, San Diego, Ca. Titch was armed with a .32 caliber automatic Beretta Firearm when he entered the liquor store and demanded that the female stock clerk (non-English speaking), to give him money from the cash register.

INMATE COPY

3

Subsequent Parole Consideration Hearing #6
September 2000 Calendar
Titch, Mark          B-89549
Page 4

The incident was interrupted by the owner, Mr. Antivan Najjar, who observed Titch with a .32 caliber weapon tucked in his waistband. The owner took the money from the cash register (approximately $450.00) and placed it in a brown paper bag and handed it to Titch. While Titch was exiting the store, he was observed by Officer James Robb. The officer followed Titch as he approached the vehicle were his accomplice was waiting. Officer Robb ordered Titch to stop walking. Titch continued toward the officer, drew his weapon, and ordered the officer to freeze. The officer attempted to take cover behind the defendant's vehicle, as Titch fired approximately 8 or 9 rounds. Officer Robb was struck 5 times. Titch fled in the awaiting vehicle with his accomplice. Officer Robb sustained severe injuries to his legs and collar bone, which resulted in arthritis in both knees, tension, and headaches. One bullet remains lodged in his right collar bone. Officer Robb received severe scarring from this incident and is now retired based on his medical disabilities sustained from Titch's violent crime.

2.    **Prisoner's Version:**  Refer to attached addendum submitted by Inmate Titch.

3.    **Aggravating Circumstances:**

   **A)**  The crime involved great violence as the victims of numerous cases were physically and mentally abused, and on two occasions murder executed.

   **B)**  A firearm was used in the commission of the majority of the offenses.

   **C)**  Victims were vulnerable.

4.    **Mitigating Circumstances:**

II.    **Preconviction Factors:**

   **A.**    **Juvenile Record:**

| Date | Offense | Disposition |
|------|---------|-------------|
| 2/11/72 | Truancy | Probation six months(8/11/72) |
| 6/20/72 | Malicious mischief | Continued Ward, Juvenile Hall released 12/14/72 |
| 1/16/73 | Runaway | Continued Ward |
| 3/2/73 | Burglary | Continued Ward. Commit to Rancho Portrero |

INMATE COPY

4



Subsequent Parole Consideration Hearing #6
September 2000 Calendar
Titch, Mark          B-89549
Page 5

| Date | Offense | Disposition |
|------|---------|-------------|
| 3/21/73 | Escape | Committed to Manchester Drive (Juvenile placement) |
| 4/20/73 | Escape | Returned to Placement (Manchester) |
| 5/15/73 | Burglary | Returned to Placement (Manchester) |
| 10/16/73 | Assault w/intent to commit murder/burglary | Released to Juvenile Hall. Dispo: NA |
| 10/28/73 | Threat of Assault | Isolated from group/ counseled |
| 11/12/73 | Burglary (x3) | Tried Orange County Superior Court Dispo: NA |
| 12/20/73 | Armed Robbery | Committed to CYA, 12/7/73 |
| 12/28/75 | Vehicle Theft | Returned to CYA, 1/6/76 |
| 9/10/76 | Burglary/Auto Theft | |
| 11/5/76 | Escape | SD County Juvenile Hall |
| 12/26/76 | Robbery/Assault w/DW | Plead to other charges/ Instant Offense |

**B.    Adult Convictions:** Records indicate present offense only.

**C.    Personal Factors:** According to the POR, Mark Wayne Titch was born July31, 1959 to Maglin Titch (mother and Walter Titch (father) and raised in the Anaheim, California area. Titch was one of six siblings, two brothers and three sisters. At the age of eleven Titch's parents divorced, leaving Mr. Titch to care for the children. Titch contends that his father was mentally abusive and an alcoholic. Due to the Mental abuse he would receive from his father and dysfunctional family, he began to runaway, became truant and eventually began his life of crime.

**III.    Postconviction Factors:** Mark Titch's Subsequent Parole Consideration Hearing #5 was conducted on 5/6/98. He was viewed as unsuitable for parole and received a two-year denial. He was placed on the 5/2000 Calendar. Recommendations were set as follows: 1) Remain disciplinary free; 2) Upgrade Vocationally/Educationally; 3) Participate in Self-help/ Therapy groups. (refer to Postconviction Progress Report)

**IV.    Future Parole Plans:** Refer to attached addendum submitted by Inmate Titch..

INMATE COPY

Subsequent Parole Consideration Hearing #6
September 2000 Calendar
Titch, Mark            B-89549
Page 6


V.   **Summary:**

A.    Considering the commitment offense, no prior record, and prison
      adjustment, the writer believes the prisoner would probably pose a high
      degree of threat to the public at this time, if released from prison.

B.    Prior to release, the prisoner could benefit from: 1. Maintain a disciplinary
      free record; 2. Upgrade vocationally and educationally; and 3. Continue to
      participate in self-help and therapy groups.

C.    This Board Report is based on a two hour interview with inmate Titch,
      specifically for the purpose of his report, coupled with routine case work,
      and a thorough review of inmate's Central File. Inmate Titch was afforded
      an Olsen Review on 6/14/00 and was provided with copies of the requested
      documents.


**Prepared by,**                           **Reviewed by,**



E. Estrada                                  A. Hernandez
CC-I                                        CC-II

INMATE COPY

6

## INMATE VERSION

I am sincerely sorry for the crimes I committed, and I immensely regret
the pain and sorrow that I caused so many people. The anguish that I
feel for having committed such senseless crimes is just enormous, and my
past actions will always fill me with overwhelming sadness.

To add to my anguish is the fact that my records don't accurately reflect
my conduct or involvement in the crimes that I or my crime partner
committed. This is becuase no probation officer's report was ever filed
in my case. Instead a C.Y.A. diagnostic report was substituted in its
place and it is both inaccurate and misleading. I was 17, not 18, at
the time that I committed my crimes; I never gunned an engine to muffle
gun shots; nor did I shoot a police officer once, then pursue him and
shoot him five more times. As I recall the incident, I told the officer
to freeze and when he didn't and went for his gun, I panicked and shot
him all at once. Moreover, my records don't reflect that the murder I
committed was not my original idea, that I only went along with it; that
I never brandished a firearm in any of the murders that my crime partner
committed; or that I never planned any of the murders my crime partner
committed or even knew that he was going to commit them. In fact, by
providing descriptions of all four murders and failing to describe what
my true actions were in these events, my records give the inaccurate
impression that I committed more than one murder.

I am not trying to minimize or justify my past actions because I fully
realize that my conduct, no matter how great or small, was totally in-
excusable. Many innocent people suffered needlessly, either as a result
of my direct actions or my own stupidity, and there is no justification
for what I did. Even so, my records should reflect my true culpability.
The truth of the matter is I was a stupid, mixed-up kid who acted
impulsively, without fully weighing the total ramifications of his actions,

INMATE COPY

7

### INMATE VERSION/CONT'D

and the consequence of that has been a tragedy beyond all proportion. I
can't even begin to express the pain and sorrow that I feel for having
acted so recklessly beause I know of no words which can convey the magni-
tude and depth of my regret. The crimes that I committed are excruciatingly
difficult for me to live with, and there isn't a day that goes by that I
don't wish I hadn't committed them. I am truly deeply sorry for all the
pain that I've caused to others, and I will always regret what I've done
for the rest of my life.

INMATE COPY

8

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

**INSTRUCTIONS:**
TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF:  EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT.  SEE BPT §§ 2290-2292, 2410 AND 2439.

| POST CONVICTION REPORT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASON |
| 5-6-98 TO 5-5-99 | | | Inmate Titch remained at CMC-E, housed in the general population under CLO-B/R Custody, with a Classification Score of 0. On 5/6/98, Titch was seen by the Board of Prison Terms for his Subsequent Parole Consideration Hearing #5. He was found unsuitable for parole and received a two-year denial. He was placed on the 5/00 calendar. The BPT recommended that Titch remain disciplinary free, upgrade vocationally and educationally, and participate in self-help and therapy groups. (AA/NA). On 6/16/98, Titch was seen by ICC/CMC-E for referral to the CSR with Rx: SOL-III, Alt: RJD-III, due to Titch's CLO-B/R Custody. On 7/20/98, Titch was endorsed for transfer to RJD-III. On 9/11/98, inmate Titch was received at RJD-III under CLO B/R Custody and with a CS of 0. He was housed in the general population and placed on the SSWL, retaining his A1/A earning staus. Titch was assigned to Facility 1 Auto Body Aide effective 9/30/98. On 10/6/98, he appeared before Facility 1 UCC. Committee acted to reduce his custody to MED-A/R- CPP. On 4/6/99, Titch appeared before Facility 1 UCC for Annual Review. CS remained 0. Inmate was referred to CSR with Rx: retain at RJD-III, Alt: CMC-E-III, due to ineligible for Level II housing.<br><br>**CUSTODY:** 5/6/98 to 10/6/98, CLOSE-B/R Custody. On 5/21/97, CDC 128G, indicates CLOSE B designation based on multiple years of denial by the BPT. 10/6/98 to 1/6/00, MED A/R Custody. On 10/6/98, CDC 128G, indicates reduction in custody level.<br><br>**VOCATIONAL INSTRUCTION:** PIA Specialty Print Plant. On 8/6/98, received CDC128B, Laudatory Chrono.<br><br>**ACADEMIC EDUCATION:** None noted this period.<br><br>**WORK PARTICIPATION:** PIA Specialty Print Shop until 6/30/98. CDC 128B, Laudatory Chrono, indicates above average work performance. 7/1/98 to 9/9/98, assigned to Yard Crew. CDC 101's dated 7/1/98 and 9/9/98, reflect above average to exceptional work performance. 9/30/98 to 5/5/99, assigned to Vocational Auto Body Aide. CDC 101's dated 9/29/98, 1/1/99, 3/31/99, and 4/1/99, reflect above average work performance. |

| CORRECTIONAL COUNSELOR SIGNATURE | | DATE 4/26/00 |
|---|---|---|

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| TITCH, MARK | B-89549 | RJDCF | 9/2000 | SEPTEMBER 6, 2000 |

BPT 1004 (REV 7/86)

PAGE 1 OF 4

INMATE COPY

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA
## CONTINUATION SHEET: POSTCONVICTION PROGRESS REPORT

| POST CONVICTION REPORT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASON |
| CONT'D 5-6-98 TO 5-5-99 | | | **PARTICIPATION IN SELF-HELP GROUPS:** Received CDC 128B's dated 6/1/98 and 7/3/98 from Alcoholics Anonymous; 7/21/98, note participation in the Literacy Council, 3/22/99, notes participation in the AA/NA 12-step Program, and 5/5/99, notes participation in and a donation to the "Polinksy Child Abuse Foundation". <br><br>**PSYCHIATRIC TREATMENT:** None noted this period. <br><br>**DISCIPLINARY:** None noted this period. <br><br>**LAUDATORY:** Received CDC 128B's on 7/21/98, 8/6/98, and 5/5/99. |
| 5-6-99 TO 5-5-00 | | | Inmate Titch was housed at RJD-III under MED-A/R Custody in the general population. He remained in his current assignment until 7/23/99. On 7/23/99, inmate Titch was reassigned to Facility 1 Maintenance Mechanic. On 12/21/99, inmate Titch appeared before Facility 1 UCC for the purpose of Program Review and "R" suffix review. Committee acted to retain "R" suffix pending ICC confirmation. On 1/6/00, ICC/GP elected to remove "R" suffix after thorough review and reduce to MED-A Custody and CPP. <br><br>**CUSTODY:** MED.A/R Custody to 1/6/00. Per ICC review, "R" suffix removed, reducing custody to MED-A and CPP. <br><br>**VOCATIONAL INSTRUCTION:** None noted this period. <br><br>**ACADEMIC EDUCATION:** None noted this period. <br><br>**WORK PARTICIPATION:** Assigned F1 5/6/99 to 7/22/99, receiving average or above work performance per CDC 101, DATED: 7/20/99. Assigned to Facility 1 Maintenance Mechanic effective 7/23/99, received average and above work performance, per CDC 101's, DATED 7/23/99, and 12/15/99. |

**ORDER:**
- [ ] BPT date advanced by _____ months.
- [ ] PBR date advanced by _____ months.
- [ ] BPT date affirmed without change.
- [ ] PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**
- [ ] Previously imposed conditions affirmed.
- [ ] Add or modify _____

- [ ] Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| **TITCH, MARK** | **B-89549** | **RJDCF** | **9/2000** | **SEPTEMBER 6, 2000** |

BPT 1004 (REV 7/86)                    PAGE 2 OF 4                    INMATE PERMANENT ADDENDA

· BOARD OF PRISON TERMS                                                                          STATE OF CALIFORNIA

# CONTINUATION SHEET: POSTCONVICTION PROGRESS REPORT

| POST CONVICTION REPORT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASON |
| CONT'D<br>5-6-99<br>TO<br>5-5-00 | | | **PARTICIPATION IN SELF-HELP GROUPS:** None noted for this period.<br><br>**PSYCHIATRIC TREATMENT:** None noted this period.<br><br>**DISCIPLINARY:** None noted this period.<br><br>**LAUDATORY:** None noted this period. |
| 5-6-00<br>TO<br>PRESENT | | | Remained at RJD-III under MED-A Custody. He remained in his present assignment as Facility 1 Maintenance Mechanic.<br><br>**CUSTODY:** MED-A Custody to present.<br><br>**VOCATIONAL TRAINING:** None noted this period.<br><br>**ACADEMIC EDUCATION:** None noted this period.<br><br>**WORK PARTICIPATION:** Assigned Facility 1 Maintenance Mechanic to present.<br><br>**PARTICIPATION IN SELF-HELP:** None noted this period.<br><br>**PSYCHIATRIC TREATMENT:** None noted this period.<br><br>**DISCIPLINARY:** None noted this period.<br><br>**LAUDATORY:** None noted this period. |

**ORDER:**

☐ BPT date advanced by _____ months.        ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.        ☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

_____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| **TITCH, MARK** | **B-89549** | **RJDCF** | **9/2000** | **SEPTEMBER 6, 2000** |

BPT 1004 (REV 7/86)                                       **PAGE 3 OF 4**                                  **PERMANENT ADDENDA**

INMATE COPY

/1

• BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA

## CONTINUATION SHEET: POSTCONVICTION PROGRESS REPORT

| POST CONVICTION REPORT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASON |
| | | | |

PREPARED BY:                              REVIEWED BY:

E. ESTRADA                                A. HERNANDEZ
CC-I                                      CC-II

**ORDER:**

☐ BPT date advanced by _____ months.        ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.        ☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

_____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| TITCH, MARK | B-89549 | RJDCF | 9/2000 | SEPTEMBER 6, 2000 |

BPT 1004 (REV 7/86)                    PAGE 4 OF 4                    PERMANENT ADDENDA

INMATE COPY 12

**EXHIBIT 16**

1998 Life Prisoner Evaluation Report

LIFE PRISONER EVALUATION
SUBSEQUENT PAROLE CONSIDERATION HEARING
MAY 1998 CALENDAR

Titch, Mark                                                                   B-89549

## I.    Commitment Factors

### A.    Life Crime:

Murder 1st, Penal Code (PC) 187 two counts from Orange County Superior Court case number C-37693. Titch received an additional commitment of Assault with Deadly Weapon upon Peace Officer PC 245(b) from San Diego County Court case number CR-42845. This commitment is for six months to Life and runs concurrently with the Murder 1st counts.

Sentence: Life plus seven years. Minimum Eligible Parole Date (MEPD) 2/4/84.
Weapon: .32 semi-automatic Beretta.
Victims: James Robb; John and Irene Simmons, Debra, Alvin, and Eleanor Bradley, Kathy Charest, Lowell and Shirley Gray, Laura Ann Stouthton, Ephrim Christian, Aubrey, Denise, and Nadine Duncan.

### B.    Offense Summary

Offense Summary is taken from the Probation Officer's Report (POR) dated 3/27/78:

Controlling Counts:

#### Count XIII:
PC 187, Murder 1st:

On January 21, 1977, a motorcyclist riding through a vacant field in Orange County reported that he had observed a female Caucasian subject lying on knoll of a hill. Police responded and found deceased victim Laura Ann Stouthton, 21 years old. The body was lying on its right side. The head of the victim was lying in a large puddle of blood. The coroner's investigators set the body in an upright position and it was noted that in her right hand she was clutching a rosary against her chest. The victim sustained two possible gunshot wounds in the mouth area. Police discovered a .22 caliber bullet lying on the blanket next to the victim's left shoulder. Police indicated that there did not appear to be a struggled in the area.

#### Count XVI:
PC 187, Murder 1st:

On January 29, 1977, at approximately 3:56 a.m. police were contacted by Mrs. Nadine Duncan reporting a murder incident. When the officers arrived they found

Life Prisoner Evaluation
Subsequent Parole Consideration Hearing
May 1998 Calendar
Page 2

the body of Aubrey Duncan lying in the front of the house, in a pool of blood with visible facial injuries. The second victim, identified as 18 year old Denise Duncan, was lying in the entrance hall. She was transferred to West Anaheim Community Hospital at 4:20 a.m. and was pronounced dead at 5:00 a.m. Mrs. Nadine Duncan was transported to Anaheim Memorial Hospital at 4:30 a.m. On February 2, 1977, police were contacted by a highway patrol officer, who stated Brett Thomas and Mathew Taphoon, later identified as Mark Wayne Titch, were in custody for suspicion of grand theft auto. The vehicle was stolen from the Anaheim area. Titch stated, "You mother fucking pigs, I don't want to talk to you. Send me to juvenile hall.

Multiple Crimes:

Count II:
PC 211, Robbery 1st:
Per the Deputy District Attorney's Report dated 4/12/77; on or about November , 20, 1976, in Orange County, Mark Titch willfully, unlawfully, and feloniously entered the residence of John and Irene Simmons, located at 2516 Chanticleer Road, Anaheim, with the intent to commit theft with the use of a firearm,.

Count IV:
PC 211, Robbery 1st:
On or about December 14, 1976, in Orange County, Mark Titch willfully, unlawfully, and feloniously entered the residence of Debra Bradley, Alvin and Eleanor Bradley, located at 1412 South Sherill Street, Anaheim, California, with the intent to commit theft with the use of a firearm.

Count VI:
PC 211, Robbery 1st:
On or about December 18, 1976, in Orange County, Mark Titch willfully, unlawfully, and feloniously entered the residence of Glen and Margaret Dittrich located at 2462 Chanticlear Road, Anaheim, California with the intent to commit theft with the use of a firearm.

County VII:
PC 211, Robbery 1st:
On or about November 21, 1976, Mark Wayne Titch did willfully, unlawfully, and feloniously rob Kathy Charest with the use of a firearm by means of force and fear.

Count IX:
PC 211, Robbery 1st:
On or about December 27, 1976, in Orange County, Mark Wayne Titch did willfully, unlawfully, and feloniously enter the residence of Powell and Shirley

Life Prisoner Evaluation
Subsequent Parole Consideration Hearing
May 1998 Calendar
Page 3

Gray, located at 8632 Harriet Lane, Stanton, California, with the intent to commit theft with the use of a firearm and robbed them of their personal property by means of force and fear.

### Count X:
### PC 459, Burglary 2nd:

On or about January 16, 1976, in County of Orange, Mark Wayne Titch did willfully, unlawfully, and feloniously enter the residence located at 1813 W. Palais Street, Anaheim, California.

### County XI:
### PC 459, Burglary 2nd:

On or about January 19, 1976, in Orange County, Mark Wayne Titch did willfully, unlawfully, and feloniously enter the residence located at 2475 W. Cerritos, Anaheim, California, with the intent to commit theft.

### Count XII:
### PC 209, Kidnap for Robbery:

On or about January 21, 1977, in Orange County, Brett Thomas and Mark Wayne Titch willfully, unlawfully, and felonious, seized, continued, enticed, decoyed, abducted, concealed, kidnapped, and carried away Laura Anne Stouthton, for the purpose of committing robbery.

### Count II:
### Assault with a Deadly Weapon upon a Peace Officer:

The Probation Officer's Report , pages 2, 3, and 6, dated 3/27/78, indicates that on December 26, 1976, Mark Titch and his accomplice, William Hauper, drove to San Diego from Anaheim in a stolen 1976 Chrysler Newport sedan. On 12/27/76, at approximately 8:50 a.m. they committed armed robbery of the Base Liquor Store located at 3201 National Avenue, San Diego, California. Titch was armed with a .32 caliber automatic Berretta when he entered the liquor store and demanded that the female store clerk (non-English speaking), to give him the money from the cash register. The incident was interrupted by the owner, Mr. Antivan Najjar, who observed Titch armed with a .32 caliber weapon tucked in his waistband. The owner took the money (approximately $450.00) from the cash register and placed it in a brown paper bag and handed it to Titch. While Titch was leaving the liquor store, he was observed by Officer James Robb. The officer followed Titch as he approached the vehicle where his accomplice was waiting. Officer Robb, upon reaching the defendants, ordered Titch to stop walking. Titch walked towards the officer, drew his weapon, and told the officer to freeze. The officer attempted to take cover behind the defendants car when Titch fired eight or nine shots; he was struck five times. Titch fled in the awaiting vehicle with his accomplice.

Life Prisoner Evaluation
Subsequent Parole Consideration Hearing
May 1998 Calendar
Page 4

Officer Robb sustained severe injuries to his legs and collar bone which resulted in arthritis in both knees, tension, and headaches. One bullet remains lodged in his right collar bone. Officer Robb received severe scarring from this incident and is now retired based on his medical disabilities sustained from Titch's violent crime.

C.    Prisoner's Version:

Titch continues to accept full responsibility for the life crime. He states, "I was 17 years old at that time and I felt my crime partner influenced me a great deal. I'm a different person now. I'm not a follower. I grew up in the streets and I now regret what I've done. It will never happen again."

C.    Aggravating/Mitigating Factors:

1) The crimes involved great violence as the victims of numerous cases were physically and mentally abused, and, on two occasions, murdered/executed.

2) A firearm was used in the commission of the majority of the offenses.

3) Victims were vulnerable.

## II.    Preconviction Factors

Juvenile Record:

| Date | Offense | Action/Disposition |
|------|---------|--------------------|
| 02/11/72 | Truancy | Six months to 8/11/72 |
| 06/20/72 | Malicious mischief, throw trash on highway, curfew, substance at vehicle, beyond control | Continued ward; continued Juvenile Hall, released 12/14/72 |
| 02/16/73 | Runaway | Continue |
| 03/02/73 | Burglary | Continue ward (mother has custody) Commit to Rancho Potrero |
| 03/21/73 | Escape | Committed to Manchester Drive |
| 04/20/73 | Escape | |
| 05/15/73 | Burglary | Committed to Manchester Drive |
| 10/16/73 | Assault with intent to commit murder, burglary | Filed on direct. Released to Juvenile Hall. Disposition unknown |
| 10/28/73 | Threat of assault on counselor at Juvenile Hall | Isolated from group and counseled |

Titch, Mark                    B-89549              CMC-East              5/98              so

4

Life Prisoner Evaluation
Subsequent Parole Consideration Hearing
May 1998 Calendar
Page 5

| | | |
|---|---|---|
| 11/12/73 | Burglary, three counts | These matters were tried in Superior Court for the Orange County Juvenile Court on 12/6/73 |
| 12/20/73 | Armed Robbery | Armed robbery was sustained; other five counts dismissed on motion by lawyer L. Mark. Committed to CYA on 12/7/73. |
| 12/28/75 | Vehicle Theft | Re-committed CYA 1/6/76 |
| 09/10/76 | Burglary: auto theft | 11/5/76 escaped San Diego Juvenile Hall |
| 12/26/76 | Robbery, Assault with a deadly weapon | Case pending |

Adult Convictions:

The instant offense is the only adult conviction noted.

Personal Factors:

Mark Titch was born on July 31, 1959, to Maglin Titch (mother) and Walter Titch (father). He was born in Fullerton, Ca., and raised in Anaheim, Ca. Titch was one of six siblings two brother and three sisters. At the age of eleven, Titch's parents divorced. The mother left all the children with the father. Titch contends that his father was mentally abusive and an alcoholic and the mental abuse he would receive from his father he contends that base on his extremely dysfunctional family life he began to runaway, stopped attending school, and thus, began his life of crime.

## III.    Postconviction Factors

Documents from previous hearings have been considered and that information remains valid. Mark Titch's fourth Subsequent Parole Consideration Hearing was conducted on 5/16/95. He was viewed as unsuitable for parole and received a three year denial and placed on the 5/98 Subsequent calendar. Recommendations were set as follows: 1) remain disciplinary free; 2) participate in Alcoholics Anonymous and Narcotics Anonymous; 3) continue upgrading vocationally. (See Post Conviction Progress Report).

## IV.    Future Plans

A.    Residence:

Titch states that he has family located in Riverside, California. However, he intends to reside independently in Anaheim, California. He expects to secure a

Life Prisoner Evaluation
Subsequent Parole Consideration Hearing
May 1998 Calendar
Page 6

rental for approximately $300.00 per month and explains that he is in the process of saving money at this time for future independent living.

B.    <u>Employment:</u>

Titch explains that he has no firm employment offer at this time, however, he has been researching opportunities via the Orange County Register. He states that he has located entry level clerical opportunities for which he may qualify. He states that he is in the process of developing an suitable resume, but understands that responses may be few until he secures a parole date.

## V.    USINS Status

Not applicable.

## VI.    Summary

A.    Considering commitment offense, prior record, and prison adjustment, this writer believes the prisoner would pose a high degree of threat to the public if release from prison at this time.

B.    Prior to release, the prisoner could benefit from remaining disciplinary free, upgrading vocationally and educationally, and participate in self-help/therapy programming.

C.    This report is based on an two hour interview with the prisoner specifically for the purpose of this report couple with routine case work, and a thorough review of the Central File. S was afforded an In re Olsen review which was completed on April 1, 1998

Prepared by:

*J.V. Basso*

J. Basso
Correctional Counselor I
B-Quad

Reviewed by:

*C. Bethel*

C. Bethel
Supervising Counselor II-B-Quad

Titch, Mark                B-89549            CMC-East            5/98            so

6

BOARD OF PRISON TERMS                                                              STATE OF CALIFORNIA

## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

**X** PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

### INSTRUCTIONS

TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.

TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 3/94 to 3/95 | | | Titch remained at CMC-E housed in the general population under Medium AR custody with a classification score of ten points.  He was assigned to the PIA Print Plant as an offset press operator and received above average work reports (per CDC 101's dated 6/94, 8/94, 9/94, and 12/94).  Titch did not participate in any self-help/therapy programming during this time period. |
| 3/95 to 3/96 | | | Titch remained at CMC-E housed in the general population under Medium AR custody with a classification score of zero.  He was assigned to the PIA Print Plant as an offset press leadman and received above average work reports (per CDC 101's dated 12/95 and 2/95.  On 5/16/95 S was seen by the Board of Prison Terms for a Subsequent Parole Consideration Hearing.  He was found unsuitable for parole and received a three year denial.  He was placed on the 5/98 Calendar.  The Board's recommended that Titch: 1) remain disciplinary free; 2) attend AA/NA; 3) continue to upgrade vocationally.  He was an active participant in AA from 7/28/95 through 10/1/95.  He remained disciplinary free during this time period. |
| 3/96 to 3/97 | | | Titch remained at CMC-E housed in the general population under Medium AR custody with a classification score of zero.  On 5/21/97 Titch was seen by UCC for the purpose of an Annual Review.  Based on multiple three year denials, Committee elected to increase his custody to Close BR.  Titch continued to remain assigned to the PIA Print Plant as an offset print leadman and received above average work reports (per CDC 101's dated 8/16/96 and 2/10/97).  He was an active participant in AA from 7/28/95 through 8/1/96.  He remained disciplinary free during this time period. |

CORRECTIONAL COUNSELOR SIGNATURE                                    DATE  4-7-98

*LV Basso*

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| Titch, Mark | B-89549 | CMC-E | 5/98 | sko |

**7**

BOARD OF PRISON TERMS                                                                          STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| | | | Reviewed by:<br><br>*C. Bethel*<br><br>C. Bethel<br>Supervising Counselor II<br>B-Quad |

**ORDER:**

☐  BPT date advanced by _____ months.     ☐  BPT date affirmed without change.

☐  PBR date advanced by _____ months.     ☐  PBR date affirmed without change.

**Special conditions of parole:**

☐  Previously imposed conditions affirmed.

☐  Add or modify _____

☐  Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| Titch, Mark | B-89549 | CMC-E | 5/98 | sko |

BPT 1004 (REV. 7/86)                         PAGE 2 of 2                         PERMANENT ADDENDA

*B*

**EXHIBIT 17**

Board's Response to Petitioner's 1040 BPT Appeal
of his 2003 Parole Hearing

BOARD OF PRISON TERMS    FORWARD TO INMATE/PAROLEE    STATE OF CALIFORNIA
OFFICE OF POLICY AND APPEALS
DECISION ON APPEAL

Your appeal was received by the Board on February 9, 2004.

## Decision you appealed:

Life parole consideration hearing of July 23, 2003. Parole denied. Next hearing in three years.

## Reasons for your appeal:

1. The prisoner contends the hearing panel used incorrect facts when discussing his commitment offense.
2. The prisoner contends the hearing panel incorrectly noted that he had a record of assaultive and violent behavior.
3. The prisoner contends he does not need a job offer to be found suitable for parole.
4. The prisoner contends the hearing panel erred when it determined he had not sufficiently participated in self-help groups.
5. The prisoner contends he does not have a lengthy history of severe mental problems.
6. The prisoner contends he has exceeded the matrix for his offense and should be released.
7. The prisoner contends there is a policy in place to deny parole to all life prisoners.

## Decision by the Board on this appeal:

[x] Denied                    [ ] Granted                    [ ] Dismissed or no action
  (No – the decision             (Yes – the decision            (The appeal will not
  stays the same)                will be changed)               be looked at)

## CDC Instructions for Grant:

| Name *Sharon Lawin* | BOARD PANEL Title Commissioner | Date 04/13/04 |
| Name *Carol Daly* | BOARD PANEL Title Commissioner | Date 4-13-04 |

## Instructions to staff:
**CDC Staff to assist in reviewing appeal decision    Yes [  ]    No [X]**

| NAME | CDC # | PRISON/REGION | DATE |
|------|-------|---------------|------|
| TITCH, Mark | B-89549 | RJD | APR 1 3 2004 |

dgm

BPT 1041 (REV. 01/02)

**BOARD OF PRISON TERMS**                                    **STATE OF CALIFORNIA**
**Page 2: DECISION ON APPEAL**

## REASONS FOR DECISION

### Introduction

Title 15 of the California Code of Regulations (15 CCR), § 2280 et seq., sets forth parole suitability criteria and procedures for life prisoners. Prisoner rights are specified at 15 CCR §§ 2245 - 2256. Appeals from parole consideration hearings are governed by 15 CCR §§ 2050-2057.

### Decision on Appeal

1.    The prisoner contends the hearing panel used incorrect facts when discussing his commitment offense.

**Appeal Denied:** The prisoner contends that the statement of facts as stated by the hearing panel is incorrect and there are no source documents to validate the circumstances of the prisoner's numerous offenses as read into the record by the hearing panel. The hearing panel read the statement of facts as noted in the prisoner's 2003 Life Prisoner Evaluation. The Life Prisoner Evaluation took the statement of facts from the documents considered when the prisoner was referred to the California Youth Authority before he was sentenced to prison, and from a signed statement from Robert D. Chatterton, Deputy District Attorney. Mr. Chatterton noted that his facts came from sworn testimony of a surviving victim and the taped confessions of the prisoner and his crime partner.

The prisoner, if he had been present at the hearing, would have been given the opportunity to discuss with the hearing panel any discrepancies he believes exist in the statement of facts as stated by the hearing panel. Also, if the prisoner disagrees with his life Prisoner Evaluation, he may appeal that document through his institution's appeal process.

2.    The prisoner contends the hearing panel incorrectly noted that he had a record of assaultive and violent behavior.

**Appeal Denied:** The statement made by the hearing panel that the prisoner is referring to is as follows: "Then from November of 1976 to December of 1976 he was convicted of five counts of robbery, three counts of burglary, one count of kidnap for the purpose of robbery, and that would be- the prisoner has a record of violence and assaultive behavior." Prior to that statement, the hearing panel noted other violence offenses for which the prisoner is currently incarcerated for, including the assault with a deadly weapon on a police officer. These convictions demonstrate that the prisoner has a record of assaultive and violent behavior.

3.    The prisoner contends he does not need a job offer to be found suitable for parole.

**Appeal Denied:** The prisoner notes that Title 15 CCR section 2402(d)(8) does not require confirmed job offers. While the prisoner is correct in that Title 15 does not require confirmed job offers, Title 15 CCR section 2281(d) clearly states that the factors as stated in Title 15 are only set forth as general guidelines. The hearing panel may have believed that since the prisoner has admitted to committing his commitment offenses for money, that a confirmed job offer is necessary for the prisoner to ensure he has a steady source of income and will not have to rely on robbery or burglary to obtain money.

APR 1 3 2004

TITCH, Mark   B89549

BPT 1041 (REV. 01/02)                                                              2

**BOARD OF PRISON TERMS**                                          **STATE OF CALIFORNIA**
**Page 3: DECISION ON APPEAL**

---

4.    The prisoner contends the hearing panel erred when it determined he had not sufficiently participated in self-help groups.

**Appeal Denied:** The hearing panel noted that the prisoner has not participated in any self help since 1998. The prisoner claims he participated in a substance abuse group until March 1999, and in a 3 day Kairos course in 2000. While the prisoner may be correct, this is harmless error. It should be noted that the previous hearing panel, on June 26, 2001, specifically recommended the prisoner participate in self help programming.

5.    The prisoner contends he does not have a lengthy history of severe mental problems.

**Appeal Denied:** The prisoner contends the hearing panel cannot consider his most recent mental health evaluation as a negative factor when determining his parole suitability. The prisoner's 2000 psychological evaluation states, "The sadistic, callous and cruel nature of his crimes requires continued and additional personal growth and resolution of underline psychological factors prior to being released." The hearing panel may consider all relevant reliable information when determining parole suitability (Title 15 CCR section 2281(b)), and this would include his current psychological makeup. The hearing panel's finding that the 2000 psychological evaluation is not totally supportive of release appears reasonable.

6.    The prisoner contends he has exceeded the matrix for his offense and should be released.

**Appeal Denied:** The current law, as stated in Title 15 CCR section 2281(a), is, "Regardless of the length of time served, a life prisoner must be found unsuitable for and denied parole if, in the judgment of the hearing panel, the prisoner will pose an unreasonable risk of danger to society if released from prison." The issue of whether a hearing panel must compare the prisoner's offense to other similar offenses when determining his suitability for parole is currently under review by the California Supreme Court.

7.    The prisoner contends there is a policy in place to deny parole to all life prisoners.

**Appeal Denied:** The prisoner contends that the hearing panel was not objective due to the ex-Governor's alleged position on parole release. However, the prisoner did not present any evidence to demonstrate that the ex-Governor's alleged position on parole release resulted in the prisoner not receiving a fair hearing. The United States Supreme Court has stated that in an administrative hearing, a decision maker is not "disqualified simply because he has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that he is not capable of judging a particular controversy fairly on the basis of its own circumstances." *Hortonville Joint School District v. Hortonville Education Association*, 426 U.S. 482, 493 (1976) (quoting *United States v. Morgan*, 313 U.S. 409, 421 (1941)). The transcript from the prisoner's hearing reveals that all due process concerns were met and that the prisoner's hearing was fair and the hearing panel impartial.

Furthermore, in *In re Rosenkrantz* (2002) 29 Cal.4th 616, the California Supreme Court addressed this issue and found the ex-Governor does not have a blanket policy to deny parole to all prisoners convicted of murder. (*Id.* at 686.) The Board of Prison Terms has granted parole to numerous life prisoners in the past and continues to do so.

TITCH, Mark    B89549

APR 1 3 2004

**BOARD OF PRISON TERMS**                                        **STATE OF CALIFORNIA**
**Page 4: DECISION ON APPEAL**

<u>Exhaustion of Remedies</u>

Since all grounds for appeal must be included in the same appeal (15 CCR § 2052(a)(2)), this decision is the final administrative decision on all issues from the decision in question. No further appeals or requests for review based on the issues from this decision will be accepted.

APR 1 3 2004

TITCH, Mark,   B89549

**BOARD OF PRISON TERMS**
**APPEAL**

**STATE OF CALIFORNIA**

| | |
|---|---|
| Name: TITCH, MARK W. <br> CDC#: B89549 <br> Prison: RJDCF <br> Date Sent: 2/2/04 | **CDC Staff Only** <br> Date Received:                    Log #: <br> Date Life Inmate Received Copy of Transcript: <br> **Did Staff Provide Assistance in Preparing this Appeal?** <br> Yes [ ]        No [ ] <br> What Type of Staff Assistance Was Provided: |

| **DECISION APPEALED** | Date of hearing or decision you are appealing: |
|---|---|
| | JULY 29, 2003 |

| | |
|---|---|
| [ ]  Parole Revocation | **REASONS** |
| [ ]  Revocation Extension | [xx]  Wrong / Not enough information |
| [ ]  Retain on Parole | [xx]  The decision was not fair in view of |
| [ ]  Screening Offer Decision | the facts |
| [xx] Life Prisoner | [xx]  The decision is illegal |
| [ ]  MDO Hearing | [xx]  The decision is against BPT rules |
| [ ]  Other:_____ | [ ]  My rights under ADA were violated |

*(stamp: RECEIVED — BOARD OF PRISON TERMS)*

| | |
|---|---|
| Did you ask for help writing this appeal? | Yes [xx]  No [ ] |
| Did anyone help you write this appeal? | Yes [xx]  No [ ] |

What would you like the Board to do?   SEE ATTACHED "Relief" Requested", p.8

Tell why you want to appeal. Use simple words. Give each reason a number. Use more paper if you need to. Don't leave anything out. You <u>can not</u> add reasons later. Sign at the bottom.

(1)_____SEE ATTACHED "Ground #1"_____

(2)_____SEE ATTACHED "Ground #2"_____

(3)_____SEE ATTACHED "Ground #3"_____

(4)_____

Signed *Mark W. Titch*   CDC# B89549   Prison/Parole Region RJDCF

BPT 1040 (REV. 01/02)                           1

5

**BOARD OF PRISON TERMS**
**APPEAL**

**STATE OF CALIFORNIA**

## HOW TO FILL OUT THIS FORM

Give the reasons for your appeal. Write on the lines. Be sure to give each reason a number. Use simple words to explain each reason. Use more paper if you need it. Don't leave anything out. You <u>cannot</u> add reasons later. Sign the form at the bottom.

## SENDING THE APPEAL

You must send this form to the Board or have someone do it for you. If you are in prison, give the form to *C&PR* staff. If you are not in prison, give it to a Parole Appeals Coordinator. You have 90 days after you get your hearing decision to send in the form. Your lawyer can send it for you if you sign that you approve.

## FASTER APPEALS

If you have a new court case, you may need a faster answer to your appeal. To get a faster answer, write "EXPEDITED CONSIDERATION" on the form. You must have a good reason why this is needed. You must send court or other papers that tell why a fast answer is needed.

> Terms:   *C&PR* - the Classification and Parole Representative in prison
> *Parole Appeals Coordinator* - Appeals Coordinator in your Parole Region

You can read the laws about your appeal. You can find the laws at California Code of Regulations, Title 15, sections 2050 to 2057.

---

*CDC Staff Only*

## DOCUMENTS THAT MUST ACCOMPANY THE APPEAL

An appeal cannot be accepted by the Board unless there is enough information to decide the issues. Until the necessary information is supplied, the appeal will not be processed. The following documents are required for each type of appeal. Please submit these documents with the appeal within 90 days of the Board's decision.

## PAROLE REVOCATION HEARING APPEALS

☐ Legal Status Summary Sheet (prior commitment and parole violation)

☐ Notice of Right to Revocation Hearing Acknowledgment [BPT Form 1100(a)]

☐ Request for Witnesses [BPT Form 1100(b)]

☐ Summary of Revocation Hearing and Decision (BPT Form 1103)

☐ Extradition from Other State: *All Documents Pertaining to Extradition*

☐ Inmate/Parolee Disability Verification (CDC Form 1845)

☐ Charge Sheet (CDC Form 1521, *Including CDC Form 1244*)

☐ Police Report(s)

☐ Attorney Determination

☐ (BPT Form 1083, if applicable)

☐ Chronological History (CDC 112, *all pages*)

☐ Reasonable Accommodation Notice and Request (BPT Form 1073)

☐ Mental Health Screening Chronos (CDC Form 128C, 128C-1)

BPT 1040 (REV. 01/02)                    2

6

**BOARD OF PRISON TERMS**
**APPEAL**

**STATE OF CALIFORNIA**

## APPEALS OF SCREENING OFFERS

☐ Legal Status Summary Sheet

☐ Notice of Right to Revocation Hearing
Acknowledgment [BPT Form 1100(a)]

☐ Waiver of Revocation Hearing
(BPT Form 1101)

☐ Charge Sheet (CDC Form 1521, *including
CDC Form 1244*)

☐ Inmate/Parolee disability Verification (CDC
Form 1845)

☐ Extradition from Other State: *All Documents
Pertaining to Extradition*

☐ Police Report(s)

☐ Summary of Revocation Hearing and Decision
(Hearing Waived) (BPT Form 1104)

☐ Chronological History (CDC 112, *all pages*)

☐ Reasonable Accommodation Notice and
Request (BPT Form 1073)

☐ Mental Health Screening Chronos
(CDC Form 128C, 128C-1)

## APPEALS FROM REVOCATION EXTENSION HEARINGS

☐ Legal Status Summary Sheet

☐ Notice of Right to Revocation Hearing
Acknowledgment [BPT Form 1100(a)]

☐ Request for Witnesses [BPT Form 1100(b)]

☐ Summary of Revocation Hearing and Decision
(BPT Form 1103)

☐ Inmate/Parolee Disability Verification (CDC
Form 1845)

☐ Rules Violation Report (CDC Form 115)

☐ Attorney Determination (BPT Form 1083, if
applicable)

☐ Chronological History (CDC 112, *all pages*)

☐ Reasonable Accommodation Notice and
Request (BPT Form 1073)

☐ Mental Health Screening Chronos
(CDC Form 128C, 128C-1

## APPEALS FROM RETAIN ON PAROLE

☐ Legal Status Summary Sheet

☐ Parole Agent's Report (CDC Form 1502)

☐ Central Office Calendar Discharge Review
(BPT Form 1130)

☐ Chronological History (CDC 112, *all pages*)

## LIFE HEARING DECISIONS

☒ Copy of Decision

☒ Chronological History (CDC 112, *all pages*)

☒ Post Board Chrono, Date Received Transcript

BPT 1040 (REV. 01/02)

**GROUND #1:  THE BOARD FAILED TO PROVIDE A FAIR AND IMPARTIAL HEARING AND, THUS, VIOLATED MY STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS (Calif. Const.: Article I, §7; U.S. Const.: 14th Amendment)**

During my 2003 parole hearing, board member Risen read into record the "alledged facts" of my crimes.  In reference to the murder of Laura Stoughton, Mr. Risen stated, "Titch and his crime partner, Thomas, abducted the victim when she drove up in her driveway.  She was put into the trunk of the car and driven to a remote area.  She was taken up the hill where Titch tried to rape her but couldn't because she was a virgin.  Titch and Thomas decided to jointly execute her.  Thomas' gun jammed and Titch shot her in the shoulder.  She was praying for her life.  Titch and Thomas discussed in her presence that she would have to be killed to prevent her from later identifying [them].  Titch shot her twice in the mouth."  (see 2003 parole hearing transcripts, p.7).  Additionally, with respect to the murder of Aubrey Duncan, Mr. Risen stated, "Aubrey Duncan was opening the door to his house, the prisoner and his crime partner opened fire striking the victim at least twice." (2003 parole hearing Decision, p.24).

I'm not sure what the Board is trying to accomplish here, but these are not the true facts of my case.  My crime partner and I never discussed killing Miss Stoughton in front of her so that she knew beforehand that she was going to be killed; I didn't shoot Miss Stoughton while she was praying for her life; I didn't drag Miss Stoughton up a hill and attempt to rape her; nor did I use a firearm during the robbery-murder of Aubrey Duncan.  Where is the evidence to support these allegations?  That is, where is the original indictment and police reports or trial court transcripts?

The true facts of my crimes are given in the Orange County Superior Court "Information" sheet (Exhibit A) and the Orange County Superior Court Sentencing Transcript (Exhibit B).  None of the "alledged facts" that the Board relied on to deny parole are contained in these documents.  As the sentencing transcripts clearly show, in fact, the Board has changed the trial court's records from a robbery-murder to a rape-murder as well as the finding that I did not use a firearm during the Duncan robbery.

As I pointed out in my 2001 Inmate Version, no probation officer's report was submitted in my case.  In my court proceedings challenging my 2001 parole hearing, the Attorney General stated that the Board was relying on my CYA report and the law permitted them to do so.  Although I don't believe this is true, even if it were, the CYA report contains no allegations of a rape, or that my crime partner and I discussed killing Miss Stoughton in front of her so that she knew she was going to be killed, or that I used a firearm during the Duncan robbery.  Furthermore, it has become apparant to me through my recent court proceedings on my 2001 parole hearing that the Orange County prosecuting district attorney sent a clarification statement to CDC and CDC incorporated those statements into my cumulative case summary and 2003 Life Prisoner Evaluation Report as fact.

CCR Title 15, §2402(b) provides that the Board can consider "all relevant, reliable information...in determining suitability for parole."  But the Board

1

B

cannot substitute the prosecuting district attorney's statements as the facts
of my case or in place of the trial court's records. The prosecuting district
attorney's statements are heresay, and many of them are false. If you don't
believe me, then write the Orange County Superior Court or District Attorney's
Office and tell them to send you the original indictment because I'd like to
see the evidence. I want to see how they determined that I stepped on the gas
to muffle gun shots (as the prosecuting district attorney claims), or that
my crime partner and I both shot Miss Stoughton while she was down on her
knees praying for her life (as the CYA report claims), or that Miss Stoughton
was raped or shot in the mouth or told beforehand that she was going to be
killed. Show me the evidence because I don't recall any of these allegations
being part of the evidence against me when I was facing trial.

In any event, it's obvious the Board didn't read my records prior to my
hearing. Had the Board read my C-File, they would have noticed that I had an
"R" removed from my custody because of "a lack of information to substantiate
the rape, noting there were no charges." (Exhibit C) More significantly, had
the Board read the transcripts of my previous hearing (i.e., 2001 parole hearing
transcripts), they would have discovered that I had asked the 2001 panel whether
I had to clarify the allegation of a rape and the panel responded no, explaining
that I had already exonerated myself through the 602 Appeal process (Exhibit D,
pp.28-31). Hence, it's clear that the Board never even read my records. This
violates state law and, as such, constitutes a substantive due process violation.
As the California Appellate Court stated, "It is one thing to go through the
motions so that a panel can recite a post-hoc rationalization for a decision
already made. It is quite another to hold a fair hearing at which three unbiased
commissioners actually read the reports and other documents...and then make a
reasoned decision on the appropriate factors." In re Rosenkrantz (2000) 80 cal.
app. 4th 409, 95 CalRptr.2d 279, 293.

There is other evidence that the Board failed to provide a fair and impartial
hearing as well. First, the Board made a finding that I have "a record of
violence and assaultive behavior" (2003 parole hearing Decision, p.21). A record
consists of convictions, and I have no convictions for violence. The threat of
assault (on a counselor) and assault with intent to commit murder (as cited in
my 2003 Life Prisoner Evaluation Report) are not convictions. The threat of
assault, in fact, is followed by "isolated from group and counselled" and the
assault with intent to commit murder is followed by "disposition unknown". No-
where in my records does it say that either of these charges resulted in con-
victions. Hence, the Board's claim that I have a record of violence and assaultive
behavior is unfounded.

Second, the Board denied parole, claiming that I lacked "realistic parole
plans" because I did not have "written confirmation of job offers." (2003 parole
hearing Decision, p.22). Nowhere in the CCR Title 15 does it state that a
prisoner has to have written job offers in order to receive parole. On the
contrary, CCR Title 15, §2402(d)(8) only requires that prisoners make "realistic
parole plans" or "develop marketable skills that can be put to use upon release."
Has the Board instituted a new qualification for parole? If so, why isn't it
in the CCR Title 15? Are we not entitled to fair notice of what we must do to

9

qualify for parole?

Third, the Board denied parole on the grounds that I had not sufficiently participated in self-help groups, claiming that I had not participated in any self-help group since 1998 (2003 parole hearing Decision, p.21). Again, the Board must not have read my records. I participated in Rapha 12-Step, an in-depth christian program incorporating the basic 12-steps of AA/NA, from 11/2/98 to 3/15/99 (see CDC-128B "Informative" Chrono in C-File, dated 3/22/99); and Kairos, a 3½ day instructional course on living in a christian community, from 9/21/2000 to 9/24/2000. This information was also noted in my previous hearing (Exhibit D, p.33).

Fourth, the Board denied parole on the basis that my previous psychological evaluation was not supportive of release (2003 parole hearing Decision, p.22). Specifically, the Board cited Dr. Chandler's 2000 Psychological Evaluation in which he stated that because it's felt that I have a tendency to minimize or emotionally distance myself from the full impact of my crimes that I could bene-fit from further growth and resolution of underlying psychological factors prior to being released. If I have a tendency to minimize or emotionally distance myself from the full impact of my crimes, it certainly isn't evident in any of my statements because I've always expressed tremendous regret for the crimes I committed; nor is it evident from my conduct because my behavior has been exemplary for quite a number of years. Furthermore, what person convicted of murder, or any prisoner for that matter, couldn't benefit from therapy prior to release? Dr. Chandler's statement is pretty much a catch-all phrase that could be applied to anyone. On this point, I honestly believe that people are losing sight of the true situation here. The crimes I committed and my past life were filled with an enormous amount of pain, anguish, and absolute misery, and the one thing I never want to do is repeat them. All the castles of gold couldn't entice me to live this kind of destructive, foolish, and insane lifestyle again. As I told the Board at my 2001 parole hearing, in fact, if I do anything when I'm released it will only be good. At any rate, I don't believe Dr. Chandler's report justifies the denial of parole. CCR Title 15, §2402(c)(5) states that only "a lengthy history of severe mental problems related to the offense" qualifies as a factor of unsuitability, and I don't have any severe mental problems. Proof of this is given in Dr. Jenesky's 1995 Psychological Evaluation, p.1, "no evidence of a major mental disorder"; Dr. Smith's 1995 Psychological Evaluation, p.1, "there was no evidence of a major psychiatric disorder and no indication from his file that this has ever been an issue"; Dr. Berning's 1998 Psychological Evaluation, p.2, "no history that he ever received psychiatric treatment"; and Dr. Chandler's 2000 Psychological Evaluation, p.4, "There does not appear to be any current diagnostic concerns for this inmate as far as a serious mental disorder".

CCR Title 15, §2250 states that prisoners are entitled to fair and impartial hearings. State law holds "a failure to follow the law, or the continued appli-cation of an arbitrary and irrational standard, will rise to the level of a sub-stantive due process violation." In re Rosenkrantz (2000) 80 Cal.App.4th 409; 95 Cal.Rptr.2d 279,293. Federal law also guarantees the right to a fair and impartial hearing O'bremski v. Maas (9th Cir., 1990) 915 F.2d 418,422. Finally, the U.S. Supreme Court holds that the right to a fair and impartial hearing in proceedings

10

adjudicating life, liberty, or property is to be jealously guarded <u>Marshall v. Jerico</u> (1980) 446 U.S. 238.

For the reasons stated above, I believe the Board failed to provide a fair and impartial hearing and, thus, violated my state and federal constitutional rights to Due Process.

4

**GROUND #2:  THE BOARD IS FAILING TO ABIDE BY THE PENAL STATUTES GOVERNING PAROLE AND, THUS, IS VIOLATING MY STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS (Calif. Const.: Article I, §7; U.S. Const.: 14th Amendment)**

Penal Code 3041(a) states that the Board "shall normally" set parole release dates and in a manner that provides "uniform terms for offenses of similar gravity and magnitude" (Calif. Penal Code).  I have appeared before the Board eight times, and eight times the Board has denied parole.  Furthermore, statistics show that prior to 1989 the Board granted parole to 48% of those who appeared before them; that by 1992 the number had fallen to 12%; and by 1996 to less than 1%.  Hence, the Board has not normally set release dates as called for by the penal code.

In addition, I have been in the prison system for approximately 26 years and have exceeded the matrix that applies to me.  Even if the Board elected to place me in the worst category on the matrix (where elements of torture are present in the commitment offense), I still will have exceeded the matrix by 4 years.  More significantly, I believe that if the Board were to look at other life prisoners with similar offenses (who have been released) that they will find that I am not serving a term that is uniform to other crimes of similar gravity and magnitude.  This violates clearly established state and federal law.  As stated by the California Appellate and Supreme Courts, "The Board's authority to make an exception based on the gravity of a life-term inmate's current or past offense should not operate so as to swallow the rule that parole is 'normally' to be granted.  Otherwise, the Board's case-by-case rulings would destroy the proportionaltiy contemplated by Penal Code 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder (Penal Code §190, et.seq.)" In re Ramirez (2001) 94 Cal.App.4th 549, 114 Cal.Rptr. 2d 381,397 affirmed in In re Rosenkrantz (2002) 29 Cal.4th 616, 128 Cal.Rptr.2d 114,161.  Additionally, "The Board...must consider the length of time the inmate has served in relation to the terms prescribed by the Legislature for the offenses under consideration in order to arrive at a 'uniform' term as contemplated by Penal Code 3041, subsection (a)" In re Ramirez (Id. at 397).  State law also holds that, while Penal Code 3041(a) requires the Board to "establish criteria for the setting of parole release dates", the Board lacks discretion to promulgate regulations that are inconsistent with the governing statutes Terhune v. Superior Court (1998) 65 Cal.App.4th 864,873.  Finally, the U.S. Supreme Court holds that States must follow their own penal statutes Hicks v. Oklahoma (1980) 447 U.S. 300.

For the reasons stated above, I believe the Board has failed to abide by the penal statutes governing parole and, thus, has violated my state and federal constitutional rights to Due Process.

5

12

**GROUND #3:  THE BOARD'S DECISION IS THE RESULT OF A NO-PAROLE POLICY AND DOES NOT ACCORD ME DUE CONSIDERATION OF MY REHABILITATIVE EFFORTS AND, THUS, VIOLATES MY STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS (Calif. Const.: Article I, §7; U.S. Const.: 14th Amendment)**

Beginning with the passage of Article V, Section 8, subdivision (b) of the State Constitution and the well publicized political agendas of Governors Pete Wilson and Grey Davis to deny parole to all convicted murderers, the Board has adopted a no-parole policy and actively engages in circumventing its own rules and regulations as well as state and federal law to deny parole to life-term inmates.  This is clearly indicated by the Board's decision to deny me parole: Whereas state law holds that the Board is to consider all relevant factors (In re Minnis (1972) 7 Cal.3d 639), the Board didn't even read my records; whereas state law holds that the Board's decision is to be based on accurate information (In re Rodriguez (1975) 14 Cal.3d 639), the Board has incorporated heresay statements into the record and changed the facts of my case; and whereas state law holds that the Board is obligated to set terms "uniform to other crimes of similar gravity and magnitude" (Penal Code 3041(a), In re Ramirez (2001) 94 Cal.App.4th 549), the Board has disregarded the matrix and imposed its own sentence of Life Without Parole.

More significantly, statistics show that, starting in 1989, the number of prisoners granted release dates dramatically declined.  As stated in Ground #2 of this appeal, prior to 1989 the Board granted parole to 48% of those appeared before them.  Then by 1992 the number of release dates granted dropped to 12%, and by 1996 to less than 1%.  This decline became so alarming, in fact, it prompted the California Legislative Office to ask the Board whether it had an unwritten administration policy of denying parole to all life-term inmates (Source: "Analysis of the 2000-01 Budget Bill", prepared by the California Legislative Office).

An analysis of Governor Grey Davis' review of parole decisions for the years 1999, 2000, and 2001 supports the existence of a no-parole policy even further.  Of the 16 decisions that Governor Davis reviewed in 1999, he reversed 10 and sent 6 back to the Board for en banc hearing.  Of the 27 decisions he reviewed in 2000, he reversed 12, modified 1, and sent 14 back to the Board for en banc hearing.  And of the 53 decisions he reviewed in 2001, he reversed 36 and sent 17 back to the Board for en banc hearing (Source: "Executive Report on Parole Review Decisions Under Grey Davis" for the years 1999, 2000, and 2001, prepared by the Governor's Office of Legal Affairs).  Hence, it's indisputable that both the governor(s) and the Board have actively engaged in circumventing the law to deny parole to life-term inmates.  In a current case before the Ninth Circuit, in fact, I understand that the Attorney General has admitted to a no-parole policy, and if that turns out to be true then it would indicate that my 1992, 1995, 1998, 2001, and 2003 hearings were nothing more than shams.

Also relevant here is the fact that the Board did not give "due consideration" to my efforts toward rehabilitation.  Under the DSL, the primary purpose of imprisonment is punishment (Penal Code §1170).  Nevertheless, rehabilitation is still an espoused goal of the prison system Biggs v. Terhune 2003 DJDAR 7245, 7247.  As the California Supreme Court holds, while prisoners have no constitu-

tional right to parole, they are entitled to have their application for parole "duly considered" In re Minnis (1972) 7 Cal.3d 639. Furthermore, state law holds that "Forbidden are determinations not based in fact upon an entire picture, refusals in advance, or pro forma hearings which completely disregard the individual's conduct in prison and his disposition toward reform" In re Seabock (1983) 140 Cal.App.3d 29, pp.36-37. Yet while the law and the prison system hold that rehabilitation is an integral part of an indeterminate life term, the Board is following a policy of denying parole on unchanging factors and irrational standards. This is clear from the following: First, the Board didn't read all of my accomplishments into record; second, the Board denied parole primarily because of my commitment offense and past conduct (which will never change); third, the Board denied parole for reasons that are not listed in the CCR Title 15; fourth, I can't reduce my time under the ISL (which I'm supposingly entitled to) because I've already passed the point where the ISL might provide any meaningful reduction; fifth, I've exceeded the original DSL matrix; and sixth, by the time I appear before the Board again I'll be in the new DSL matrix which isn't even supposed to apply to me.

For these reasons, then, I believe the Board has a no-parole policy and is not according me "due consideration" for my rehabilitative efforts and, thus, is violating my state and federal constitutional rights to Due Process.

14

**RELIEF REQUESTED**

1)  Vacate the Decision rendered during my 2003 hearing;

2)  Expunge the 2003 Life Prisoner Evaluation Report from my C-File;

3)  Hold a new hearing in accordance with CCR Title 15 as well as state and
    federal law.

*15*

**EXHIBIT 18**

CDC 602 Appeal of Petitioner's 2003 Life Prisoner. Evaluation Report

STATE OF CALIFORNIA                                                      DEPARTMENT OF CORRECTIONS

# INMATE/PAROLEE APPEAL FORM
CDC 602 (12/87)

Location: Institution/Parole Region        Log No.                Category

1. _____        1. 04-472 _____

2. _____        2. _____

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME | NUMBER | ASSIGNMENT | UNIT/ROOM NUMBER |
|------|--------|------------|------------------|
| TITCH, MARK | B89549 | I.D.L. | 1-3-215 |

A. Describe Problem: In April 2003, CC-I A. Nanquil prepared a Life Prisoner Evaluation Report for my eighth parole hearing (Exhibit A). In this report, Mr. Nanquil wrote "she was taken up a hill where Titch tried to rape her but couldn't because she was a virgin". This is not true. The truth is my crime partner said that I attempted to rape Laura Stoughton. It is also true that I was not charged with rape because there was no evidence to support my crime partner's statement. Furthermore, I just appealed this issue and established I was never charged with rape (Exhibit B). I also discussed it at my 2001 parole hearing (in front of the District Attorney representing Orange County) and

If you need more space, attach one additional sheet.                    (SEE ATTACHMENT 1)

B. Action Requested: Expunge the 2003 Life Prisoner Evaluation Report from my C-File so I can receive a fair parole hearing; send notices to the agencies where the 2003 report was sent, stating the report has been expunged.

Inmate/Parolee Signature: Mark W. Titch          Date Submitted: 3/9/04

C. INFORMAL LEVEL (Date Received: 3.9.04 )

Staff Response: TITCH, INFORMATION IN THIS BOARD REPORT WAS OBTAINED FROM YOUR CENTRAL FILE (WHICH INCLUDES REFERRAL REPORT FROM CYA, REFERRAL DOCUMENT, & CIRCUMSTANCES OF OFFENSE). YOU HAD THE OPPORTUNITY TO ADDRESS THESE ISSUES IN THE "PRISONER'S VERSION" OF THE REPORT AND DID NOT. IN ADDITION, THE "R" SUFFIX WAS REMOVED IN 2000. CHANGES IN CENTRAL FILE DONE THRU COURTS/BPT. REQUEST DENIED AT THIS LEVEL.

Staff Signature: _____          Date Returned to Inmate: 3.23.04

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

DISSATISFIED: The alleged facts that Mr. Nanquil recorded in my 2003 Life Prisoner Evaluation Report are not the true facts of my case. Instead, they are the views of the prosecuting district attorney who no doubt wrote them in an attempt to prolong my incarceration for as long as possible. In any event, CDC cannot substitute (SEE ATTACHMENT 2)

Signature: Mark W. Titch          Date Submitted: 3/28/04

Note: Property/Funds appeals must be accompanied by a completed
Board of Control form BC-1E, Inmate Claim

CDC Appeal Number: _____

cc:  Inmate

Eof this
This
NOT
BACK SIDE

First Level    ☐ Granted    ☐ P. Granted    ☒ Denied    ☐ Other _____

E. REVIEWER'S ACTION (Complete within 15 working days): Date assigned: _____4/6/04_____    Due Date: _____

Interviewed by: _____

*See Attached*

Staff Signature: _____    Title: __C C I__    Date Completed: __4/20/04__
Division Head Approved:                                            Returned
Signature: _____    Title: __C.C.I__    Date to Inmate: _____

F. If dissatisfied, explain reasons for requesting a Second-Level Review, and submit to institution or Parole Region Appeals Coordinator within 15 days of receipt of response.

DISSATISFIED:  First Level Response claims that I can write to the courts and request
that the false information be corrected.  Did anyone even read this appeal?  There is
nothing wrong with my court records.  If Mr. Nanquil relied on my court records, as my
seven previous BPT reports do, then I wouldn't be filing this appeal.  The fact is,

Signature: __Mark W. Titel__    (SEE ATTACHMENT 3)  Date Submitted: __5/2/04__

Second Level    ☐ Granted    ☒ P. Granted    ☐ Denied    ☐ Other __5/10/04__

G. REVIEWER'S ACTION (Complete within 10 working days): Date assigned: __5/10/04__    Due Date: __6/24/04__
☒ See Attached Letter

Signature: __B. Early__    Date Completed: __6/9/04__
Warden/Superintendent Signature: __D. M. BARNES, CDW (A)__    Date Returned to Inmate: __6-14-04__

H. If dissatisfied, add data or reasons for requesting a Director's Level Review, and submit by mail to the third level within 15 days of receipt of response.

DISSATISFIED:  Second Level response partially granted this 602 on the grounds that the
erroneous reference to a POR as a source document would be changed.  This does little to
correct the problem.  The BPT Report prepared by Mr. Nanquil states that I committed a
rape which I've already established on appeal is unsubstantiated by any evidence (EXHIBIT
B).  Furthermore, the BPT Report changes my committment offense from robbery-murder to
rape-murder, contradicting my court records (EXHIBIT D).  Finally, this erroneous infor-

Signature: __Mark W. Titel__    (SEE ATTACHMENT 4)  Date Submitted: __6/25/04__

For the Director's Review, submit all documents to: Director of Corrections
                                                      P.O. Box 942883
                                                      Sacramento, CA 94283-0001
                                                      Attn: Chief, Inmate Appeals

DIRECTOR'S ACTION:  ☐ Granted    ☐ P. Granted    ☐ Denied    ☐ Other _____
☐ See Attached Letter
                                                      Date: _____

CDC 602 (12/87)

2

ATTACHMENT 1
Titch, M./B89549 - 602 Cont'd

Was told that I was under no obligation to clarify it further (Exhibit C).

Shortly after I received the 2003 report, I asked Mr. Nanquil if he was aware that I just had an "R" removed from my custody, and he said yes, but it didn't matter because there was still evidence in my file to support his report. I also informed Mr. Nanquil that the 2003 report contained other significant errors too. Specifically, the report states "Titch and Thomas abducted the victim when she drove up in her driveway" and "she was put into the trunk of their car." This is not true. Ms. Stoughton was initially abducted from the front of her home (not the driveway) and she was initially placed in the front seat of the car (not the trunk). The report states "Titch and Thomas discussed in her presence that she should be killed to prevent her from later identifying them." This is only partly true. The first shot didn't initially kill Ms. Stoughton and there was some discussion between my crime partner and I what we should do next, but Ms. Stoughton was unconscious at that time from being shot in the shoulder. The report states "she was praying for her life." Apparently, this seems to be based on the fact that Ms. Stoughton was found clutching a rosary. But the truth is I initially shot Ms. Stoughton from a distance of fifteen feet, it was dark at night, she had the rosary concealed in her hand, and I never noticed it. Hence, if she was praying for her life, it was not something I was immediately aware of at that point of the crime. The 2003 report also states "Titch shot her twice in the mouth." Again, this is not true. Ms. Stoughton was shot near the mouth, not in the mouth. Finally, I also brought it to Mr. Nanquil's attention that I had two charges listed in my juvenile record as convictions, which I wasn't convicted of, and that the Board was using them to erroneously establish that I have a history of violence and assaultive behavior. The charges included "assault with intent to commit murder" and "threat of assault on a counselor". Although Mr. Nanquil said he was going to correct them, he never did.

In the 2003 report, Mr. Nanquil stated that the report was based on my Probation Officer's Report (POR) and Cumulative Case Summary. I don't have a Probation Officer's Report. In recent court proceedings challenging my 2001 parole hearing, in fact, the Attorney General stated that CDC could properly rely on my CYA report as a substitute. Although I don't believe that's true, even if it were, the CYA report doesn't contain many of the allegations recorded in the 2003 report. Furthermore, my Cumulative Case Summary isn't accurate either. Apparently, the prosecuting district attorney sent a clarification statement to CDC when I first came to prison and CDC incorporated parts of the statement into my Cumulative Case Summary under "Facts: CYA Diagnostic Report". But the D.A.'s statements should have been listed under "Views of D.A.". Why this was done, I don't know, but the D.A.'s statements are not the true facts of my case (Note: I will be contacting Case Records to see if they'll amend or correct this error).

One of the consequences of having this erroneous information in my board report is that, during my 2003 parole hearing, the Board incorporated it into the record as fact and it prevented me from receiving a fair hearing. In 1998 and 2001 I received 2-year denials; at my 2003 hearing I received a 3-year denial. (Note: I didn't find this out until Nov. 2003 when I received my hearing transcripts, and I've filed a BPT 1040 appeal in Feb. 2004). Another consequence is that it has changed my conviction from robbery-murder to rape-murder (Exhibit D). Finally, it has also resulted in erroneous information being transmitted to an outside agency (i.e., a copy of the 2003 report was sent to the D.A.'s office and BPT), which is prohibited per D.O.M. §13030.13.1

3

ATTACHMENT 2
Titch, M./B89549 - 602 FORMAL LEVEL Cont'd

the district attorney's views in place of the court records.  Had the district
attorney sent police records or court transcripts verifying his statements, well
then, that would be a different matter, but that's clearly not the case here.

Besides, this isn't the point.  Whatever records Mr. Nanquil might have relied on
isn't important because they all state the same thing; that is, my crime partner
stated that I attempted to rape Laura Stoughton.  But in the 2003 Life Prisoner
Evaluation Report, Mr. Nanquil dropped the fact that my crime partner stated this
and just wrote, "She was taken up a hill where Titch tried to rape her but couldn't
because she was a virgin", thus changing the fact altogether.

Mr. Nanquil states that I had an opportunity to address these issues in my "Inmate
Version".  I don't know how I could have done this because I didn't learn what
he had wrote until after I had received a copy of his report.  Furthermore, until
his report, I had no reason to address them because I had previously resolved the
rape issue on a 602 and none of my prior Life Prisoner Evaluation Reports ever
relied on the district attorney's clarification statement.  I have to wonder, in
fact, if Mr. Nanquil even knows the law or CCR, Title 15 pertaining to life
prisoners because Penal Code 5011(b) clearly states that an admission of guilt is
not to be required and CCR, Title 15, Rule 2280 states that the Board is to rely
on the same information as that used at the initial hearing unless new informa-
tion is developed.

Based on the foregoing information, I believe Mr. Nanquil has made serious errors
in writing my 2003 Life Prisoner Evaluation Report and that the appropriate remedy
is to expunge the report from my C-File.

4

ATTACHMENT 3
Titch, M./B89549 - 602 Cont'd

however, Mr. Nanquil relied solely on the District Attorney's clarification
statement which, as I've indicated, is either false or misleading.  Furthermore,
Mr. Nanquil doesn't state that my crime partner made an allegation of a rape; he
just states that I did it, thus changing my conviction from robbery-murder to
rape-murder.  Hence, if anything needs to be corrected, it's Mr. Nanquil's report,
not my court records.

First Level Response also claims that I was interviewed by Mr. Muniz concerning
this appeal on 4/7/04.  Not true.  I haven't spoken with anyone about this appeal.
I believe, in fact, that Mr. Muniz has me confused with other life-term inmates
who are challenging the use of threat assessments by CC-I's in BPT reports be-
cause he insinuates that this is one of my issues, and I haven't raised this
issue at all.

I'll try to keep this explanation simple:  Mr. Nanquil took exception to my crimes,
and he changed the material facts of my case.  More importantly, he did this in
spite of documentation to the contrary (Exhibit B) and my bringing this to his
attention after he wrote the report (Attachment I) which clearly shows deliberate
indifference and/or evil motive.  To some degree, I can understand Mr. Nanquil's
feelings because I did commit some terrible crimes.  I shot a police officer, I
killed a young woman, and I also participated in other robberies in which my
crime partner killed several people.  As I've told the Board many times, in fact,
the crimes I committed fill me with tremendous anguish and sorrow, and they will
always be a heavy burden for me to live with.  By the same tokken, the false in-
formation contained in my CYA report and the D.A.'s clarification statement
depicts me as being a ruthless killer devoid of any reservations, and I can easily
understand why some people would take offense to my crimes.

Regardless of what I've done or what Mr. Nanquil may feel about them, however,
he has an obligation to be fair and impartial and accurately report the facts of
my case.  This means he should be relying on the facts of the court records, any
police reports, and, although I don't agree with it, my CYA report.  (NOTE: the
reason I object to my CYA report is because 1) it clearly states it's based on
only a portion of the original indictment; 2) it describes the murder of Ephraim
Christian without identifying who actually perpetrated it; 3) it lists assault
with intent to commit murder and threat of assault on a counselor as part of my
juvenile record when, in fact, I was never convicted of these charges; and 4) it
states that both my crime partner and I shot Laura Stoughton as she was down on
her knees holding a crucifix which is completely false.  At present, in fact, I'm
trying to get a copy of my preliminary hearing transcript or the actual police
reports so I can prove this conclusively).  Either way, Mr. Nanquil shouldn't be
relying on the D.A.'s statements, especially in the absence of any court records
or police reports to substantiate his claims.  As I've said before, this wasn't
done in any of my previous BPT reports, and it shouldn't have been done in Mr.
Nanquil's report either because, as a consequence, the Board read it into the
record as fact during my 2003 parole hearing and relied on it to give me a 3-year
denial.  This clearly violates my Due Process rights.  In fact, I'll even attach
a copy of one of the federal cases I have because this is well established law
(see Exhibit E).

In any event, I really don't want to file a lawsuit against Mr. Nanquil which I

ATTACHMENT 3 (Cont'd)
Titch, M./B89549

could very well do.  I'm not stating this as an implied threat either.  My main
gripe is with the parole board, not CDC.  Regardless of the errors made by Mr.
Nanquil, the Board should have noticed them because it's their duty to meet at
the institutions for "a full and complete study" of all the cases they review
(Penal Code 5076.1).  Additionally, the Director's Review Unit, which is "to
assure complete, accurate, consistent, and uniform decisions" (CCR §2042), should
have noticed the errors and corrected them, and they didn't.  Hence, it's clear
from my hearing that the Board and DRU didn't do their job, and I'm going to
address that in the courts.

In the meantime, I'm requesting that Mr. Nanquil's report be expunged from my
file because it's not accurate and it's not right for him to act as judge and
jury.  Furthermore, if the report remains in my file, it is certain to have a
prejudicial effect on future BPT reports and hearings which leaves me no choice
but to challenge it in the courts.

If possible, I would like to have an interview with someone before any final
decisions are made because I have numerous documents which I've received from
the courts, and I think if I reviewed them with someone along with my C-File
that my issues  would be a lot clearer.

6

**ATTACHMENT 4**
**Titch,M./B89549 - 602 Cont'd**

mation was used by the BPT at my 2003 parole hearing to justify giving me a
3-year denial.

When I first received the BPT Report, I brought the errors to Mr. Nanquil's
attention, and he chose not to correct them.  Additionally, as I've processed
this 602 through each step, I've received one run-around after another.
Hence, I'll politely ask again, please pull this report out of my file so
that I can receive fair parole hearings in the future.

**DATE:**              April 19, 2004

**NAME:**              TITCH, M.

**CDC#:**              B-89549

**APPEAL#:**           04-472                          **FIRST LEVEL REVIEW**

**APPEAL DECISION:**   DENIED

**APPEAL ISSUE:**      You are appealing the issue that Correctional Counselor I
                       (CCI) A. Nanquil wrote in your Board of Prison Terms report that
                       "she was taken up a hill where Titch tried to rape her but couldn't
                       because she was a virgin."   You are requesting that this
                       statement be expunged because there was no evidence to
                       support your crime partner's statement.   Additionally, you are
                       requesting that notices be sent to the agencies where the 2003
                       reports were sent stating that this report has been expunged.

**APPEAL RESPONSE:**   In reaching a decision on this issue, a thorough review of your
appeal has been conducted.  The attached supporting documents, applicable sections of
the California Code of Regulations, Department Operations Manual, and your Central File
have been reviewed.  Additionally, on April 7, 2004, you were interviewed by Correctional
Counselor I L. Muniz, relative to your appeal concerns.

Mr. Titch, the information contained in your Board of Prison Term (BPT) report is information
that was obtained from legal documents in your Central File.  If you feel this information is
incorrect/inaccurate, you can write to the courts and request it be reviewed and corrected.
A review of previous BPT reports by other Correctional Counselor I's also include the
degree of threat/risk to the community.

Based on the above information, your CDC-602 Appeal is DENIED at the First Level of
Review.

L. MUNIZ
Correctional Counselor II (A)

J. R. SANDLIN
Facility Captain
Facility 1

8

**DATE:**          June 7, 2004                          6/14          ②

**NAME:**          TITCH, M.

**CDC#:**          B-89549

**APPEAL#:**       04-472                    **SECOND LEVEL REVIEW**

**APPEAL DECISION:**     PARTIALLY GRANTED

**APPEAL ISSUE:**        You are appealing the issue that Correctional Counselor I
                         (CCI) A. Nanquil wrote in your Board of Prison Terms report,
                         "she was taken up a hill where Titch tried to rape her but couldn't
                         because she was a virgin."   You are requesting that this
                         statement be expunged because there was no evidence to
                         support your crime partner's statement.   Additionally, you are
                         requesting that notices be sent to the agencies where the 2003
                         reports were sent stating that this report has been expunged.

**APPEAL RESPONSE:**     In reaching a decision on this issue, a thorough review of your
appeal has been conducted.   The attached supporting documents, applicable sections of
the California Code of Regulations, Department Operations Manual, and your Central File
have been reviewed.   Additionally, on May 25, 2004, you were interviewed by Acting
Correctional Counselor II E. B. Castillo, relative to your appeal concerns.

Mr. Titch, the information contained in your Board of Prison Terms (BPT) report is
information that was obtained from documents in your Central File.  However, the reference
to the Parole Officer's Report (POR) being a source document will be changed.

Based on the above information, your CDC-602 Appeal is PARTIALLY GRANTED at the
Second Level of Review.

*B. Oliveron*
D. M. BARNES
Chief Deputy Warden (A)

9

STATE OF CALIFORNIA—YOUTH AND ADULT CORRECTIONAL AGENCY                                    ARNOLD SCHWARZENEGGER, *Governor*

**DEPARTMENT OF CORRECTIONS**
**Inmate Appeals Branch**
**P.O. Box 942883**
**Sacramento, CA 94283-0001**


August 4, 2004



Titch, CDC #B-89549
Richard J. Donovan Correctional Facility
        at Rock Mountain
480 Alta Road
San Diego, CA  92179


         Re:  Medical

Dear Mr. Titch:

The enclosed documents are being returned to you for the following reasons:

An appellant must submit the appeal within 15 working days of the event or decision being appealed, or of receiving a lower level decision in accordance with CCR 3084.6(c).

Your assigned counselor, the Appeals Coordinator, or your Parole Agent can answer any questions you may have regarding the appeals process.  Library staff can help you obtain any addresses you need.



N. GRANNIS, Chief
Inmate Appeals Branch


******PERMANENT APPEAL ATTACHMENT-DO NOT REMOVE*****

*10*

**EXHIBIT 19**

2006 Mental Health Evaluation

**RICHARD J. DONOVAN CORRECTIONAL FACILITY**

**HEALTH CARE SERVICES**
**PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS**
**MENTAL HEALTH EVALUATION**

**JULY 2006 Calendar**

I.   **IDENTIFYING INFORMATION:**
This is apparently the 8th Mental Health Evaluation for the Board of Prison Terms concerning inmate, Mark Wayne Titch, a 46 year-old, single, White male. His DOB is July 31, 1959. Mr. Titch entered the California Department of Corrections on January 18, 1978. His commitment offenses include the following: 2 counts of 1st degree murder, 6 counts of robbery, 3 counts of burglary, and 1 count of kidnap. In addition there is a separate offense of assault with a deadly weapon on a peace officer with use of a firearm which occurred prior to the other offenses listed above. Mr. Titch describes himself as Christian and does participate in several church activities including the Kairos. He has no unusual physical characteristics and denies any nicknames or aliases.

II.  **DEVELOPMENTAL HISTORY:**
Mr. Titch recalls that his mother was a cigarette smoker, but is uncertain whether she smoked during her pregnancies. He is uncertain whether she used alcohol during her pregnancies as well. He denies any knowledge of her using drugs during her pregnancies. Mr. Titch denies any developmental problems such as speech or motor delay. He denies any unusual habits including firestarting, cruelty to animals or arson. He feels that his peer interactions and socialization skills were normal. He did suffer from a severe chicken pox infection with pneumonia which required hospitalization when he was about a year old. He denies any physical or sexual abuse, either as a perpetrator or victim.

III. **EDUCATION:**
Mr. Titch has an A.A. degree in General Education and is within a few credits of qualifying for a Bachelor's degree. His measured grade level is 12.9. He recalls that his grades in school were quite poor, but he attributes this to the fact that he had no confidence and had poor self esteem. He recalls that his father was psychologically and verbally abusive and tended to be extremely critical.



TITCH, MARK        B-89549        RJDCF/SD        F1-04-227L        JP/bl

INMATE COPY

/

IV.    **FAMILY HISTORY:**
Mr. Titch has 3 sisters and 2 brothers. Both his parents are deceased. His
father worked in his own business performing maintenance. He was
apparently alcoholic. His mother worked in a factory. His parents split up
when he was around 10 years old and he remained with his father. His
oldest sibling is his sister, Debbie, who is 52 years old. She apparently
has a drug history. His next oldest sibling is his sister, Becky, who is 50
years old. She apparently worked with her father in his business and
currently has an Elder Care business. His next oldest sibling is his brother,
Walter, who is 48 years old. Walter has a long psychiatric history, as well
as a criminal history. He is currently incarcerated at R.J. Donovan and is a
participant in the EOP Mental Health Program. Walter has been
diagnosed with psychosis, as well as developmental disability and has a
long history of substance abuse. The next oldest sibling is his sister,
Candy, who apparently also has some history of developmental disability.
His youngest sibling is his brother, Joseph, who is 38 years old. He
apparently works as a printer.

In summary, there is some family history of substance abuse specifically
in his oldest sister, as well as his brother, Walter. There is also a criminal
history in his brother, Walter. Mr. Titch continues to have some contact
with family members, mostly with his younger brother, Joseph.

V.    **PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:**
As noted in the prior reports, Mr. Titch states he had a normal puberty
with normal heterosexual relationships. He denies any sexual disorders.
He denies any history of high risk behaviors or sexual aggression. He was
engaged to a woman for some time while he was incarcerated at CMC.
She apparently was killed in a motor vehicle accident.

VI.    **MARITAL HISTORY:**
As noted previously, Mr. Titch has no prior marriages or children.

VII.    **MILITARY HISTORY:**
There is no prior military history.

VIII.    **EMPLOYMENT AND INCOME HISTORY:**
Mr. Titch recalls having one job working for an electronic firm, assembling
circuit boards. He apparently was able to hold a job, but lost it when he
was arrested. Over the course of his incarceration, Mr. Titch has held a
number of jobs. He worked for Inmate Day Labor for 5 years. He has also
worked as a welder and on heating equipment. He worked as a printer for
10 years while at CMC. He has also studied drafting and has obtained
vocational certificates in that area. He is currently employed as the
Lieutenant's disciplinary clerk on Facility 1.

**TITCH, MARK**       **B-89549**       **RJDCF/SD**       **F1-04-227L**       **JP/bl**

2

### IX.   SUBTANCE ABUSE HISTORY:

Mr. Titch acknowledges using a number of substances, but denies he was ever addicted and believes that his use was experimental and recreational only. These substances included marijuana, alcohol, LSD, hashish, PCP, and peyote. He denies any history of intravenous drug use. Mr. Titch has participated in a number of programs aimed at addictive behaviors. These programs include: the12-Step Programs, Narcotics Anonymous and Alcoholics Anonymous which he continues to participate in. During the interview, he was able to describe several of the steps in detail and noted that participation in 12-Step allows him to stay away from prison politics and provides the reinforcement of prosocial behaviors. He is able to incorporate his criminal past into the 12-Step Program and finds that he is able to express some sense of remorse and regret in doing so. Other programs have included the Hands of Peace, both basic and advanced, as well as the Biblical Self Confrontation Program. He also participated in the 40-Day Purpose Driven Life Program and has worked the Rapha 12-Step Program. When asked about current problems or needs, he states, "I feel blessed and fortunate" and states his belief that he is headed in the right direction.

### X.   PSYCHIATRIC AND MEDICAL HISTORY:

There is no prior psychiatric history. As noted he was quite ill as an infant with chicken pox. He has had a hernia repair and has also been diagnosed with Hepatitis C, which he believes he contracted through a tattoo or a fight. He has apparently had a liver biopsy and has been told that his Hepatitis is stable. There is no history of serious accident or head injury. There is no history of suicidal behavior. There is no history of seizures or other neurologic conditions. There are no current disabilities. He is currently taking no prescribed medications.

### XI.   PLANS IF GRANTED RELEASE:

Mr. Titch notes that he has many friends who are very supportive and will help him in the event of parole. His current plan is to live in el Cajon with his friend Lenona, who is retired and will provide him with housing and transportation. He states that he has a job offer from another friend who has a boat maintenance business. He would like to pursue a job in welding and has sent correspondence to NASSCO. He notes that he will have to become certified in welding and states his intention to prepare for the exam. Mr. Titch states that he has several letters offering support as outlined above, that he intends to submit to his Correctional Counselor for incorporation into his Central File. He states his belief that he will be able to comply with conditions of parole. It would appear that he has started looking into obtaining appropriate statements of support from community members and his prognosis for community living is certainly beginning to look more favorable.

## CLINICAL ASSESSMENT

**XII.** **CURRENT MENTAL STATUS/TREATMENT NEEDS:**
Mr. Titch appeared on time for his interview. He was appropriately dressed and displayed very good hygiene. He was engaging and forthright throughout the interview. Eye contact was maintained throughout. There was no evidence of mood disorder or psychotic disorder. The affect was broad and appropriate to the situation. Mr. Titch was fully oriented. His cognitive skills were intact. His insight and judgment were both felt to be good.

**DIAGNOSES:**
**Axis I:** No diagnosis.
**Axis II:** Antisocial Personality Disorder, by hx.
**Axis III:** Hepatitis C, currently stable.
**Axis IV:** Incarceration, Life-term.
**Axis V:** **Current GAF = 85.**

Mr. Titch is currently programming in the General Population and does not receive any psychiatric or psychological treatment.

**XIII.** **REVIEW OF LIFE CRIME:**
Mr. Titch went into some detail with regard to his gradual drift into criminal behavior starting when he was around 10 years old. His mother had left the family and he was feeling increasingly psychologically abused by his alcoholic father. His older brother, Walter, had also started getting in some trouble, stealing money from his father and going out at night without his parents' knowledge. Walter was eventually committed to Camarillo State Hospital and has deteriorated further over the years. Inmate Titch started getting into trouble with the police when he was around 12 years old. He began to engage in shoplifting and burglaries and eventually ended up in juvenile hall on several occasions. He was eventually committed to the California Youth Authority for armed robbery. He returned to the Youth Authority later for Grand Theft Auto before he paroled to San Diego County. It was in San Diego that he was continuing to commit crimes and ended up in a confrontation with a police officer. He apparently ended up firing a gun at the police officer which became the Assault with a Deadly Weapon offense that is part of his life crime. Mr. Titch traveled to Orange County where he partnered with his sister's boyfriend who became his crime partner in the murders that comprise the other portion of the instant offense. The crime partner was older than Mr. Titch and he apparently looked up to him somewhat. I did not get a sense that Mr. Titch is attempting to blame his crime partner, however, for the various crime they committed together. The Orange County crimes consisted of a series of incidences in which the two partners assaulted, robbed, kidnapped and murdered their victims. Mr. Titch describes these crimes as a series of blunders in which he and his crime partner initially

4

**REVIEW OF LIFE CRIME**: con't
sought to rob people of their property and money and ended up killing
them so as not to have witnesses. He also notes that they really were
unable to get any significant amount of money or property from any of the
victims. He describes his thinking at the time as "having a dunce cap on
my head". He denies either he or his partner were under the influence of
drugs or alcohol during the crimes. Details of the various crimes will not be
repeated in this updated report. I will note that Mr. Titch's current version
of the crimes is consistent with what I read in prior Mental Health
Evaluations. With regard to relevance of mental condition to criminal
behavior, I will only note that Mr. Titch's criminal past is entirely consistent
with his prior diagnosis of Antisocial Personality Disorder. There does not
appear to be significant involvement of drugs and no involvement of
mental illness in the crimes. It is also my belief that Mr. Titch has
developed some significant level of insight into his prior behavior. He is
able to connect the fact that he had no work ethic instilled in him and was
unhappy living with his father who was apparently alcoholic and abusive
toward him. Mr. Titch does not seem to make excuses for his
behavior such that he feels that it was in any way justifiable for him to
have committed the acts for which he is incarcerated. During my interview
with Mr. Titch, he did express remorse for his victims and seemed to be
able to express a degree of empathy toward them. When asked about
contacting his victim's families, his response was that he did not believe
they would want to hear from him in light of what he had done to their
loved ones. In terms of causative factors, Mr. Titch has never undergone
a Category T or Category X Program. There is limited information in his
medical record with regard to psychological factors. It is my belief
however, that Mr. Titch developed an early pattern of criminal behavior as
a child that developed through adolescence into adulthood and resulted in
the antisocial personality disorder. The development of antisocial
personality disorder is undoubtedly an interplay of environmental and
hereditary factors. There is limited information with regard to the treatment
of antisocial personality disorder, but there is widespread consensus that
the disorder does tend to show improvement with the passage of time.

XIV. **ASSESSMENT OF DANGEROUSNESS:**
It is my opinion that Mr. Titch poses a less than average risk of violence in
the structured setting as compared to other inmates in this institution.
Support for this opinion is based upon his programming history which is
quite positive for many years. Mr. Titch has not received a CDC 115 since
1986. He is participating in self-help and is employed in a position of
responsibility working for a Correctional Lieutenant. In the event of release
to the community, it is my opinion that he will continue to present a less
than average risk of violent behavior.

TITCH, MARK          B-89549          RJDCF/SD          F1-04-227L          JP/bl

5

**BOARD OF PRISON TERMS REPORT**
**PAGE 6**

**ASSESSMENT OF DANGEROUSNESS:** con't
The real issue with antisocial personality disorder boils down to whether the individual has developed a sense of self control and conscience, such that they maintain a prosocial lifestyle and do not engage in crime, be it white collar crime or street crime. It appears that Mr. Titch has begun to solidify some plans for his survival in the community in the event of release. These plans include forming connections with friends and relatives with viable employment offers. With the passage of time, Mr. Titch continues to accumulate a record of programming which points toward a diminishing propensity toward criminal behavior. It is always difficult to make an assessment with regard to how long an individual must be observed in a controlled setting before the time comes when his release to a less controlled setting poses an acceptable level of risk. It is my feeling that as long as Mr. Titch continues to program positively and continues to upgrade his parole plans and level of support in the community, he is moving toward a point in time in which that risk may be acceptable. I do not believe that mental health issues will necessarily be the deciding factor in terms of deciding when Mr. Titch is appropriate for parole.

XV.     **CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:**
The most valid predictor of future behavior is seen in the history of past behavior. As time goes by and the record accumulates, Mr. Titch's positive custody history will be compared to the extremely violent facts of his life crimes. Parole consideration will be based upon other than mental health issues.

**JOHN C. PRESTON, M.D.**
Staff Psychiatrist

D: 04/19/06
T: 04/20/06

**TITCH, MARK          B-89549          RJDCF/SD          F1-04-227L          JP/bl**