**EXHIBIT 20**

2000 Mental Health Evaluation

# RICHARD J. DONOVAN CORRECTIONAL FACILITY

# HEALTH CARE SERVICES

## PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS

### May/June 2000 Calendar

### PSYCHOLOGICAL ASSESSMENT

I.  **IDENTIFYING INFORMATION:**
This is apparently the seventh psychological evaluation for the Board of Prison Terms concerning Mark Wayne Titch, a forty-year-old, single, White male. His date of birth is July 31, 1959. Mr. Titch entered the California Department of Corrections on January 18, 1978. Mr. Titch's controlling offense is first degree murder (2 counts), for which he was sentenced to Life plus seven years. In addition, he has an added controlling offense of assault with a deadly weapon on a peace officer, for which he was given six months to Life. Both sentences are to be served concurrently. His non-controlling offenses included numerous robberies and burglaries. He denies any aliases.

II.  **DEVELOPMENTAL HISTORY:**
His mother was reported to be in good physical health during the pregnancy. There were no reported prenatal or perinatal concerns of birth defects. He reports normal progress with speech and motor development. He denies attending any special education classes or other remedial academic support. There was no reported history of animal cruelty or enuresis. His childhood medical history is unremarkable. He was the fourth of six siblings. His family was dysfunctional with chaotic relationships. Mr. Titch has significant negative feelings towards his biological mother who left the family when he was eleven years of age. He was left in the care of his father who was reported to be an abusive alcoholic. He describes his adolescence as being somewhat hopeless, alienated and aimless. He has a rather early history of continued antisocial behavior, including numerous incarcerations beginning at the age of twelve, with a series of escapes from various institutions. He appeared to lack genuine remorse for his various criminal activities which continued to increase in severity throughout his late adolescence. He was noted to have outbursts of temper.

III.  **EDUCATION:**
Mr. Titch stopped attending school prior to graduation from high school. He has, however, during the period of his continued incarceration, not only completed high school requirements but gone on to receive an associate of arts degree from Chapman College.

**TITCH, MARK**          **B-89549**     **F1-02-149U  C/rs**

|



**BOARD OF PRISON TERMS REPORT**
**PAGE 2**

Previous documentation further indicates that Mr. Titch was pursuing a bachelor of science degree from Chapman College, in public administration. However, Mr. Titch has not received his bachelor of science degree as of this date. It should also be noted that Mr. Titch was on the dean's honor roll with a grade point average an assess of 3.7. In addition, Mr. Titch had a full-time assignment as a vocational office clerk, while a CMC-East, earning exceptional work performance reports. He also had a full-time work assignment in the printing plant with above average to exceptional work performance reports. He was noted to have evaluations indicating that he was a quick learner with above average mechanical skills and an overall above average worker. While here at R.J. Donovan Correctional Facility, Mr. Titch has worked as a teacher aid/clerk for vocational auto-body and his work ethic was reported to be very good. He is currently working as a maintenance mechanic and his evaluation as a worker continues to be above average.

IV. **FAMILY HISTORY:**
Mr. Titch is the fourth of six siblings born to Walter and Maglin Titch. His parents were noted to have a turbulent marriage which ended when Mr. Titch was eleven-years of age. His biological father was granted custody of the children. Mr. Titch reports that his father was abusive and an active alcoholic. His living arrangements were rather chaotic and his placement fluctuated between both parents and various court ordered placements. He also had both a step-father and step-mother, respectively, married to his mother and father. He has one sibling, Walter, with reported significant emotional problems resulting in at least two state hospitalizations, one at Camarillo State Hospital and the other at Patton State Hospital. The only other sibling with possible noted criminal activities was his sister, Debbie, who may have been peripherally involved in knowledge about his commitment offenses. There is a harshness in his fathers relationship with Mark, including a statement by his father that capital punishment, were still in effect, would be sufficient payment for the deeds which Mark has committed. In discussing family difficulties which may have played a part in his criminal history, Mark noted the rejection of the family by his biological mother, leaving the children with the father who is both abusive and alcoholic. Mark indicated he felt he was the target of unjust criticism from his father throughout his formative years. He indicated from the age of twelve years he ran away from home repeatedly, spending a great deal of time on the streets or escaping from other institutions. He indicated that his father made him feel like a failure and he was never really able to meet his father expectations. Mark did, however, indicate that he felt his relationships with his siblings have always been relatively good and stable.

V. **PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:**
Mr. Titch reported that he was eleven or twelve years of age at the onset of puberty. He reports that his first sexual relationship was at the age of seventeen.

**TITCH, MARK**          **B-89549**          **F1-02-149U  AC/rs**

2

**BOARD OF PRISON TERMS REPORT**
**PAGE 3**

His sexual orientation is reported to be heterosexual exclusively. He denies a history of sexual disorders or dysfunction's. However, it was reported by his crime partner that Mr. Titch attempted to rape their twenty-one-year-old female captive prior to shooting her in the mouth twice. Mr. Titch denies any history of high risk sexual behaviors or fantasies. He reports a history of no sexually transmitted diseases. He reported living with one girl for a six month period at the age of seventeen, just prior to his incarceration. He reports a history of three primary relationships, one of which involved living together. Mr. Titch has never been married. He reports that his last romantic relationship occurred between the years of 1989 and 1991 while he was incarcerated. This relationship ended when his fiancé was killed on Christmas day of 1991, on her route to visit him at prison.

VI.   **MARITAL HISTORY:**
Mr. Titch has never been married.

VII.   **MILITARY HISTORY:**
Mr. Titch denied any periods of military service.

VIII.   **EMPLOYMENT AND INCOME HISTORY:**
Mr. Titch reports that he was employed on a part-time basics for nine months, at the age of sixteen. He indicated he worked part-time for an electronic firm working on circuit boards. Mr. Titch indicated that he has worked full-time while incarcerated, since 1994. His rate of pay has ranged from 18 cents an hour to 95 cents an hour. He reports that he has managed to save eleven-hundred dollars. Mr. Titch indicated that he has worked in various jobs while incarcerated, including maintenance, printing and mechanics. He is currently working full-time as a maintenance mechanic here at R.J. Donovan Correctional Facility.

IX.   **SUBSTANCE ABUSE HISTORY:**
Mr. Titch denies a history of addiction to alcohol or other drugs. However, Mr. Titch does acknowledge that he began experimenting with alcohol and various hallucinogenic drugs, starting at the age of twelve years. He reports a history of periodic use of alcohol, marijuana, hash oil, PCP and LSD. Mr. Titch denies that alcohol or drugs played any part in any of his criminal behaviors. He noted that he was sober during all criminal activities.

TITCH, MARK          B-89549          F1-02-149U  AC/rs

3

**BOARD OF PRISON TERMS REPORT**
**PAGE 4**

X.  **PSYCHIATRIC AND MEDICAL HISTORY:**

Mr. Titch denies any history of psychiatric problems or treatment. He has never been on psychotropic medication nor has he ever been treated for psychological problems. He denied any significant physical or mental disabilities, impairments or illnesses. Mr. Titch was operated on in May of 1989, for left inguinal hernia repair. He was reported to have been in an altercation in February of 1986, which, after being struck in the head by another inmate, left him unconscious for a matter of minutes. It was determined that he had sustained a concussion and slight scalp laceration with a contusion to the left clavicle. There was no reported signs of neurological damage as the result of this injury.

XI.  **PLANS IF GRANTED RELEASE:**

Mr. Titch plans to reside in southern California and seek employment. Mr. Titch has proven himself to be ambitious and would like to continue his education upon his release as well as working full-time in a management position. He states that he has no problems that would interfere with his parole conditions. Historically, during his incarceration Mr. Titch has shown no difficulty maintaining full-time employment or pursuing higher education.

XII.  **PSYCHIATRIC OBSERVATION AND COMMENTS:**

Mr. Titch appears to be above average intelligence and he appears to be motivated to work and learn in the program available to him here at Richard J. Donovan Correctional Facility. He indicated that he is desirous of eventually being released into the community and becoming a productive and contributing member of society. There does not appear to be any current diagnostic concerns for this inmate as far as a serious mental disorder. However, his prognostic outlook in terms of effective community living is considered to be somewhat guarded.

## MENTAL HEALTH EVALUATION

I.  **CURRENT MENTAL HEALTH STATUS/TREATMENT NEEDS:**

Mr. Titch indicated that he has no current psychiatric needs. There are no reported historic psychiatric concerns. He did, however, note a few years of involvement voluntarily in Alcoholics Anonymous. He indicated that he became involved in Alcoholics Anonymous both for personal growth and because it was encouraged by the Board of Prison Terms. He is not currently involved in Alcoholics Anonymous or any other personal growth pursuits.

**TITCH, MARK**          **B-89549**          **F1-02-149U  AC/rs**

4



**BOARD OF PRISON TERMS REPORT**
**PAGE 5**

**DIAGNOSIS:**
Axis I:        No diagnosis or conditions.
Axis II:       Antisocial Personality Disorder.
Axis III:      None noted.
Axis IV:       Incarceration while serving a life term.
Axis V:        GAF = 85.

     Regarding his currently level of care, Mr. Titch is currently receiving no psychiatric treatment. His prognostic outlook is considered good for continued growth and self exploration.

II.    **REVIEW OF LIFE CRIME:**
    The inmate states that the offense occurred while he and his crime partner were on an escalating crime spree. The first controlling offense, murder in the first degree, occurred according to Mr. Titch while he and his crime partner were attempting to burglarize a residence. The person living at the residence, a twenty-one-year-old, single female reportedly drove up while he and his crime partner were attempting to crawl into the window of her residence. They kidnapped her and put her in the trunk of their vehicle and drove to a remote area. They got her out of the trunk walked her up to a knoll on a hill where Mr. Titch says that his crime partner attempted to shoot her in the back with a 30.06 rifle, which jammed. Mr. Titch said that he then took his own 22 rifle and shot her in the back, causing her to collapse and cry in pain. Mr. Titch reports that his crime partner went up to her and rolled her over and came back to Mr. Titch, who was about ten feet way, and told Mr. Titch that she was still alive. Mr. Titch reports that he then went up to her and shot her twice in the face at close range with his 22 rifle. He indicated that he and his crime partner discussed the issue prior to his terminating her life and decided that they did not want her to live because she could witness against them. He indicated that he felt no real remorse for his crime at the time. The second count of first degree murder was associated with attempted armed robbery in which his crime partner shot and murdered two family members, a daughter and her father, and also shot the mother. The daughter and father died and the mother survived. The crime partner emptied his rifle into the three victims and when he ran out of bullets took a shot gun and shot the surviving victim with the shot gun. Mr. Titch says that he was not directly involved in the shooting of the victims but was simply the driver of the vehicle.

**TITCH, MARK**     **B-89549**     **F1-02-149U  AC/rs**

**BOARD OF PRISON TERMS REPORT**
**PAGE 6**

The third commitment offense involved Mr. Titch's assault with a deadly weapon upon a peace officer. Mr. Titch indicated that he had just committed an armed robbery and was exiting the store when he was observed by a peace officer who was on patrol in a marked police vehicle. He indicated the peace officer ordered him to stop and walk back to his location. Mr. Titch then walked towards the officer drew his weapon and told the officer to freeze. The officer attempted to take cover behind his parole car, while Mr. Titch was pursing him on foot. Mr. Titch says the officer was attempting to draw his weapon, so Mr. Titch shot him and continued shooting him until his gun was emptied. The officer was reportedly shot five times. Mr. Titch then jumped into the waiting get away vehicle and they drove off together. Mr. Titch's self-report of the commitment offense were basically straight forward and consistent with police records and witness reports. The only possible exception to that was that Mr. Titch denied his crime partners report that Mr. Titch had attempted to rape the twenty-one-year-old female victim, after shooting her in the shoulder and prior to shooting her twice in the mouth. At the time of this crime spree, which involved numerous other non-controlling offenses, Mr. Titch appeared to have very little remorse or concern for the victims or their family or the impact of these crimes on his own family. His primary concerns seem to be one of anxiety around not being caught. These crimes took placed when Mr. Titch was seventeen years of age. The major crimes occurring in January of 1977. During this crime spree, Mr. Titch indicated that they needed more money to escape after these commitment offenses. As a result, other homes were burglarized and other people were shot and died. However, their escalating criminality ended when Mr. Titch and a different crime partner were caught in a stolen vehicle and incarcerated. In general, Mr. Titch has been forth right in taking responsibility for his criminal behavior. Even though Mr. Titch has admitted to his wrong doing it does not appear that he has dealt with his feelings about the full impact of his crimes. He seems to intellectualize and emotionally distance himself somewhat from the grievous nature of these crimes and terrible emotional impact that they have had on the victims,the victims families and others. Mr. Titch is quick to point out that he has worked very hard during his twenty plus years of incarceration for these crimes and that he has pursued and achieved academic success during his incarceration. He points out that he was seventeen at the time of the these crimes and that he is not the same person today that he was when he committed these crimes. He also points out that he willingly participated in Alcoholics Anonymous program and would consider other areas of personal growth in the future.

**TITCH, MARK**          **B-89549**          **F1-02-149U  AC/rs**

**BOARD OF PRISON TERMS REPORT**
**PAGE 7**

To some degree, however, his motivation is more extrinsic then intrinsic.
That is to say when it was recommended by the board that he became
involved in Alcoholics Anonymous, he then became involved in Alcoholics
Anonymous. He also appears to be waiting until he is closer to a more
certain release date before he becomes involved in other forms of
personal growth and psychological enhancement. This carries some
flavor of superficiality and shallowness. On the other hand, Mr. Titch has
shown an ambiguous and genuine willingness to work hard, pursue
educational achievements and remain disciplinary free for over ten years.

III.    **ASSESSMENT OF DANGEROUSNESS:**
Mr. Titch's potential for violence in a controlled setting appears to be
somewhat less than the average inmate at the present time. It is difficult
to say if Mr. Titch were released into the community that his violent
potential may return. He had rather lengthy history of juvenile criminality
prior to the commitment offenses. These offenses included truancy,
malicious mischief, runaway, burglary, repeated escapes, assault with
attempt to commit murder, threat of assault on a counselor at Juvenile
Hall, armed robbery, vehicle theft and robbery assault with a deadly
weapon. His juvenile crimes appear to have started at the age of eleven
when he started to runaway, stop attending school and became
increasingly dangerous to society. Although Mr. Titch denies a history of
significant alcohol or drug abuse, these are likely to be possible risk
factors and precursors to violence in the future. Other considerations are
anger management, stress management and the need for greater insight
and resolution of unresolved issues related to his family of origin. It is
recommended that should he be paroled he would be required to attend
parole out patient clinic to work through these issues to provide a better
safety net for society.

TITCH, MARK                    B-89549        F1-02-149U  AC/rs

7

**BOARD OF PRISON TERMS REPORT**
**PAGE 8**

IV.    **CLINICIAN OBSERVATION/COMMENTS/RECOMMENDATIONS:**
The inmate was interviewed on May 26, 30,2000.  It is felt that he still has a tendency to minimize and emotionally distance himself from the full impact of his responsibility for his role in the instant offenses.  The sadistic, callous and cruel nature of his crimes requires continued and additional personal growth and resolution of underline psychological factors prior to his being released.  On the other hand, Mr. Titch is to be commended for his proven work ethic, pursuit of academic excellence and record of being disciplinary free for many years.

**ALVIN CHANDLER II, Ph.D.**
Clinical Psycholigist

**TITCH, MARK**          **B-89549**       **F1-02-149U  AC/rs**

ß

**EXHIBIT 21**

1998 Mental Health Evaluation

PSYCHOLOGICAL EVALUATION
FOR THE BOARD OF PRISON TERMS
MAY 1998 CALENDAR
CMC-EAST

<u>IDENTIFICATION/FORENSIC DATA:</u>    This is the fifth Psychological Evaluation for the Board of Prison Terms concerning Mark Titch, a 37-year-old male who entered the Department of Corrections on 1-18-78 to serve a life sentence for Murder, Second Degree, with the following offenses:  Robbery, burglary, kidnap/robbery, and assault with a deadly weapon.

<u>SOURCES OF INFORMATION:</u>    Mr. Titch was interviewed on 2-26-98 following a review of his C-File and Unit Health Record.

<u>SUBSTANCE ABUSE:</u>    Mr. Titch said that he began using PCP and LSD on an experimental basis since the age of 16, but he did not use it beyond his teenage years.  With regard to alcohol, he also began drinking at the age of 16, but he considers himself to be, "just a social drinker."  The inmate said that he has been participating in AA at the Board's request since 7-28-95.  Although not actively involved in the Twelve Step Process, the inmate said that he pursues a course of insight based on his past experience.  The inmate denies ever being addicted to any drug, and he said that he was not intoxicated at the time of his crimes.

<u>PRIOR PSYCHOLOGICAL/PSYCHIATRIC CONCLUSIONS:</u>    Psychological evaluations conducted during the late 1970s pointed out the chaotic family relationships that were the basis of Mr. Titch's early learning.  There was no positive, meaningful relationship between the inmate and his mother, and the father tended to be alcoholic and abusive.  At the time of the crime, the inmate was perceived to be antisocial and aimless, displaying little remorse for his activity, and was prone to outbursts of temper.  The concluding diagnosis of that evaluation taken soon after these crimes, focused on a severe sociopathic personality disorder with concerns for future homicidal behavior.

<u>MENTAL STATUS EXAMINATION:</u>    Mr. Titch arrived as scheduled for this evaluation.  He was well-groomed, properly focused, and showed no acute distress.  His interaction with the examiner showed that he was sensitive to social cues, and when given the opportunity he freely expanded upon issues.

When questioned about his perception of his own difficulties which led up to the crime, he said that he did not have a stable family life.  His mother rejected the family and left the children with his father who was abusive and alcoholic.  The inmate said that he was the oldest child and was the target of unjust criticism for not managing the household in a better manner.  The inmate said that he ran away from home at the age of 12 and then spent his time on the streets or escaping from other institutions. The inmate learned that he was a failure from his inability to satisfy his father's expectations.  With regards to interpersonal relationships, the inmate said that he had many acquaintances and those people tended to perceive him as a nice guy, but deep down, "I felt I was always alone."

TITCH, MARK        B-89549            CMC-EAST            2-26-98            dw

PSYCHOLOGICAL EVALUATION
FOR THE BOARD OF PRISON TERMS
MAY 1998 CALENDAR
CMC-EAST
PAGE TWO:

During his earlier years, he said that he did not make commitments with others and consequently his relationships were mostly short-term. He said that he committed crimes in order to survive. All the while he expected failure from himself and always felt hopeless and full of despair.

During the clinical interview, the inmate's speech was clear and rational. There were no indications of instability in his mood, and his affect was generally unremarkable. He denied suffering from any psychiatric symptoms, and there is no history that he ever received psychiatric treatment.

DIAGNOSTIC IMPRESSION:

AXIS  II: ANTISOCIAL PERSONALITY DISORDER.

INTERVIEW/DISCUSSION:    The inmate was asked to describe his motivations and self-understanding during his crime spree in which four people were murdered. He said the first shooting occurred when he shot a police officer several times. After the shooting, he believed that the man was dead, and he realized that, "my life was over." He realized that if he had only stopped his burglary crimes, events would not have gone as far as they did. But he realized at the time that he thought the worst of things would come about and that he was doomed to some kind of ultimate failure. He described himself as desperate and in a process of escalating criminal behavior.

One of the crimes as noted from the Probation Officer's Report involved abducting a 21-year-old female who surprised the inmate and his crime partner while initiating a burglary. The woman was eventually taken to a remote area, and the inmate attempted to rape her, but as noted from the report that he was unable to do so because of her virginity. Fearing that the crime partner may be later identified, the inmate shot the woman in the shoulder, and then moments later shot her twice in the mouth while she prayed, clutching a rosary against her chest. Mr. Titch acknowledged that in order to make their escape, they needed to commit more burglaries in order to obtain money. While attempting to burglarize other homes, more people were shot and died. The inmate acknowledged that he was desperate and their level of criminality escalated as they attempted to resolve their problems and escape detection.

CONCLUSIONS:    During the inmate's period of incarceration, he did meet on a regular basis for approximately a year-and-a-half with a female visitor. The inmate's description of this relationship suggests that some level of trust was established, and the inmate began to be aware of his difficulties in relating to others and the presence of angry feelings. To the inmate's credit, he has attempted to explore these initial insights and come to some level of peace with his own negative feelings.

TITCH, MARK          B-89549          CMC-EAST          2-26-98          dw



PSYCHOLOGICAL EVALUATION
FOR THE BOARD OF PRISON TERMS
MAY 1998 CALENDAR
CMC-EAST
PAGE THREE:


A review of the inmate's history shows little in the way of positive early
experiences.  According to the inmate and available documentation, the
inmate's mother rejected the family, and the inmate's father was alcoholic
and abusive.  There was a divorce in the family when Mr. Titch was a
youngster and he left home at the age of 12.  There are several instances
of escape from various institutions and youth authorities.  There is an
extensive history of violent crime and failure to abide by conditional
release.  The inmate has never married, and until recently, has no history
of positive interaction with others.  There is little indication from the
record that drugs or alcohol played a persistent role in the inmate's
failure to adapt in a more prosocial manner.

During the inmate's period of incarceration some indications of maturity
are present and the inmate has expressed a desire to find some peace in his
life and to diminish the negative feelings that he has towards others.
These are issues which he needs to continue to explore.  To the extent that
he obtains insight into his angry feelings, his elevated potential for
violence in the community is expected to recede with time.


L. W. BERNING, PH. D.
STAFF PSYCHOLOGIST


TITCH, MARK          B-89549          CMC-EAST          2-26-98          3  dw

**EXHIBIT 22**

1995 Mental Health Evaluation

PSYCHOLOGICAL EVALUATION
FOR THE BOARD OF PRISON TERMS
MAY 1995 CALENDAR
CMC-EAST

**IDENTIFICATION/FORENSIC DATA:**   This is apparently the fourth psychological evaluation for the Board of Prison Terms concerning Mark Wayne Titch, a 34-year-old first-termer who entered the California Department of Corrections on 1/18/78.  Mr. Titch's controlling offense is First Degree Murder, for which he was sentenced 15 years to life.  His non-controlling offenses include robbery, burglary, kidnap/robbery and assault with a deadly weapon on a peace officer.

**SOURCES OF INFORMATION:**   This evaluation is based upon reviews of the Central File and his Medical File and on a single, structured 45-minute clinical interview conducted on April 28, 1995.

**MENTAL STATUS EXAMINATION:**   Mr. Titch arrived promptly for the interview, displaying good hygiene and grooming, as well as appropriate clothing.  He appeared to be completely oriented, alert, aware, coherent and articulate, displaying no evidence of a formal thought disorder.  His presenting mood was rather bright, with appropriate affective variation in response to the different topics discussed.  There was no evidence of blocking, derailing or response to internal stimuli.  Mr. Titch's capacity for attention, concentration and short-term memory all appeared to be within normal limits.  His intellectual functioning, as assessed by vocabulary, fund of information and abstract reasoning ability, appeared to be in the bright-average range.  Overall, at the time of this interview, there was no evidence of a major psychiatric disorder and no indication from his file that this has ever been an issue.

Interpersonally, Mr. Titch displayed an extensive mastery of social skills and conventions, and he conducted himself in a manner consistent with what would be expected during a fairly important interview.  His demeanor could best be described as somewhat formal, cautious, conservative and carefully controlled, if not disciplined.  He appeared to be weighing his statements carefully and obviously had sufficient command of the English language to express himself with as precise a degree of meaning as he intended.  There was little evidence of spontaneity, even when rather novel questions were posed.

**INTERVIEW/DISCUSSION:**   During the interview, Mr. Titch showed a clear preference for analyzing his life via intellectual, cognitive and logical means.  He also showed a considerable degree of strength in this area, manifested by his superior verbal skills and clear, logical style.  Mr. Titch appeared to be somewhat at a loss when he attempted to process emotional material.  As the interview progressed, it became increasingly evident that Mr. Titch has, to a very considerable extent, divorced himself from his emotional experiences, particularly the rage that was clearly related to his current offense.

Apparently, Mr. Titch has elected to try to manage his problematic behavior by encapsulating and sealing off the anger that clearly drove him to violent criminality.  In light of the absence of any disciplinary reports in his file since 1986, it would appear that he has been substantially successful.

**TITCH, MARK**      B-89549          CMC-EAST/3207        **PSYCHIATRIC**        05/11/95        **rb**

PSYCHOLOGICAL EVALUATION FOR
THE BOARD OF PRISON TERMS
Page 2

However, the remaining question is, obviously, prognosis for his continued
lack of aggressiveness upon eventual release from CDC.  It seems safe to
say that Mr. Titch has, at this point, a considerable amount of ego
strength, which indicates that he has the ability to exercise self-control,
should he so choose.  The other, more complicated, consideration is the
attempt to assess whether he will, in fact, choose to refrain from violence
after release.  First and foremost, the best prognostic indicator for
future conduct is past conduct, particularly over the past two years.
There is no documented evidence that Mr. Titch has engaged in any violent
behavior at CDC for over nine years.   The other consideration is Mr.
Titch's apparent conversion from a more crude, violent, antisocial
personality style to his current highly-socialized presentation.  Should he
elect to re-offend, it would probably involve non-violent means toward a
non-violent goal.  There was no indication during the interview that Mr.
Titch has internalized any significant amount of values or ethics during
his time in custody.  However, he appears to have learned that he can
realize greater benefit from patience and in subtlety than overt violence.

DIAGNOSTIC IMPRESSION:

AXIS I:        V71.09      No Diagnosis or Condition.

AXIS II:                   Antisocial Personality Disorder.

AXIS III:                  None noted.

AXIS V:                    Global Assessment of Functioning (GAF):  75.

CONCLUSIONS:  Mr. Titch appears to have improved greatly during his time
in the custody of CDC.  In a less-controlled setting, such as return to the
community, he may continue to hold most of his present gains, particularly
if he refrains from use of alcohol and/or drugs.  Also, it is the opinion
of this writer that Mr. Titch has probably realized most, if not all, of
the improvement that he is likely to experience in the custody of CDC.  As
of the current interview, Mr. Titch did not appear to be suffering from any
major psychiatric disorder, and there is no evidence that this has ever
been an issue for him.  Any decisions related to his parole should be based
upon other criteria.

RECOMMENDATIONS:  Whether Mr. Titch is retained or released, it is
recommended that he become involved in some form of process group therapy
to help him gain additional insight and consolidate his growth to date.


_____          noted by _____
SCOTT SMITH, Ph.D.                                JOHN GANNON, Ph.D.
STAFF PSYCHOLOGIST                                SENIOR PSYCHOLOGIST


SS:rb:d:r:t:   05/11/95

TITCH, MARK     B-89549     CMC-EAST/3207     PSYCHIATRIC     05/11/95     rb 2

**EXHIBIT 23**

1995 Mental Health Evaluation

PSYCHOLOGICAL EVALUATION
FOR THE BOARD OF PRISON TERMS
FEBRUARY 1995 CALENDAR
CMC-EAST

**INTRODUCTION:**      This is the fifth report to the Board of Prison Terms concerning Mark Titch, a 35 year old inmate sentenced to seven-years-to-life for two counts of first degree murder and numerous other charges to which he pled guilty in 1977.  At the age of 18 years old, Mr. Titch embarked on a heinous crime spree with his crime partners, leading to burglary, kidnap, robbery, and murder.  Details of the commitment offense and his escalating pattern of violence from youth are available in the files and shall not be reiterated in this report.

**BACKGROUND:**   This evaluation is based upon a review of the Central File, the Medical Record, and a structured clinical interview.  Mr. Titch is currently assigned to the Specialty Print Plant as a journeyman press operator.  He has developed trade skills in printing, as well as drafting, receiving excellent work reports.  He earned an AA degree and was near completion of his BA degree when Chapman College courses were discontinued. He received a three year denial at his 1992 Board of Prison Terms hearing with recommendations to remain disciplinary free, upgrade educationally, and participate in self-help groups.  He has followed the Board's recommendations with the exception of participation in self-help groups. His current classification score is 10 points.  Mr. Titch has remained disciplinary free since 1986.

**MENTAL STATUS EVALUATION:**      Mr. Titch arrived promptly for the interview presenting himself in a cooperative manner.  He was oriented in the three spheres with a mood and affect within normal limits.  He has matured in his attitude compared to earlier reports.  There were no signs of cognitive impairment as he appears to function within the high-averge range of intelligence as previously reported.  No evidence of a major mental disorder was observed during this interview.

**DIAGNOSIS:**

AXIS I: NO DIAGNOSIS.
AXIS II: ANTISOCIAL PERSONALITY DISORDER BY HISTORY.
AXIS V: GAF 85.

**DISCUSSION:**      Mr. Titch explained that the criminal behavior was a result of his drifting around and getting caught up with the crowd.  He takes responsibility for his actions saying, "I dealt with my problems in the wrong way."  He had a troubled youth, started stealing at the age of 11, and began running away from home.  Now he believes that at that time "I had a death wish."  He began to develop insight after five years in prison when he finally realized his anger was self-defeating.  Today, he says he cannot understand how he acted so stupidly in the past.  In 1988, Dr. Davis pointed out that Mr. Titch uses a defensive style of avoidance and intellectualization.  This apparently remains intact today.  Mr. Titch needs to confront his defensive style and develop a sense of remorse for the suffering he caused his multiple victims.  He believes he would not

TITCH, MARK        B-89549        CMC-EAST        10-25-94        dw

PSYCHOLOGICAL EVALUATION
FOR THE BOARD OF PRISON TERMS
FEBRUARY 1995 CALENDAR
CMC-EAST
PAGE TWO:

involve himself in crime nor commit murder in the future.  He is well aware
that he will spend many years in prison before he becomes eligible for
serious parole considerations.

<u>CONCLUSIONS AND RECOMMENDATIONS:</u>    The diagnosed psychopathology, i. e. an
antisocial personality disorder, although not considered a major mental
illness, has been directly related to criminal behavior.  During
observation in the institution, he has shown improvement by remaining
disciplinary free, working with excellent reports, obtaining trade skills,
and upgrading educationally.  Although he has matured, he has yet to
confront the underlying causes of his criminal behavior.  In a less
controlled setting, such as return to the community, this inmate can be
considered likely in all probability to deteriorate because he has yet to
take a cold, hard look at himself, his past and present anger, his
personality and his defensive style of intellectualization and avoidance.
On the surface he has shown improvement which deserves recognition,
however, Mr. Titch has not explored deeper issues.  From a psychological
standpoint, this inmate must utilize any available opportunities for group
or individual therapy offered to him.  For example, he may benefit from
either CAT T or CAT X Programs.  His current level of dangerousness based
upon his disciplinary history compared to other incarcerated felons is
considered to be average.  Serious parole considerations are premature at
this time.

This report is not confidential and a copy is to be provided to Mr. Titch
for his review.


EDWIN P. JENESKY, PH. D.
STAFF PSYCHOLOGIST


TITCH, MARK          B-89549          CMC-EAST          10-25-94          dw

**EXHIBIT 24**

1992 Mental Health Evaluation

PSYCHIATRIC EVALUATION
FOR THE BOARD OF PRISON TERMS
MARCH 1992 CALENDAR
CMC-EAST

This is the fourth mental health report on this inmate. The last one was for February 1989. This 32-year-old White male doing time for murder in the first degree, two counts and kidnapping for purposes of robbery. He has been sentenced from seven years to life.

The material available to prepare this report was the C-File, the health chart and the interview of the inmate for approximately 40 minutes.

ACTIVITY OF THE INMATE SINCE THE LAST REPORT:

The subject reportedly has been working in Printing Industries on an average of seven hours a day five times a week and that he went to college and is getting his Bachelor's Degree in Business Administration.

There is no history of mental illness, no hospitalization in a mental hospital. He does not give a history of substance abuse or alcohol abuse. He has never taken psychiatric medication and he has never experienced any symptoms of mental illness. There is no history of mood disturbance problems or suicide attempts. Basically, on mental status, he is cooperative, oriented properly and his speech is coherent. There are no symptoms of mental illness such as delusions or hallucinations. His affect is appropriate. His intelligence level is estimated to be above average and his general knowledge in keeping with his education. His insight is questionable since he did not understand why he committed the offense.

DIAGNOSIS:

AXIS I:    No diagnosis.
AXIS II:   Antisocial personality disorder.
AXIS II:   No diagnosis.

His GAF is estimated to be 80.

He describes his offense pretty much as he did previously and he indicates that he has been told that he needs to have some therapy done to understand why he commits a crime, so that he wouldn't do it any longer.

CONCLUSION:

In asking the subject whether he could relate to the examiner something that would be convincing as to why he would be safe at large, he was not able to verbalize anything other than explain to the examiner that he has already been told that he needs to do 30

TITCH, MARK        B-89549        CMC-EAST/3232        1-30-92        kf

PSYCHIATRIC EVALUATION
FOR THE BOARD OF PRISON TERMS
PAGE - 2 -

years anyhow.  It would seem, therefore, that we are basically
dealing with a personality problem and there is no emotional mental
illness to be treated, which means, in essence, mental health reports
may not significantly affect his parole status.  It would seem,
therefore, that the decision to parole would have to depend on
factors other than psychological.


John Hirschberg, M.D.
Staff Psychiatrist

d/r/t:  1-30-92
TITCH, MARK        B-89549        CMC-EAST/3232        1-30-92        kf        2

**EXHIBIT 25**

1989 Mental Health Evaluation

PSYCHOLOGICAL EVALUATION
FOR THE BOARD OF PRISON TERMS
FEBRUARY 1989 CALENDAR
CMC-EAST

The following is the third evaluation concerning Mark Titch, a twenty-nine-year-old Caucasian serving a life term for two counts of first degree murder, six counts of robbery, three counts of burglary and one count of kidnap. There is also a charge of assault with a deadly weapon on a police officer. Subject was interviewed for approximately one hour for the purpose of this report. In addition, a thorough review of his central and medical/psychiatric file was conducted. A detailed account of subject's offenses is contained in the record and will not be repeated here.

In regard to his part in the multiple offenses, subject continues to accept full responsibility and to express remorse for the death of his victims. There continues to be, however, a sense of emotional distancing on subject's part from the full impact of his actions. As yet he appears to have developed no insight into who he was at that time and how he developed into a person who, in his own words, "didn't feel anything at the time" and felt, "it wasn't even serious."

Subject reports an extremely dysfunctional childhood from age eleven when his mother left subject and his two brothers and three sisters in the care of his alcoholic father. He was left in charge of his younger brothers and sisters and states he could never fulfill his father's expectations which he feels were unrealistically high.

Subject has made a conforming institutional adjustment. His last CDC-115 was in 1986 when subject was involved in a physical fight. He is presently enrolled in Chapman College courses and reports receiving A's and B's. Presently, he is assigned as Procurement Clerk in the Vocational Administration Office and has received several laudatory chronos regarding his work aptitude and attitude. Although the Board of Prison Terms had requested that subject participate in the Category "X" Program, he has elected not to given the probable length of time remaining before he is realistically considered for parole.

MENTAL STATUS EXAMINATION:

There was slight difficulty scheduling subject for his interview due to his work and school programs, but he was cooperative and forthcoming with information. He was oriented in all spheres, affect was appropriate to mood, and eye contact was good. At no time was there an indication of a primary affective or formal thought disorder.

TITCH, Mark          B-89549          CMC-E          12-9-88          jag

Psychological Evaluation
For the Board of Prison Terms - Page 2

Memory and concentration were intact.  Subject's defensive
style is avoidant and intellectualized.  He agreed to
psychological testing to be administered as time permits,
given his schedule and that of the interviewer.  Subject
expressed an interest in learning more about himself through
psychological testing.

DIAGNOSTIC IMPRESSIONS:

    Axis I:   V71.09     No diagnosis or condition.

    Axis II:  301.70    Antisocial personality disorder.

CONCLUSION:

To date, subject has avoided self-examination by postponing
psychological programs until he approaches a realistic time
frame for release.  He has a number of problematic areas to
explore, but before psychological growth occurs, he must
develop intrinsic rather than extrinsic motivation.  Until
that time, he is clearly stating to all concerned that he is
not ready for a parole date.  It is also premature to
consider an answer to the question of the subject's violence
potential in the free community and the extent to which he
has explored the commitment offense.

Beryl R. Davis, Ph.D.
Staff Psychologist

Noted by:  James B. Hollingsworth, M.D.
           Assistant Warden
           Psychiatric Services

D: 12--9-88
T: 12-12-88

TITCH, Mark     B-89549     CMC-E   12-9-88   jag

2

**EXHIBIT 26**

1986 Mental Health Evaluation

PSYCHIATRIC EVALUATION
FOR THE BOARD OF PRISON TERMS
FEBRUARY 1986 CALENDAR
CMC-EAST

This is apparently the second report for the Board of Prison Terms in the case of
this now 27-year-old first-termer with the committing offenses of 2 counts of first
degree murder, 6 counts of robbery, 3 counts of burglary and 1 count of kidnap. In
addition, there is an entirely separate assault with a deadly weapon on a police
officer with a firearm. In reviewing his crimes he did display some remorse over the
death of the then 21-year-old female victim but then complained that "when I got
here they put an 'R' on my jacket just because my crime partner said I tried to rape
her." He again, as in the past, vehemently denies that he attempted to rape the girl
whom he admittedly shot dead. Repeatedly throughout the interview he made statements
to the effect, "I've matured and I have different priorities. I had no respect for
people's lives or property. Today I feel bad about robbing. I'm no longer self-
centered."

Overall he seemed to be painting a picture of himself as a illegitimate capitalist,
a robber and burglar, who became an extremist on the subject of leaving no witnesses.
Although he professes to have had remorse immediately after the first callous murder,
historically this is followed by he and the same crime partner murdering two other
people, one of whom was a child. His crime partner apparently emptied his rifle,
and next shot the surviving victim with a shotgun. He was familiar with material in
his central file, he spontaneously commented about the District Attorney's statement,
he commented, "I'd have to agree with it. But not the part about never being released
or it would demean the victim's lives." He also spontaneously stated that the view of
the judge that "release would be to authorize multiple murders", "I don't agree with
that."

MENTAL STATUS EXAMINATION: He arrived for the interview on time, fairly well organized
and with what he referred to as a "outline" of what he wanted to present. He very
recently received a laudatory chrono from his boss in the Vocational Education Depart-
ment and in reviewing his file one got the overall impression that he has made a fairly
stable institutional adjustment. Most of the utterances he made during the course of
the entire meeting could be classified under the heading "testimonials on his own behalf."
"I'm a very conscientious person, I'm able to handle my own resonsibilities." Some of
the testimonials became quite histrionic. He asked questions and then can't answer
them. "Why couldn't I have feelings and why couldn't I respect (pause)   because
I didn't have no damn feelings." Some of his more histrionic statements such as "I had
no right to go out there and take anybody's life. I didn't stop to think of what she
wanted out of life or that she even had a life." In the interview there is no flatness
of affect, looseness of associations, disparity between affect and thought content,
predilection for autism, or any other evidence of a major thought disorder. His mood
fluctuations were generally appropriate but during some of his most emphatic and dramatic
statements on his own behalf it became more theatrical than emotional. He hyperintellec-
tualizes quite considerably. Insight is minimal and he appears to this examiner to be
acting the way he expects other people think he should act. One gets an overall feeling
of contrivance and all of his motivation seems directed not toward understanding what
his brutally sadistic crimes mean, but rather to convince other people that he is not
such a bad guy after all. When I commented that it sounded like the last few minutes
of victim Laura's life were pretty nightmarish his response was "I wish to hell I'd
never done it." There is a superficiality and a shallowness to all of his productions
which makes me believe that the lack of psychological constaint which enabled him to

TITCH          B-89549              CMC-E              11-22-85          be

1

Page 2
Psychiatric Evaluation
For the Board  of Prison Terms

kill people with no anxiety, no guilt, and no remorse is as yet untouched.  In my opinion the most descriptive psychiatric diagnosis is antisocial personality with sadistic features.  I am recommending to the Board of Prison Terms that he be referred to Category "X" Program for a 90-day indepth evaluation of his psychological status.  This would be a first step in his becoming involved in some kind of meaningful therapy.  His violence potential has certainly been markedly elevated in the past and is assumed to remain so although he can control it in a structured setting, such as prison.  I pointed out to him that making a conforming adjustment in a structured setting didn't count for much and neither did testimonials on his own behalf.  He said he would think about it but I doubt if he'll give his presentation much alteration from his peformance on the day that I saw him.

RECOMMENDATION TO THE CLASSIFICATION COMMITTEE:  None, except continue present programming.

NOTE:  The inmate has been furnished a copy of this report.

Robert C. Brandmeyer, M.D.
Senior Psychiatrist

TITCH          B-89549          CMC-E          11-22-85          2

**EXHIBIT 27**

1983 Mental Health Evaluation

PSYCHIATRIC EVALUATION TO THE BOARD OF PRISON TERMS

JANUARY 1983 CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD

OCTOBER 26, 1982

This is the first Board of Prison Terms psychiatric evaluation for this 23 year old white male, first termer with extensive prior arrest record, dating back to age 12. He is incarcerated for two counts of Murder 1st, Robbery 1st with the use of Firearm. Burglary 2nd, and Assault on a Police Officer. This report is based on approximately 30 minute interview with the inmate and review of his Central File without any prior contact with him. Since being in custody the inmate has obtained a high school diploma and two semester of courses through the San Jose State University, without receiving any further academic credentials. He has no work history and has no current vocational plans, other than his wish to become a writer of materials that he hopes will benefit youth and others. His plans do not include writing about his own personal experiences. He describes the relationship to h family as somewhat distant, yet maintains letter contact with his mother and sister and a friend that he met while incarcerated, a professor of criminology, on a monthly basis. There were two episodes of assault charges in 1979 and 1980 with other inmates, but no other record of out of control behavior has been noted since incarceration. Inmate believes that he may be incarcerated for at least another twenty or thirty years or perhaps for life and further believes that he is not ready for parole, since he would only return to live with his family and has no vocational skills of which he is aware.

MENTAL STATUS EXAMINATION: Inmate is alert, makes ready contact, moves the chair over to be nearer, the examiner, responds readily to direct questioning, somewhat nervous about being specific, describing his future plans or incidents that have happened in the past. He has difficulty gaining perspective on the acts, which he had committed as he was responsible for the murders that he had committed, although he transfers much of this to his relationship with his father at the age of twelve. Affect is appropriate although superficial, his mood generally elated when speaking of his plans to be a writer. He talks of harming himself, although he says this is not natural, and has no history of impulsive acts towards himself.

PSYCHIATRIC DIAGNOSIS:  Anti-social personality disorder.

TITCH          B-89549          CTF-CENTRAL          11/15/82          aw

Page 2

PSYCHIATRIC CONCLUSION:  The inmate has had a long history of
impulsive behavior, distructive acts carried out towards others,
first with property and then with peoples lives, most of the
episodes seem to have been events undertaken on sudden impulse,
in fact for the incident that he feels the most regret he finds
no reason for it accept that his crime partner was concerned,
but that he himself had no patience for the killing.  Inmate
himself has noted a change, which he sees reflected in his
ability to take pride in his writing skills, and feels that
someday, infact be ready for parole and be out in the world
were he might persue his own ocupation.  I believe that he
will know when he is ready for parole by persuing a specific
objective, educationally and vocationally achieving those
objectives in an institutional setting, such as this.  Were he
to be paroled at this stage of his development, I believe that
his potential for violence would still be greater than the average
man on the street.  Inmate is to be commended for the progress he
is making and the effort he is putting into his own rehabilitation.

JOHN W. MC KEAN, M.D.
Staff Psychiatrist

TITCH        B-89549        CTF-CENTRAL        11/15/82        aw

2

**EXHIBIT 28**

2003 Parole Hearing Decision

# LIFE PRISONER DECISION FACE SHEET

## PERIOD OF CONFINEMENT
### (RECORDS OFFICER USE ONLY)

|  | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement................................. | | | |
| Date Life Term Begins.............................................. + | | | |
| At Large Time........................................................... + | | | |
| PAROLE DATE........................................................... = | | | |

## MISCELLANEOUS

Deny 3 years
Req New Psych Report

Remain disaplinary Free
Partispite in self help.

---

PENAL CODE SECTION 3042 NOTICES      ☒      SENT      (Date)   May 28, 2003

**COMMITMENT OFFENSE**

| PC 187 | MURDER 1ST |
|---|---|
| (CODE SECTION) | (TITLE |
| C37693 | 13 & 16 |
| (CASE NUMBER) | (COUNT NUMBER) |

| Date Received by CDC 1/18/78 | Date Life Term Begins 1/18/78 | Controlling MEPD 2/04/84 |
|---|---|---|

| Type of Hearing ☐ INITIAL ☒ SUBSEQUENT (HEARING NO.) #7 | If Subsequent Hearing, Date of Last Hearing 6/26/01 |
|---|---|

**Department Representative**
Frank Michell, Classification & Parole Representative

| Counsel for Prisoner KEITH STANTON | Address 43430 E. FLORIDA AVE. #F, HEMET 92544 |
|---|---|
| District Attorney Representative PETE PIERCE | County ORANGE |

## PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a proposed decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

By:

| Presiding (Name) | Date |
|---|---|
| Concurring (Name) Carol J. Bentley | Date |
| Concurring (Name) | Date |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| TITCH, MARK | B-89549 | RJDCF | 7/2003 | 7/29/03 |

BPT 1001 (REV 1/91)                                         PERMANENT ADDENDA

**LIFE PRISONER: PAROLE CONSIDERATION**
**PROPOSED DECISION  (BPT §2041)**

I. [X] PAROLE DENIED  *Deny 3 Years*

If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

II. [ ]  PAROLE GRANTED

A. Base Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____ Months

| Case No. | Count No. | Offense |
|---|---|---|

B. Firearm Enhancement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

C. Other Crimes Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

| Case No. | Count No. | Offense | _____ mos. |
|---|---|---|---|
| Case No. | Count No. | Offense | _____ mos. |
| Case No. | Count No. | Offense | _____ mos. |

D. Total Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .= _____ Months

E. Postconviction Credit From _____ (Date) To _____ (Date) — _____ Months

F. Total Period of Confinement. . . . . . . . . . . . . . . . . . . . . . . . . . . = _____ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or postponement of your parole date.

III. If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

**PANEL HEARING CASE**

| Name | Date |
|---|---|
| Name  *Carol J. Bentley* | Date |
| Name | Date |

| NAME | CDC NUMBER | INSTITUTION | HEARING DATE |
|---|---|---|---|
| TITCH, MARK | B-89549 | RJDCF | 7/29/03 |

Distribution: White—C. Fi
Canary—BP

19

1        **CALIFORNIA BOARD OF PRISON TERMS**

2                    **D E C I S I O N**

3        **DEPUTY COMMISSIONER BENTLEY:**  Okay, you're

4    on record.

5        **PRESIDING COMMISSIONER RISEN:**   Okay, we'll

6    reconvene the hearing.  Everyone who was

7    previously in the room has returned, it's 12:10

8    p.m.  The Panel reviewed all information received

9    from the public and relied on the following

10   circumstances in concluding that the prisoner is

11   suitable for parole -- is unsuitable for parole

12   and would pose an unreasonable risk of danger to

13   society or a threat to public safety if released

14   from prison.  First of all, the commitment

15   offense, the offense was carried out in an

16   especially cruel and callous manner.  Multiple

17   victims were attacked, injured, and killed in the

18   same and separate incidents.  The offense was

19   carried out in a dispassionate and calculated

20   manner such as an execution style murder.  The

21   offense was carried out in a manner which

22   demonstrates an exceptionally callous disregard

23   for human suffering.  These conclusions are drawn

24   from the Statement of Facts wherein the prisoner

25   and his crime partner went on a horrendous crime

26   spree.  There were two murders that he was

27   **MARK TITCH  B-89549  DECISION PAGE 1  7/29/03**

3

20

1    convicted of.  The first one was for the murder of

2    Laura Ann Stoughton, S-T-O-U-G-H-T-O-N, aged 21.

3    She was abducted from the driveway of her house,

4    taken to a remote area where the victim attempted

5    to rape her.  He then -- His crime partner then

6    tried to shoot her with a gun but it jammed, then

7    Titch shot the victim in the shoulder.  She was

8    praying for her life when Titch and Thomas

9    discussed with her -- or in her presence the fact

10   that she had to be killed because she could later

11   identify them.  Titch then shot her twice in the

12   mouth killing her.  She was found clutching a

13   rosary in her right hand against her chest.  The

14   second murder was of Aubrey Duncan.  On January

15   29th of 1977 Mr. Duncan had gotten out of his car

16   and was attempting to unlock the front door of his

17   house at which time the prisoner's crime partner,

18   Thomas, opened fire with a .22 caliber rifle

19   shooting him numerous times.  He died as a result

20   of the gunshot wounds.  The mother and daughter

21   heard the loud noise, opened the front door and

22   saw the father lying dead on the front porch.  The

23   daughter, Denise, was then shot three times and

24   subsequently died.  He was not convicted of this

25   murder.  Nadine Duncan, the mother, was shot by

26   Thomas with a sawed-off shotgun as he had run out

27   **MARK TITCH  B-89549  DECISION PAGE 2  7/29/03**

4

21

1    of ammunition for his .22 caliber rifle.  The

2    prisoner was also convicted of assault with a

3    deadly weapon on a police officer where, during

4    the commission of a robbery, the prisoner shot the

5    police officer five times with a gun.  The result

6    of these injuries, the officer had to be retired

7    from the police department.  Then from November of

8    1976 until December of 1976 he was convicted of

9    five counts of robbery, three counts of burglary,

10   one count of kidnap for the purpose of robbery,

11   and that would be -- the prisoner has a record of

12   violence and assaultive behavior.  He has an

13   escalating pattern of criminal conduct and

14   violence.  He has failed to profit from society's

15   previous attempts to correct his criminality.

16   Such attempts include juvenile probation, juvenile

17   camp, and a California Youth Authority commitment.

18   He has an unstable social history and prior

19   criminality as a juvenile which includes numerous

20   arrests for runaway, burglary, an escape from

21   juvenile facilities and the California Youth

22   Authority, and an armed robbery.  The prisoner has

23   programmed somewhat in a limited manner while

24   incarcerated.  He has not sufficiently

25   participated in beneficial self-help.  His last

26   self-help participation was in 1998.  The

27   **MARK TITCH   B-89549   DECISION PAGE 3   7/29/03**

5

22

1    psychiatric report dated 5-26 of 2000 authored by

2    Alvin Chandler, C-H-A-N-D-L-E-R, II, Ph.D., is not

3    totally supportive of release.   States on page

4    eight,

5              "It is felt that he still has a

6              tendency to minimize and emotionally

7              distance himself from the full impact

8              of his responsibility for his role in

9              the instant offenses.  The sadistic,

10             callous, and cruel nature of his

11             crimes requires continued and

12             additional personal growth and

13             resolution of the underlying

14             psychological factors prior to his

15             being released."

16   The prisoner lacks realistic parole plans in that

17   we need written confirmation of job offers, and

18   the Panel notes that a representative from the Los

19   Angeles County -- from the Orange County District

20   Attorney's Office was present at the hearing

21   today.  He participated in the hearing and was

22   opposed to parole.  The Hearing Panel notes that

23   responses to the 3042 Notices indicate an

24   opposition of a finding of parole suitability from

25   the Anaheim Police Department.  The Panel makes

26   the following findings:  The prisoner needs to

27   **MARK TITCH  B-89549  DECISION PAGE 4  7/29/03**

6

23

1    continue to participate in self-help in order to

2    face, discuss, understand, and cope with stress in

3    a nondestructive manner. Until progress is made,

4    the prisoner continues to be unpredictable and a

5    threat to others. Nevertheless, the prisoner

6    should be commended for remaining disciplinary

7    free since 1986, for working as an apprentice

8    electrician and welder, and for receiving an AA

9    degree. However, these positive aspects of his

10   behavior do not outweigh he factors of

11   unsuitability. In a separate decision, the

12   Hearing Panel finds that the prisoner has been

13   convicted of murder, two counts, and it is not

14   reasonable to expect that parole would be granted

15   at a hearing during the next three years.

16   Specific reasons for these findings are as

17   follows: The prisoner committed the offense in an

18   especially cruel manner, multiple victims were

19   attacked, killed, and injured in the same and

20   separate incidents. The offense was carried out

21   in a dispassionate and calculated manner. The

22   offense was carried out in a manner which

23   demonstrates an exceptionally callous disregard

24   for human suffering. Specifically, the prisoner

25   was convicted of two counts of first-degree

26   murder. In the first murder, he abducted the

27   **MARK TITCH  B-89549  DECISION PAGE 5  7/29/03**

7

24

1   victim from her front porch, took her to a remote

2   area, attempted to rape her, and then brutally

3   shot her in the head as she was praying for her

4   life.  The second murder occurred on January 29th,

5   1977 when the victim, Aubrey Duncan, was opening

6   the door to his house, the prisoner and his crime

7   partner opened fire striking the victim at least

8   twice, killing him.  They also killed his

9   daughter, Denise, but was not convicted of that

10  crime.  And at the same shooting, he shot the wife

11  Nadine, Thomas did, with a shotgun, that is the

12  crime partner.  The prisoner was also convicted of

13  assault with a deadly weapon on a police officer,

14  during a robbery he shot a police officer five

15  times disabling him from the job.  During the rash

16  of robberies and crimes he committed, he was

17  convicted of five counts of robbery, three counts

18  of burglary, one count of kidnapping for the

19  purpose of robbery.  A recent psychiatric report

20  dated May 26th of 2000 authored by Alvin Chandler

21  II, Ph.D., indicates a need for a longer period of

22  observation and evaluation.  Therefore a longer

23  period of observation and evaluation of the

24  prisoner is required before the Board should find

25  that the prisoner is suitable for parole.  The

26  Panel recommends that the prisoner remain

27  **MARK TITCH  B-89549  DECISION PAGE 6  7/29/03**

8

25

1   disciplinary free and participate in self-help.

2   We're also requesting his cooperation with

3   clinicians in the completion of a clinical

4   evaluation.   Any comments?

5          **DEPUTY COMMISSIONER BENTLEY:**   I don't have

6   any comments.

7          **PRESIDING COMMISSIONER RISEN:**   Okay, that

8   will conclude the reading of the decision.   It's

9   12:20.   We're off the record.

10                          --oOo--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   **PAROLE DENIED THREE YEARS**          OCT 2 7 2003

26   **FINAL DATE OF DECISION**_____

27   **MARK TITCH   B-89549   DECISION PAGE 7   7/29/03**

9

26

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, WENDY THOMAS, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 25, and which recording was duly recorded at RICHARD J. DONOVAN CORRECTIONAL FACILITY at SAN DIEGO, CALIFORNIA in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of MARK TITCH, CDC No. B-89549, on JULY 29, 2003 and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated August 11, 2003 at Sacramento County, California.

Wendy Thomas
Wendy Thomas
Transcriber
**CAPITOL ELECTRONIC REPORTING**

*10*

BOARD OF PRISON TERMS                                          STATE OF CALIFORNIA
### SETTING A LIFE PRISONER TERM - PAROLE DENIED

---

### 11. NOTE TO CDC STAFF: RECOMMENDATIONS AND REQUESTS

---

☒ 3.  the panel's belief that the prisoner's current mental health is an
       important issue.  In the new full evaluation, the panel requests that the
       clinician specifically address the following:

    ☒ a.  the prisoner's violence potential in the free community;

    ☒ b.  the significance of alcohol/drugs as it relates to the commitment
       offense and an estimate of the prisoner's ability to refrain from
       use/abuse of same when released;

    ☐ c.  the prisoner's psycho-sexual problems;

    ☒ d.  the extent to which the prisoner has explored the commitment
       offense and come to terms with the underlying causes;

    ☒ e.  the need for further therapy programs while incarcerated.

    ☐ f.  other: _____

_____

_____

☐ 4.  the panel's belief that the prisoner has deteriorated psychologically and
       there appears to be a need for treatment.  The panel bases this conclusion
       upon

_____

_____

_____

_____

☐ B.  (Other requests to CDC staff): _____

_____

_____

*Tich, MARK B89549      RJDCF                7-29-03*

*11*

BOARD OF PRISON TERMS                      STATE OF CALIFORNIA
**LIFE PRISONER HEARING - EXTRAORDINARY ACTION AND DECISION**    BPT 1001 A (Rev. 10/89)

| ACTION TYPE (select one) | ☒ Waiver of Appearance | ☐ Request for Postponement | ☐ Waiver of Parole Consideration Hearing- Stipulation of Unsuitability | |
|---|---|---|---|---|
| HEARING TYPE (select one) | ☒ Parole Consideration | ☐ Progress | ☐ Rescission | Hearing Date  7/29/03 |

## WAIVER OF RIGHT TO ATTEND HEARING

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☒ I do not wish to attend my Board hearing and do not wish to be represented at the hearing. The hearing will be held in my absence.

☐ I do not personally wish to attend my hearing but I do wish to be represented by counsel at the hearing.

    ☐ I will employ counsel to represent me at the hearing.

    ☐ I cannot afford counsel and wish counsel appointed to represent me.

## POSTPONEMENT

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☐ I hereby request that the hearing indicated above be Postponed to _____

    The reasons for my request for a postponement are stated below.

## WAIVER OF HEARING AND STIPULATION TO UNSUITABILITY

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☐ I waive my right to a parole consideration hearing and I waive the right to have an attorney represent me at a hearing In my absence. I find that I am unsuitable for parole based on my reasons given on this form and therefore request that you find me unsuitable.

    ☐ One-year Denial    ☐ Two-year Denial    ☐ Three-year Denial

PRISONER'S REASON(S) FOR REQUEST:
(For Example: Psychiatric Evaluation Not Supportive, Programming Inadequate, Cat H Incomplete, etc.)

_____

_____

_____

| Signature of Prisoner  *Mark W Titel* | Date 7/29/03 |
|---|---|
| Signature of Attorney (if applicable) | Date |
| Signature and Title of Witness (CDC) | Date |
| | Date |

| NAME  *Titch Mark* | CDC NUMBER  B89549 | INSTITUTION  RJDCF | CALENDAR  7/28/03 | DATE  7/29/03 12 |
|---|---|---|---|---|

**BOARD OF PRISON TERMS**
**LIFE PRISONER HEARING – EXTRAORDINARY ACTION AND DECISION**
STATE OF CALIFORNIA
BPT 1001A (Rev. 10/89)

☐ I certify to the best of my knowledge and information, the foregoing reasons as stated by the prisoner are accurate, and that the prisoner was capable of making a knowledgeable decision regarding his/her hearing.

The following information is submitted for the Board's consideration in making their decision:

_____
_____
_____
_____

| C&PR Signature | Date |
|---|---|

*FOR BOARD OF PRISON TERMS USE ONLY*

## DECISION / ORDER
## WAIVER OF RIGHT TO ATTEND HEARING

1. ☐ Request is denied.
   ☐ Request is granted. Hearing will be conducted in absence of prisoner.

### POSTPONEMENT

2. ☐ Request is denied.
   ☐ Request is granted. Grant based on a finding of good cause. Place on _____ calendar.

### WAIVER OF HEARING AND STIPULATION TO UNSUITABILITY

3. ☐ Request is denied.
   ☐ Request is granted. The Board agrees to enter into the stipulation, on a finding of good cause, offered by the prisoner on the waiver of his/her Life Parole Consideration Hearing and orders a:
   ☐ One-year denial    ☐ Two-year denial*    ☐ Three-year denial**

\* The Board must find it unreasonable to expect that the prisoner would be eligible for parole during the second, or second and third year, and the Board must state the reasons for its finding.

\*\* In addition to the above (*), the prisoner must have been convicted of more than one offense which involves the taking of a life.

(The basis of the finding of good cause for postponement or multiple-year denial must be stated below.)

☐ Good cause based on the reasons given by the prisoner.

Other comments (if applicable):

_____
_____
_____
_____

Signature of BPT Commissioners

| l. | Date |
|---|---|
| 2. | Date |

BPT Action Taken At: ☐ BPT Headquarters    ☐ Institution

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | DATE |
|---|---|---|---|---|

*13*

BOARD OF PRISON TERMS.                                          STATE OF CALIFORNIA

## LIFE PRISONER: REQUEST FOR ATTORNEY / WAIVER OF ATTORNEY OR WITHDRAWAL OF REQUEST

| Date of Hearing | Time of Hearing | Type of Hearing |
|---|---|---|
| 7/29/03 | 11:00 | Subsequent Parole Consideration |

**Please complete and return as instructed by staff as soon as possible but no later than 5 days after receipt.**

## REQUEST FOR ATTORNEY

☐  **I request the assistance of an attorney at my hearing.**

    1. ☐  I have or can retain my own attorney. The attorney is:

| Attorney's Name | Telephone |
|---|---|
| | |

Attorney's Address

| Signature of Prisoner | CDC Number | Date |
|---|---|---|
| | | |

    2. ☐  I wish to have the state provide an attorney to assist me. I declare under penalty of perjury that I am indigent (I have less than $1,500 in cash and/or accounts, Title 15 CCR §2256(c)) and cannot afford an attorney.

| Signature of Prisoner | CDC Number | Date |
|---|---|---|
| | | |

## WAIVER OF ATTORNEY

☐  **I waive my right to have an attorney.**

On _____ (Date), I was informed that I have been scheduled to appear before the BOARD OF PRISON TERMS for a hearing. I was also informed of my right to be represented by an attorney at my Board hearing. I know that if I am indigent and cannot afford to retain an attorney the state will appoint an attorney to represent me at state expense. Knowing this, I have decided that I DO NOT wish the assistance of an attorney at my Board hearing.

| Signature of Prisoner | CDC Number | Date |
|---|---|---|
| | | |

## WITHDRAWAL OF REQUEST FOR AN ATTORNEY

☒  **I withdraw my request for an attorney.**

I have reconsidered my request for an attorney at my Board hearing and have decided that I DO NOT wish to have the assistance of an attorney at my Board hearing. This decision to withdraw my request for an attorney is not being made as a result of any promises or duress. I know that if I withdraw my request for an attorney, I will not be able to later request an attorney again for this hearing.

| Signature of Prisoner | CDC Number | Date |
|---|---|---|
| Mark W. Titch | B-89549 | 7/29/03 |

| NAME | CDC NUMBER | INSTITUTION |
|---|---|---|
| Titch, Mark | B89549 | RJDCF |

BPT 1003 (Rev. 9/90)                                                                    14

**EXHIBIT 29**

2001 Parole Hearing Decision

BOARD OF PRISON TERMS                                                STATE OF CALIFORNIA

# LIFE PRISONER DECISION FACE SHEET

## PERIOD OF CONFINEMENT

### (RECORDS OFFICER USE ONLY)

| | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement .................................................................... | | | |
| Date Life Term Begins ................................................................................. + | | | |
| At Large Time ............................................................................................. + | | | |
| PAROLE DATE ............................................................................................ = | | | |

## MISCELLANEOUS    RECOMMENDATIONS AND REQUESTS:

*Parole Denied*
*2 yrs.*

_____ Become _____ Remain Disciplinary Free.
_____ Work Towards Reducing His/Her Custody Level.
_____ Upgrade _____ Vocationally _____
_____ Participate in _____ Self-Help (and) _____
_____ Transfer To _____ Cat. X _____ Cat. ..

PENAL CODE SECTION 3042 NOTICES    ☐ SENT    (Date)_____

COMMITMENT OFFENSE

| PC187 | Murder 1st |
|---|---|
| (Code Section) | (Title) |
| C37693 | 13 |
| (Case Number) | (Count Number) |

| Date Received by CDC | Date Life Term Begins | Controlling MEPD |
|---|---|---|
| 1/18/78 | 1/18/78 | 2/4/84 |

| Type of Hearing | If Subsequent Hearing, Date of Last Hearing |
|---|---|
| ☐ INITIAL  ☒ SUBSEQUENT (Hearing No.) __#6__ | 5/6/98 |

Department Representative
____A. Hernandez,  Classification & Parole Representative (A)

| Counsel for Prisoner | Address |
|---|---|
| Daniel Koryan | 5105 Cass St. San Diego, CA 92109 |

| District Attorney Representative | County |
|---|---|
| Tom Crofoot | ORANGE |

## PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a __proposed__ decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

By:

| Presiding (Name)    *B. Welch* | Date *6-26-0* |
|---|---|
| Concurring (Name)    *D. Torres* | Date |
| Concurring (Name) | Date |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| TITCH, MARK W. | B-89549 | RJD | 6/2001 | 6/26/01 |

BPT 1001 (REV. 1/91)                                          PERMANENT ADDENDA

1

75

1      CALIFORNIA BOARD OF PRISON TERMS

2                    D E C I S I O N

3      DEPUTY COMMISSIONER TORRES:  We're on record.

4          PRESIDING COMMISSIONER WELCH:  The Panel reviewed

5      all information received from the public and relied on the

6      following circumstances in concluding that the prisoner is

7      not suitable for parole and would pose an unreasonable

8      risk of danger to society or threat to public safety if

9      released from prison.  The offense was carried out in an

10     especially cruel and callous manner.  Multiple victims

11     were attacked, injured or killed in separate incidents.

12     The offense was carried out in a dispassionate and

13     calculated manner such as an execution style murder.  The

14     victim was abused, defiled and mutilated during or after

15     the offense.  The offense was carried out in a manner

16     which demonstrates an exceptionally callous disregard for

17     human suffering.  The motive for the crime was

18     inexplicable or very trivial in relationship to the

19     offense.  The murder of the victim did not deter the

20     prisoner from later committing other criminal offenses and

21     those offenses will be addressed later.  The conclusion

22     was drawn from the Statement of Facts wherein starting on

23     January 21st, 1977 the prisoner went on a crime spree,

24     during the spree the murder of victim Laura Ann Stouthton,

25     S-T-O-U-T-H-T-O-N, 21 years old.  She sustained a gunshot

26     wound in the mouth area and one gunshot wound was in

27     MARK TITCH      B-89549  DECISION PAGE 1        6/26/01

2

76

1   the shoulder area.  There was two possible gunshot wounds

2   in the mouth area and one in the shoulder.  Another victim

3   was Nadine Duncan who was injured and then Aubrey Duncan,

4   that's A-U-B-R-E-Y, Duncan was killed and then there was

5   Denise Duncan, age 18, who was also killed.  Then there

6   was numerous robberies and burglaries were committed, a

7   kidnap was committed.  An assault on a peace officer

8   occurred on 12/27, 1976 at 8:50 as a known robbery was

9   being committed by defendant.  The officer was struck five

10  times, I believe it was, with rounds by the prisoner.  The

11  prisoner has on previous occasions inflicted or attempted

12  to inflict serious injury on a victim and that was

13  summarized earlier.  The prisoner has a record of violent

14  or assaultive behavior and an escalating pattern of

15  criminal conduct and/or violence.  He has a history of

16  unstable of tumultuous relationships with others.  He's

17  failed previous grants of probation and cannot be counted

18  upon to avoid criminality.  He's failed to profit from

19  society's previous attempts to correct his criminality.

20  Such attempts include juvenile probation, juvenile camp,

21  CYA.  The prisoner has an unstable social history that

22  started in 1972.  He has truancy, malicious mischief, run

23  away, burglary, escapes, two escapes, assault with intent

24  to commit murder/burglary, threats of assault, burglary,

25  armed robbery, vehicle theft, burglary/auto theft and

26  another escape and robbery/assault with a deadly

27  **MARK TITCH**     **B-89549  DECISION PAGE 2**        **6/26/01**

3

77

1    weapon.  The psychiatric report doesn't have a date but

2    it's the May -- June, 2000 report by Dr. Chandler,

3    C-H-A-N-D-L-E-R, first name Alvin, A-L-V-I-N, was not

4    totally supportive of release and I'll just read an

5    excerpt.  Dr. Chandler states, and this is a quote,

6    Mr. Titch appears to have very little remorse or concern

7    for the victims or their families or the impact of these

8    crimes on his own family.  His primary concern appears to

9    be one of anxiety around being caught.  The doctor also

10   writes, and this is another quote, he seems to

11   intellectualize and emotionally distance himself somewhat

12   from the egregious nature of those crimes and the terrible

13   emotional impact that they had on the victims and the

14   victims' families and others.  Then he goes on to say

15   Mr. Titch is quick to point out that he's worked very hard

16   during his 21 plus years of incarceration for these crimes

17   and that he has pursued and achieved academic success

18   during his incarceration.  And another area of concern,

19   and this is a quote, it's difficult to say if Mr. Titch

20   were released to the community that his violence potential

21   may return.  He has a rather lengthy history of juvenile

22   criminality prior to the commitment offense.  And lastly

23   other considerations are anger management, stress

24   management and the need for greater insight.  I guess this

25   is the key here, the need for greater insight and

26   resolution of unresolved issues related to his family of

27   **MARK TITCH        B-89549  DECISION PAGE 3        6/26/01**

4

k

---

78

1  origin.  It is recommended that should he be paroled he
2  would be required to attend parole outpatient clinic to
3  work through these issues to provide a better safety net
4  for society.  Mr. Titch, you lack realistic parole plans
5  even though you're to be commended for working on them.
6  He does not have a viable residential plan in the last
7  county of residence and you do not have acceptable
8  employment plans at this time.  The hearing Panel notes
9  that response to 3042 notices indicate opposition to a
10  finding of parole suitability, that there are letters in
11  the file from the District Attorney from Orange County and
12  also the Deputy District Attorney from Orange County spoke
13  in strong opposition to a finding of suitability at this
14  time.  The Panel makes the following findings:  The
15  prisoner needs therapy in order to face, discuss,
16  understand and cope with stress in a non-destructive
17  manner.  Until progress is made the prisoner continues to
18  be unpredictable and a threat to others.  Nevertheless the
19  prisoner should be commended, and you really should be
20  commended, Mr. Titch, for achieving an AA from a sixth
21  grade education to an associate of arts degree.  It's very
22  very commendable and you should be commended for that.
23  You should be commended for your drafting, for the
24  participation in getting a certificate of drafting.  You
25  worked in print, you worked in voc auto, you worked in the
26  yard crew.  You worked on the IDL steam line and you
27  **MARK TITCH        B-89549  DECISION PAGE 4        6/26/01**

5

79

1    received above-average to excellent reports on all of

2    those. And you should be commended for the work that you

3    did in the print shop. You received accolades for that

4    work. You also received accolades for the child abuse

5    program. It shows that you're trying to improve yourself

6    in that area. However these positive aspects of your

7    behavior does not outweigh the factors of unsuitability.

8    Your parole is denied for another two years. The prisoner

9    committed an offense that was especially cruel and as

10   stated previously resulted in a crime spree which included

11   the murder of Mrs. Laura Stouthon and Aubrey Duncan,

12   Denise Duncan and just a host of robberies and also the

13   assault on a peace officer where he was shot at least five

14   times. The offense was carried out in an especially cruel

15   and callous manner. Multiple victims were attacked,

16   injured or killed during separate incidents. The offense

17   was carried out in a dispassionate and calculated manner

18   such as an execution style murder. The victims were

19   abused, defiled and the offense was carried out in a

20   manner which demonstrates an exceptionally callous

21   disregard for human suffering. The motive for the crime

22   was inexplicable or very trivial in relationship to the

23   offense. And the murder did not deter the prisoner from

24   later committing other criminal acts which were outlined

25   previously. The prisoner has a prior record of violent

26   behavior and that has been outlined previously. The

27   **MARK TITCH       B-89549    DECISION PAGE 5       6/26/01**

6

80

1    prisoner has an extensive history of criminality and

2    misconduct and that has been outlined previously.  And the

3    prisoner has a history of unstable or tumultuous

4    relationships with others.  The recent psychiatric report

5    dated June, 2000 authored by Dr. Chandler indicates a need

6    for a longer period of observation and evaluation and

7    treatment.  The prisoner has not completed necessary

8    programming which is essential to his adjustment and needs

9    additional time to gain such programming.  Therefore a

10   longer period of observation and evaluation of the

11   prisoner is required before the Board should find that the

12   prisoner is suitable for parole.  The Panel recommends

13   that the prisoner continue to remain disciplinary-free and

14   to participate in self-help and therapeutic programs.

15   Mr. Titch, we deliberated long and hard over your case.

16   You committed some pretty horrendous crimes and there's

17   just no getting around it.  And I guess the thing that

18   really disturbed me when I read the psych report and our

19   dialogue together is the feeling of lack of insight into

20   the crime and the feeling of feeling that the public would

21   be, real candidly, would be safe if you were to return and

22   I think your psychiatrist said it best is that when he

23   raised the issue of would you revert back to that.  And I

24   know there is no way that anyone could accurately predict

25   that but the Board has some grave concerns in that area.

26   But on the other hand the Board has some -- We were

27   **MARK TITCH**      **B-89549  DECISION PAGE 6**      **6/26/01**

7

81

1    extremely extremely pleased and nothing but accolades to

2    you for your education and the other programs that you

3    participated in and we strongly recommend that

4    you -- You're going to need to really get involved in some

5    type of therapy.

6                INMATE TITCH:  They don't have it, Sir.

7                PRESIDING COMMISSIONER WELCH:  I understand that

8    and until that happens I couldn't in good conscious vote

9    for a parole date for you.  And you said that you don't

10   have it and I believe that you're being honest with me and

11   I can't magically make it put out there --

12               INMATE TITCH:  Right.

13               PRESIDING COMMISSIONER WELCH:  -- but until that

14   happens, until that life crime is thoroughly explored and

15   your family relationship is thoroughly explored, I could

16   not in good conscious vote for a parole date for you

17   because I think even though your work in prison has been

18   just commendable.  I wish more prisoners would do the

19   kinds of things that you're doing but I don't think the

20   public, and I'm real honest with you, I don't think the

21   public at this time would be real safe with you out of

22   prison.  I don't feel that we could insure that -- We

23   would do an injustice to the public I really feel if we

24   were to put you out there before you go through some type

25   of therapy to come to terms with that and I will put it on

26   the recommendation that you need therapy in order to deal

27   MARK TITCH    B-89549  DECISION PAGE 7        6/26/01

8

82

1    with that and I'll go to Commissioner Granlund for

2    comments.

3              COMMISSIONER GRANLUND:  Well, I just, you know,

4    agree with Mr. Welch, and maybe in a different

5    perspective, sir.  You've done well in your work

6    assignments here.  You've done well in your pursuit of

7    education and you've done well in remaining disciplinary-

8    free.  However -- And certainly those were recommendations

9    of the Board that you do that and we noted that you did

10   that.  The single most important recommendation the Board

11   made two years ago is the single most important

12   recommendation the Board is making today and that is to

13   really gain some more insight into these crimes because

14   quite frankly remaining disciplinary-free, upgrading

15   educationally and vocationally -- It might come as a

16   surprise, the vast majority of human beings wandering

17   around in the free world they do that and they take it for

18   granted.  That's what people do.  That's not anything

19   anybody wants a pat on the back for, you know, going to

20   school or going to their job and doing a good job at their

21   job.  That's what normal people do in a normal environment

22   every single day of the week and it goes totally

23   unnoticed.  On the other hand the one thing that you truly

24   need to do in order to give us a level of comfort that in

25   a stressful situation or in a tough spot you wouldn't be

26   able to similarly execute anybody that got in your way or

27   **MARK TITCH      B-89549  DECISION PAGE 8        6/26/01**

83

1    had something you wanted.  There's nothing that indicates

2    to me that that couldn't happen and our job here in a

3    finding of suitability is to make sure that we are

4    preserving the public safety and that's first and foremost

5    and when you meet that criteria then all the other

6    criteria falls in place and as we talked about the matrix

7    falls in place and then you get out of prison.  It's just

8    too -- It's just too easy for you to say well, you know,

9    somebody else did it when you tried to tell us that you

10   weren't armed.  You were only armed in the robberies in

11   which nobody got shot but then you weren't armed in the

12   robberies where people got shot and that your crime

13   partner had both guns and I was -- That was a big factor

14   for me in determining that you still don't get it.  To

15   imagine that you could convince us that two murderers and

16   robbers walk into a house, one of them unarmed and the

17   other one with two guns, and the other one shoots up the

18   whole family I don't know how you'd cock or load or pump

19   the gun while you're standing innocently without a gun.

20   And it's -- It demonstrates you haven't come to grips with

21   what you did, okay.

22           INMATE TITCH:  Yeah.

23           PRESIDING COMMISSIONER WELCH:  Commissioner

24   Torres, any questions?

25           DEPUTY COMMISSIONER TORRES:  No questions --

26           PRESIDING COMMISSIONER WELCH:  I mean, any --

27   MARK TITCH      B-89549  DECISION PAGE 9      6/26/01

10

84

1       DEPUTY COMMISSIONER TORRES:  -- or comments.

2       PRESIDING COMMISSIONER WELCH:  -- comments?

3       DEPUTY COMMISSIONER TORRES:  It's already been

4  covered, thank you.

5       PRESIDING COMMISSIONER WELCH:  Do you have a

6  brief comment?

7       INMATE TITCH:  Yeah, did you need those copies

8  right there?

9       COMMISSIONER GRANLUND:  No, those are yours.

10       INMATE TITCH:  Yeah, because it's kind of hard

11  for me to get copies.

12       PRESIDING COMMISSIONER WELCH:  Okay, this hearing

13  is concluded at approximately 11:15 A.M.

14                          --oOo--

15

16

17

18

19

20

21

22

23

24

25  PAROLE DENIED TWO YEARS          JUL 2 3 2001

26  EFFECTIVE DATE OF THIS DECISION_____

27  MARK TITCH     B-89549  DECISION PAGE 10     6/26/01

//

BOARD OF PRISON TERMS                                                      STATE OF CALIFORNIA
LIFE PRISONER HEARING – EXTRAORDINARY ACTION AND DECISION                  BPT 1001A (Rev. 10/89)

| ACTION TYPE (select one) | ☐ Waiver of Appearance | ☒ Request for Postponement | ☐ Waiver of Parole Consideration Hearing- Stipulation of Unsuitability |
|---|---|---|---|

| HEARING TYPE (select one) | ☐ Parole Consideration | ☐ Progress | ☐ Rescission | Hearing Date |
|---|---|---|---|---|

## WAIVER OF RIGHT TO ATTEND HEARING

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☐ I do not wish to attend my Board hearing and do not wish to be represented at the hearing. The hearing will be held in my absence.

☐ I do not personally wish to attend my hearing but I do wish to be represented by counsel at the hearing.

☐ I will employ counsel to represent me at the hearing.

☐ I cannot afford counsel and wish counsel appointed to represent me.

## POSTPONEMENT

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☒ I hereby request that the hearing indicated above be Postponed to ___6/2002___.

The reasons for my request for a postponement are stated below.

## WAIVER OF HEARING AND STIPULATION TO UNSUITABILITY

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☐ I waive my right to a parole consideration hearing and I waive the right to have an attorney represent me at a hearing in my absence. I find that I am unsuitable for parole based on my reasons given on this form and therefore request that you find me unsuitable.

☐ One-year Denial        ☐ Two-year Denial        ☐ Three-year Denial

PRISONER'S REASON(S) FOR REQUEST:
(For Example: Psychiatric Evaluation Not Supportive, Programming Inadequate, Cat H Incomplete, etc.)

Would like a 1-year postponement due to pending litigation against the BPT.

| Signature of Prisoner M.W. Titch | Date 2/27/01 |
|---|---|
| Signature of Attorney (if applicable) | Date |
| Signature and Title of Witness (CDC) A. Kahban, CCI | Date 2/27/01 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | DATE |
|---|---|---|---|---|
| TITCH, MARK WAYNE | B-89549 | RJDCF | 6/2001 | JUNE 26, 2001 |

12

STATE OF CALIFORNIA
BPT 1001A (Rev. 10/89)

BOARD OF PRISON TERMS
LIFE PRISONER HEARING – EXTRAORDINARY ACTION AND DECISION

[ ] I certify to the best of my knowledge and information, the foregoing reasons as stated by the prisoner are accurate, and that the prisoner was capable of making a knowledgeable decision regarding his/her hearing.

The following information is submitted for the Board's consideration in making their decision:

_____

_____

_____

| LCPR Signature | Date |

_FOR BOARD OF PRISON TERMS USE ONLY_

DECISION / ORDER
WAIVER OF RIGHT TO ATTEND HEARING

1. [ ] Request is denied.
   [ ] Request is granted. Hearing will be conducted in absence of prisoner.

POSTPONEMENT

2. [X] Request is denied.
   [ ] Request is granted. Grant based on a finding of good cause. Place on _____ calendar.

WAIVER OF HEARING AND STIPULATION TO UNSUITABILITY

3. [ ] Request is denied.
   [ ] Request is granted. The Board agrees to enter into the stipulation, on a finding of good cause, offered by the prisoner on the waiver of his/her Life Parole Consideration Hearing and orders a:
     [ ] One-year denial    [ ] Two-year denial*    [ ] Three-year denial**

* The Board must find it unreasonable to expect that the prisoner would be eligible for parole during the second, or second and third year, and the Board must state the reasons for its finding.
** In addition to the above (*), the prisoner must have been convicted of more than one offense which involves the taking of a life.

(The basis of the finding of good cause for postponement or multiple-year denial must be stated below.)

   [ ] Good cause based on the reasons given by the prisoner.

Other comments (if applicable): _____

_____

_____

Signature of BPT Commissioners
1. _____  Date 3/6/01
2. _____  Date 3-6-01

BPT Action Taken At:  [ ] BPT Headquarters   [ ] Institution

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | DATE |
| TITCH, MARK WAYNE | B-89549 | RJDCF | 6/2001 | JUNE 26, 2001 |

**EXHIBIT 30**

1998 Parole Hearing Decision

BOARD OF PRISON TERMS                                                     STATE OF CALIFORNIA

# LIFE PRISONER DECISION FACE SHEET

## PERIOD OF CONFINEMENT

### (RECORDS OFFICER USE ONLY)

|  | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement ............................................................ | | | |
| Date Life Term Begins ..................................................................... + | | | |
| At Large Time ................................................................................ + | | | |
| PAROLE DATE .............................................................................. = | | | |

## MISCELLANEOUS

**PANEL RECOMMENDATIONS AND REQUESTS:**
_____ BECOME ✓ REMAIN DISCIPLINARY FREE.
_____ WORK TOWARDS REDUCING HIS/HER CUSTODY LEVEL.
✓ UPGRADE _____ VOCATIONALLY ✓ EDUCATIONALLY.
✓ PARTICIPATE IN _____ SELF-HELP (AND) _____ THERAPY.
_____ TRANSFER TO _____ CAT. X _____ CAT. T.

*2 YR. DENIAL*

PENAL CODE SECTION 3042 NOTICES    ☒ SENT    (Date) ___MARCH 19, 1998___

COMMITMENT OFFENSE

| 209 PC W/12022.5 PC | KIDNAP FOR ROBBERY W/USE OF F'ARM |
|---|---|
| (Code Section) | (Title) |
| C-37693 | CT. 12 |
| (Case Number) | (Count Number) |

| Date Received by CDC | Date Life Term Begins | Controlling MEPD |
|---|---|---|
| 1-18-78 | 1-18-78 | 2-4-84 |

| Type of Hearing | If Subsequent Hearing, Date of Last Hearing |
|---|---|
| ☐ INITIAL  ☒ SUBSEQUENT (Hearing No.) ___5___ | 5-16-95 |

Department Representative

| Counsel for Prisoner (W) | Address |
|---|---|
| District Attorney Representative  C. MIDDLETON | County  ORANGE |

## PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a <u>proposed</u> decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

By:

| | | Date |
|---|---|---|
| Presiding (Name) | | 5/ |
| Concurring (Name) | | 6/ |
| Concurring (Name) | | 98 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| TITCH, MARK | B-89549 | CMC-E | 5/98 | 5/6/98 |

BPT 1001 (REV. 1/91)                                              PERMANENT ADDENDA

39

| | |
|---|---|
| 1 | CALIFORNIA BOARD OF PRISON TERMS |
| 2 | D E C I S I O N |
| 3 | PRESIDING COMMISSIONER ORTEGA:  All right, |
| 4 | thank you.  Let the record show that the time now is |
| 5 | approximately 11:30 and we are all now here for the |
| 6 | decision.  And the Panel has reviewed all the |
| 7 | information received from the public and has relied on |
| 8 | the following circumstances in concluding that the |
| 9 | prisoner is not suitable for parole, and he would pose |
| 10 | an unreasonable risk of danger to society and a threat |
| 11 | to public safety if released from prison.  The number |
| 12 | one reason was the commitment offense.  The offense |
| 13 | was carried out in an especially cruel and callous |
| 14 | manner.  It was carried out in a manner which exhibits |
| 15 | a callous disregard for the life and the suffering of |
| 16 | another.  And the offense was carried out in a |
| 17 | dispassionate and calculated manner.  Multiple victims |
| 18 | were attacked, injured, and killed in the same and |
| 19 | separate incidents.  These conclusions are drawn from |
| 20 | the Statement of Facts wherein the prisoner and crime |
| 21 | partners were involved in a crime spree which ended in |
| 22 | the results of that ending with the involvement of |
| 23 | four murders, two of which the inmate was convicted, |
| 24 | several robberies and burglaries.  In addition, he |
| 25 | shot and wounded severely a police officer.  His |
| 26 | previous record, he had a record of violence or |
| 27 | MARK TITCH    B-89549    DECISION PAGE 1    5/6/98 |

2

40

1    assaultive behavior. And he had an escalating pattern
2    of criminal conduct. He had a persistent pattern of
3    tumultuous relationships and criminal behavior which
4    commenced at an early age. He had failed at previous
5    grants of probation and he failed to profit from
6    society's previous attempts to correct his behavior.
7    And such attempts did include juvenile probation,
8    juvenile camp, and he had a CYA commitment. He had an
9    unstable social history and prior criminality which
10   included numerous arrests for burglary, escape,
11   assault with attempt to commit murder, threats on
12   juvenile hall staff, armed robbery, burglary. He also
13   had dropped out of school at an very early age. By
14   the statement of the inmate he doesn't really remember
15   when he attended a formal schooling while he was
16   outside the prison. And had a very tumultuous and
17   unstable family history as well. Institutionally, he
18   has not participated in sufficient beneficial
19   self-help and therapy programming and needs more time
20   to complete that. Also the psychiatric report that
21   was written by Dr. Berning, dated 2/36/98, was not
22   totally supportive of release at this time. The Panel
23   makes the following findings: That the prisoner needs
24   therapy in order to face, discuss, understand, and
25   cope with stress in a nondestructive manner. Until
26   the progress is made the prisoner continues to be
27   **MARK TITCH    B-89549    DECISION PAGE 2**        5/6/98

3

41

1  unpredictable and a threat to others.  And also the

2  prisoner's gains are recent and he must demonstrate an

3  ability to maintain gains over an extended period of

4  time.  Nevertheless, the prisoner should be commended

5  for completing the Drafting Vocation, for completing

6  his AA degree, for being disciplinary-free since 1986,

7  and for the excellent work he has done in the PIA

8  Print Shop.  However, these positive aspects of his

9  behavior do not outweigh the factors of unsuitability.

10  I might also mention you've been involved in AA since

11  1995 and doing very well in that I might add.  Now

12  this is going to be a two year denial.  The Hearing

13  Panel finds it is not reasonable to expect that parole

14  would be granted at a hearing during the following two

15  years.  The specific reasons for this finding is as

16  follows:  The prisoner committed the offenses in an

17  especially cruel and callous manner.  I won't go

18  through that again, but specifically there was a very

19  murderous crime spree which began in December of 1976

20  and culminated in January of 1977.  As a result a

21  longer period of observation and evaluation is

22  required before the Board can set a parole date.  Also

23  the prisoner has a prior record of violent behavior.

24  The prisoner had been arrested for burglary and for

25  robbery prior to committing the commitment offenses.

26  And also the psychiatric report dated 2/26/98 authored

27  **MARK TITCH    B-89549    DECISION PAGE 3**                    5/6/98

4

42

```
 1    by Dr. Berning, indicates a need for a longer period
 2    of observation and evaluation.  The recommendations to
 3    the prisoner is that he remain disciplinary-free, that
 4    he continue to upgrade vocationally especially in the
 5    area of printing.  You do real good work.  That's
 6    going to be your future I think.  And also that you
 7    continue to participate in any and all self-help and
 8    therapy programming that becomes available to you.  I
 9    got to tell you the Board was impressed, as was the
10    last Board.  I read that last decision and they were
11    all impressed.  And they told you then and I will tell
12    you again, we could have given you a five year denial.
13    The crimes that you committed were such a variety that
14    five years, you know, is not out of the question.  But
15    you're programming -- I don't know what turned it
16    around for you but whatever it was, it's been good.
17    But by your own admission you have time to do because
18    of the crimes.  Those crimes are very serious crimes
19    and left an awful lot of families very saddened and
20    with losses that they'll never recover from.  But you
21    are doing well and I commend you for that.  You're an
22    intelligent man and I think that when the day comes
23    when you do get out you're going to be successful.  I
24    don't think we'll see you here again.  The day hasn't
25    come yet.  Mr. Douglas, is there anything that would
26    like to add?
27    MARK TITCH   B-89549   DECISION PAGE 4            5/6/98
```

5

43

1          **DEPUTY COMMISSIONER DOUGLAS:**  Only that, you

2     know, a 3.8 grade average, you really got it together

3     now.  And it's a shame you had to go through all this

4     to get there, to realize you can do it.

5          **INMATE TITCH:**  Yeah.

6          **DEPUTY COMMISSIONER DOUGLAS:**  But that's the

7     way it is.  So just keep on trying, keep working.

8          **PRESIDING COMMISSIONER ORTEGA:**  That will end

9     the hearing.  Good luck to you.

10         **INMATE TITCH:**  All right.

11         **PRESIDING COMMISSIONER ORTEGA:**  The time now is

12    approximately 11:35.

13         **INMATE TITCH:**  Are you guys going to keep this?

14         **PRESIDING COMMISSIONER ORTEGA:**  You can, that's

15    yours.

16         **INMATE TITCH:**  Okay.  Thank you.

17         **PRESIDING COMMISSIONER ORTEGA:**  You're welcome.

18         **INMATE TITCH:**  Appreciate it.

19                              --o0o--

20

21

22

23

24

25    **PAROLE DENIED TWO YEARS**

26    **EFFECTIVE DATE OF THIS DECISION** ___**JUN  9 1998**___

27    **MARK TITCH    B-89549    DECISION PAGE 5**          **5/6/98**

6

**EXHIBIT 31**

1995 Parole Hearing Decision

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA

# LIFE PRISONER DECISION FACE SHEET

## PERIOD OF CONFINEMENT

*(RECORDS OFFICER USE ONLY)*

|  | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement ............................................. |  |  |  |
| Date Life Term Begins ............................................................. + |  |  |  |
| At Large Time ........................................................................... + |  |  |  |
| PAROLE DATE ........................................................................... = |  |  |  |

## MISCELLANEOUS

*Denied 3 years*

1. *Remain disc. free*
2. *AA/NA*
3. *Continue vocational upgrade*

PENAL CODE SECTION 3042 NOTICES   ☒ SENT   (Date) 2-6-95 (3042 D.A. copy and 3043 sent 4-6-95)

COMMITMENT OFFENSE

| 209 PC w/12022.5 PC | Kidnap for Robbery w/use of f'arm |
|---|---|
| (Code Section) | (Title) |
| C-37693 | Ct. 12 |
| (Case Number) | (Count Number) |

| Date Received by CDC | Date Life Term Begins | Controlling MEPD |
|---|---|---|
| 1-18-78 | 1-18-78 | 2-4-84 |

| Type of Hearing | If Subsequent Hearing, Date of Last Hearing |
|---|---|
| ☐ INITIAL  ☒ SUBSEQUENT (Hearing No.) 4 | 3-31-92 (4-4-95 Postponed) |

Department Representative

| Counsel for Prisoner  Jerry Quintiliani | Address  P O Box 1088, San Luis Obispo, Ca. 93406 |
|---|---|
| District Attorney Representative | County  Orange |

## PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a **proposed** decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

By:

| Presiding (Name) | Date | /95 |
|---|---|---|
| Concurring (Name) | Date  5/16/95 |  |
| Concurring (Name)  Carol J. Bentley | Date |  |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| Titch, Mark | B-89549 | CMC-e | 2/95 | 5-16-95 |

PERMANENT ADDENDC

BPT 1001 (REV. 1/91)

45

1    CALIFORNIA BOARD OF PRISON TERMS

2                    D E C I S I O N

3        **PRESIDING COMMISSIONER GILLIS:**    The time is

4    now 11:40 a.m. and all those who were previously

5    identified have returned.  Mr. Titch, the Panel has

6    unanimously determined that you're not suitable for

7    parole at this time and would pose an unreasonable

8    risk of danger and a threat to public safety if

9    released.  The commitment offense was just cruel and

10   callous -- or I should say commitment offenses were

11   cruel and callous and multiple victims were attacked

12   in separate incidents.  They were attacked and killed

13   in separate incidents.  These conclusions are drawn

14   from the Statement of Facts wherein the prisoner went

15   on a crime spree with a wanton disregard for the life

16   and safety and psychological well-being of others and

17   during the crime spree murdered four victims and

18   terrorized numerous others.  In the previous record,

19   the prisoner has an escalating pattern of criminal

20   conduct which commenced at an early age, tumultuous

21   relationships which began at an early age, was a

22   product of a dysfunctional family, and was left to

23   fend for himself prior to his teen years.  He has

24   failed to profit from society's previous attempts to

25   correct his behavior and those attempts included

26   juvenile probation, juvenile camp and CYA commitments.

27   **MARK TITCH   B-89549        DECISION PAGE 1     5/16/95**

46

1    Institutional behavior:  the prisoner has not

2    participated in beneficial self-help and therapy

3    programming.  The remarks:  the Panel finds that the

4    prisoner's gains are recent and he must demonstrate an

5    ability to maintain gains of an extended period of

6    time and in view of the prisoner's assaultive and

7    criminal history, there is no indication at this time

8    that he would behave differently if paroled.

9    Nevertheless, he should be commended for being

10    disciplinary free since 1986, for lowering his

11    classification score to zero.  He has also completed

12    college courses and has his AA and is just a few units

13    away from his Bachelor's degree and these are all

14    commendable acts.  However, the Panel feels that these

15    positive aspects of his behavior do not outweigh the

16    factors of unsuitability.  In a separate finding, the

17    Panel finds that it is not reasonable to expect that

18    parole would be granted in the next three years and

19    the reasons are as follows:  the commitment offense

20    was cruel and callous, specifically he participated in

21    the callous killing of four victims in separate

22    incidents and as a result a longer period of

23    observation and evaluation is required before the

24    Board can set a parole date.  A longer period of time

25    is required to evaluate his suitability in view of the

26    prisoner's long history of criminality.  He has

27    **MARK TITCH  B-89549**    **DECISION PAGE 2**    5/16/95B

3

47

1  previous convictions and commitments for assaultive

2  behavior.  Also, the prisoner has not completed the

3  necessary programming which is essential to his

4  adjustment, specifically, he has not participated in

5  AA or NA or any other self-help programming and this

6  is critical in that the prisoner has a history of

7  substance abuse -- polysubstance abuse -- which

8  included marijuana, hashish, PCP, et cetera.

9  Recommendations to the prisoner for the next hearing

10  is that you remain disciplinary free, that you

11  participate in self-help and therapy programming,

12  specifically a substance abuse program or AA or NA.

13  That concludes the formal reading.  I'll give you a

14  copy of the tentative decision.  You're making good

15  progress, but I think you very simply stated it when

16  you said your crimes are bad.  I mean, they really are

17  and you've got some time to do -- you're making some

18  progress so keep going at it.  Comments from the Panel

19  Members?

20      COMMISSIONER BENTLEY:   I just wanted to say we

21  could have gone up to five years, but we didn't.  We

22  went three because you're doing a good job in prison.

23  Yeah.

24      INMATE TITCH:   Thank you.  I appreciate it.

25      PRESIDING COMMISSIONER GILLIS:   It may not be

26  of much importance to you, but I found over the years

27  MARK TITCH  B-89549      DECISION PAGE 3      5/16/95

*4*

48

1    that most 10-11 year old kids, particularly boys, at

2    that age think their fathers are idiots.  Okay?  Just

3    for what it's worth.

4              INMATE TITCH:    Okay.

5              PRESIDING COMMISSIONER GILLIS:    Good luck to

6    you.  You're doing a good job.  Keep it up.

7              INMATE TITCH:    Thank you.

8              DEPUTY COMMISSIONER PLILER:    Okay.  That

9    concludes the hearing.  The time is 11:45 a.m.  Okay.

10   Good luck to you.

11             INMATE TITCH:    All right.  Thank you.

12                          ---o0o---

13

14

15

16

17

18

19

20

21

22

23

24

25   PAROLE DENIED THREE YEARS          SEP 2 6 1995

26   EFFECTIVE DATE OF THIS DECISION _____

27   MARK TITCH   B-89549        DECISION PAGE 4    5/16/95

5

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA

# LIFE PRISONER DECISION FACE SHEET

## PERIOD OF CONFINEMENT

### (RECORDS OFFICER USE ONLY)

|  | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement ................................................................ |  |  |  |
| Date Life Term Begins ...................................................................... | + |  |  |
| At Large Time ............................................................................... | + |  |  |
| PAROLE DATE ............................................................................... | = |  |  |

## MISCELLANEOUS

*Postpone until next available calendar. Due to unavailability of a full hearing panel, hearing had to be postponed.*

PENAL CODE SECTION 3042 NOTICES    ☒ SENT    (Date)    February 6, 1995

COMMITMENT OFFENSE

| 209/12022.5 PC | Kidnap for Robbery w/use of f'arm |
|---|---|
| (Code Section) | (Title) |
| C-37693 | 12 |
| (Case Number) | (Count Number) |

| Date Received by CDC | Date Life Term Begins | Controlling MEPD |
|---|---|---|
| 1/18/78 | 1/18/78 | 2/4/84 |

| Type of Hearing | If Subsequent Hearing, Date of Last Hearing |
|---|---|
| ☐ INITIAL  ☒ SUBSEQUENT (Hearing No.) __4__ | 3/31/92 |

Department Representative

| Counsel for Prisoner    J. Quintiliani | Address P. O. Box 1088,  San Luis Obispo, CA  934( |
|---|---|
| District Attorney Representative | County    Orange |

## PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a proposed decision and order of the Board of Prison Terms.  The decision becomes effective when issued following the decision review process.*

By:

| Presiding (Name) | Date  4/4/95 |
|---|---|
| Concurring (Name)  Carol J. Bentley | Date |
| Concurring (Name) | Date |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| Titch, Mark | B-89549 | CMC-E | 2/95 | 3/24/95 |

6

**EXHIBIT 32**

1992 Parole Hearing Decision

BOARD OF PRISON TERMS                                                        STATE OF CALIFORNIA

# LIFE PRISONER DECISION FACE SHEET

## PERIOD OF CONFINEMENT

### (RECORDS OFFICER USE ONLY)

|  | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement ................................................... |  |  |  |
| Date Life Term Begins ................................................................... | + |  |  |
| At Large Time ................................................................................. | + |  |  |
| PAROLE DATE .............................................................................. | = |  |  |

## MISCELLANEOUS

Denied 3 yrs

PENAL CODE SECTION 3042 NOTICES    ☒ SENT    (Date) 2-24-92

COMMITMENT OFFENSE

| 209/12022.5 | KIDNAP FOR ROBB W/USE F'ARM |
|---|---|
| (Code Section) | (Title) |
| C-37693 | 12 |
| (Case Number) | (Count Number) |

| Date Received by CDC | Date Life Term Begins | Controlling MEPD |
|---|---|---|
| 1-18-78 | 1-18-78 | 2-4-84 |

| Type of Hearing | If Subsequent Hearing, Date of Last Hearing |
|---|---|
| ☐ INITIAL  ☒ SUBSEQUENT (Hearing No.) __3__ | 3-2-89 |

Department Representative

| Counsel for Prisoner | Address |
|---|---|
| LINDA CLARK | P.O. BOX 26, TEHACHAPI, CA. 93561 |

| District Attorney Representative | County |
|---|---|
|  | ORANGE |

## PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a proposed decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

By:

| Presiding (Name) | [signature] | Date | 3/ |
|---|---|---|---|
| Concurring (Name) | [signature] | Date | 3, / |
| Concurring (Name) | [signature] | Date | 92 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| TITCH, MARK | B-89549 | CMC-E | 2-92 | 3-31-92 |

BPT 1001 (REV. 1/91)                                              PERMANENT ADDENDA

1

## CALIFORNIA BOARD OF PRISON TERMS

In the Matter of the                                          **Life Prisoner**

Hearing of                              **Subsequent Parole Consideration (3)**

TITCH, Mark                                             **Denied (3 Years)**

B-89549

CMC-E

 This matter was heard before the Board of Prison Terms (BPT) on March 31, 1992, at the California Mens Colony - East. The hearing panel was composed of A. Leddy, Commissioner; R. Jauregui, Commissioner; and D. McCuen, Deputy Commissioner.

 Present at the hearing were M. Titch, prisoner; L. Clark, counsel for prisoner; and P. Odwald, Deputy District Attorney, Orange County.

 Any others present are identified in the transcript.

 Oral and documentary evidence was submitted and after due consideration of all the evidence, the panel makes the following findings:

### Legal Status

 On January 18, 1978, the prisoner was received in prison pursuant to Penal Code (PC) § 1168 for a violation of PC §§ 187, 209/12022.5, 211/12022.5 and 459, first degree murder, two counts, kidnap for robbery with use of a firearm, first degree robbery with use of a firearm, five counts, and second degree burglary, three counts, all counts concurrent (Orange County Case

2

No. C-37693, counts 13, 16, 12, 2, 4, 6, 7, 9, 10, 11 and 15; counts 13 and 16, Life; count 12, Life with the additional penalty offense of five - life, consecutive; counts 2, 4, 6, 7 and 9, five - life, consecutive; counts 2, 4, 6, 7 and 9, five - life with the additional penalty offense of five - life, consecutive; counts 10, 11 and 15, one to 15 years).

The prisoner was subsequently received on April 5, 1978, for violations of PC §§ 245(b)/12022.5, assault with a deadly weapon on a peace officer with use of a firearm, consecutive and concurrent with prior term (San Diego County Case No. CR-42845, count 2; six months - life with the additional penalty offense of five - life, consecutive and concurrent with prior term).

The controlling minimum eligible parole date (MEPD) was February 4, 1984.

PC § 3041(a) provides that the BPT shall meet with persons sentenced under PC § 1168 and shall normally set a parole release date unless, pursuant to PC § 3041(b), the Board determines that a parole date cannot be fixed at this hearing.

This hearing is conducted pursuant to Title 15, California Code of Regulations (15 CCR), Division 2, Chapter 3, Article 5, which sets forth parole consideration criteria and guidelines for life prisoners implementing PC § 3041.

**Statement of Facts**

Incorporated by reference as if fully set forth herein from the BPT hearing of February 24, 1983, pages two through eleven.

**Parole Suitability**

15 CCR § 2281(a) requires that the panel first determine

3

whether the prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison. 15 CCR § 2281(c) sets forth circumstances tending to show unsuitability and 15 CCR § 2281(d) sets forth circumstances tending to show suitability. These regulations are guidelines only.

The panel relied on the following circumstances in determining whether or not the prisoner is suitable for parole:

1. Commitment offense. The offense was carried out in an especially heinous, atrocious, cruel, dispassionate and calculated manner which exhibits a callous disregard for the life and suffering of others. Multiple victims were injured and killed in separate incidents. The murder of the first victim did not deter the prisoner from later committing a series of other crimes including several homicides.

These conclusions are drawn from the Statement of Facts wherein the prisoner and his crime partners were involved in an armed crime spree over a two-month period involving a least 23 victims. The crimes were identified as five armed robberies, three burglaries, a kidnapping, and the taking of four lives. One incident included an assault on a family of three, the father and daughter were killed and the mother was shot three times. The prisoner additionally shot a female victim twice in the mouth after disabling her as she laid on the ground. This young female was found with a rosary clutched in her hands, praying for her

TITCH, M.   B-89549        -3-        3/31/92
mr

4

life. This was an inexplicable act, by itself, performed by the prisoner. Three days later, the prisoner was involved in a robbery of a businessman who was shot and killed.

Additionally, the prisoner was in the San Diego area where he was in the process of committing a commercial armed robbery of a liquor store. He was observed by a police officer. The prisoner refused to stop and, in fact, as the officer was attempting to approach, the prisoner asked the officer to freeze as he had a gun on him. The officer attempted to take cover behind a parked vehicle. The prisoner fired one time, striking the officer in the back as he continued to find cover, moving along the side and toward the front of his parked vehicle. He was pursued by the prisoner, who fired eight or nine times at the officer, striking him with five slugs. The prisoner fled south and jumped into his waiting vehicle which was driven from the scene. The prisoner and crime partner were later taken into custody in Victorville, California.

2. Previous record. The prisoner has a record of violence and assaultive behavior. He has a persistent pattern of tumultuous relationships and criminal behavior which commenced at an early age. He has an unstable social history. He has failed previous grants of probation and parole and cannot be counted upon to avoid criminality. He has failed to profit from society's previous attempts to correct his criminality. Such attempts include juvenile probation, juvenile camp and a California Youth Authority (CYA) commitment.

3. Institutional behavior. The prisoner has programmed in

TITCH, M.  B-89549                    -4-              3/31/92
mr

5



a limited manner while incarcerated and has not participated in beneficial self-help and therapy-programs.

4. Psychiatric factors. The psychiatric evaluation dated January 30, 1992, by J. Hirschberg, M.D., is inconclusive.

The panel finds the prisoner needs therapy in order to face, discuss, understand and cope with stress in a non-destructive manner. Until progress is made, he continues to be unpredictable and a threat to others.

The prisoner needs therapy in a controlled setting, but motivation and amenability are questionable.

Nevertheless, the prisoner should be commended for being disciplinary free, for getting his Associate of Arts (AA) Degree and working on his Bachelor of Arts (BA) Degree, for his trades and for his excellent work reports. However, these positive aspects of his behavior do not outweigh the factors of unsuitability.

Based on the information contained in the record and considered at this hearing, the panel concludes and states, as required by PC §§ 3043 and 3043.5, that the prisoner would pose a threat to public safety if released on parole.

Therefore, the prisoner is found unsuitable for parole.

PC § 3041.5(b)(2) permits a three year denial if a prisoner has been convicted, in the same or different proceedings, of more than one offense which involves taking a life and the Board finds that it is not reasonable to expect that parole would be granted at a hearing during the intervening years. In addition to the foregoing reasons supporting postponement of parole

TITCH, M.  B-89549          -5-          3/31/92
mr

consideration, the panel also specifically finds that it is not reasonable to expect that parole would be granted at a hearing scheduled earlier based on the following facts:

1.  The prisoner committed the offense in an especially heinous, atrocious and cruel manner.  Specifically, 23 victims were involved with the prisoner entering a plea of guilty for two counts of murder.  As a result, a longer period of observation and/or evaluation is required before the Board should set a parole date.

2.  The prisoner has a prior record of violent behavior in that he has five armed robberies, three burglaries, a kidnapping and the taking of four lives.

3.  The prisoner has not completed necessary programming which is essential to his adjustment and needs additional time to gain such programming.  He needs therapy participation.

The next hearing will be scheduled in three years.

### Recommendation

PC § 3041.5(b)(2) provides that within 20 days following any meeting where a parole date has not been set, the Board shall send the prisoner a written statement setting forth the reason or reasons for refusal to set a parole date and when the prisoner can reasonably expect to be considered again for the setting of a parole date and in what beneficial activities the prisoner might participate.

This case shall be scheduled for hearing for parole consideration as provided in 15 CCR § 2270(c).

In preparation for the next parole consideration hearing,

TITCH, M.  B-89549                    -6-.               3/31/92
mr

7

the panel recommends that the prisoner:

    1.  Remain disciplinary free.

    2.  Upgrade educationally.

    3.  Participate in self-help and therapy programming.

  **Order**

    Based on the foregoing findings and reasons, parole is denied.


**EFFECTIVE DATE OF THIS DECISION**    JUN 15 1992


TITCH, M.  B-89549        -7-        3/31/92
mr

B

**EXHIBIT 33**

1989 Parole Hearing Decision

PRISON TERMS                                                    STATE OF CALIFORNIA
PRISONER DECISION FACE SHEET

## PERIOD OF CONFINEMENT
### *(RECORDS OFFICER USE ONLY)*

|  | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement ............................... |  |  |  |
| Reception Date (See BPT §2289) ............................... + |  |  |  |
| At Large Time ............................... + |  |  |  |
| PAROLE DATE ............................... = |  |  |  |

## MISCELLANEOUS

3 Years

PENAL CODE NOTICES

SECTION 3042    [X] SENT _____ 1-11-89 _____
                                        (DATE)

COMMITMENT OFFENSE

209/12022.5 PC                          KIDNAP FOR ROBB W/USE OF F'ARM
(CODE SECTION)                          (TITLE)

C-37693                                 CT. 12
(CASE NUMBER)                           (COUNT NUMBER)

| Date Received by CDC 1-18-78 | Controlling MEPD 2-4-84 |
|---|---|
| Type of Hearing [ ] INITIAL [X] SUBSEQUENT 2 (HEARING NO.) | If Subsequent Hearing, Date of Last Hearing 2-4-86 |

Department Representative

| Counsel for Prisoner LINDA CLARK | Address P.O. BOX 26, TEHACHAPI, CA 93561 |
|---|---|
| District Attorney Representative | County ORANGE |

## PAROLE HEARING CALENDAR

*The following represents the findings, determination, and order of the Board of Prison Terms, State of California.*

By:
Presiding (Name)                                    Date
Joseph L. Arias
Concurring (Name)                                   Date 3/2/89
Albie M. Leddy
Concurring (Name)                                   Date
W. Adam Spence

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| TITCH, MARK | B-89549 | CMC-EAST | 2/89 | 3-2-89 |

CALIFORNIA BOARD OF PRISON TERMS

In the Matter of the                                    Life Prisoner

Hearing of                        Subsequent Parole Consideration (2)

TITCH, Mark                                          Denied (3 Years)

B-89549

CMC-E

This matter was heard before the Board of Prison Terms (BPT)
on March 2, 1989, at the California Mens Colony – East.  The
hearing panel was composed of J. Aceto, Commissioner; A. Leddy,
Commissioner; and W. Spencer, Deputy Commissioner.

Present at the hearing were:  M. Titch, Prisoner; L. Clark,
Counsel for Prisoner; and J. Moseley, Deputy District Attorney,
Orange County.

Any others present are identified in the transcript.

Oral and documentary evidence was submitted and after due
consideration of all the evidence, the panel makes the following
findings:

Legal Status

On January 18, 1978, the prisoner was received in prison
pursuant to Penal Code (PC) §1168 for a violation of PC §§187,
209/12022.5, 211/12022.5 and 459, first degree murder, two counts,
kidnap for robbery with use of a firearm, first degree robbery
with use of a firearm, five counts, and second degree

2

burglary, three counts, all counts concurrent (Orange
County Case No. C-37693, Counts 13, 16, 12, 2, 4, 6, 7, 9,
10, 11, and 15; Counts 13 and 16, Life; Count 12, Life with
the additional penalty offense of five - life, consecutive;
Counts, 2, 4, 6, 7, and 9, five - life with the additional
penalty offense of five - life, consecutive; Counts 10, 11,
and 15, one to 15 years).

The prisoner was subsequently received on April 5,
1978, for a violation of PC §§245(b)/12022.5, assault with
a deadly weapon on a peace officer with use of a firearm,
consecutive and concurrent with prior term (San Diego
County Case No. CR-42845, Count 2; six months - life with
the additional penalty offense of five - life, consecutive
and concurrent with prior term).

The controlling minimum eligible parole date (MEPD) is
February 4, 1984.

PC §3041(a) provides that the BPT shall meet with
persons sentenced under PC §1168 and shall normally set a
parole release date unless, pursuant to PC §3041(b), the
Board determines that a parole date cannot be fixed at this
hearing.

This hearing is conducted pursuant to the California
Code of Regulation (CCR), Division 2, Chapter 3, Article 5,
which sets forth parole consideration criteria and

TITCH, M.  B-89549          -2-          3/2/89
sc

3

guidelines for life prisoners implementing PC §3041.

Statement of Facts

Incorporated by reference as if fully set forth herein from the BPT hearing of February 24, 1983, pages two through 11.

Parole Suitability

CCR §2281(a) requires that the panel first determine whether the prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.  CCR §2281(c) sets forth circumstances tending to show unsuitability and CCR §2281(d) sets forth circumstances tending to show suitability.  These regulations are guidelines only.

The panel relied on the following circumstances in determining whether or not the prisoner is suitable for parole.

1.  Commitment offense.  The offense was carried out in an especially heinous, atrocious, and cruel manner which exhibits a complete disregard for the life or suffering of another.  The offense was carried out in a dispassionate and calculated manner wherein multiple victims were

TITCH, M.  B-89549          -3-             3/2/89
sc

4

attacked, injured, and/or killed in separate incidents.
The panel identifies approximately 23 victims.  The victims
were abused and/or mutilated in some form during or after
the offenses.  The murder of the victims did not deter the
prisoner from later committing other criminal offenses.

These conclusions are drawn from the Statement of Facts
wherein the prisoner and his crime partners were involved
in an armed crime spree over a two month period involving
at least 23 victims.  The crimes were identified as five
armed robberies, three burglaries, a kidnapping, and the
taking of four lives.  One incident included an assault on
a family of three, the father and daughter were killed and
the mother was shot three times.  The prisoner additionally
shot a female victim twice in the mouth after disabling her
as she laid on the ground.  This young female was found
with a rosary clutched in her hands, held between her
breasts, praying for her life.  This was an inexplicable
act, by itself, performed by the prisoner.  Three days
later, the prisoner was involved in a robbery of a
businessman who was shot and killed.

Additionally, the prisoner was in the San Diego area
where he was in the process of committing a commercial
armed robbery of a liquor store.  He was observed by a
police officer.  The prisoner refused to stop and, in fact,

TITCH, M.  B-89549          -4-                3/2/89
sc

5

as the officer was attempting to approach, the prisoner
asked the officer to freeze as he had a gun on him.   The
officer attempted to take cover behind a parked vehicle.
The prisoner fired one time, striking the officer in the
back as the officer continued to find cover, moving along
the side and toward the front of his parked vehicle.   He
was pursued by the prisoner, who fired eight or nine times
at the officer, striking him with five slugs.   The prisoner
fled south and jumped into his waiting vehicle which was
driven from the scene.   The prisoner and crime partner were
later taken into custody in Victorville, California.

2.  Previous record.  The prisoner has a record of
violence and assaultive behavior and an escalating pattern
of criminal conduct and violence.  He has a persistent
pattern of tumultuous relationships and criminal behavior
which commenced at the early age of 12.  He has an unstable
social history.  He has failed previous grants of probation
and parole and he cannot be counted upon to avoid
criminality.  He has failed to profit from society's
previous attempts to correct his criminality which include
juvenile probation, juvenile camp, California Youth
Authority (CYA) commitment, and CYA parole.  His unstable
social history and prior criminality includes robbery,
burglary, kidnapping, grand theft auto, at least three

TITCH, M.   B-89549          -5-              3/2/89
sc

6

escapes, assault with the intent to commit murder, runaways, and drug abuse.  At one point, threatened to kill his father for reporting him to his probation officer for having a stolen vehicle in his possession.  During the crime spree the prisoner was on escape status from CYA.

3.  Institutional behavior.  The prisoner has programmed in a limited manner while incarcerated and has failed to upgrade educationally and vocationally up until recently.  He has not participated in beneficial self-help or therapy programs.  The latest 115 was reported February 23, 1986, for force and violence.  Other prior 115's that were documented include July 13, 1983, for possession of pruno and May 15, 1985, for force and violence.  He has refused to participate in the Category X diagnostic program as recommended by the prior panel.

4.  Psychiatric factors.  The Psychological Evaluation dated December 9, 1988, authored by Beryl R. Davis, Ph.D., Staff Psychologist and noted by James B. Hollingsworth, M.D., Assistant Warden, Psychiatric Services, is not totally supportive of release, provides a diagnosis of antisocial personality disorder and states in part:

"CONCLUSION:  To date, subject has avoided self-examination by postponing psychological programs until he approaches a realistic time frame for release.  He has a

TITCH, M.  B-89549        -6-          3/2/89
sc

7

RECORDS OFFICER USE
Pre-prison Credit

number of problematic areas to explore, but before psychological growth occurs, he must develop intrinsic rather than extrinsic motivation. Until that time, he is clearly stating to all concerned that he is not ready for a parole date. It is also premature to consider an answer to the question of the subject's violence potential in the free community and the extent to which he has explored the commitment offense."

The panel finds that the prisoner needs therapy in order to face, discuss, understand, and cope with stress in a non-destructive manner. Until progress is made the prisoner continues to be unpredictable and a threat to others. He needs therapy in a controlled setting, but his motivation and amenability are questionable at this time. The prisoner's gains are short-term and he must demonstrate an ability to maintain gains over an extended period of time.

The prisoner should be commended for his good work habits and for remaining disciplinary free from May 1986, until the present time. However, these positive gains do not outweigh the above-stated factors of unsuitability.

Based on the information contained in the record and considered at this hearing, the panel states as required by PC §3043 that the prisoner would pose a threat to public

TITCH, M.   B-89549          -7-          3/2/89
sc



safety if released on parole.

Therefore, the prisoner is found unsuitable for parole.

PC §3041.5(b)(2) permits a three year denial if a prisoner has been convicted, in the same or different proceedings, of more than one offense which involves taking a life and the Board finds that it is not reasonable to expect that parole would be granted at a hearing during the intervening years.   In addition to the foregoing reasons supporting postponement of parole consideration, the panel also specifically finds that it is not reasonable to expect that parole would be granted at a hearing scheduled earlier based on the following facts:

1.  The prisoner has a prior record of violent behavior starting at an early age including threatening his father. He has been involved in murder and attempted murder indicating requiring a longer period of observation and evaluation is needed before the Board can project a parole date.

2.  A recent psychiatric report dated December 9, 1988, authored by Dr. Davis, indicates a need for a longer period of observation and evaluation.   It mainly includes that he is doing self-evaluation rather than to follow the recommended programs which could be made available to him.

TITCH, M.  B-89549          -8-          3/2/89
sc

9

The next hearing will be scheduled in three years.

Recommendation

PC §3041.5(b)(2) provides that within 20 days following any meeting where a parole date has not been set, the Board shall send the prisoner a written statement setting forth the reason or reasons for refusal to set a parole date and when the prisoner can reasonably expect to be considered again for the setting of a parole date and in what beneficial activities the prisoner might participate.

This case shall be scheduled for hearing for parole consideration as provided in BPT Rules §2270(c).

In preparation for the next parole consideration hearing, the panel recommends that the prisoner:

1.  Become disciplinary free;

2.  Continue to upgrade vocationally and/or educationally;

3.  Participate in self-help and/or therapy programs when they become available to him.

Order

Based on the foregoing findings and reasons, parole is denied.

EFFECTIVE DATE OF THIS DECISION ___ **MAY 0 2 1989** ___.

TITCH, M.  B-89549          -9-          3/2/89
sc

*10*

**EXHIBIT 34**

1986 Parole Hearing Decision

LIFE PRISONER DECISION FACT SHEET

## PERIOD OF CONFINEMENT

### (RECORDS OFFICER USE ONLY)

|  | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement .................................................................. |  |  |  |
| Reception Date (See BPT §2289) ................................................................. | + |  |  |
| At Large Time ............................................................................................... | + |  |  |
| PAROLE DATE | *1/12 2/89 cci* | = |  |

## MISCELLANEOUS

( Cat X with psychological Tests )

Denial 3 years.

PENAL CODE NOTICES

SECTION 3042     [X] SENT _____ 12-9-85 _____
                                         (DATE)

COMMITMENT OFFENSE

| 209/12022.5 PC | Knap for Robb w/use of f'arm |
|---|---|
| (CODE SECTION) | (TITLE) |
| C-37693 | 12 |
| (CASE NUMBER) | (COUNT NUMBER) |

| Date Received by CDC | Controlling MEPD |
|---|---|
| 1-18-78 | 2-4-84 |

| Type of Hearing  [ ] INITIAL  [X] SUBSEQUENT __1__ (HEARING NO.) | If Subsequent Hearing, Date of Last Hearing  2-24-83 |
|---|---|

Department Representative

| Counsel for Prisoner | Address |
|---|---|
| James Flegge | P.O. Box 383, Santa Maria, CA.  93456 |
| District Attorney Representative  *M. Hinsen* | County  Orange |

## PAROLE HEARING CALENDAR

*The following represents the findings, determination, and order of the Board of Prison Terms, State of California.*

By:

| Presiding (Name) | Date |
|---|---|
| *Ken Kurluij* | 2/ |
| Concurring (Name) | Date |
| *R.L.H.* | /4/ |
| Concurring (Name) | Date |
| *R. Boppung* | /86 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| TITCH, Mark | B-89549 | CMC EAST | 2-86 | 2-4-86 |

APR 25 1986

1

PERMANENT ADDENDA

CALIFORNIA BOARD OF PRISON TERMS

In the Matter of the                                    Life Prisoner

Hearing of                            Subsequent Parole Consideration (I)

TITCH, Mark                                          Denied (3 Years)

B-89549

CMC-E

    This matter was heard before the Board of Prison Terms (BPT)
on February 4, 1986 at the California Mens Colony-East.   The
hearing panel was composed of R. Jauregui, Member; R. Roos, Member;
and

D. Epperly, Representative.

    Present at the hearing were:  M. Titch, Prisoner; J. Flegge,
Counsel for Prisoner; and M. Jensen, Deputy District Attorney,
Orange County.

    Any others present are identified in the transcript.

    Oral and documentary evidence was submitted and after due
consideration of all the evidence, the panel makes the following
findings:

    Legal Status

    On January 18, 1978, the prisoner was received in prison
pursuant to Penal Code (PC) §1168 for a violation of PC §§187,
209/12022.5, 211/12022.5 and 459, first degree murder, two counts
(Counts 13 and 16), kidnap for robbery with use of a firearm
(Count 12), first degree robbery with use of a firearm, five
counts (Counts 2, 4, 6, 7 and 9), and second degree burglary,
three counts (Counts 10, 11, and 15), all counts concurrent

2

(Orange County Case No. C-37693; the prisoner's sentences on these counts are as follows:  Counts 13 and 16, life; Count 12, life, with the additional penalty offense of five years to life, consecutive; Counts 2, 4, 6, 7 and 9, five years to life with the additional penalty offense of five years to life, consecutive; Counts 10, 11, and 15, one to 15 years.

The prisoner was subsequently received on April 5, 1978, for a violation of PC §§245(b)/12022.5, assault with a deadly weapon on a peace officer with use of a firearm, consecutive, and concurrent with prior term (San Diego County Case No. CR-42845, Count 2; the prisoner was sentenced to six months to life with the additional penalty offense of five years to life, consecutive, and concurrent with prior term).

The controlling minimum eligible parole date (MEPD) is February 4, 1984.

PC §3041(a) provides that the BPT shall meet with persons sentenced under PC §1168 and shall normally set a parole release date unless, pursuant to PC §3041(b), the Board determines that a parole date cannot be fixed at this hearing.

This hearing is conducted pursuant to the California Administrative Code (CAC), Division 2, Chapter 3, Article 5, which sets forth parole consideration criteria and guidelines for life prisoners implementing PC §3041.

TITCH, Mark   B-89549          -2-          2/4/86
kf

3

FOR RECORDS OFFICER USE

Pre-prison Credit

Statement of Facts

Incorporated by reference as if fully set forth herein from the Board of Prison Terms hearing of February 24, 1983, pages 2 through 11.

Parole Suitability

CAC §2281(a) requires that the panel first determine whether the prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison. CAC §2281(c) sets forth circumstances tending to show unsuitability and CAC §2281(d) sets forth circumstances tending to show suitability. These regulations are guidelines only.

The panel relied on the following circumstances in determining whether or not the prisoner is suitable for parole:

1. Commitment offenses. The commitment offenses were carried out in an especially heinous, atrocious and cruel manner which exhibited a callous disregard for the life or suffering of others. Multiple victims were attacked, injured and killed in separate incidents. The murder of the victims did not deter the prisoner from later

TITCH, Mark    B-89549              -3-              2/4/86
kf

4

FOR
RECORDS OFFICER
USE
· Pre-prison
Credit

committing other criminal acts.

During an armed crime spree, the prisoner and his crime partners committed five armed robberies, three burglaries, a kidnapping and the taking of four lives. One of these crimes included an assault on a family; the father and daughter were killed and the mother was shot three times.

Other murders occurred: the prisoner shot a female victim twice in the mouth and, three days later, was involved in a robbery in which a businessman was shot and killed.

The prisoner was also involved in a gun fight with a peace officer in which he shot the peace officer six times;

2. Previous record. The prisoner has a record of violent and assaultive behavior with an escalating pattern of criminal conduct and violence. His unstable social history includes a persistent pattern of tumultuous relationships and criminal behavior which commenced at the age of twelve. This record includes numerous arrests for robbery, burglary, kidnapping, grand theft auto, truancy, escapes and assault with intent to commit murder.

The prisoner's numerous adjustment problems include being absent without leave (AWOL) and abusing drugs since the age of 13 when he started using PCP and LSD.

The prisoner has failed previous grants of probation

TITCH, Mark    B-89549          -4-              2/4/86
kf

5

and parole and cannot be depended upon to avoid further criminality. He has failed to profit from society's previous attempts to correct his criminality, which include juvenile probation, juvenile camp, California Youth Authority (CYA) commitments, county jail, and parole;

3. Institutional behavior. The prisoner has programmed in a limited manner while incarcerated; he has failed to develop a marketable skill for use upon release and has significantly failed to upgrade educationally or vocationally as previously recommended by the Board. In addition, he has not participated in beneficial self-help or therapy programs.

The prisoner has failed to demonstrate evidence of positive change. Misconduct while incarcerated includes receiving two California Department of Corrections (CDC) disciplinaries (115's), one on July 13, 1983 for possession of inmate-manufactured alcohol, and another on May 15, 1985 for force and violence;

4. Psychiatric factors. The Psychiatric Evaluation of November 22, 1985 by Robert C. Brandmeyer, M.D., Senior Psychiatrist, is unfavorable and not supportive of a release date. It states in part:

"...There is a superficiality and a shallowness to all of his productions which makes me believe that the lack of

TITCH, Mark    B-89549         -5-            2/4/86
kf

FOR
RECORDS OFFICER
USE

Pre-prison
Credit

psychological constaint [sic] which enabled him to kill people with no anxiety, no guilt, and no remorse is as yet untouched..."

The panel finds that the prisoner needs therapy in order to face, discuss, understand and cope with stress in a non-destructive manner. Until further progress is made, the prisoner continues to be unpredictable and a threat to others. His gains are short-term and he must demonstrate an ability to maintain gains over an extended period of time.

In view of the prisoner's assaultive history, continued negative behavior and lack of program participation, there is no indication that the prisoner would behave differently if paroled.

The prisoner should be commended for his excellent work efforts and for receiving seven laudatory reports in the beginning of his vocational program; the panel feels, however, that these positive gains do not outweigh the negative factors of unsuitability listed above.

Therefore, the prisoner is found unsuitable for parole.

PC §3041.5(b)(2) permits a three year denial if a prisoner has been convicted, in the same or different proceedings, of more than one offense which involves taking a life and the Board finds that it is not reasonable to

TITCH, Mark    B-89549              -6-              2/4/86
kf

7

expect that parole would be granted at a hearing during the intervening years.   In addition to the foregoing reasons supporting postponement of parole consideration, the panel also specifically finds that it is not reasonable to expect that parole would be granted at a hearing scheduled earlier based on the following facts:

The prisoner has been convicted of more than one offense which involves the taking of a life; to wit, the killing of Laura Stoughton and, in a separate incident, the murders of Aubrey and Denise Duncan.   In yet another and separate incident, the prisoner killed victim E. J. Christian.

It is not reasonable to expect that parole would be granted at a hearing during the next three years.   The specific reasons for this conclusion are:

1.   The prisoner committed the offenses in an especially heinous, atrocious or cruel manner, wherein he and a crime partner were responsible for shooting victim Laura Stoughton twice in the mouth after an unsuccessful rape and, thereafter, the shooting of a Mr. Duncan "several times with (a) rifle", shooting the daughter, Denise Duncan, three times and the mother, Mrs. Duncan, twice.   The daughter died and the mother, absent a portion of her breast, survived.   In yet a third murder incident, the pair of crime partners were responsible for the death of victim E. J. Christian, who was shot to death;

TITCH, Mark    B-89549          -7-          2/4/86
kf

8

FOR
RECORDS OFFICER
USE

Pre-prison
Credit

2.  The prisoner has a prior record of violent behavior; to wit, the prisoner has a record of arrests for robbery, kidnapping and assault with intent to commit murder.  The prisoner, therefore, requires a longer period of observation and/or evaluation before the Board can project a parole date;

3.  In view of the prisoner's long history of criminality and misconduct, which includes robbery, kidnapping, burglary, grant theft auto, truancy, escapes, abuse of drugs, etc., a longer period of time is required in order to evaluate his suitability.

Based on the information contained in the record and considered at this hearing, the panel states as required by PC §3043 that the prisoner would pose a threat to public safety if released on parole.

The next hearing will be scheduled in three years.

Recommendation

PC §3041.5(b)(2) provides that within 20 days following any meeting where a parole date has not been set, the Board shall send the prisoner a written statement setting forth the reason or reasons for refusal to set a parole date and when the prisoner can reasonably expect to be considered again for the setting of a parole date and in what beneficial activities the prisoner might participate.

This case shall be scheduled for hearing for parole

TITCH, Mark    B-89549              -8-           2/4/86
kf

9

FOR
RECORDS OFFICER
USE
Pre-prison
Credit

consideration as provided in BPT Rules §2270(c).

In preparation for the next parole consideration hearing, the panel recommends that the prisoner:

1.  Become disciplinary free;

2.  Upgrade vocationally or educationally;

3.  Participate in self-help or therapy programming;

4.  Cooperate with clinicians and staff in a Category X program.

    NOTE TO CDC STAFF:  The Category X program is to explore:

1.  The prisoner's violence potential in the free community;

2.  The extent to which the prisoner has explored the commitment offenses and resolved the underlying causes;

3.  The prisoner's need for therapy programs while incarcerated;

4.  The standard battery of psychological testing.

Order

Based on the foregoing findings and reasons parole is denied.

APR 03

EFFECTIVE DATE OF THIS DECISION _____.

TITCH, Mark    B-89549    ___ __ _9__ _____ 2/4/86 _____ __
kf

10

**EXHIBIT 35**

1983 Parole Hearing Decision

# LIFE PRISONER DECISION FACE SHEET

## PERIOD OF CONFINEMENT

### (RECORDS OFFICER USE ONLY)

|  | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement | + | | |
| Reception Date (See BPT §2289) | + | | |
| At Large Time | + | | |
| PAROLE DATE | = | | |

## MISCELLANEOUS

3041.5 (t)(2)A - Next hearing in 3 years.
Place on 2/86 Sub. cal.

**PENAL CODE NOTICES**

SECTION 3042    ☑ SENT    _11-19-82_
(DATE)

**COMMITMENT OFFENSE**

209/12022.5 PC     Knap for Robb w/use of F'arm
(CODE SECTION)          (TITLE)

C-37693              12
(CASE NUMBER)        (COUNT NUMBER)

| Date Received by CDC 1-18-78 | Controlling MEPD 2-4-84 |
|---|---|
| Type of Hearing ☑ INITIAL ☐ SUBSEQUENT (HEARING NO.) | If Subsequent Hearing, Date of Last Hearing |
| Department Representative | |

| Counsel for Prisoner Ann J. Howell | Address P.O. Box 22205, Carmel, Ca 9393 |
|---|---|
| District Attorney Representative | County Orange |

## PAROLE HEARING CALENDAR

*The following represents the findings, determination, and order of the Board of Prison Terms, State of California.*

| By: | | Date: |
|---|---|---|
| Presiding (Name) | | 2-24-83 |
| Concurring (Name) | | Date |
| Concurring (Name) Ralph L. Pegram | | Date |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| Titch, Mark W. | B-89549 | CTF-C | 2/83 | |

1

CALIFORNIA BOARD OF PRISON TERMS

In the Matter of the                              Life Prisoner

Hearing of                          Initial Parole Consideration

TITCH, Mark                              Denied (3 Years)

B-89549

CTF-C

This matter was heard before the Board of Prison Terms
(BPT) on February 24, 1983 at the Correctional Training
Facility-Central.  The hearing panel was composed of R. Roos,
Member; F. Coronado, Member; and R. Pizarro, Member.

Present at the hearing were:  M. Titch, Prisoner; A.
Howell, Counsel for prisoner; and R. Toohey, Deputy District
Attorney, Orange County.

Any others present are identified in the transcript.

Oral and documentary evidence was submitted and after due
consideration of all the evidence, the panel makes the following
findings:

Legal Status

On January 18, 1978, the prisoner was received in prison
pursuant to Penal Code (PC) §1168 for a violation of PC §§187,
209/12022.5, 211/12022.5 and 459, first degree murder (Counts 13
and 16), kidnap for robbery with use of firearm (Count 12),
first degree robbery with use of firearm (Counts 2, 4, 6, 7, and

2

9), and second degree burglary (Counts 10, 11 and 15) (Case

No. C-37693.

The prisoner was additionally received on April 5, 1978

for a violation of PC §§245(b)/12022.5, assault on a peace

officer with use of a firearm (Case No. CR-42845).   The

controlling minimum eligible parole date (MEPD) is February

4, 1984.

PC §3041(a) provides that the BPT shall meet with

persons sentenced under PC §1168 and shall normally set a

parole release date unless, pursuant to PC §3041(b), the

Board determines that a parole date cannot be fixed at this

hearing.

This hearing is conducted pursuant to the California

Administrative Code (CAC), Division 2, Chapter 3, Article 5,

which sets forth parole consideration criteria and guidelines

for life prisoners implementing PC §3041.

Statement of Facts

Case No. C-37693 Counts 12 and 13:

On January 21, 1977, a motorcyclist, riding through a

vacant field in the city of Orange, observed a female

Caucasian, the victim, Laura Stoughton, lying on the knoll of

a hill.  Police responded to that location and observed the

TITCH, M.  B-89549           -2-              2/24/83
jp

3

body lying on its right side with the head in a northeasterly direction.  A large quantity of blood was observed on the face with the head lying in a large puddle of blood. Approximately three feet east of the victim's head was a second comparatively large puddle of coagulated blood measuring approximately 18 inches across.

The victim was set into an upright position by the coroner's investigator and it was noted that she had a rosary clutched in her right hand.  The right hand was clutching the rosary against her chest between her breasts.  The left arm was extremely loose and somewhat dangling in appearance from the shoulder area, being somewhat twisted lying beneath her body.  Preliminary examinations indicated that there were two possible gunshot wounds in the mouth area.  There did not appear to have been a struggle.

The prisoner and crime partner Thomas were at the side of the victim's residence trying to gain entry when the victim drove up in her driveway.  The victim was abducted by the prisoner and crime partner and placed into the trunk of their car.  The victim was taken into a remote area of the county where she was directed up a hill.  At that location, the crime partner told the police, the prisoner tried to rape

TITCH, M.  B-89549                -3-              2/24/83
jp

4

then decided to execute her.  The crime partner's gun jammed but the prisoner's did not.  The prisoner shot the victim in the shoulder and she fell to the ground.  The victim was praying for her life, while the prisoner and his crime partner discussed in her presence that she would be killed to prevent her from later identifying them.  The prisoner shot her twice in the mouth.

Count 16:  On January 29, 1977, police responded to a possible murder scene.  When they arrived, the murder victim, Aubrey Duncan, was lying in front of the house with his feet facing west and his head facing toward the east.  It was noted that he had visible facial injuries and that he was lying in a pool of blood.  The second victim, Denise Duncan, daughter of Aubrey Duncan, was found lying in the entrance hall.  The third victim, Mrs. Duncan, had contacted the police.

Mrs. Duncan indicated to the police that she had heard a loud noise outside and that she and her daughter Denise, had gone to the door to investigate the sounds.  Mrs. Duncan stated that her husband had just got home from work.  Immediately upon opening the door she heard a loud blast and was pushed back to the kitchen door.  At this time she

TITCH, M.  B-89549          -4-              2/24/83
jp

5

contacted the police.

After following Mr. Duncan home from work, the prisoner, the driver of the car, stopped in front of Mr. Duncan's home. When Mr. Duncan went to unlock the door, the crime partner pointed a .22 caliber rifle from the passenger's seat. The prisoner was supposed to put the car in neutral and run the engine so as to muffle the gunshots, but instead he got the car in gear and the car went forward. The prisoner then backed the car up and the crime partner shot Mr. Duncan several times with the rifle. This noise awoke Mrs. Duncan and Denise. Mrs. Duncan and Denise went to the front door. Mrs. Duncan opened the door and stepped out onto the porch, seeing her husband dead. She was then shot twice with the .22 caliber rifle causing a loss to a portion of her breast. Mrs. Duncan fell to the porch and called to Denise. Her daughter was unconscious from being shot three times; she subsequently died. Mrs. Duncan was then shot by the crime partner with a shotgun. The crime partner had run out of ammunition for the .22 caliber rifle (10 shots). Mrs. Duncan then crawled over the body of her daughter and went to the phone to call the police.

Count 2: On November 19, 1976, the victim and his wife

TITCH, M.   B-89549      -5-       2/24/83
jp

6

were awakened at their residence in Anaheim. The victim saw
the prisoner in the bedroom doorway and stated "Don't move or
I'll blow your head off. I have a gun." The prisoner then
went through the dresser drawers, cut the phone cord, took
the keys to their car, house and business. The prisoner then
left in the victim's 1975 Chevrolet Monte Carlo. Items
missing from the home included approximately $280 cash, one
.32 caliber Baretta handgun and a box of ammunition.

Count 4: On December 14, 1976, the victims, their
daughter and son were asleep in their residence in Anaheim
when the prisoner entered the bedroom of the daughter and
placed a handgun to her head asking for money. It was
indicated that the prisoner took $11 from her and then took
her to her parent's bedroom where he woke them with the gun
at their daughter's head. It was indicated that he got two
$1 bills, asked about guns and valuables and then left via
the front door. Latent prints taken from a window at the
victim's residence were later positively identified as those
of the prisoner.

Count 6: On December 18, 1976, the prisoner and crime
partner entered the bedroom of the victims at their residence
in Anaheim. The prisoner and his crime partner had one

TITCH, M.  B-89549              -6-              2/24/83
jp

7

FOR
RECORDS OFFICER
USE
Pre-prison
Credit

handgun between them which they used to threaten the victims.
It was indicated that they took approximately $27 from the
victims' purse and wallet; then the telephone wires were cut
and they left the house.

Count 7:  On December 21, 1976, the prisoner went to the
service window of Theo's Restaurant in Anaheim.  He showed a
handgun and demanded all of the clerk's money.  The clerk
complied and gave the prisoner about $60; the prisoner then
fled the area on a bicycle.

Count 9:  On December 27, 1976, the prisoner burglarized
the home of victims who lived in Stanton.  Items removed
included car keys and the victim's 1976 Chrysler automobile.

Count 10:  On January 16, 1977, the victim returned to
his residence in Anaheim and discovered that someone had
entered his residence through a window, had taken his car
keys from the dining room table and driven away in his 1976
Chevrolet.  This is the same vehicle that the prisoner and
the crime partner were driving when arrested by the
California Highway Patrol (CHP).

Count 11:  On January 19, 1977, the victim returned to
her residence in Anaheim, found that someone had broken a
large window to her kitchen door in order to gain entry to

TITCH, M.  B-89549          -7-              2/24/83
jp

$B$

FOR
RECORDS OFFICE
USE
Pre-prison
Credit

her home.  The house had been ransacked with $35 in coins; a

Ruger model 10-22 carbine rifle; a British Enfield .303

carbine; two soft-sided rifle cases; two military .50 caliber

ammunition cans containing approximately 1000 rounds of .22

caliber cartridges and appriximately 900 rounds of military-

type .303 ammunition having been taken.

Count 15:  On January 27, 1977, the prisoner entered a

residence in Garden Grove with the intent of committing

theft.

Count 14:  On January 24, 1977, at about 7:35 p.m.,

officers were dispatched to a Rockview Dairy on Katella

Street in Anaheim, in response to an attempted robbery which

had just occurred where the clerk had been shot.  According

to the police report, the victim, Ephraim Jacob Christian,

was inside the dairy lying on the floor on his back with his

head pointed in a southward direction toward the cooler.  It

was noted that there was a large amount of blood around the

victim's head and around the floor where he was lying; there

were no vital signs.  The victim expired at the scene.

Police subsequently talked with John Jonathan Christian

who stated that he and the victim were partners in the dairy.

John stated that he had gone back into the cooler area to

TITCH, M.  B-89549              -8-                2/24/83
jp

9

FOR
RECORDS OFFICER
USE

Pre-prison
Credit

clean-up and left the victim outside in the cash register
area.  He stated that he had been there for approximately ten
minutes when he heard a car pull up through the drive-in
portion.  John stated that at that time he suddenly heard two
or three shots, became extremely frightened and laid down on
the floor to remain unseen.  He stated he then heard the
prisoner pushing the keys on the cash register attempting to
open it, saying "Which keys, which keys?"  John stated that
he assumed the prisoner was talking to his crime partner;
however, did not hear any reply.

According to the police, a witness, Lorrie Reed,
contacted them and stated that she had observed a vehicle in
the drive-in area.  Ms. Reed heard the gunshots and then
observed the prisoner run from the passenger side of the
vehicle into the dairy.  Ms. Reed stated that she believed
that something was transpiring and that she did not want to
get involved; so she continued eastbound on Katella.

Case No. CR-42845 Count 2:

On December 26, 1976, the prisoner and crime partner
Haupu arrived in San Diego.

On December 27, 1976, they drove to the Base Liquor
Store on National Avenue.  The prisoner, was armed with a .32

TITCH, M.  B-89549          -9-              2/24/83
-jp

10

caliber automatic Baretta, proceeded to the open business,
and contacted the clerk inside and made demands for money.
The clerk did not speak English and the conversation was
interrupted by the owner of the business who also observed
the prisoner armed with a .32 caliber weapon tucked in his
waistband.  Upon the demand for money, the owner placed the
money from the cash register into a brown paper bag and
handed it to the prisoner.  Taken from the store was $450.

As the prisoner exited the front of the liquor store, he
was observed by an officer who was on patrol in a marked
police unit.  The officer pursued the prisoner in the
direction where the crime partner and the vehicle were
waiting.  The officer ordered the prisoner to stop and walk
back to his location.  The prisoner started walking toward
the officer, drew a weapon and told him to "freeze".  As the
officer attempted to take cover behind his parked vehicle,
the prisoner fired one time striking the officer in the back.
As the officer continued to find cover by moving along the
side and toward the front of his parked vehicle, he was
pursued by the prisoner firing eight or nine times, striking
the officer with five slugs.  The prisoner then fled south
and jumped into his waiting vehicle which was driven from the

TITCH, M.  B-89549          -10-               2/24/83
jp

11

FOR RECORDS OFFICER USE

Pre-prison Credit

scene rapidly by the crime partner.

On February 1, 1977, the prisoner was taken into custody by the CHP in the area of Victorville, California.

Subsequent information indicates the officer suffered permanent disability; loss of feeling to his legs, arthritis in his ankles and was subsequently forced to retire.

Parole Suitability

CAC §2281(a) requires that the panel first determine whether the prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison. CAC §2281(c) sets forth circumstances tending to show unsuitability and CAC §2281(d) sets forth circumstances tending to show suitability. These regulations are guidelines only.

PC §3041.5(b)(2) permits a three year denial if a prisoner has been convicted, in the same or different proceedings, of more than one offense which involves taking a life and the Board finds that it is not reasonable to expect that parole would be granted at a hearing during the

TITCH, M.  B-89549          -11-                    2/24/83
jp

/2

Pre-prison
Credit

intervening years.  The panel finds the prisoner meets the
criteria for a three year denial.

The panel arrived at said findings of unsuitability and
three year denial by reason of the following:

1.  The life crime.  The prisoner and his crime partner
in Orange County committed an incredible spree of most
serious crimes.  As a result of their actions, four people
died from gunshot wounds in what appears to be execution-
style murders.  The prisoner admits to personally killing
victim Laura Stoughton by firing two shots into her face
while she was holding a rosary and praying for her life.  The
motive was apparently to prevent her from testifying as to
her kidnapping and robbery.

The prisoner further indicates that his crime partner
shot the three Duncan family members, killing the father and
daughter, and severely injuring the mother.

According to the prisoner, the crime partner also shot
victim Christian during another robbery.

The prisoner admits his culpability, willing and equal
participation in all of the many criminal acts, including
multiple robberies and burglaries.

Prior to the killing of victim Stoughton, the prisoner

TITCH, M.  B-89549          -12-              2/24/83
jp

13

and another crime partner in San Diego County were involved in a robbery.  The prisoner while leaving the premises was contacted by a uniformed police officer.  The prisoner shot the officer five times resulting in very serious injuries and his eventual retirement from the police force.

The totality of these criminal acts staggers the imagination and demonstrates the prisoner's shocking disregard for the property rights and the lives of the many victims;

2.  Prior criminal record.  The prisoner began his criminal career at approximately age 12.  The prisoner's prior criminal conduct reflects approximately 13 arrest entries, including three escapes, four burglaries, two grand theft autos, armed robbery and assault with intent to commit murder.  The prisoner was sent to the California Youth Authority (CYA) as a result of this criminal behavior.  The prisoner was on escape status when he began the spree of life crimes;

3.  Psychiatric/Psychological Reports.  The Psychological Report dated April 14, 1978 by Leisla M. Howell, Senior Psychologist, states in part:

"...DIAGNOSTIC IMPRESSION:  Antisocial personality;

TITCH, M.  B-89549          -13-              2/24/83
jp

14

severe, with paranoid features; with homicidal potential. ..

"...The description of Subject's behavior in the offenses and the offense per se, reflect the cold unfeeling attitude which made it possible for him to terrorize, torture, and take the lives of so many people.  The prognosis for such persons is extremely poor.  The only way society can be protected from this man would be to prevent him from entering society..."

The Psychiatric Evaluation dated November 15, 1982 by John W. McKean, M.D., Staff Psychiatrist, states in part:

"...<u>PSYCHIATRIC DIAGNOSIS</u>:  Anti-social personality disorder..

"<u>PSYCHIATRIC CONCLUSION</u>:  The inmate has held a long history of impulsive behavior, distructive (sic) acts carried out towards others first with property and then with peoples lives, most of the episodes seem to have been events undertaken on sudden impulse, in fact for the incident that he feels the most regret he finds no reason for it accept (sic) that his crime partner was concerned, but that he himself had no patience for the killing...Were he to be paroled at this stage of his development, I believe that his potential for violence would still be greater than the

TITCH, M.  B-89549                 -14-                    2/24/83
jp


average man on the street.    Inmate is to be commended for the progress he is making and the effort he is putting into his own rehabilitation."

The panel wishes to compliment the prisoner for his laudatory work record, enhancing his education and for having only received two California Department of Corrections (CDC) disciplinary (115) reports during his incarceration.    However, this positive record does not outweigh the most serious record reflected above.

Based on the information contained in the record and considered at this hearing the panel states as required by PC §3043 that the prisoner would pose a threat to public safety if released on parole.

Therefore, the prisoner is found unsuitable for parole and next hearing will be scheduled in three years.

Recommendation

PC §3041.5(b)(2) provides that within 20 days following any meeting where a parole date has not been set, the Board shall send the prisoner a written statement setting forth the reason or reasons for refusal to set a parole date and when the prisoner can reasonably expect to be considered again for the setting of a parole date and in what beneficial

TITCH, M.    B-89549        -15-            2/24/83
jp

16

| Pre-prison Credit |
|---|
|  |

activities the prisoner might participate.

This case shall be scheduled for hearing for parole consideration as provided in BPT Rules §2270(c).

In preparation for the next parole consideration hearing, the panel recommends that the prisoner:

1. Be disciplinary free;

2. Continue educational upgrading;

3. Pursue vocational upgrading as custody permits;

4. Continue positive work programs;

5. Involve himself in self-help or therapy groups as his custody permits and as staff recommends.

<u>Order</u>

Based on the foregoing findings and reasons parole is denied.

EFFECTIVE DATE OF THIS DECISION _____ APR 2 4 1983 _____.

TITCH, M.  B-89549          -16-                2/24/83
jp

/7

**EXHIBIT 36**

Achievements



CHAPMAN UNIVERSITY
Orange, California
1861

# Chapman University

Orange, California

The Trustees of the University on the recommendation of the Faculty and by virtue of the Authority in Them vested have conferred on

## Mark W. Titch

the degree of

### Associate of Arts

with all the Rights, Privileges and Honors as well as the obligations and responsibilities pertaining thereto.

Given this month of January, nineteen hundred ninety-two.

President of the University

Chairman, Board of Trustees

**Student Name:** Titch, Mark W.
**Former Name:**
**Birthplace:** Fullerton, California

**SSN:**
**ID:** 90169946
**Birthdate:** 07/31/1959
**Sex:** Male
**HS Grad Date:**
**ACT:**
**SAT:**
**GRE:**

**High School:**
**HS Location:**
**Previous College:**
**Previous Degree:**                                        **Date:**

# Chapman University

## ORANGE, CA. 92666
## OFFICE OF THE REGISTRAR
### Permanent Academic Record

**Date Printed:** 04/02/1992          **Page 1 of 1**

**Major Emph:**
**Major Emph:**
**Minor:**

Student is in good standing and is eligible to return unless otherwise stated. This transcript is not official unless it bears the signature and impression seal of the Registrar.

**Admitted to:** Undergraduate school
San Jose State University

**Transfer Term**

| Disc. | Crse. No. | Course Title | Grade | Hrs. Attempt. | Hrs. Earned | Grade Points | GPA |
|---|---|---|---|---|---|---|---|
| | | **07/80 - 05/81** | | | | | |
| | | Transfer Credits Accepted | | | | | |
| | | **TRANSFER TOTALS** | 58 | 24.0 | 24.0 | 87.0 | 0.000 |

**Term VI-88** 09/12/88 - 12/16/88

| Disc. | Crse. No. | Course Title | Grade | Hrs. Attempt. | Hrs. Earned | Grade Points | GPA |
|---|---|---|---|---|---|---|---|
| EDUC | 150 | READING SKILLS | B | 2.0 | 2.0 | 8.0 | |
| HIST | 311 | THE SOVIET UNION | A | 3.0 | 3.0 | 12.0 | |
| MATH | 100 | MATH TUTORIAL | A | 3.0 | 3.0 | 12.0 | |
| | | **TERM TOTALS** | 58 | 8.0 | 8.0 | 32.0 | 4.000 |
| | | **CHAPMAN TOTALS** | 58 | 8.0 | 8.0 | 32.0 | 4.000 |

**Term I-89** 01/23/89 - 04/28/89

| Disc. | Crse. No. | Course Title | Grade | Hrs. Attempt. | Hrs. Earned | Grade Points | GPA |
|---|---|---|---|---|---|---|---|
| CPSC | 200 | INTRO COMP/DATA PROC | A | 3.0 | 3.0 | 12.0 | |
| ENG | 100 | BASIC WRITING SKILLS | A | 3.0 | 3.0 | 12.0 | |
| MATH | 102 | INTERMEDIATE ALGEBRA | A | 3.0 | 3.0 | 12.0 | |
| | | **TERM TOTALS** | 58 | 9.0 | 9.0 | 36.0 | 4.000 |
| | | **CHAPMAN TOTALS** | 58 | 17.0 | 17.0 | 68.0 | 4.000 |

**Term V-89** 05/22/89 - 08/26/89

| Disc. | Crse. No. | Course Title | Grade | Hrs. Attempt. | Hrs. Earned | Grade Points | GPA |
|---|---|---|---|---|---|---|---|
| MATH | 104 | PRE-CALCULUS MATH I | A- | 3.0 | 3.0 | 11.1 | |
| ENG | 103 | FRESHMAN RHETORIC | A | 3.0 | 3.0 | 12.0 | |
| | | **TERM TOTALS** | 58 | 6.0 | 6.0 | 23.1 | |
| | | **CHAPMAN TOTALS** | 58 | 23.0 | 23.0 | 90.2 | 3.700 |
| | | | | | | | 3.922 |

**Term VI-89** 09/11/89 - 12/15/89

| Disc. | Crse. No. | Course Title | Grade | Hrs. Attempt. | Hrs. Earned | Grade Points | GPA |
|---|---|---|---|---|---|---|---|
| ENG | 104 | WRITING ABOUT LITERATURE | A | 3.0 | 3.0 | 12.0 | |
| REL | 209 | INTRO TO PHIL OF RELIGION | A | 3.0 | 3.0 | 12.0 | |
| | | **TERM TOTALS** | 58 | 6.0 | 6.0 | 24.0 | 4.000 |
| | | **CHAPMAN TOTALS** | 58 | 29.0 | 29.0 | 114.2 | 3.938 |

**Term I-90** 01/22/90 - 04/28/90

| Disc. | Crse. No. | Course Title | Grade | Hrs. Attempt. | Hrs. Earned | Grade Points | GPA |
|---|---|---|---|---|---|---|---|
| BIOL | 229 | HUMAN BIOLOGY | A | 3.0 | 3.0 | 12.0 | |
| ECON | 200 | PRIN OF MICROECONOMICS | B | 3.0 | 3.0 | 9.0 | |
| | | **TERM TOTALS** | 58 | 6.0 | 6.0 | 21.0 | |
| | | **CHAPMAN TOTALS** | 58 | 32.1 | | 146.3 | 3.567 |
| | | | | | | | 3.850 |

**Term V-90** 05/21/90 - 08/25/90

| Disc. | Crse. No. | Course Title | Grade | Hrs. Attempt. | Hrs. Earned | Grade Points | GPA |
|---|---|---|---|---|---|---|---|
| ART | 101 | INTRODUCTION TO ART | A- | 3.0 | 3.0 | 11.1 | |
| REL | 104 | INTRO TO ETHICS | A | 3.0 | 3.0 | 12.0 | |
| | | **TERM TOTALS** | 58 | 6.0 | 6.0 | 23.1 | |
| | | **CHAPMAN TOTALS** | 58 | 20.1 | 20.1 | 170.3 | 3.767 |
| | | | | | | 9.9 | 3.922 |

**Term VI-90** 09/10/90 - 12/14/90

| Disc. | Crse. No. | Course Title | Grade | Hrs. Attempt. | Hrs. Earned | Grade Points | GPA |
|---|---|---|---|---|---|---|---|
| ACTG | 210 | PRIN OF ACCOUNTING I | B+ | 3.0 | 3.0 | 9.9 | |
| HIST | 231 | HISTORY UNITED STATES | A | 3.0 | 3.0 | 12.0 | |
| MGSC | 208 | MATH ANALYSIS BUSINESS | A | 3.0 | 3.0 | 12.0 | |
| REL | 345 | MORAL ISSUES TODAY | G | 3.0 | 3.0 | 12.0 | |
| | | **TERM TOTALS** | 58 | 12.0 | 12.0 | 45.9 | 3.767 |
| | | **CHAPMAN TOTALS** | | 53.0 | 53.0 | 204.2 | 3.853 |

---

**Term I-91** 01/21/91 - 04/26/91

| Disc. | Crse. No. | Course Title | Grade | Hrs. Attempt. | Hrs. Earned | Grade Points | GPA |
|---|---|---|---|---|---|---|---|
| ACTG | 211 | PRIN OF ACCOUNTING II | B | 3.0 | 3.0 | 9.0 | |
| MGSC | 309 | INTRO BUS STATISTICS | A- | 3.0 | 3.0 | 11.1 | |
| | | **TERM TOTALS** | 58 | 6.0 | 6.0 | 20.1 | 3.350 |
| | | **CHAPMAN TOTALS** | | 59.0 | 59.0 | 224.3 | 3.802 |

**Term V-91** 05/20/91 - 08/23/91

| Disc. | Crse. No. | Course Title | Grade | Hrs. Attempt. | Hrs. Earned | Grade Points | GPA |
|---|---|---|---|---|---|---|---|
| ACTG | 322 | Managerial Accounting | A | 3.0 | 3.0 | 12.0 | |
| MGMT | 316 | Principles of Management | B+ | 3.0 | 3.0 | 9.9 | |
| REL | 153 | Religion and Values | A- | 3.0 | 3.0 | 11.1 | |
| | | **TERM TOTALS** | 58 | 9.0 | 9.0 | 33.0 | 3.667 |
| | | **CHAPMAN TOTALS** | | 68.0 | 68.0 | 257.3 | 3.784 |

**Term VI-91** 07/16/91 - 12/20/91

| Disc. | Crse. No. | Course Title | Grade | Hrs. Attempt. | Hrs. Earned | Grade Points | GPA |
|---|---|---|---|---|---|---|---|
| ENG | 303 | Technical Writing | W | 3.0 | | | |
| SCI | 102 | History of the Earth | G | 3.0 | 3.0 | 12.0 | |
| | | **TERM TOTALS** | | 3.0 | 3.0 | 12.0 | 4.000 |
| | | **CHAPMAN TOTALS** | | 74.0 | 74.0 | 281.3 | 3.801 |
| | | **TRANSFER TOTALS** | | 24.0 | 24.0 | 87.0 | 3.625 |
| | | **OVERALL TOTALS** | | 98.0 | 98.0 | 368.3 | 3.758 |

```
***** END OF TRANSCRIPT TO DATE *****
Conferred January, 1992
Associate of Arts
```

*In accordance with the Family Rights and Privacy Act of 1974, this transcript must not be released to a third party without written authorization from the student.*

APR    9    1992

Sookia Knight
REGISTRAR

2



# State of California

## Certificate of Educational Achievement

*This is to certify that*

### Mark Fitch

has successfully completed a prescribed course in
Vocational Drafting with a grade of A+,
a total of 1732 hours and is therefore presented
this certificate.

*Supervisor of Education (A)*

*Supervisor of Vocational Services*

*Vocational Instructor*

Date 2-2-88

No. 1085.

3

# TRAINING CERTIFICATION

This certificate is awarded to

**MARK TITCH**

In Recognition of Completion
Forklift Operator Training Program

**STATE OF CALIFORNIA– INMATE DAY LABOR**

Signature ______________ Date 5/25/05

**OPERATOR'S IDENTIFICATION CARD**

| | | | | | |
|---|---|---|---|---|---|
| CARD NO | 276 | | | | |
| DATE ISSUED | 5/05/05 | | | | |
| DATE EXPIRES | 5/25/08 | | | | |
| NAME OF OPERATOR | MARK TITCH | | | | |
| SEX | DATE OF BIRTH | HAIR | EYES | HEIGHT | WEIGHT |
| M | 7/31/59 | BRN | BRN | 6'1" | 185 |

The holder of this card is authorized to operate vehicles and/or equipment Specified, subject to the restrictions set forth on the reverse side of this card.

EMPLOYER AUTHORIZED SIGNATURE — TITLE: USS

EMPLOYEE OF

STATE OF CALIFORNIA

NOT TRANSFERABLE

Card must be carried at all times when operating vehicles

SIGNATURE OF OPERATOR (Not valid until signed)

TITLE: FORKLIFT OPERATOR

4

# Certificate of Achievement

Awarded to:

## Mark Titch

For Successful Completion of Confined Space Awareness Training

Within the Facilities, Business & Management Division,

Eight hours,

This 19th day of October, 2001

Presented by

_Gil Wong, C.S.I_

; Day Labor and Professional Services Branch

5

**EXHIBIT 37**

Laudatory Memorandums and Chronos

State of California

Department of Corrections

# Memorandum

Date    :  January 23, 2006

To      :  To Whom It May Concern

Subject :  **LAUDATORY MEMORANDUM FOR I/M TITCH, B-89549, F1-04-227L**

This memorandum is in regards to the employment and skills of Inmate TITCH, B-89549, while assigned to Inmate/Ward Labor (I/WL), at Richard J. Donovan Correctional Facility.

Inmate TITCH was first hired by I/WL in July of 2000. At that time he was employed as a welder/pipe fitter for the Steamline and Heating Hot Water Projects. His work required skills in arc welding (SMAW), which was used in pipe fabrication. Additionally, Inmate TITCH worked on the Fire Alarm and Energy Efficiency Projects, the Plaza and Roadway Repavement Project, the Shower Pan Replacement Project, the Remodeling of Psych Services Unit Project, the Mental Health Building Project (Facility 4) and the Substance Abuse Treatment Building Project (AMITY/Facility3).

Throughout these projects, Inmate TITCH also learned to operate heavy equipment (Skiploader, Bobcat, Pettibone, & Forklift), and acquired his Forklift Operator's License. He also completed Confined Space Awareness Training.

It should also be noted that during Inmate TITCH's last year with I/WL, he worked as the Toolroom Clerk, a position of considerable trust, and was responsible for the control and inventory of all I/WL tools.

In view of Inmate TITCH's five years of employment with I/WL, we would like to commend him for his outstanding efforts, hard work, and professionalism. During this time, Inmate TITCH proved himself to be a reliable , quality-conscious worker and an asset to our program.

BRENT YOUNG
Utility Shop Supervisor
I/WL, RJD

Orig:  C-File
Cc:    CC-I
       Inmate
       R3 Files

CDC 1617 (3/89)

MARK TITCH, B-89549
FACILITY I, BLDG. #3, RM-215UP

To Whom it may concern:

This memorandum is in regards to the employment and skills of Inmate TITCH, B-89549, while in Inmate Day Labor (IDL) at R. J. Donovan Correctional Facility.

Inmate TITCH was first hired in IDL in July of 2000. At that time, he was employed as a welder / pipe fitter for the steamline and the heating hot water project. His work required skills in arc welding (SMAW) which were used in pipe fabrication. Inmate TITCH worked well in this area.

At present, Inmate TITCH is working as an apprentice elctrician for the fire alarm and energy efficiency projects. This work has required him to learn how to bend conduit, install transformers, louver motors, temperature sensors, and the wiring of such devices to existing air conditioning and heating units. Inmate TITCH has been very eager to learn these skills and is doing a great job as an apprentice.

I would like to commend Inmate TITCH for his efforts at IDL. Aside from learning valuable skills that will benefit him upon his return to society, he brings a strong work ethic and good attitude to the job site.

If you have any question or concerns regarding the above information, please feel free to contact me at (619) 661-6925, or at extension 7374.

BRENT LEE,
Construction Supervisor I
Inmate Day Labor (IDL) / RJDCF

cc: Board of Prison Terms
    Central file
    Inmate
    R3Files

2

**NAME and NUMBER**    TITCH, Mark    #B-89549    **ROOM NO:**    3207    CDC-128-B

Offset Printing is a highly technical field. Inmate TITCH, Mark, #B-89549, Rm. #3207, met the challenge and has developed into one of the "BEST" pressman in my area. With his vast knowledge of printing and pressmanship, "S" makes an excellent trainer and is currently the "Leadman" for the Offset Department, and his skills would be hard to replace. "S" could obtain employment with a starting salary of approximately $13-$14 per hour, and could advance to more than $25.0 per hour as he learns larger and multi-color presses. For these reasons it is requested that "S" be retained at CMC as he is already on the CMC Permanent Work Crew.

Orig:    C-File
cc:    CCI                  W.J. Randall, Superintendent II
      Classification Committee        PIA Specialty Print Plant
      Factory File
      Inmate

**DATE**   07-24-96          **REQUESTED CMC RETAINMENT**          **CMC-East**

NAME and NUMBER    TITCH, MARK    B-89549    RM. #3232    CDC-128-B (Rev. 4/74)

We at Prison Industry Authority have been notified that inmate TITCH is coming up for Classification and possible transfer. TITCH has been assigned to PIA since 23 August 1989 as a Offset Press Operator. He makes ready and operates the printing press to print single and multi-color copy from lithographic subtractive plates, and silver paper plates, examining the job order to determine press operating time, quantity to be printed, ink and stock to be used, the number of impressions needed, and other specifications. During operation of the press he makes minor adjustments and repairs. TITCH helps the supervisor in training personnel in press operation, bindery operation, pre-press & camera operation, and maintains preventative maintenance on this valuable piece of equipment. Since the skills required to operate a printing press takes years to master, and inmates with the prerequisite skills are so short in supply, TITCH is needed as part of a team effort to perform and streamline production in the PIA Print Plant. For the above reasons, we respectfully request that TITCH be retained at CMC East, or in the alternative, that he be permitted to remain at CMC East for the 4 to 6 months it would be necessary to give a semblance of training to a replacement inmate worker. Thank you.

cc: AWC File, B-Quad PA, PIA File, Factory File, Inmate      W.J. Randall, Superintendent
                                            PIA Specialty Print Plant
DATE 6-24-92      ( INFORMATIVE - REQUEST TO RETAIN AT CMC EAST )      GENERAL CHRONO

3

NAME and NUMBER     **Titch, M.**          B-89549          Room 3308     **CMC-E**     CDC-128-B (Rev. 4/74)

**During my tenure as Supervisor of Vocational Education, I supervised inmate Titch for roughly a year and an half.  Within this time he has proven himself to be an exceptionally skilled clerk.  He is a consistently hard worker, self-directed, able to handle many responsibilities, relates well with staff and other inmates, and needs only minimum supervision.  It should also be noted that his assignment as Procurement Clerk is a sensitive position and can be occupied only by inmates who have demonstrated trustworthiness.  I was very satisfied with inmate Titch's performance and believe he will continue to do well in the future.**

cc: **C-FILE**
     **C. VARELA**
     **INMATE**

C. Varela
Community Resources Manager
California Mens Colony

DATE  **12-9-85**          **(LAUDATORY CHRONO)**                              GENERAL CHRON

---

NAME and NUMBER     **Titch, M.**     B-89549     RM-3308     **CMC-E**     CDC-128-B (Rev. 4/74)

"S" is lead procurement clerk for the Vocational Administration Office.  His responsibilities include procuring needed supplies and equipment for 18 vocational shops; keeping an accurate, up-to-date account of the vocational budget; performing monthly audits and other end-of-the-month reports; managing office supplies to be delegated to each vocational program; maintaining procurement and accounting files; and training other inmates to perform the various clerical positions in the office.  In the two years I have known "S" and the four months I have supervised him, he has performed these responsibilities exceptionally well.  "S" also relates well with other staff members, follows directives, conducts himself in a mature manner, and presents no management problems.  "S" has been (and continues to be) a very capable clerk and I look forward to working with him in the future.

     : C-File
     Writer                    CENTRAL FILE.
     Ed. File
DATE Inmate  12/12/85     (LAUDATORY CHRONO)

L. Sargent, Supervisor
Vocational Education/3rd Watch
GENERAL CHRONO

4

NAME and NUMBER  **TITCH, Mark**        **B-89549**        **RM-3232**        **CMC-EAST**    CDC-128-B (Rev. 4/74)

**Mark Titch has been under my direct supervision for a one (1) year period. During this time he has done an outstanding job as the Vocational Education Procurement Clerk. He relates well with staff and free persons, as well as with his fellow inmate workers. On some occasions he has filled in for other inmate clerks, while still performing his own duties. I have observed that "S" is a very stable individual who puts forth a very professional attitude. I strongly recommend that his exemplary performance be considered by the Board of Prison Terms which they may bestow upon him.**

**ORIG.: C-File**
    **cc: Educ. File**
        **Quad File**
        **Inmate**
        **file**

                          **D. W. BOWLIN, Supervisor**
                          **Vocational Instruction**

DATE  **November 3, 1988**    **(LAUDATORY CHRONO)**                    GENERAL CHRONO

---

                          -L A U D A T O R Y-
NAME and NUMBER  TITCH, MARK            B-89549            Rm. 4135X        CDC-128-B (Rev. 4/74)

This chrono is written in commendation of inmate Mark Titch, B-89549, Procurement clerk, CMC Vocational office, East Facility. Inmate Titch has consistently displayed outstanding work performance. He maintains a positive attitude under heavy work loads, tight time constraints, and multiple requests by various vocational instructors and supervising personnel. Mr. Titch often works after hours to ensure necessary work is completed. He carefully researches ordering information to keep all Form 5's accurate and minimize processing delays. He is an exemplary worker, and his conscientious efforts are gratefully appreciated by the Education Department staff.

cc:  C-File
     Education file
     AWC file
     Inmate

                          JAMES F. ACORD
                          Supervisor of Vocational Instruction - CMC

DATE  JUNE 20, 1986                                    GENERAL CHRONO Ⓧ
                -L A U D A T O R Y-

5

rykes

NAME and NUMBER     TITCH, Mark     B-89549     Room: 3232     CDC-128-B

On ___Dec. 18, 1988___ I received a copy of the ~~Psychiatric~~ and/or Psychological Evaluation prepared for the Board of Prison Terms by ___Dr. Davis___ . I understand if I have any q  tions about this report I can contact ___above___ for further explanation.

_Mark W. ___

Inmate Signature

_____ SMITH

Staff Witness

Original: C-File
    cc: HEALTH RECORD

DATE 12-18-88jag

**RECEIPT OF PSYCH EVALUATION**
**FOR THE BOARD**          **CMC-EAST**          **GENERAL CHRONO**

---

NAME and NUMBER     TITCH, M.     B-89549     RM-3232     CMC-EAST     CDC-128-B (Rev. 4/74)

Inmate Titch, B-89549, RM-3232, is assigned as Procurement Clerk in the Vocational Administration Office. I have supervised him since May of 1987. During this time I have observed him to be a very conscientious, responsible, and reliable worker. He takes pride in his work and often goes beyond the range of his normal duties. He gets along well with other inmate workers and free staff, and sets a good example for others. "S" is an asset to our office.

_Kathleen Hanson_

KATHLEEN HANSON
OAII (T)

ORIG:  C-File
    cc:  Educ. File
         Psych File
         Inmate
         file

DATE  November 16, 1988          (LAUDATORY)          GENERAL CHRONO

---

NAME and NUMBER     TITCH, M.,     B-89549     #3308     CDC-128-B (Rev. 4/74)

As a new Instructor at CMC-East and limited in the procurement procedures for the Institution, I was assisted by inmate Titch in procuring all the spare parts and equipment needed to get my program off the ground. Without his diligent help and knowledge of the system, it would have been a very difficult time incorporating the class to Institutional standards. He has assisted me, as well as the other Instructors whenever asked to do so. It is refreshing to work with a person with such a professional attitude and abilities as inmate Titch display's.

I feel his knowledge and expertise in the procurement and administrative area would compliment his abilities in any employment endeavors he may seek. It is obvious by his willingness to seek ways to improve his knowledge, that his standards and goals in life will be high. Keep up the good work...

ORIG:  C-File ✓
    cc:  Education File
         Psych. File
         Quad Office
         Inmate

DATE     11-8-88     (LAUDATORY CHRONO)

_Dewey Beck_

DEWEY L. BECK, INSTRUCTOR
VOC. SEWING MACHINE REPAIR
CMC-EAST

GENERAL CHRONO  6

**EXHIBIT 38**

Resume of Employment Skills

(Job Queries and Information)

# MARK W. TITCH

## RESUME OF EMPLOYMENT SKILLS

**EDUCATION:**

- Associate of Arts Degree
- Completed 139 units towards B. S. in Business Administration
- Vocational Drafting:
     Machine Drafting, X/Y coordinates, geometric tolerances,
     Computer Assisted Drafting (CAD)

**EXPERIENCE:**

**Welder/Pipe Fitter:** 3 years experience
- Wire-feed and shielded metal arc welding (SMAW)
- Structural or pipe welding
- Torch and plasma cutting

**Commercial Construction:** 5 ½ years experience
- Site preparation, surveying, slab development, concrete finishing, metal-stud framing, drywall, flooring, roofing, insulation, interior/exterior hardware, conduit, and duct installation
- Heavy equipment operator
- Licensed forklift operator
- Certified for working safely in confined spaces
- Acquired working knowledge of:
     Material Safety Data Sheets (MSDS)
     OSHA safe work practices
     Handling/Disposal of hazardous materials
     Fire safety

**Press Operator/Mechanic:** 9 years experience
- Operated single and multicolor sheet-fed presses
- Worked as part-time press mechanic
- Specialized in specialty inks and papers
- Knowledgeable in all aspects of printing
     (Bindery, cutting, collating, folding, etc.)

**Procurement Clerk:** 5 years experience
- Data Base Networking
- Bookkeeping and Accounting Procedures
- "Contract" and "out to bid" orders

Mark W. Titch
B-89549, Fl-04-227L
P.O. Box 799001
San Diego, Ca    92179-9001


Monday, February 20, 2006


Dear Human Resources Manager:

I am an inmate at the Richard J. Donovan Correctional Facility.  I'm sending
this job query and resume to inquire whether your company would be willing to
hire me, given my background and qualifications.

At present, I'm not sure when I'll be released from prison because I have to
appear before a parole board which may or may not grant parole.  I'm scheduled
to appear before the board again either in the middle or latter part of this
year.  In the event that I'm granted parole, I'm interested in working as a
welder/pipe fitter and wanted to know if your company would be willing to hire
me.

I originally came to prison for robbery-murder over 29 years ago, when I was
17-years-old.  All of my education, vocational training, and work experience
has been acquired during my incarceration.  I hope you don't form the wrong
impression of me because, in many ways, I'm not what you might expect.  Basically,
I was just a dumb kid who made some terrible decisions which I now regret.  I
don't intend to make these same mistakes again because, in addition to having
matured into a wiser, better person, my life today is directed in a more
positive direction.  If I'm fortunate enough to meet and talk with you in
person, I believe this will be readily apparent to you.

As I've stated, I would like to apply for a position as a welder/pipe fitter.
Although I'm not certified, I'm capable of doing both stick and wire-feed
welding (structural or pipe).  I worked for over five (5) years on the prison
construction crew here at Donovan, the most significant work consisting of
upgrading the heat and hot water lines (some of this work included threaded
pipe fabrication); construction of a mental health building (with 16 offices,
2 conference rooms, staff and inmate bathrooms, fire alarm system, heating and
air conditioning, electrical, plumbing, etc..); and construction of a substance
abuse treatment building (with 8 offices, 6 group therapy rooms, staff and
inmate bathrooms, etc..).  Throughout most of this work, I was required to do
a variety of different types of welding, especially in metal fabrication.

An additional benefit is my previous experience of working in an industrial
setting.  From 1989 to 1998 I worked in a print shop for the Prison Industry
Authority (PIA) while at a prison in San Luis Obispo.  Like most other industries,
PIA required training in OSHA safe work practices, the use of Material Safety

2

Mark Titch/Job Query                                    Page 2

Data Sheets (MSDS), fire safety, and the labeling, handling, and disposal of
volatile or hazardous materials.  I also received similar training while
working in construction here at Donovan, except there was more emphasis on
working safely with heavy equipment, around high voltage, and in confined
spaces.

As I trust my background and qualifications demonstrate, I possess the skills
and experience to be a valuable and productive employee for your company.
More importantly, with the additional training that your company provides and
my strong desire to learn and excel, I'm confident that over time I would
become an asset to your organization.

Should you feel that your company would like to hire me, I would be grateful
if you could send me a short reply letter expressing your interest.  Also, I
would like you to provide me with a general idea of what a welder/pipe fitter
earns as a starting salary and, assuming he acquires additional training,
certification, and experience, what he might earn after a year or two.

In closing, I thank you for taking the time to read and consider my job query,
resume, and attachments and hope I hear from you soon.

Sincerely,


Mark W. Titch




cc:  LC/mt

Attachments:  (15)

3

Case 3:08-cv-00634-J-WMC     Document 1-3     Filed 04/10/2008     Page 141 of 155

# Employment Opportunities

*2798 Harbor Dr.*
*San Diego CA 92113*

## NASSCO Needs You

NASSCO's employees are the single most important asset for our growth and prosperity. We need competent, industrious, dependable people. As one of the largest industrial employers in San Diego, NASSCO is committed to equal employment opportunities, as evidenced by our diverse workforce.

## Health and Safety

Employee safety is a value at NASSCO. We are committed to a safe workplace for all, through our behavior, environment and processes. All employees receive an in-depth safety orientation and safety topics are reinforced in daily meetings by supervisors and fellow workers.



Interested in a Career at NASSCO?
[VIEW VIDEO]

## Training

We are committed to ensuring all employees are properly trained for their jobs. We continually make training available to those seeking new skills for their betterment and advancement within the organization. Training programs are available for technical trades, engineering and manufacturing skills as well as leadership, quality and personal development. NASSCO encourages continuous learning by all employees and offers a tuition reimbursement program to assist with accredited school expenses.

## Benefits Beyond Salary

NASSCO job opportunities have substantial benefit packages including group life and health insurance, group dental, an average of ten paid holidays annually, one to four weeks of vacation depending on length of service, and a 401(k) Savings Plan. All NASSCO employees are eligible to join the USA Federal Credit Union and take advantage of a variety of products and services. For details, call 1-800-220-1872.

For detailed information regarding benefits, please follow these links:

- Hourly Employee Benefits — *see attached* —
- Salaried Employee Benefits

*01/31/06*

**NASSCO gets cargo ship order**

The Naval Sea Systems Command has awarded a $317 million contract to National Steel and Shipbuilding Co. to build a dry cargo and ammunition cargo ship. The option represents the ninth ship in the T-AKE class of Navy cargo ships to be built by NASSCO. Construction of the latest ship also will be done in San Diego, and the work is expected to be completed by May 2009.

# Employment Opportunities

**NASSCO BENEFITS**
**Hourly Employees**
**As of 1-1-2006**

## HEALTH CARE

A variety of medical and dental options are available to cover the majority of your health care needs and to provide you and your eligible dependents with coverage for extraordinary expenses.

- When Coverage Begins
  - Newly Hired or Rehired Employees
    Coverage for you and your eligible dependents begins on the first day of the month following 30 days of employment.
  - Recalled Employees
    Coverage for you and your eligible dependents begins on the first day of the month following your date of re-employment.
- Annual Enrollment
  If you are enrolled in one of the medical/dental plans NASSCO offers, you may change to one of the other medical/dental plans during the annual enrollment period, which is two weeks in November each year. Once you change your medical or dental plan or both to another medical/dental plan, your new coverage becomes effective the following January.
- New Dependents
  To have coverage from the time you acquire a new dependent, you must enroll him or her within 31 days following the date you acquire the new dependent. Coverage becomes effective on the date of the qualifying event. If you fail to enroll the dependent during the 31-day period, you may enroll them during annual enrollment (November), in which case coverage becomes effective the following January.
- Health Plans Currently Available
  Currently, NASSCO offers its hourly employees the following health plans:
  - Kaiser Medical Plans
  - PacificCare Medical Plan
  - SIMNSA Medical Plan
  - DeltaCare PMI Base Dental Plan
  - Delta Dental Buy-up Plan
  - Liberty Dental Plans – Base or Buy-up Plan

## INCOME PROTECTION & SURVIVOR BENEFITS

- Life Insurance
  - Basic life insurance is $25,000
- Accidental Death and Dismemberment
  - Coverage is for an additional $25,000
- Temporary Disability Insurance (TDI)
  - Short-term disability benefits of $125 per week for non-industrial illness or injury.
  - Benefits start on the 8th day of a non-industrial illness or injury or 1st day of hospitalization.
  - Benefits paid for a maximum of 39 weeks.

5

- California State Disability Insurance (SDI)
  - Benefits start on the 8th day of a non-industrial illness or injury.
  - Benefits paid for a maximum of 1 year.

## FINANCIAL PROGRAMS

- 401(k)
  - You can enroll in the Plan at anytime following your hire date.
  - Eligible participants can defer from 1 to 15% (level of contribution percentage may be subject to Internal Revenue Service limitations) on a pre-tax basis.
  - 6 fund choices:
    - Fixed Income
    - Bond Index
    - Balanced
    - S&P 500 Index
    - Small Cap Index
    - General Dynamics Stock Fund
- Pension Plan
  - Upon retirement the NASSCO Pension Plan, paid entirely by company contributions, provides eligible participants monthly income for the rest of their life. Participants vest in this benefit after only 5 years of service. Currently, the following benefit options are available:
    - Guaranteed Period Payments: 3 years
    - 50% Joint and Survivor
    - 100% Joint and Survivor
  - Early Retirement – age 55 with 10 or more years of service.
  - Disability Retirement – totally disabled with at least 10 years of service and receiving Social Security Disability benefits
  - Normal Retirement age is 62
- Flexible Benefit Plan (Section 125 Plan)
  - Employees can use pre-tax dollars for:
    - Group Insurance Premiums
    - Unreimbursed Medical Expenses
    - Dependent Care Costs

The above is intended to represent a summary of NASSCO benefits. Should there be conflict between this information and that appearing in plan documents or summary plan descriptions, provisions in the plans will apply. NASSCO may alter or discontinue these benefits at any time, with or without notice.

_____

© Copyright and Privacy Notice 2006 NASSCO/General Dynamics Corporation, All Rights Reserved

6

 **Employment Development Department**

**State of California**



**Jim Sanders**
Ex-Offender Specialist
Job Developer

Department of Corrections
Parole and Community Services Division
3502 Kurtz Street
San Diego, CA   92110
www.edd.ca.gov

(619) 718-7800
Ext. 228
Fax (619) 718-7888

7

Please click here to return to the previous page.

## Employment Development Department

# Job Seekers

EDD HomePage
About EDD

**Services For:**
Employers
Job Seekers
People With Disabilities
Senior Workers
Veterans
Workforce Community
Youth

**How to:**
File a Claim
  Disability Insurance
  Paid Family Leave
  Unemployment Insurance
Fill a Job / Find a Job
Get Data
  Labor Market Information
Get Tax Info
Get Training
  Businesses
  Individuals

**General Information**
Careers With EDD
Department Directory
Equal Opportunity Notice
FAQs
Forms & Publications
News Releases
Programs & Services
Proposed EDD
Regulations
Related Sites
Report Fraud
Subscribe
Taxpayer Advocate

**How prepared are you for the job market? The EDD can help you explore career options, get job ready, prepare applications and resumes, and improve your interview skills.**

## Programs and Services

Explore Career Options
Find a Job
Get Job Ready
- Prepare a Job Application
- Create Your Resume
- Attend a Workshop
- Upgrade Your Skills
- Improve Your Interview Skills
- Join a Job Club
Improve Your Chances of Being Hired
Lost Your Job?
Job Service Employment Assistance Programs and Services
Where to Get Help

## Explore Career Options

Labor Market Information
**The EDD is your best source for labor market and occupational trends vital to planning your future. Labor market information can help answer questions like:**

- What jobs will be in demand in the future?
- What kinds of businesses hire the job that I'm looking for?
- What jobs use the skills I have now?
- How much does this job pay?
- What benefits are employers providing?
- I need a license/certificate. Where do I get one?
- Where can I get training to get a better job?

Career Voyages
**Brighter future... better pay... good jobs. Start here to plan your road trip to career success. Find out about high-growth industries, hot careers, emerging fields, and more - for students,**

**Top Links**
- America's Job Bank
- CalJOBS$^{SM}$
- Experience Unlimited
- Job Fairs/Events
- Job Search Workshops
- WorkSmart

**Featured Items**
- Career Voyages
- Interested in a Health Care Career? (PDF)
- Put Your Experience to Work (PDF)
- LaborMarketInfo Career Center

career changers, parents, and teachers. (U.S. Department of Labor/U.S. Department of Education)

**Find a job**

- What is CalJOBS<sup>SM</sup> and how to use it
- View California job listings on CalJOBS<sup>SM</sup> and build your on-line resume
- What is America's Job Bank (AJB) and how to use it
- View nationwide job listings on AJB and build your on-line resume
- How EDD can help you find a job

**Get Job Ready**

- **Prepare a Job Application**
  - Tips for filling out applications
  - CalJOBS<sup>SM</sup> – Apply for job openings on-line
- **Create Your Resume**
  - Tips for successful resumes – An important tool for your job search.
  - Post your resume – With CalJOBS<sup>SM</sup>, you will have 24-hour exposure to thousands of employers, the flexibility to change your resume anytime, and the ability to send your resume directly to employers.
  - View articles and tips America's Career InfoNet
- **Attend a Workshop**
  - Job Search Workshops – Attend a job search training session in your area.
  - Job Fair – Find out when the next job fair or event is coming to your area.
  - Road to Self-Sufficiency – A workshop designed to help public assistance recipients develop lifetime job search techniques.
  - Contact your nearest Job Service Office or One-Stop Career Center for more information on additional workshops.
- **Upgrade Your Skills**
  - Where can I get training to get a new or better job?
  - I need a license/certificate. Where do I get one?
- **Improve Your Interview Skills**

Case 3:08-cv-00654-J-WMC    Document 1-3    Filed 04/10/2008    Page 147 of 155

- Interview tips on what to wear, researching the employer, questions the employer may ask, and questions you might ask the employer
- View articles and tips America's Career InfoNet
- **Join a Job Club**
  - Are you a professional worker who is out of a job? Many professional, managerial, and technical workers who have unexpectedly found themselves out of work are now working together - helping each other find new employment opportunities through Experience Unlimited "job clubs" sponsored by EDD. Attend workshops, network with your peers, and receive job search assistance
  - View articles and tips America's Career InfoNet

## Improve Your Chances of Being Hired

If you are in one of the "target groups," an employer who hires you can receive a federal tax credit of up to $8,500. The Work Opportunity Tax Credit gives the employer an incentive to hire you for the job.

Having trouble finding work without bonding? You might qualify for bonding services, which could give the employer an incentive to hire you. Contact your nearest Job Service Office for more information.

## Lost Your Job?

Did you lose your job as part of a plant closing or large layoff? You might be eligible for dislocated worker services.

Find out if you are eligible for Unemployment Insurance.

Did you lose your job to foreign competition? You might qualify for Trade Adjustment Assistance.

## Job Service Employment Assistance Programs and Services

Job Service employment assistance programs and services are available to help individuals experiencing difficulty in finding work, including:

- Dislocated workers
- Ex-offenders

- High school drop-outs
- Migrant and seasonal farmworkers
- Non-English speaking
- People with disabilities
- Public assistance recipients
- Senior workers
- Welfare recipients
- Youth
- And more

**Where to Get Help**

Job Service Offices – Find out how EDD can help you find a job and how to apply for EDD services.

One-Stop Career Centers – "One-stop shops" for all of your employment and training needs. Most centers offer:

- Job search assistance
- Job listings
- Access to phones, Internet, printers, fax machines, copy machines
- Workshops
- Information on wages and trends
- Community resources
- Referrals to other services
- And more

**Other Resources**
America's Career InfoNet
Employers
People With Disabilities
Senior Workers
Veterans
Youth

---

**EDD HomePage | Top of Page | Contact Us**
The Employment Development Department is an equal opportunity employer/program. Auxiliary aids and services are available upon request to individuals with disabilities.

Please click here to return to the previous page.

4/13/2006





## employment



# LABOR READY
*Dependable Temporary Labor*

- ABOUT US
- NEWS
- INVESTORS
- CUSTOMERS
- SERVICES
- DIVISIONS
- EMPLOYMENT

➡ Field & Corporate Careers
➡ Temporary Employment
➡ Benefits
➡ Frequently Asked Questions



# Employment Oppor

## HELP US PUT PEOPLE TO WORK!

Welcome to Labor Ready's Career Opportunities page. Labor Ready offers full- and part-time employment in our field operations throughout the United States, Canada Puerto Rico and the United Kingdom, as well as corporate positions in our headquarters in Tacoma, Washington.



Field and Corporate Career Opportunities

Temporary Employment

home | site map | terms & conditions | privacy policy  ⊛ BRANCH LOCATOR ➡  ⊞ CONTAC



**1. EL CAJON 800-245-2267**
1027 BROADWAY
EL CAJON, CA  92021
**Branch Number:** 1512
**Phone:** 619-444-7877
**Fax:** 619-444-8055
**Email Address:** 1512-Br@LaborReady.com
**Distance:** 1.41 miles

**2. NORTHPARK(619) 276-7364**
2884 UNIVERSITY AVE
SAN DIEGO, CA  92104-
**Branch Number:** 1535
**Phone:** 619-276-7364
**Fax:** 619-276-5731
**Email Address:** 1535-Br@LaborReady.com
**Distance:** 11.00 miles

**3. SAN DIEGO AIRPORT**
1021 W. MAPLE ST.
SAN DIEGO, CA  92101
**Branch Number:** 1558
**Phone:** 619-696-9675
**Fax:** 619-696-9394
**Email Address:** 1558-Br@LaborReady.com
**Distance:** 13.55 miles

**4. CLAIREMONT MESA**
4688 CLAIREMONT MESA BLVD
SAN DIEGO, CA  92117
**Branch Number:** 1595
**Phone:** 858-273-6082
**Fax:** 858-273-6040
**Email Address:** 1595-Br@LaborReady.com
**Distance:** 14.40 miles

**5. CHULA VISTA**
1105 BROADWAY 210
CHULA VISTA, CA  91911
**Branch Number:** 1521
**Phone:** 619-425-0295
**Fax:** 619-425-0094
**Email Address:** 1521-Br@LaborReady.com
**Distance:** 14.48 miles

OFFICE LOCATOR FOR: LABOR READY, TEMPORARY EMPLOYMENT OPPORTUNITIES.

Manpower Inc.

What do you do?



Manpower



Job Seekers

Employers

About Manpower

## Welcome to Manpo

We lead in the creation and d
services that enable our clien
in the changing world of work

**Manpower Employment
Survey for 2nd Quarter
Rock Solid Hiring Plans
Employers**

**Manpower Survey Find:
U.S. Employees Recons
Options Due to Rising F**

in the Press Room

© 2006 Manpower Inc.  All Rights  Reserved.  **Terms of Use**  |  **Privacy**

http://www.us.manpower.com/uscom/index.jsp

3/26/2006

14

Office Locator



Manpower

**Office Locator Results**

Your search returned
3 offices.

<< back 1 | 1 next >>

**San Diego, CA**

**Manpower**
2225 Camino Del Rio South Suite E
San Diego, CA 92108

Phone:     619-293-3606
Fax:       619-293-7236
Email:     SanDiego.CA-MissionValley@na.manpower.com

**San Diego, CA**

**Manpower Professional**
7094 Miratech Drive, Suite 100
San Diego, CA 92121

Phone:     858-566-1322
Fax:       858-635-5515
Email:     SanDiego.CA-Professional@na.manpower.com
Website:   http://www.manpowerprofessional.com/sandiego

**San Diego, CA**

**Manpower**
7094 Miratech Drive, Suite 100
San Diego, CA 92121

Phone:     858-635-5835
Fax:       858-635-5825
Email:     SanDiego.CA-Miramar@na.manpower.com

<< back 1 | 1 next >>

© 2006 Manpower Inc. All Rights Reserved. Terms of Use | Privacy

OFFICE LOCATOR FOR: **MANPOWER**, EMPLOYMENT OPPORTUNITIES.

15

# Michael Kinsman

# Adjusting isn't easy, but ex-offenders

## offer key job skills



After spending 18 years behind bars on a second-degree murder conviction, Tim Smith was released from prison in January and counts himself lucky these days.

"I had a home, family and job waiting for me when I was released," said Smith, now living outside the Bay Area. "I couldn't have made it without all that."

State prison officials know all too well how difficult it is for former inmates to adjust to the outside world. Sixty percent of released inmates in California return to prison within five years.

But no time is more crucial than the first 48 hours they are free.

"Transition can be very difficult," says Matt Powers, general manager of the Prison Industry Authority, which provides job training and jobs to prisoners while they are behind bars. "You have to get them working or else they'll be right back in jail."

PIA, which runs factories staffed by inmates at 22 state prisons, is asking San Diego employers to step up and give ex-offenders jobs when they leave prison. PIA is a self-funded program that sells products made inside the prison walls.

In an experimental program, PIA works with San Diego employers to jump-start the hiring of former prisoners, who it says have job skills sought in the outside world.

"We don't want them back in prison," Powers says. "These are people who have skills, work experience and are highly motivated. We think they have a lot to offer the community."

Woody Breece, hiring manager at National Steel & Shipbuilding Co., says about 20 percent of the shipyard's 4,200 blue-collar workers have some sort of criminal conviction in their past.

"This is just the population we work with," Breece said. "We have a lot of turnover, so we're always looking for good workers. As long as the people we hire obey our rules and do good work, there are no problems."

NASSCO is one of the employers PIA hopes will begin hiring some of the 600 inmates from its program who enter the outside world each year. PIA is holding an employers forum Oct. 20 in San Diego and expects 150 companies to participate.

Smith was one of the 6,000 inmates working at a PIA job. He learned electrical engineering, eventually working with an outside contractor on a job at Solano State Prison.

"I was lucky because the contractor said he would give me a job if I ever got out, based on how I had worked for him," Smith says. "I could get a job making a lot more money, but this guy took a chance on me and I want to show him how I appreciate his trust."

PIA offers job-skill certification programs in fields such as welding, woodworking, optical manufacturing, dairy pasteurization, machining and electronics.

---

Another San Diego company, Second Chance/Strive, has been working to find jobs for former prisoners for five years.

But Scott Silverman, the chief executive of the company, says it takes more than just a job to help inmates adjust to the outside world.

"Take someone who has been in prison five or six years," he says. "That's a long gap in your employment history, and it's hard to gloss over that. Add to that you may not have had good job-seeking skills or good work performance in the past and that creates a problem."

His Second Chance program assesses prisoners while they are still behind bars, escorts them from prison the day they are released, provides housing and transportation for 60 days, enrolls them in a class to help them learn job-search and interviewing skills, and then counsels them for the next two years.

"You've got to do that," Silverman says. "Otherwise, these transitions are very difficult."

He estimates that two-thirds of employers won't even consider hiring ex-offenders.

"In the post 9/11 world, security concerns have made it even harder for ex-offenders," he says. "But we believe we have people who can be good, productive workers in the right environment."

Second Chance's prison re-entry program handles nearly 200 prisoners a year, but Silverman says there is a larger population of former inmates who need assistance.

Powers says his goal is to make an immediate impact, cutting recidivism by 5 to 10 percent.

For him to do that, he says, employers need to keep an open mind and hire ex-offenders when their job skills meet hiring needs.

**Michael Kinsman:** (619) 293-1370;
michael.kinsman@uniontrib.com

---

*E 11/10 2005 SDUT*

## San Diego ministry gets grant

Metro United Methodist Urban Ministry in San Diego was one of 30 groups to receive funding from the U.S. Labor Department to help ex-convicts find jobs upon their release from prison and smooth their transition into society.

The ministry received $665,935 and expects to have its program running in the next 90 days, according to executive director John Hughes. Grant funds will be used for job training, job placement and education, he said. A total of 5 organizations applied for the grants. The ministry is the social service arm of 48 Methodist churches in San Diego and Imperial counties.

16

# Work Opportunity Tax Credit

## A Helping Hand — for employers and employees

by Judith B. Gerber

**I**f you are a business owner looking for a tax credit, and wouldn't mind helping someone gain job training in the process, there is a federally-funded program that might be just what you are looking for. The program is called the Work Opportunity Tax Credit Program, known as the WOTC. The program was created for two reasons: 1) To promote the hiring of individuals who qualify as a member of a target group; and 2) To provide a federal tax credit to employers who hire these individuals.

**Tax Credit**

In short, through the WOTC, employers can earn an income tax credit for hiring certain categories of workers who lack the experience necessary to get a job or who are in need of job training. Employers who hire such individuals are eligible for a federal tax credit incentive of up to $8,500. In addition, the employer can hire whomever they like, using any resources they might have available or have previously used. There is no government agency dictating where you hire potential employees from.

Administered in California by the state Employment Development Department, the program was initially created under the Small Business Protection Act of 1996 and actually has two parts: the Work Opportunity Tax Credit Program and the Welfare-to-Work Tax Credit Program. It was augmented by the Taxpayer Relief Act of 1997, which extended the WOTC and also created the Welfare-to-Work Tax Credit. The Work Opportunity Credit has been extended through June 30, 1999. The Welfare-to-Work Tax Credit portion of the WOTC goes through April 30, 1999.

Exactly how can you benefit from WOTC? When you hire an individual who meets the criteria for this program, you may be able to claim federal tax credits against wages paid to that employee. Specifically, you may earn the tax credit if the employee is a member of a designated target group and meets the specific requirements for that group.

**Requirements**

There are a couple of things you should know about the program up front. The first is that the new hire must work a minimum number of days or hours of paid employment before tax credit eligibility can be claimed. The second thing to remember is that the applicant must be a first-time employee of the company.

The most important qualification is that the potential employee belong to one of the following nine target groups:

A. Qualified recipients of Aid to Families with Dependent Children (AFDC).

B. Qualified veterans who are receiving food stamps.

C. Qualified economically-disadvantaged ex-felons hired no later than one year after conviction or release from prison.

D. High risk youth ages 18 through 24 residing in an empowerment zone or enterprise community.

E. Vocational rehabilitation referrals.

F. Qualified summer youth ages 16 through 17 who reside in an empowerment zone or enterprise community and have not previously worked for the employer seeking this tax credit.

G. Qualified food stamp recipients ages 18 through 24.

H. Qualified recipients of Supplemental Security Income (SSI).

I. Long-term recipients of AFDC. (Individuals who begin work on or after January 1, 1998.)

The amount of the tax credit you can take advantage of varies according to the target group. For example, the credit for the majority of target groups is 40 percent of first year wages up to $6,000 if the individual is retained for at least 400 hours. If the individual is retained less than 400 hours but at least 120 hours, a 25 percent credit is available (also up to $6,000). One exception is people in target group F (summer youth). For them, the maximum amount of wages to which the credit can be applied is $3,000.

The last qualification is to certify the applicant. The way to do this is to find out if your job applicant is willing to provide the required information necessary for participation in the program. Prospective employees are not required to provide this type of information to an employer. Therefore, you must keep in mind that their participation is voluntary. If the applicant is willing to provide the required information, there are some pre-screening forms that must be completed. Note that these pre-screening forms must be completed by the prospective employee prior to the offer of a job.

→

17

# Buildings to go up like never before

## Study: Half needed for 2030 don't exist

By Haya El Nasser
USA TODAY

Residential and commercial development in the next quarter-century will eclipse anything seen in previous generations as the nation moves to accommodate rapid population growth, according to a Brookings Institution report today.

About half the homes, office buildings, stores and factories that will be needed by 2030 don't exist today, says Arthur C. Nelson, author of the report for the think tank in Washington, D.C.

The U.S. population is expected to increase 33% to 376 million by 2030, according to Nelson's analysis. That's 94 million more people than in 2000.

To serve that population, almost 60 million housing units will have to be built. About 20 million of these units will replace destroyed or aging homes. In addition, half of the largest metropolitan areas will have to add as much or more commercial and industrial space as existed in 2000, the report says.

The projections are startling for a nation already coping with sprawl, traffic congestion and the strains they put on the environment. Phe-



**Housing demand soars**

115.9 million
Units existing
in 2000

154.8 million
Units needed
in 2030

Source: Brookings Institution report
By Arthur C. Nelson

USA TODAY

**New housing needed**
■ Your state by 2030, 4A

nomenal growth in the South and West has turned deserts and soybean fields into cities. The report projects that these regions, which face water limitations, will experience the greatest surge in construction in the next 25 years.

"That kind of statistic is either terrifying or a wonderful opportunity," says David Goldberg, spokesman for Smart Growth America, a national coalition of groups that support managing growth.

If development patterns don't change, subdivisions will continue to sprout on farmland farther from metropolitan areas, requiring more

roads and sewer lines.

"We need to get this message out to planners so that they see the big numbers," says Nelson, director of urban affairs and planning at the Metropolitan Institute at Virginia Tech in Alexandria, Va. "There may be no better time than now to plan the shape of the landscape."

For generations, Americans favored single-family homes on larger lots. Development spread to where land is cheaper but within commuting distance to jobs.

Communities must decide if they want to develop policies consistent with those preferences or constrain them," says John Kasarda, director of the Kenan Institute of Private Enterprise at the University of North Carolina-Chapel Hill. "Sprawl is a choice."

There are signs that people want more choices. Frustration with long commutes is mounting. Downtown housing is enjoying a revival. Even suburbs are creating city-styled town centers that combine stores, offices, condos and townhouses in a walkable environment.

But change is coming slowly, says John McIlwain, senior housing fellow at the Urban Land Institute, a research group that works with developers: "We're going to wind up with anywhere between 60% and 70% of development occurring where it's always occurred since World War II: on the outer edge."

18