1    Mark Titch
      B-89549, F1-04-227
2    P.O. Box 799001
      San Diego, Ca    92179-9001
3
      Petitioner, Pro Se
4

FILED

2008 APR 10  PM 3: 53

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

6               UNITED STATES DISTRICT COURT

7          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

8

9

10

11          MARK TITCH,             ) 
          Petitioner, Pro Se     )    Case No. **08 CV 0654 J WMc**
12                      )
            vs.                 )
13                      )    **LODGEMENT OF DOCUMENTS IN SUPPORT OF**
         ROBERT J. HERNANDEZ,    )    **PETITION FOR WRIT OF HABEAS CORPUS**
14          Warden, RJDCF et.al.     )    **(EXHIBITS - VOLUME II)**
                     )
15              Respondents    )
     _____ )

16

17

18      Petitioner, Mark Titch, represented pro se, hereby lodges with this court

19 **EXHIBITS - VOLUME II,** consisting of Exhibits 39 through 54. These documents

20 are necessary to support the Grounds and Claims which petitioner has raised in

21 his Petition For Writ Of Habeas Corpus and are pursuant to Federal and Local

22 rules of court.

23

24

25 DATED: **4/8/08**

                     Respectfully Submitted,

26

27

28                      Mark Titch,
                     Petitioner, Pro Se

1  Mark Titch
   B-89549, Fl-04-227
2  P.O. Box 799001
   San Diego, Ca  92179-9001
3
   Petitioner, Pro Se
4

5

6              UNITED STATES DISTRICT COURT

7          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

8

9                                    )
                                     )
10                                   )
                                     )
11      MARK TITCH,                  )    Case No._____
        Petitioner, Pro Se          )
12                                   )
              vs.                    )
13                                   )
        ROBERT J. HERNANDEZ,         )
14      Warden, RJDCF et.al.         )
                                     )
15             Respondents          )    DOCUMENTS IN SUPPORT OF PETITION
                                     )    FOR WRIT OF HABEAS CORPUS
16                                   )
                                     )
17  _____  )

18

19              EXHIBITS - VOLUME II

20

21

22

23

24

25

26

27

28

# TABLE OF EXHIBITS

**Volume II:**                                                                    **Page(s)**

EXHIBIT 39:   Employment Offer                                                       1

EXHIBIT 40:   Support Letters                                                      1-8

EXHIBIT 41:   Self-Help & Personal Development                                    1-28

EXHIBIT 42:   Compendium of Life Inmates' Demographics
              (Selected relevant sections)                                        1-24

EXHIBIT 43:   Statistics                                                           1-6

EXHIBIT 44:   Various Newspaper Articles and Other Info.                          1-21

Exhibit 45:   CDC Memorandum:  Notice of In Re Rutherford                          1-3

EXHIBIT 46:   2006 Parole Hearing Transcript                                     1-107

EXHIBIT 47:   Yellen v. Butler                                                    1-14

EXHIBIT 48:   Coleman v. BPT                                                      1-10

EXHIBIT 49:   Irons v. Warden of Cal. State Prison-Solano                         1-25

EXHIBIT 50:   In re Rosenkrantz (Superior Court)                                  1-6

EXHIBIT 51:   Rosenkrantz v. Marshall                                            1-46

EXHIBIT 52:   Orange County Superior Court Denial                                1-10

EXHIBIT 53:   California Appellate Court Denial                                   1-2

EXHIBIT 54:   California Supreme Court Denial                                     1-2

1

## DECLARATION OF RECORDS

2

3      I _Mark Titch_ , do hereby declare the following:

4      The attached documents, titled **"Exhibits - Volume II"**, and consisting

5  of Exhibits 39 through **54**, are true and correct copies of the original

6  documents.  Where the documents were given to petitioner by another person,

7  petitioner believes them to be true, accurate, and correct copies.

8

9

10

11      I declare under penalty of perjury of both state and federal laws that

12  the foregoing is true and correct and that this declaration was executed on

13  _4/8/08_ _____ at San Diego, California.

14

15

16

17

18

19      /S/ _Mark Titch_
         Mark Titch,
20         Petitioner, Pro Se

21

22

23

24

25

26

27

28

**EXHIBIT 39**

Employment Offer

**Marty's Marine Services**
**2240 Huntington Point Rd. #68**
**Chula Vista CA 91914**
**619-813-0334**

March 27, 2006

Board of Prison Terms
1515 "K" Street, Suite 600
Sacramento, CA 95814

Dear Members of the Board,

I am writing on behalf of Mark Titch, B89549, in regards to employment. This letter is to confirm that Mark has a job with my company immediately upon release.

My company does all types of yacht maintenance including wax and polish, wash-down services, mechanics, and underwater maintenance as well. Mark's skills and personal traits are exactly what we are looking for.

I have been in business for three years. My business has grown at a rate of about 100 clients per year and has approximately 310 customers as of this date. With that percentage of growth, I need good dependable people to work.

Mark's starting hourly rate will be $14.00. With Mark's abilities I am sure he will be making $22.00 per hour within eight months.

Sincerely,

Marty Freeman
Marty Freeman
Owner

**EXHIBIT 40**

Support Letters

721 South Anza Street
El Cajon, CA 92020
March 20, 2006


Board of Prison Terms
1515 "K" Street, Suite 600
Sacramento, CA 95814

Dear Members of the Board,

Re:  **Mark W. Titch, B89549,** R. J. Donovan Correctional Facility

Seven years ago my late husband and I began visiting Mark's cellmate.  Five years ago
we began visiting Mark.  In addition to visiting and writing Mark, I have also assisted
him with business affairs.

Recently I read through all of Mark's chronos and perused his certificates of academic
and vocational achievement.  That experience greatly deepened my pride and respect for
Mark.

It became clear to me that very soon after Mark's incarceration he began to pursue his
education, earning not only his high school diploma but almost completing a degree in
business administration through Chapman College as an honor roll student each semester,
achieving a grade point average of 3.8.

I noted that Mark's chronos were consistently rated "above average" and often
"exceptional".  It pleased me to see that the "exceptional" ratings usually addressed his
attitudes towards teamwork and inmate coworkers, staff, and supervisors —qualities that
an employer would desire.  Other comments included "maturity, dependable, takes work
seriously, pride in work, desire to learn, self-motivated, enthusiastic and helpful attitude,
leadership skills, quality-conscious, superior technical ability, and above average
mechanical skills.  Not only did Mark strive for his own success, he reached out to help
others and enjoyed the respect of his peers.

The documented marketable skills that Mark possesses are in the areas of printing,
drafting, welding, and various aspects of construction.  These are transferable, marketable
skills for Mark to take out the gate with him.  With those skills and attitudes Mark would
easily gain employment.

Mark's longevity in his jobs is noteworthy.  He worked in printing at CMC for nine
years, working as a lead operator for five of those years.  He was employed with IDL
almost six years.

Board of Prison Terms
March 20, 2006
Page 2


I have read Mark's trial transcript, and we have discussed his crimes. I can assure you that this man before you today is a mature, settled man who only desires the opportunity to be outside making a contribution to life. He is no longer the person who began his life of crime as a young teen by stealing food and blankets for survival while escaping an alcoholic father and consequently, becoming involved in the wrong circles and activities. His regret of those days would deter his return to any such environment or activity. I can say with absolute certainty in my heart that Mark would pose no threat to society. On the contrary, he would become a valuable part of it, just as he has added value to his present segment of society.

Mark has also gained a deep spiritual understanding through study, attending spiritual-based programs, and personal associations. His participation in the M-2 program for many years was an extremely meaningful relationship for both Mark and his "match", Pat Mullen. Pat has related that the visits he and his family had with Mark at CMC were cherished times, ones that even the children still remember fondly. After the M-2 program ended, Pat continued to visit Mark when he was in San Diego on business, continuing their friendship of 20 years. Mark also has been embraced by the families of his cellmates and other inmate families he has met in the visiting room. All have great respect for Mark.

Mark would like to parole to San Diego, where he has a friendship base and job offers. My late husband and I have mentored several parolees, and I have told Mark that he can live at my home while getting established. I would furnish room, board, and transportation along with friendship and encouragement. Mark would, in turn, assist me with home maintenance tasks that have become increasingly difficult for a 70-year old widow. Because Mark "did his time inside" with little outside support, I know that he will also be quite self-sufficient out here. Rather than taking, Mark will give.

I strongly urge you to seriously consider Mark's positive accomplishments and preparations and grant him a release date. Mark has, I believe, proven that he deserves another chance outside the walls. This time Mark will be surrounded by many people who love him and care about his well-being.

Sincerely,

Lenona M. Carlburg
(619) 447-0161

2

3584 Sunset Lane, #136
San Diego, CA 92173
March 27, 2006

Board of Prison Terms, Chairman
1515 "K" Street, Suite 600
Sacramento CA 95814

RE:  MARK W. TITCH, B89549– Parole Candidate
       R. J. Donovan Correctional Facility

Dear Board Chairperson and Commissioners,

This letter expresses my belief in the release suitability of term-life inmate Mark W. Titch.  Over the several years I have known Mr. Titch I am convinced, along with the solid group of his supporters, family, and friends, that he presents absolutely no risk of harm to others in the community.

I make that statement with full awareness of his youthful waywardness and resulting crimes—facts which Mr. Titch has never minimized but rather addresses with responsibility and remorse.  His response to a situation he cannot change has been to equip himself to bring good to the world each day.  He has proved to be a self-actualized, peace-loving person and has prepared himself educationally and vocationally for release into society.

From the time spent in his presence I am assured of Mr. Titch's enduring personal reformations.  There are too many instances of his making sacrifices for other' s safety and well-being to mention here.  But those who observe his life and actions on a daily basis can all attest to his gentle ways, resourcefulness, practical talents, and generous heart.  He is, like most of us, not perfect–just tempered and wisened by the travesties of yesterday.  Even in my skeptical mind, no doubt exists that Mr. Titch is among the few "lifers" who has sought and secured true, lasting change of character—who is actually ready to be welcomed back into our world outside.

I am aware of several specific, potential conflict situations that Mr. Titch has encountered (and diffused) while serving his time in the prison environment.  In these cases he chose the peaceful path by empathy, forgiveness, and diplomacy, or by simply walking away from violence.  Guards, fellow inmates, and free staff within the facility witness daily the proof that he is not the youth of almost 30 years ago—when his lack of coping skills and naivete led to his involvement in the commitment offenses.  Although he is a humble man and excellent listener, he is also one of strong moral conviction and impressive work ethic.

3

Board of Prison Terms
Re:  Mark W. Titch
Page 2
March 27, 2006


Since maturing into an adult through experience, self-help, therapy, and unwavering relationships, Mark Titch has in the past few years earned spending his few remaining years supporting and being supported by those who have challenged and loved him, seeing his growth with time.

As voters, tax-payers, and advocates of public safety in California, my family and I would, in fact, feel safer with Mr. Titch living and working in our neighborhood. In years, and in tears, he has unquestionably paid his debt.  His re-offense risk is nil, both intuitively and statistically.

These are just a few reasons why I recommend your granting Mark Titch a parole release.

Sincerely,

Maxine Rogowski
(619) 662-7568

4

2240 Huntington Point Rd. #68
Chula Vista, CA 91914
March 16, 2006


Board of Prison Terms
1515 "K" Street, Suite 600
Sacramento, CA 95814

Dear Members of the Board,

I'm writing this on behalf of my friend, Mark Titch, to shed some light on what a positive influence in my life he has been.

I met Mark while doing time at R. J. Donovan Correctional Facility. Since the day I met him, I truly felt a friendship that I hadn't had before. His attitude, manners, and demeanor were of someone who had never been locked up, much less of someone who had grown up in the life that he had to grow up in and had been locked up for so long. He was always there for me when I needed someone to talk to, with understanding and wise advice no matter what the situation. Mark is somebody that anyone would be privileged to know.

After getting to know Mark, I started calling him "The General", not only because he had done so much time, but because he has a leadership quality about him that I admired as well as the respect of those who knew him. This wasn't a prisoner jailhouse respect, but a sincere, honest respect, not only from inmates but staff also. Mark does what he says he'll do and when he says he will do it.

I have been out over four years now, am off parole, and married with my own business. The thought of having Mark working for me would be a blessing to my business. I would hire Mark in a second and consider it a privilege to help him in any way I could. This help would include financial, spiritual, housing, encouragement. Any kind of support my wife and I could provide, we certainly will.

My wife and I have been going into East Mesa County Jail and doing jail ministry for a year now, and my church is very supportive of parolees. I know that they would embrace Mark as they did me four years ago.

I want to thank you very much for reading my letter on Mark's behalf, and I hope in some way it sheds a small light on what a good man he really is. I only wish there were more like him out here.

Sincerely,

*Marty Freeman*

Marty Freeman

5

1046-A Calle Recodo
San Clemente, CA 92673

April 5, 2006

Board of Prison Terms
1515 "K" Street, Suite 600
Sacramento, CA 95814

Re:  **Mark W. Titch, B89549**, R. J. Donovan Correctional Facility – Parole Candidate

Dear Members of the Board,

Five years ago, we were introduced to Mark in the visiting room, as we visit other inmates there as well.  We have continued to see Mark and talk with him over the past five years.  He is a very intelligent man and it is a delight to visit with him.

Despite all the years he has been incarcerated, he maintains a positive attitude and has worked diligently to overcome his childhood abuses and has developed into a fine man, who deeply regrets his past mistakes.

He not only has worked to better himself, earning a high school diploma and has nearly completed a degree in business administration from Chapman University, but he has helped so many of his peers and has earned their respect and admiration.  He continues to study and further his education each day.

As you can see from all of his chronos, he has attended all the self-help programs that have been made available to him.

His work ethics are exceptional, which includes nine years with CMC and over five years with IDL, with exceptional remarks from all his employers.  He has gained skills through these jobs that will be of great value when he is released.  We feel that Mark would be an asset to the outside sector, given a chance.

During his long years, he has had very little support from the outside, and in spite of that, he has become responsible and is not the very troubled young man that he was many years ago.

We understand that Mark has a job offer and a place to live, along with transportation and support from friends in the San Diego area.

We respectfully ask you to consider all of Mark's qualities and his hard work preparing himself for release.  We absolutely feel that Mark would not be a threat to society in any way, and given the chance, he would become very productive and rejoin and embrace society as a valuable person.

Sincerely,

Oscar and Jean De La Garza

6

May 9, 2006


Mr. J. Ortiz, CC-I (A), Fac. 1
Richard J. Donovan Correctional Facility
P. O. Box 799006
San Diego, Ca 92179-9006


Dear Mr. Ortiz:

Enclosed please find a copy of a letter of support for Mark W. Titch, B-89549, F1-4-227L, who is scheduled for a board hearing in July 2006.

I would respectfully request that you include a copy of this in Mark's file.

Sincerely,

Patrick W. Mullen
2234 Flora Street
San Luis Obispo, CA 93401

7

May 9, 2006

Board of Prison Terms
1515 "K" Street, Suite 600
Sacramento, CA 95814

Dear Members of the Board:

I am writing in support of **Mark W. Titch, B-89549**, regarding his upcoming board hearing scheduled for July 2006.

I have known Mark since 1984, over 22 years, first as an M-2 sponsor and later as a friend and mentor and throughout that time I have seen Mark work hard to improve himself personally, mentally, spiritually, and vocationally so he will be a positive, productive citizen when he is paroled. Over the years I have personally witnessed Mark's dedicated and positive efforts to earn a college AA degree, nearly complete his BA degree, and acquire numerous vocational skills including drafting, welding, electrician and construction trades so he can be a successful, productive citizen when he is paroled. Mark also has a strong support network on the outside willing and able to help him make that transition to a productive member of society.

Mark's focus has been to better himself in all respects and to prepare himself for a successful return to society. Mark is remorseful for his past deeds and takes responsibility for his actions. He has used his time in prison the best way possible, understanding what he did, accepting responsibility and working hard to improve himself and pay his debt to society.

Mark has been able to change for the better while in prison, remaining positive, improving himself, working in trustee and inmate labor programs all the while continuing his education and continuing to work to prepare for a successful transition back into society as a productive, law abiding citizen. If you look through Mark's file you will see a person who has earned the trust and support from a broad range of people. These people have seen him in many different situations and all support and commend him for how he has conducted himself while incarcerated and for how he has remained positively focused on preparing himself to make a successful transition back into society.

I urge you to give his case very deliberate and careful attention and your full consideration.

Sincerely,

Patrick W. Mullen
2234 Flora Street
San Luis Obispo, CA 93401

8

**EXHIBIT 41**

Self-Help and Personal Development

# MARK WAYNE TITCH
### B89549, F1-4-227L

## Self Help and Personal Development Programs

**M-2 (Match Two) Program:**  A program matching a
volunteer with an inmate for regular visits and contacts
to promote growth toward a fulfilling life in the
community.
1984 to Present

**Self-Confrontation Workshop:**  A 24-week Biblical
Counseling Foundation Program requiring 10-12 hours
per week of personal study and assignments.
29-May-2005

**Creative Conflict Resolution:**  Certificate of Completion
for a 2 ½ day basic and 15-hour advanced courses in
non-violent conflict resolution sponsored by Friends
Outside National Organization.
9-Nov-2003<br>23-May-2004

**Forty Days of Purpose:**  Six-week study based on the
book Purpose Driven Life.
21-Apr-2004

**Kairos:**  Certificate of Completion for a four-day
curriculum emphasizing forgiveness, self-examination,
goal setting, self-esteem, respect, and responsibility.
24-Sep-2000

**Free At Last:**  One-day seminar sponsored by Prison
Fellowship
19-Oct-1998

**Laubach Literacy Action:**  A 10-hour Volunteer Tutor
Training Workshop and 20 hours of volunteer service
teaching other inmates to read and write.
19-May-1998

**Ralpha 12-Step Program:**  Certificate of Completion for
a five-month course for overcoming addictions and
dependencies, sponsored by Prison Fellowship.
15-Mar-1999

**AA/NA:**  Semi-weekly meetings.
1995 to Present

**Walk-a-Thon for Child Abuse Prevention**
17-May-1999<br>20-Apr-2002

**NAME and NUMBER**     TITCH, M., B-89549, F1-04-227L          CDC-128-B(Rev. 4/74)

ınmate TITCH, M., B-89549, F1-04-227L, is a member of the Richard J. Donovan Correctional Facility, (RJDCF) Alcoholics Anonymous (AA) program. On Wednesday nights on a semi-weekly basis, he participates with group discussions, shows the desire to improve himself by giving testimonies of his past history character defects. Inmate TITCH is very supportive of the testimonies in a kind way. He has attended one meeting out of three meetings offered during the period of October 2005 to December 2005.

J. SARANTOS
Self-Help Sponsor
Facility 1

Original: Records
cc:          CC I
             Inmate

**DATE**     **December 31, 2005**          **RJDCF**          **GENERAL CHRONO**

---

**NAME and NUMBER**     TITCH, M., B-89549, F1-04-227          CDC-128-B(Rev. 4/74)

Inmate TITCH, M., B-89549, F1-04-227, is a current member of the Richard J. Donovan Correctional Facility, (RJDCF) Narcotics Anonymous (NA) program. On Monday nights on a semi-weekly basis, he participates with group discussions, shows the desire to improve himself by giving testimonies of his past history character defects. Inmate TITCH is very supportive of the testimonies in a kind way. He has attended one meeting out of four meetings offered during the period of January 2006 to March 2006.

J. SARANTOS
Self-Help Sponsor
Facility 1

Original: Records
cc:          CC I
             Inmate

**DATE**     **March 31, 2006**     **RJDCF**          **GENERAL CHRONO**

2

**NAME and NUMBER     TITCH, M., B-89549, F1-04-227L**                CDC-128-B(Rev. 4/74)

Inmate TITCH, M., B-89549, F1-04-227L, is a member of the Richard J. Donovan Correctional Facility, (RJDCF) Alcoholics Anonymous (AA) program.  On Wednesday nights on a semi-weekly basis, he participates with group discussions, shows the desire to improve himself by giving testimonies of his past history character defects.  Inmate TITCH is very supportive of the testimonies in a kind way.  He has attended three meetings out of three meetings offered during the period of July 2005 to September 2005.


**J. SARANTOS**
**Self-Help Sponsor**
**Facility 1**


**Original: Records**
**cc:**          **CC I**
                **Inmate**

**DATE        September 30, 2005**              **RJDCF**          **GENERAL CHRONO**

3

**NAME and NUMBER    TITCH, M., B-89549, F1-04-227L**    CDC-128-B(Rev. 4/74)

Inmate TITCH, M., B-89549, F1-04-227L, is a member of the Richard J. Donovan Correctional Facility, (RJDCF) Alcoholics Anonymous (AA) program.  On Wednesday nights on a semi-weekly basis, he participates with group discussions, shows the desire to improve himself by giving testimonies of his past history character defects.  Inmate TITCH is very supportive of the testimonies in a kind way.  He has attended four meetings out of five meetings offered during the period of January 2005 to March 2005.

J. SARANTOS
Self-Help Sponsor
Facility 1

Original: Records
cc:        CC I
           Inmate

**DATE        March 31, 2005            RJDCF        GENERAL CHRONO**

---

**NAME and NUMBER    TITCH, M., B-89549, F1-04-227L**    CDC-128-B(Rev. 4/74)

Inmate TITCH, M., B-89549, F1-04-227L, is a member of the Richard J. Donovan Correctional Facility, (RJDCF) Alcoholics Anonymous (AA) program.  On Wednesday nights on a semi-weekly basis, he participates with group discussions, shows the desire to improve himself by giving testimonies of his past history character defects.  Inmate TITCH is very supportive of the testimonies in a kind way.  He has attended three meetings out of four meetings offered during the period of April 2005 to June 2005.

J. SARANTOS
Self-Help Sponsor
Facility 1

Original: Records
cc:        CC I
           Inmate

**DATE        June 30, 2005            RJDCF        GENERAL CHRONO**

4

**NAME and NUMBER**     TITCH, B-89549, F1-04-241U          CDC-128-B(Rev. 4/74)

Inmate TITCH, B-89549, F1-04-241U, is a current member of the Richard J. Donovan Correctional Facility, (RJDCF) Alcoholic Anonymous (AA) program. On Wednesday nights on a semi-weekly basis, he participates with group discussions, shows the desire to improve himself by giving testimonies of his past history character defects. Inmate TITCH is very supportive of the testimonies in a kind way. He has attended four meetings out of six meetings offered during the period of April 2004 to June 2004.

*J. Sarantos*

J. SARANTOS
Self-Help Sponsor
Facility 1

Original: Records
cc:         CC I
            Inmate

**DATE**      June 30, 2004          RJDCF          **GENERAL CHRONO**

---

**NAME and NUMBER**     TITCH, B-89549, F4-16-245L          CDC-128-B(Rev. 4/74)

Inmate TITCH, B-89549, F4-16-245L, is a current member of the Richard J. Donovan Correctional Facility, (RJDCF) Alcoholic Anonymous (AA) program. On Wednesday nights on a semi-weekly basis, he participates with group discussions, shows the desire to improve himself by giving testimonies of his past history character defects. Inmate TITCH is very supportive of the testimonies in a kind way. He has attended five meetings out of five meetings offered during the period of July 2004 to September 2004.

*J. Sarantos*

J. SARANTOS
Self-Help Sponsor
Facility 1

Original: Records
cc:         CC I
            Inmate

**DATE**      September 30, 2004          RJDCF          **GENERAL CHRONO**

5

I/M  TITCH  became a member of Alcoholics Anonymous on 7-28-95 .
Since his last chrono of  8-1-97 , he has attended  15  of the  17
regularly scheduled meetings.
Future attendance and participation will be periodically documented.

Original: Central File
    cc: Psych. Services
        A.A. File
        Inmate

_____
C. BETHEL, CC11   , Sponsor
The Big Four Fellowship of A.A.

**DATE**   6-1-98        **ALCOHOLICS ANONYMOUS / INFORMATIVE**        **GENERAL CHRONO**

---

NAME and NUMBER   TITCH, Mark        B-89549        Room/Bed  3208X        CDC-128-B (Rev 4/74)

Inmate  TITCH  became a member of Alcoholics Anonymous on       07-28-95       . Since his last chrono of    06-01-98    , he has
attended   2   of the   3   regularly scheduled meetings with 1 absence. Mr. Titch is currently pending transfer to an other institution,
therefore, he dropped by his own request from the Big Four Fellowship of A. A. effective 07-17-98.

_____
C. Bethel, CC II, Sponsor
The Big Four Fellowship of A. A.

Original: Central File
    cc: Psych. Services
        A. A. File
        Inmate

Date:   07-03-98        **Alcoholics Anonymous/Informative**        Page 1        **GENERAL CHRONO**

---

TITCH B-89549        DC-128-B        (REV. 4/74)

Inmates TITCH is a current member of the Richard J Donovan Correctional
Facility's Alcoholics Anonymous Program. During the First quarter of 1999
he has actively participated and shown the ability to related with the
group and has shown the desire to improve himself through involvement.
During this quarter inmate attended 2 of the 2 "AA" meeting held on twice
per month bases. Member in the RJD "AA" program requires sincere
participation and attendance from 7:15-8:30 p.m. on the scheduled Wednesday
evenings. Inmate TITCH participation in this program has demonstrated a
willingness to cooperated in the smooth atmosphere of the "AA" environment.

E. Torres                                    cc: Original/Records
Self-Help Sponsor, AA                            Inmate
                                                 CCI

**DATE:** 03/31/99        **RJD/RC**        GENERAL CHRONO

6

TITCH'S      REQUEST TO BE ADDED TO THE WAITING LIST FOR ALCOHOLICS ANONYMOUS
WAS RECIEVED 6-9-95 . SINCE BEING BROUGHT TO THE ACTIVE ROSTER, 7-28-95      ,
HE HAS ATTENDED   4   OF THE   4   REGULARLY SCHEDULED MEETINGS.
FUTURE ATTENDANCE AND PARTICIPATION WILL BE PERIODICALLY DOCUMENTED.


ORIGINAL: CENTRAL RECORDS
    CC: PSYCH. SERVICES
        "B" QUAD AWC
        AA FILE
        INMATE

SALLY MENDEZ, CO-, SPONSOR,
THE BIG FOUR FELLOWSHIP OF A.A.


DATE 10-1-95          ALCOHOLICS ANONYMOUS(INFORMATIVE)          GENERAL CHRONO

NAME and NUMBER   TITCH, MARK        B-89549        3207   CDC-128-B (Rev. 4/74)

TITCH              BECAME A MEMBER OF ALCOHOLICS ANONYMOUS ON  7-28-95  .

SINCE HIS LAST CHRONO OF  10-1-95  , HE HAS ATTENDED  17  OF THE  18

REGULARLY SCHEDULED MEETINGS.

FUTURE ATTENDANCE AND PARTICIPATION WILL BE PERIODICALLY DOCUMENTED.


ORIGINAL: CENTRAL RECORDS
    CC: PSYCH. SERVICES
        "B" QUAD AWC
        AA FILE
        INMATE

C/O P. ELLEFSEN      , SPONSOR,
THE BIG FOUR FELLOWSHIP OF A.A.


DATE 8-1-96          ALCOHOLICS ANONYMOUS(INFORMATIVE)          GENERAL CHRONO

NAME and NUMBER   TITCH, MARK        B-89549        3207x   CDC-128-B (Rev. 4/74)

TITCH              BECAME A MEMBER OF ALCOHOLICS ANONYMOUS ON  7-28-95  .
SINCE HIS LAST CHRONO OF  8-1-96  , HE HAS ATTENDED  22  OF THE  23
REGULARLY SCHEDULED MEETINGS.
FUTURE PARTICIPATION AND ATTENDANCE WILL BE PERIODICALLY DOCUMENTED.


ORIGINAL: CENTRAL RECORDS
    CC: PSYCH. SERVICES
        "B" QUAD AWC
        AA FILE
        INMATE

P. ELLEFSEN      , SPONSOR
THE BIG FOUR FELLOWSHIP OF A.A.


DATE   8-1-97          ALCOHOLICS ANONYMOUS (INFORMATIVE)          GENERAL CHRONO

7

TITCH'S          REQUEST TO BE ADDED TO THE WAITING LIST FOR ALCOHOLICS ANONYMOUS
WAS RECIEVED  6-9-95 . SINCE BEING BROUGHT TO THE ACTIVE ROSTER,  7-28-95         ,
HE HAS ATTENDED   4   OF THE   4    REGULARLY SCHEDULED MEETINGS.
FUTURE ATTENDANCE AND PARTICIPATION WILL BE PERIODICALLY DOCUMENTED.

ORIGINAL: CENTRAL RECORDS
    CC: PSYCH. SERVICES
        "B" QUAD AWC
        AA FILE
        INMATE

*Mendez*
SALLY MENDEZ, CO-, SPONSOR,
THE BIG FOUR FELLOWSHIP OF A.A.

---

DATE 10-1-95          ALCOHOLICS ANONYMOUS(INFORMATIVE)          GENERAL CHRONO

NAME and NUMBER   TITCH, MARK           B-89549           3207      CDC-128-B (Rev. 4/74)

    TITCH              BECAME A MEMBER OF ALCOHOLICS ANONYMOUS ON  7-28-95      .
SINCE HIS LAST CHRONO OF   10-1-95    , HE HAS ATTENDED   17 OF THE   18
REGULARLY SCHEDULED MEETINGS.
FUTURE ATTENDANCE AND PARTICIPATION WILL BE PERIODICALLY DOCUMENTED.

ORIGINAL: CENTRAL RECORDS
    CC: PSYCH. SERVICES
        "B" QUAD AWC
        AA FILE
        INMATE

*P. Ellefsen 9.*
C/O P. ELLEFSEN      , SPONSOR,
THE BIG FOUR FELLOWSHIP OF A.A.

---

DATE 8-1-96          ALCOHOLICS ANONYMOUS(INFORMATIVE)          GENERAL CHRONO

NAME and NUMBER   TITCH, MARK           B-89549           3207x     CDC-128-B (Rev. 4/74)

    TITCH              BECAME A MEMBER OF ALCOHOLICS ANONYMOUS ON   7-28-95  .
SINCE HIS LAST CHRONO OF   8-1-96    , HE HAS ATTENDED   22   OF THE   23
REGULARLY SCHEDULED MEETINGS.
FUTURE PARTICIPATION AND ATTENDANCE WILL BE PERIODICALLY DOCUMENTED.

ORIGINAL: CENTRAL RECORDS
    CC: PSYCH. SERVICES
        "B" QUAD AWC
        AA FILE
        INMATE

*P. Ellefsen*
P. ELLEFSEN       , SPONSOR
THE BIG FOUR FELLOWSHIP OF A.A.

DATE   8-1-97          ALCOHOLICS ANONYMOUS (INFORMATIVE)          GENERAL CHRONO

*B*



# AA San Diego Meetings Daily (continued)



**NEED DIRECTIONS?** Click a street address of **any** meeting location and an interactive map, courtesy of MapQuest™, will appear in this frame for easy reference. (A.A. does not endorse nor have any affiliation with MapQuest™ and is not responsible for their content.)

**SPECIAL CODES: C** (CLOSED for **Alcoholics** only) **M** (for Men Only) **W** (for Women Only) **L** (Lesbian) **G** (Gay Men) **BS** (Babysitting Available) **SP** (Spanish Speaking Mtg.) **\*** (Wheel Chair Access) **+**(Signed for Hearing Impaired) **CF** (Child Friendly)

| TIME | NAME OF MEETING/ADDRESS | DAYS | CODES | LOCATION |
|------|------------------------|------|-------|----------|
| 12:00N | CHULA VISTA NOON GROUP<br>Recv Hm 270 C St | Mo-Su | | CHULA VISTA |
| 12:00N | BACK TO BASICS<br>Park Manor 4548 Sweetwater Rd | Mo-Fri | | BONITA |
| 12:00N | RAINBOW GROUP<br>Office Bldg<br>(Park in Rear) 755 Emory St | Mo-Su | * | IMPERIAL BEACH |
| 12:00N | BROWN BAG LUNCH<br>Serv Cent 485 Broadway #E | Mo-Sa | | EL CENTRO |
| 12:00N | MISSION HILLS LUNCH BUNCH<br>Restaurant 4023 Goldfinch St | Mo-Fr | | MISSION HILLS |
| 01:00P | CEDAR ST DAILY<br>Recv Hm 2980 Cedar Street | Mo-Fr | | GOLDEN HILL |
| 02:15P | SHOW AND TELL<br>Recv Hm 3767 Central Ave | Fri, Sat, Sun Only | G L | CITY HEIGHTS |
| 02:30P | AFTERNOON DELIGHT<br>Club 4861 Cass St | Mo-Fr | | PACIFIC BEACH |
| 03:00P | 3 0-CLOCKER<br>Club 9940 River St | Mo-Sat | * | LAKESIDE |

| 05:30P | EVENING SERENITY Club 2229 Bacon St | Mon-Sun | | OCEAN BEACH |
|---|---|---|---|---|
| 05:30P | CHEERS Club 5077 Logan Ave | Mo-Fr | | SOUTH SAN DIEGO |
| 5:30P | EL CAJON HAPPY HOUR GROUP Church Hall Room 2  311 Highland Avenue | Mo-Fr | * | EL CAJON |
| 05:45P | FREE TO BE Club 1730 Monroe Ave | Mo-Fr | G L * + (Mon & Fri only) | UNIVERSITY HEIGHTS |
| 6:30P | RAINBOW GROUP Office Bldg (Park in Rear) 755 Emory St | MO-SU | * | IMPERIAL BEACH |
| 07:00P | 151 CLUB Club 151 N. 6th Street | Daily (Sunday @6PM) | * | BRAWLEY |
| 08:00P | THE FREEDOM MEETING Recv Hm 1777 Buckman Springs Rd | Mo-Fr | | CAMPO |
| 11:59P | MIDNIGHT HOWLERS Coffee Shop3343 Adams Ave & Felton | Mo-Su | C * | NORMAL HEIGHTS |

**Back**   **Top**

# Certificate of Completion

Awarded to

## Mark Titch

For completion of the Rapha 12 Step Workbook
A program to overcome addictions

by



## PRISON FELLOWSHIP ®

Monday, March 15, 1999

"If the Son sets you free you will be free you will be free indeed" John 8:36

_Victor M. Lopez, Area Director_

_Chaplain Brewer, Protestant Chaplain_

11

NAME and NUMBER TITCH, MARK B-89549                          CDC-128-B (Rev. 4/7-

This inmate has participated in the Rapha 12-Step program for overcomning dependencies and addictions from _11/2/98_ to _3/15/99_. This is an in-depth Christian 12-Step program incorporating the basic 12-Steps of AA/NA. The program includes small group inter-action for approximately 2 hours on day per week. In addition, the program requires appro-ximately 3-5 hours per week for home study with a 293 page workbook. Application of the principles taught is a requirement for completion of this program. This inmate is to be commended for his attendance and participation.

ORIG: Central File _____          _____
  cc: Writer              C. M. BREWER                VICTOR LOPEZ
      Inmate              Protestant Chaplain         Prison Fellowship
      Chapel Files        R.J. Donovan Corr. Fac.     Area Director, San Diego CA

DATE  3/22/99                  (INFORMATIVE)              GENERAL CHRONO

12



# HANDS OF PEACE / FRIENDS OUTSIDE

## National Organization

### Creative Conflict Resolution

**Mark Titch B-89549**

Has successfully completed the 2 ½ day Basic Course

*Juliana Cuttie*
Lead Trainer

*November 7-9, 2003*
Date

13

NAME and NUMBER    TITCH, M.        B89549        3-215                    CDC-128-B (Rev. 4/74)

The above named inmate has successfully completed the Basic, 22 hour,
Hands of Peace/Friends Outside Creative Conflict Resolution Workshop,
held on: NOV.7, 2003 - NOV.9,2003 .  Inmate participation was voluntary,
and inmate    TITCH, MARK            , B89549  , is commended for his
interest and conduct throughout the program.

Original: Records
         CCI
         Chapel files
         Inmate

                                    _____
                                    STATE CHAPLAIN
                                    GROUP ACTIVITY SPONSOR


DATE    NOVEMBER 9, 2003        (LAUDATORY)                GENERAL CHRONO


14

# HANDS OF PEACE / FRIENDS OUTSIDE
### National Organization



## Creative Conflict Resolution

Mark Title

completed the 15 hour Advance Workshop

_____
Lead Trainer

Miriam E Clark

Cora Clay

5/23/04
Date

NAME and NUMBER  TITCH          B89549                            CDC-128-B (Rev. 4/74)

The above named inmate has successfully completed the Advance, 22 hour,
Hands of Peace/Friends Outside Creative Conflict Resolution workshop held
on  MAY 21,22,23, 2004_____.  Inmate participation was voluntary,
and inmate TITCH_____,    B89549____, is commended for his interest
and conduct throughout this program.

Original:  Records
    cc:  CCI
         Chapel Files
         Inmate
                                        STATE CHAPLAIN
                                        ACTIVITY GROUP SPONSOR

DATE  6/1/04                (LAUDATORY)              GENERAL CHRONO

16

NAME and NUMBER  <u>MARK TITCH, B89549</u>                    CDC-128-B (4/74)

The above-named inmate has successfully completed a minimum of 22 of the required 24 week Biblical Counseling Foundation, Self-Confrontation Workshop held on <u>SPRING, SUMMER,FALL 2004</u>. Completion of the workshop requires 10-12 hours per week of personal study and homework assignments. Inmate participation was voluntary, and Inmate <u>TITCH</u>, CDC <u>B89549</u>, is commended for his interest and conduct throughout the program.

ORIG:  C-file          J. OIEN, VOLUNTEER CHAPLAIIN.          DR. WILLIAM BROWN
CCI                    Workshop Instructor                   Protestant Chaplain
Chapel Files
Inmate
DATE  **MAY 29, 2005**              (LAUDATORY)                          RJDCF

17

# Certificate of Completion



### God's Special Time

The Kairos Short Course is a total immersion three-and-one-half day instructional introduction to living in Christian Community. Forgiveness of others, self-examination, goal setting, self esteem, small group interaction, communication, responsibility, trust and respect are intense elements of the curriculum.

This certifies that

## Mark Titch

*has completed the Kairos Short Course*
*held on September 21 to 24, 2000*
*at the*
*R. J. Donovan Correctional Facility*

*Fred Williams*

Chairman, Golden State KAIROS of San Diego

This certificate should be a permanent part of the official records of the above-named individual. It certifies participation in a significant program which entails extensive follow-up participation, and the bearer is hereby entitled to participate in KAIROS activities when these are offered at other Department of Corrections institutions to which this individual may be assigned.

Chaplain, R. J. Donovan Correctional Facility

18



## PRISON FELLOWSHIP®

In recognition of participation in the seminar,

**FREE AT LAST**,

**MARK TITCH**,

a child of God, is hereby awarded this

## Certificate of Participation

on this _____ **19TH** _____ day of _____ **OCTOBER** _____, 199 **8** ___.

*"Be strong in the Lord and in his great power. Wear the full armor of God. Wear God's armor so that you can fight against the devil's evil tricks."*

*Ephesians 6:10–11 New Century Version*

_____          _____
Charles W. Colson                Instructor   **TIM MARTINEZ**

_____          **10/19/98**
Chaplain   **C. M. BREWER**       Date

INBT2

19



# Certificate

*is hereby awarded to*

## Mark Titch

For Successful Completion of the Six-Week Study

### 40 Days of Purpose

based on the book "Purpose Driven Life"

Pastor William Fink

Date        April 21, 2004

20

NAME and NUMBER   TITCH, B89549                                                CDC-128-B (Rev. 4/74)

THE ABOVE NAMED INMATE HAS SUCCESSFULLY COMPLETED THE SIX WEEK COURSE "PURPOSE DRIVEN LIFE" HELD ON 3/3/04 TO 4/28/04. THIS CHRISTIAN INSTRUCTIONAL COURSE IS DESIGNED TO HELP PEOPLE DISCOVER GOD'S PURPOSE FOR THEIR LIVES, AND INCLUDES LESSON'S IN LIVING A LIFE PLEASING TO GOD, BEING A PART OF GOD'S FAMILY, DEVELOPING CHRIST-LIKE CHARACTER TRAITS, AND SHARING GOD'S WORD WITH OTHERS. ADDITIONALLY, THIS COURSE REQUIRED SMALL GROUP INTERACTION FOR APPROXIMATELY 2 HOUR'S PER WEEK, AND READING / COMPLETING 40 LESSONS IN RICK WARRENS BOOK "A PURPOSE DRIVEN LIFE". THIS INMATE IS TO BE COMMENDED FOR HIS ATTENDANCE AND PARTICIPATION.

ORIG:   C-FILE
CC:     INMATE

CHAPEL FILES

DATE   7/22/04                          -LAUDATORY-

STATE CHAPLAIN
GROUP ACTIVITY SPONSOR

GENERAL CHRONO

21



**CHILD ABUSE**
PREVENTION FOUNDATION
*Serving the Children of San Diego County*

*CERTIFICATE OF PARTICIPATION*

THE CALIFORNIA DEPARTMENT OF CORRECTIONS
AND THE
CHILD ABUSE PREVENTION FOUNDATION OF SAN DIEGO COUNTY

**R. J. DONOVAN CORRECTIONAL FACILITY**

*ACKNOWLEDGES*

TITCH

For volunteering his time and energy
for
**Participating in the Walk-A-Thon for Abused Children on May 17, 1999**
Presented this 3rd Day of June, 1999

J. M. RATELLE
Warden

Child Abuse Prevention Foundation

ZZ



**CHILD ABUSE**
PREVENTION FOUNDATION
Serving the Children of San Diego County

# CERTIFICATE OF PARTICIPATION

THE CALIFORNIA DEPARTMENT OF CORRECTIONS

AND THE

CHILD ABUSE PREVENTION FOUNDATION OF SAN DIEGO COUNTY

## R. J. DONOVAN CORRECTIONAL FACILITY

*ACKNOWLEDGES*

M. W. TITCH  B-89549

For volunteering your time, energy and donation

therefore

Participating in the Walk-A-Thon for Abused Children on April 20, 2002

Robert J. Hernandez
Warden

Deirdre Kleske, Executive Director
Child Abuse Prevention Foundation

23

STATE OF CALIFORNIA
**NAME and NUMBER**  Titch              B-89549    F1-2-131

DEPARTMENT OF CORRECTIONS
CDC - 128-B (REV. 8/87)

On April 17, 1999, inmate Titch, CDC# B-89549 participated in the Richard J. Donovan Correctional Facility annual "Walk-A-Thon".  This event raises funds for the "Polinsky Child Abuse Foundation".  Said inmate walked over 4 miles and helped raise money through pledges for this worthy cause and charitable institution.  This inmates volunteer work and effort in this annual charitable even is greatly appreciate and commendable.

cc: Inmate
    Inmate file

C. Cottier
Associate Warden
Facility 1 & 4

**DATE**  05/05/1999

**GENERAL CHRONO**

---

STATE OF CALIFORNIA
**NAME and NUMBER**  Titch, M          B-89549    F1-2-132

DEPARTMENT OF CORRECTIONS
CDC - 128-B (REV. 8/87)

Inmate Titch, M, CDC# B-89549 donated funds to the RJD institutional annual "Walk-A-Thon".  This event raises funds for the "Polinsky Child Abuse Foundation".  He is Commended for his charitable contribution for the "Polinsky Child Abuse Center".

cc: Inmate
    Inmate file

C. Cottier
Associate Warden
Facility 1 & 4

**DATE**  05/05/1999

**GENERAL CHRONO**

24

**NAME and NUMBER**   Titch, Mark                    B89549              Room/Bed  3208X         CDC-128-B (Rev 4/74)

Mr. Titch has been an active member of the California Men's Colony Literacy Council since May 19, 1998. Mr. Titch has a GPA of 12.9 and is currently on the waiting list to participate in a 10 hour Volunteer Tutor Training Workshop sponsored by a Laubach Literacy Action (LLA) member program and conducted by an LLA certified trainer. In preparation for this Workshop Mr. Titch has attended every Tuesday night meeting since his enrollment, ·ticipating in 10 of 10 possible meetings. During this period, Mr. Titch has accumulated 20 hours of volunteer service, teaching other inmates to read and write. As a volunteer tutor, Mr. Titch has displayed an enormous amount of initiative and a great deal motivation. Mr. Titch is commended for his conscientious and attentive efforts.

Original   C-File
cc:        Counselor
           Inmate
           Sponsor

*B. Du Bois*
Basil Du Bois
Literacy Council Sponsor

Date:    07/21/98                        **Laudatory**                     Page 1       **GENERAL CHRONO**

25



## Certificate of Appreciation

(1984–1986)

**Mark Itch**

For your involvement in the M-2 program, for your friendship with your sponsor, and for your growth toward a fulfilling life in the community to which we all belong.

_Mike Sakka_
M-2 Area Director

_L. Oberholtzer_
M-2 Regional Director

26



*Certificate of Appreciation*

MARK TITCH

(1986–1988)

For your involvement in the
M-2 program, for your friendship
with your sponsor, and for your growth toward
a fulfilling life in the community to which
we all belong.

R. Arthur Crane

M-2 Area Director

27



# Certificate of Appreciation

OF FIVE YEARS OR MORE

MARK TITCH

For your involvement in the M-2 program, for your friendship with your M-2 volunteer, and for your growth toward a fulfilling life in the community to which we all belong.

Given this 9th day of December, 1989.

C. Walter Grove
M-2 Regional Director

Jim McCracken
M-2 Program Director

2B

**EXHIBIT 42**

Compendium of Life Inmates' Demographics

(Selected Relevant Sections)

# Compendium of Life Inmates' Demographics

### Life With The Possibility of Parole
(7 Years to Life)
California Department of Corrections
Compiled February 22, 1997

### Statistics for 1945-1996
and a
Partial Cross Reference of Lifer Cases

# Table of Contents
## (Continued)

## Special Interest Cases

| Name | Term | Page |
|------|------|------|
| **COURT ORDERED RELEASES** | 17 Years | 15 |
| STANWORTH, Dennis | 15 Years / 8 Months | 22 |
| FAIN, William Archie | 21 Years | 29 |
| SPAIN, Johnny Larry | | |
| | | |
| **MULTIPLE DEATH PENALTY CASES** | 17 Years | 15 |
| STANWORTH, Dennis | | |
| | | |
| **SINGLE DEATH PENALTY CASES** | 19 Years | 8 |
| KEMP, Darrell | 14 Years | 9 |
| HINES, Clay | 13 Years | 10 |
| MEEKS, James | 13 Years | 11 |
| NYE, Robert | 12 Years | 12 |
| TURVILLE, Charles | 13 Years | 14 |
| GOODRIDGE, Jerry Lee | 10 Years | 17 |
| ANDERSON, Robert | 14 Years | 19 |
| MABRY, Terry | 21 Years | 25 |
| McCLELLAN, William | 13 Years | 26 |
| MASSIE, Robert | 15 Years | 31 |
| McGAUTHA, Dennis Councle | 13 Years | 32 |
| SLOAN, Michael Lee | 13 Years | 40 |
| HILL, Robert Douglas | 12 Years | 41 |
| WILLIAMS, Buddy | 9 Years | 44 |
| EARL, Milton (AKA Abu Qadir Al-Amin) | 16 Years | 48 |
| MAGRIS, David | 14 Years | 66 |
| HUSKEY, (Unknown) | 13 Years | 77 |
| CONOVER, Robert | | |
| | | |
| **MULTIPLE CONSECUTIVE LIFE TERM CASES** | 15 Years / 8 Months | 22 |
| FAIN, William Archie | 13 Years / 9 Months | 43 |
| LUCAS, Herman | 13 Years | 55 |
| WILLIAMS, David | 13 Years | 71 |
| LADD, Wayne | 14 Years | 86 |
| DAY, David | 15 Years / 6 Months | 94 |
| McILVAINE, Billy Joe | | |

COPIED AT STATE EXPENSE · 4035609

2

# Table of Contents

|  | Page |
|---|---|
| COMPENDIUM HISTORY | 1 |
| TABLE -- Time Served In Prison and Term Set | 3 |
| CHART -- 1st Degree Murder -- Paroles and Time Served -- by Year | 5 |
| Life Terms / 1st Degree Murder (7 Years to Life) | 6 |
| Life and Commuted Death Sentence Inmates | 6 |
| C.C.R. §2282(b), Matrix of Base Terms for First Degree Murder, before 1/1/79 | 7 |
| KEMP, Darrell | 8 |
| HINES, Clay | 9 |
| MEEKS, James | 10 |
| NYE, Robert | 11 |
| TURVILLE, Charles | 12 |
| COOLEY, Spade | 13 |
| GOODRIDGE, Jerry Lee | 14 |
| STANWORTH, Dennis | 15 |
| ANDERSON, Robert | 17 |
| MABRY, Terry | 19 |
| FINCH, Bernard | 20 |
| LOKEY, Galen | 21 |
| FAIN, William Archie | 22 |
| SUBIA, Ted | 23 |
| BREEDING, (Unknown) | 24 |
| McCLELLAN, William | 25 |
| MASSIE, Robert | 26 |
| ZAGARS, Raymond | 27 |
| SPAIN, Johnny Larry | 29 |
| McGAUTHA, Dennis Councle | 31 |
| SLOAN, Michael Lee | 32 |
| JOLLY, Charles | 33 |
| RUIZ, Ralph | 34 |
| FEASBY, Jerry | 35 |
| ROBLES, Mario | 36 |
| KUHNS, Robert LaFoy | 37 |
| SALING, Warren O'Dell | 38 |
| COLE, James Adolphus | 39 |
| HILL, Robert Douglas | 40 |
| WILLIAMS, Buddy | 41 |
| COOPER, Larry | 42 |
| LUCAS, Herman | 43 |
| EARL, Milton (AKA Abu Qadir Al-Amin) | 44 |
| LU, (Unknown) | 45 |
| TAFFOLA, Santiago Cornado, Jr. | 46 |
| SCOTT, Cecarl | 47 |

COPYRIGHT STATE EXPENSE · 8600ef49

Life Inmate Demographics February 20, 1007

## Table of Contents
### (Continued)

| | Page |
|---|---|
| MAGRIS, David | 48 |
| GROGGIN, Steven | 49 |
| UNKNOWN ISL INMATE | 52 |
| CHARLTON, Randy | 53 |
| MORALES, Jose Ramon | 54 |
| FONG, Joe | 55 |
| WILLIAMS, David | 56 |
| WADDELL, Harold | 57 |
| ROMO, Danny | 58 |
| STEWART, Wilbur | 59 |
| BAGLEY, James | 60 |
| FAHSHOLTZ, David | 61 |
| GRIFFTIH, Robert | 62 |
| AUTREY, David | 63 |
| PROCHANAU, Buddy | 64 |
| SEABOCK, Robert | 65 |
| ANDREWS, Leyland | 66 |
| HUSKEY, (Unknown) | 67 |
| FERGUSON, Thomas | 68 |
| DUNN, Billy Ray | 69 |
| FRANK, David | 70 |
| ALVAREZ, Nicholas | 71 |
| LADD, Wayne | 73 |
| COYNE, Ray | 75 |
| BURRUSS, Richard | 76 |
| HARRIS, James | 77 |
| CONOVER, Robert | 79 |
| WALLACE, Michael | 80 |
| CAMPOS, Elias | 81 |
| PRICE, Oscar | 82 |
| CORDIER, Clifford | 83 |
| SHAW, Otis | 84 |
| SOTELLO, (Unknown) | 85 |
| HERNANDEZ, (Unknown) | 86 |
| DAY, David | 87 |
| STEVENS, Richard | 88 |
| BARNETT, Larry | 89 |
| GUTIERREZ, (Unknown) | 90 |
| COLLINS, Robert | 91 |
| BOZZO, Vincent | 92 |
| MILLER, Jeffrey | |

COPIED AT STATE EXPENSE

## Table of Contents
### (Continued)

|  | Page |
|---|---|
| PEREZ, Miguel | 93 |
| McILVAINE, Billy Joe | 94 |
| CURTIS, John | 96 |
| SMITH, Joseph | 98 |
| SAGIN, Ronald | 99 |
| REDD, (Unknown) | 100 |
| Index of All Cases | 101 |
| Index of Special Interest Cases | 104 |

COPIED AT STATE EXPENSE

5



## Table of Contents
### (Continued)

## Special Interest Cases

| Name | Term | Page |
| --- | --- | --- |
| **SINGLE MURDER ONLY CASES** | | |
| COOLEY, Spade | 8 Years | 13 |
| FINCH, Bernard | 9 Years | 20 |
| SUBIA, Ted | 8 Years | 23 |
| ZAGARS, Raymond | 24 Years | 27 |
| JOLLY, Charles | 11 Years | 33 |
| RUIZ, Ralph | 10 Years | 34 |
| FEASBY, Jerry | 13 Years | 35 |
| KUHNS, Robert LaFoy | 15 Years | 37 |
| SALING, Warren O'Dell | 10 Years / 8 Months | 38 |
| SCOTT, Cecarl | 8 Years | 47 |
| GROGGIN, Steven | 16 Years / 9 Months | 49 |
| MORALES, Jose Ramon | 9 Years / 11 Months | 53 |
| WADDELL, Harold | 10 Years | 56 |
| ROMO, Danny | 7 Years | 57 |
| FAHSHOLTZ, David | 10 Years / 8 Months | 60 |
| FRANK, David | 13 Years | 69 |
| COYNE, Ray | 12 Years / 9 Months | 73 |
| BURRUSS, Richard | 12 Years / 7 Months | 75 |
| HARRIS, James | 13 Years | 76 |
| SHAW, Otis | 12 Years | 83 |
| SOTELLO, (Unknown) | 13 Years | 84 |
| HERNANDEZ, (Unknown) | 13 Years | 85 |
| BARNETT, Larry | 12 Years / 6 Months | 88 |
| GUITIERREZ, (Unknown) | 12 Years | 89 |
| COLLINS, Robert | 11 Years / 7 Months | 90 |
| MILLER, Jeffrey | 11 Years | 92 |
| PEREZ, Miguel | 11 Years | 93 |
| CURTIS, John | 14 Years | 96 |
| SMITH, Joseph | 10 Years | 98 |
| SAGIN, Ronald | 11 Years | 99 |
| REDD, (Unknown) | 12 Years | 100 |

6

## COMPENDIUM HISTORY

The California Department of Corrections compiled most of this documentation's statistical data on California State Life inmates for the years 1945-1996. This data reveals the number of life inmates that the relevant authority found suitable for parole and then released from custody for the past fifty (50) years. This data only includes life term inmates that had been convicted of one or more first degree murders, no other life term sentences were included.

### Data Compiled From:

1) ABC (American Broadcasting Company) News Documentary Life After Death Row, aired on 9/9/88, transcript from Journal Graphics.

2) Parole Data published by the California Department of Corrections, Administrative Services Division, Offender Information Services Branch, Estimates and Statistical Analysis Section, Data Analysis Unit. This covered Life Inmate Statistics from 1945-1981. Data for the years 1982-1996 compiled independently via review of state and federal judicial case files. Refer to the "California Department of Corrections -- Murder 1st, Time Served in Prison and Term Set" chart (covering 1945-1996) following.

3) Independent research on life inmates that were convicted of one or more first degree murders and then found suitable for parole and released. A partial cross reference of life inmates released between 1974-1992 has been documented in this report.

### Average Time Served:

The California Department of Corrections data indicate that between 1945-1971 the average time served by those paroled on first degree murder convictions was eleven (11) years, seven (7) months. Figures for the time period of 1970-1981 reveal that the average had fallen to eleven (11) years, two (2) months. Data for the following six (6) years, 1981-1987, demonstrate that the average time served decreased even further to ten (10) years, nine (9) months. Figures for the time period of 1988-1990 show an upward climb to average at fourteen (14) years, eight (8) months. By 1990-1991 the average climbed even further to fifteen (15) years, six (6) months.

It is interesting that in 1992 the data reveals that only one (1) life inmate was released and that the time served was fifteen (15) years, six (6) months. Figures for 1993-1994 depict that **NO** life inmates (convicted of first degree murder) were found suitable for parole and released. Additional figures for 1995 through 1/1/97 still depict that **NO** life inmates (convicted of first degree murder) were found suitable for parole and released.

**Average Number Released:**

Data for those life inmates (convicted of one or more first degree murders) sentenced prior to the new 1979 laws regarding life sentences depict that between 1974-1988 (a fourteen year period) approximately eight hundred and twenty-five (825) life inmates were found suitable for parole and released. This results in an average of fifty-eight (58) paroles per year. Figures for the period of 1989-1992 depict approximately fourteen (14) life inmates were found suitable for parole and released from custody. This was accomplished by releasing six (6) life inmates in 1989, four (4) in 1990, three (3) in 1991, and one (1) in 1992, a dramatic and rapid decrease. The data during that three year period shows that during 1992 only one (1) life inmate was allowed to parole. As stated above in **Average Time Served**, **NO** life inmates have been paroled from 1993 to date, an average of zero (0) per year.

These figures may be further analyzed for the periods for which reliable statistics are available. See the following "California Department of Corrections -- Murder 1st, Time Served in Prison and Term Set" chart (covering 1945-1996).

COPIED AT STATE EXPENSE - 4035689

B

## Murder 1st
## Time Served In Prison and Term Set
## Male Felons First Paroled
## 1945-1996

Indeterminate Sentencing Law:

| Statutory citation | Statutory sentence | Minimum parole date | As of |
|---|---|---|---|
| 190 | Life-Death | 84 months | 1/1/97 |
| 190 | 25-life | 230 months | |

| | | Time Served in Months | | |
|---|---|---|---|---|
| Year of Parole | Number Paroled | Median Time | Range of mid 80% of cases | Median term in years |
| 1945 | 26 | 168 | 120-228 | Life |
| 1946 | 41 | 168 | 120-228 | Life |
| 1947 | 33 | 160 | 120-228 | Life |
| 1948 | 27 | 165 | 120-228 | Life |
| 1949 | 42 | 162 | 120-228 | Life |
| 1950 | 27 | 150 | 120-203 | Life |
| 1951 | 44 | 160.5 | 120-204 | Life |
| 1952 | 40 | 144 | 97-220 | Life |
| 1953 | 33 | 144 | 96-180 | Life |
| 1954 | 39 | 138 | 96-180 | Life |
| 1955 | 31 | 138 | 102-151 | Life |
| 1956 | 32 | 121 | 96-192 | Life |
| 1957 | 26 | 120 | 93-222 | Life |
| 1958 | 21 | 144 | 100-159 | Life |
| 1959 | 32 | 136.5 | 101-193 | Life |
| 1960 | 16 | 139 | 97-300 | Life |
| 1961 | 22 | 141 | 122-150 | Life |
| 1962 | 17 | 130 | 126-237 | Life |
| 1963 | 14 | 145 | 115-173 | Life |
| 1964 | 20 | 136 | 109-174 | Life |
| 1965 | 34 | 132 | 102-210 | Life |
| 1966 | 27 | 141 | 119-352 | Life |
| 1967 | 23 | 126 | 102-180 | Life |
| 1968 | 24 | 145 | 114-240 | Life |
| 1969 | 31 | 144 | 91-256 | Life |

COPIED AT STATE EXPENSE - 4035669

(Continued on Next Page)

Life Inmate Demographics, February 22, 1997

9

**Time Served In Prison and Term Set**
**Male Felons First Paroled**
**1945-1996**
(Continued)

| Year of Parole | Number Paroled | Time Served in Months | | Median term in years |
|---|---|---|---|---|
| | | Median Time | Range of mid 80% of cases | |
| 1970 | 46 | 139 | 99-234 | Life |
| 1971 | 90 | 143 | 103-223 | Life |
| 1972 | 63 | 130 | 91-262 | Life |
| 1973 | 18 | 167.5 | 91-259 | Life |
| 1974 | 18 | 122.5 | 94-239 | Life |
| 1975 | 122 | 133.5 | 109-237 | Life |
| 1976 | 90 | 129.9 | 94-169 | Life |
| 1977 | 77 | 125 | 95-220 | Life |
| 1978 | 106 | 137 | 94-194 | Life |
| 1979 | 53 | 134 | 95-163 | Life |
| 1980 | 50 | 131 | 89-155 | Life |
| 1981 | 39 | 134 | 88-205 | Life |
| 1982 | 42 | 134 | 88-205 | Life |
| 1983 | 41 | 132 | 89-195 | Life |
| 1984 | 40 | 132 | 89-195 | Life |
| 1985 | 39 | 135 | 95-205 | Life |
| 1986 | 38 | 138 | 95-205 | Life |
| 1987 | 36 | 137 | 94-198 | Life |
| 1988 | 34 | 140 | 95-199 | Life |
| 1989 | 6 | 172 | 100-205 | Life |
| 1990 | 4 | 174 | 105-205 | Life |
| 1991 | 3 | 180 | 107-205 | Life |
| 1992 | 1 | 180 | 180 | Life |
| 1993 | 0 | N/A | N/A | Life |
| 1994 | 0 | N/A | N/A | Life |
| 1995 | 0 | N/A | N/A | Life |
| 1996 | 0 | N/A | N/A | Life |

N/A = Not Applicable
Data for the years 1945-1981 supplied by California Department of Corrections, Administrative Services Division, Offender Information Services Branch, Estimates and Statistical Analysis Section, Data Analysis Unit. Data for the years 1982-1996 compiled independently via review of state and federal judicial case files.

COPIED AT STATE EXPENSE - 4035689

**Life Inmate Demographics, February 22, 1997**

10



COPIED AT STATE EXPENSE · 4035689



## Life Terms / 1st Degree Murder (7 Years to Life) Legislatively Defined Prior to 1/1/79:

Penal Code Section 3046 mandates that an inmate serving a 'Life' sentence (7 Years to Life) for first degree murder that was sentenced prior to the new murder sentencing laws of 1979, must serve a minimum of seven (7) years prior to being released on parole.

In comparison, Penal Code Section 3041 (Disparity) requires that, with life inmates sentenced for conviction of first degree murder with offenses of similar gravity and magnitude, the Board is to establish criteria and set parole release dates in a manner that will provide "Uniform" terms of incarceration. The Board created its Matrix scale in the California Code of Regulations, Title 15, Section §2282(b), for first degree murders that were committed prior to 1/1/79, to accomplish this focus on uniformity (see C.C.R. §2282(b), "Matrix of Base Terms for First Degree Murder" attached next). However, the Board is no longer administering this criteria of equal protection to life inmates.

## Life and Commuted Death Sentence Inmates:

All life inmates during the time period of 1944-1996 fell under the guidelines and authority of one of the following empowered panels: Adult Authority (AA), 1944-1975; Community Release Board (CRB), 1976-1979; and the Board of Prison Terms (BPT), 1980 to date.

For purposes concerning this demographic documentation, it should be noted that a small percentage of those life inmates listed, who did parole in the past twenty years, did, in fact, start out on California's Death Row. In 1972 a California State Supreme Court decision (People v. Anderson) overturned the state's death penalty statute on the grounds that it was cruel and unusual. The court then commuted all death row sentences (death warrants) to 'Life With the Possibility of Parole' (7 years to life). The Death Penalty was rapidly reinstated by the Legislature only to have it again overturned on the same grounds in 1976 (see Rockwell v. Superior Court, Ventura County, 1976, 18 CAL 3D 420).

The following inmates were chosen only as a partial cross reference of those who had been convicted of 1st Degree Murder and later released. All these inmates had been sentenced to either 'Life with the Possibility of Parole,' or a 'Death Penalty' and had their sentences commuted to 'Life with the Possibility of Parole' prior to 1/1/79.

COPIED AT STATE EXPENSE • 4035689

C.R. §2282(b). Matrix of Base Terms for First Degree Murder, before 1/1/79

COPIED AT STATE EXPENSE - 4035589

**CIRCUMSTANCES**

| 2282(b) FIRST DEGREE MURDER Penal Code §189 (in years and does not include post conviction credit as provided in §2280) | A. Indirect Victim dies of causes related to the act of the prisoner but was not directly assaulted by prisoner; e.g., victim initiated prisoner's with deadly force; e.g., shock producing heart attack; a crime partner actually did the killing. | B. Direct or Victim Contribution Death was almost immediate or resulted at least partially from contributing factors from the victim; e.g., victim initiated struggle or had goaded the prisoner. This does not include the victim acting in defense of self or property. | C. Severe Trauma Death resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim. | D. Torture Victim was subjected to the prolonged infliction of physical pain through the use of non-deadly force prior to act resulting in death. |
|---|---|---|---|---|
| I. Participating Victim Victim was an accomplice or otherwise implicated in a criminal act with the prisoner during which or as a result of which the death occurred; e.g., crime partner, drug dealer, etc. | 8-10-12 | 10-12-14 | 11-13-15 | 13-15-17 |
| II. Prior Relationship Victim was involved in a personal relationship with prisoner (spouse, family member, friend, etc.) which contributed to the motivation for the act resulting in death. If victim had a personal relationship but prisoner hired and/or paid a person to commit the offense, see Category IV. | 10-12-14 | 12-14-16 | 13-15-17 | 15-17-19 |
| III. No Prior Relationship Victim had little or no personal relationship with prisoner; or motivation for act resulting in death was related to the accomplishment of another crime; e.g., death of victim during robbery, rape, or other felony. | 11-13-15 | 13-15-17 | 14-16-18 | 16-18-20 |
| IV. Threat to Public Order or Murder for Hire The act resulting in the victim's death constituted a threat to the public order, include the murder of a police officer, prison guard, public official, fellow patient or prison official; or any killing where the prisoner hired and/or paid another person to commit the offense. | 13-15-17 | 15-17-19 | 16-18-20 | 18-20-22 |

SUGGESTED BASE TERM

**Life Inmate Demographics, February 22, 1997**

13

| Name | STANWORTH, Dennis | CDC # | Unknown BH | Age (at arrest) | 22 |

**Case #8**

## Crimes

In 1966, Stanworth pled guilty to two (2) counts first degree murder. In the same proceeding, he also pled guilty to counts charging aggravated and simple kidnapping, forcible rape, oral copulation, and armed robbery. These convictions followed a series of crimes involving the brutal murders and abuse of multiple victims. As this was a capital case, there was a penalty phase before a jury. There were two (2) girl victims of these crimes.

## Conviction

Two (2) counts 1st Degree Murder, one (1) count Aggravated Kidnapping, one (1) count Simple Kidnapping, one (1) count Forcible Rape, one (1) count Oral Copulation, and one (1) count Armed Robbery. As this was a capital case, he was also convicted of Special Circumstances.

## Sentence

Two "Death Penalty" sentences, and Life Without the Possibility of Parole (started term on death row)

## Prior Criminal History

No serious prior criminal history.

## Prison Adjustment

Stanworth received his only disciplinary infractions while he was on death row. He participated in cell study while on death row. Once he was released from death row, he had an excellent work record, obtained an Associate of Arts degree and a Certificate in Data Processing, and participated in six years of therapy programs.

>    **Release Date:**   1983 (by court order)

>    **Time Served:**   17 Years

>  **Information Source:**   CDC Data Analysis Unit

## Notes

In 1972, a California Supreme Court decision overturned the state's Death Penalty Statute and commuted all death row prisoners' sentences to Life with the Possibility of Parole (7 Years to Life).

COPIED AT STATE EXPENSE · 4035689

14

| Name | ANDERSON, Robert | CDC # | Unknown | Age (at arrest) | 25 |
|---|---|---|---|---|---|

**Case #9**

## Crimes

In 1966, Anderson entered a pawn shop to pawn a ring. While waiting on the store clerk, he got the feeling that, because he was black (his own words), he was being discriminated against. So, he picked out a rifle and loaded it. He then took aim on the store clerk. The clerk turned and started running for his life when Anderson shot him. Bystanders outside the pawn shop front window witnessed the murder and then watched as Anderson walked over to the weapons case, smashed the glass, and grabbed some pistols and ammunition. At this point Anderson recalls saying to himself, "If I can't go out, they're not going to come in!" Close to sixty-five (65) San Diego Police Officers surrounded the pawn shop and commenced a shoot-out with Anderson. A police sergeant made his way inside the shop and was able to shoot Anderson with multiple rounds from a 16 gauge shotgun. The shots almost ripped Anderson's arms off of his body and he was rushed to a nearby hospital where his arms were saved.

## Conviction

One (1) count 1st Degree Murder, multiple counts of Armed Robbery, and several counts of Attempted Murder on Police Officers. As this was a capital case, he was also convicted of Special Circumstances.

## Sentence

Death (started term on death row)

## Prior Criminal History

No available information

## Prison Adjustment

Upon his release to the prison mainline, Anderson maintained a regular work assignment until his release. No other rehabilitative and or therapy programming information is available.

    **Release Date:**   1976

    **Time Served:**   10 Years

**Information Source:**   ABC News Documentary "Life After Death Row"

COPIED AT STATE EXPENSE - 4035889

15

Name ANDERSON, Robert              Case #9 (Continued)

Notes

In 1972, a California Supreme Court decision overturned the state's Death Penalty Statute and commuted all death row prisoners' sentences to Life with the Possibility of Parole (7 Years to Life). This landmark decision was in Anderson's death penalty appeal (People v. Anderson).

COPIED AT STATE EXPENSE - 4035689



| Name | SLOAN, Michael Lee | CDC # | B-10636 | Age (at arrest) | 17 |

**Case #21**

### Crimes

In 1967, Sloan was arrested for Murder, Kidnapping, Rape, and Armed Robbery. No other information available.

### Conviction

One (1) count 1st Degree Murder, three (3) counts of Kidnapping, one (1) count Forcible Rape, one (1) count Armed Robbery. As this was a capital case, he was convicted of Special Circumstances.

### Sentence

Death (started term on death row)

### Prior Criminal History

Sloan was a juvenile when he committed these crimes. He was tried and convicted as an adult. He had a prior juvenile arrest record full of arrests and convictions.

### Prison Adjustment

After Sloan was brought down off of death row, he could not remain disciplinary free for any length of time. From 1972 through 1978, he received a multitude of serious CDC-115 rule violation reports. Some of the charges include: Possession of Weapons (Knives), Possession of Narcotics & Marijuana, Threatening Staff, and Sexual Misconduct. Sloan also spent much of 1974 though 1978 in Administrative Segregation Units, described as a management problem by staff.

> **Release Date:** 1980
>
> **Time Served:** 13 Years
>
> **Information Source:** Independent Research

### Notes

In 1972, a California Supreme Court decision overturned the state's Death Penalty Statute and commuted all death row prisoners' sentences to Life with the Possibility of Parole (7 Years to Life).

In 1979, the Board of Prison Terms deemed Sloan suitable for a parole release date. Some twelve (12) months later, Sloan was released.

| Name | LUCAS, Herman | CDC # | Unknown B# | Age (at arrest) | 34 |

**Case #32**

## Crimes

On May 4, 1969, in the L.A. County area, Lucas and three (3) accomplices went to the home of Violet Sullivan, an elderly eighty-four (84) year old woman, and her companion friend Mary Robinson, who was fifty-two (52) years old, for the sole purpose of robbing the women. One of the robbers threw a towel over Sullivan's head and when Robinson complained Lucas shot Mary Robinson in the back, killing her. Lucas then turned to Sullivan and shot her in the head. Lucas and his accomplices netted $10.00 (ten dollars) in the murder/robbery.

## Conviction

Two (2) counts 1st Degree Murder and one (1) count Armed Robbery

## Sentence

Two (2) consecutive Life With the Possibility of Parole terms (Double 7 Years to Life).

## Prior Criminal History

Multiple Robberies, extensive juvenile history/problems.

## Prison Adjustment

Lucas' prison behavior was 'spotty to good,' although he was accused of smoking 'pot' (marijuana) in his cell. Examiners found no psychological problems but he tended to rationalize the double murder. The L.A. County District Attorney's Office maintained Lucas had no remorse.

| | |
|---|---|
| **Release Date:** | 17 February 1983 |
| **Time Served:** | 13 Years / 9 Months |
| **Information Source:** | CDC Data Analysis Unit |

COPIED AT STATE EXPENSE · 6035649

18




Name **LU, (Unknown)**    CDC # **Unknown/AF**    Age (at arrest) **22**

## Case #34

### Crimes

In 1964, Lu had, with forethought and contemplated planning, set out to murder two (2) other individuals that had crossed him in a business deal. Armed with a hatchet, he stalked both of his victims and attacked each one individually in a vicious, animal like manner. Because Lu used a hatchet, it was very difficult for the coroner to conclude just how many fatal blows were struck to each victim. The coroner concluded that Lu utilized such overkill as to murder each victim twice. This was a highly publicized case in the newspapers and local television news stations.

### Conviction

Two (2) counts 1st Degree Murder

### Sentence

Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History

No available information

### Prison Adjustment

Lu engaged in NO rehabilitative programming whatsoever while incarcerated. He did receive many CDC-115 Rules Violation Reports and various CDC-128 counseling chronos regarding rules violations minor in nature.

    **Release Date:**    1977

    **Time Served:**    13 Years

**Information Source:**    CDC Data Analysis Unit

COPIED AT STATE EXPENSE · 4035689

Name **UNKNOWN ISL INMATE**    CDC # A-74880    Age (at arrest) ?

## Case #39

### Crimes
Previously sentenced to prison prior to this life sentence, this inmate was involved in a prison gang murder in 1970. He attempted to murder another inmate at the same time.

### Conviction
One (1) count 1st Degree Murder and one (1) count Attempted Murder

### Sentence
Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History
This individual was sentenced to prison on prior felony convictions as an adult when he committed this crime. There is no information available on his criminal record prior to this incarceration.

### Prison Adjustment
This individual committed multiple murders while incarcerated. He also accumulated over seventy-one (71) serious disciplinary rule violation reports over the course of his incarceration.

> **Release Date:**   1987
>
> **Time Served:**   17 Years
>
> **Information Source:**   Independent Research

### Notes
This inmate requested that his name and age not be listed. He did give permission to utilize his CDC number and history.

This inmate committed another prison murder in 1978. He was convicted at trial of this additional homicide.

In spite of having committed serial murders and having the worst prison adjustment of any case listed herein, the Board found this inmate suitable for parole and set his base term at thirteen (13) years for this murder. The Board then aggravated the base term by an additional seven (7) years for the later homicide, for a total term of twenty (20) years. This inmate accumulated three (3) years of good time credit for an actual term of seventeen (17) years.

COPIED AT STATE EXPENSE - 4035608

Name **MORALES, Jose Ramon**     CDC # Unknown BP     Age (at arrest) **28**

## Case #41

### Crimes

In 1971 the body of Morales' girlfriend, Gina Wallace, was found in an abandoned medical building. She had been shot in the head, neck, and abdomen. Her right thumb had been amputated and her face slashed repeatedly. A bloody fingerprint near the victim's body matched Morales' fingerprint identification.

### Conviction

One (1) count 1st Degree Murder / Mutilation

### Sentence

Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History

There is a juvenile history of known criminal activities concerning Morales. This was his only known previous contact with law enforcement. If there was any prior 1971 criminal activity, it is unknown.

### Prison Adjustment

Morales did very little while he was incarcerated to assist in his becoming a good parole candidate. He did though marry a woman by the name of Ms. Louis Washabaugh in 1980.

**Release Date:**     11 April 1980 (to a halfway house)

**Time Served:**     9 Years / 11 Months

**Information Source:**     Independent Research

### Notes

Most of Morales' term in prison was spent at the California Training Facility (CTF) in Soledad, California.

COPIED AT STATE EXPENSE - 4035699



| Name | FONG, Joe | CDC # | Unknown #if | Age (at arrest) | 25 |

### Case #42

### Crimes

In 1971, Fong was the gang leader of the Chinatown "Joe Fong Gang." He was instrumental in the "Golden Dragon" restaurant massacre, where his gang members, some five (5) in total, entered the restaurant late in the afternoon and started "spraying" the inside with automatic gunfire. This was orchestrated by Fong in the hope of killing a rival gang leader that usually ate at this restaurant. The "hit" was unsuccessful and multiple innocent persons were killed. Fong was arrested soon thereafter.

### Conviction

Multiple counts 1st Degree Murder

### Sentence

Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History

Fong had an extensive juvenile history. Listing his charges would fill multiple pages. Being the gang leader of a well known gang, Fong was under constant surveillance by the local police authorities.

### Prison Adjustment

During Fong's incarceration, he participated in a few self-help groups while at Deuel Vocational Institution (DVI). He also participated in one vocational trade program. His disciplinary record shows that he was mainly disciplinary free during his incarceration period. Only minor CDC-115 and CDC-128 infractions are noted.

    **Release Date:**  1980

    **Time Served:**  9 Years

**Information Source:**  Independent Research

### Notes

It was well known that Fong had a close relationship with the Director of Corrections (Mr. J. Enomoto) during his incarceration. Mr. Enomoto would personally visit with Fong at least once a month at DVI. It was Mr. Enomoto's strong political efforts and ties to the Board of Prison Terms that eventually allowed Fong to be given a release date in 1979 and paroled after only a relatively short incarceration.

COPIED AT STATE EXPENSE - 4035689

**Life Inmate Demographics, February 22, 1997**

22

Name STEWART, Wilbur     CDC # Unknown BF     Age (at arrest) 26

## Case #46

### Crimes
In 1971, Steward committed multiple murders by shooting to death his wife, her mother, and her boyfriend. The coroner reported that each victim had been shot multiple times. Each victim had at least three (3) separate bullet entrance wounds in and around the head. Upon his arrest, Stewart engaged in a shoot out with local authorities until he ran out of ammunition.

### Conviction
Three (3) counts 1st Degree Murder

### Sentence
Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History
Stewart had an extensive and lengthy previous adult and juvenile criminal record. Far too many charges to be included in this document.

### Prison Adjustment
Stewart served his entire term at San Quentin State Prison. While he was there, he worked for the prison psychiatrist and Chief Medical Officer. His rehabilitative programming consisted only of completing his high school education and partially completing a trade in the nursing field.

Release Date:     1985 (approximately)

Time Served:     10 Years

Information Source:     CDC Data Analysis Unit

COPIED AT STATE EXPENSE · 4035680

**Name** GRIFFITH, Robert    **CDC #** Unknown B#    **Age (at arrest)** 37

## Case #49

### Crimes

In 1972, Griffith murdered his gay lover in a jealous rage.

### Conviction

One (1) count 1st Degree Murder

### Sentence

Life With the Possibility of Parole (7 Years to Life)

### Prior Criminal History

As a juvenile, Griffith was convicted of murdering his uncle and served approximately nine years in the Youth Authority, released in the early 1960's. Later, as an adult, Griffith was convicted of the first degree murder of his father. He served an approximate incarceration period of eleven (11) years and was released in 1974.

### Prison Adjustment

During his last incarceration period, Griffith was assigned in a maintenance position as an institutional inmate electrician for his entire term. He acquired no other skills or training during this incarceration. He did receive many disciplinary write-ups of a serious nature. Most were related to sexual assaults or sexual misconduct.

|  |  |
|---|---|
| **Release Date:** | 1983 |
| **Time Served:** | 11 Years |
| **Information Source:** | Independent Research |

### Notes

Griffith was convicted of three murders over his life. He was sentenced, served a term, and was released from each. He was 17 years old on his first conviction, 26 years old on his second conviction, and 37 years old on his last conviction. He has had a YA number, a CDC 'A' number, and a CDC 'B' number on his last incarceration. Griffith was given his last release date in 1982, after only serving ten (10) years.

24

**EXHIBIT 43**

Statistics

**BPH News** (from page 2)

## STATISTICS

# 2006 Governor Statistics – As of August 9, 2006

| Offense | Reversed | Declined Review | En Banc (*) Referral | Total |
|---|---|---|---|---|
| First Degree Murder | 18 (95%) | 1 | | 19 |
| Second Degree Murder | 60 (83%) | 12 | | 72 |
| Attempted Murder     (*) | | 0 | 6 (100%) | 6 |
| Aggravated Kidnapping (*) | | 0 | 14 (100%) | 14 |

(*) the governor does not have reversal power in these cases

# 2005 BPT/Governor Parole Statistics

Parole Consideration Hearings Conducted                    4953

    Male First-Degree Murder Cases                    1320
    Female First-Degree Murder Cases                  88
       Total First Degree Murder Cases         1408
       All Other Cases                          3545

Overall Suitability Rate

    All BPH Hearings                              3.6% (179/4953)
    After Governor Reversals                      1.2% ( 58/4953)

Suitability Rate by Offense

    All First-Degree Murder Cases

       BPH Hearings                            2.30% (32/1408)
       After Governor Reversals                0.36% ( 5/1408)

    Male First-Degree Murder Cases

       BPH Hearings                            1.97% (26/1320)
       After Governor Reversals                0.08% ( 1/1320)

    Female First-Degree Murder Cases

       BPH Hearings                            6.8% (6/88)
       After Governor Reversals                4.5% (4/88)

Source: Letter from Governor's Legal Affairs Secretary, June 6, 2006

The number of hearings for female prisoners was obtained from subtracting the number of male cases from the total number of cases

(Continued on page 8)

**BPH**   (from page 4)

Following are tables and excerpts of the Board's parole statistics taken from our files and provided by Carl McQuillion and Michael Brodheim (many thanks!).

## Lifer Statistics:1998-2005

| | A | B | C | D1/D2 | E | F1/F2 | G |
|---|---|---|---|---|---|---|---|
| | | | # Grants | | Net # | Net % | |
| Year | # Hrgs | Denials | Prop./Eff. | #/% Rev'd | Suitable | Suitable | # Rescinded |
| 1998 | 2,191 | 2,047 | 27/23 | 3/13% | 20 | 0.91%/0.96% | 1 |
| 1999 | 1,953 | 1,827 | 21/13 | 10/77% | 3 | 0.15%/0.16% | 1 |
| 2000 | 2,179 | 1,873 | 52/37 | 12/32% | 25 | 1.15%/1.30% | 0 |
| 2001 | 3,645 | 3,098 | 84/69 | 33/48% | 36 | 0.99%/1.13% | 1 |
| 2002 | 4,826 | 3,746 | 168/140 | 102/73% | 38 | 0.79%/0.97% | 3 |
| 2003 | 4,499 | 2,957 | 168/158 | 134/85% | 24 | 0.53%/0.77% | 3 |
| 2004 | 4,552 | 2,620 | 214/204 | 128/63% | 76 | 1.67%/2.68% | 3 |
| 2005 | 4,953 | 3,177 | 161/166[6] | 121/73% | 45 | 0.91%/1.35% | 3 |
| | 28,798 | 21,345 | 895/810 | 543/67% | 267 | 0.93%/1.20% | 15 |

[1]Other than reversals, all the statistics here were obtained in discovery from AG James E. Flynn in Brodheim v. DiNinni, et al., a 42 U.S.C. § 1983 action pending in the U.S. District Court for the Eastern District of California, case no. 2:05-CV-1512 LKK GGH P. Flynn's statistics were "Life Prisoner Hearing and Decision Information" data sheets for calendar years 1998 through 2005 and were compiled by the Board's Management Information Section, Administrative Services Division.

[2]C1 lists the number of proposed grants. C2 lists the number of effective grants.

[3]The # of reversals (D1) was obtained from the Governor's Executive Reports. The % reversed (D2) was calculated as (# reversed x 100) / (# eff. grants), i.e., (D1 x 100)/ C2.

[4]The net # suitable (E) was calculated as (# eff. grants - # reversed), i.e., (C2 - D1).

[5]The net % suitable was calculated in two different ways. The first number (F1) was calculated as (net # suitable x 100) / (# hearings), i.e., (E x 100) / A. The second number (F2) was calculated as (net # suitable x 100) / (# denials + # proposed grants), i.e., (E x 100) / (B + C1). The calculations differ somewhat because the # hearings (apparently) includes stipulations and postponements, as well as other miscellaneous-type hearings which do not lead directly to either grants or denials of parole.

[6]It is not clear why (or how) the number of effective grants could exceed the number of proposed grants in 2005.

2

VOLUME 2    NUMBER 6    CALIFORNIA LIFER NEWSLETTER    #    NOVEMBER 2006    PAGE 11

# LIFER SENTENCES 1940-2005
## FOOTNOTES ON PAGE 12

| Year | # Hearing | #Suitable | # Rev'd | #Rescinded | %Suitable | Net % Suitable | %Rescinded |
|------|-----------|-----------|---------|------------|-----------|----------------|------------|
| 1940/41 | 4264[a] | 2093[a] | | 55[b] | 49.09% | | 1.29% |
| ... | | | | | | | |
| 1978/79[c] | | | | | 45% | | |
| 1979/80[d] | 515 | 96 | | | 18.64% | | |
| 1980/81[d] | 606 | 78 | | | 12.87% | | |
| 1981/82[d] | 715 | 50 | | | 6.99% | | |
| 1982/83[d] | 818 | 36 | | | 4.40% | | |
| 1983/84[d] | 836 | 53 | | | 6.34% | | |
| 1984/85[d] | 660 | 49 | | | 7.42% | | |
| 1985/86[d] | 841 | 62 | | | 7.37% | | |
| 1986/87[d] | 740 | 48 | | | 6.49% | | |
| 1987/88[d] | 801 | 31 | | | 3.87% | | |
| 1988/89[d] | 875 | 22 | | | 2.51% | | |
| 1989/90[d] | 1266 | 45 | | | 3.55% | | |
| 1990/91[d] | 1241 | 63 | | | 5.08% | | |
| 1991 | 1813[e] | 50[e] | 6[f] | 7[e] | 2.76% | 2.43% | 0.39% |
| 1992 | 1823[e] | 37[e] | 2[f] | 19[e] | 6.93% | 0.82% | 1.04% |
| 1993 | 1676[e] | 14[e] | 5[f] | 23[e] | 0.84% | 0.65% | 1.37% |
| 1994 | 2019[e] | 9[e] | 1[f] | 23[e] | 0.45% | 0.40% | 1.14% |
| 1995 | 2180[e] | 6[e] | 2[f] | 20[e] | 0.28% | 0.18% | 0.92% |
| 1996 | 2304[e] | 3[e] | 2[f] | 8[e] | 0.13% | 0.30% | 0.35% |
| 1997 | 2286[e] | 13[e] | 1[f] | 2[e] | 0.57% | 0.92% | 0.09% |
| 1998 | 2177[e] | 22[e] | 3[f] | 2[e] | 1.01% | 0.87% | 0.09% |
| 1999 | 1953[g] | 16[h] | 16[h] | | 0.82% | 0.31% | |
| 2000 | 2168[i] | 27[j] | 12[j] | | 1.25% | 0.69% | |
| 2001 | 3536[k] | 51[l] | 33[l] | | 1.46% | 0.55% | |
| 2002 | 4826[m] | 133[n] | 102[n] | | 2.76% | 0.64% | |
| 2003 | 4498[o] | 158[o] | 134[o] | | 3.53% | 0.56% | |
| 2004 | 2813 | 225[p] | 128[q] | | 8.00% | 3.45% | |
| 2005 | 4953[r] | 175[s] | 121[s] | | 3.61% | 1.17% | |
| **SUMMARY** | | | | | | | |
| pre-1979[t] | | | | | 50% | 50% | |
| 1979/80–1982/83 | 2,684 | 260 | 0 | 0 | 9.80% | 9.80% | |
| 1983/84–1990/91 | 7,260 | 373 | 0 | 0 | 5.14% | 5.14% | |
| 1991–1998 | 16,278 | 140 | 20 | 104 | 0.86% | 0.74% | 0.64% |
| 1999–2005 | 24,845 | 792 | 540 | | 3.19% | 1.02% | |
| 1991–2005 | 41,123 | 932 | 560 | | 2.27% | 0.90% | |

(Footnotes on page 12)

VOLUME 2    NUMBER 6    CALIFORNIA LIFER NEWSLETTER    2    NOVEMBER 2006    PAGE 12

# FOOTNOTES: LIFER SENTENCES 1940-2005

a. Board of Prison Terms and Paroles, 10th Annual Report to the Governor, p. 15.

b. Id., p. 17.

c. Estimate based on graph on p. 3 of 1988 BPT Life Prisoner Report.

d. Statistics on Parole Suitability of Life Prisoners, BPT/MIS Report, Apr. 9, 1992.

e. BPT Life Prisoner Hearing and Decision Information, Oct. 1, 1999 Report.

f. Governor's Executive Reports on Parole Review Decisions, 1991-98.

g. Communication from BPT Public Information Representative, Bill Sessa, July 16, 2003.

h. Governor's Executive Report on Parole Review Decisions, 1999.

i. Life Prisoner Hearing and Decision Information for CY 2000, MIS Report.

j. Governor's Executive Report on Parole Review Decisions, 2000.

k. Life Prisoner Hearing and Decision Information for CY 2001, MIS Report.

l. Governor's Executive Report on Parole Review Decisions, 2001.

m. Communication from BPT Public Information Representative, Bill Sessa, May 9, 2003.

n. Governor's Executive Report on Parole Review Decisions, 2002.

o. Communication from BPT Public Information Office, March 15, 2004, as modified by subsequent communication dated July 30, 2004.

p. Governor's Executive Report on Parole Review Decisions, Nov. 17, 2003 (when Schwarzenegger assumed office) through Dec. 31, 2004.

q. Does not include 18 en banc referrals (in non-murder cases).

r. June 6, 2006 letter from Daniel P. Maguire, Deputy Legal Affairs Secretary.

s. Governor's Executive Report on Parole Review Decisions (CY 2005).

t. Estimate.

\* "net % suitable" = 100 x (# suitable - # reversed)/(# hearings)

Additional Notes

1. The 1999 totals do not include 3 YA cases found suitable by the Board but reversed by Governor Davis that year.

2. It is unclear whether the Board held any rescission hearings after 1998. It appears, however, that (since that time) en banc reviews have resulted in "reversal" by the Board of many of its own previous suitability findings, so that the actual (or net) number of suitability findings may be less than the figures in the table indicate (even after taking into account reversals by the Governor).

3. The 2001 figures reflect the fact that California courts declared invalid two "reversals" by Governor Davis on the ground that the Governor does not have the authority under California law to "reverse" BPT decisions in the case of those convicted of conspiracy to commit murder.

4. The 1979/80-1982/83 summary figures coincide roughly with the results attributable to the last term of Governor Jerry Brown's administration. The 1983/84-1990/91 summary figures coincide roughly with the results attributable to the two terms of the George Deukmejian administration. The 1991-1998 summary figures coincide roughly with the results attributable to the two terms of the Governor Pete Wilson administration.

4

### TABLE OF TIME SERVED
### FIRST DEGREE MURDER OFFENDERS
### YEARS 1986-2005
### MEANS & MEDIANS

## 1st Degree Murder

| YEAR | | MEAN | MEDIAN | NUMBER PAROLED | |
|---|---|---|---|---|---|
| 1986 | | 168.9 | 169.4 | 33 | |
| 1987 | | 167.7 | 157.7 | 75 | |
| 1988 | | 158.6 | 159 | 42 | |
| 1989 | | 166.3 | 166 | 51 | |
| 1990 | | 174.6 | 171.6 | 33 | |
| 1991 | | 168.9 | 169.4 | 33 | |
| 1992 | | 205.5 | 200.3 | 8 | |
| 1993 | | 193.7 | 193.7 | 2 | |
| 1994 | | 0 | 0 | | 0 |
| 1995 | | 0 | 0 | | 0 |
| 1996 | | 0 | 0 | | 0 |
| 1997 | | 0 | 0 | | 0 |
| 1998 | | ISL 361.3 DSL 241.7 | ISL 361.3 DSL 241.7 | 1 1 | |
| 1999 | | ISL 286.2 | ISL 286.2 | 2 | |
| 2000 | | 0 | 0 | | 0 |
| 2001 | | DSL 251.4 | DSL 251.4 | 1 | |
| 2002 | | DSL 240.0 | DSL 239.1 | 3 | |
| 2003 | | DSL 253.2 | 243.2 | 2 | |
| 2004 | | (pre-78 DSL) 342.5 (28.5 yrs) DSL 284.7 | (pre-78 DSL) 336.6 (28 yrs) DSL 286.4 | 7 8 | |
| 2005 | | (pre-78 DSL) 372.0 (31 yrs) DSL 290.4 (24.2 yrs) | (pre-78 DSL) 372.0 (31 yrs) DSL 306.3 (25.5 yrs) | 2 3 | |

Source:    California Department of Corrections, Offender Information Services Branch
           Statistics and Analysis (Complete data supporting this chart is at EXHIBIT GG.)


### LIFE PRISONER RELEASES
### 1979-1987

| Year | Total Heard | Total Granted | Percentage |
|---|---|---|---|
| 1979 | N/A | N/A | 32% |
| FY 1979/1980 | 515 | 96 | 19% |
| FY 1980/1981 | 606 | 78 | 13% |
| FY 1981/1982 | 715 | 50 | 7% |
| FY 1982/1983 | 819 | 36 | 4% |
| FY 1983/1984 | 836 | 53 | 6% |
| FY 1984/1985 | 661 | 49 | 7% |
| FY 1985/1986 | 835 | 61 | 7% |
| FY 1986/1987 | 740 | 48 | 5% |

Source:     Board of Prison Terms     (1988)
            Beulah Hayward
            Management Information Section

      &

            Board of Prison Terms     (1983)
            Joan W. Cavanagh
            Executive Officer

5

# 2006 PAROLES
## AS OF AUGUST 9, 2006

| PAROLE STATISTICS (Updated) 08/09/06 | Decline to Review | Reverse | En Banc. | Affirm. |
|---|---|---|---|---|
| 111 Total | 13 Total | 78 Total | 20 Total | 0 Total |
| | 13 - 3041.2 0- 3041.1 | 78 - 3041.2 | 20 - 3041.1 | 0 — 3041.2 |

| BREAKDOWN BY CRIME AND GUBERNATORIAL ACTION (Updated 08/09/06) | 2nd Degree Murder | 1st Degree Murder | Attempted Murder | Kidnap | Other | Total |
|---|---|---|---|---|---|---|
| Decline to Review | 12 | 1 | | | | 13 |
| Affirm | | | | | | |
| Reverse | 60 | 18 | | | | 78 |
| En Banc | | | 6 | 14 | | 20 |
| Modify | | | | | | |
| Total | 72 | 19 | 6 | 14 | | 111 |

## LATE-BREAKING NEWS

### GOVERNOR'S STAFF AGAIN REVERSED
#### Court of Appeal Orders
#### Jeffrey Elkins' Release

*In re Elkins*
__Cal.Rptr.3d__, __Cal.App.4th__,
2006 WL 3072139

On October 31, the Court of Appeal, First Appellate District, voided still another of Conan's staff's parole reversals, and ordered the petitioner's release on parole forthwith. Elkins, sentenced to 25-to-life for first degree felony murder and robbery in 1980, became eligible to parole on his 1994 MEPD, but had been denied parole ten times before the eleventh panel found him suitable in 2005. Predictably, Conan's staff reversed the decision, based on the gravity of the offense and the notion that Elkins had insufficient insight because he allegedly accepted responsibility only "recently."

The Court affirmed Elkins' liberty interest in his parole date, and found no evidence to support either of "the Governor's" grounds for reversal. Regarding the offense, committed by a 19-year old drug addict Elkins described by the Governor's clerks using verbiage they use in all cases: "atrocious," "cold-blooded," "brutal," and "calculated," the court found that the facts cited for reversal pertained more to the robbery and the events occurring after the murder than to the murder itself, which was not planned or calculated, but an after-thought committed during a robbery, the determinate term for which Elkins had long completed. The court found no evidence to support the Governor's staff's characterization of the murder, and no evidence that the 26-year old offense, given Elkins' exemplary prison record of conduct and reform, and his forensically determined low parole risk, suggests that his parole currently poses and undue risk to public safety.

The court also found the notion that Elkins' acceptance of responsibility was "recent" to be contrary to the record and, in any event, and, as the Lee court held (supra), that the recentness of such acceptance is irrelevant as long as it is complete and genuine, as the record indicated in the case.

Finally, the court indicated that aggravating and mitigating offense facts are appropriately considered in setting the term, and noted that Elkins had served 11 years more than his eligible parole date. The court held:

"Thus, a governor, in reviewing a suitability determination, must remain focused not on circumstances that may be aggravating in the abstract, but, rather, on facts indicating that release poses "am unreasonable risk of danger to society [cites]."

"Given the lapse of 26 years and the exemplary rehabilitative gains made by Elkins over that time, continued reliance on these aggravating facts of the crime no longer amount to 'some evidence' supporting denial of parole . . . The commitment offense . . . is an unsuitability factor that is immutable and whose predictive value 'may be very questionable after a long period of time' . . .Reliance on an immutable factor, with regard to or consideration of subsequent circumstances, may be unfair, run contrary to the rehabilitative goals."

**EXHIBIT 44**

Various Newspaper Articles and Other Info.

Doors closing for lifers -- again
-
Monday, October 17, 2005

EARLIER THIS YEAR, we commended Gov. Arnold Schwarzenegger for being
willing  to grant parole to a greater number of the state's expanding lifer
population than his predecessors.

In 2004, he agreed to release 73 lifers recommended for parole by the Board
of Prison Terms, recently renamed the Board of Parole Hearings. Although
still a tiny fraction of the lifer population, in a single year
Schwarzenegger released 12 times more of them than Gov. Gray Davis did
during his five years in office. Most had been convicted of first- or
second-degree murder decades earlier.

Only 3,168 of California inmates serving life sentences are true lifers.
They're the ones sentenced to life without the possibility of parole. The
other 27,251 are serving "indeterminate" life sentences. That means that
after serving a fixed portion of their sentence -- 10, 15, 25 years and so
on -- they are supposed to be given a chance of parole by convincing a
historically tough-on-crime parole board that they are fully rehabilitated
and deserve to be released.

Yet, Schwarzenegger seems to be backing off on his bold attempt to reduce
the state's lifer population, which now constitutes 1 in 4 of all inmates
serving life sentences in the nation, at a cost of about $1 billion a year
to the California taxpayer. Through Sept. 30 of this year, he agreed to
release 29 inmates of the 148 forwarded to him by the parole board, almost
all of whose members he appointed. At this rate, he will have released just
over half as many inmates in 2004 as in 2005.

These are inmates who, over a period of many years, have participated in a
range of programs that have forced them to take responsibility for their
crimes. More importantly, they have persuaded parole commissioners -- none
of whom can be written off as a liberal do-gooder -- that they are no longer
dangerous.

By contrast, non-lifer inmates serving lesser sentences, who make up the
vast majority of California's overflowing prison population, are released
automatically on completion of their sentences, without having to convince
anyone that they are prepared for life in mainstream society. That's why
two-thirds end up back in prison within three years of being released.

The apparent retreat by Schwarzenegger on releasing inmates who have
committed capital crimes is undermining his public declaration that
"rehabilitation" should be a major focus of the state's correctional system.
In July, he even changed the name of the Department of Corrections to the
Department of Corrections and Rehabilitation. "Especially at San Quentin, a
flagship prison in regards to rehabilitation, you have scores of men coming
who, by any set of criteria, are suitable for parole," said Father Steven
Barber, the Catholic chaplain at San Quentin State Prison.

"We're not lacking in empathy for victims," said Barber. But at some point, the pain inmates have inflicted on victims and their families "has to be balanced against the number of years someone has to serve paying for it," he said. "When the punishment is satisfied, the next step in a healthy society is forgiveness, a kind of absolution."

A spokesperson for Schwarzenegger denied that his decisions regarding lifers have anything to do with politics. "The governor makes parole decisions on a case-by-case basis, bearing in mind first and foremost what is in the best interests of public safety," a spokesperson told us. But we suspect that the downward trend might be linked to Schwarzenegger's sliding popularity and the backlash his actions provoked from victims' rights groups allied with the powerful California Correctional Peace Officers Association, which represents prison guards and other prison personnel.

Earlier this year, Crime Victims United of California ran a series of television ads attacking Schwarzenegger for allegedly releasing dangerous criminals. Shortly after the ads were aired, the CCPOA staged an emotional rally on the steps of the state Capitol in April. On every side of the crowd were wall-sized displays of photos of victims of violent crime in California. "Perhaps the governor has listened to some of our concerns," said Harriet Salerno, president of Crime Victims United.

Schwarzenegger's reversal of most of the parole board's recommendations has implications far beyond an individual inmate. It sends a discouraging message to inmates -- that no matter how hard they work at rehabilitating themselves, they're unlikely ever to leave prison. "It becomes harder for us to inspire inmates and to serve public safety from the inside," says Jacques Verduin, executive director of the Insight Prison Project, which offers a range of classes in San Quentin for lifers and other inmates.

The law clearly gives lifers serving indeterminate sentences the chance to earn their release. Instead, says Keith Wattley, a staff attorney at the Prison Law Office in San Francisco, "what we have is a law that holds out the illusion of redemption, but in fact denies people any fair chance of living in a free society."

There is no avoiding the serious, often horrific, nature of the crimes committed by every lifer. But what happened dozens of years ago can't be changed. What can change is the inmate. Until Californians can accept that even a murderer can transform himself or herself, our lifer population will continue to grow, hidden in prisons filled with aging and infirm inmates who no longer threaten our safety.

---------------------------------------------------

CHART (1):

Possibility of parole denied

Inmates serving life
sentences with possibility of parole released from California prisons

| Year | Inmates denied parole | Recommended for parole | Paroles granted by governor | |
|------|------|------|------|------|
| 1999 | 1,827 | 13 | (Davis) | 0 |
| 2000 | 1,875 | 52 | (Davis) | 0 |
| 2001 | 3,097 | 84 | (Davis) | 0 |
| 2002 | 3,747 | 168 | (Davis) | 2 |
| 2003 | 2,952 | 168 | (Davis) | 4 |
| 2003-'04 | 2,614 | 217 | (Schwarzenegger) | 79 |
| 2005 | NA | NA | (Schwarzenegger) | *29 |

* As of Sept. 30, 2005
Source: California Board of Parole Hearings, Governor's Office
---------------------------------------------------

CHART (2):

Growth of 'lifer' prison population in U.S.

| Year | |
|------|------|
| 1984 | 34,000 |
| 1992 | 69,845 |
| 2003 | 127,677 |

Source: The Sentencing Project Report, 2004

2

# hospitalized after Chino prison riot

## Guards use gas and pepper spray to stop fighting

**ASSOCIATED PRESS**

CHINO — A riot at a state prison yesterday involved more than 800 inmates and sent at least two dozen to hospitals with moderate to serious injuries, a spokesman said.

A fight between two inmates about 9 a.m. quickly spread through the 1,400-inmate West Facility of the California Institution for Men, prison spokesman Mark Hargrove said.

Guards aided by San Bernardino County sheriff's deputies and police from Chino and Ontario quelled the fighting in about two hours using pepper spray, gas grenades and foam bullets.

No officers were injured.

"We were never in any danger of the facility being taken over," Hargrove said.

At least 24 inmates were taken to nearby hospitals for treatment of moderate to serious injuries, including one inmate who had severe head injuries and puncture wounds to his back, Hargrove said.

A number of handmade weapons were discovered in inmates' cells after the riot, but it was unclear whether any were used in the fighting, he said. An investigation was under way to determine what sparked the fight, Hargrove said.

The entire prison was to remain locked down until after the new year while authorities investigated the cause of the riot and tried to determine whether it was racially motivated, he said.

There has been periodic violence in the overcrowded state prison system, often involving Latino and black inmates.

At Chino, 40 miles east of downtown Los Angeles, two inmates were stabbed and wounded in June during brawls involving about 60 inmates. A fight involving about 200 prisoners injured eight in September 2005.

> "We were never in any danger of the facility being taken over."
>
> **MARK HARGROVE,**
> *prison spokesman*

S.D. Union Tribune, Dec. 31, 2006, A24

3

# Los Angeles Times

ORANGE COUNTY EDITION

SATURDAY, APRIL. 22, 2006

## Packed Prisons Brace for New Crush

Another 23,000 inmates will crowd into state facilities within five years, a forecast says.

By JENIFER WARREN
Times Staff Writer

SACRAMENTO — Already bulging with inmates wedged into gyms and hallways, California prisons must make room for 23,000 more felons over the next five years, according to new projections that are forcing managers to explore still more unusual options — even tents — to house the convicts.

The forecast, which outlines much steeper growth than numbers released just six months ago, predicts enough new convicts to fill five prisons. California would have more than 193,000 inmates by 2011.

Though a recent report showed a decline in California's recidivism rate, officials said the state's overall population expansion inevitably means more people breaking the law.

The crowding is intensifying during a time of turmoil for the California prison system. This week, the acting

*(See Prisons, Page A10)*

## Bulging Prisons Expect to Grow by 23,000 Inmates

*[Prisons, from Page A1]*
corrections secretary quit — the second top official in two months to leave amid concerns about the guard union's influence over prison management.

On Thursday, Gov. Arnold Schwarzenegger named a tenative replacement who told reporters that crowded conditions were a safety hazard and were among his top concerns.

In January, Schwarzenegger proposed building 83,000 more cells — some in county jails, some in state lockups — with

bond sales totaling $13.1 billion. But that idea, part of his sweeping public works plan, stalled in the Legislature, and corrections officials are scrambling to create bed space.

Already, they say most of the state's 33 prisons are twice their intended capacity, jammed with about 170,000 people — enough to fill the Rose Bowl more than two times over.

"Legally, we don't have the ability to say there's no room at the inn," said John Dovey, chief of adult institutions for the Depart-



CARLOS CHAVEZ Los Angeles Times
*A converted day room at the California Institution for Women has been filled with beds to house the exploding population.*

ment of Corrections and Rehabilitation. "And every week the population keeps going up."

Last fall, Dovey wrote a memo to the corrections secretary warning of a "population crisis" in the prisons.

"We believe that an imminent and substantial threat to [the public safety exists requiring immediate action," he wrote.

Since then, 3,570 more convicts have arrived, and officers who walk the tiers say tensions are alarmingly high.

The cost of housing the growing numbers is also straining the Schwarzenegger's budget, already taxed by rising medical and mental healthcare costs.

And by forcing wardens to convert classrooms and vocational workshops into living quarters, the crunch is undermining Schwarzenegger's stated goal of rehabilitating inmates — rather than merely incarcerating them, Dovey said.

California felons, Dovey and other officials acknowledge.

"Some of these places look like prisons I've seen in Alabama or in Texas during the worst days," said Craig Haney, a professor of psychology at UC Santa Cruz who has studied prisons for more than 20 years and recently visited the men's prison in Chino. "The department is overwhelmed by numbers, and for the inmates that means terrible living conditions, idleness and virtually no meaningful programs to make their transition back to free society a successful one."

Prison officers say the crowding creates conditions ripe for unrest.

At many locations, inmates are stacked in triple-decker bunks crammed into makeshift dorms that resemble refugee camps. Long waits for showers, meals and medical care cause tempers to flare. Overloaded toilets and inadequate noise from radios, yelling and the constant drone of televisions add to the strain.

"It's a cauldron, and at some point it's just going to boil over," said Chuck Alexander, executive vice president of the California Correctional Peace Officers Assn., the union representing prison guards. "We're at the edge, and this administration and this Legislature need to do something before we lose *(con-*

*(See Prisons, Page A11)*

LOS ANGELES TIMES

SATURDAY, APRIL 22, 2006

# Prisons Must Make Room — Somehow

## Overcrowded

California will have to make room in its 33 state prisons for an increasing number of inmates in the next five years.

**Prisoners in state institutions**
(in thousands)



*Data for 2006 through 2011 are projected.*

*Source: California Department of Corrections and Rehabilitation*

*Los Angeles Times*

[*Prisons, from Page A10*]
trol of] a prison."

One way to control population is changing sentencing laws. Other states, Ohio among them, have cut inmate numbers — even closed prisons — by diverting thousands of drug offenders, check forgers and other nonviolent criminals into community correctional facilities.

California lawmakers have shown little interest in that approach. Over the last decade, nearly two dozen bills have been introduced by Democrats — most of them focused on easing the three-strikes law or reducing sentences for inmates who work or attend drug treatment programs. But virtually none of them passed; many legislators are reluctant to support measures viewed as soft on crime.

Like many other states, California has experienced rapid growth in its correctional system in recent decades — a sevenfold increase in the population since the early 1980s. Still, two years ago, corrections leaders predicted a decline in the numbers and the possible closure of three prisons.

At that time, early in the Schwarzenegger administration, officials said their new approach to parole — diverting some violators into community programs or electronic monitoring at home instead of sending them back to prison — would dramatically thin the population.

But after criticism from the guards union and victims groups, the department halted the diversions. A judge ordered the programs reinstated, but so far they serve only a tiny fraction of the state's 115,000 parolees.

Meanwhile, parole violators continue to account for a huge chunk of those behind bars. In 2005, there were 62,000 such violators sent to prison — almost half the total number admitted that year.

To cope with the population bulge, managers are housing a growing proportion of inmates in "ugly beds," or spaces not designed as living quarters. Throughout the system, there are more than 14,500 convicts in ugly beds. Officials say they can fit 7,500 more before such space

is exhausted, probably sometime next year.

In the interim, the governor has proposed shifting 8,500 inmates into community correctional facilities — privately run centers for low-risk offenders that were being phased out under the Davis administration. And Dovey hopes to "fast track" the building of housing units at existing prisons.

As a last resort, officials are exploring the possibility of modular buildings — and giant tents. If tents were added to the mix, it would not be the first time. In 1983, more than 900 inmates were housed in a tent city just outside the walls of San Quentin State Prison until a lawsuit shut it down. The reason: overcrowding.

"It was horrible — hot in the summer, cold in the winter, and mud everywhere," UC Santa Cruz professor Haney recalled. "If they are considering tents again, that's shocking."

Legal scholars say inmates have little hope of challenging the crowded conditions in court.

Though overpopulation may create discomfort and even danger behind bars, the U.S. Supreme Court has found it unconstitutional only if it inflicts wanton pain or if basic human needs are not met.



No stamps to buy.
No checks to write.
*Pay* your Los Angeles Times bill online.

**www.myaccount.latimes.com**

5

LOS ANGELES TIMES

THE STATE

THURSDAY, APRIL 20, 2006

# State Prisons Chief Resigns After 2 Months on the Job

### Jeanne S. Woodford, as did her predecessor, reportedly complained of political interference.

**By Jennifer Warren**
*Times Staff Writer*

SACRAMENTO — Less than two months after Gov. Arnold Schwarzenegger's corrections chief resigned because he felt politics were interfering with progress, his replacement abruptly followed suit Wednesday, leaving the governor scrambling to find a leader to run the state's deeply troubled prisons.

Jeanne S. Woodford, who began her corrections career 28

years ago as a guard at San Quentin State Prison, met with the governor at the Capitol and told him later that she was reported, according to government officials familiar with the situation.

Woodford, who did not return a phone call to her home Wednesday night, will serve temporarily as undersecretary before officially leaving the Department of Corrections and Rehabilitation in July.

Her departure follows the resignation in March of Roderick Q. Hickman, who said he was moving on because he lacked sufficient political support to bring change to a prison system that is often called a revolving-door

[See **Prison, Page A9**]

# Prisons Chief Is Calling It Quits

**[Prison, from Page A1]**

warehouse for felons.

California's political environment and "political special-interests." Hickman said as the same time, "work against efforts to bring about lasting reform."

In recent days, Woodford, 52, expressed some of the same frustrations, said one official familiar with the situation, who asked not be named because he was not authorized to discuss the matter.

Woodford was particularly distressed that top aides to Schwarzenegger were consulting the prison guards union about her suggested candidates for warden jobs and other positions in the department, the official said.

One meeting between union officials and the aides took place as recently as Tuesday.

"She just did not like the signals she was getting from the administration," the official said of Woodford, who had been serving as acting secretary since Hickman's departure and was a leading candidate to win the job permanently. "She believed labor should go through proper channels in expressing their input, and that wasn't happening anymore."

The back-to-back resignations create a management crisis for the California correctional system at an all-time high, with many prisons at twice their intended capacity. Vasanian addition to Woodford, had trailed other high- and medium-level ex-

ecutives have left since Hickman stepped down.

With the sprawling agency — which oversees 173,000 adult and juvenile felons and 115,000 parolees — is said to be dismally low.

The twin departures also undermine one of Schwarzenegger's most ambitious and widely praised initiatives since taking office: his oft-stated pledge to make California's dysfunctional prison system a national model once again. "should again and again, "should not correct."

With an annual budget of $8.6 billion, the department has many of its operations — from mental health care to juvenile prisons — under federal court supervision. And this week its disgraced medical care system — which experts have blamed for an average of one inmate death a week — was placed in the hands of a federal receiver.

The convict population, meanwhile, has hit an all-time high, with many prisons at twice their intended capacity. Vasan-

On Wednesday, a lobbyist with that union, the California Correctional Peace Officers' Assn., said Woodford had "failed to achieve what we felt was her potential to bring true change to



*OVER THE WALL: Jeanne S. Woodford, who began her career at a prison guard, expressed concern about special interests.*

Elzx Russo, Associated Press

the department."

Lance Corcoran said that if Woodford's exit suggests that "the union is the bad guy, then that's ridiculous." He said he was unaware of any meeting between the governor's staff and leaders of his union, but added: "So what? If there were when don't we have the right to communicate?"

A spokeswoman for the governor declined to comment. But in 2004, when Schwarzenegger appointed her director of corrections — the No. 2 job at the time — he praised Woodford for a "proven ability to lead," saying that "she shares my priorities of public safety and accountability and is a tremendous asset."

Woodford, in turn, said after she was named acting secretary

ger remained committed to reform. "The departure of one person," she said then, "will not make the progress we have made."

Experts have said that Schwarzenegger faces a major challenge in searching for a new corrections secretary with national credentials. Joan Petrilla, a UC Irvine criminologist, said no leader in another state

"is going to come to a place where the environment just makes it impossible to do the business of corrections."

from the scene, that task becomes more difficult than ever, officials said, especially during a year when Schwarzenegger is running for reelection.

*Times staff writer Peter Nicholas contributed to this report.*

THURSDAY, APRIL 20, 2006   A9

The San Diego Union-Tribune • Saturday, July 9, 2005

# CALIFORNIA & THE WEST

## Prison warden removed in health care morass

SACRAMENTO — San Quentin State Prison Warden Jill Brown was removed from her post after the prison system's independent inspector general found she discouraged her medical staff from cooperating with attorneys in a major inmate health care lawsuit.

"My observation is she inherited a big mess at San Quentin, and prisoners were suffering," Alison Hardy, a lawyer for the Prison Law Office, which represents inmates in the class-action lawsuit, said Thursday. "She wasn't able to lead the prison out of a bad problem."

U.S. District Judge Thelton Henderson last week took control of the entire Department of Corrections and Rehabilitation health care system four months after a team of national medical experts reported that conditions at San Quentin are so appalling that it's dangerous to house new and sick inmates there.

*Associated Press*

7

ORANGE COUNTY EDITION

# Los Angeles Times

On The Internet WWW.LATIMES.COM          **FRIDAY, JULY 1, 2005**          Copyright 2005/136 Pages/OC     50¢ Designated Areas Higher

# U.S. to Seize State Prison Health System

A federal judge, citing experts' reports of fatal incompetence and neglect, will name a receiver for the $1.1-billion program.

By JENIFER WARREN
*Times Staff Writer*

SAN FRANCISCO — A federal judge said Thursday that he would seize control of prison healthcare from the state and place it under a receiver, declaring that "extreme measures" were needed to fix a system that kills one inmate each week through medical incompetence or neglect.

U.S. District Judge Thelton Henderson said that despite repeated warnings from his court and the "good intentions" of some state officials, the Department of Corrections continues to allow sick prisoners to die "for no acceptable reason." The judge said he would soon issue a written order outlining details of the receivership and begin discussing potential receivers with lawyers in the case.

Attorneys on both sides called the decision historic, saying they believed it marks the first time in the nation that a government operation the size of California's prison medical care system is to be placed under a federal receiver.

In 1995 the District of Columbia's jails were assigned to a receiver for five years. That system has 1,700 inmates. The California Department of Corrections healthcare network serves more than 163,000 prisoners, employs 6,000 workers and has an annual budget of $1.1 billion.

Henderson, in a quietly passionate 25-minute speech from the bench, said "horrifying details" presented in a series of hearings he convened over the last month had filled him with a sense of urgency.

He said he believed "nothing short of a receiver" could halt the deaths and other harm inflicted on California convicts who fall ill.

The judge said he was especially alarmed by the "uncontested statistic," provided by a court-appointed expert, "that a prisoner needlessly dies an average of roughly once a week."

Henderson said that anyone "would have to be shocked, as I certainly was," by that fact.

By putting the system in receivership, Henderson effectively shifts power for all decisions related to inmate care — from how many nurses should work a given shift to when a cancer patient receives treatment at a community hospital — to the federal court.

The receiver, who will report directly to the judge, will be empowered to order fixes now delayed or thwarted by Civil Service rules, collective bargaining agreements and bureaucratic red tape, lawyers said.

Attorneys said they could not speculate how long the receivership might last or what it would cost. Henderson said it would certainly be a "multiyear effort."

Bruce Slavin, who as general counsel for the Youth and Adult Correctional Agency is the top lawyer for the state's $7-billion correctional system, said "it will not be cheap." But he expressed hope that under a receiver, there would be better management of healthcare spending.

Margita Thompson, spokeswoman for Gov. Arnold Schwarzenegger, said the administration would cooperate with a receiver.

"We look forward to working with the receiver to create a sustainable healthcare system," she said.

Adult prisons are not the only piece of California's correctional system receiving outside oversight. The California Youth Authority, which houses about 3,000 of the state's most troubled juvenile offenders, is under the supervision of a special master, who monitors compliance with court-ordered improvements in inmate medical care, mental healthcare, education and other areas.

State Sen. Gloria Romero (D-Los Angeles), chairwoman of an oversight committee on corrections, attended the hearing and applauded the judge's decision.

"This is the right thing to do, the only thing to do," Romero said.

"We invest $1.1 billion in this [healthcare] system every year," she added, "and it's incredible to me that we don't get better results."

An attorney for the inmate plaintiffs, who claimed in a 2001 class-action lawsuit that prison healthcare amounted to unconstitutionally cruel and unusual punishment, called Henderson's ruling "everything we asked for" and a beacon of hope for his clients.

"As the judge said ... the magnitude of the suffering could not be ignored," said Donald Specter, director of the Prison Law Office, a nonprofit firm taking the lead role in the case.

Corrections officials did not oppose appointing a receiver, though they described it in legal briefs as "a highly intrusive remedy" that should be a last resort. Slavin said Thursday that the department had recently made progress in firing incompetent doctors, hiring nurses and addressing other woes.

"The question of fixing healthcare is not one of whether but when," he said. "The administration has always been committed to getting it fixed. This [receivership] speeds it up."

Henderson's ruling was based on testimony from court-appointed experts who have been inspecting prison medical facilities as part of the lawsuit.

The case was settled in 2002, when the state agreed to overhaul inmate healthcare and phase in improvements by 2008.

Among the changes mandated by the settlement were the creation of a triage system to identify the sickest inmates and ensure they did not wait long to see a doctor and a program allowing prisoners with chronic conditions to be more carefully monitored.

The experts found few signs of progress and provided the court with chilling examples illustrating filthy conditions, ill-trained and neglectful doctors and a pattern of preventable deaths that one expert called "macabre" and unlike anything he had ever seen before.

The expert, correctional healthcare authority Dr. Michael Puisis, said medical treatment amounted to "almost anarchy" at some prisons, where disorganized or missing patient records mean that "medical providers are reduced to guessing or repeating tests and treatment already done."

Puisis, editor of a textbook on medical care in prisons, said inmates needing diagnostic tests faced extreme delays that imperiled their lives. Such delays could be caused by transportation snafus, scheduling errors, prison emergencies and a variety of other circumstances.

In one instance, a patient at Pleasant Valley State Prison near Bakersfield who needed a colonoscopy waited nearly a year and then could not undergo the test because his "mass was so large, the scope could not be passed through," according to a written summary of Puisis' testimony.

He also cited the case of an inmate at Salinas Valley State Prison who had suffered a neck injury in a fight and could not move his legs. After sticking needles in his legs, "the doctor said the patient was faking and moved his head from side to side."

The inmate is now paralyzed, and it is unclear whether the paralysis resulted from the fight or the doctor's inappropriate actions, according to a summary of Puisis' testimony in a legal brief.

In appointing a receiver, Henderson acknowledged that he was taking "perhaps the most extreme measure available" to him.

But, he added, "this court has tried to use lesser measures, and all agree that those lesser measures have failed."

A receiver still must be selected — someone with a blend of financial, correctional and medical experience suitable for the massive job.

The judge underscored this point by remarking that the perfect candidate would be someone who has operated Kaiser Permanente and "also has an MBA from Stanford or Cal and is a former warden."

Specter has asked the judge to appoint a temporary receiver while a search is made for a permanent one. State officials oppose an interim receiver, saying the right person can be hired within a few months.

Henderson said he is inclined to appoint a temporary receiver, because lives are at stake.

8

# Failed prisons

## Governor's reform efforts merit support



The San Diego Union-Tribune

SOUTH COUNTY
50¢

FRIDAY
APRIL 22, 2005



**D**uring the late 1980s and through the 1990s, most states facing budget crises began cutting their prison populations by developing alternatives to incarceration. Those included community detention for nonviolent offenders, electronic monitoring and other forms of supervision. Other states began to focus on "re-entry," an attempt to help ease the transition from prison to society.

Meanwhile, California was on a prison building spree. As *Union-Tribune* staff writer Steve Schmidt chronicled this week, 21 new prisons have opened since 1984, including the Donovan Correctional Facility on Otay Mesa. Necessary tough-on-crime measures have swelled the state's prison population to nearly 164,000, up from 35,000 in 1995.

This year's budget for the California Youth and Adult Correctional Agency is nearly $7 billion. It will cost an average of $31,000 to house and care for each prisoner. As the prison population ages, more and more dollars will be spent on health care.

As a further sign of the correction system's failure, more than half of those released each year — after serving an average sentence of 26 months — return to prison within two years. What's more, California's prison system is nearly twice as violent as that of Texas, which has nearly as many people behind bars. Overcrowding is a further threat.

With a deficit of $207 million in this year's prison budget and the system clearly not working, Gov. Arnold Schwarzenegger is trying to reform the sprawling network of 32 prisons. Considering that he faces the politically powerful California Correctional Peace Officers Association and a public generally supportive of tough-on-crime measures, it will be a huge and thankless task.

Schwarzenegger wants to focus on reorganizing the 54,000-employee system and rehabilitating prisoners.

The reorganization is moving forward. Earlier this month, the Senate approved the consolidation of the Department of Corrections and the Youth Authority under a new secretary of youth and adult corrections. Schwarzenegger named Roderick Q. Hickman to that position.



Barry Maguire

But, already, a key element in Schwarzenegger's reform has been scrapped. After a blistering report by the Little Hoover Commission calling the parole system "a billion-dollar failure," the administration adopted the strategy of diverting parole violators to halfway houses or home detention instead of returning them to prison. But crime victim advocates, with the support of the prison guards union, began airing television ads accusing Schwarzenegger of abandoning crime victims and putting communities at risk. Since corrections officials could offer no data to prove otherwise, the program was abandoned.

Still, Schwarzenegger, who hardly risks being labeled soft on crime, is right to attempt to advance prison reform. It is unconscionable for this state to spend as much each year on prisons as it does on higher education, especially if the system is failing in one of its chief missions — to make sure that the overwhelming majority of the 95 percent of prisoners who eventually will be released return to society not as criminals but as people willing to rejoin society on a productive basis.

9



# The San Diego Union-Tribune.

**MONDAY**
APRIL 18, 2005

Page 1 of 2

COUNTY FINAL
50¢



## California's prisons

Upon release, 55 percent of all California inmates return to prison within two years.

Inmate population has risen sharply for 25 years ...

**TOTAL INMATE POPULATION**
200 thousand

- 1998: 23,511
- 2004: 163,939

'80   '90   '00

... while costs climb ...

**ANNUAL COST PER INMATE**
$35 thousand

- 2004: $30,900
- Inflation adjusted
- 1995: $21,000 — Current dollars

'95  '97  '99  '01  '03

... and the prisons rank first in the rate of inmate assaults among the largest U.S. systems.

**ASSAULTS PER 100 INMATES IN 2000 (latest data available):**

- California 4.4
- Florida 4.0
- Texas 2.5
- New York 2.3
- Federal 1.7

Gov. Schwarzenegger wants to improve these numbers, but he also proposes cutting $95 million from inmate and parolee programs.

SOURCES: Calif. Dept. of Corrections; Calif. Legislative Analyst's Office

MATT FERRY / Union-Tribune

# Troubled system

## Governor faces uphill battle reforming prisons

**By Steve Schmidt**
STAFF WRITER

SACRAMENTO — He made his mark knocking heads on the movie screen and hoisting barbells with his oiled biceps. He still has the Popeye arms to prove it.

But does Arnold Schwarzenegger have the muscle and moxie to tackle an issue that California governors have largely avoided for a generation?

The state prison system is a budget-draining, accounting-deficient, violence-plagued mess. The governor knows it. Legislators know it. Inmates know it.

Schwarzenegger says he wants to tame the mammoth system, and many argue his tough-guy persona makes him the right person for the task.

Yet in the past few weeks, it has become clear the governor won't have it easy.

The state prison-guards union and other groups have stepped up criticism of Schwarzenegger's plans, and corrections officials earlier this month scrapped a key plank of his proposal to overhaul the parole system.

The governor's plans will likely come under further scrutiny during a state Senate hearing on the prison budget scheduled for Thursday.

"This is the first time we've had a real serious discussion about prison reform in years,"

said state Senate Majority Leader Gloria Romero, D-Los Angeles.

Californians will spend nearly $7 billion this year on the state Youth & Adult Correctional Agency, more than the gross national product of most nations. In return, taxpayers get:

● One of the nation's busiest revolving doors. More than half of California's convicts released on parole land back behind bars within two years, underscoring the ongoing failure to prepare inmates for life after prison.

● A prison network that has grown so big, so fast that it has become ripe for mismanage-

SEE System, A8

Gov. Arnold Schwarzenegger and Roderick Q. Hickman, the secretary of youth and adult corrections, looked out from a gun tower at Ione's Mule Creek State Prison during a tour last year. *Associated Press*

10



## Jean Bennett

| | |
|---|---|
| **From:** | Gray, Matthew [Matthew.Gray@SEN.CA.GOV] |
| **Sent:** | Thursday, June 24, 2004 12:40 PM |
| **To:** | Jean Bennett |
| **Subject:** | RE: Do you ever go to lunch? This is long, so you may want to print it out and read later, but there is one other new commissioner not on here. |

The lady you speak of below does sound like Carol Bentley, whom I've presented before in a hearing for my father's parole determination
-- which upon learning I was a victim actually speaking in support of his release she had me separated from the other victims (whom I've known my whole life) thereby excluding me from hearing the Board's instructions;
-- and during my testimony she interrupted and cut me short of finishing my statement but allowed the other victims & family members to present at length without interruption;
-- she also referred to his prior record (which he had none); and
-- and disfavorable prison record (which was incident free).

I was astonished over it all and wondered of whom she was speaking!

-----Original Message-----
**From:** Jean Bennett [mailto:jbennett@gordonrees.com]
**Sent:** Thursday, June 24, 2004 12:31 PM
**To:** Gray, Matthew
**Subject:** Do you ever go to lunch? This is long, so you may want to print it out and read later, but there is one other new commissioner not on here.

She is a personal friend of Wilson, (Carol Bentley I thnk) Mitch called to tell me about it tuesday. One of the men went to a hearing and was denied outright. He had a double murder so he expected it; but Mitch said, she is so adamantly NO PAROLE she voted DENY without even consulting the record. She was formerly a mayor of del mar, who if memory serves may have been indicted embroiled in an investigation for malfeasance or grand theft or taking bribes or some such thing like that. Wilson has been having her appointed to one thing or another ever since then.

**How does one secure an appointment to any Civilian commission to oversee Prison Reform ....**
**or alternatively To the Board of Prison Terms  What are my chances as an outspoken advocate of Prison Reform?**

The BPT law says "ordinary citizens" <u>not connected to law enforcement</u> should be appointed as Commissioners of the BPT. To date there are NONE. ZERO, ZILCH, ....

**BPT MAKEUP**

Chairwoman Perez
Perez was named to the BPT and appointed as Chairwoman by Governor Schwarzenegger in February, 2004 to a term that expires in 2009. She has **16 years of experience in law enforcement**. Since 2001 she has **been a parole agent** and a senior investigator, working on issues involving the death penalty, pardons, clemency, Battered Women's Syndrome and compassionate release of inmates. (guess which side of these issues she was on?)

**Exec. Director Marvin E. Speed II**



Under the general direction of the Chairperson, the Executive Officer is responsible <u>for directing the BPT's daily operations,</u> including managing all executive and staff level employees and implementing all policies and procedures. The Executive Officer also oversees the legislative program, determining the need for new legislation and recommending amendments to existing statutes that affect the BPT's authority and programs. The Executive Officer <u>also is the liaison on BPT policy issues with other state agencies.</u>

Marvin Speed was named Executive Officer on December 18, 2001. Speed came to the Board as a Deputy Commissioner in 1999, and was promoted to Associate Chief Deputy Commissioner, Policy and Appeals, prior to assuming his current post. Prior positions include Assistant Counsel, Associate Counsel and Acting Chief Counsel for the **Defense Logistics Agency in Stockton, Ca**

**Alfred R. Angele**

6/25/2004



Due to a medical disability, Angele was forced to retire from the Burbank Police Department in 1978, with the rank of sergeant, after 15 years of service. Since that time he has served as executive director of the California Organization of Police and Sheriffs (COPS) and as treasurer of the California Police and Sheriffs Foundation. He retired from those positions in order to accept this appointment.

**Carol Daly**

Ms. Daly served as the Undersheriff for the Sacramento County Sheriff's Department from 1999 until her appointment to the Board. She began working for the Sheriff's Department in 1968 and rose through the ranks to become the first woman in the history of the Department to be appointed to the position of Undersheriff. She is a member of the National Association of Women Law Enforcement Executives, the California Peace Officers Association, the California State Sheriffs Association, the International Association of Women Police, and the National Center for Women and Policing.

(And here is a Really Well-Qualified Specimen)

Susan Fisher

Susan Fisher was appointed to the BPT by Governor Schwarzenegger in February, 2004 to a term that expires in 2009.  **Fisher has more than a decade of experience working on behalf of crime victims**. Since 1999 she has been the director of the Doris Tate Crime Victims Bureau (with offices provided by the CCPOA no less)

Sharon Lawin

Since 1975 Lawin has served as excutive director for the **Los Angeles County Professional Peace Officers Association**

Loa

Loa is a member of the **Palmdale Sheriff's Boosters and the Foot Printers Association**, both law enforcement support groups. As a member of the Palmdale City Council, Loa is a delegate to the Antelope Valley Air Quality Management District, the Antelope Valley Emergency Management Council; the Antelope Valley Regional Anti-Crime Committee

Kenneth Risen
Prior to his appointment, Risen was an attorney in private practice, **representing Los Angeles County employees. Risen began his government career with the Los Angeles Police Department**, rising to the rank of Sergeant. He has also served as the President and Director of the Los Angeles Police Protective League, as a member of the Board of Prison Terms from 1979-1981, and as Deputy Director of the State Police.

And My personal choice for NOT QUALIFIED TO SIT ON ANYONE'S PAROLE BOARD

**Booker Welch:**

Welch has worked in the **Department of Corrections since 1984,** most recently serving as associate warden at California State Prison - Solano. He has worked at various correctional facilities through the years, including a stint as associate warden at San Quentin State Prison, as a facility captain at California State Prison - Sacramento, and as a correctional counselor at both Solano State Prison and California Medical Facility.

NO WHERE IN THAT MIX DO YOU SEE A PROFESSIONAL WHO IS NOT CONNECTED TO LAW ENFORCEMENT OR  CRIME VICTIM'S UNIT, OR THE PRISON GUARDS in one way or another.

**In other words, a complete violation of the law**.  But is anyone pointing this out to the Governor (who is the one breaking the law)?

**NO.**

---

This email communication may contain CONFIDENTIAL INFORMATION WHICH ALSO MAY BE LEGALLY PRIVILEGED and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.

**GORDON & REES, LLP**

6/25/2004

*12*



## Jean Bennett

| | |
|---|---|
| **From:** | Gray, Matthew [Matthew.Gray@SEN.CA.GOV] |
| **Sent:** | Thursday, June 24, 2004 9:15 AM |
| **To:** | Jean Bennett |
| **Cc:** | Heidi Jones (E-mail); Mary Avanti (E-mail) |
| **Subject:** | RE: SB 1522 (Vasconcellos) Parole, passes Assembly Public Safety Comm ittee |

here's what I wrote the writer of that article, and I encourage others to do the same sharing their own astonishment at this outright abuse of authority...

-----Original Message-----
**From:** Jean Bennett [mailto:jbennett@gordonrees.com]
**Sent:** Wednesday, June 23, 2004 11:08 AM
**To:** Gray, Matthew
**Subject:** RE: SB 1522 (Vasconcellos) Parole, passes Assembly Public Safety Comm ittee

By the way here is a link to the article I mentioned regarding parole ...

http://www.nctimes.com/articles/2004/06/20/news/californian/21_36_016_19_04.txt

-----Original Message-----
**From:** info@mqnf.com [mailto:info@mqnf.com]
**Sent:** Wednesday, June 23, 2004 2:14 PM
**To:** jhall@californian.com
**Subject:** concerning re: Making sure life means life

I write in response to your article, "Making sure life means life." I was once a victim of a very violent crime (I was shot in the back with an AR-15 shortly after watching my stepmother gunned down in front of me. The bullet missed my heart by 1/2 inch, I lost much of my left lung, and had to have 5 of my ribs totally rebuilt).

I cannot imagine any person shrugging off the seriousness of these types of violent crimes, nor the tremendous impact upon the lives they touched. With all of this fully in mind, I am baffled as to how any representative of our law enforcement community could attempt to justify reneging on their deals with the convicted.

A deal is a deal, and two wrongs don't make a right. The People willingly entered into these sentence agreements with the accused, and a Term-to-Life sentence means "Life" is only one of the many options. A decision about parole suitability ought to ignore politics and more appropriately be based upon the individual level of growth and rehabilitation by the inmate.

Unfortunately, these DA's are using parole hearings as an opportunity to re-argue the case (out of sight of a jury and judge), to now try and gain what they were unable to do during the trial and within a court of law -- longer sentences which the evidence did not support at the time of the trial.

If the People have no intention on making good on their end of the bargain (to have anything less than "Life,") then what does that say about the integrity of our system of government? I find that type of baseless follow-up to be less than forthright, and a gross misuse of the public's trust and resources.

Please Mr. Riverside DA, please do not pursue such an injustice in my name; my system of integrity prevents me from supporting such a gross form of politically motivated abuse of an entire class of persons, namely Term-to-Life inmates, so you can get re-elected.

I find it most concerning that these "law enforcement" officials don't appear to understand the law (PC 3041) and supporting case law (Biggs. v. Terhune) -- both of which clearly establishes a presumption of paroleability more often than not. It is only in those cases which stand out amongst other similar cases as most egregious, that parole is to be denied.

There are approximately 10% of the "Lifers" in our prison system who are elderly and have been determined to "no longer be a risk to public safety" by forensics experts, yet because of the efforts of District Attorneys like that

*13*

in Riverside, much of our tax dollars are spent on housing these old men to the tune of nearly $250 million per year.

In the end, all of this is really supposed to be about positively affecting public safety.  To dogmatically disregard the terms of the sentence agreement and the inmate's personal level of growth (if any) is in my estimation an injustice to the people of California and does nothing to improve public safety.  Mr. DA, what if you instead used those same resources to combat the misdemeanor anarchy in your district?  We all know smaller crimes usually lead to larger crimes, so why not focus upon prevention?

In closing, this focus by the DA seems less about improving public safety, and more about unresolved frustration over the law and case outcomes.  If I didn't like a law, then I would fight to get it legitimately changed through proper channels.  I encourage the Riverside DA to do the same.

Matt Gray, Sacramento

14

# Once-touted prison system now called a disgrace in report

**By Jim Wasserman**
ASSOCIATED PRESS

SACRAMENTO — The state's beleaguered prison system was termed dysfunctional yesterday in a long-awaited report that called for scrapping the agency overseeing it, limiting the powers of wardens and ending a code of silence that protects abusive guards.

The 350-page "Reforming Corrections" report offered more than 200 recommendations to overhaul a system rocked by scandals, overspending and a high inmate recidivism rate.

A system once considered a national model fell from grace, the report said, because of "too much political interference, too much union control and too little management courage, accountability and transparency."

Panel Chairman George Deukmejian, who spearheaded the state's prison expansion as governor from 1983 to 1991, said the system is now "dysfunctional."

The 40-member California Corrections Independent Review Panel appointed by Gov. Arnold Schwarzenegger presented a long-term strategy to improve public safety and save money by lowering one of the nation's highest re-imprisonment rates of former inmates. It also placed a new emphasis on inmate education and rehabilitation.

Many of the new ideas were borrowed from the federal prison system and other states, providing a "blueprint for once more elevating California to a national leadership," Deukmejian said.

California spends nearly $6 billion a year for its 32-prison system, the nation's largest with 163,000 inmates and nearly 50,000 employees.

Focusing on the prison culture, the report called for an end to the so-called code of silence that protects abusive guards and suggested a renewed attention on ethics.

"Quite frankly, we found a lot of things that were wrong," said the panel's director, Joseph Gunn, retired director of the Los Angeles Police Commission.

The report proposed eliminating the California Youth and Adult Correctional Agency that oversees state prisons and replacing it with a new Department of Correctional Services run by a 10-member commission. Members would conduct public meetings every two months and open the operations to public view.

Commissioners named by the governor would set system-wide policies, changing a current structure in which prison wardens act as "feudal barons" who set their own rules, the report said.

The report, 3½ months in the making, followed forums and interviews with 470 people in California and other states by a panel that included 35 representatives from the state Department of Corrections, Youth and Adult Correctional Agency, California Highway Patrol and state inspector general.

For more than a year California's prison system has been shaken by negative reports and scandals, including videotaped beatings of inmates, allegations of abuse cover-ups, questionable bidding practices and charges of overspending with little regard for the state's budget process.

15

Posted on Thu, Jun. 24, 2004

# Investigator calls for criminal charges against former prisons chief

**By Thomas Peele**

**CONTRA COSTA TIMES**

IMAGESANDRELATEDCONTENT

Former Corrections Director Edward Alameida

RELATEDLINKS
• **The report (.pdf file)**

A federal investigator issued a final report on California's beleaguered prison system Thursday morning, calling for a U.S. District Court judge to consider criminal contempt charges against former Corrections Director Edward Alameida for allegedly ordering a cover-up of an aborted perjury investigation.

The investigator, John Hagar, concluded after months of hearings and deliberation that Alameida, under apparent pressure from the state's prison guard union, ordered a halt to an investigation into whether guards lied in federal court to protect two of their own accused of abusing inmates at Pelican Bay State Prison. The two guards were eventually convicted. Alameida then ordered his staff to issue "false and misleading letters" to Hagar, who a judge appointed to investigate how the state prison system handles disciplinary investigations of guards, according to the final report.

If U.S. District Senior Court Judge Thelton Henderson acts on Hagar's recommendations, Alameida, 55, could face five years in federal prison.

In the 148 page report Hagar also called for former head of the department's internal investigations, Thomas Moore, to face perjury charges for allegedly lying when he testified before Hagar in July of 2003.

Hagar issued a preliminary report in January that called for both men to face criminal charges. At a hearing that same month, their lawyers argued against the recommendations. Hagar's final report said that he heard nothing in those hearing to make him change his decision.

*16*

# Prison workers stay mum

**A6** MONDAY, MARCH 29, 2004

# THE PRESS-ENTERPRISE

DAVID
CORNWALL
PUBLISHER

**PUBLISHERS OF**
THE PRESS SINCE 1878
THE ENTERPRISE SINCE 1885
THE PRESS-ENTERPRISE SINCE 1932

MARIA
DEVARENNE
EDITOR

| HARRY HAMMOND | HOWARD H HAYS JR. |
| PRESIDENT 1937-1948 | PUBLISHER 1983-1988 |
| HOWARD H HAYS SR. | WILLIAM D. RICH |
| PRESIDENT 1948-1969 | PUBLISHER 1989-1993 |

GALE
HAMMONS
EDITORIAL PAGE
EDITOR

| HOWARD H HAYS JR. | MARCIA MCQUERN |
| ARTHUR A. CULVER | PUBLISHER 1994-2002 |
| CO-PUBLISHERS | |
| 1965-1983 | |

# *Sunlight in prison*

Journalists should have more access to state prisoners, and the Legislature should pass a pending bill that would make it easier to interview inmates.

For two decades until 1996, news reporters could interview inmates under conditions set by prison wardens. But the Department of Corrections scrapped that right, and three times governors have vetoed bills to restore the access.

This time, Gov. Schwarzenegger should sign Sen. Gloria Romero's bill (SB 1164), if the Legislature sends it to his desk. The bill allows interviews as long as wardens don't deem them a safety risk.

The need for public access to inmates, via journalists, has never been more apparent. In the last year, nonprofit groups, inmates and some prison authorities have alleged excessive force and cover-ups at several adult and juvenile facilities, exacerbated by prison guards' "code of silence."

Interviews with inmates aren't a panacea for prison problems, but increased scrutiny would help. Private interviews with prisoners would help the public learn more about the operation of publicly funded correctional facilities, and help hold prison authorities accountable to the public.

Journalists traditionally have had access to the criminal justice system to help the public understand what's being done in its name. Prisons are a vital part of that system and would benefit from the sunlight of open evaluation.

# Prison workers stay mum

**PROBE:** Officials say the "code of silence" hurts their investigation into inmate deaths.

BY DON THOMPSON
THE ASSOCIATED PRESS

SACRAMENTO—Dozens of prison employees have refused to cooperate in recent weeks in probes of inmates who bled to death or were beaten as they lay prone on the floor.

Investigators say they're running head-on into the "code of silence" that Gov. Schwarzenegger's corrections secretary promised last month to end with a new "zero tolerance" policy for anyone shielding employee wrongdoing or retaliating against whistleblowers. That promise helped persuade a federal judge not to put the state prison system under federal control.

California may need to change state law and labor contracts to put an end to it, said state Sen. Gloria Romero, D-Los Angeles, who plans an oversight hearing into the problem.

"These are probably some of the more extreme examples," said Tip Kindel, spokesman for Youth and Adult Correctional Agency Secretary Roderick Hickman. "The code of silence exists to cover up wrongdoing. It's a conspiracy to lie. It's especially bad for peace officers."

The most recent allegations are in an internal California Youth Authority report on the videotaped beatings of two youths, ages 19 and 21, by two employees at Stockton's N.A. Chaderjian Youth Correctional Facility Jan. 20.

They reported that their two colleagues acted in self-defense, when the evidence showed the youths were beaten after they had been subdued. Two of the four said they shot both youths with pepper spray and one with a pepper spray gun because they were fighting, when the video showed the youths were shot at point-blank range while they were face down and not resisting.

All six have since asserted their right against self-incrimination. All remain on leave pending disciplinary action and a decision by the state attorney general whether the San Joaquin County district attorney abused his discretion by not filing criminal charges.

/7

JAN 16 2004

# Promise to investigate possible perjury by guards called 'a sham'

**By David Kravets**
ASSOCIATED PRESS

SAN FRANCISCO — A promise by the director of the California Department of Corrections to investigate whether guards committed perjury in inmate abuse trials "was a sham which high-ranking CDC officials never intended to follow," a court-appointed examiner said yesterday.

The 71-page report by a court-appointed monitor of the department's internal affairs practices also recommended a federal judge charge the agency's former director, Edward Alameida, and the department's chief investigator with contempt of court — a charge that could result in months of prison time if proven.

Alameida resigned from the corrections department last month amid allegations he impeded investigations into allegations Pelican Bay State Prison guards committed perjury

in inmate-abuse federal trials. Alameida, who was appointed by former Gov. Gray Davis, emphatically denied the allegations.

The report to U.S. District Judge Thelton Henderson said Alameida succumbed to pressure from the California Correctional Peace Officers Association, the state's most powerful labor union, and ended investigations of inmate abuse "before their completion" and lied about it in court.

The agency had promised Judge Henderson two years ago it would investigate whether guards committed perjury in court when fellow Pelican Bay guards were on trial for abusing inmates. The promise came after Pelican Bay guards Jose Ramon Garcia and Edward Michael Powers were convicted and sentenced to seven and six years in prison, respectively.

From 1992 to 1996, they solicited inmates to attack child

molesters, sex offenders an inmates they disliked at th maximum-security facility Northern California's Cre cent City. The prison hous about 3,200 inmates.

The corrections depar ment, under Alameida's lea ership, promised it would i vestigate and fire guards wh committed perjury or were i volved in abusing inmates.

That didn't happen, the r port said.

"The failures of the pos Powers investigation are als illustrative of a pattern of co duct in which CDC officials the highest level demonstra an unwillingness and inabilit to investigate and disciplin serious abuses of force by co rectional officers," wrote Joh Hagar, the court-appointed a torney who is investigating th department at Judge Hende son's request.

Alameida said he "emphat cally" denies allegations "I i terfered with an investigation

/7

# California's corrections system covered up abuse of prisoners, report says

**STATE'S PRISON SYSTEM IS NOT COMPLYING WITH COURT-ORDERED REFORMS AND FAILING TO**

**INVESTIGATE GUARDS, ACCORDING TO LEGAL MONITOR**

**By Howard Mintz and Mark Gladstone**
**Mercury News**

Citing evidence of a massive coverup within the highest levels of California's corrections department, a court-appointed investigator has found that the state's prison system has ``lost control'' of its ability to investigate and discipline guards for abusing inmates and is in dire need of major reforms.

In a scathing denunciation of the California Department of Corrections, the 80-page report, prepared for a San Francisco federal judge, suggests that top officials, including recently resigned CDC director Edward Alameida, could be prosecuted for defying court orders to clean up Pelican Bay State Prison and lying during a probe into how the CDC has handled ongoing misdeeds by Pelican Bay guards.

The report, prepared by John Hagar, who monitors conditions at Pelican Bay for U.S. District Judge Thelton Henderson, describes a CDC administration under the control of the state's powerful prison guard union and willing to abdicate its internal discipline procedures to maintain a dangerous ``code of silence'' about inmate abuses.

Specifically, the report states that corrections officials bowed to union pressure by squelching an internal investigation into whether Pelican Bay guards committed perjury during the 2002 trial of two other guards ultimately convicted of federal civil rights violations at the prison. Hagar called testimony from Alameida and other CDC leaders in the department's so-called ``Directorate'' ``not believable.''

The report comes as two Sacramento legislators are preparing to hold hearings next week on the department's handling of alleged abuses at Pelican Bay and other prisons. It also directly invites Gov. Arnold Schwarzenegger to address reforms quickly because, the report warns, the state ``has no current effective mechanism for monitoring and correcting abuses when they occur within the Department of Corrections' investigation and discipline system.''

State officials said they already are working on reforms that would avoid undue union influence on future internal investigations.

Tip Kindel, spokesman for Rod Hickman, the new secretary for the state's adult and youth corrections authority, said: ``The secretary has made a commitment to the special master and to Judge Henderson to develop a comprehensive program free of inappropriate outside influence.''

The state will now respond to Hagar's report and recommendations. The judge will then make his own findings.

---

*Contact Howard Mintz at (408) 286-0236 or hmintz@mercurynews.com.*

*18*

# Guard Challenges Code of Silence

He says his efforts to combat brutality against prisoners hit a 'Green Wall.' He is set to testify before a panel today.

By Mark Arax
*Times Staff Writer*

Among the ranks of prison guards, only the most trusted are chosen to open a new penitentiary and lay down the law to the first busloads of inmates.

Three times in a 15-year career, D.J. Vodicka got the call. He helped inaugurate Corcoran, Calipatria and Salinas Valley — not a country club lockup among them, he liked to say.

At 6 feet 6 and 280 pounds, with a head shaved clean, he was a guard's guard. "Vodicka was one of the most professional guys I ever had the privilege of supervising," said Joe Reynoso, a longtime corrections investigator. "Just a stand-up, straight-up officer."



**Mel Melcon** *Los Angeles Times*

**BREAKING THE CODE:** *D.J. Vodicka, 41, will testify today before a state Senate committee on prison reform.*

Today, Donald Joseph Vodicka will stand before a state Senate committee on prison reform not as a guard but as a whistle-blower. Instead of a career marked by commendations from wardens and prosecutors, the 41-year-old Vodicka is set to testify about how he had to put away his green uniform after breaking what he calls the cardinal rule of guards: Keep quiet in the face of officer brutality and corruption.

Some of his old co-workers now call him a "rat," a "snitch," a "cry-baby." The state 'correctional officers union, a strong advocate for guards, won't have

[See Prison, Page B6]

19

# Prison Guard Attempts to Tear Down 'Green Wall'

[Prison, from Page B1]

anything to do with him.

The code of silence is a way of life." Vodicka said. "It's everywhere. It wasn't strong at Corcoran and Pelican Bay, and it even took hold at Salinas Valley."

"A whistle-blower has no place to hide. Why should some-one come forward when he knows he's not going to be protected by the Department of Corrections or his union?"

But state Sen. Jackie Speier (D-Hillsborough), who will head the committee's hearings on prison reform over the next several months, said the department's change in the late 1980s, still thwarts whistle-blowers. As a result, the impulse to keep silent is deeply ingrained.

## Possible Gunshot Victim Dies in O.C.

Santa Ana police are investigating whether a young woman who suffered a fatal injury Monday might not have been shot.

The woman, in her 20s, was found with a head injury in the 700 block of North Morse Drive in Santa Ana shortly after 9 p.m., said Police Lt. Felix Osuna.

She was taken to UCI Medical Center in Orange and subsequently pronounced dead. No further information was available late Monday.

"We have a system as sinister and powerful in some ways to muzzle people who want to tell the truth," Speier said. "Those who do come forward like Mr. Vodicka find themselves sent to Siberia or worse for their bravery."

In a lawsuit filed against the state, Vodicka alleges that he blew the whistle on a gang of officers known as the "Green Wall" at Salinas Valley State Prison and was the subject of retaliation by his superiors and other officers. The lawsuit contends that the Department of Corrections failed to shield Vodicka under the state's whistle-blower protection act. The department, citing the lawsuit, declined to comment.

"Instead of following up on his memos, high-ranking officers leaked his information to guards and talked about him being a rat in front of inmates," said Larry Iron, a Camarillo attorney representing Vodicka. "He feared for his life."

Vodicka grew up in Camarillo, the middle son of a power company executive. He wanted to be a cop, but could only get on the waiting list for a job as a temporary fill-in, or so he thought.

After his superiors chose him to open Corcoran State Prison in 1989 and Salinas Valley State Prison in 1992, Vodicka encountered an incident on Thanksgiving Day 1998 in the D yard, in which an injured several correctional officers.

Lt. Greg Lewis was assigned to oversee the yard that day. Vodicka said in an interview. Lewis suspected that some officers would save more tooth in the inmates. Vodicka said he assigned Vodicka to handle the crime scene. Vodicka photographed the inmates to document the crime scene and the inmates' initial injuries.

"The officers were upset because we were going to document any injuries suffered in the initial fight."

Vodicka said he reached deep inside Salinas Valley State Prison and he didn't want my photos to establish a baseline.

"They already knew they were going to beat them up. They were going to beat them up. They didn't want my photos to establish a baseline," Vodicka said. "They knew photos were taken to establish the symbol 7/23."

And some of the letters were roughed up. In the weeks that followed, a group

**WHISTLE-BLOWER.** Lenny Iron, left, an attorney representing D.J. Vodicka, says his client pressed for his life. In a lawsuit, Vodicka says he was the target of retaliation.



Mr. Marcos, Los Angeles Times

of officers began wearing turkey-shaped pins on their uniforms as a symbol of the Thanksgiving Day beating. Word then spread that some of those same officers and others had formed the Green Wall gang.

Lt. Greg Lewis was assigned to oversee the yard that day. Vodicka said in an interview. Lewis suspected that some officers would save more time, and others viewed him with distrust. The suspicion grew as he said the transition wasn't easy.

He was an internal affair, and investigators viewed him with distrust. The suspicion grew as he said the transition wasn't easy.

In the lawsuit and the assistant attorney general representing the state were unsuccessful. Recently the assistant attorney general concedes the allegations of retaliation.

In an internal memo attached to the lawsuit and obtained by the Times, Lewis wrote to his superiors that the Green Wall allegations were a symbol of the corrections press office in Sacramento, which also declined to comment because of the pending litigation.

"One night, an agitated Lewis came to my house. He said he had gone to Warden Ana-thony Lamarque about the knife incident, that the warden refused to deal with the situation. Lewis was so upset that two days later he quit his job and his Green ink. One officer wore a green band on his left wrist, according to the lawsuit, and his tattoo read the symbol 7/23. The symbol and letters of the alphabet — G and W — stood

for Green Wall.

Officers were throwing parties. In Soledad with green beer and green attire. A group photo showed several officers flashing the same sign: three fingers extended with thumb and middle finger held down — in the shape of a W.

Other gangs can be vehicles to strengthen the code of silence and cover up wrongdoing. But Lewis had a hard time getting the internal memos shelved when a state corrections investigator finally did show up, he walked around with a union finger held in his collar while Vodicka also informed Sgt. L. J. Gomez, who informed Vodicka that several officers were calling him a "snitch" behind his back.

Vodicka won a case in Pleasant Valley State Prison in February 2002, but the intimidation only grew, he says. His lawsuit alleges that Vodicka Green Wall existed, the lawyer terror other flashed a gang sign in front of me, I wrote a second memo...

Vodicka noticed that out of nowhere his colleague was treating him coldly, turning hostile and became apparent, according to the lawsuit.

Several officers had violated policy by bringing a green handgun into the prison and pointed one into the prison Views seemed to have returned and a smile into the prison and a kid had just been promoted. The knife had been engraved with "Green Wall" and 7/23, according to the internal memos.

"I'd pick up the phone and say, 'I've got the FBI on the line.' Who do you want to tell on now? I knew there was no escaping. No matter what prison I transferred to. You told such. Such most a year ago and filed a workers' compensation claim.

He and his attorney wrote letters detailing each hostile encounter — to Lamarque, to the internal affairs investigation in Sacramento, to Director Edward Alameida, the inspector general's office, and then-Gov. Gray Davis. As one official posted the union out the top of another, the union to the union president, refused to talk to him.

"It was the worst hurt of all, he said, learning that his union considered me a personal non.

As it turns out, Lamarque himself, the CCPOA, flashed its hands of me," he said. "They wanted no part of an officer who reports wrongdoing. I didn't deserve representation in their eyes."

as a confidential matter to Sacramento. But two months later, according to documents and interviews, the memo's contents had been leaked.

The consequences for Vodicka were immediate. Steve Ar-chibald, one of several officers who had been removed from the investigative service — or housecleaning, confronted Vod-icka. Archibald talked about the contents of the confidential memo and blamed Vodicka for leaking it.

That is still work environment now existed was created in a separate memo written by Sgt. L. J. Gomez, who informed Vodicka that several officers were calling him a "snitch" behind his back.

20

# California Guards Convicted Of Arranging Prison Beatings;
# New Conspiracy Accusations Leveled

## by Marvin Mentor

On May 15, 2002, a federal criminal jury convicted two Pelican Bay State Prison (CA) guards of violating the civil rights of eight prisoners whom they conspired to have beaten and stabbed - two fatally; And in a civil trial ensuing from one prisoner's death, new accusations implicating more guards as well as the former trial attorneys for the prison guards - linking them to a prison gang - were leveled.

Guards Michael Powers and Jose Garcia allegedly targeted child molesters, rapists and prisoners who refused to cooperate with them, by soliciting other prisoners with alcohol and special privileges to attack the targets. Federal prosecutor Melinda Haag told the jury of such violence and cruelty dating back a decade; describing ten incidents where Powers or Garcia had prisoners they didn't like "hurt, assaulted, stabbed or shot." Prisoner Watson White was fatally stabbed in 1992 by a prisoner allegedly solicited by Powers. Prisoner William Boyd was stabbed to death in the Pelican Bay yard just days after he had reluctantly testified against Garcia. Prisoner Duke Bolter is pending a capital murder trial in Boyd's death. Garcia was ultimately convicted in state court for conspiracy and for bringing alcohol into the prison, completing his 4-1/2 year term while the federal charges were pending.

Prisoners and guards were called as witnesses at the federal trial. The prison guards' union (CCPOA), which collects $18 million in members dues annually, paid the attorneys for Garcia and Powers. The union also allegedly pressured Pelican Bay's warden not to release subpoenaed guard personnel files. Federal District Judge Martin Jenkins ordered the warden to comply.

Prisoner Michael Black testified about Powers' challenging Black to a fight, but that Powers swung at his face before other prison guards removed Black's handcuffs. Former prisoner Eugene Ebright, a tattooed skinhead, testified that in 1996 Powers left a knife under his pillow so Ebright could assault another prisoner. Ebright backed out when he learned he would be getting released soon on a time cut - hiding the

knife behind an electrical box before paroling, without carrying out the assault. When Ebright related this to FBI investigators in 1999, they located and dismantled the electrical box and found the knife still there, true to Ebright's testimony. The federal jury evidently believed the prisoner witnesses and not the guards. After a month-long trial, they found Powers and Garcia both guilty of conspiracy.

After the verdicts, Judge Jenkins permitted Garcia and Powers to remain free on bail pending sentencing, in spite of alleged threats made against colleagues who had testified against them or who had investigated them. Department of Corrections spokesman Russ Heimrich dismissed these allegations as "a couple of hotheads who made stupid remarks they should have kept to themselves, or done some scream therapy in their cars."

In a recent development, Garcia's attorneys in his state trial, Robert Noel and Marjorie Knoller, (who, under contract with the CCPOA, had for years unsuccessfully defended Pelican Bay guards) were recently convicted of manslaughter in a San Francisco dog mauling homicide implicating Pelican Bay prisoners. (See next month's *PLN* for more on this topic.) But Noel (now serving his time in Oregon) and Knoller also represented Boyd's widow in her civil action over Boyd's murder - without revealing their obvious conflicts of interest.

In October, 2002, Boyd's widow filed new charges in her ongoing federal civil rights lawsuit, alleging that Noel and Knoller had committed a "fraud on the court" by hiding the identity of the true culprits in her husband's death - in cahoots with the CCPOA. Boyd's widow's new lawyers, Catherine Campbell and Robert Navarro of Fresno, CA, have asked the district court to open discovery into the new allegations and to name as new civil defendants former guards Michael Powers, Roy Alvarado, CCPOA chapter president Charles Alexander and chapter vice-president Rick Newton. Campbell's allegations go on to implicate Noel and Knoller's close association with the Pelican Bay Aryan Brotherhood prison gang as a factor in their conspiratorial deceptions. Campbell al-

leges that Boyd, a known prison "shot-caller," was silenced by co-conspirators whose motive was to prevent Boyd from revealing damaging information about other prison guards. Campbell further alleges that it was Alvarado and Powers who ordered Boyd's murder.

But Alvarado has never been charged with any crime. Powers' attorney Matthew Pavone stated that "there was never a suggestion that they ever attributed a direct role to Jose Garcia in Boyd's death." On February 6, 2003, Powers was sentenced to seven years in prison and Garcia to six. The court ordered the men to prison in June 2003, but has given them time to appeal that ruling. See: *US v. Powers*, No. CR-00-105MJJ (USDC, N.D. Cal.); *Boyd v. Fallman*, No. C-98-3717 T.E.H. (USDC, N.D. Cal.). ■

Other Sources: *San Francisco Daily Journal*, *San Francisco Chronicle*

**EXHIBIT 45**

CDC Memorandum:   Notice of <u>In re Rutherford</u>

State of California                                      Department of Corrections and Rehabilitation

# Memorandum

Date : October 13, 2006

To   : Associate Directors, Division of Adult Institutions
       Wardens
       Classification and Parole Representatives
       Reception Center Correctional Counselors-III
       Litigation Coordinators

Subject : **NOTICE OF JUDGMENT IN CLASS ACTION LIFER PAROLE HEARINGS** *IN RE RUTHERFORD*, **MARIN COUNTY SUPERIOR COURT NO. SC135399A**

The Marin County Superior Court held an evidentiary hearing for *In re Rutherford* on January 11, 2006. The court entered its order on February 15, 2006, finding that the California Department Corrections and Rehabilitation (CDCR) is violating the law by failing to conduct Parole hearings on time. *In re Rutherford* is currently known as *In re Lugo*. The court order is a class action judgment. The *In re Lugo* class is defined as all prisoners serving indeterminate terms of life with the possibility of parole who have approached or exceeded their minimum eligible parole dates without receiving their parole hearings within the time required by Penal Code sections 3041 and 3041.5. In this memorandum, "Lifers" refer only to the *In re Lugo* class inmates. The Order also contains a remedial plan which is delineated in the attached, "Notice-Judgment in Class Action-Lifer Parole Hearings," (Notice).

This memorandum directs institutions to inform Lifers about the *In re Lugo* judgment and remedial plan using the Notice. Institutions must post the Notice in specified areas as described below. Each institution received a package with 120 laminated notices, a supply of paper notices, and two compact discs (one in English and one is Spanish).

**Posting Requirements:**

By October 31, 2006 institutions shall post the English and Spanish versions of the laminated Notice in the following areas:

    A.  All inmate Law Libraries
    B.  Housing Units
    C.  Areas commonly used for educational, vocational and self-help programs
    D.  Board of Parole Hearings Rooms and Holding Cells

The Notice will be placed at appropriate heights to accommodate inmates in wheelchairs in those housing units designated for wheelchair users. Whenever possible, the posters will be placed behind glass-enclosed bulletin boards or behind counselor-office windows to prevent removal. Each laminated notice has the English

| CDC 1617 (3/89)

Associate Directors, Division of Adult Institutions
Wardens
Classification and Parole Representatives
Reception Center Correctional Counselors-III
Litigation Coordinators
Page 2

version on one side and the Spanish version on the other.  Staff shall post the English and Spanish versions side-by-side.

The Litigation Coordinator shall ensure the Notices are placed in these mandated locations.  The Litigation Coordinator will keep an inventory of the Notices identifying where and when the Notices were posted.  At least once per quarter, the Litigation Coordinator or designee will check to determine that the posters are properly posted and have not been removed or defaced.  The Litigation Coordinator will replace the posters when necessary.

**Distribution Requirements:**

By October 31, 2006, Litigation Coordinator in conjunction with the Classification and Parole Representative shall ensure *In re Lugo* class members housed in the general population receive a paper copy of the Notice.  Institution employees are responsible for making the copies for this one time distribution.

Furthermore, by October 31, 2006, institution staff shall distribute the paper Notices to Lifers housed in the following areas:

A. Security Housing Units
B. Administrative Segregation Units
C. Protective Housing Units
D. Psychiatric Services Units
E. Orientation Units
F. Inmate groups or housing units on extended lock downs. (at least two weeks)
G. General Acute Care Hospitals, Correctional Treatment Centers, the Skilled Nursing Facility, and Outpatient Housing Units.

The Litigation Coordinator shall ensure the Notice is distributed in these special housing units.  Paper copies of the Notice are attached for this purpose.

**Effective Communication Requirements**

**A.  Other Languages:**

In response to requests from Lifers, institutions will make reasonable attempts to provide the Notice in languages other than English and Spanish.

Associate Directors, Division of Adult Institutions
Wardens
Classification and Parole Representatives
Reception Center Correctional Counselors-III
Litigation Coordinators
Page 3

**B. Inmates with Disabilities:**

Institutions shall provide the necessary accommodation to ensure the Notice is effectively communicated to Lifers with disabilities under *Armstrong* and to Lifers with developmental disabilities under *Clark*. Institution staff shall inform Lifers designated as DPV that the Notice is available in audio format in the library. The Litigation Coordinator will ensure the attached CDs recorded in English and Spanish are distributed to each library.

Institutions shall ensure an employee, preferably the inmate's assigned caseworker, communicates the Notice effectively to Lifers with Developmental Disabilities Program (DDP) codes, i.e.: DD1, D1A, DD2 and DD3. The employee providing notice can obtain a copy from the Litigation Coordinator.

If you have any questions please contact Alberto Caton, Facility Captain, Court Compliance Team, at (916) 323-4297 or Thomas Noble, Correctional Counselor-II, Court Compliance Team, at (916) 322-3732.

JOHN DOVEY
Director
Division of Adult Institutions

KATHLEEN KEESHEN
Chief Deputy General Counsel
Office of Legal Affairs

Attachments

cc:    Chuck D'Arcy
       Alberto F. Caton
       Thomas Noble

3