**EXHIBIT 46**

2006 Parole Hearing Transcript

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )
Hearing of:               )          CDC Number B-89549
                          )
MARK TITCH                )          INMATE
                          )          COPY
_____)

R.J. DONOVAN CORRECTIONAL FACILITY

SAN DIEGO, CALIFORNIA

JULY 19, 2006


PANEL PRESENT:

Mr. James Davis, Presiding Commissioner
Mr. Alejandro Armenta, Deputy Commissioner


OTHERS PRESENT:

Mr. Mark Titch, Inmate
Mr. Daniel Coryn, Attorney for Inmate
Mr. Tony Ferrentino, Deputy District Attorney
Correctional Officer Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____   No      See Review of Hearing
_____   Yes     Transcript Memorandum


**Stacy Wegner, Peters Shorthand Reporting**

ii

## INDEX

| | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 12 |
| Pre-Commitment Factors | 22 |
| Post-Commitment Factors | 57 |
| Parole Plans | 44 |
| Closing Statements | 90 |
| Recess | 96 |
| Decision | 97 |
| Adjournment | 104 |
| Transcriber Certification | 105 |

--oOo--

2

1

1     **P R O C E E D I N G S**

2         **PRESIDING COMMISSIONER DAVIS:**   This is a

3     Subsequent Parole Consideration hearing for Mark

4     Titch, CDC number B-89549.   Today's date is July

5     19th, 2006.   We're located at R.J. Donovan

6     Correctional Facility.   The inmate was received

7     on January 18th, 1978, from Orange County.   The

8     life term began on January 18th, 1978, with a

9     minimum eligible parole date of February 4th,

10    1984.   The controlling offense for which the

11    inmate is committed is murder first, case number

12    C-37693.   Count 13, 187 first with additional

13    charges of robbery, Penal Code Section 211, same

14    county, same case number, counts two, four, six,

15    seven, and nine; burglary, Penal Code Section

16    459, same county, same case number, counts 10,

17    11 and 15; kidnap, Penal Code Section 209, same

18    county, same case number, count 12; murder,

19    Penal Code Section 187, same county, same case

20    number, count 16; and assault with a deadly

21    weapon, Penal Code Section 245(b), San Diego,

22    case number CR-42845, and that is count two.

23    This hearing -- the inmate did receive a term of

24    life.   This hearing is being tape record, and

25    for the purposes of voice identification, we

26    will each state our first and last name,

27    spelling your last name.   When it comes to you,

3

2

1    Mr. Titch, if you would also give us your CDC

2    number, please, sir.  So I will start and move

3    to my left.  I'm James Davis, D-A-V-I-S,

4    Commissioner.

5        **DEPUTY COMMISSIONER ARMENTA:**  Alejandro

6    Armenta, A-R-M-E-N-T-A, Deputy Commissioner.

7        **INMATE TITCH:**  I'm Inmate Titch, T-I-T-C-H.

8    Prison number is B-89549.

9        **PRESIDING COMMISSIONER DAVIS:**  And your

10   first name also, please?

11       **INMATE TITCH:**  Mark.

12       **PRESIDING COMMISSIONER DAVIS:**  Mark.  Thank

13   you.

14       **ATTORNEY CORYN:**  Daniel Coryn, C-O-R-Y-N,

15   attorney for Mr. Titch.

16       **DEPUTY DISTRICT ATTORNEY FERRENTINO:**  Tony

17   Ferrentino, F-E-R-R-E-N-T-I-N-O, Deputy District

18   Attorney of Orange County.

19       **PRESIDING COMMISSIONER DAVIS:**  Thank you.

20   Let the record also reflect that we are joined

21   by a correctional officer today who is here for

22   security purposes only and will not be actively

23   participating in this hearing.  Before we begin,

24   Mr. Titch, if you'd also -- excuse me, in front

25   of you is a laminated piece of paper containing

26   the American's with Disabilities Act statement.

27   Could you please read that aloud, sir?

4

3

1    **INMATE TITCH:**

2            The American's with Disabilities Act,

3            ADA, is a law to help people with

4            disabilities.  Disabilities are

5            problems that make it harder for some

6            people to see, hear, breathe, talk,

7            walk, learn, think, work, or take care

8            of themselves than it is for others.

9            Nobody can be kept out of public places

10           or activities because of a disability.

11           If you have a disability, you have the

12           right to ask for help to get ready for

13           your BPT hearing, get to the hearing,

14           talk, read forms and papers and

15           understand the hearing process.  BPT

16           will look at what you ask for to make

17           sure that you have a disability that is

18           covered by the ADA and that you have

19           asked for the right kind of help.  If

20           you do not get help, or if you don't

21           think you got the kind of help you

22           need, ask for a BPT 1074 Grievance

23           Form.  You can also get help to fill it

24           out.

25           **PRESIDING COMMISSIONER DAVIS:**  All right.

26   Thank you.  And our records indicate that

27   together with staff from the institution on

4

1  March 2nd, 2006, you reviewed and signed a BPT

2  Form 1073 indicating that you do not have any

3  disabilities that would qualify under the

4  American's with Disabilities Act.  Is that

5  correct, sir?

6      **INMATE TITCH:**  That's correct.

7      **PRESIDING COMMISSIONER DAVIS:**  All right.

8  So you were able to read that today without

9  glasses?

10      **INMATE TITCH:**  Yes.

11      **PRESIDING COMMISSIONER DAVIS:**  Do you

12  normally wear glasses?

13      **INMATE TITCH:**  No, sir.

14      **PRESIDING COMMISSIONER DAVIS:**  Good for

15  you.  You're able to hear me all right?

16      **INMATE TITCH:**  Yes, sir.

17      **PRESIDING COMMISSIONER DAVIS:**  And you came

18  here today.  You walked here under your steam,

19  you walked here -- you seem fit and healthy and

20  ready to go?

21      **INMATE TITCH:**  Yes, sir.

22      **PRESIDING COMMISSIONER DAVIS:**  All right.

23  You're not part of any mental health programs?

24      **INMATE TITCH:**  No, sir.

25      **PRESIDING COMMISSIONER DAVIS:**  All right.

26  Is there any reason that you can think of that

27  you would not be able to actively participate in

6

5

1  this hearing today?

2    **INMATE TITCH:**  None.

3    **PRESIDING COMMISSIONER DAVIS:**  Very well.

4  Counsel, you're satisfied with that as well?

5    **ATTORNEY CORYN:**  Yes, I am.  This hearing

6  is being conducted pursuant to Penal Code

7  Sections 3041 and 3042 and the rules and

8  regulations of the Board of Prison Terms

9  governing parole consideration hearings for life

10  inmates.  The purpose of today's hearing is to

11  once again consider the number and the nature of

12  the crimes for which you were committed, your

13  prior criminal and social history, and your

14  behavior and programming since your commitment.

15  We've had the opportunity to review your Central

16  File and your prior transcripts, and you'll be

17  given an opportunity to correct or clarify the

18  record as we proceed.  We will reach a decision

19  today and inform of whether or not we find you

20  suitable for parole and the reasons for that

21  decision.  If you are found suitable for parole,

22  the length of your confinement will be explained

23  to you.  Nothing that happens in today's hearing

24  will change the findings of the Court.  The

25  Panel is not here to retry your case.  We're

26  here for the sole purpose of determining your

27  suitability for parole.  Do you understand that,

7

6

1  sir?

2      **INMATE TITCH:**  Yes, sir.

3      **PRESIDING COMMISSIONER DAVIS:**  All right.

4  This hearing will be conducted in two phases.

5  First, I will discuss with you the crimes for

6  which you were committed, as well as your prior

7  criminal and social history.  Then Commissioner

8  Armenta will then discuss with you your progress

9  since your commitment, your counselor's report,

10  your psychological evaluation, parole plans, and

11  any letters of support or opposition as they may

12  exist.  Once that's concluded, the

13  Commissioners, the District Attorney, and then

14  your attorney will have an opportunity to ask

15  you questions.  Questions that come from the

16  District Attorney will be asked through the

17  Chair, and then you will respond back to the

18  Panel with your answer.  After that, the

19  District Attorney and then your attorney will

20  then be given an opportunity for a final closing

21  statement, followed by your statement, which

22  should be focused on why you believe that you

23  are suitable for parole.  California Code of

24  Regulations states that regardless of time

25  served, a life inmate shall be found unsuitable

26  for and denied parole, if in the judgment of the

27  Panel the inmate would pose an unreasonable risk

*8*

7

1  of danger to society if released from prison.

2  You have certain rights.  Those rights include

3  the right to a timely notice of this hearing,

4  the right to review your Central File, and the

5  right to present relevant documents.  Counsel,

6  are you satisfied that your client's rights have

7  been met to date?

8      **ATTORNEY CORYN:**  Yes.

9      **PRESIDING COMMISSIONER DAVIS:**  You have an

10  additional right, and that is to be heard by an

11  impartial Panel.  Now, you've heard Commissioner

12  Armenta and I introduce ourselves today.  Is

13  there any reason to believe that we would not be

14  impartial?

15      **INMATE TITCH:**  I've never had any -- I've

16  never gone before any of you.  I think the law

17  says that I'm supposed to have one of the guys

18  from my prior hearing?

19      **PRESIDING COMMISSIONER DAVIS:**  No.

20      **INMATE TITCH:**  No?

21      **PRESIDING COMMISSIONER DAVIS:**  No.

22      **INMATE TITCH:**  It doesn't say that, okay.

23  Well, maybe that's my mistake.  But no, I don't

24  have any problems.

25      **PRESIDING COMMISSIONER DAVIS:**  Thank you.

26      **INMATE TITCH:**  Yes, sir.

27      **PRESIDING COMMISSIONER DAVIS:**  You will

9

8

1    receive a written copy of our tentative decision

2    today.   That decision becomes effective within

3    120 days.   A copy of the decision and a copy of

4    the transcript will be sent to you.   You are not

5    required to admit to your offense or discuss

6    your offense.   However, this Panel does accept

7    the findings of the Court to be true.   You

8    understand that, sir?

9         **INMATE TITCH:**  Yes, sir.

10        **PRESIDING COMMISSIONER DAVIS:**  The Board --

11        **ATTORNEY CORYN:**  Can I interrupt?   Mr.

12   Titch will be exercising that right.

13        **PRESIDING COMMISSIONER DAVIS:**  Okay.   That

14   will be fine.   And we'll clarify that in a

15   moment, but I appreciate that.   Thank you.

16        **ATTORNEY CORYN:**  Yes.

17        **PRESIDING COMMISSIONER DAVIS:**  The Board

18   has eliminated its appeal process.   If you

19   disagree with anything in today's hearing, you

20   have the right to go directly to court with your

21   complaint.   Commissioner Armenta, are we going

22   to be dealing with anything from a confidential

23   file today?

24        **DEPUTY COMMISSIONER ARMENTA:**  We are not.

25        **PRESIDING COMMISSIONER DAVIS:**  All right.

26   Thank you.   I'm going to pass a checklist of

27   documents to both counsel.   If you would please

*10*

9

1    take a look at that and make sure that we're all

2    operating off the same list of documents.

3         **DEPUTY DISTRICT ATTORNEY FERRENTINO:** I

4    have all the documents.

5         **PRESIDING COMMISSIONER DAVIS:** All right.

6    Thank you.

7         **ATTORNEY CORYN:** I have all the documents

8    as well.

9         **PRESIDING COMMISSIONER DAVIS:** Thank you.

10        **ATTORNEY CORYN:** Additionally, I have a

11   packet here that is a folder with an index

12   prepared by Mr. Titch that has tabs, and you can

13   see how they relate to job offers.

14        **DEPUTY COMMISSIONER ARMENTA:** We have this

15   one?

16        **INMATE TITCH:** Yes. It's -- yeah, that's

17   the more developed version of that.

18        **ATTORNEY CORYN:** Okay.

19        **INMATE TITCH:** That was the binder that I

20   told you that was going to be in here.

21        **ATTORNEY CORYN:** All right. Then I don't

22   need to submit it --

23        **INMATE TITCH:** Yeah.

24        **ATTORNEY CORYN:** -- if the Board has one

25   then.

26        **PRESIDING COMMISSIONER DAVIS:** All right.

27   Then they're the same document then?

*11*

10

1      **INMATE TITCH:**  Yes.

2      **PRESIDING COMMISSIONER DAVIS:**  All right.

3  Very good.  We appreciate you -- I haven't had a

4  chance to look at it, but we will review it at

5  the appropriate time, and we do appreciate you

6  preparing that.  It --

7      **DEPUTY COMMISSIONER ARMENTA:**  It's very

8  impressive.

9      **PRESIDING COMMISSIONER DAVIS:**  It's very

10  good.

11      **INMATE TITCH:**  Thank you.

12      **PRESIDING COMMISSIONER DAVIS:**  All right.

13  So the list of documents will be marked Exhibit

14  One.  And anything aside from that document,

15  Counsel that you would like for the Panel to

16  consider today?  Any additional documents?

17      **ATTORNEY CORYN:**  No.  I have submitted a

18  June 29th letter, which I believe the

19  Commissioner also has.

20      **PRESIDING COMMISSIONER DAVIS:**  I believe

21  that was in our package.

22      **ATTORNEY CORYN:**  Okay.  Thank you.

23      **PRESIDING COMMISSIONER DAVIS:**  It's in

24  here, I believe.

25      **DEPUTY COMMISSIONER ARMENTA:**  Let me look.

26      **PRESIDING COMMISSIONER DAVIS:**  All right.

27  Anything additional, Counsel?  Any additional

12

11

1    documents, nothing else?

2        **ATTORNEY CORYN:**  No.

3        **PRESIDING COMMISSIONER DAVIS:**  Nothing else

4    from the prosecution side, all right.   And

5    preliminary objections, Counsel, anything?

6        **ATTORNEY CORYN:**  No objections.

7        **DEPUTY DISTRICT ATTORNEY FERRENTINO:**  No

8    objections.

9        **PRESIDING COMMISSIONER DAVIS:**  And can I

10   assume from your earlier statement that your

11   client will not be speaking about the instant

12   offense?

13       **ATTORNEY CORYN:**  That's correct.  He will

14   not be speaking about the offense.  He'll be

15   exercising his right to rely on the state of the

16   record, as he stated previously.  He does accept

17   responsibility for the offenses.  And he will

18   also exercise his right not to talk about his

19   prior social or criminal history.

20       **PRESIDING COMMISSIONER DAVIS:**  All right.

21   Will he be speaking to us on any matters?

22       **ATTORNEY CORYN:**  Yes, he'll be answering

23   questions pertaining to post-conviction factors,

24   the psychiatric report and parole plans.

25       **PRESIDING COMMISSIONER DAVIS:**  All right.

26   For all matters that you will be speaking to us,

27   then I'll have you raise your right hand, and

*13*

12

1   I'll swear you in at this point.  Do you

2   solemnly swear or affirm that the testimony you

3   are about to give at this hearing will be the

4   truth, the whole truth, and nothing but the

5   truth?

6        **INMATE TITCH**:  I do.

7        **PRESIDING COMMISSIONER DAVIS**:  All right.

8   Absent objection, I'll incorporate by reference

9   the probation officer's report pages two through

10  five, and refer to the board report dated July

11  2006 for -- excuse me, on page one, starting on

12  the second paragraph under summary of crime.

13  The offense summary taken from the cumulative

14  case summary dated 3/2/78 and the probation

15  officer's report dated 3/27/78, controlling

16  accounts, 12 kidnap for robbery/use of a

17  firearm, Penal Code Section 209/12022.5, and

18  count 13, murder, Penal Code Section 187.

19              On January 21st, 1977, a motorcyclist

20              riding through a vacant field in the

21              city of Orange reported that he had

22              observed a female Caucasian subject

23              lying on a knoll of the hill.  Police

24              responded and found the deceased, later

25              identified as victim Laura Ann

26              Sthouthton, S-T-H-O-U-T-H-T-O-N, 21

27              years old.  The coroner's investigation

*14*

13

```
 1        set the body in the upright position,
 2        and it was noted in her right hand she
 3        was clutching a rosary against her
 4        chest.  Additionally, investigators
 5        noticed that the victim sustained two
 6        possible gunshot wounds in the mouth
 7        area and one gunshot wound in the
 8        shoulder area.  Police discovered a 22-
 9        caliber bullet lying on a blanket next
10        to the victim's left shoulder.
11        Investigator indicated that there did
12        not appear to be a struggle in the
13        area.
14   Count 16, Penal Code Section 187, murder
15 first.
16        On January 29th, 1977, at approximately
17        3:56 a.m. Titch and Thomas
18        (codefendant) followed Aubery, A-U-B-E-
19        R-Y, Duncan, D-U-N-C-A-N, home from
20        work.  Titch stopped a car he was
21        driving in front of the victim's home.
22        As Aubery Duncan went to the front door
23        to unlock it, Thomas, who was the
24        passenger of the car, shot Duncan can
25        several times with a 22-caliber rifle.
26        Nadine (phonetic) Duncan, D-U-N-C-A-N,
27        and her daughter Denise heard the loud
```

15

14

1      noise and went to the front door.  As

2      Nadine Duncan opened the door and

3      stepped out on to the porch seeing her

4      husband dead, she was shot twice with a

5      22-caliber rifle and fell to the porch.

6      Her daughter Denise was shot three

7      times, unconscious, and subsequently

8      died at the hospital.  Nadine Duncan

9      was shot by Thomas with a shotgun

10     before he ran out of ammunition for the

11     22-caliber rifle.  She crawled over the

12     body of her daughter to get to the

13     phone to call the police.

14     Under Item B, multiple crime, count two,

15  Penal Code Section 211, robbery first with use

16  of a firearm.

17     On 11/19/76 at about 3:00 a.m. the

18     victim John and Irene Simmions, S-I-M-

19     M-I-O-N-S, were awakened at their

20     residence.  Titch stated, "Don't move

21     or I'll blow your head off.  I have a

22     gun."  Titch cut the phone cord, went

23     through the dresser drawer, took keys

24     to the car, house, and business, and

25     left in the victim's 1975 Chevrolet

26     Monte Carlo.  Items missing from the

27     home included $280 in cash, one 32-

16

15

1           caliber Beretta handgun and a box of
2           ammunition.
3       Count four, Penal Code Section 211, robbery
4   first with the use of a firearm.
5           On 12/14/76 at about 4:20 a.m. Titch
6           entered the bedroom of Deborah Bradley,
7           B-R-A-D-L-E-Y, placed a handgun to her
8           head and asked her for money.  He took
9           $11 from her.  He took her to her
10          parent's bedroom.  He woke Alvin and
11          Eleanor Bradley with the gun at their
12          daughter's head.  He got two one-dollar
13          bills, asked about guns and valuables,
14          and left via the front door.
15      Count six, Penal Code Section 211, robbery
16   first with the use of a firearm.
17          On 12/18/76 at about 2:30 a.m. Titch
18          and Thomas (codefendant) entered the
19          bedroom of the victims with a handgun
20          which they used to threaten them.  They
21          took approximately $27 from the
22          victim's purse and wallet.  The
23          telephone wire was cut, and they left
24          the house.
25      Count seven, Penal Code Section 211,
26   robbery first with the use of a firearm.
27          On 12/21/76 at about 5:30 p.m. Titch

17

16

1          went to the service window of Theo's

2          Restaurant, showed a handgun and

3          demanded all of the clerk's money.  The

4          clerk gave Titch about $60, and then

5          fled the area on a bicycle.

6      Count nine, Penal Code Section 211, robbery

7  first with the use of a firearm.

8          On 12/27/76 at about 4:00 a.m. Titch

9          burglarized the home of Mr. and Mrs.

10         Lowell Gray.  Items removed included

11         car keys and the victim's 1976

12         Chevrolet -- or Chrysler, excuse me,

13         Chrysler automobile.

14     Count 10, Penal Code Section 459, murder

15  second.

16         On 1/16/77 at about 9:00 a.m. Mr.

17         Armando Gomez, G-O-M-E-Z, returned to

18         his residence to discover that someone

19         entered his residence through the

20         window, taken the car keys from the

21         dining room table, and driven away in

22         his 1976 Chevrolet Monte Carlo.

23     Count 11 burglary, second degree, Penal

24  Code Section 459.

25         On 1/19/77 at about 11:00 a.m. Mertyl

26         (phonetic) Irene King, K-I-N-G,

27         returned to her residence and found

18

17

1          that someone had broken a large window

2          to her kitchen door to again enter to

3          her home.   The house had been

4          ransacked, and the following items were

5          taken:   $35 in coins, a Ruger model

6          10/22 carbine rifle, one British

7          Enfield .303 carbine, two military 50-

8          caliber ammunition cans containing

9          approximately 1,000 rounds of 22-

10          caliber cartridges, and approximately

11          900 --

12    It says -- I'm sure it means rounds --

13    **INMATE TITCH:**   It should say 90 rounds.

14    **PRESIDING COMMISSIONER DAVIS:**   Well, it

15 says 900.

16    **INMATE TITCH:**   Yeah.

17    **PRESIDING COMMISSIONER DAVIS:**   It says 900,

18 what I sure means rounds and not pounds "of

19 military type 303 ammunition.   Count two,

20 assault with a deadly weapon on a peace officer,

21 Penal Code Section 2456/12022.5, from the parole

22 officer's report dated 3/27/78, pages two, three

23 and six.

24          On 12/27/76 at approximately 8:50 a.m.

25          Mark Titch and his accomplice William

26          Hauper, H-A-U-P-E-R, committed armed

27          robbery at the Base Liquor Store, B-A-

*19*

18

```
 1          S-E.  Titch walked out with
 2          approximately $450.  Officer Robb, R-O-
 3          B-B, observed Titch exiting the store
 4          and ordered Titch to stop walking.
 5          Titch started walking towards the
 6          officer, drew his weapon, and ordered
 7          the officer to freeze.  As Officer Robb
 8          attempted to take cover behind his
 9          parked vehicle, Titch fired
10          approximately eight to nine rounds, and
11          the officer was struck five times.  The
12          officer did not draw his weapon.  Titch
13          fled in the waiting vehicle driven by
14          William Hauper, H-A-U-P-E-R.  Officer
15          Robb sustained several injuries to his
16          legs and collarbone, and is now retired
17          based on his medical disabilities.
18     Under the prisoner's version it states:
19          I am sincerely sorry for the crimes I
20          committed in 1976 and January 1977 and
21          regret all of the pain and suffering
22          that I have brought to so many people's
23          lives.  I don't make any excuses for my
24          past actions because regardless of what
25          depravations or abuses I experienced as
26          a youth it doesn't justify robbing and
27          murdering innocent people or depriving
```

20

19

1    them of their property.  I truly wish
2    with all my heart that I would have
3    made better decisions.  If there were
4    any way that I could go back and undo
5    the harm that I perpetrated or any way
6    that I could make amends, I would
7    without hesitation.  The crimes I
8    committed will always be a heavy burden
9    for me to live with, and they will
10   always fill me with tremendous sadness
11   and regret.
12   And under the area of clarification and
13 corrections:
14   In review of my 2003 life prisoner
15   evaluation report and other documents
16   contained in any prison file, I have
17   discovered that I would -- and would
18   like to correct some significant
19   factual errors.  Although these factual
20   corrections in no way mitigate the
21   severity of my offense, I don't believe
22   a thorough and informed evaluation is
23   possible unless these clarifications
24   are made.  These
25   corrections/clarifications are as
26   follows:  I:  My cumulative case
27   summary erroneously incorporates the

21

20

1      Orange County District Attorney's Penal

2      Code Section 1203.01 statement under

3      "facts":  CYA diagnostic report" when

4      it should be listed under "DA's

5      review."  II:  The DA's Penal Code

6      Section -- P.C. 1203.01 statement

7      insinuates or claims as fact that A, I

8      stepped on the gas to muffle gun shots

9      during the Duncan robbery/murder; B,

10     attempted to rape Laura Straughton, S-

11     T-R-A-U-G-H-T-O-N, in her presence and

12     made her aware that she was about to be

13     killed, and B, I was aware Ms.

14     Straughton was clutching a rosary and

15     praying for her life.  These statements

16     presented, in fact, are false or

17     misleading and there is no sworn

18     testimony or evidence that support

19     them.  III:  The CYA report that makes

20     the statement that my crime partner and

21     I fired rifle shells at or into Laura

22     Straughton's body as she knelt with a

23     Crucifix, which is completely untrue.

24     Furthermore, the CYA report lists

25     assault with attempt to commit murder,

26     threat of assault on a juvenile hall

27     counselor, and robbery and assault with

22

21

1      a deadly weapon as other charges as my

2      prior record, which is also untrue.

3      Many of these charges listed are

4      arrests not convictions, and the

5      assault with a deadly weapon is part of

6      my current offense not my prior record.

7      With respect to the Orange County

8      commitment, my records are unclear

9      about my role -- about what my role was

10     in the three robberies which resulted

11     in murder.  With respect to the

12     robbery/murder of Laura Straughton I

13     was the sole perpetrator.  I had no

14     predisposition to commit this crime,

15     but was induced by my crime partner

16     into believing that killing Laura

17     Straughton would prevent us from being

18     apprehended for the kidnapping, which

19     was a life offense.  With respect to

20     the other robbery/murders, it was -- it

21     was an accomplice to what I thought

22     would be -- or excuse me, I was an

23     accomplice to what I thought would only

24     be robbery not murder.  I didn't use a

25     firearm in either of these incidents,

26     even though one was available.  And my

27     participation with this events was only

23

22

1          with great reluctance.

2      And counsel, I could offer that if your

3  client at any time would like to speak to us

4  about the instant offense, he is certainly

5  welcome to; however, we understand and respect

6  that he has an absolute right not to do so if he

7  so chooses.  With regard to the record, we do

8  find that you were arrested in two -- or

9  according to the record -- according to the

10  board report, you were arrested for truancy in

11  February of 1972 for which you received six

12  months probation.  On June of 1972 you were

13  arrested for malicious mischief, which you were

14  -- you went to juvenile hall on that?  Now, were

15  you going to talk about your offenses or not, I

16  don't remember.

17      **INMATE TITCH:**  This is all right.

18      **ATTORNEY CORYN:**  Okay.

19      **INMATE TITCH:**  The record, yes.  The record

20  is fine.

21      **ATTORNEY CORYN:**  Okay.

22      **PRESIDING COMMISSIONER DAVIS:**  That way we

23  can kind of clarify what you remember about it -

24  -

25      **INMATE TITCH:**  Yes.

26      **PRESIDING COMMISSIONER DAVIS:**  -- and what

27  is you think is erroneous.  So you went to

24

23

1    juvenile hall for malicious mischief?

2        **INMATE TITCH:**  Yes.

3        **PRESIDING COMMISSIONER DAVIS:**  Okay.  Now,

4    that's normally an offense to which you would be

5    released back to your parents.  How come you

6    weren't?

7        **INMATE TITCH:**  Probably because my dad

8    wouldn't -- didn't want me out.

9        **PRESIDING COMMISSIONER DAVIS:**  Okay.  In

10   '73 you ran away, and you were continued as a

11   ward.  In March of '73 you were arrested for

12   burglary, and you were committed to Rancho

13   Petraro (phonetic)?

14       **INMATE TITCH:**  Yes.  That's a juvenile

15   camp.

16       **PRESIDING COMMISSIONER DAVIS:**  And for how

17   long were you committed there?

18       **INMATE TITCH:**  I escaped.  The next charge

19   was escape?

20       **PRESIDING COMMISSIONER DAVIS:**  Yeah.

21       **INMATE TITCH:**  Which was on --

22       **PRESIDING COMMISSIONER DAVIS:**  So you

23   weren't there very long?

24       **INMATE TITCH:**  Yeah, 3/21/73.

25       **PRESIDING COMMISSIONER DAVIS:**  Okay.  So

26   why did you escape?

27       **INMATE TITCH:**  Because I didn't like it.  I

25

24

1    didn't like the program.

2       **PRESIDING COMMISSIONER DAVIS:**  Was it

3    fairly -- to escape, what did you have to do?

4       **INMATE TITCH:**  Just walk away.

5       **PRESIDING COMMISSIONER DAVIS:**  Walk away?

6       **INMATE TITCH:**  Yeah.

7       **PRESIDING COMMISSIONER DAVIS:**  On 4/20/73

8    you were returned placement, and this time you

9    went to Manchester.  Is that correct?

10      **INMATE TITCH:**  Yes.  That was the juvenile

11   hall program.

12      **PRESIDING COMMISSIONER DAVIS:**  Okay.  Was

13   that a more secure facility?

14      **INMATE TITCH:**  Yes, that was.

15      **PRESIDING COMMISSIONER DAVIS:**  Okay.  On

16   10/16/73 assault with intend to commit murder.

17      **INMATE TITCH:**  Okay.  Now, that was an

18   arrest, but I believe that charge was dismissed.

19   It says --

20      **PRESIDING COMMISSIONER DAVIS:**  There's no

21   disposition indicated here.

22      **INMATE TITCH:**  Yeah, it says disposition

23   not available.

24      **PRESIDING COMMISSIONER DAVIS:**  Correct.

25      **INMATE TITCH:**  And then it says -- where

26   did I see that?  Okay.  Further down on 11/12/73

27   it says tried Orange County Superior Court --

26

25

1    **PRESIDING COMMISSIONER DAVIS:**  For

2  burglary.

3    **INMATE TITCH:**  Yeah, maybe that's not --

4    **PRESIDING COMMISSIONER DAVIS:**  There's no

5  disposition is indicated here.  It is not

6  available also.  And the 10/28/73, assault on a

7  counselor.  What happened with that one?

8    **INMATE TITCH:**  That wasn't even an arrest.

9  I don't know how that got in there.

10    **PRESIDING COMMISSIONER DAVIS:**  Did you --

11  or did you threaten a counselor while you were

12  at camp?

13    **INMATE TITCH:**  Well, probably in juvenile

14  hall.

15    **PRESIDING COMMISSIONER DAVIS:**  Okay.

16    **INMATE TITCH:**  Yeah.

17    **PRESIDING COMMISSIONER DAVIS:**  They

18  probably took a crime report on it, but there

19  may not be any disposition on --

20    **INMATE TITCH:**  Yeah, because I don't even

21  remember being arrested or going to court on

22  that or nothing, so that's why I kind a --

23    **PRESIDING COMMISSIONER DAVIS:**  12/12/73,

24  armed robbery, committed to CYA?

25    **INMATE TITCH:**  Yeah.  Now, that is where

26  the assault with intent to commit murder with

27  that armed robbery is tied to that, but that

27

26

1   assault with intent to commit murder was

2   dropped.

3        **PRESIDING COMMISSIONER DAVIS:**  Okay.

4        **INMATE TITCH:**  There should of been like

5   four charges there dropped.

6        **PRESIDING COMMISSIONER DAVIS:**  So what was

7   the crime that you actually -- what did you

8   actually do?

9        **INMATE TITCH:**  Armed robbery.

10       **PRESIDING COMMISSIONER DAVIS:**  Okay.

11       **INMATE TITCH:**  Oh, in the assault with

12   intent to commit murder?  I actually fired a gun

13   in the air.

14       **PRESIDING COMMISSIONER DAVIS:**  Okay.  So

15   you were committing a armed robbery?

16       **INMATE TITCH:**  But since it was slightly,

17   you know, I was running away from the guy, and

18   it was in the air slightly over his head.  Not,

19   you know, like I'm not saying a foot or two, I'm

20   saying in the air.  That's probably where they

21   originally charged with assault with intent to

22   commit --

23       **PRESIDING COMMISSIONER DAVIS:**  But you were

24   in the middle of -- you had gotten out of camp?

25       **INMATE TITCH:**  Right.

26       **PRESIDING COMMISSIONER DAVIS:**  And how old

27   were you at this time?

28

27

1    **INMATE TITCH:**  '73?  Well, I was born in

2    '59, so that's '69 -- 14 years old.

3    **PRESIDING COMMISSIONER DAVIS:**  And so you

4    committed -- but you committed armed robbery?

5    **INMATE TITCH:**  Yeah.

6    **PRESIDING COMMISSIONER DAVIS:**  Where did

7    you get the gun?

8    **INMATE TITCH:**  From one of my friends.

9    Actually, it was my neighbor.  He had run away

10   with me.

11   **PRESIDING COMMISSIONER DAVIS:**  Yeah.

12   **INMATE TITCH:**  And I took his mom's gun.

13   **PRESIDING COMMISSIONER DAVIS:**  Oh, okay.

14   **INMATE TITCH:**  It was a little 22 handgun.

15   **PRESIDING COMMISSIONER DAVIS:**  And then on

16   12/28/75 -- now, so you were committed, but you

17   were caught and tried and sent back to CYA in,

18   was that 12 --

19   **INMATE TITCH:**  Well, actually that was the

20   first time that I went to YA for the armed

21   robbery.

22   **PRESIDING COMMISSIONER DAVIS:**  All right.

23   But you had been at camp and juvenile hall

24   before that?

25   **INMATE TITCH:**  Right.

26   **PRESIDING COMMISSIONER DAVIS:**  And this

27   time you went to YA?

29

28

1    **INMATE TITCH:**  Right.

2    **PRESIDING COMMISSIONER DAVIS:**  How long

3    were you in YA?

4    **INMATE TITCH:**  On that time I think I was

5    at least a year, I believe.

6    **PRESIDING COMMISSIONER DAVIS:**  So you --

7    **INMATE TITCH:**  Or pretty close to that.

8    **PRESIDING COMMISSIONER DAVIS:**  So within

9    about a year or less after getting out of YA you

10   were arrested for auto theft?

11   **INMATE TITCH:**  Yes.

12   **PRESIDING COMMISSIONER DAVIS:**  Okay.

13   **INMATE TITCH:**  And then I went back to YA.

14   **PRESIDING COMMISSIONER DAVIS:**  Now, why did

15   you steal a car?

16   **INMATE TITCH:**  I don't know, just stupid,

17   stupid kid stuff.

18   **PRESIDING COMMISSIONER DAVIS:**  Were you

19   going to sell it, or what were you going to do

20   with it?

21   **INMATE TITCH:**  No, just drive it around.

22   **PRESIDING COMMISSIONER DAVIS:**  Where did

23   you learn how to steal cars?

24   **INMATE TITCH:**  I didn't hot wire them or

25   nothing.  I just usually found them in -- the

26   keys in them or something like that.

27   **PRESIDING COMMISSIONER DAVIS:**  The keys was

*30*

29

1   in it?

2       INMATE TITCH:  Yeah.

3       PRESIDING COMMISSIONER DAVIS:  Took it

4   away?

5       INMATE TITCH:  Yeah.

6       PRESIDING COMMISSIONER DAVIS:  And you got

7   caught?

8       INMATE TITCH:  Yeah.

9       PRESIDING COMMISSIONER DAVIS:  And you went

10  back to YA?

11      INMATE TITCH:  Yeah.  Yes, I went back to

12  YA.

13      PRESIDING COMMISSIONER DAVIS:  Now, when

14  did they send you back to San Diego juvenile

15  hall?

16      INMATE TITCH:  Okay.  Then I got out of YA.

17  I went to a halfway house, and then I got

18  arrested for burglary, grand theft auto.

19      PRESIDING COMMISSIONER DAVIS:  Okay.

20      INMATE TITCH:  And then while I was waiting

21  adjudication on that -- or actually, I had

22  actually been found guilty, and while I was

23  waiting to go to YA again I escaped.

24      PRESIDING COMMISSIONER DAVIS:  Now this

25  time you escaped from juvenile hall?

26      INMATE TITCH:  Right.

27      PRESIDING COMMISSIONER DAVIS:  A little bit

31

30

1    more of a difficult situation than a camp?

2         **INMATE TITCH:**  Yes.

3         **PRESIDING COMMISSIONER DAVIS:**  How did you

4    do that?

5         **INMATE TITCH:**  I scaled the -- one of the

6    walls up on the roof.

7         **PRESIDING COMMISSIONER DAVIS:**  What was

8    your plan?  Where were you headed?

9         **INMATE TITCH:**  I didn't have any concrete

10   plans or nothing.  I didn't know anybody, so

11   basically it was just, you know, life back on

12   the streets again.

13        **PRESIDING COMMISSIONER DAVIS:**  So were you

14   out on this escape when the instant offense

15   occurred?

16        **INMATE TITCH:**  Yes.

17        **PRESIDING COMMISSIONER DAVIS:**  Okay.  And

18   that's -- those are the robbery assault charges

19   and so forth listed in December of '76?  Is that

20   accurate?

21        **INMATE TITCH:**  Yeah.  That's part of this

22   commitment offense.

23        **PRESIDING COMMISSIONER DAVIS:**  Right.

24   That's what I'm saying.

25        **INMATE TITCH:**  Okay.

26        **PRESIDING COMMISSIONER DAVIS:**  Okay.  All

27   right.  Anything we're missing out of that, or

*32*

31

1    anything you want to add for clarification for
2    that?
3         INMATE TITCH:   Nope.   I think that's pretty
4    much it.   I had some stuff highlighted here.
5    The only thing that -- you read the
6    clarification and correction statement?
7         PRESIDING COMMISSIONER DAVIS:   Uh-huh.
8         INMATE TITCH:   And the only thing that I
9    wanted to --
10        ATTORNEY CORYN:   With respect to --
11        INMATE TITCH:   Yeah, point two --
12        ATTORNEY CORYN:   Point four --
13        INMATE TITCH:   Yeah, they kind of had typos
14   in that.   They missed out.   I had what points A,
15   B, C and D, and I think they ran it into A, B,
16   and then they went into D, and they forgot C
17   altogether.
18        PRESIDING COMMISSIONER DAVIS:   What was C?
19        INMATE TITCH:   Why don't you give them
20   that?
21        ATTORNEY CORYN:   You mean one, two, three
22   and four?
23        INMATE TITCH:   No, no, no, no.
24        PRESIDING COMMISSIONER DAVIS:   No, like
25   Roman Numeral two has A, B -- you're right, and
26   then it goes to D from there.
27        INMATE TITCH:   Yeah, can you --

33

32

1          **ATTORNEY CORYN:**  Yeah.

2          **INMATE TITCH:**  -- just hand them that copy

3     right there?

4          **PRESIDING COMMISSIONER DAVIS:**  Okay.  This

5     is a --

6          **ATTORNEY CORYN:**  Is this something that's

7     missing C?

8          **INMATE TITCH:**  Yeah, it's a duplicate, but

9     if you look at point two, you could see the

10    typos in there.

11         **PRESIDING COMMISSIONER DAVIS:**  Okay.  Is

12    this something that you typed up?

13         **INMATE TITCH:**  Yes.

14         **PRESIDING COMMISSIONER DAVIS:**  All right.

15         **INMATE TITCH:**  And I submitted that with

16    this report.

17         **PRESIDING COMMISSIONER DAVIS:**  So they

18    copied this -- they copied down theirs from

19    yours and just simply left out C, which says,

20    "My crime partner and I discussed killing Laura

21    Straughton in her presence and made her aware

22    that she was about to be killed."  And then goes

23    onto D, "I was aware that Ms. Straughton was

24    clutching a rosary and praying for her life."  I

25    think that's actually in here but it's just not

26    listed as C?

27         **INMATE TITCH:**  Yes.  Right.

*34*

33

1        **PRESIDING COMMISSIONER DAVIS:**  Okay.

2        **INMATE TITCH:**  They just ran it kind

3   together.

4        **PRESIDING COMMISSIONER DAVIS:**  All right.

5        **INMATE TITCH:**  And I asked them to clear --

6   in retrospect, the bottom statement, the last

7   sentence.

8        **PRESIDING COMMISSIONER DAVIS:**  Number --

9        **INMATE TITCH:**  The very bottom there.

10       **PRESIDING COMMISSIONER DAVIS:**  Number four?

11       **ATTORNEY CORYN:**  Yeah.

12       **INMATE TITCH:**  Yes.

13       **PRESIDING COMMISSIONER DAVIS:**  Roman

14   Numeral four?

15       **INMATE TITCH:**  Where I said some of my

16   participation --

17       **PRESIDING COMMISSIONER DAVIS:**  And some of

18   the elements --

19       **INMATE TITCH:**  Right.

20       **PRESIDING COMMISSIONER DAVIS:**  -- of these

21   events?

22       **INMATE TITCH:**  Right.

23       **PRESIDING COMMISSIONER DAVIS:**  Okay.

24       **INMATE TITCH:**  Okay.

25       **PRESIDING COMMISSIONER DAVIS:**  All right.

26   So in -- and just for the clarification for the

27   person -- for the transcriptionist then, for

*35*

34

1   Roman Numeral four, which is the last of the

2   correction statement, the last -- next to the

3   last line should read, "and my participation in

4   some of the elements of those events was only

5   with great reluctance." All right. Does that

6   satisfy?

7       **INMATE TITCH:** Thank you, sir.

8       **PRESIDING COMMISSIONER DAVIS:** All right.

9   Thank you, officer. All right. In terms of the

10  social history then we have that you were born

11  in 1959 and raised in Anaheim, California. You

12  are the fourth of six children, three boys and

13  three girls. At age 11 your parents divorced.

14  Your father received legal custody, and then you

15  -- this says you fluctuated in placement between

16  parents and various court ordered placements.

17  So you kind of back and forth between mom and

18  dad? Is that --

19      **INMATE TITCH:** No.

20      **PRESIDING COMMISSIONER DAVIS:** What

21  happened?

22      **INMATE TITCH:** No, my -- actually, my mom

23  moved out. So actually, I went back and forth

24  between juvenile hall, camp and my father.

25      **PRESIDING COMMISSIONER DAVIS:** Okay. So

26  this was actually because you were committing

27  crimes during that time, right?

36

35

1      **INMATE TITCH:**  At -- in the initial stage,
2   no, it was for running away from home.
3      **PRESIDING COMMISSIONER DAVIS:**  Okay.  So
4   then --
5      **INMATE TITCH:**  And then, yes, it progressed
6   into committing burglaries and stealing cars and
7   stuff, yes.
8      **PRESIDING COMMISSIONER DAVIS:**  So which --
9   the running away from home came first --
10     **INMATE TITCH:**  Yes.
11     **PRESIDING COMMISSIONER DAVIS:**  -- before
12  you started committing crimes?
13     **INMATE TITCH:**  Yes.
14     **PRESIDING COMMISSIONER DAVIS:**  Okay.
15     **INMATE TITCH:**  And in fact, I noticed they
16  listed a truancy there, and that's probably
17  because I ran away from home, but instead of
18  charging me with runaway, they only charged me
19  with truancy and dropped the runaway part that
20  first time.
21     **PRESIDING COMMISSIONER DAVIS:**  Okay.
22     **INMATE TITCH:**  But I think the first three
23  or four times was all truancy, incorrigible
24  running away.
25     **PRESIDING COMMISSIONER DAVIS:**  So were you
26  using any drugs or alcohol at this time?
27     **INMATE TITCH:**  No, not -- no.

37

36

1       **PRESIDING COMMISSIONER DAVIS:**  Not at all?

2       **INMATE TITCH:**  No.

3       **PRESIDING COMMISSIONER DAVIS:**  Okay.  Have

4    you ever?

5       **INMATE TITCH:**  Yes, of course.

6       **PRESIDING COMMISSIONER DAVIS:**  Well, what

7    about -- of course?

8       **INMATE TITCH:**  Well, when I got older,

9    yeah, 17.

10       **PRESIDING COMMISSIONER DAVIS:**  Yeah?

11       **INMATE TITCH:**  Yeah.  I mean, I really

12    didn't have too much of drug or alcohol because

13    I was incarcerated a lot, you know, a lot of the

14    time, so anyways --

15       **PRESIDING COMMISSIONER DAVIS:**  Was the

16    drugs and/or alcohol ever a problem for you?

17       **INMATE TITCH:**  No.

18       **PRESIDING COMMISSIONER DAVIS:**  Did you ever

19    feel out of control as a result --

20       **INMATE TITCH:**  No.

21       **PRESIDING COMMISSIONER DAVIS:**  -- of the

22    use of drugs and/or alcohol?

23       **INMATE TITCH:**  No.

24       **PRESIDING COMMISSIONER DAVIS:**  Was -- did

25    you have a drug of choice, including alcohol?

26       **INMATE TITCH:**  Yeah, I didn't like alcohol,

27    you know, I preferred to smoke marijuana.

*38*

37

1       **PRESIDING COMMISSIONER DAVIS:**  Okay.

2       **INMATE TITCH:**  Yeah.

3       **PRESIDING COMMISSIONER DAVIS:**  How often

4    would you smoke marijuana?

5       **INMATE TITCH:**  When I was 17, probably

6    every day.

7       **PRESIDING COMMISSIONER DAVIS:**  Okay.  And

8    Counsel, there were several things I know you

9    didn't want to talk about, so if I begin to

10   tread on some of those, please don't hesitate to

11   bring that to my attention.

12      **ATTORNEY CORYN:**  Okay.

13      **PRESIDING COMMISSIONER DAVIS:**  So you're

14   smoking marijuana virtually every day?

15      **INMATE TITCH:**  Yeah.

16      **PRESIDING COMMISSIONER DAVIS:**  Okay.

17      **INMATE TITCH:**  When I was 17.

18      **PRESIDING COMMISSIONER DAVIS:**  And when did

19   you -- starting about age 17?

20      **INMATE TITCH:**  Yeah.

21      **PRESIDING COMMISSIONER DAVIS:**  Why did you

22   start doing it at age 17?  What happened?

23      **INMATE TITCH:**  I don't know why, you know,

24   it's just -- it really, you know, it really

25   didn't become a factor until like the last time

26   I got out of YA.  Drugs were like, you know, I

27   wasn't --

39

38

1    **PRESIDING COMMISSIONER DAVIS:**  Was it --

2    **INMATE TITCH:**  -- immersed in a drug

3    culture, put it that way.

4    **PRESIDING COMMISSIONER DAVIS:**  Was there a

5    different group of people that you were with --

6    **INMATE TITCH:**  Yeah.

7    **PRESIDING COMMISSIONER DAVIS:**  -- where it

8    was more common?

9    **INMATE TITCH:**  Yeah, oh yeah, it was lot

10    more common.  It was like the thing to do.  You

11    know, it was -- when I got out of YA it was

12    totally different.  That was the culture, you

13    know, smocking pot, listening to music, going to

14    concerts and stuff like that.  It all changed,

15    so that's what I got out too.

16    **PRESIDING COMMISSIONER DAVIS:**  Okay.  None

17    of your other brothers and sisters have been

18    involved in law enforcement with the exception

19    of your brother who has had some emotional

20    problems?

21    **INMATE TITCH:**  Yeah, well, actually he's a

22    lot more than emotional.  He's DDP, and he's

23    also --

24    **PRESIDING COMMISSIONER DAVIS:**  DDP stands

25    for?

26    **INMATE TITCH:**  Developmentally disabled.

27    **PRESIDING COMMISSIONER DAVIS:**  Okay.

*40*

39

1    **INMATE TITCH**:  And he's also schizophrenic.

2    **PRESIDING COMMISSIONER DAVIS**:  Has that

3    gotten into problems with law enforcement?

4    **INMATE TITCH**:  Yes.

5    **PRESIDING COMMISSIONER DAVIS**:  Does he --

6    **INMATE TITCH**:  It's actually ended him up

7    here.

8    **PRESIDING COMMISSIONER DAVIS**:  Yeah.

9    **INMATE TITCH**:  Yeah.

10    **PRESIDING COMMISSIONER DAVIS**:  Is he

11    getting appropriate medication now do you think?

12    **INMATE TITCH**:  Well, I don't know if it can

13    be, you know, treated.  Schizophrenia you can

14    only do so much, you know.  He's improved a

15    little bit, but he needs to be committed to a

16    hospital because his mental state is that far

17    gone.  I tried to help and do what I could to

18    get him in the hospital from here, and he's

19    getting -- I just found out today that he's

20    going back to Atascadero State Hospital.  I

21    don't know for how long.  He's been there before

22    and gets out on parole, and they put them in

23    these homes, but you know, he doesn't last very

24    long because he gets into conflicts about his

25    money and stuff like that.

26    **PRESIDING COMMISSIONER DAVIS**:  Yeah.

27    **INMATE TITCH**:  Or he starts drinking, and

41

40

1  he just really needs to be in a hospital.  A
2  prison -- he's never going to get any better in
3  my opinion than what it is now, and he needs to
4  be committed.
5      PRESIDING COMMISSIONER DAVIS:  Okay.  Other
6  siblings are doing all right though?
7      INMATE TITCH:  Yeah.
8      PRESIDING COMMISSIONER DAVIS:  Do you stay
9  in contact with them?
10      INMATE TITCH:  I don't write my oldest
11  sister anymore because she had a drug problem,
12  and I kind a -- it kind of burned me out on
13  that, but I hear from my little sister.  In
14  fact, they said I was mostly -- one of these
15  reports said I was mostly in contact with my
16  little brother.  Actually, it's my little sister
17  Candy who lives in New Mexico, and she's
18  primarily the main one who I write to.
19      PRESIDING COMMISSIONER DAVIS:  Okay.
20      INMATE TITCH:  Every now and then I hear
21  from my brother, but it's just, you know,
22  sparse.
23      PRESIDING COMMISSIONER DAVIS:  And your
24  father was a strict disciplinarian and mentally
25  abusive and an alcoholic, and the police were
26  often at your house for family fights and
27  problems?

42

41

1      **INMATE TITCH:**  Yeah.

2      **PRESIDING COMMISSIONER DAVIS:**  How do you

3  know your father was an alcoholic?

4      **INMATE TITCH:**  Well, I mean looking back in

5  retrospect -- I didn't at the time, but looking

6  back in retrospect I now know, you know, he used

7  to go to the garage a lot to drink but he kept

8  it hidden.  And also there were times when he

9  got -- my stepmother had to go pick him up at

10  work because he was drunk, you know, he couldn't

11  perform his job.  And also just knowing him

12  personally, you know, sometimes he would come

13  and get in arguments with me, either about

14  frivolous stuff or about stuff that made

15  absolutely no sense.

16      **PRESIDING COMMISSIONER DAVIS:**  Was he ever

17  physically abusive?

18      **INMATE TITCH:**  No.

19      **PRESIDING COMMISSIONER DAVIS:**  No bruises

20  or broken bones or nothing like that?

21      **INMATE TITCH:**  No, he never really hit me

22  until I got older, and it really wasn't like --

23  he didn't beat on me or nothing like that, but

24  there was a lot of verbal abuse all the time

25  from him.

26      **PRESIDING COMMISSIONER DAVIS:**  Okay.  And

27  you describe your family as dysfunctional with

*43*

42

1    the mental abuse and so forth, and indicated

2    that was one of the reasons why you began to run

3    away?

4         INMATE TITCH:  Yeah.

5         PRESIDING COMMISSIONER DAVIS:  That you

6    have worked only on occasion.  What kind of work

7    did you do?

8         INMATE TITCH:  I only worked -- the only

9    job that I can remember having was at an

10   electronics firm assembling electronic boards,

11   circuit boards.

12        PRESIDING COMMISSIONER DAVIS:  Yeah.

13        INMATE TITCH:  And I only kept that a

14   little while, and then I was arrested and lost

15   that job.

16        PRESIDING COMMISSIONER DAVIS:  Said you did

17   casual smoking of marijuana?

18        INMATE TITCH:  Yeah.

19        PRESIDING COMMISSIONER DAVIS:  Some

20   experimentation with other drugs.  What other

21   drugs did you experiment with?

22        INMATE TITCH:  I experimented with LSD.  I

23   think I tried PCP once or twice, and peyote, you

24   know, some peyote once or twice.

25        PRESIDING COMMISSIONER DAVIS:  Okay.

26        INMATE TITCH:  Not, nothing major.

27        PRESIDING COMMISSIONER DAVIS:  No children?

44

43

1      **INMATE TITCH:**  No, no children.

2      **PRESIDING COMMISSIONER DAVIS:**  And it

3    doesn't talk about your education much.  Did you

4    -- you didn't graduate from high school?

5      **INMATE TITCH:**  Right.

6      **PRESIDING COMMISSIONER DAVIS:**  Did you get

7    your GED in here?

8      **INMATE TITCH:**  Yeah, I got my GED.

9      **PRESIDING COMMISSIONER DAVIS:**  Okay.  We'll

10    talk about that more in just a little bit.

11      **INMATE TITCH:**  Yeah.

12      **PRESIDING COMMISSIONER DAVIS:**  Is there

13    anything that I haven't asked you about with

14    regard to your criminal history or your social

15    history that you believe is important for this

16    Panel to understand this afternoon?

17      **INMATE TITCH:**  I don't think so.  I think

18    you pretty much covered everything.  I'll just

19    take a look at this real quick.

20      **PRESIDING COMMISSIONER DAVIS:**  All right.

21    All right.  If you think of anything --

22      **INMATE TITCH:**  I think we're fine.

23      **PRESIDING COMMISSIONER DAVIS:**  Okay.  Well,

24    if you think of anything that we've missed or if

25    something comes up, something strikes you a

26    little bit later, you can always come back.

27    Commissioner Armenta, do you have any questions?

45

44

1      **DEPUTY COMMISSIONER ARMENTA:**  No.

2      **PRESIDING COMMISSIONER DAVIS:**  Okay.  I'll

3  ask you to turn your attention now to

4  Commissioner Armenta.

5      **INMATE TITCH:**  Okay.

6      **DEPUTY COMMISSIONER ARMENTA:**  Okay.  Let's

7  go over your plans.

8      **INMATE TITCH:**  Okay.

9      **DEPUTY COMMISSIONER ARMENTA:**  Okay.  First

10  of all, though I should report that we did

11  receive -- did receive a letter from the city of

12  Anaheim --

13      **INMATE TITCH:**  Uh-huh.

14      **DEPUTY COMMISSIONER ARMENTA:**  -- Police.

15  We send out what are known as 3042 notices, and

16  as a response we received two letters.

17      **INMATE TITCH:**  Okay.  That's in opposition

18  to parole?

19      **DEPUTY COMMISSIONER ARMENTA:**  Yes.

20      **INMATE TITCH:**  Yes.

21      **DEPUTY COMMISSIONER ARMENTA:**  One is from

22  the police department, the other is from the

23  DA's office.

24      **INMATE TITCH:**  Right.

25      **DEPUTY COMMISSIONER ARMENTA:**  We do have

26  someone here from the DA's office.

27      **INMATE TITCH:**  Right.

46

45

1       **DEPUTY COMMISSIONER ARMENTA:**  But since we
2  don't have anyone here from the police
3  department, I am going to read the letter into
4  the record.
5       **INMATE TITCH:**  Okay.
6       **DEPUTY COMMISSIONER ARMENTA:**  May 24th,
7  2006.
8            Dear Board of Prison Terms, I am the
9            sergeant of the Anaheim Police
10           Department's Homicide Detail.  I have
11           received a notice that a subsequent
12           parole hearing for Mark Titch is to be
13           held on July 19th, 2006.  I would like
14           to offer my opinion as to the
15           suitability of parole.  Mr. Titch was
16           convicted of several offenses,
17           including two counts of first-degree
18           murder in the city of Anaheim.
19           Although I was not involved in this
20           investigation, I reviewed the
21           investigation case files.  The
22           investigation revealed the following
23           facts:  During 1976 and 1977 Mark Titch
24           and his accomplice set out on an
25           extremely violent crime spree that left
26           a wake of a minimal of four dead people
27           and two critically wounded, including a

47

46

1    San Diego police officer.  One of these
2    crimes involved Titch shooting and
3    killing Mr. Aubrey Duncan, a local
4    businessman, during the course of a
5    robbery.  Titch and his accomplice also
6    shot and injured Mrs. Nadine Duncan,
7    Mr. Duncan's wife, and brutally shot
8    and killed their 18 year-old daughter
9    Denise Duncan.  Mrs. Duncan was
10   critically wounded and had to have part
11   of her liver and spleen removed.  As
12   one could imagine, this incident
13   devastated the Duncan family.  They
14   have had to bear the scars of this
15   crime of unspeakable evil ever since.
16   This should have been enough to keep
17   Mark Titch in prison for the rest of
18   his life, but he has admitted to having
19   committed an extremely high number of
20   extremely violent crimes in the two
21   years from the time -- in the two years
22   up to the time of his arrest.  These
23   crimes included a kidnap of Ms. Laura
24   Straughton from the city of Garden
25   Grove, taken for the purpose of
26   robbery, of Ms. Straughton to the city
27   of Orange.  The shooting and murder of

48

47

1       Ms. Straughton with a rifle, the murder

2       of Efran Christian, (phonetic), who was

3       shot during the attempted robbery of

4       the business where he worked.   The

5       shooting and critically wounding of a

6       San Diego police officer James Robb

7       when he attempted to stop Titch after

8       Titch committed an armed residential

9       robbery in San Diego, California, two

10      residential robberies in the city of

11      Anaheim, one residential robbery in the

12      city of Stanton, two commercial armed

13      robberies in the city of Anaheim, a

14      residential burglary in which firearms

15      were stolen and he later used to commit

16      the listed murders, the commission of

17      several additional burglaries.   Having

18      brutally murdered four different people

19      in three separate incidents and having

20      wounded two additional victims during

21      this crime spree, it should be readily

22      apparent to anyone that Mark Titch is

23      an extreme danger to society, and he

24      should not be granted parole at this

25      time or any time in the future.   It is

26      obvious that Mark Titch has not learned

27      anything since he has been in custody,

49

48

1      and he also committed an assault on a
2      life prisoner while incarcerated for
3      these crimes.  Mark Titch also spent
4      the -- should spend the rest of his
5      miserable wrench existence in prison.
6      His crimes were extremely brutal, cold
7      blooded, planned, calculated and
8      vicious.  He has no regard whatsoever
9      for the life of others and the impact
10     that his crimes have upon the lives of
11     surviving family members and friends.
12     It should be readily apparent from the
13     above information that Mark Titch
14     should never be paroled or allowed the
15     opportunity to again victimize innocent
16     citizens.  Anaheim Police Department
17     opposes his release.  Thank you for the
18     opportunity to express my opinion in
19     this matter.  Don't hesitate to contact
20     me if I can be of further assistance.
21   Signed Sergeant David Flutts, F-L-U-T-T-S.
22 And as stated, we also have a letter from the
23 office of the DA; however, we do have a member
24 here and we have no need to read that letter.
25     **INMATE TITCH:**  Yeah, okay.
26     **DEPUTY COMMISSIONER ARMENTA:**  Yeah.  Now,
27 we also have letters for you, a number of

50

49

1    letters from friends.

2        **INMATE TITCH:**  Yes.

3        **DEPUTY COMMISSIONER ARMENTA:**  And we also

4    have your package, and sometime in the next few

5    minutes I will be going over the information.

6        **INMATE TITCH:**  Okay.

7        **DEPUTY COMMISSIONER ARMENTA:**  What I was

8    doing when I got it I was checking that with

9    your C file.

10        **INMATE TITCH:**  Okay.

11        **DEPUTY COMMISSIONER ARMENTA:**  And it's in

12    there.

13        **INMATE TITCH:**  Okay.

14        **DEPUTY COMMISSIONER ARMENTA:**  You got a

15    short letter here, says from Pat Mullen

16    (phonetic) of San Luis Obispo.

17        **INMATE TITCH:**  Mullon (phonetic).

18        **DEPUTY COMMISSIONER ARMENTA:**  Mullon?

19        **INMATE TITCH:**  Yeah.

20        **DEPUTY COMMISSIONER ARMENTA:**  And says,

21    "Please find a copy of letter of support for

22    Mark Titch."  Basically saying that she's

23    supports your release.  The letter is dated May

24    9th, 2006.  She has known Mark since 1984, over

25    22 years, first as an M-2 sponsor and later as a

26    friend and mentor.  "And throughout that time I

27    have seen Mark work hard to improve himself

51

50

1  personally, mentally, spiritually, and

2  vocationally so he will be positive productive

3  citizen when he is paroled.  Over the years I

4  have personally witnessed Mark's dedicated and

5  positive efforts to earn a college AA degree,

6  nearly complete his BA degree, and acquire

7  numerous vocational skills, including drafting,

8  welding, electrician, and construction traits so

9  he can be a successful productive citizen when

10  he is paroled.  Mark also has a strong support

11  network on the outside willing and able to help

12  him make that transition to a productive member

13  of society."

14              **(Off the Record)**

15      **DEPUTY COMMISSIONER ARMENTA:**  Okay.  We are

16  on side two.  Okay.

17              Mark's focus has been to better himself

18              in all respects and to prepare himself

19              for a successful return to society.

20              Mark is remorseful for his past deeds

21              and takes responsibility for his

22              actions.  He has used his time in

23              prison the best way possible,

24              understanding what he did, accepting

25              responsibility, and working hard to

26              improve himself and to pay a debt to

27              society.  Mark has been able to change

52

51

1          for the better while in prison,

2          remaining positive, improving himself,

3          working and trustee in inmate labor

4          programs, all the while continuing his

5          education and continuing to work to

6          prepare for a successful transition

7          back into society as a productive law-

8          abiding citizen.  If you look through

9          Mark's files you will see a person who

10         has earned the trust and support from a

11         broad range of people.  These people

12         have seen him in many different

13         situations.  They all support and

14         commend him for how he has conducted

15         himself while incarcerated and how he

16         has remained positively focused on

17         preparing himself for making a

18         successful transition back into

19         society.  I urge you to give him -- to

20         give his case very deliberate and

21         careful attention, and your full

22         consideration.

23      Signed Pat Mullon.

24      **INMATE TITCH:**  Mullon.

25      **DEPUTY COMMISSIONER ARMENTA:**  Mullon?

26      **INMATE TITCH:**  Yeah.

27      **DEPUTY COMMISSIONER ARMENTA:**  San Luis

*53*

52

1    Obispo.

2        **INMATE TITCH:**  Yeah.

3        **DEPUTY COMMISSIONER ARMENTA:**  I got a

4    similar letter, except a lot longer, from Lenona

5    (phonetic).

6        **INMATE TITCH:**  Lenona.

7        **DEPUTY COMMISSIONER ARMENTA:**  Lenona

8    Carlburg (phonetic).

9        **INMATE TITCH:**  Carlburg.

10       **DEPUTY COMMISSIONER ARMENTA:**  Carlburg.

11       **ATTORNEY CORYN:**  See if Lenona Carlburg --

12       **INMATE TITCH:**  Yeah.

13       **ATTORNEY CORYN:**  Marty Freeman (phonetic).

14       **DEPUTY COMMISSIONER ARMENTA:**  Marty

15   Freeman's letter, it's a letter of employment.

16       **INMATE TITCH:**  Okay.  That was important

17   that you have --

18       **DEPUTY COMMISSIONER ARMENTA:**  Yeah.

19           I'm writing on behalf of Mark Titch in

20           regards to employment.  This letter is

21           to confirm that Mark has a job with my

22           company immediately upon release.  My

23           company does all types of yaught

24           maintenance, including wax and polish,

25           wash down services, mechanics and

26           underwater maintenance as well.  Mark's

27           skills and personality traits are

54

53

```
 1          exactly what we're looking for.  I've
 2          been in the business for three years.
 3          My business has grown at a rate of
 4          about a hundred clients per week and
 5          approximately 310 customers as of this
 6          date.  With that percent of growth, I
 7          need good dependable people to work.
 8          Mark's starting salary, hourly rate
 9          will be $14 an hour.  And with Mark's
10          ability, I'm sure he will be making $22
11          per hour within eight months.
```

12      And it's signed Marty Freeman.  The

13  letterhead is Marty's Marine Services, and

14  that's in the city of Chula Vista.  There's also

15  a phone number.

16      **INMATE TITCH:**  Yes.

17      **DEPUTY COMMISSIONER ARMENTA:**  And you've

18  known him for how long?

19      **INMATE TITCH:**  Since 2000.

20      **DEPUTY COMMISSIONER ARMENTA:**  2000?

21      **INMATE TITCH:**  Yeah.

22      **DEPUTY COMMISSIONER ARMENTA:**  You also have

23  a letter of support from Maxine?

24      **INMATE TITCH:**  Yes.

25      **DEPUTY COMMISSIONER ARMENTA:**  Roboloski

26  (phonetic).

27      **INMATE TITCH:**  Roboloski.  Yeah, that's a

55

54

1    tough one there.

2        DEPUTY COMMISSIONER ARMENTA:  And there's a

3    letter from Lenona.  Where would you live?

4        INMATE TITCH:  El Cajon.

5        DEPUTY COMMISSIONER ARMENTA:  With her?

6        INMATE TITCH:  Yes.

7        DEPUTY COMMISSIONER ARMENTA:  Okay.  You

8    got to point to me because I read the letter.  I

9    was trying to find where she says that you could

10   live with her.

11       INMATE TITCH:  That should -- okay.  I

12   would have to --

13       DEPUTY COMMISSIONER ARMENTA:  Here's her

14   letter.

15       INMATE TITCH:  Okay.  Thank you.

16       DEPUTY COMMISSIONER ARMENTA:  Basically,

17   her letter says that she began to visit your

18   cellmate seven years ago, and then she began to

19   visit with you five years ago.  Oh, here it is.

20   I would furnish room, board and transportation

21   along with friendship and encouragement, right?

22       INMATE TITCH:  Yeah.

23       DEPUTY COMMISSIONER ARMENTA:  That's what I

24   was looking for.

25       INMATE TITCH:  Yeah, there you go.

26       DEPUTY COMMISSIONER ARMENTA:  It's on page

27   two --

56

55

1        **INMATE TITCH:**  Right.

2        **DEPUTY COMMISSIONER ARMENTA:**  -- of the

3    letter.

4        **INMATE TITCH:**  Okay.

5        **DEPUTY COMMISSIONER ARMENTA:**  Yeah.

6        **INMATE TITCH:**  I think he's got it in the

7    other -- in this one.

8        **ATTORNEY CORYN:**  Okay.

9        **INMATE TITCH:**  I don't think it's in the --

10       **ATTORNEY CORYN:**  I would stipulate --

11       **INMATE TITCH:**  They're in my C file though.

12       **DEPUTY COMMISSIONER ARMENTA:**  Yeah, it's

13    here.  That's where I got it.  I got it from the

14    package.

15       **ATTORNEY CORYN:**  Oh, I see.

16       **DEPUTY COMMISSIONER ARMENTA:**  And that's on

17    page two towards the bottom?

18       **INMATE TITCH:**  Right.

19       **DEPUTY COMMISSIONER ARMENTA:**  Yeah, that's

20    what I was looking for.

21       **INMATE TITCH:**  Okay.

22       **DEPUTY COMMISSIONER ARMENTA:**  And probably

23    didn't really catch it because most of the time

24    we read the words "I will furnish housing."

25       **INMATE TITCH:**  Oh.

26       **DEPUTY COMMISSIONER ARMENTA:**  In your case

27    it says room -- room and board and

57

56

1  transportation.

2      **INMATE TITCH:**  Right.

3      **DEPUTY COMMISSIONER ARMENTA:**  So it's

4  actually a very favorable letter, and it's a

5  letter for housing.  Now, I know I saw some

6  letters from a Mr. And Mrs. Delagarza

7  (phonetic), right?

8      **INMATE TITCH:**  Yes, you did.

9      **DEPUTY COMMISSIONER ARMENTA:**  Right.  Okay,

10  here we go.

11           Five years ago we were introduced to

12           Mark in the visiting room as we visited

13           other inmates there as well.  We have

14           continued to see Mark and talk with him

15           over the past five years.  He's a very

16           intelligent man and a delight to visit

17           with him.  Despite all the years he's

18           been incarcerated, he maintains a

19           positive attitude and has worked

20           diligently to overcome his childhood

21           abuses, and has developed into a fine

22           man who deeply regrets his past

23           mistakes.  He not only has worked to

24           better himself, earn a high school

25           diploma, and nearly completed a degree

26           in business administration from Chapman

27           University.

SB

57

1     Now, you do have your AA from there?

2     **INMATE TITCH:**  Yes, I do.

3     **DEPUTY COMMISSIONER ARMENTA:**  Okay.  "And

4     has helped so many of his peers and has earned

5     their respect and admiration.  He continues to

6     study and further his education."  Basically,

7     they talk about your chronos, all the positive

8     things that you've done, and during the long

9     years he's had very little support from the

10    outside.  "Despite all of that, he's become

11    responsible and not the very troubled young man

12    he was many years ago.  We understand that Mark

13    has a job offer, a place to live, along with

14    transportation."  So this is a letter of

15    support.

16    **INMATE TITCH:**  Yes.

17    **DEPUTY COMMISSIONER ARMENTA:**  And they feel

18    you would be a very productive person.  Okay.

19    Let's go over what you've been doing in prison.

20    **INMATE TITCH:**  Okay.

21    **DEPUTY COMMISSIONER ARMENTA:**  Actually, I

22    should say let's go over what you've been doing

23    since your last hearing, but we like to cover

24    the whole time.

25    **ATTORNEY CORYN:**  It's a long time, 30 years

26    almost.

27    **DEPUTY COMMISSIONER ARMENTA:**  I know, but

*59*

58

1  he's also done quite a lot.  You did get your

2  GED, right?

3      INMATE TITCH:  Yes, I did.

4      DEPUTY COMMISSIONER ARMENTA:  Were you down

5  in Salinas at that time?

6      INMATE TITCH:  Yeah, Soledad.

7      DEPUTY COMMISSIONER ARMENTA:  Soledad,

8  yeah.  Then after that you received your AA?

9      INMATE TITCH:  Yes.

10     DEPUTY COMMISSIONER ARMENTA:  You also took

11 some credits from San Jose State?

12     INMATE TITCH:  Yeah, that was when I was at

13 Soledad.

14     DEPUTY COMMISSIONER ARMENTA:  Yeah.

15     INMATE TITCH:  And I transferred to

16 California Men's Colony in San Luis Obispo.

17 That's where I got my AA degree, Chapman --

18     DEPUTY COMMISSIONER ARMENTA:  Chapman.

19     INMATE TITCH:  -- University, as well as

20 other credits towards a BS/BA.

21     DEPUTY COMMISSIONER ARMENTA:  Right.  When

22 you take those courses who pays for them?

23     INMATE TITCH:  Well, this --

24     DEPUTY COMMISSIONER ARMENTA:  You do?

25     INMATE TITCH:  No, half was paid by the

26 state, and half was paid by a federal grant.

27     DEPUTY COMMISSIONER ARMENTA:  Federal

60

59

1  grant?

2      **INMATE TITCH:**  Yeah, you had to maintain a

3  certain GPA in order to --

4      **DEPUTY COMMISSIONER ARMENTA:**  You had over

5  a 3.0?

6      **INMATE TITCH:**  Yes.

7      **DEPUTY COMMISSIONER ARMENTA:**  You were

8  probably getting grades there that you did never

9  get in your life?

10     **INMATE TITCH:**  No, you're right.

11     **DEPUTY COMMISSIONER ARMENTA:**  Just

12  recently.

13     **INMATE TITCH:**  Actually, there and Soledad

14  actually.  Even in high school kind like a --

15  that's what motivated me.  I remember I used to

16  ask my teacher all the time how come I couldn't

17  do this on the streets.  And he said, well, the

18  answers just weren't there, you know, but --

19     **DEPUTY COMMISSIONER ARMENTA:**  Yeah.

20     **INMATE TITCH:**  -- it seemed real easy then.

21     **DEPUTY COMMISSIONER ARMENTA:**  You been

22  involved in some training.  I have you down for

23  having taken courses in vocational drafting.

24     **INMATE TITCH:**  Yes.

25     **DEPUTY COMMISSIONER ARMENTA:**  And office --

26  is it vocational office clerk?

27     **INMATE TITCH:**  No.

61

60

1       **DEPUTY COMMISSIONER ARMENTA:**  No?

2       **INMATE TITCH:**  That's a vocational

3  procurement clerk.  Actually, that's not a

4  trade.

5       **DEPUTY COMMISSIONER ARMENTA:**  That's where

6  you worked?

7       **INMATE TITCH:**  That's where I worked.

8       **DEPUTY COMMISSIONER ARMENTA:**  Yeah.

9       **INMATE TITCH:**  For five years, yes.

10       **DEPUTY COMMISSIONER ARMENTA:**  Yeah, you did

11  that too?

12       **INMATE TITCH:**  Yes.

13       **DEPUTY COMMISSIONER ARMENTA:**  Well, you've

14  been a clerk for many years, weren't you?

15       **INMATE TITCH:**  Actually, I was a clerk for

16  five years at CMC, and then I've been a clerk

17  here for five years.

18       **DEPUTY COMMISSIONER ARMENTA:**  Yeah, that's

19  10 years.

20       **INMATE TITCH:**  Yeah.  I mean -- five years,

21  excuse me, a year.

22       **DEPUTY COMMISSIONER ARMENTA:**  A year.

23  Okay.  Because you worked in the --

24       **INMATE TITCH:**  I worked in --

25       **DEPUTY COMMISSIONER ARMENTA:**  -- IDL?

26       **INMATE TITCH:**  Yeah, I worked in printing

27  when I was at CMC for 10 years.

62

61

1    **DEPUTY COMMISSIONER ARMENTA:**  No, printing?

2    **INMATE TITCH:**  Yes.

3    **DEPUTY COMMISSIONER ARMENTA:**  With the PIA?

4    **INMATE TITCH:**  Yes.  And then I worked in

5    IDL here for five years.

6    **DEPUTY COMMISSIONER ARMENTA:**  Okay.

7    **INMATE TITCH:**  In construction.

8    **DEPUTY COMMISSIONER ARMENTA:**  Yep, you've

9    been in printing.

10    **INMATE TITCH:**  Yeah.

11    **DEPUTY COMMISSIONER ARMENTA:**  Machine

12    operator?

13    **INMATE TITCH:**  Yes.

14    **DEPUTY COMMISSIONER ARMENTA:**  Yeah.

15    **INMATE TITCH:**  One of the best.

16    **DEPUTY COMMISSIONER ARMENTA:**  Huh?

17    **INMATE TITCH:**  One of the best.

18    **DEPUTY COMMISSIONER ARMENTA:**  Did you do

19    this?

20    **INMATE TITCH:**  No.

21    **DEPUTY COMMISSIONER ARMENTA:**  No?

22    **INMATE TITCH:**  No, she bought it.

23    **DEPUTY COMMISSIONER ARMENTA:**  Oh, she

24    bought it?

25    **INMATE TITCH:**  It's nice stuff though, huh?

26    **DEPUTY COMMISSIONER ARMENTA:**  I was going

27    to say, my gosh.

63

62

1      **INMATE TITCH:**  Excellent paper right there.

2      **DEPUTY COMMISSIONER ARMENTA:**  How did she

3   manage --

4      **INMATE TITCH:**  That's parchment paper right

5   there.

6      **DEPUTY COMMISSIONER ARMENTA:**  I was going

7   to say where did you get the computer.

8      **INMATE TITCH:**  Yeah.

9      **DEPUTY COMMISSIONER ARMENTA:**  Yes, she did

10   a good job.

11      **INMATE TITCH:**  Yes.  That was presented by

12   Lenona Carlburg.

13      **DEPUTY COMMISSIONER ARMENTA:**  Okay.  It

14   says here that you -- okay.  I did mention

15   drafting?

16      **INMATE TITCH:**  Yes.

17      **DEPUTY COMMISSIONER ARMENTA:**  You did take

18   part in that?

19      **INMATE TITCH:**  Yes.

20      **DEPUTY COMMISSIONER ARMENTA:**  Okay.  And

21   press operator?

22      **INMATE TITCH:**  Yes.

23      **DEPUTY COMMISSIONER ARMENTA:**  You've talked

24   about that.  That's one of your skills.  And you

25   were a procurement clerk.  You got experience in

26   that.  And part of your work you've also been

27   like a teacher's aid?

64

63

1      **INMATE TITCH:**  Yes, I was a teacher's aid
2  in vocational auto body.
3      **DEPUTY COMMISSIONER ARMENTA:**  Okay.  Did
4  you also work in the yard crew?
5      **INMATE TITCH:**  Yes, that was when I was at
6  CMC, the last six months or nine months before I
7  left there.  I believe there was some work-
8  related chronos in there that --
9      **DEPUTY COMMISSIONER ARMENTA:**  We'll get to
10  those.
11      **INMATE TITCH:**  Okay.  I'm sorry.
12      **DEPUTY COMMISSIONER ARMENTA:**  They're very
13  important.
14      **INMATE TITCH:**  Yeah.
15      **DEPUTY COMMISSIONER ARMENTA:**  They're also
16  very important.  That's where we get --
17      **INMATE TITCH:**  Well, they summarize the
18  skills.
19      **DEPUTY COMMISSIONER ARMENTA:**  The skills,
20  yeah.
21      **INMATE TITCH:**  Yeah.
22      **DEPUTY COMMISSIONER ARMENTA:**  I've went
23  over all your letters.  I've went over all your
24  efforts --
25      **INMATE TITCH:**  Yeah.
26      **DEPUTY COMMISSIONER ARMENTA:**  -- of sending
27  out your letters to different companies.  Very

65

64

1    impressive to me that you've -- you looked into

2    AA?

3          **INMATE TITCH:**  Yes.

4          **DEPUTY COMMISSIONER ARMENTA:**  In other

5    words, whenever you get a date you go right

6    there and --

7          **INMATE TITCH:**  I'll know exactly where

8    they're --

9          **DEPUTY COMMISSIONER ARMENTA:**  Where to go?

10         **INMATE TITCH:**  Where the meetings are.

11         **DEPUTY COMMISSIONER ARMENTA:**  Yeah.  And

12    like we said earlier, you mentioned that you

13    took courses and you got your high school

14    diploma?

15         **INMATE TITCH:**  Yes.

16         **DEPUTY COMMISSIONER ARMENTA:**  You went to

17    Hartnell College?

18         **INMATE TITCH:**  Yes.

19         **DEPUTY COMMISSIONER ARMENTA:**  That was in

20    Soledad, and also there at San Jose State?

21         **INMATE TITCH:**  Yeah.

22         **DEPUTY COMMISSIONER ARMENTA:**  You got 24

23    credits?

24         **INMATE TITCH:**  Out of there, yeah.

25         **DEPUTY COMMISSIONER ARMENTA:**  Out of San

26    Jose State?

27         **INMATE TITCH:**  Yeah.

66

65

1    **DEPUTY COMMISSIONER ARMENTA:**  Was that back

2  in 1981?

3    **INMATE TITCH:**  That was in 19 -- yeah, that

4  would of been right around there, '80, '81.

5    **DEPUTY COMMISSIONER ARMENTA:**  I kind of

6  remember because I was going through your file -

7  -

8    **INMATE TITCH:**  Yeah.

9    **DEPUTY COMMISSIONER ARMENTA:**  -- and

10  remember some of those dates.  Okay.  Chapman,

11  you got a 3.8, huh?

12    **INMATE TITCH:**  Yeah.

13    **DEPUTY COMMISSIONER ARMENTA:**  Wow.  We got

14  your certificates here.  I'll tell you many

15  people wish they had a 3.8.

16    **INMATE TITCH:**  Yeah, that's a lot of hard

17  work.

18    **DEPUTY COMMISSIONER ARMENTA:**  I have to

19  admit I only got a 3.5.

20    **INMATE TITCH:**  Oh, really?

21    **DEPUTY COMMISSIONER ARMENTA:**  Yeah, that's

22  a highest.

23    **INMATE TITCH:**  That's still good.

24    **DEPUTY COMMISSIONER ARMENTA:**  Not 3.8.

25    **INMATE TITCH:**  But if you get what you

26  wanted from it --

27    **DEPUTY COMMISSIONER ARMENTA:**  Yeah.

67

66

1    **INMATE TITCH:** -- that's what counts, you

2    know.  You can have all the grade point

3    averages, but if you don't get what you want, it

4    won't amount to much.

5    **DEPUTY COMMISSIONER ARMENTA:** Then of

6    course all your letters -- your letters of you

7    making the honor roll at Chapman.

8    **INMATE TITCH:** Right.

9    **DEPUTY COMMISSIONER ARMENTA:** You must of

10    felt very good?

11    **INMATE TITCH:** Yeah, I was very proud.

12    **DEPUTY COMMISSIONER ARMENTA:** You have your

13    certificate of completion from vocational

14    drafting and also from a confined space

15    awareness training?

16    **INMATE TITCH:** Yes, that's from IDL.

17    **DEPUTY COMMISSIONER ARMENTA:** Forklift

18    operator.  You were even -- gosh, you were even

19    in first aid?

20    **INMATE TITCH:** Yeah.

21    **DEPUTY COMMISSIONER ARMENTA:** Long time

22    ago.  And again we have a list of all your

23    different courses, and I have looked in your C

24    file.  You participated in a self confrontation

25    workshop?

26    **INMATE TITCH:** Yes.

27    **DEPUTY COMMISSIONER ARMENTA:** 24 hour

68

67

1  biblical counseling partnership program

2  requiring 10 to 12 hours per week, personal

3  study, and assignments.  And also in the M-2,

4  Match Two program?

5      INMATE TITCH:  Yes.

6      DEPUTY COMMISSIONER ARMENTA:  The program

7  matching a volunteer with an inmate for regular

8  visits and contacts to promote growth towards

9  fulfilling life in the community.  You've been

10 involved in creative conflict resolution.  You

11 know about that one?

12     INMATE TITCH:  Yes.

13     DEPUTY COMMISSIONER ARMENTA:  Forty days of

14 purpose, six week study based on the book

15 "Purpose Driven Life".  Who put on that class?

16 That's recent, too.

17     INMATE TITCH:  Yeah, it was -- gosh, I

18 can't remember the name.  It was one of the guys

19 from the church.

20     DEPUTY COMMISSIONER ARMENTA:  Okay.  Also

21 in Kiros?

22     INMATE TITCH:  Yeah Kiros, free at last,

23 and you also been a -- in the Laubach literacy

24 action program?

25     INMATE TITCH:  Yep.

26     DEPUTY COMMISSIONER ARMENTA:  Was that as a

27 tutor?

69

68

1        **INMATE TITCH:**  Yes.

2        **DEPUTY COMMISSIONER ARMENTA:**  And the 12

3    step program?

4        **INMATE TITCH:**  Yeah, (indiscernible).

5        **DEPUTY COMMISSIONER ARMENTA:**

6    (Indiscernible), yep.  Did you learn your steps?

7        **INMATE TITCH:**  12 steps, yeah.

8        **DEPUTY COMMISSIONER ARMENTA:**  Yeah.

9        **INMATE TITCH:**  Yeah.

10       **DEPUTY COMMISSIONER ARMENTA:**  I won't ask

11   you all, I'll ask you number eight.

12       **INMATE TITCH:**  Made a list of the people

13   who we have harmed and became willing to make

14   amends to them all.

15       **DEPUTY COMMISSIONER ARMENTA:**  Make amends,

16   yeah.  And the only reason I know that is

17   because that seems to be the one that they all

18   ask.

19       **INMATE TITCH:**  Oh, really?

20       **DEPUTY COMMISSIONER ARMENTA:**  Number eight.

21       **INMATE TITCH:**  I think they asked me that

22   in '95 or something like that.  I knew that one.

23       **DEPUTY COMMISSIONER ARMENTA:**  You got your

24   certificates here for all that.  So you've been

25   keeping busy?

26       **INMATE TITCH:**  Yes.

27       **DEPUTY COMMISSIONER ARMENTA:**  Also hands of

70

69

1    peace, conflict resolution?

2        **INMATE TITCH:**  Yeah, those are the -- I

3    included the certificates because those are

4    something that you don't get to see in the C

5    file, you just get the chrono.

6        **DEPUTY COMMISSIONER ARMENTA:**  You know,

7    there was some in there, but not -- they were

8    not all in there.

9        **INMATE TITCH:**  No, I know.

10       **DEPUTY COMMISSIONER ARMENTA:**  Yeah.  In

11   some institutions they have them all.

12       **INMATE TITCH:**  Oh, really?

13       **DEPUTY COMMISSIONER ARMENTA:**  Yeah.  I can

14   open it and go to the third section and they're

15   all in there.

16       **INMATE TITCH:**  Oh, really?

17       **DEPUTY COMMISSIONER ARMENTA:**  And they're

18   right there.  Right now I was looking for them.

19   For our purposes just the fact that we see them.

20       **INMATE TITCH:**  Right.

21       **DEPUTY COMMISSIONER ARMENTA:**  And always

22   keep this copy.  If you're going to give them

23   one give them a Xerox.

24       **INMATE TITCH:**  Right.

25       **DEPUTY COMMISSIONER ARMENTA:**  Okay.  Let's

26   get into your psychological report.

27       **INMATE TITCH:**  Okay.

71

70

1      **DEPUTY COMMISSIONER ARMENTA:**  It was

2   prepared by Dr. Preston.   Under diagnostic

3   impression, there is no diagnosis an Axis I.

4   Axis II:   Antisocial Personality Disorder.

5   Under Axis III:  Hepatitis.   Axis IV:   Your

6   Stress, it says due to Being Incarcerated.   It

7   gives you a favorable functional score of 85.

8   In terms of whether they consider you a threat,

9   this is what they write, Section 14, assessment

10   of dangerousness.   It is, "My opinion is that

11   Mr. Titch poses a less than average risk of

12   violence in the structured setting as compared

13   to other inmates in this institution.   Support

14   for this opinion is based upon his programming

15   history, which is quite positive for many years.

16   Mr. Titch has not received a CDC 115 since 1986.

17   He participated in self-help and is employed in

18   a position of responsibility working for a

19   correctional lieutenant.   In the event of

20   release to the community, it is my opinion that

21   he will continue to present a less than average

22   risk of violent behavior.   The real issue of

23   antisocial personality disorder boils down to

24   whether the individual has developed a sense of

25   self control and conscience, such as they

26   maintain a pro-social lifestyle and do not

27   engage in crime, be it white collar crime or

72

71

1  street crime.  It appears that Mr. Titch has

2  begun to solidify some plans for his survival in

3  the community in the event of release.  These

4  plans include forming connections with friends

5  and relatives with viable employment offers.

6  With the passage of time Mr. Titch continues to

7  accumulate a record of programming, which points

8  towards a diminished propensity of criminal

9  behavior.  It is always difficult to make an

10  assessment with regards to how long an

11  individual must be observed in a controlled

12  setting before the time comes when his release

13  into the less controlled setting poses an accept

14  level of risk.  It is my feeling that as long as

15  Mr. Titch continues to program positively and

16  continue to upgrade his parole plans and level

17  of support in the community, he is moving

18  towards the point of time in which that risk may

19  be acceptable.  I do not believe that mental

20  health issues will necessarily be a deciding

21  factor in terms of deciding when Mr. Titch is

22  appropriate for parole."  Okay.  Sir, is

23  everything been covered?

24      **INMATE TITCH:**  I think you covered

25  everything.

26      **DEPUTY COMMISSIONER ARMENTA:**  Okay.  I'm

27  sorry, one last thing.  In the area of 115s, you

73

72

1   have a total of five.

2        **INMATE TITCH:**  True.

3        **DEPUTY COMMISSIONER ARMENTA:**  And none

4   since 1986.

5        **INMATE TITCH:**  That would be February.

6        **DEPUTY COMMISSIONER ARMENTA:**  February

7   23rd.

8        **INMATE TITCH:**  Right.

9        **DEPUTY COMMISSIONER ARMENTA:**  And you have

10  one 128, and that was for horse playing?

11       **INMATE TITCH:**  Okay.

12       **DEPUTY COMMISSIONER ARMENTA:**  Okay.

13       **PRESIDING COMMISSIONER DAVIS:**  Since we're

14  there, let's talk about that real quick.  You

15  haven't had a 115 since February of '86?

16       **INMATE TITCH:**  Right.

17       **PRESIDING COMMISSIONER DAVIS:**  But the 115s

18  that you had at that time were all, with the

19  exception of one, which was for alcohol.

20       **INMATE TITCH:**  Right.

21       **PRESIDING COMMISSIONER DAVIS:**  Were all

22  involving violence.

23       **INMATE TITCH:**  Fighting.

24       **PRESIDING COMMISSIONER DAVIS:**  Yeah.

25       **INMATE TITCH:**  Yeah.

26       **PRESIDING COMMISSIONER DAVIS:**  Okay.  What

27  happened?

74

73

1       **INMATE TITCH:**  Well, you didn't expect me
2   to come to prison and stay out of trouble, did
3   you?
4       **PRESIDING COMMISSIONER DAVIS:**  Yeah.
5       **INMATE TITCH:**  You did?
6       **PRESIDING COMMISSIONER DAVIS:**  Actually,
7   you know it has been done on many, many
8   occasions.
9       **INMATE TITCH:**  Well, that's --
10      **PRESIDING COMMISSIONER DAVIS:**  Yeah.
11      **INMATE TITCH:**  I don't know.
12      **PRESIDING COMMISSIONER DAVIS:**  We do this a
13  lot, and there's a lot of people that sit on
14  that side of the table who don't have any 115s,
15  believe it or not.  I mean, there's not a lot,
16  but there are --
17      **INMATE TITCH:**  Yeah, there's not a lot.
18      **PRESIDING COMMISSIONER DAVIS:**  -- but it
19  can be done.
20      **INMATE TITCH:**  I would say --
21      **PRESIDING COMMISSIONER DAVIS:**  I guess my
22  question is more --
23      **INMATE TITCH:**  Some people can do it.
24      **PRESIDING COMMISSIONER DAVIS:**  Yeah.  I
25  guess my question is really not so much why you
26  were doing that originally because --
27      **INMATE TITCH:**  Right.

75

74

1      **PRESIDING COMMISSIONER DAVIS:**    -- I get it,

2    but what changed in '86?

3      **INMATE TITCH:**  Well, I think I grew up.   I

4    think I finally, you know, the light clicked on.

5    I said look, man, if I continue doing this I'm

6    never going to get out of here.   I'm just going

7    to stay on level four all my life, and I won't

8    make it out of prison.

9      **PRESIDING COMMISSIONER DAVIS:**  Can you

10   point to anything that made that decision appear

11   for you, or what happened?

12     **INMATE TITCH:**  I think -- I think it was

13   just normal maturity.   I think it took -- you

14   know, I always tell other lifers, you know,

15   there's a critical period when you're a lifer,

16   and that's your first seven years because on

17   your seventh year, I don't know what it is, but

18   for me anyways, that was a very critical year

19   for me.   It was a make or break -- there was a

20   moment where I decided which way I was going to

21   go in life, and I decided to go the right way.

22     **PRESIDING COMMISSIONER DAVIS:**  Do you know

23   what -- can you attribute that to anything?

24     **INMATE TITCH:**  You know, I really -- I

25   can't.  If I have to attribute to --

26     **PRESIDING COMMISSIONER DAVIS:**  You don't

27   have to.  I'm just curious to know if you

76

75

1  thought about it.

2      **INMATE TITCH:**   If I have to attribute it to

3  anything, I would probably say it was probably

4  because of the people in my life, meaning my

5  friends, many of the people that I knew in the,

6  you know, in the Department of Corrections, the

7  teachers, my supervisors and stuff like that

8  because I was a pretty angry hostile person back

9  then, and I was pretty hopeless as far as doing

10  the program and stuff like that.  And I think

11  had it not been for their encouragement to go on

12  and to hang in there, yeah, I don't think I

13  would of made it.  In fact, I often wonder if I

14  came in the Department of Corrections today

15  whether I would of changed.  I don't think I

16  would of because all of those systems have been

17  eliminated now, you know, they're gone.  You

18  don't have the people they used to.  I mean, I

19  was an -- I was an idiot, and these guys went

20  out of their way to say, hey, you know what, it

21  ain't over for you.  It's your choice still.

22  You can still do something with your life if you

23  want to, but you got to do it, and I didn't

24  deserve it.  I mean, like I said, I was

25  arrogant.  I was a loud mouth.  You know, I look

26  back really now, and I'm really ashamed.  I wish

27  I could back and see some those people and

76

1  apologize to them and tell them -- and thank

2  them that they didn't give up on me.  I don't

3  know what they seen in me, but some of them seen

4  a spark of light in me somewhere, you know,

5  where I didn't see it, and that made a big

6  difference in my life, and I never forgot that.

7  I've never forgotten the people who stopped to

8  help me along the way, you know.  Now, it's more

9  of just wanting to prove to them, you know that

10 I'm not going to let them down.

11     **PRESIDING COMMISSIONER DAVIS:**  Mr. Armenta,

12 do you have any questions?

13     **DEPUTY COMMISSIONER ARMENTA:**  Yes.  Do you

14 think that going to school and working towards

15 your AA and getting those high grades had

16 something to do with that big turnaround?

17     **INMATE TITCH:**  Oh, absolutely.

18     **DEPUTY COMMISSIONER ARMENTA:**  Yeah, where

19 you saw yourself --

20     **INMATE TITCH:**  Oh, absolutely.

21     **DEPUTY COMMISSIONER ARMENTA:**  Yeah.

22     **INMATE TITCH:**  You know, I'm not sure if it

23 was going to school, although, you know --

24 although, I think -- I think one of the critical

25 moments when I found out that I wasn't stupid --

26 you got to remember that when I grew up I used

27 to think I was retarded because of the way I

78

77

1    grew up.  Because I was placed in juvenile hall,

2    and I missed valuable school time.  And then

3    when I got back out and went to school, you

4    know, public school was, you know, when you

5    entered the fourth grade or fifth grade they

6    started at a certain level and they kept on

7    going throughout the year, right.  Well, when

8    you miss six months and then you get put into

9    the middle of that you don't understand because

10   you missed -- you've already missed all the

11   basics.  And I used to think that I was really

12   retarded.  And going to school -- when I went to

13   San Jose State University and I maintained in an

14   upper graduate program I maintained A and Bs, it

15   dawned on me that I could do this.  All I had to

16   do was commit myself.  It was through

17   dedication.  But I think too one of the most

18   significant things that really helped was my

19   work environment.  PIA was a very, very critical

20   time.  You know, I was one of the -- you seen

21   some of the chronos.  I was one of their best

22   pressmen there, and you know, I learned the

23   printing field from the floor up.  I went in

24   there, I started out, I didn't know nothing.  I

25   started out as a collator.  I got on a folding

26   machine.  I got on a collating machine.  Then I

27   got on a little small press, and then I started

79

78

1  learning how to repair them.  Then I got on a

2  big press, and a lot of this stuff is very

3  technical.  It's very intimidating.  I mean, I

4  can remember when my bosses said hey, you're on

5  your own.  It's time for you to put up now, you

6  know what I mean.  And I can remember being very

7  intimidated, but as I succeeded, I can remember

8  the sense of accomplishment.  It was just

9  enormous.  I mean, to be left alone with a piece

10  of a machinery that costs a quarter of a million

11  dollar and your boss says hey, go ahead I trust

12  you.  That's pretty significant, so --

13      PRESIDING COMMISSIONER DAVIS:  Okay.  Tell

14  me what you learned on your class on your

15  "Purpose Driven Life".

16      INMATE TITCH:  "Purpose Driven Life."

17      PRESIDING COMMISSIONER DAVIS:  What -- do

18  you remember the main theme of the book?

19      INMATE TITCH:  Yeah, finding your purpose

20  in life.  And I think to me what I got out of

21  the course was that our purpose is to reflect

22  God's glory in our daily lives, and that means

23  you don't have to do something -- you don't have

24  to accomplish something big, you know what I

25  mean, or you don't have to go out and become a

26  multimillionaire or something like.  But what

27  I'm saying is that you reflect God's glory by

80

79

1   getting up in the morning, by smiling, by being

2   positive, not being negative, not being a cry

3   baby or a complainer, and you know, and trying

4   to do good things in life in spite of your

5   circumstances.   To me, that's what I got out of

6   that.   That's the "Purpose Driven Life."

7          **PRESIDING COMMISSIONER DAVIS:**   And how do

8   you think that applies to you?

9          **INMATE TITCH:**   I think I've done

10  exceptionally well, but I think I've been

11  exceptionally blessed too, you know.   I think

12  I've had good people around me who have

13  influenced me to do the right thing.   I'm just

14  so grateful and thankful that I've had those

15  people in my life.   And you know, I'll tell you

16  what, I think I've had angels look out for me.

17  I really do because it's so easy to do bad, and

18  it's so easy to cross that line on to the bad

19  side.   And for some reason, you know, even when

20  there was a lot of turmoil around me, even

21  temptation, there was a lot of temptation, I

22  always said no.   I'm not going to step over that

23  line.   And I honestly think that's because

24  somebody was looking out for me and all the good

25  people that I've had in any life.   I really do.

26

27          **PRESIDING COMMISSIONER DAVIS:**   Commissioner

81

80

1    Armenta asked you about step eight of the

2    Alcoholics Anonymous, and you were articulate

3    what that -- what step eight entails, have you

4    done it?

5        INMATE TITCH:  Yes, but step nine says

6    accept when to do so would injure them or

7    others.  So there's only, you know, when you're

8    talking about murder -- I remember I was sitting

9    in my 1995 hearing, and I remember talking to

10   the Board members there.  And I remember I asked

11   -- I said hey, would you convey this to the

12   District Attorney, you know, I would like to

13   send money or do whatever I can, you know.  And

14   it was conveyed to me that, you know what, those

15   people probably don't want to hear from you

16   anymore because, you know, the devastation that

17   you create and the sorrow.  So I think --

18       PRESIDING COMMISSIONER DAVIS:  Yeah, and

19   many people write that -- use that time to write

20   that letter, but it's really for you as well.

21       INMATE TITCH:  Yeah.

22       PRESIDING COMMISSIONER DAVIS:  So have you

23   done that?

24       INMATE TITCH:  Yes.  I don't think I've

25   written the letter, but I think what I've done

26   is I've talked to my close friends about it, and

27   I've also said a lot of prayers too.  And I

82

81

1   think in making amends, you know, I may not be

2   able to make amends to them personally, but I

3   can make amends by doing other things.  And

4   that's why being a more responsible person,

5   giving back to the, you know, to the prison when

6   I could.  For example, they had these child

7   abuse -- where we raise funds for child abuse,

8   the literacy council where I helped other

9   inmates to learn how to read and write.

10  Printing, you know, I was teaching people -- I

11  was giving them a trade, you know, I was

12  teaching how to run presses and stuff like that.

13  So that's how I make amends.  You know, I can't

14  make -- I can't undo what I've done.  I was an

15  idiot, and that will -- the harm of that will be

16  forever, but what I can do is be a better person

17  and make sure that my tomorrows are bright.

18      **PRESIDING COMMISSIONER DAVIS:**  And it's --

19  I understand what you're saying.  And sometimes,

20  although -- it's my understanding is that part

21  of the program is that if the letter is somewhat

22  cathartic for you as well that sometimes help

23  you.  By putting things down on paper maybe you

24  bring out some things that conversation doesn't,

25  so it's a -- part of it is a process for you as

26  well.

27      **INMATE TITCH:**  That's interesting that you

B3

82

1    should say that because I was just thinking

2    about that.  I was talking to somebody about it

3    actually, but you know, step four in Alcoholics

4    Anonymous is make a searching and fearless moral

5    inventory.  And I tell you what, one of the

6    hardest things that I had ever had to do was sit

7    there and read that package, you know, page

8    after just page of just page of all the horrible

9    things that I did.  Some of them aren't true,

10   you know, but a lot of them are.  There are a

11   lot of victims, and you know, it's really just

12   burned me to the soul, you know, to have to do

13   that.

14         **PRESIDING COMMISSIONER DAVIS:**  Commissioner

15   Armenta, do you have any other questions?

16         **DEPUTY COMMISSIONER ARMENTA:**  No, I do not.

17         **PRESIDING COMMISSIONER DAVIS:**  All right.

18   Mr. Ferrentino?

19         **DEPUTY DISTRICT ATTORNEY FERRENTINO:**  Yes.

20   I would ask the Commissioner to ask the inmate

21   in talking about his psychological background

22   all the way to 1986 and 1989 he was diagnosed

23   with antisocial personality behavior with

24   sadistic features, and Dr. Chandler's (phonetic)

25   report from May -- June of 2000.  Dr. Chandler

26   noted the sadistic, callous and cruel nature of

27   his crimes requires continued and additional

84

83

1   personal growth and resolution of underlying

2   psychological factors prior to his being

3   released.  In '86 and '89 he was recommended to

4   attend a Category X program, and I don't see any

5   addressing by the inmate of any of the

6   psychological factors up to this point.  I would

7   like to ask him why he hasn't taken advantage of

8   those recommendations.

9       **PRESIDING COMMISSIONER DAVIS:**  Do you

10  understand the question?

11      **INMATE TITCH:**  Yes.

12      **PRESIDING COMMISSIONER DAVIS:**  Why haven't

13  you?

14      **INMATE TITCH:**  Well, there is no Category

15  X, first of all.  And second of all, there

16  really isn't any Cat T program anymore, and

17  there isn't very many self-help groups.

18  Whatever is available, I take.

19      **PRESIDING COMMISSIONER DAVIS:**  And what

20  have you taken since that time?

21      **INMATE TITCH:**  Well, primarily AA, but I've

22  also taken the self confrontation workshop.

23  I've taken conflict resolution, which how to

24  deal with anger.

25      **PRESIDING COMMISSIONER DAVIS:**  But that

26  would also include the AA/NA, the 12 steps?

27      **INMATE TITCH:**  Yes.

B5

84

1      **PRESIDING COMMISSIONER DAVIS:**   The

2    literacy, the free at last, the Kiros, 40 days

3    of purpose, creative conflict resolution, self

4    confrontation workshop and the M-2 program?

5      **INMATE TITCH:**   Right.

6      **PRESIDING COMMISSIONER DAVIS:**   Okay.  Did

7    you do the "Purpose Driven Life" part also?

8      **INMATE TITCH:**   Yeah.

9      **PRESIDING COMMISSIONER DAVIS:**   All right.

10      **DEPUTY DISTRICT ATTORNEY FERRENTINO:**   I

11    guess my question was more back when those --

12    when Category X was available why was that not

13    taken advantage of at the time?

14      **PRESIDING COMMISSIONER DAVIS:**   Okay.

15      **INMATE TITCH:**   I think primarily that at

16    that time that I was -- I remember one time they

17    asked me if I wanted to take it, and I said no

18    at that time because I was going to school and I

19    had work and I had a lot of stuff.  And I always

20    thought there was going to be time to take those

21    things.  I had -- I don't think anybody

22    envisioned how prison has changed as to what it

23    has changed to now.

24      **PRESIDING COMMISSIONER DAVIS:**   You were

25    still getting your 115s in '86 too?

26      **INMATE TITCH:**   Yes.

27      **PRESIDING COMMISSIONER DAVIS:**   Okay.

86

85

1    **DEPUTY DISTRICT ATTORNEY FERRENTINO:**  This

2    may be an area where Counsel may not want the

3    inmate to answer, but there --

4    **ATTORNEY CORYN:**  If it's anything related

5    to the offense, no.

6    **DEPUTY DISTRICT ATTORNEY FERRENTINO:**

7    There's some clarification and corrections that

8    were made in the report by the inmate and spoken

9    about by the inmate with regard to what happened

10   previously, in the previous offenses.  And in

11   the previous offenses up until about 1992 the

12   inmate had accepted responsibility solely for

13   the offenses in the April 1978 report, in the

14   January '83 report, in the February 1989 report,

15   and then in 1992 and afterwards, including this

16   report, the inmate is now pointing to the fact

17   that he was influenced or did these crimes as a

18   part of the influence of his partner.  I'm

19   wondering what had changed from those previous

20   admissions of sole responsibility to up from

21   1992 to the present they were -- where the

22   inmate appears to be shifting some of the blame

23   to his partner?

24   **PRESIDING COMMISSIONER DAVIS:**  Okay.  And

25   Counsel, feel free to weigh in on any part of

26   this, but --

27   **INMATE TITCH:**  I'll answer that.

87

86

1       **PRESIDING COMMISSIONER DAVIS:**  -- to the

2    extent that you want to answer that.

3       **INMATE TITCH:**  Well, that's really

4    addressed here in my report, my mental health

5    evaluation report where the doctor -- you know,

6    I talked to the doctor here about my crimes.  It

7    says review of life crime, and he did -- he said

8    right here that he didn't think that I was

9    trying to blame anybody, and I don't.  I really

10   don't, you know.  It was my decision, so I take

11   full responsibility for that.  I think what I'm

12   trying to say, you know, what I'm getting -- and

13   he's new.  I've never seen this particular

14   District Attorney here, but what I'm getting is

15   that it seems like the facts of my crimes are

16   beginning to change, and that's starting to

17   concern me really.  I mean, in the police letter

18   that you read from the police department, the

19   sergeant, the police sergeant said that I shot

20   Aubrey Duncan, okay, and here -- these are my

21   original court papers.  The information sheet

22   when I was first arrested, and it says right

23   here, you know, in my charges that I was charged

24   with that murder.  However, it says it is

25   further alleged that at the time of the

26   commission of the commitment offense alleged in

27   count 16 of this information the defendant Brett

88

87

1    Thomas was armed with the deadly weapon, to wit

2    a rifle.  It is further alleged that at the time

3    the commission of the offense allegedly count 16

4    the defendant Brett Thomas used a firearm, to

5    wit a rifle.  It doesn't say where Mark Titch

6    used a rifle.  So I just, you know, a long time

7    has gone by.  Mistakes happen, but I just happen

8    to notice that a lot of things are starting to

9    change, and it seems to me the better I do the

10   worse these crimes start to get, you know.  I

11   notice in the letter from the District Attorney

12   Pierce (phonetic) where in the beginning they

13   were saying that Laura Straughton was praying

14   for her life.  Now that's changed to begging for

15   her life.  And of course, with the attempted

16   rape, you know, I was never charged with any

17   rape.  They don't have any evidence of that.

18   They're free to bring, you know, they're free to

19   present any kind of evidence, you know.  My --

20        **PRESIDING COMMISSIONER DAVIS:**  There's no

21   attempted rape listed in the charges.

22        **INMATE TITCH:**  No, of course, no.  But I

23   mean, it's stuff like that that really concerns

24   me.  In the very beginning I would of never said

25   anything about this.  I would of just kept my

26   mouth shut, took my lumps, and that's that, you

27   know.  I understand that a lot of people are mad

89

88

1    at me.  I don't expect people to forgive me, but

2    by the same token, you know, I'm not just going

3    to sit and let people run over me.

4        **PRESIDING COMMISSIONER DAVIS:**  Okay.  So

5    you're interested in clarifying the record?

6        **INMATE TITCH:**  That's all.  That's it.

7        **PRESIDING COMMISSIONER DAVIS:**  Okay.

8        **INMATE TITCH:**  That's -- hopefully that

9    will answer his question.

10       **PRESIDING COMMISSIONER DAVIS:**  I've got

11   that.

12       **DEPUTY DISTRICT ATTORNEY FERRENTINO:**  I

13   have just one more question in that area,

14   whether the inmate want to answer or not, but

15   specifically in the 1978 report, psychological

16   report talking about Ms. Straughton, the inmate

17   indicated his action were the result of bitter

18   anger and said his actions satisfied his rage.

19   And now, in clarifications we have here it says,

20   "I was sole perpetrator.  I had no

21   predisposition to commit this crime but was

22   induced by my crime partner in believing that

23   the killing of Laura Straughton would prevent us

24   from being apprehended."  So I understand the

25   inmate's position on the crimes being stated

26   correctly, but my question is to how do we have

27   such a drastic change as to accepting

*90*

89

1   responsibility from back then to today's date?

2       **INMATE TITCH:**  Well, I was a jerk back

3   then.  I mean, you know, there's been a lot

4   changes that have taken place here.  I'm not the

5   same person that I was -- when did you say that

6   was, 1978, '79?

7       **DEPUTY DISTRICT ATTORNEY FERRENTINO:**  Yes.

8       **INMATE TITCH:**  I'm not that same person,

9   you know.  I might of said that just to be a

10  smart alec to the psych, you know, that's what

11  kind of jerk I was back then, and I'm not that

12  person, you know.  I'm trying to deal with this

13  as responsible a way that I know how, you know.

14  I haven't shirked any of my responsibility for

15  these crimes.

16      **PRESIDING COMMISSIONER DAVIS:**  Okay.

17      **INMATE TITCH:**  You know --

18      **PRESIDING COMMISSIONER DAVIS:**  And just

19  continue to direct your answers to the Panel.

20      **INMATE TITCH:**  Yeah.  I haven't shirked any

21  of my responsibilities for these crimes.

22      **PRESIDING COMMISSIONER DAVIS:**  All right.

23  That answers the question.

24      **DEPUTY DISTRICT ATTORNEY FERRENTINO:**  No

25  further questions.

26      **PRESIDING COMMISSIONER DAVIS:**  All right.

27  Mr. Coryn?

91

90

1       **ATTORNEY CORYN:**   No further -- no

2   questions.

3       **PRESIDING COMMISSIONER DAVIS:**   All right.

4   Mr. Ferrentino, closing?

5       **DEPUTY DISTRICT ATTORNEY FERRENTINO:**   Yes,

6   I would direct most of my comments to the

7   letter, which I have submitted, but based on the

8   crimes which were committed and Mr. Titch's

9   statements in the prior reports with regard to

10  him accepting responsibility and then later now

11  placing blame on his crime partner, as well as

12  the extensive psychological background

13  indicating that he does have psychological

14  problems, which I don't see addressed anywhere

15  with the psychological team, the crime that he

16  committed were heinous and callous in nature.

17  The murder, which he himself inflicted on Ms.

18  Straughton, and as well as him being a

19  participant in the murder of Mr. Aubrey and the

20  wounding of his wife and also his daughter who

21  was murdered at the scene are callous and

22  malicious, and he's an unreasonable risk of

23  danger to society at any point.   And I would

24  point to a paragraph in my letter where the

25  original judge, as well as the prosecutor in the

26  matter, felt it would be basically be tantamount

27  to murder for Mr. Titch to be ever released.

92

91

1    Also Senior Psychologist Howell (phonetic)

2    stated in her report of April of '78 the only

3    way society can be protected from this man would

4    to prevent from entering society.  It's our

5    position that Mr. Titch should not have a date

6    set at this point, and that a new hearing not be

7    set for five years.  With that I'll close.

8         **PRESIDING COMMISSIONER DAVIS:**  All right.

9    Thank you.  Mr. Coryn.

10        **ATTORNEY CORYN:**  Mr. Titch did exercise his

11   right not to discuss the offense, his social or

12   criminal history.  He's been to the Board eight

13   times before.  He's had the facts of the case

14   rehashed over and over.  He does accept

15   responsibility.  The nature of the crimes

16   described by the Deputy District Attorney will

17   never change, and that should not be held

18   against him.  What he did speak to today during

19   the hearing, Mr. Titch should be commended for

20   being open, frank, and candid regarding his

21   prior criminality, upbringing, his truancy, his

22   marijuana use.  His post-conviction factors,

23   he's really programmed in a positive manner, and

24   he should be commended for being 115 free for 20

25   years.  His accomplishments, he's upgraded

26   educationally.  Vocationally, he has a number of

27   certificates.  He's participated in numerous

*93*

92

1   self-help and therapy groups.  I think the Board
2   spent a lot of time going over those, and what's
3   more important is that Mr. Titch is able to
4   articulate what he's learned in those groups
5   with the 12 step and with what he learned in his
6   "Purpose Driven Life", creative conflict
7   resolution and those classes.  The psych report,
8   I disagree with the deputy District Attorney
9   again that last time he appeared before the
10  Board he received a three-year denial, a
11  stipulation to get a new psych report, and they
12  made certain recommendations, which Mr. Titch
13  complied with them all.  Previous to that he
14  received -- after a hearing, I think I
15  represented him in 2001 at a lifer hearing, and
16  he received a two-year denial with certain
17  recommendation, and he complied with those.  It
18  wasn't his fault that he didn't have a psych
19  report, but one finally got prepared for this
20  report by Dr. Preston for this hearing in July,
21  today's date.  And it should be noted that the
22  report is favorable, supportive of release,
23  notices he has a GAF, Global Assessment of
24  Functioning Score of 85.  It notes that he has
25  significant amount of insight, and his judgment
26  is good.  His risk to society if released is
27  less than average.  And he has solidified his

94

93

1    plans for survival in the community, which is

2    obviously very important, considering the length

3    of his confinement.  Finally, Mr. Titch should

4    be commended for his parole plans.  They're

5    solid, realistic, a number of letters of

6    support.  He realizes the need to continue with

7    AA.  He has an M-2 sponsor, and he should be

8    commended for having a job offer that is

9    concrete.  I think there's a lot of factors in

10   mitigation.  I would respectfully ask that this

11   Board consider them all in determining

12   suitability.

13        **PRESIDING COMMISSIONER DAVIS:**  Thank you.

14   Now is your opportunity --

15        **DEPUTY COMMISSIONER ARMENTA:**  We need to

16   change tapes.

17        **PRESIDING COMMISSIONER DAVIS:**  We're going

18   to change tapes so we won't interrupt you in

19   mid-thought.

20        **INMATE TITCH:**  All right.

21                      **(Off the Record)**

22        **DEPUTY COMMISSIONER ARMENTA:**  Okay.  We are

23   on tape two, side A.

24        **INMATE TITCH:**  Okay.

25        **PRESIDING COMMISSIONER DAVIS:**  This is your

26   opportunity Mr. Titch, to go ahead and address

27   the Board now and tell us why you believe you're

*95*

94

1   suitable for parole.

2       **INMATE TITCH**:  Okay.  Well, fist of all, I

3   just want to say that I'm sincerely sorry for

4   all the harm that I did.  I've tried to show

5   that through all my behavior over the years.

6   That's really the only way that I can show that

7   I'm sorry, you know.  Words don't -- words by

8   themselves don't do it without action, and I

9   think I've shown that.  You know, the last time

10  I was at the hearing, I think it was at 2001.  I

11  didn't come at my 2003 hearing.  They asked me

12  why do you think you ought to get out.  And I

13  remember, I was like, well, what do I say, you

14  know.  And you know, I've had five years to

15  think about that, and I think it really comes

16  down to what a Board member told me way back in

17  '92 or '86, I forget, one of my hearings, but he

18  said it really comes down to a calculated risk.

19  And what he meant by that is, you know, people

20  that, as they mature and get older they're less

21  likely statistically, and this is proven too, to

22  commit crime.  People who participate in

23  education are less likely to participate in

24  crime.  People who get a trade are less likely

25  to participate in crime.  And people with have

26  support and who have firm parole plans are less

27  likely.  I mean, this is all proven

96

95

1    statistically, and I think I've done all of

2    those things to show that statistically I don't

3    present -- not a, you know, a high risk of

4    recidivism. There's no way -- you guys aren't

5    perfect. You guys can't read minds, so there's

6    no way that you can be absolutely sure. You

7    can't have a hundred percent records, but lifers

8    in themselves have a low recidivism rate. It's

9    like less than one percent, I believe. And, you

10    know, personally my own belief is that people

11    who do 15, 20 years, you know, they're not

12    coming back. I don't know what you guys think,

13    but I can tell you that from my own personal

14    experience of what I've seen in the past, you

15    know, most people that do that much time they're

16    done. They don't want no more, and that's where

17    I am, you know. I can't change the past. You

18    know, I was a jerk, you know, he said it. Some

19    of the things in the past, there's nothing I can

20    do to change that. I'm always going to be an

21    idiot. The things that I did will always be

22    cruel. I wish I could take them all back. I

23    wish with all my heart I could take all that

24    back but I can't, so all I can do is try to be a

25    better person, and that's what I'm trying to do.

26    And that's -- I wish I had something better to

27    tell you, but that's all I can tell you, and

97

96

1    that's my statement.

2        **PRESIDING COMMISSIONER DAVIS:**    All right.

3    Thank you, very much.    We're going to recess for

4    our deliberations.

5                        **R E C E S S**

6                        --o0o--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

*98*

97

1         **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                   **D E C I S I O N**

3         **PRESIDING COMMISSIONER DAVIS:**   Let the

4    record reflect that all those previously

5    identified as being in the room have returned.

6    This is in the matter of Mark Titch, CDC number

7    B-89549.  The Panel reviewed all information

8    received from the public and relied on the

9    following circumstances in concluding that the

10   prisoner is not suitable for parole and would

11   pose an unreasonable risk of danger to society

12   or a threat to public safety if released from

13   prison.  We come to this conclusion first and

14   foremost by the commitment itself -- commitment

15   offenses themselves.  The offenses were carried

16   out in a especially cruel and callous manner.

17   There were multiple victims attacked, injured,

18   and killed in separate instances.  The offenses

19   were carried out in a dispassionate and

20   calculated manner.  The offenses were carried

21   out in a manner which demonstrates an

22   exceptionally callous disregard for human

23   suffering, and the motive for the crimes were

24   very trivial in relation to the offenses.  These

25   conclusions are drawn from the statements of

26   facts wherein, for reasons still best to him,

27   **MARK TITCH B-89549 DECISION PAGE 1 7/19/06**

*99*

98

1  the prisoner engaged in a crime spree that
2  involved murders, kidnap, robbery, and assault
3  with a deadly weapon on a police officer.  With
4  regard to prior record, we find that there is an
5  escalating pattern of criminal conduct and
6  violence, a history of unstable and tumultuous
7  relationships, failed previous grants of parole,
8  and failed to profit to -- or failed to profit
9  from society's previous attempts to correct
10  criminality, such attempts including juvenile
11  probation, parole, juvenile camp, and CYA
12  commitments.  With regard to behavior while
13  incarcerated, we find that there are two 128(a)
14  counseling chronos, the last of which was in
15  June of 2005, and five serious 115 disciplinary
16  reports, the last of which was in February of
17  '86, four of these for violence and one for
18  alcohol.  And we have already talked about the
19  turnaround that occurred in 1986.  The July 2006
20  report by -- psychological report by Dr.
21  Preston, we do not find that to be supportive,
22  and I will quote from the report itself.  Where
23  it's under the assessment of dangerousness it
24  states, "It is my opinion that Mr. Titch
25  possesses a less than average risk of violence
26  in the structured setting as compared to other
27  **MARK TITCH B-89549 DECISION PAGE 2 7/19/06**

100

99

1    inmates in this institution.  Support for this

2    opinion is based on his programming history,

3    which is quite positive for many years.  Mr.

4    Titch has not received a CDC 115 since 1986.  He

5    is participating in self-help and is employed in

6    a position of responsibility working for a

7    correctional lieutenant.  In the event of

8    release to the community, it is my opinion that

9    he will continue to present a less than average

10   risk of violent behavior," where she continue on

11   the following page.  "The real issue with

12   antisocial personality disorder boils down to

13   whether the individual has developed a sense of

14   self control and conscience such that they

15   maintain a pro-social lifestyle and do not

16   engage in crime, be it white collar crime or

17   street crime.  It appears that Mr. Titch has

18   begun to solidify some plans for his survival in

19   the community in the event of release.  These

20   plans include forming connections with friends

21   and relatives and a viable employment offer.

22   With passage of time, Mr. Titch continues to

23   accumulate a record of programming, which points

24   towards a diminishing propensity towards

25   criminal behavior.  It is always difficult to

26   make an assessment with regard to how long an

27   **MARK TITCH B-89549 DECISION PAGE 3 7/19/06**

*101*

1  individual must be observed in a controlled

2  setting before the time comes when his release

3  to a less controlled setting poses an acceptable

4  level of risk.  It is my feeling that as long as

5  -- I'm sorry, it is my feeling that as long as

6  Mr. Titch continues to program positively and

7  continues to upgrade his parole plans and level

8  of support in the community, he is moving

9  towards a point in time in which that risk may

10 be acceptable.  I do not believe that mental

11 health will necessarily be the deciding factor

12 in terms of deciding when Mr. Titch is

13 appropriate for parole."  With regard to your

14 parole plans, we do find that you have

15 appropriate parole plans, and I think that you

16 have done an exceptional job in putting this

17 book together, and I commend you for that.  We

18 don't often see that, but when we do, it speaks

19 volumes for the person who did prepare it, so we

20 appreciate your doing that.  With regard to the

21 3042 notices, we note that the District Attorney

22 from Orange County is here in person by

23 representative and does oppose parole, as does

24 the Anaheim Police Department by letter, the

25 Anaheim Police Department being the law

26 enforcement agency responsible for the

27 **MARK TITCH B-89549 DECISION PAGE 4 7/19/06**

*102*

101

1   investigation of this crime.  Nevertheless, we

2   do want to commend you for a variety of things,

3   including your -- I want to get to this so I

4   quote this correctly, including your

5   participation in AA, your vocational drafting,

6   your M-2 program, your self confidence workshop,

7   creative conflict resolution, 40 days of purpose

8   involving the "Purpose Driven Life", and I think

9   you were actually able to fairly well capture

10   the essence of that book, your work in Kiros,

11   free at last, the -- is it the Laubach L-A-U --

12       **INMATE TITCH:**  Lauderbach (phonetic).

13       **PRESIDING COMMISSIONER DAVIS:**  Lauderbach?

14       **INMATE TITCH:**  Yeah, Lauderbach.

15       **PRESIDING COMMISSIONER DAVIS:**  Okay.

16   Because it's spelled in here L-A-U-B-A-C-H, but

17   it's Lauderbach Literacy Action, in which I

18   think you were also a tutor, correct?

19       **INMATE TITCH:**  Right.

20       **PRESIDING COMMISSIONER DAVIS:**  And your 12

21   step program.  And I was also impressed by your

22   ability to articulate the 12 step program.  It's

23   obvious -- some people have been in the 12 step

24   program for 12 years and have one year of

25   experience.  You obviously have taken the whole

26   process to heart and do have several years –

27   **MARK TITCH B-89549 DECISION PAGE 5 7/19/06**

*103*

102

1    have really taken that to heart and have several

2    years of experience.  However, these positive

3    aspects of behavior do not outweigh the factors

4    for unsuitability, and in a separate decision

5    the Hearing Panel finds that you have been

6    convicted of murder, and it is not reasonable to

7    expect that a hearing would be granted during

8    the next two years.  We come to this conclusion

9    by the fact that the offense was carried out in

10   a -- the offenses were carried out in a

11   especially cruel and callous manner.  That there

12   were multiple victims attacked, injured and

13   killed in separate instances.  The offenses were

14   carried out in a dispassionate and calculated

15   manner.  The offenses were carried out in a

16   manner which demonstrates an exceptionally

17   callous disregard for human suffering, and the

18   motive for the crimes were very trivial in

19   relationship to the offenses.  These conclusions

20   are drawn from the statement of facts wherein

21   the prisoner, for reasons still best known to

22   him, engaged in a crime spree that included

23   murders, kidnapping -- kidnap, robberies, and

24   assault with a deadly weapon on a police

25   officer.  With regard to a previous record, we

26   find that there is an escalating pattern of

27   **MARK TITCH B-89549 DECISION PAGE 6 7/19/06**

*104*

103

1  criminal conduct and violence, history of

2  unstable and tumultuous relationships, a failure

3  of a previous grant of parole, and failure to

4  profit from society's previous attempts to

5  correct criminality, such attempts including

6  juvenile probation, parole, juvenile camp and

7  CYA commitments.  There are two 128 counseling

8  chronos, the last of which was in June of 2005,

9  and five serious 115 disciplinary reports, the

10  last of which was in February of 1986.  The

11  psychological report of July 2006 by Dr. Preston

12  was not supportive of release for all the

13  reasons read into the previous decision.  We do

14  find that you do have appropriate parole plans.

15  With regard to 3042 notices, we note that the

16  District Attorney from Orange County is here in

17  person by representative and does oppose parole,

18  as does the Anaheim Police Department who

19  opposes parole by letter, the Anaheim Police

20  Department being the law enforcement agency that

21  was responsible for the investigation of this

22  crime.  With regard to recommendations, the

23  Panel recommends that you become and remain

24  disciplinary free, that includes 128s and

25  everything, that you, as available, continue to

26  participate in self-help programs, and that you

27  **MARK TITCH B-89549 DECISION PAGE 7 7/19/06**

*105*

104

1    earn positive chronos.  Commissioner, do you

2    have anything else that you would like to add?

3        **DEPUTY COMMISSIONER ARMENTA:**  No.

4        **PRESIDING COMMISSIONER DAVIS:**  All right.

5    With that, Mr. Titch, we do want to wish you the

6    best of luck.  Continue on the path that you're

7    on.  I know that it's difficult, but it's

8    something that you're just going to have to do.

9    And we are adjourned.

10

11

12

13

14

15

16

17

18

19

20

21

22

23    **PAROLE DENIED TWO YEARS.**

24    **THIS DECISION WILL BE FINAL ON:**_____NOV 1 6 2006_____

25    **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26    **DATE, THE DECISION IS MODIFIED.**

27    **MARK TITCH B-89549 DECISION PAGE 8 7/19/06**

106

105

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, STACY WEGNER, a duly designated transcriber,

PETERS SHORTHAND REPORTING, do hereby declare and

certify under penalty of perjury that I have

transcribed tape(s) which total two in number and

cover a total of pages numbered 1 - 104, and which

recording was duly recorded at R.J. DONOVAN

CORRECTIONAL FACILITY, SAN DIEGO, CALIFORNIA, in the

matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING

OF MARK TITCH, CDC NO. B-89549, ON JULY 19, 2006, and

that the foregoing pages constitute a true, complete,

and accurate transcription of the aforementioned tape

to the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated November 7, 2006, at Sacramento,

California.


STACY WEGNER
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

107

**EXHIBIT 47**

Yellen v. Butler

**FILED**

FEB 2 3 2004

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNI.

_____

1
2
3
4
5
6
7

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MIKE YELLEN,

               Petitioner,

    vs.

DIANE BUTLER, et al.,

               Respondents.

_____/

No. CIV S-01-2398 MCE GGH P

ORDER AND

FINDINGS AND RECOMMENDATIONS

I. BACKGROUND

        Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On October 1, 2003, the district court granted petitioner's writ of habeas corpus application in part as to petitioner's due process claim that there was not sufficient evidence to support the 1999 decision finding him unsuitable for parole. It was also ordered that within thirty days of that order, petitioner was to be given a parole date, assuming his record remained substantially unchanged from the time of the 1999 hearing. The petition was denied in all other respects. Judgment was entered on October 2, 2003. On October 30, 2003, respondent filed a notice of appeal, and on October 31, 2003, respondent filed an application for stay of the order and judgment. Petitioner filed an opposition and motion for

1

1    immediate release on November 3, 2003, based on respondent's violation of the district court

2    order requiring respondent to set a parole date.[1]  The parties have since filed further requests for a

3    ruling on their respective motions.[2]

4          By separate order on February 4, 2004, the district court granted respondent's

5    request for a stay of the order and judgment pending appeal without prejudice to a later decision

6    on petitioner's motion for release, and referred petitioner's motion for release to the undersigned.

7    That motion is before the court.  In considering the motion, this court on February 5, 2004, issued

8    an order to show cause why the temporary stay granted on February 4, 2004, should not be

9    dissolved as moot due to respondent's apparent inconsistency in requesting a stay while the

10   Board of Prison Terms ("BPT") was acting to grant a parole date.  Respondent filed a response

11   on February 17, 2004.

12         Respondent's response and petitioner's recent filings indicate the following

13   proceedings which have transpired since the judgment was entered.  On December 23, 2003, the

14   BPT held a parole hearing in which it issued a proposed decision granting petitioner a parole

15   date.[3]  On February 10, 2004, the BPT disapproved the proposed decision after an en banc

16   hearing.  Respondent's Response, filed February 17, 2004, Exhs. B, C.  Although the printed

17   decision states that a re-hearing would be scheduled on the next available calendar, respondent

18   represents that in light of the court ordered stay, the BPT would not hold a re-hearing.

19   \\\\\

20   _____

21      [1]   Petitioner filed a renewed motion on January 5, 2004.

22      [2]   The snafu regarding respondent's initial and subsequent motions may stem in large part from respondent counsel's failure to utilize the correct district judge initials.  This is a MCE

23   case not a LKK case.  Failure to identify the correct district judge can lead to distribution problems including an unwarranted shelf-life for motions.

24      [3]   Although the BPT found petitioner suitable for parole and stated it was setting a parole date, an actual date was not given at that time.  This decision was stamped "pending review and

25   approval."  Petitioner's supplemental motion, filed January 28, 2004, Exh. A.  See also

26   Petitioner's motion for immediate release, filed January 5, 2004, Exh. B (notifying petitioner that the decision would be reviewed and if approved, a copy of the final decision would be sent to petitioner within thirty days).

2

Having now reviewed the parties' filings, the court denies petitioner's motions for release, and recommends that the judgment in this case not be stayed and the stay entered February 4, 2004 be dissolved.

## II. ISSUES TO BE DECIDED

Respondent professes initial confusion regarding the issues to be decided by the undersigned indicating that it should be "allowed to rely on the finality of this Court's grant of the stay," and that a release of petitioner would be inconsistent with a stayed judgment. Respondent would be correct if the stay had been intended to be final. However, as respondent observed, since the matter of considering petitioner's release would be inconsistent with a stayed judgment, it is only correct to view the previous grant of the stay as temporary, which was to be reconsidered at the time petitioner's motion for immediate release was considered. No other interpretation of the district judge's order would be logical.[4] Therefore, both the potential release and continued stay are issues to be decided.

## III. MAGISTRATE JUDGE'S JURISDICTION

This court must always be cognizant of its own jurisdiction to enter orders as opposed to Findings and Recommendations. See, 28 U.S.C. § 636(b)(1)(A) and § 636(b)(1)(B). The instant case was referred for all purposes to the undersigned pursuant to Local Rule 302 of the Eastern District of California. E.D. Local Rule 72-302(c)(17). That Local Rule has been universally interpreted in this district as requiring magistrate judges to initially adjudicate all aspects of a prisoner's habeas corpus case. See also § 636(b)(1)(B). The statute and rule have also been interpreted as authorizing magistrate judges to issue orders under § 636(b)(1)(A) for non-dispositive motions or motions not involving injunctive relief. See also, United States v. Raddatz, 447 U.S. 667, 673, 100 S. Ct. 2406 (1980) (magistrate judge may decide any pretrial matter except "dispositive" motions).

---

[4]    In addition, the undersigned asked for briefing concerning possible mootness of any stay given that the BPT had initially effectuated the judgment.

1    As in nearly all rulings of magistrate judges pursuant to § 636(b)(1)(A), parties are

2 told to do something or not do something.  For example, parties are compelled to answer

3 interrogatories, produce documents, attend a deposition at a certain time and place, pay sanctions,

4 precluded from using documents and so forth.  No one would think of asserting that such non-

5 dispositive orders are invalid because they command or disallow the performance of a certain

6 activity.  Therefore, the fact that parties are directed in their activities by a magistrate judge

7 cannot, without more, transform the matter at hand into an "injunctive" relief matter governed by

8 § 636(b)(1)(B).  See, e.g., Grimes v. City and County of San Francisco, 951 F.2d 236 (9th Cir.

9 1991) (magistrate judge may compel a party to pay prospective sanctions of $500.00 per day

10 during period of non-compliance with discovery orders to ensure compliance); Rockwell Intern.

11 Inc., v. Pos-A-Traction Industries, 712 F.2d 1324 (9th Cir. 1983) (magistrate judge may order

12 witnesses to answer questions); New York v. United States Metals Roofing Co., 771 F.2d 796

13 (3rd Cir. 1985) (magistrate judge may prevent a party from releasing discovery information to the

14 public; specifically held not to be an injunction beyond authority of magistrate judge); Affeldt v.

15 Carr, 628 F. Supp. 1097, 1101 (N.D. Oh. 1985) (issuance of gag orders and disqualification of

16 counsel are duties permitted to a magistrate judge).  It is only when the "injunctive" relief sought

17 goes to the merits of plaintiff's actions or to complete stays of an action that orders under

18 §636(b)(1)(A) are precluded.  See. e.g. Reynaga v. Cammisa, 971 F.2d 414 (9th Cir. 1992);

19 compare, State of New York, 771 F.2d at 801 (orders which restrain or direct the conduct of the

20 parties are not to be characterized as an appealable injunction beyond the authority of the

21 magistrate judge unless the restraint goes to the merits of the action).  See also Tam v. INS, 14 F.

22 Supp. 2d 1184 (E.D. Cal. 1998) (the undersigned ordered petitioner released on conditions

23 pending a decision in a habeas corpus action).

24    Local Rule 72-302(a) provides that a magistrate judge should "perform all duties

25 permitted by 28 U.S.C. § 636(a), (b)(1)(A), or other law where the standard of review of the

26 \\\\\

4

1  Magistrate Judge's decision is clearly erroneous or contrary to law." The rule specifically states

2  that such authority is not limited to the specific duties delineated in the rule.

3        While § 636(b)(1)(B) precludes a magistrate judge from determining a motion for

4  injunctive relief, it does not preclude a magistrate judge from ordering a prisoner released

5  pursuant to Fed. R. App. P. 23(c), see infra. Rule 23(c) does not preclude a magistrate judge

6  from acting by order.

7        A habeas corpus action is a quasi-criminal action. Magistrate judges decide

8  matters relating to bail in criminal cases by order as a matter of course. No court has ever held

9  that such is a "dispositive" order. Deciding whether petitioner gets bail pending appeal similarly

10 does not dispose of this case. It merely determines whether to release petitioner pending a court

11 of appeals ruling on the case itself. When there is no principled basis for the distinction between

12 the magistrate judge authority in criminal cases and habeas corpus cases, the magistrate judge

13 should act by order. In either case, the order of the magistrate judge is not dispositive to the

14 merits. The law has not become so illogical such as to warrant the magistrate judge "ordering"

15 release on bail or other conditions in a criminal action, but to deny the magistrate judge the same

16 authority to release, or deny a request for release, on bail or conditions in a habeas corpus action.

17 Therefore, the court will decide petitioner's motion for release by order.

18       In regard to the matter of dissolving the stay granted to respondent, because that

19 stay of judgment was ordered by the district court, the undersigned may not override that order by

20 another order, and will make findings and recommendations.

21 **IV. PETITIONER'S MOTION FOR RELEASE**

22       Fed. R. App. P. 23 provides in part:

23 (c) Release Pending Review of Decision Ordering Release.
   While a decision ordering the release of a prisoner is under review,

24 the prisoner must - unless the court or judge rendering the decision,
   or the court of appeals, or the Supreme Court, or a judge or justice

25 of either court orders otherwise - be released on personal
   recognizance, with or without surety.

26

5

1         The filing of respondent's appeal does not divest this court of jurisdiction to

2   determine petitioner's motion for release.  <u>Stein v. Wood</u>, 127 F.3d 1187, 1190 (9th Cir. 1997).

3          The plain language of Rule 23 gives the district court jurisdiction

                concurrent with the appeals court over the custody of a habeas

4          petitioner.  As the Supreme Court has made clear, a district court

                has broad discretion in conditioning a judgment granting habeas

5          relief, including whether or not to release a prisoner pending

                appeal.

6

7   <u>Id.</u>, citing <u>Hilton v. Braunskill</u>, 481 U.S. 770, 775, 107 S. Ct. 2113, 2118-19 (1987).  <u>See also</u>

8   <u>Foster v. Lockhart</u>, 9 F.3d 722, 727  (8th Cir.1993) (finding that "[f]ederal district courts have

9   power to order a successful state habeas petitioner's release with or without bail .... " and citing

10  Fed. R. App. P. 23(c) ).

11         Therefore, the motion for release should be determined under appellate Rule 23.

12         "Rule 23(d) creates a presumption of correctness for the order of a district court

13  entered pursuant to Rule 23(c), whether that order enlarges the petitioner or refuses to enlarge

14  him, but this presumption may be overcome in the appellate court 'for special reasons shown.'"

15  <u>Hilton</u>, 481 U.S. at 774, 107 S. Ct. at 2118 (quoting Rule 23(d)).  Although subsection (c) creates

16  a presumption of release from custody, it specifically states that a judge may otherwise order.  A

17  district court has broad discretion in conditioning its judgments in habeas corpus actions.  <u>Hilton</u>,

18  481 U.S. at 775, 107 S. Ct. at 2118.  "Federal courts are authorized, under 28 U.S.C. § 2243, to

19  dispose of habeas corpus matters 'as law and justice require.'"  <u>Id.</u>

20         Such discretion is especially important in the unique circumstances of this case.

21  This case does not present the ordinary situation where a conviction has been "overturned" by a

22  district court judgment, and if upheld by the appellate court, the petitioner is in the same position

23  he would be prior to his state trial.  In such an ordinary situation, bail is appropriately the

24  presumption for such "pre-trial detainees."  However, in this case, petitioner Yellen was not

25  entitled to be "retried or released," at best, he was only entitled to the actual setting of a parole

26  date.  This setting does not guarantee his immediate release.

1    The instant case did not involve a finding by this court that parole was to be set on

2  a date certain—it involved a finding that the BPT and state court's refusal to find parole

3  eligibility was unreasonable. Parole eligibility is only the first step in the parole of

4  indeterminately sentenced prisoners; a parole date must be calculated according to state law

5  regulatory matrices.  If, however, petitioner's actual parole date would, with reasonable

6  certainty, coincide with the eligibility finding (which might happen in situations where parole

7  eligibility was unjustly delayed), release on bail pending appeal could well be appropriate. The

8  court cannot find that petitioner would be entitled to parole at the present time.  The

9  aforementioned matrices do not involve calculations ordinarily within the ken of this federal

10  court, and petitioner's papers, although establishing a possibility of immediate parole, are

11  insufficient to convince this court that the judgment of this court regarding parole eligibility

12  would require such a finding.

13    Therefore, the court will not order the immediate release of petitioner on bail at

14  this time.

15  V. CONTINUED STAY OF JUDGMENT

16    In the circumstances of this case, the propriety of a continued stay is not the

17  mirror image of the release issue.  While petitioner is not entitled to immediate release, whether

18  the BPT should remain entirely inactive with respect to setting a date is a different matter.  And,

19  as the facts indicate, BPT has acted both to set a date in conformance with the judgment and has

20  retracted such action as well.  In deciding the propriety of the continued stay, the court will

21  utilize the standards set forth by the Supreme Court.

22    The rules governing a stay of judgment on appeal are found in Fed. R. Civ. P. 62.

23  In Hilton, the Supreme Court restated the traditional factors:

24    "(1) whether the stay applicant has made a strong showing that he is likely to

25  succeed on the merits;  (2) whether the applicant will be irreparably injured absent a stay; (3)

26  \\\\\

7

1  whether issuance of the stay will substantially injure the other parties interested in the

2  proceeding; and (4) where the public interest lies." Id. 481 U.S. at 776, 107 S. Ct. at 2119.

3               1. State's Likelihood of Success on Appeal / Substantial case on the Merits

4            In regard to this first factor, respondent argues that this court failed to apply the

5  appropriate standard of review under the Antiterrorism and Effective Death Penalty Act

6  ("AEDPA"). Respondent claims that this court did not explain how the state court's decisions

7  were "clearly contrary to" or an "objectively unreasonable application of" controlling supreme

8  court authority, but instead granted habeas relief on the grounds expressly rejected by the state

9  courts. Respondent states that the Board's hearing decision need be based only on some

10  evidence, which the hearing transcript shows. Resp. Memo of P & A, filed May 30, 2002, Exh.

11  E. Specifically, respondent states that the circumstances of the crime and petitioner's description

12  of his responsibility for the crime meet the some evidence standard.

13            Respondent takes objection with this court's findings and recommendations in

14  which it was noted that the circumstances of petitioner's crime will never change. Respondent

15  claims that consideration of the facts of the crime are not prohibited from consideration by the

16  Board in deciding parole. Under California law, respondent argues that the commitment offense

17  may be the sole reason to deny parole. Respondent also attempts to distinguish McQuillion v.

18  Duncan, 306 F.3d 895 (9th Cir. 2002) and Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003).

19            The state has not shown that it would likely be successful on appeal or that it has a

20  substantial case on the merits. Respondent's arguments are simply a rehash of arguments

21  previously addressed in the findings and recommendations. AEDPA deference does not mean

22  that state court decisions are never subject to being overturned in federal habeas. Respondent

23  suggests that the Ninth Circuit's opinion in Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003),

24  that continued reliance on an unchanging factor such as the circumstances of the offense can

25  result in a due process violation, was dicta.

26  \\\\\

8

1    Specifically, respondent takes issue with this court's rejection of BPT's mantra-

2 like invocation of the gravity of the offense criteria. The Ninth Circuit cautioned the BPT

3 regarding its continued reliance on the gravity of the offense and petitioner's conduct prior to the

4 offense:

> As in the present instance, the parole board's sole supportable reliance on the
> gravity of the offense and conduct prior to imprisonment to justify denial of parole
> can be initially justified as fulfilling the requirements set forth by state law. Over
> time, however, should Biggs continue to demonstrate exemplary behavior and
> evidence of rehabilitation, denying him a parole date simply because of the nature
> of his offense would raise serious questions involving his liberty interest.

9 Biggs, 334 F.3d at 916.

10 The Ninth Circuit continued that "[a] continued reliance in the future on an unchanging factor,

11 the circumstance of the offense and conduct prior to imprisonment, runs contrary to the

12 rehabilitative goals espoused by the prison system and could result in a due process violation."

13 Id. at 917.

14    The Ninth Circuit's opinion is simply an expression of common sense. The way

15 in which a murder is carried out speaks much, *initially*, to a person's propensity to continue with

16 acts of senseless violence. What is important for the BPT to figure out in a parole suitability

17 context is whether a prisoner may still possess that state of mind. The more senseless the initial

18 crime, the more likely that the prisoner has the potential for more senseless acts. However, when

19 a prisoner demonstrates by his conduct over time, in a place that is undeniably difficult in terms

20 of restraining oneself from further violent acts, that he can indeed refrain from senseless acts of

21 violence, the significance of the *potential* for violence as an inference from the facts of the crime

22 substantially evaporates. Long term conduct reaching into the present time speaks much louder

23 for predictive purposes than an inference drawn from long ago, unchanging facts.

24    Refusing to acknowledge common sense in this case, respondent attempts to

25 justify the BPT's continued reliance on the facts of the crime in one BPT parole eligibility

26 hearing after another. This court had determined that enough was enough, and refused to further

1   sanction such a rejection of common sense.  Yellen has been a model prisoner, has undergone

2   several parole eligibility hearings, and has been incarcerated for over twenty years (at present),

3   and approximately seventeen at the time of his eligibility hearing in question.  In essence, this

4   court determined that in light of the well established facts, the serious character of the crime

5   would never change, and to continue to invoke it as a reason to deny eligibility would transform

6   Yellen's sentence into one in which parole could never be granted, except when some board in

7   the future decided, arbitrarily and at odds with the facts, that maybe the crime wasn't so serious

8   after all.  In addition, this court determined that the BPT's "needs more therapy" justification was

9   so contradicted by the facts (even recited facts at the hearing) that parole eligibility could not

10  reasonably be upheld on that ground.[5]

11          In sum, there was no reasonable justification advanced previously for BPT's

12  denial of parole eligibility, and respondent's mere filing of a notice of appeal has not changed

13  _____

14  [5]The findings and recommendations set forth this information and is repeated here:
        Petitioner had no juvenile record and lacked any criminal history
15      other than some vehicle code violations.  Id., p. 13.  Petitioner had
        a classification score of zero.  Id., p. 18.  Petitioner was virtually
16      disciplinary free.  Id., p. 18.  Petitioner also had obtained
        substantial vocational training since being imprisoned and
17      completed his GED as well as participated in college programs.
        Id., pp. 19-20.  Petitioner participated in the Straight Life Program
18      and the Parole Recidivism Program, volunteered as a tutor in the
        Literacy Program, and completed the Anger Management Program.
19      Id., p. 20.  Petitioner had psychological reports stating that his
        violence potential upon release was average or lower than average.
20      Id., p. 23.  At the hearing, petitioner expressed remorse for his
        crimes.  Id. at 36.  A psychological report stated,
21
            There is no evidence of psychopathology or mental or
22      emotional problems of any kind that would preclude routine
        release planning in this case.  There is no evidence of emotional
23      problems that would require further diagnosis or participation in
        psychotherapy.  The prognosis of successful adjustment in this case
24      is very good.
25      Id., pp. 24-25.
26  Findings and Recommendations, filed August 20, 2003, at 11.

10

1  this fact.  While in many cases a district court's judgment may be subject to reasonable

2  arguments in support of overturning the judgment, this case does not appear to be in that genre.

        2. Irreparable Injury to the State

4        Respondent advances no meritorious argument that indicates that the mere setting

5  of a parole date while this case is pending on appeal would cause any harm, much less irreparable

6  harm. Respondent does not assert that petitioner would have his actual parole date calculated

7  such that he would be entitled to release during the pendency of appeal.

        3. Substantial Injury to Petitioner

9        Petitioner could be potentially, seriously impacted by a delay in setting his parole

10  date.  If the judgment were ultimately affirmed, the BPT could "start from scratch" and calculate

11  petitioner's parole date, not from 1999, or even the time that the district court judgment was

12  entered, but at the time the appellate mandate issued and/or after a petition for certiorari was

13  denied.  In addition, if BPT should change its current position with respect to calculating

14  petitioner's actual parole date, it might find that a reasonable calculation would indicate that

15  petitioner should be immediately placed on parole, in which case, petitioner could renew his

16  motion to be released pending appeal.

        4. The Public Interest

18        There appears to be no public interest in continuing a stay of the judgment in this

19  case.  The facts of this case are unique to this case, and to not warrant a finding that the public

20  interest, in general, would be impacted by having the BPT calculate and establish a parole date.

21  Neither BPT nor the courts will be flooded with applications for parole eligibility findings based

22  on the facts of this case.

23  VI.  CONCLUSION

24        Accordingly, IT IS HEREBY ORDERED that:

25        1.  Petitioner's motions for immediate release, filed November 3, 2003, and

26  January 5, 2004, are denied.

//

1        For the reasons stated within this opinion, IT IS HEREBY RECOMMENDED

2  that the judgment in this case not be stayed, and the stay entered February 4, 2004 be dissolved.

3        These findings and recommendations are submitted to the United States District

4  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within ten days

5  after being served with these findings and recommendations, any party may file written

6  objections with the court and serve a copy on all parties. Such a document should be captioned

7  "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections

8  shall be served and filed within five days after service of the objections. The parties are advised

9  that failure to file objections within the specified time may waive the right to appeal the District

10  Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

11  DATED: February 23, 2004.

12

13

14  GREGORY G. HOLLOWS.
      UNITED STATES MAGISTRATE JUDGE

15

16  GGH:076
      yell2398.rel

17

18

19

20

21

22

23

24

25

26

*12*

**FILED**

OCT - 1 2003

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

BY DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MIKE YELLEN,

        Petitioner,             No. CIV S-01-2398 MCE GGH P

      vs.

DIANE BUTLER, et al.,

        Respondents.            <u>ORDER</u>

_____/

      Petitioner, a state prisoner proceeding pro se, has filed this application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local General Order No. 262.

      On August 20, 2003, the magistrate judge filed findings and recommendations herein which were served on all parties and which contained notice to all parties that any objections to the findings and recommendations were to be filed within twenty days. Respondent Diane Butler has filed objections to the findings and recommendations.

      In accordance with the provisions of 28 U.S.C. § 636(b)(1)(C) and Local Rule 72-304, this court has conducted a <u>de novo</u> review of this case. Having carefully reviewed the entire file, the court finds the findings and recommendations to be supported by the record and by proper analysis.

13

1    Accordingly, IT IS HEREBY ORDERED that:

2        1.  The findings and recommendations filed August 20, 2003, are adopted in full;

3  and

4        2.  Petitioner's application for a writ of habeas corpus is granted as to petitioner's

5  due process claim that there was not sufficient evidence to support the 1999 decision finding him

6  unsuitable for parole; within thirty days of the date of this order, petitioner shall be given a parole

7  date, assuming his record remains substantially unchanged from the time of the 1999 hearing; the

8  petition is denied in all other respects.

9  DATED:  SEP 3 0 2003 .

10

11

12        MORRISON C. ENGLAND JR.
          UNITED STATES DISTRICT JUDGE

13

14  /ycll2398.806

2

**EXHIBIT 48**

Coleman v. BPT

**FILED**

DEC 2 2 2004

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____

United States District Court

Eastern District of California

| | |
|---|---|
| Melvyn H. Coleman, | No. Civ. S-96-0783 LKK PAN P |
| Petitioner, | Findings and Recommendations |
| vs. | |
| Board of Prison Terms, et al., | |
| Respondents. | |

-oOo-

Petitioner seeks a writ of habeas corpus.

In his November 14, 1997, second amended petition petitioner claims his federal due process guarantee was violated because the California Board of Prison Terms (Board) has failed to conduct a fair parole suitability hearing.

In 1974 petitioner was convicted of first degree murder, attempted murder, first degree robbery, first degree burglary and other charges. The victims, Mr. And Mrs. Siewart, returned to their home while petitioner was burglarizing it; he then

1 approached before they got out of their car and robbed and shot

2 them, killing Mr. Siewart and seriously wounding Mrs. Siewart.

3 Petitioner had a prior juvenile record.

4      Under California law, a prisoner including a convicted

5 murderer serving an indeterminate term (i.e., seven years to

6 life) is entitled to a hearing before a panel composed of members

7 of the Board to determine his suitability for parole.   By

8 statute, parole at some point normally is appropriate and the

9 Board "shall set a release date unless it determines that the

10 gravity of the current convicted offense or offenses, or the

11 timing and gravity of current or past convicted offense or

12 offenses, is such that consideration of the public safety

13 requires a more lengthy period of incarceration. . . ."  Cal.

14 Penal Code § 3041(b).  Procedures  governing suitability hearings

15 are set forth in Penal Code § 3041.5 (providing prisoners with

16 notice and an opportunity to be heard and requiring a written

17 statement of reasons if the panel refuses to set a parole date).

18 Regulations prescribe factors for the panel to consider in

19 determining whether each prisoner is suitable or unsuitable for

20 parole.   15 CAC § 2281.[1]

21 ─────────────────────

22   [1] Factors supporting a finding of unsuitability include: (1) whether the
prisoner's offense for which he is confined was committed in an "especially

23 heinous, atrocious or cruel manner"; (2) the prisoner's record of violence prior
to the offense; (3) whether the prisoner has an unstable social history; (4)

24 whether the prisoner has committed sadistic sexual offenses; (5) whether the
prisoner has a lengthy history of severe mental problems related to the offense;

25 and (6) whether the prisoner has engaged in serious misconduct in prison or jail.
Factors supporting a finding of suitability include: (1) whether the prisoner has

26 a juvenile record; (2) whether the prisoner has experienced reasonably stable
relationships with others; (3) whether the prisoner shows signs of remorse; (4)

1      Petitioner presents evidence that under Governors Wilson and

2  Davis the Board disregarded regulations ensuring fair suitability

3  hearings and instead operated under a sub rosa policy that all

4  murderers be found unsuitable for parole.  The record shows that

5  between 1992 and 1998 less than one percent of the prisoners in

6  this group were released on parole.  During the previous period

7  the parole rate had been about four percent.  Petitioner presents

8  sworn testimony that the policy was enforced by (1) appointing

9  Board members less likely to grant parole and more willing to

10  disregard their statutory duty; (2) removing Board members more

11  likely to grant parole; (3) reviewing decisions finding a

12  prisoner suitable and setting a new hearing before a different

13  panel; (4) scheduling rescission hearings for prisoners who had

14  been granted a parole date; (5) re-hearing favorable rescission

15  proceedings and hand-picking panels to ensure the desired

16  outcome; (6) panel members agreeing upon an outcome in advance of

17  the hearing; and (7) gubernatorial reversal of favorable parole

18  decisions.  See e.g., declaration of former BPT Commissioner

19  Albert Leddy (Leddy) paras. 5, 6, 8-17, 20 (attached as Ex. 17 to

20  petitioner's March 27, 2003, motion for discovery); deposition of

21  Leddy taken in In re Fortin, et al., San Diego Superior Court

---

23  whether the prisoner committed his crime as the result of significant stress in
   his life; (5) whether the prisoner suffered from Battered Woman Syndrome when she
24  committed the crime; (6) whether the prisoner lacks any significant history of
   violent crime; (7) whether the prisoner's present age reduces the probability of
25  recidivism; (8) whether the prisoner has made realistic plans for release or has
   developed marketable skills that can be put to use on release; and (9) whether
26  the prisoner's institutional activities indicate an enhanced ability to function
   within the law upon release.  15 CAC § 2281.

3

3

1  case number HSC10279 at 18-19, 47-50, 56-59, 61-63, 65-66, 88-89,

2  95, 97-99, 102, 106, 110, 118 & 126 (attached as Ex. 10 to

3  petitioner's March 27, 2003, motion for discovery); deposition of

4  former BPT Commissioner Edmund Tong taken in <u>Kimble v. Cal. BPT</u>,

5  C.D. Cal. case number CV 97-2752 at 42-43, 45-47, 71, 73, 80-82,

6  85-86, 96, 103, 105, 107 & 109 (lodged December 30, 2003).[2]

7          The unrefuted record shows the no-parole-for-murderers

8  policy existed and continued under Governor Davis. In <u>In re</u>

9  <u>Rosencrantz</u>, the California Supreme Court took note of evidence

10 presented in the state trial court establishing that the Board

11 held 4800 parole suitability hearings between January 1999

12 through April 2001, granting parole to 48 murderers (one

13 percent).  29 Cal. 4th 616, 685 (2003).  Of those 48, the

14 governor reversed 47 of the Board's decisions and only one

15 murderer out of 4800 actually was released on parole.  <u>Id.</u>

16 Petitioner in <u>Rosenkrantz</u> also submitted evidence of the

17 following interview of Governor Davis reflected in the April 9,

18 1999, edition of the Los Angeles Times: " . . . [T]he governor

19 was adamant that he believes murderers - even those with second-

20 degree convictions - should serve at least a life sentence in

21 prison. [Para.]  Asked whether extenuating circumstances should

22 _____

23      [2]  Meanwhile, the annual cost to taxpayers of conducting these "pro forma"
    hearings is enormous, amounting to millions of dollars per year.  <u>See</u> Exhibit 7
24  to petitioner's March 27, 2003, motion for discovery (California Legislative
    Analyst's Office - Analysis of the 2000-01 Budget Bill for the Board of Prison
25  Terms criticizing proposed $19 million annual budget and noting huge cost of
    additional incarceration resulting from no-parole policy).

26

4

1  be a factor in murder sentences, the governor was blunt: "No.

2  Zero . . .  They must not have been listening when I was

3  campaigning. . . .  If you take someone else's life, forget it.

4  I just think people dismiss what I said in the campaign as either

5  political hyperbole or something that I would back away from . .

6  . .  We are doing exactly what we said we were going to do."'"

7  29 Cal. 4th at 684.

8      Respondent does not refute the alleged facts.  Instead,

9  respondent argues that, assuming arguendo prisoners in California

10 have an interest in a parole date protected by the due process

11 clause, constitutional requirements are met so long as there is

12 "some evidence" supporting the findings petitioner is unsuitable.

13 See Oppo. at 7:20 (so long as "some evidence" standard is met,

14 "the Board decisions could not have been arbitrary.")  For the

15 reasons explained, this court rejects that claim.  As this court

16 previously has found, there always will be "some evidence" that

17 can be used to explain a denial or rescission under the

18 circumstances.  Federal due process requires more.

19     California's parole scheme gives rise to a protected liberty

20 interest in release on parole.  McQuillion v. Duncan, 306 F.3d

21 895, 902 (2002); Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389,

22 1390 (9th Cir. 1987); Greenholtz v. Inmates of Nebraska Penal &

23 Correctional Complex, 442 U.S. 1 (1979); Biggs v. Terhune, 334

24

25

26

5

1   F.3d 910, 915 (9th Cir. 2003); <u>In re Rosenkrantz</u>, 29 Cal. 4th 616

2   (2003).[3]

3       Therefore, petitioner is entitled to the process outlined in

4   <u>Greenholtz</u>, viz., notice, opportunity to be heard, a statement of

5   reasons for decision, and limited right to call and cross-examine

6   witnesses.  The determination that petitioner is unsuitable for

7   parole must be supported by some evidence bearing some indicia of

8   reliability.

9       These guarantees do not exhaust petitioner's right to due

10  process.  The fundamental core of due process is protection

11  against arbitrary action:

12      The principal and true meaning of the phrase has never
        been more tersely or accurately stated than by Mr.
13      Justice Johnson, in <u>Bank of Columbia v. Okely</u>, 17 U.S.
        235, 4 Wheat. 235-244, 4 L.Ed. 449 [(1819)]: "As to the
14      words from Magna Charta, incorporated into the
        Constitution of Maryland, after volumes spoken and
15      written with a view to their exposition, the good sense
        of mankind has at last settled down to this: that they
16      were intended to secure the individual from the
        arbitrary exercise of the powers of government,
17      unrestrained by the established principles of private
        right and distributive justice."
18
    <u>Hurtado v. California</u>, 110 U.S. 516, 527, (1884).  "The
19
    concessions of Magna Charta were wrung from the king as
20
    guaranties against the oppressions and usurpations of his
21

22  _____

23      [3] That is so because the parole statute, Penal Code § 3041, uses mandatory
    language ("The panel or board <u>shall</u> set a release date <u>unless</u> it determines"
24  further incarceration is necessary in the interest of public safety) which
    "'creates a presumption that parole release will be granted,'" unless the
25  statutorily defined determinations are made. <u>Board of Pardons v. Allen</u>, 482 U.S.
    369, 378 (1987) (quoting <u>Greenholtz</u>, 442 U.S. at 12).  As of 1988, by amendment
26  of the state constitution, a parole date given can be withdrawn by the Governor
    under the same factors considered by the Board.

                              6

1  prerogative."  _Id._ at 531.  "The touchstone of due process is

2  protection of the individual against arbitrary action of

3  government."  _Wolff v. McDonnell_, 418 U.S. 539, 558 (1974),

4  _citing_ _Dent v. West Virginia_, 129 U.S. 114 (1889).

5      A government official's arbitrary and capricious exercise of

6  his authority violates the essence of due process, contrary to

7  centureis of Anglo-American jurisprudence.  _See_ _Yick Wo v._

8  _Hopkins_, 118 U.S. 356, 369 (1886) ("When we consider the nature

9  and the theory of our institutions of government, the principles

10  upon which they are supposed to rest, and review the history of

11  their development, we are constrained to conclude that they do

12  not mean to leave room for the play and action of purely personal

13  and arbitrary power."); _United States v. Lee_, 106 U.S. 196, 220

14  (1882) ("No man in this country is so high that he is above the

15  law.  No officer of the law may set that law at defiance with

16  impunity.  All the officers of the government from the highest to

17  the lowest, are creatures of the law and are bound to obey it.

18  It is the only supreme power in our system of government, and

19  every man who by accepting office participates in its functions

20  is only the more strongly bound to submit to that supremacy, and

21  to observe the limitations which it imposes upon the exercise of

22  the authority which it gives."); _U.S. v. Nixon_, 418 U.S. 683,

23  695-96 (1974) (rule of law is "historic commitment"); _Accardi v._

24  _O'Shaughnessy_, 347 U.S. 260, 267-68 (1954) (Attorney General must

25  abide by regulations and cannot dictate immigration board's

26  exercise of discretion in decision on application to suspend

7

1  deportation; remedy is new hearing where board will exercise it's

2  discretion free from bias).

3    Concomitant to the guarantee against arbitrary and

4  capricious state action is the right to a fact-finder who has not

5  predetermined the outcome of a hearing.  See Withrow v. Larkin,

6  421 U.S. 35 (1975) (a fair trial in a fair tribunal is a basic

7  requirement of due process, and this rule applies to

8  administrative agencies which adjudicate as well as to courts);

9  Edwards v. Balisok, 520 U.S. 641 (1997) (recognizing due process

10 claim based on allegations that prison disciplinary hearing

11 officer was biased and would suppress evidence of innocence);

12 Bakalis v. Golembeski, 35 F.3d 318, 326 (7th Cir. 1994) (a

13 decision-making body "that has prejudged the outcome cannot

14 render a decision that comports with due process").

15    Courts too numerous to list have recognized that the right

16 to a disinterested decision-maker, who has not prejudged the

17 case, is part of the fundamental guarantee against arbitrary and

18 capricious government conduct in the California parole context.

19 See, e.g., Rosenkrantz, 29 Cal. 4th at 677 (parole decision "must

20 reflect an individualized consideration of the specified criteria

21 and cannot be arbitrary and capricious"); In re Ramirez, 94 Cal.

22 App. 4th 549, 563 (2001) ("some evidence" standard is "only one

23 aspect of judicial review for compliance with minimum standards

24 of due process" (citing Balisok) and Board violates due process

25 if its decision is "arbitrary and capricious"); In re Minnis, 7

26 Cal. 3d 639 (1972) (blanket no-parole policy as to certain

B

1  category of prisoners is illegal); In re Morrall, 102 Cal. App.

2  4th 280 (2003) (same). The guarantee of neutral parole officials

3  in a suitability hearing is just as fundamental as the right to a

4  neutral judge in a court proceeding. Compare Sellars v.

5  Procunier, 641 F.2d 1295 (9th Cir. 1981) (holding that California

6  parole officials, analogous to judges, are entitled to absolute

7  immunity).

8      The Ninth Circuit previously has acknowledged California

9  inmates' due process right to parole consideration by neutral

10  decision-makers. See O'Bremski v. Maas, 915 F.2d 418, 422 (9th

11  Cir. 1990). In that case the appellate court found that a

12  neutral parole panel at a new hearing would reach the same

13  outcome and so denied relief. The record in this case simply

14  will not permit the same conclusion. The requirement of an

15  impartial decision-maker transcends concern for diminishing the

16  likelihood of error. As the Supreme Court clearly held in

17  Balisok a decision made by a fact-finder who has predetermined

18  the outcome is per se invalid -- even where there is ample

19  evidence to support it. 520 U.S. at 648.

20      Petitioner presents a convincing case that a blanket policy

21  against parole for murderers prevented him from obtaining a

22  parole suitability determination made after a fair hearing.

23  Respondent offers nothing to counter petitioner's showing.

24      Accordingly, the court hereby recommends that the petition

25  for habeas corpus be granted unless, within 60 days of the

26  district court's adoption of these recommendations, respondent

1 │ provides a fair parole suitability hearing, conducted by a board
2 │ free of any prejudice stemming from a gubernatorial policy
3 │ against parole for murderers.
4 │     Pursuant to the provisions of 28 U.S.C. § 636(b)(1), these
5 │ findings and recommendations are submitted to the United States
6 │ District Judge assigned to this case.  Within 20 days after being
7 │ served with these findings and recommendations, respondent may
8 │ file written objections.  The document should be captioned
9 │ "Objections to Magistrate Judge's Findings and Recommendations."
10 │ The district judge may accept, reject, or modify these findings
11 │ and recommendations in whole or in part.
12 │     Dated: __DEC 2 1 2004__.
13 │
14 │                          Peter A. Nowinski
                         Magistrate Judge
15 │
16 │
17 │
18 │
19 │
20 │
21 │
22 │
23 │
24 │
25 │
26 │ cole0783.f&r grant

10

**EXHIBIT 49**

Irons v. Warden of Cal. State Prison-Solano

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                       EASTERN DISTRICT OF CALIFORNIA

10

11   CARL MERTON IRONS, II,

                                         NO. CIV. S-04-220 LKK/GGH P
12

            Petitioner,
13

        v.                                      O R D E R
14

     ARNOLD SCHWARZENEGGER,
15   Governor, et al.,

16          Respondents.

17   _____/

18        The court is in receipt of respondents' motion for a stay of

19   judgment in the above-captioned case.  Having reviewed respondents'

20   motion and petitioner's opposition, the court hereby ORDERS that

21   the judgment is STAYED for thirty (30) days to allow respondents

22   to seek a stay from the Court of Appeals.

23        IT IS SO ORDERED.

24        DATED:  February 11, 2005.

25                              /s/Lawrence K. Karlton
                                LAWRENCE K. KARLTON
26                              SENIOR JUDGE
                                UNITED STATES DISTRICT COURT

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

**JUDGMENT IN A CIVIL CASE**

**CARL MERTON IRONS II,**

CASE NO: 2:04−CV−00220−LKK−GGH

v.

**TOM L CAREY,**

_____

**XX** — **Decision by the Court.** This action came to trial or hearing before the Court. The issues
have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED

**THAT JUDGMENT IS HEREBY ENTERED IN ACCORDANCE WITH THE
COURT'S ORDER OF 01/19/05**

**Jack L. Wagner**
Clerk of the Court

ENTERED:     **January 19, 2005**

by: /s/ − N. Cannarozzi
Deputy Clerk

2

1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CARL MERTON IRONS, II,

11            Petitioner,                    No. CIV S-04-0220 LKK GGH P

12        vs.

13   WARDEN OF CALIFORNIA
     STATE PRISON-SOLANO, et al.,

14
              Respondents.                   ORDER
15   _____/

16            Petitioner, a state prisoner proceeding with counsel, has filed this application for a

17   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The matter was referred to a United States

18   Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local General Order No. 262.

19            On September 1, 2004, the magistrate judge filed findings and recommendations

20   herein which were served on all parties and which contained notice to all parties that any

21   objections to the findings and recommendations were to be filed within twenty days.  Both

22   parties have filed objection to the findings and recommendations.  Petitioner has filed a reply to

23   respondent's objections.

24            In accordance with the provisions of 28 U.S.C. § 636(b)(1)(C) and Local Rule 72-

25   304, this court has conducted a de novo review of this case.  Having carefully reviewed the

26   entire file, the court finds the findings and recommendations to be supported by the record and by

3

1  proper analysis.

2          Accordingly, IT IS HEREBY ORDERED that:

3              1. The findings and recommendations filed September 1, 2004, are adopted in

4  full.

5              2. The petition is granted as to the claim that there was not sufficient evidence to

6  support the 2001 decision finding petitioner unsuitable for parole; the petition is denied in all

7  other respects.

8              3. Within thirty days of the date of this order, assuming the commission of no

9  serious disciplinary infractions henceforth, especially infractions of a violent nature,  BPT is

10  ordered to calculate petitioner's release date, and petitioner is to be released on parole.

11          DATED:  January 18, 2005.

12                                          /s/Lawrence K. Karlton
                                            LAWRENCE K. KARLTON
13                                          SENIOR JUDGE
                                            UNITED STATES DISTRICT COURT

14

15  /iron0220.805

16

17

18

19

20

21

22

23

24

25

26

4

**FILED**

SEP - 1 2004

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
LY _____
                    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CARL MERTON IRONS, II,

          Petitioner,          No. CIV S-04-0220 LKK GGH P

    vs.

WARDEN OF CALIFORNIA
STATE PRISON-SOLANO[1], et al.,    ORDER AND

          Respondents.      FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas

corpus pursuant to 28 U.S.C. § 2254. In 1985, petitioner was convicted of second degree murder

and sentenced to seventeen years to life with a two year enhancement for use of a firearm.

Petitioner challenges the 2001 decision of the Board of Prison Terms (BPT) finding him

unsuitable for parole. This was petitioner's fifth parole suitability hearing.

---

[1] Previously named as respondent was Governor Arnold Schwarzenegger. The court
now substitutes in the correct respondent, the Warden of the California State Prison-Solano,
where petitioner is presently incarcerated. "A petitioner for habeas corpus relief must name the
state officer having custody of him or her as the respondent to the petition." Stanley v. California
Supreme Court, 21 F.3d 359, 360 (9th Cir. 1994) (citing Rule 2(a), 28 U.S.C. foll. § 2254).

5

1    The petition raises the following claims: 1) Cal. Penal Code § 3041 required the

2    BPT to set a parole date for petitioner; 2) petitioner's prison term was not proportionate to

3    persons committed for similar crimes in violation of the Equal Protection Clause; 3) petitioner

4    was found unsuitable pursuant to a no-parole policy; 4) the Superior Court abused its discretion;

5    and 5) there was not sufficient evidence to find petitioner unsuitable. *

6    On May 3, 2004, respondents filed an answer to the petition, attached to which are

7    various exhibits. On May 12, 2004, respondents filed an amended answer. The amended answer

8    refers to the exhibits attached to the original answer.

9    After carefully considering the record, the court recommends that the petition be

10    granted on grounds that there was not sufficient evidence to support the 2001 decision. The court

11    recommends that the petition be denied in all other respects.

12    II. Anti-Terrorism and Effective Death Penalty Act (AEDPA)

13    The AEDPA applies to this petition for habeas corpus which was filed after the

14    AEDPA became effective. Neeley v. Nagle, 138 F.3d 917 (11th Cir.), citing Lindh v. Murphy,

15    117 S. Ct. 2059 (1997). The AEDPA "worked substantial changes to the law of habeas corpus,"

16    establishing more deferential standards of review to be used by a federal habeas court in

17    assessing a state court's adjudication of a criminal defendant's claims of constitutional error.

18    Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

19    In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

20    Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion

21    for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy

22    between "contrary to" clearly established law as enunciated by the Supreme Court, and an

23    "unreasonable application of" that law. Id. at 1519. "Contrary to" clearly established law applies

24    to two situations: (1) where the state court legal conclusion is opposite that of the Supreme

25    Court on a point of law, or (2) if the state court case is materially indistinguishable from a

26    Supreme Court case, i.e., on point factually, yet the legal result is opposite.

2

6

1       "Unreasonable application" of established law, on the other hand, applies to

2   mixed questions of law and fact, that is, the application of law to fact where there are no factually

3   on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

4   Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the

5   AEDPA standard of review which directs deference to be paid to state court decisions. While the

6   deference is not blindly automatic, "the most important point is that an *unreasonable* application

7   of federal law is different from an incorrect application of law . . . . [A] federal habeas court may

8   not issue the writ simply because that court concludes in its independent judgment that the

9   relevant state-court decision applied clearly established federal law erroneously or incorrectly.

10  Rather, that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120

11  S. Ct. at 1522 (emphasis in original). The habeas corpus petitioner bears the burden of

12  demonstrating the objectively unreasonable nature of the state court decision in light of

13  controlling Supreme Court authority. Woodford v. Viscotti, ___U.S.___, 123 S. Ct. 357

14  (2002).

15      The state courts need not have cited to federal authority, or even have indicated

16  awareness of federal authority in arriving at their decision. Early v. Packer, ___U.S.___, 123

17  S. Ct. 362 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is

18  contrary to, or an unreasonable application of, established Supreme Court authority. Id. An

19  unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

20  occurred. Lockyer v. Andrade, ___U.S.___, 123 S. Ct. 1166, 1175 (2003). Moreover, the

21  established Supreme Court authority reviewed must be a pronouncement on constitutional

22  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

23  binding only on federal courts. Early v. Packer, 123 S. Ct. at 366.

24      However, where the state courts have not addressed the constitutional issue in

25  dispute in any reasoned opinion, the federal court will independently review the record in

26  adjudication of that issue. "Independent review of the record is not de novo review of the

3

1  constitutional issue, but rather, the only method by which we can determine whether a silent state

2  court decision is objectively unreasonable." Himes v. Thompson, ____ F.3d ____. 2003 WL

3  21544120 (9th Cir. 2003).

4        In this case, petitioner received a silent denial from the California Supreme Court.

5  Exhibit 2L of the answer reveals a short order by the Marin County Superior Court y concluding

6  that the BPT's 2001 decision was supported by substantial evidence. Answer, Exhibit 2L.

7  III. Background

8        The background of petitioner's offense is contained in the life prisoner evaluation

9  report prepared for petitioner's 2001 suitability hearing:

10        The defendant and victim both rented separate rooms from a
   couple who owned a house in the San Francisco area. The couple
11       also, lived at the residence. The couple suspected the victim of
          stealing various items from them and conveyed this to Irons. On
12       the night of March 9, 1984, Irons confronted the victim at the
          residence concerning the thefts and an argument ensued. The
13       victim denied responsibility for the thefts and went to his room.
          Irons went to his room, obtained a .22 caliber rifle, inserted an
14       ammunition clip and went downstairs to the victim's room. Irons
          called the victim's name and immediately fired 12 rounds of .22-
15       caliber ammunition into him. Irons entered the room and told the
          victim he was going to let him bleed to death. When the victim
16       complained of the pain, Irons took out his buck knife and stabbed
          him twice in the back. The victim was then rolled up into a
17       sleeping bag and locked into the room. Over the next 10 days,
          Irons attempted to borrow a car. On March 19, 1984, Irons was
18       able to borrow a friend's car. Irons wrapped a plastic drop cloth
          over the sleeping bag containing the body and then wrapped it in
19       wire mesh weighted with pieces of pipe. After placing the body in
          the car, Irons drove to an isolated coastal location, carried the body
20       into the surf as far as he could and released it.

21        On March 20, 1984, the body of the victim was found on the San
          Mateo County Coast. On March 30, 1984, the owner of the
22       residence, where Irons and the victim were residents, was going to
          be arrested as a result of an investigation by the San Mateo County
23       Sheriff's Department. At that point, Irons came forward and
          informed the detectives that he was the person they were looking
24       for. Irons was subsequently arrested, advised of his rights and
          made a statement.

25

26  Answer, Exhibit D.

8

IV. Discussion

    A. Sufficient Evidence

        Petitioner argues that there was not sufficient evidence to find him unsuitable for parole. California's parole scheme gives rise to a cognizable liberty interest in release on parole. Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003). "In the parole context, the requirements of due process are met if 'some evidence' supports the decision." Id. The evidence underlying the board's decision must have some indicia of reliability. Id.

        In Biggs, the Ninth Circuit indicated that a continued reliance on an unchanging factor such as the circumstances of the offense could result in a due process violation. Biggs was serving a sentence of twenty-five years to life following a 1985 first degree murder conviction. In the case before the Ninth Circuit, Biggs challenged the 1999 decision by the BPT finding him unsuitable for parole despite his record as a model prisoner. 334 F.3d at 913. While the Ninth Circuit rejected several of the reasons given by the BPT for finding Biggs unsuitable, it upheld three: 1) petitioner's commitment offense involved the murder of a witness; 2) the murder was carried out in a manner exhibiting a callous disregard for the life and suffering of another; 3) petitioner could benefit from therapy. 334 F.3d at 913.

        The Ninth Circuit cautioned the BPT regarding its continued reliance on the gravity of the offense and petitioner's conduct prior to the offense:

> As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of his offense would raise serious questions involving his liberty interest.

334 F.3d at 916.

        The Ninth Circuit stated that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs

5

9

1  contrary to the rehabilitative goals espoused by the prison system and could result in a due

2  process violation." 334 F.3d at 917.

3          The court now considers whether there was some evidence to support the finding

4  of the 2001 panel that petitioner was not eligible for parole. The relevant regulations provide as

5  follows.

6          Cal. Code Regs. tit. 15 § 2402 sets forth the criteria for determining whether an

7  inmate is suitable for release on parole. Circumstances tending to show unsuitability include, in

8  relevant part,

9          (1) Commitment Offense. The prisoner committed the offense in
           an especially heinous, atrocious or cruel manner. The factors to be
10         considered include:

11         *****

12         (B) The offense was carried out in a dispassionate and calculated
           manner, such as an execution-style manner.

13         *****

14         (D) The offense was carried out in a manner which demonstrates
           an exceptionally callous disregard for human suffering.

15

16         (E) The motive for the crime is inexplicable or very trivial in
           relation to the offense.

17         *****

18         (3) Unstable Social History. The prisoner has a history of unstable
           or tumultuous relationships with others.

19

20  Cal. Code Regs. tit. 15 § 2402 (c).

21         Circumstances tending to indicate suitability for parole include:

22         (1) No Juvenile Record. The prisoner does not have a record of
           assaulting others as a juvenile or committing crimes with a
23         potential of personal harm to the victims.

24         (2) Stable Social History. The prisoner has experienced reasonably
           stable relationships with others.

25         (3) Signs of Remorse. The prisoner performed acts which tend to
26         indicate the presence of remorse, such as attempting to repair the

10

damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for the Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome . . .

(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

(7) Age. The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

Cal. Code Regs. tit. 15 § 2402(d).

In finding petitioner unsuitable for parole, the panel found as follows:

Mr. Irons, this Panel has reviewed all information received from the public and relied on the following circumstances in concluding that you are not suitable for parole. And that you would pose an unreasonable risk of danger to society if released from prison at this time. In a unanimous decision, the Panel has-has given you a one year denial. Many factors were considered in coming to the decision. First and foremost was the commitment offense itself. This offense was carried out in an especially cruel and callous manner. The offense was carried out in a-in a calculated manner and also in a manner which demonstrates a callous disregard for human life. And the motive for this crime was trivial in relation to the offense. These conclusions are drawn from the Statement of Facts, wherein-wherein the prisoner reacted in a-in a violent manner when informed by his landlord that a co-tenant and acquaintance of the prisoner was stealing from the landlord. This report angered the inmate and caused him to confront the victim in the victim's room. Words were exchanged, causing the inmate to-causing the inmate more anger. The inmate left the room, retrieved a rifle, returned to the victim's room and shot the victim 12 times. In addition, he also stabbed the-the victim twice with his buck knife. The inmate then wrapped the body in a sleeping bag, left the body in the victim's room and-for about 10 days before disposing of the dead body in the ocean. When he disposed the

7

1    body, he prepared the body for disposal by wrapping the body with
2    a plastic drop cloth and wire mesh weighted down with pieces of
     pipe. During this hearing, the inmate said he planned to get away
3    with the murder and probably would have, if not for the imminent
     arrest of a–an innocent party, which caused the inmate to–to
4    confess to the authorities regarding his responsibility for this–for
     this crime. The inmate's actions resulted in the demise of a human
5    being. The–the inmate has no–has minimal prior criminality and I
     note there are no convictions. He did have an unstable social
6    history and I'm referring to his drug use at the time of the–of the
     commitment offense. He's done well while incarcerated. His
7    psychiatric reports are good. His parole plans are good. There is
     no opposition from the District Attorney towards parole in this
8    matter. And this Panel makes the following findings: That the
     prisoner needs therapy and continued participation in self-help
9    programming in order to face, discuss, understand and cope with
     stress in a nondestructive manner. The prisoner's gains are
10   appreciated by this Panel and he must continue the path that he's
     on. And he should be commended for a large number of things.
11   He has participated in a number–to his credit, in a number of self-
     help programming, and I'll name just a few. The–The Alternatives
12   to Violence, I think there are three different phases of it, the
     KAIROS Program, and also, he was –he was an active participant
13   in the Gavel Club, a Toastmaster organization, and took part in
     Breaking Barriers, took part in the walkathon. He obtained his
14   GED, I believe, while incarcerated. And he hasn't had any
     115s–he's had one 115 during his incarceration and that was back
15   in–on November 2nd, 1985, and has had no 128s. However, the
     positive aspects of his behavior do not outweigh the factors of his
16   unsuitability. This Panel recommends that the prisoner remain
     disciplinary free and that, if available, continue his participation in
17   self-help and therapy programming. And one of the–well, there's a
     number of things we consider, as I said earlier, Mr.–Mr. Irons, one
18   of the things that caused me concern was some of your responses
     to the questions, even when your counsel asked you. I think you
19   were asked by your counsel whether a–a situation like this would
     happen again, whether you would kill somebody. And I think you
20   said, I don't think so. I'm not–that's not a very convincing reply,
     to me, personally, and I–I think you're a sincere person and I
21   certainly appreciate your–your forthrightness and your candor in
     this–in this hearing but as I indicated, I don't think you're quite
22   ready for parole. I think it–it would be some time in the near
     future. I think you've heard me say that before, and hopefully the
23   outcome of this hearing won't cause you any bitterness. I know
     you're disappointed. And you will continue to do what you're
     doing.

24

25   Respondent's Answer, Exhibit B.

26   /////

8

12

1    In finding petitioner unsuitable for parole the panel relied on the circumstances of

2  the commitment offense. In particular the BPT stated that the offense was carried out in a

3  calculated manner, demonstrated a callous disregard for human life, and that petitioner's motive

4  for the crime was trivial. The panel also stated that at the time of the offense, petitioner had been

5  using drugs.

6    All other factors weighed in favor of finding petitioner suitable for parole.

7  Petitioner had no juvenile record. Respondent's Answer, Exhibit D. See Cal. Code Regs. tit. 15,

8  § 2402(d)(1) (no juvenile record tends to show suitability). In addition, petitioner had a stable

9  social history. See Cal. Code Regs. tit. 15, § 2402(d)(2) (stable social history tends to show

10 suitability). The panel noted that petitioner came from a relatively stable home, although his

11 father died when he was twelve. Respondent's Answer, Exhibit C, p. 20. Although petitioner

12 was twice divorced with a twenty-five year old son with whom he was in contact, Id., pp. 27-38,

13 this court would not characterize these circumstances as being the type of unstable social history

14 on which to find a prisoner unsuitable for parole.

15    At the hearing, petitioner discussed his remorse. See Cal. Code Regs. tit. 15,

16 § 2402(d)(3) (presence of remorse indicated by understanding nature and magnitude of offense

17 tends to show suitability). Petitioner told the panel that he wished he could go back and change

18 what happened. Id., p. 17. He stated that he had been motivated by arrogance induced by his

19 lifestyle at the time. Id. He was not working steadily and had lost his spiritual values. Id., p. 18.

20    Petitioner's criminal history was minimal. See Cal. Code Regs. tit. 15,

21 § 2402(d)(6) (lack of any significant history of violent crime tends to show suitability). In 1971,

22 petitioner was arrested for refusing to submit to induction. Respondent's Answer, Exhibit D. He

23 was not convicted of this offense. Id. In 1983, petitioner was arrested for possession of cocaine

24 and possession of a hypodermic needle. Id. These charges were dismissed for lack of evidence.

25 Id.

26 /////

13

1    Petitioner had realistic plans for the future. See Cal. Code Regs. tit. 15,

2  § 2402(d) (realistic plans or development of marketable skills tends to show suitability).

3  Petitioner told the panel that upon release he planned to use the services of Samaritan House in

4  San Mateo, which appears to be a half-way house. Respondent's Answer, Exhibit C, p. 28.

5  Petitioner could also live with his mother in El Dorado County. Id. Petitioner also had a letter

6  from Illuminata Films in Sausalito. Id., p. 32-33. The letter, written by Executive Producer Ann

7  Rogers, stated that she met petitioner in 1999 when she volunteered with the Alternatives to

8  Violence Project at San Quentin. Id., p. 33. She agreed to pay petitioner $15.00 an hour for 30

9  hours a week to provide computer and office assistance to Illuminata. Id. She wrote, "Carl's

10  computer skills and gifted writing ability will be a tremendous asset to our operation. In

11  addition, Carl is welcome to occupy the extra bedroom in my Mill Valley home, if that suits his

12  parole specifications." Id., pp. 33-34.

13        The psychological report prepared by Dr. Flax in 1999, which the 2001 panel

14  considered, indicated that petitioner was suitable for parole. See Respondent's Answer, Exhibit

15  C, p. 25 (discussion of Flax report by panel). See Cal. Code Regs. tit. 15, § 2402(c)(5) (lengthy

16  history of severe mental problems related to offense tends to show unsuitability). A copy of this

17  report is attached to the answer as Exhibit E. Dr. Flax concluded,

18        It appears to this writer that Mr. Irons possesses the skills,
      maturity, and social support necessary to be successful if released
19    to the community. He has grown up in many ways throughout his
      years in prison and has developed plans for his future life as a law-
20    abiding citizen in the community.

21        The panel also referred to the Life Prisoner Evaluation Report prepared by prison

22  Counselor Sorgdrager for petitioner's 2001 suitability hearing. Id., p. 23 (discussing report). This

23  report supported a finding that petitioner was suitable for parole based on his conduct in prison.

24  See Cal. Code Regs. tit. 15, § 2402(c)(6) (serious misconduct in jail tends to show unsuitability).

25  A copy of this report is attached to respondent's answer as Exhibit D. In this report Counselor

26  Sorgdrager described petitioner's custody history:

10

14

> Irons was originally received in CDC on 05/08/85. He was processed through the Northern Reception Center at the California Medical Facility and then transferred to the Correctional Training Facility for Level IV programming. He was subsequently transferred to California Medical Facility-South for Level III programming and was transferred to San Quentin (SQ)-II for Level II programming on 03/26/93. His initial review established his custody at Close B due to the length of his term. Iron's custody was reduced to Medium A on 06/06/88 due to his positive programming and he has maintained Medium A custody since that time. Irons has held clerical positions in the following areas: Assignment Lieutenant's office, Computer Room, Procurement, Education, Prison Industry Authority (PIA), Data Processing, Vocational Machine and is currently assigned to Vocational Printing. Irons has also completed a course in Electronic Data Processing. Work Supervisor Reports throughout his incarceration indicate above average to exceptional job performance.

Respondent's Answer, Exhibit D.

In his report Counselor Sorgdrager also noted that the probation officer's report indicated that petitioner tended to see people as either friends or enemies, and that he clearly viewed the couple who owned the house as friends. Id. Counseler Sorgdrager states, "This is probably the most significant factor that led to his commission of this crime." Id. The panel asked petitioner if he agreed with this observation. Respondent's Answer, Exhibit C, p. 21. Petitioner responded that there was some truth to it. Id. He told the panel that he tends to be very loyal to his friends. Id. He also stated, "To at least some extent, I've learned that I don't have to get along with everybody in the world and that doesn't mean that they're my enemy. We just can go our separate ways." Id. The court does not find that the counselor's observation and petitioner's response in any way undercut Dr. Flax's conclusion that petitioner was suitable for release.

Counselor Sorgdrager's report also described petitioner's therapy and self help activities:

> Irons has participated in the following programs: Alcoholics Anonymous 05/90, 05/91; Men's Violence Prevention Seminar (ten weekly sessions) 07/92; Breaking Barriers 08/92; Victim/Offender Reconciliation Group 12/92; Gavel Club, 12/94-02/99; Walk-A-Thon '96, 05/96; Alternatives to Violence, 08/96;

15

1    Advance Alternative to Violence, 12/96; and Alternatives to
     Violence Training for Co-facilitators Workshop, 07/97. Basic
2    Alternatives to Violence Inside Co-facilitator 7/98, 10/98, 5/99,
     4/00, 6/00, Spirituality Class 4/99, 10/99 Irons has certificates in
3    completion in the following areas: Electric Data Processing
     6/21/90; Principle Copy Planning 6/30/97; Cold Type Composition
4    (Photo Typesetting) 9/30/97 Proofreading and Correction 12/31/97.

5    Respondent's Answer, Exhibit D.

6        In his report, Counselor Sorgdrager stated that petitioner had received one serious

7    CDC disciplinary report on November 2, 1985, for delaying close custody counts. Id. No other

8    disciplinary report were noted. Id.

9        In his summary, Counselor Sorgdrager concluded that petitioner would pose a low

10   degree of threat to society if paroled:

11       Irons behavior while incarcerated has been conforming and his
         programming has been exceptional. He maintains an excellent
12       rapport with both staff and inmates and constantly strives toward
         personal growth.
13
         The callousness of Irons crime cannot be overlooked. However,
14       the major changes in his violence potential, as documented in his
         psychiatric reports, cannot be diminished nor denied.
15
         In his first psychiatric report dated 01/24/89, Dr. Martin
16       documents, "If he is to be released, I feel that his potential for
         violence is greater than that of the average inmate because of his
17       not coming to terms with his crime and its meaning for him."
         Whereas, in Irons most recent psychiatric report dated 07/15/99,
18       Dr. Flax states, "It appears to this writer that Mr. Irons possess the
         skills, maturity, and social support necessary to be successful if
19       released to the community. He has grown in many ways
         throughout his years in prison . . . ." Under the category labeled, If
20       Released to the Community; Dr. Flax writes, Mr. Irons gives no
         indication of being dangerous if released to the community. It also
21       cannot be ignored that the investigating Detective Sergeant, on
         Irons case, stated in court that he did not feel that Irons would be a
22       threat in the future. This was stated on May 1, 1985, fifteen (15)
         years ago. After spending 15 years being involved in self-help
23       groups, alternatives to violence groups, and other non-violence
         oriented groups, I feel that statement is truer now then it was at the
24       time the Detective Sergeant uttered it.

25   /////

26   /////

                                   12

16

1  Taking into account the commitment offense, the minimal criminal
   history adjustment to prison, programming efforts, and the
2  psychological report dated 07/15/99. by Dr. Flax. I believe that
   Irons will pose a low degree of threat to society if paroled.

3

4  Respondent's Answer, Exhibit D.

5         The Deputy District Attorney attending petitioner's 2001 suitability hearing stated

6  that his office would submit the issue to the discretion of the panel.  Respond

7  Exhibit C, p. 49.  In other words, the District Attorney's Office did not oppos

8  suitability.

9         In finding petitioner unsuitable, the panel stated that it was troubled by

10  petitioner's response to questions from his counsel asked during the hearing regarding whether

11  he would kill somebody again.  The panel stated that petitioner's answer of "I don't think so"

12  was not very convincing.  The court will set forth below the exchange the panel is referring to:

13      Attorney:  You gave the impression, in response to one of the
        questions, almost that if it wasn't [the victim], that it might have
14      been somebody else.  Was that the impression that—that you made,
        or intended to give?

15      Petitioner:  Looking back on it, after the fact, I–now, I guess that
16      those two questions relate to each other.  Looking back, I realize
        that I was responsible.  And in that sense, it could have been
17      somebody else.  I mean, I don't mean I was going to kill somebody
        at random, but the circumstances–some set of circumstances that
18      led me to that rage, I was primed for it.  I was–I had let myself
        become that person who could kill and it could have been
19      somebody else.  I'm fortunate that it wasn't.

20      Attorney:  Do you have any of that rage now?

21      Petitioner:  *I don't think so.*  I try to make a real effort to examine
        my motives, to look inside of myself . . .

22

23  Respondent's Answer, Exhibit C, pp. 45-46.

24         The court does not agree with the panel's finding that petitioner's comments

25  suggested that he was not sure if he was capable of killing again.  In fact, earlier in the hearing

26  when directly asked if he could kill again petitioner answered unequivocally "no."

13

1   Presiding Commissioner Munoz: It's–well, you were overcome
    with anger, no doubt, and you killed a man. Would you do that
2   today?

3   Petitioner: No.

4   Id., p. 17.

5       In finding petitioner unsuitable at this fifth parole suitability hearing, the panel

6   relied exclusively on unchanging factors: the commitment offense and petitioner's drug use at the

7   time of the offense. In Biggs, the Ninth Circuit stated that the BPT was "*initially* justified" in

8   finding Mr. Biggs unsuitable based on the circumstances of the offense and his conduct prior to

9   imprisonment. 334 F.3d at 916 (emphasis added). However, the Ninth Circuit was not specific

10  as to when reliance on the circumstances of the offense and conduct prior to imprisonment would

11  "run contrary to the rehabilitative goals espoused by the prison system" and result in a due

12  process violation. 334 F.3d at 917.

13      More important to the undersigned in assessing any due process violation is the

14  fact that continuous reliance on unchanging circumstances transforms an offense for which

15  California law provides eligibility for parole into a de facto life imprisonment without the

16  possibility of parole. The court asks rhetorically—what is it about the circumstances of

17  petitioner's crime or motivation which are going to change? The answer is nothing. The

18  circumstances of the crimes will always be what they were, and petitioner's motive for

19  committing them will always be trivial. Petitioner has no hope for ever obtaining parole except

20  perhaps that a panel in the future will arbitrarily hold that the circumstances were not that serious

21  or the motive was more than trivial. Given that *no one* seriously contends lack of seriousness or

22  lack of triviality at the present time, the potential for parole in this case is remote to the point of

23  /////

24  /////

25  /////

26  /////

14

18

1 | non-existence. Petitioner's liberty interest should not be determined by such

2 | possibility.[2]

3 | In the instant case, the BPT has apparently relied on these unchanging factors at

4 | least four prior times in finding petitioner unsuitable for parole. Petitioner has "continue[d] to

5 | "demonstrate exemplary behavior and evidence of rehabilitation.'"" 334 F.3d at 916. Under

6 | these circumstances, the continued reliance on these factors at the 2001 hearing violated due

7 | process.

8 | Finally, the one other reason given by the BPT for parole denial—the need for

9 | more therapy such that petitioner can face, discuss, understand and cope with stress in a

10 | nondestructive manner—is devoid of any medical or other evidence in support. The conclusion

11 | appears to be simply one repeated often in order to add another factor to the non-suitability

12 | conclusion. Clearly, a conclusion by lay BPT commissioners that petitioner has not yet achieved

13 | required therapy for insight or other reasons is not reasonably sustainable, and a state court's

14 | conclusion to the contrary is patently unreasonable.

15 | Respondent argues that the instant petition should be denied as moot because

16 | petitioner has had two subsequent parole suitability hearings. Under Article III, § 2 of the

17 | Constitution, an action is moot if it no longer presents a case or controversy. "Once a convict's

18 | sentence has expired, however, some concrete and continuing injury other than the now-ended

19 | incarceration or parole—some 'collateral consequence' of the conviction—must exist if the suit

20 | is to be maintained." Spencer v. Kemna, 523 U.S. 1, 7, 118 S. Ct. 978, 983 (1998).

21 | Petitioner is still in custody as a result of the 2001 suitability hearing. That he has

22 | had two suitability hearings since that time does not render his challenge to the 2001 hearing

---

23 | [2] To a point, it is true, the circumstances of the crime and motivation for it may indicate a
24 | petitioner's instability, cruelty, impulsiveness, violent tendencies and the like. However, after
    fifteen or so years in the caldron of prison life, not exactly an ideal therapeutic environment to
25 | say the least; and after repeated demonstrations that despite the recognized hardships of prison,
    this petitioner does not possess those attributes, the predictive ability of the circumstances of the
26 | crime is near zero.

1    moot. See Hubbart v. Knapp, __F.3d__, 2004 WL 1801889 (9th Cir. 2004) (expiration

2    of SVP commitment term did not moot petitioner's case regarding the expired commitment

3    proceedings even though new proceedings had been commenced). Moreover, petitioner was

4    found unsuitable after the 2002 hearing on the same grounds as the 2001 decision was based.

5    See Transcript from March 20, 2002, hearing, respondent's answer, Exhibit S. However, the

6    panel conducting the 2002 hearing additionally found that petitioner required additional AA and

7    NA programming. Id., decision of panel, p. 7. No evidence submitted at the hearing supported

8    this recommendation. In fact, Dr. Flax's report, on which the 2002 panel relied, stated that

9    petitioner had no known substance abuse treatment needs. Respondent's Answer, Exhibit E.

10            At the 2002 hearing, the Deputy District Attorney who actually prosecuted

11    petitioner appeared and spoke in favor of petitioner's release on parole. Deputy District Attorney

12    Wagstaffe stated, in part,

13            And that is. I say at many other parole hearings. I don't want to
         say somebody is okay to be paroled until I can tell you I would feel
14            comfortable with that person living on my street, as my next door
         neighbor. And I do hold that standard. And that's a standard I hold
15            today. And if life would have it that Carl Irons was my next door
         neighbor or I heard that he was going to move next door to me, my
16            view to you would be I'm going to have a good neighbor; not
         that—Don't let that happen. And realizing that within myself, that's
17            why I (indiscernible) this is on behalf of our office and our county,
         that we do not pose any objection to you—if you choose, based on
18            all the factors you have to look at.

19    Id., pp. 70-71.

20            The 2003 panel found petitioner unsuitable for parole on the same grounds as the

21    2001 decision was based. Respondent's Answer, Exhibit 6. However, the panel also found

22    petitioner unsuitable because he had received a prison disciplinary since his last hearing. Id.,

23    decision, p. 2. In particular, petitioner was found guilty of over familiarity with prison staff. Id.,

24    p. 34. At the hearing, petitioner discussed the disciplinary with the panel. Petitioner's female

25    supervisor filed the charge against him after petitioner engaged in conduct which apparently

26    made her uncomfortable. Id., p. 38. Petitioner stated that before he began working for her, he

1  realized that there could be a problem because she was younger and more attractive than most of

2  the women he had worked around. Id., p. 38. Because he did not trust his socialization skills

3  having been in prison for so long, he asked her to tell him if he did anything inappropriate. Id.

4  About one month later, she told him that he was doing something to make her uncomfortable. Id.

5  Petitioner told her that if it happened in the future, she should tell him again. Id. The next thing

6  that happened was the "incident" that resulted in the rules violation report. Id.

7          It is unclear to the court what the "incident" involved. The panel referred to a

8  letter stating that petitioner had rubbed his supervisor's back, but it is not clear if this was the

9  incident that led to the rules violation report. Id., p. 39.

10         The court's finding that the 2001 decision finding him unsuitable was not

11  supported by some evidence is somewhat complicated by the prison disciplinary petitioner

12  received approximately two years later. However, the court notes that the psychological report

13  prepared for the 2003 hearing acknowledged the rules violation report but still concluded that

14  petitioner would be a low risk of dangerousness upon release. Id., pp. 40-41. Because the nature

15  of this disciplinary was not serious and did not reflect on petitioner's ability to function upon

16  release, the court does not find that it effects the conclusions regarding the 2001 hearing.

17         Accordingly, for the reasons discussed above, the court finds that the California

18  Supreme Court's silent denial of this claim was an unreasonable application of clearly

19  established Supreme Court authority. The petition should be granted as to this claim.

20      B. Remaining Claims

21         Petitioner argues that Cal. Penal Code § 3041 requires the BPT to give him a

22  parole date. Section 3041 provides that one year prior to the inmate's minimum eligible parole

23  release date a panel consisting of at least two commissioners of the BPT shall meet with the

24  inmate and *shall normally* set a parole release date. Petitioner appears to argue that because

25  § 3041 provides that the BPT shall normally set parole release dates, the BPT violated due

26  process by failing to set his parole release date.

21

1        As discussed above, California's parole scheme gives rise to a cognizable liberty

2    interest in release on parole. Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003). "In the parole

3    context, the requirements of due process are met if 'some evidence' supports the decision." Id.

4    If there is not some evidence to support a decision denying parole, due process is violated.

5    Therefore, even though California law states that the BPT shall normally set parole release dates,

6    due process does not require the BPT to state a date where some evidence exists demonstrating

7    that petitioner should not be paroled. Accordingly, petitioner's claim that the BPT was required

8    to set his parole release date pursuant to Cal. Penal Code § 3041 is without merit.

9        Petitioner next argues that by finding him unsuitable, the BPT is making him

10    serve a sentence that is longer than that prescribed for similar crimes of second degree murder.

11    In support of this claim, petitioner refers to Cal. Code Regs. tit. 15, § 2403 which sets forth a

12    matrix of base terms for second degree murder. The court construes this claim as alleging a

13    violation of the Equal Protection Clause.

14        "The Constitution permits qualitative differences in meting out punishments and

15    there is no requirement that two persons convicted of the same offense receive identical

16    sentences." Williams v. Illinois, 399 U.S. 235, 243, 90 S. Ct. 2018, 2023 (1970). Parole

17    considerations require only a rational relationship to legitimate state interests. McGinnis v.

18    Royster, 410 U.S. 263, 270, 93 S. Ct. 1055, 1059-60 (1973).

19        In order to prevail on this claim, petitioner must demonstrate that similarly

20    situated prisoners have been released on parole sooner than him. See McQueary v. Blodgett, 924

21    F.2d 829, 835 (9th Cir. 1991). In other words, petitioner must demonstrate that prisoners

22    convicted of second degree murder based on similar circumstances have been released on parole.

23    Petitioner has not done this. Accordingly, this claim is without merit.

24        Petitioner next argues that the BPT and former Governor Davis in conspiracy

25    have pre-determined that no murder-lifer will be paroled. Petitioner argues that he was denied

26    parole pursuant to this illegal policy. These allegations state a claim for violation of the due

1    process clause. See McQuillion v. Schwarzenegger, 369 F.3d 1091, 1097 (2004).

2             In support of this claim, petitioner submitted various exhibits. Exhibit I attached

3    to the exhibit package filed in support of the petition is a declaration by Albert Leddy. Mr.

4    Leddy served from 1983 to 1992 as Commissioner and then Chairman of the BPT. In his

5    declaration, dated March 15, 1999, Mr. Leddy contends that former Governor Wilson had a no-

6    parole policy. This declaration does not support petitioner's claim that he was denied parole in

7    2001 pursuant to former Governor Davis's no-parole policy.

8             Exhibit K submitted in support of the petition is a copy of an article from the San

9    Francisco Examiner. This undated article quotes former Governor Davis as stating that he would

10   be "hard-pressed to find any reason" to parole a convicted murderer. Exhibit L is a copy of an

11   article from the Los Angeles Times which quotes former Governor Davis as stating that he

12   believes that murderers should serve at least a life sentence. This evidence does not demonstrate

13   a conspiracy between the BPT and former Governor Davis to deny parole to inmates convicted of

14   murder and serving life sentences.

15            In In re Rosenkrantz, 29 Cal.4th 616, 128 Cal. Rptr. 2d 104 (2002), the California

16   Supreme Court considered the trial court's finding that the Governor, in revoking the Board's

17   grant of parole, had applied a no-parole policy. This finding was based on express quotes of the

18   Governor expressing that all convicted murderers should serve life terms without exception, as

19   well as the Governor's review and reversal of almost all grants of parole. 29 Cal.4th at pp. 684-

20   685, 128 Cal. Rptr. 2d at 162-163. The California Supreme Court found this to be insufficient

21   evidence of a no-parole policy. It reasoned that even if the quotations truly did reflect the

22   Governor's views when he made the statements, his subsequent actions of either affirming the

23   grant of parole or providing individualized analyses for reversing the Board's findings of

24   suitability belied the claim that he was applying a blanket policy of reversing the grant of parole

25   regardless of the circumstances of the particular case. 29 Cal.4th at 685, 128 Cal. Rptr. 2d at

26   163.

1    In <u>Rosenkrantz</u>, the California Supreme Court also observed that the BPT had

2    approved a much larger number of paroles than the former Governor. 29 Cal.4th at p. 638, n. 5,

3    128 Cal. Rptr. 2d at 124. This finding undercuts petitioner's claim that the BPT and former

4    Governor Davis conspired to deny parole to convicted murderers serving life sentences. For

5    these reasons, this claim has no merit.

6        Because the denial of these claims by the California Supreme Court was not an

7    unreasonable application of clearly established Supreme Court authority, these claims should be

8    denied.

9        Finally, petitioner argues that the Marin County Superior Court erred in twice

10   denying his applications for petitions for writs of habeas corpus. Petitioner contends that the

11   Superior Court should have found that the BPT improperly found him unsuitable. This claim is

12   really further argument in support of the claim raised in the instant petition that there was

13   insufficient evidence to support the unsuitability finding.[3] Accordingly, the court will not

14   address this claim further.

15   <u>Conclusion</u>

16       Because the petition should be granted, appointment of counsel is warranted to

17   represent petitioner in the proceedings which will follow this recommendation.

18       Accordingly, IT IS HEREBY ORDERED that:

19           1. The Office of the Federal Defender is appointed to represent petitioner;

20           2. The Clerk of the Court is directed to serve a copy of these findings and

21   recommendations on Assistant Federal Defender Ann McClintock;

22   /////

23   /////

24

25       [3] Respondent construes this claim as alleging that the Superior Court Judge was not
     impartial. The court does not construe this claim to be alleging impartiality by the Superior
26   Court Judge.

24

1       IT IS HEREBY RECOMMENDED that the petition be granted as to the claim

2   that there was not sufficient evidence to support the 2001 decision finding petitioner unsuitable

3   for parole; the petition should be denied in all other respects.

4       Assuming the commission of no serious disciplinary infractions henceforth,

5   especially infractions of a violent nature, BPT should be ordered to calculate petitioner's release

6   date, and if such would have already occurred, petitioner should be released on parole.

7       These findings and recommendations are submitted to the United States District

8   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty

9   days after being served with these findings and recommendations, any party may file written

10  objections with the court and serve a copy on all parties. Such a document should be captioned

11  "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections

12  shall be served and filed within ten days after service of the objections. The parties are advised

13  that failure to file objections within the specified time may waive the right to appeal the District

14  Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

15  DATED: ~~August~~ 1 , 2004.

16

17                   GREGORY G. HOLLOWS
                     UNITED STATES MAGISTRATE JUDGE

18

19  GGH:kj/kf
    iron0220.157

20

21

22

23

24

25

26

                  21

25

**EXHIBIT 50**

In re Rosenkrantz (Superior Court)

**FILED**

Los Angeles Superior Court

JUN 2 6 2006

John A. Clarke, Executive Officer/Clerk

By _Joseph H. Pulido_ , Deputy

JOSEPH M. PULIDO, S.C.C.
233210

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| In re, | Case No.: BH003529 |
| | ORDER RE: WRIT OF HABEAS CORPUS |
| ROBERT ROSENKRANTZ, | |
| Petitioner, | |
| On Habeas Corpus | |

The court has read and considered petitioner's Writ of Habeas Corpus filed on August 17, 2005, as well as the return and denial filed in response to the court's order to show cause. Having independently reviewed the record, giving deference to the broad discretion of the Board of Prison Hearings ("Board") in parole matters, the court concludes that the Board's decision denying petitioner parole is not supported by "some evidence."

Petitioner is currently serving a sentence of 15 years to life with a two-year firearm enhancement following his 1986 conviction of second degree murder. Petitioner's minimum eligible parole date was January 23, 1996. Petitioner asserts constitutional claims, including the argument that the Board violated its regulations and petitioner's right to due process by its refusal to set a parole date despite its inability to find him unsuitable for parole or to deem him an unreasonable risk to public safety if paroled.

On April 25, 2005, the Board denied petitioner parole for one year. In denying petitioner parole, the Board relied upon the circumstances of the commitment offense. When determining

ep

1

1   unsuitability based on commitment offense, the Board may consider as a factor whether the

2   victim was abused, defiled or mutilated during or after the offense. (See Cal. Code Regs., tit. 15,

3   § 2402(c)(1)(C).)  Here, the Board found that the victim was "abused" due to "the number of

4   times he was shot and the manner in which he was shot."  In addition, the Board concluded that

5   the case "rises to the highest level of second-degree murder."  The Board further stated in its

6   decision that the Deputy District Attorney and the Los Angeles Sheriff's Department opposed

7   parole.  While the Board is required to consider such opposition (see Penal Code section 3042),

8   that opposition is not a factor on which the Board may rely to deny parole as enumerated in title

9   15, section 2281 of the California Code of Regulations.

10          Towards the conclusion of the hearing, the Board summarily mentioned its concern that

11  petitioner is a danger to his brother, Joey.  The court finds that this assertion is not only

12  unsupported by the record, but belied by the record, which contains documented evidence that

13  contradicts any fear that the petitioner is a threat to his brother's safety.  Furthermore, the court

14  rejects the Board's inference that the absence of yearly supportive letters from petitioner's

15  brother shows that petitioner is a danger to his brother.  In fact, the petitioner's denial and

16  traverse draws attention to a recent psychological evaluation addressing and dismissing the

17  Board's concern for the safety of petitioner's brother.  However, because this psychological

18  evaluation was not evidence before the Board at the time of petitioner's hearing, the court may

19  not properly rely upon it in reviewing the Board's decision.  Regardless, the court finds that there

20  is no evidence in the record that supports the conclusion that petitioner remains a danger to his

21  brother.

22          The Board's sole reliance on the gravity of the offense to justify denial of parole can be

23  initially justified as fulfilling the requirements set forth by state law.  (*Biggs v. Terhune* (9th Cir.

24  2003) 334 F.3d 910, 916.)  However, over time, should petitioner continue to demonstrate

25  exemplary behavior and evidence of rehabilitation, denying a parole date simply because of the

26  nature of the commitment offense raises serious questions involving his liberty interest in parole.

27  (*Id.* at p. 917.)  Here, petitioner's record is replete with reports of petitioner's exemplary conduct

28  as well as his vocational and educational achievements over a period of many years.  Indeed,

ep                                    2

1   petitioner is a model prisoner in every respect. A parole decision supported by some evidence

2   may nonetheless abrogate due process if it did not consider and weigh all favorable evidence.

3   (*In re Capistran* (2003) 107 Cal.App.4th 1299, 1306.)

4        The court finds that petitioner's continual parole denials have been based mainly on the

5   gravity of the commitment offense, the circumstances of which can never change. Therefore, the

6   Board's continued sole reliance on the commitment offense will essentially convert petitioner's

7   original sentence of life with the possibility of parole into a sentence of life without the

8   possibility of parole. Petitioner has no chance of obtaining parole unless the Board holds that his

9   crime was not serious enough to warrant a denial of parole. (*Irons v. Warden* (E.D. Cal. 2005)

10  358 F.Supp.2d 936, 947.)

11       Prior Board panels have found petitioner suitable for parole. Petitioner was found

12  suitable for parole on June 18, 1996, but a review unit later disapproved the parole grant. At

13  subsequent hearings in 1996, 1997 and 1998, petitioner was found unsuitable for parole based on

14  the gravity of his offense. On September 9, 1999, petitioner was found unsuitable for parole but

15  the panel set his prison term. On November 18, 1999, Governor Davis reversed petitioner's

16  parole grant. On June 30, 2000, a new panel found petitioner suitable for parole, but Governor

17  Davis reversed its decision on October 28, 2000. Petitioner has now served in excess of the

18  maximum term for both second degree and first degree murder. Therefore, the commitment

19  offense should no longer function as a factor for unsuitability and in that case, it should no longer

20  operate as "some evidence" to support the Board's parole denial. Petitioner has reached the

21  point in which the denial of parole can no longer be justified by reliance on his commitment

22  offense. The Board's continued reliance on the circumstances of the offense runs contrary to the

23  rehabilitative goals espoused by the prison system and has violated petitioner's due process.

24  //

25  //

26  //

27  //

28  //

ep

3

1    Therefore, this court orders that the petition for writ of habeas corpus be, and hereby is,

2    granted.

3

4    June 26, 2006

5

6                                                                DAVID S. WESLEY

7                                                                Judge of the Superior Court

8    Clerk to give notice.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



ep

4

4

**FILED**
Los Angeles Superior Court

JUL 27 2006

John A. Clarke, Executive Officer/Clerk

By _____, Deputy

JOSEPH M. PULIDO, S.C.C.
233219

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| In re, | ) Case No.: BH003529 |
| ROBERT ROSENKRANTZ, | ) ORDER |
| Petitioner, | ) |
| | ) |
| On Habeas Corpus | ) |
| | ) |

    In papers filed on July 18, 2006, petitioner requested to be released from prison on parole or suitable bail pending final disposition of this Court's order in the matter. The Court issued an order on July 24, 2006 denying petitioner's request.

    Having considered the matter further, the Court orders its July 24, 2006 order vacated as it pertains to petitioner's request for release. Instead, the Court finds that petitioner's request for release is supported by some evidence and is with merit. Petitioner's request for release on parole until final disposition of this matter is granted.

    As a result of this Court granting of petitioner's writ on June 26 2006, the most petitioner could have expected under normal circumstances was that the Board of Parole Hearings would grant a new hearing consistent with the Court's ruling. However, the Court has learned that petitioner has in fact again been found suitable for parole on May 25, 2006. As a result, nothing could be accomplished by ordering the Board of Parole Hearings to hold another suitability

-1-

5

1  hearing.  Therefore, the Court June 26, 2006 order shall be amended by adding "and the

2  petitioner be released on parole" to the last sentence of the order.

3       The clerk is to give fax and mail notice to all parties.

4

5

6  Date:  7/27/06



7                                              DAVID S. WESLEY

7                                              Judge of the Superior Court

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

29

-2-

6

**EXHIBIT 51**

Rosenkrantz v. Marshall



CANNED

FILED
CLERK, U.S. DISTRICT COURT

JUN 2 6 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

1

2                                                        )

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10                         WESTERN DIVISION

11   ROBERT M. ROSENKRANTZ,        )
                                   )
12                    Petitioner,  )  Case No. CV 05-3836-GAF(AJW)
                                   )
13            v.                   )
                                   )
14   JOHN MARSHALL, Warden,        )  REPORT AND RECOMMENDATION
                                   )  OF MAGISTRATE JUDGE
15                    Respondent.  )
     _____)

16

17                           Background

18       When petitioner was 18 years old, his younger brother, Joey, and

19   his brother's friend, Steven Redman, secretly spied on him in order to

20   confirm their suspicion that he was a homosexual.  On the night of

21   petitioner's  high  school  graduation,  Joey  and  Redman  watched

22   petitioner with a male companion through a window of petitioner's

23   parents' beach house.  Redman suggested that they enter the house and

24   take pictures of petitioner and his companion so that they could prove

25   to others that petitioner was gay.  Before doing so, Redman and Joey

26   obtained a flashlight and a stun gun from Joey's car.  Redman then

27   kicked in the door of the house, yelled "Get the fuck out of here you

28   faggots," and struck petitioner with the flashlight, breaking his

1  nose.  Joey burned petitioner's hands with the stun gun.  Petitioner

2  obtained a BB gun from his car and attempted to prevent Redman and

3  Joey from leaving.  Petitioner's father was called to the house, and

4  Redman told him that he and Joey had seen petitioner with another male

5  who had his pants down.

6      The next morning, petitioner insisted to his father that he was

7  heterosexual, and that Redman and Joey had lied.  Petitioner's father

8  was extremely upset and angry.  Petitioner left his parents' home.  He

9  spent that night in his car.  During the next few days, while he was

10  living alone in his car, petitioner obtained a firearm.[1]  Petitioner

11  then confronted Redman with the firearm, demanding that he recant what

12  he had told petitioner's father.  Redman refused, and continued to

13  taunt and ridicule petitioner.  Eventually, petitioner shot Redman ten

14  times, killing him.

15      Petitioner was acquitted by a jury of first degree murder.  He

16  was convicted of second degree murder, and sentenced to fifteen years

17  to life, plus a two year term for using a firearm.

18      In the two decades since his crime, petitioner has had a perfect

19  prison record.  He has never committed a violent act or engaged in any

20  other conduct warranting discipline.  While in prison, he has earned

21  an A.A. degree from Chapman College, and a B.S. degree in computer

22  science from Columbia Southern University.  He has completed every

23  therapy and self-help program available, and he has obtained numerous

24  vocational certifications.  Petitioner has received exceptional work

25  reports, including special recognition for developing software

26  programs for staff training, tracking sexually violent predators, and

27

28      [1]  The firearm was an Uzi.

2

1    managing the inmate welfare fund.

2        From 1989 to 2004, petitioner was evaluated by numerous

3    psychologists. All opined that petitioner's offense was the result of

4    an extremely stressful, isolated incident, presenting specific

5    situational factors which were unlikely to recur, and that his offense

6    did not reflect a "tendency toward violent behavior." [Petitioner's

7    Exhibit ("Ex.") E (petitioner's psychological reports) at 3-4, 6, 9,

8    12, 14, 15]. The psychologists who examined petitioner unanimously

9    concluded that petitioner's level of dangerousness was very low, using

10   terms such as "nil," "no higher than the average person in the

11   community," or "very low to nonexistent." [Petitioner's Ex. E at 3-4,

12   6, 9, 12, 14, 15].

13       Petitioner also has earned glowing recommendations from all of

14   his prison correctional counselors, who, like the psychologists, have

15   opined that petitioner presents no more risk of danger than the

16   average person in the community. [Petitioner's Ex. F (correctional

17   counselor reports including statements that petitioner "would pose

18   absolutely no threat to the public safety if released at this time,"

19   "would pose an extremely minimal threat, if any, to public safety if

20   released from prison," "would pose no threat to the public safety,"

21   and "his conduct in prison is indicative of an inmate who is ready for

22   release")].

23       Petitioner possesses realistic parole plans, including family and

24   community support, employment, a guaranteed monthly income, and a

25   residence. He has letters urging that he be granted parole from the

26   trial judge, family members, legislators, the arresting officer, and

27   the victim's grandmother. Further, although they subsequently changed

28   their minds, both the District Attorney and the Sheriff's Department

3

1  previously did not oppose granting petitioner parole. Finally, while

2  in custody, petitioner saved another inmate's life.

3      Not surprisingly, after petitioner's second parole suitability

4  hearing in 1996, the Board of Prison Terms ("BPT")[2] concluded that

5  petitioner did not pose an unreasonable risk of danger to society or

6  a threat to public safety, and that he was suitable for parole.

7  [See Petitioner's Ex. B]. As the BPT panel explained, petitioner had

8  no criminal record; a stable social history; no drug or alcohol

9  involvement; excelled in school; participated in prison programs;

10  upgraded educationally; participated extensively in self-help and

11  therapy so as to "come to an understanding of why he reacted so

12  violently" in committing his offense; received excellent work reports;

13  possessed realistic parole plans; maintained positive institutional

14  behavior indicating "significant improvement in self-control;" and

15  demonstrated acceptance of responsibility and remorse. [Petitioner's

16  Ex. B at 2-3]. The panel also found that petitioner committed the

17  crime as a result of significant stress in his life, namely, being

18  exposed as a homosexual to his father, who then rejected petitioner

19  because of the revelation. In addition, the panel noted that

20  psychological reports from 1989, 1994, and 1996 all supported release.

21  Further, the panel pointed out that the trial judge supported granting

22  parole, opining that petitioner's offense was "situational," and that

23  petitioner was "highly unlikely to re-offend." [Petitioner's Ex. B at

24  4]. Finally, the panel noted that the governor's legal advisor and

25  the district attorney supported petitioner's release. [Petitioner's

26  ─────────────────────

27      [2] The Board of Prison Terms was abolished as of July 1, 2005, and
replaced by the Board of Parole Hearings. Cal. Penal Code § 5075(a).
Because the decision petitioner challenges was made in 2004, the Court

28  refers to the parole agency as the BPT.

1    Ex. B at 4]. Consequently, petitioner received a March 30, 2000 parole

2    date. [Petitioner's Ex. B at 1].

3         The 1996 decision, however, was disapproved by the BPT's decision

4    review committee, on the ground that the panel had not considered some

5    of the facts of the commitment offense.  See In re Rosenkrantz, 80

6    Cal.App.4th 409, 414 n.3 (2000).

7         After parole hearings in 1996, 1997 and 1998, BPT panels found

8    petitioner unsuitable for parole.  The December 1996 decision was the

9    rehearing on the panel's grant of parole earlier in 1996.  One of the

10   rehearing panel members had served on the decision review committee

11   that had reversed the original panel's grant of parole.   This

12   rehearing panel considered, among other things, a letter from the

13   investigating homicide detective, which addressed some of the points

14   in the review committee's decision and reflected the detective's view

15   that petitioner should be paroled.   In particular, the detective

16   stated that when investigating the crime, he had found a knife on

17   Redman's body.  See In re Rosenkrantz, 29 Cal.4th 616, 631 (2002),

18   cert. denied, 538 U.S. 980 (2003).  Despite this additional favorable

19   evidence, the panel ultimately denied parole based upon the finding

20   that the commitment offense was carried out in a dispassionate and

21   calculated manner.  See Rosenkrantz, 80 Cal.App.4th at 416 n.5.

22        The panel at the 1997 hearing included two of the three panel

23   members who had served on the decision review committee which reversed

24   the 1996 grant of parole.  The new evidence presented at the hearing

25   was entirely positive. It included the District Attorney's statement

26   that he was "not opposed to this man receiving a parole date."

27   Rosenkrantz, 80 Cal.App.4th at 417.  In addition, Assemblywoman Carole

28   Migden, Assemblywoman Martha Escutia, and Senator John Vasconcellos

5

1  wrote to the BPT and urged it to consider that, although Redman's

2  violence "obviously does not absolve [Rosenkrantz] of responsibility"

3  for Redman's death, it was a factor to be considered, and they opined

4  that "[t]he action of the Board in overturning the June 1996 decision

5  to release Mr. Rosenkrantz raises the disturbing possibility that the

6  reprehensible gay-bashing endured by Mr. Rosenkrantz is not being

7  viewed in the same light as other hate crimes, despite the fact that

8  the law of California recognizes it as an equally grave offense."

9  Rosenkrantz, 80 Cal.App.4th at 418 n.8.    Nevertheless, the panel

10 denied parole, finding that (a) the offense was carried out in a cruel

11 and callous manner with a disregard for the life and suffering of

12 another, in a dispassionate and calculated manner, and (b) petitioner

13 had not sufficiently participated in beneficial self-help and therapy

14 programming. See Rosenkrantz, 80 Cal.App.4th at 418.

15     In 1998, the BPT reached a split decision, with two of the three

16 members of the panel finding petitioner unsuitable for parole.    The

17 majority explained its reasoning as follows: "The number one reason

18 was the offense was carried out in a manner which exhibits a callous

19 disregard for the life and the suffering of another. These conclusions

20 are drawn from the Statement of Facts where the prisoner laid in wait

21 for the victim to come out. ... He confronted him and, during the

22 course of the confrontation, an argument ensured [sic] and the victim

23 was subsequently shot ten times." Rosenkrantz, 80 Cal.App.4th at 418.[3]

24 _____

25      [3] As the state appellate court subsequently explained, the panel
   later modified its decision.

26
   On October 27, 1998, the Decision Review Unit recommended a
27 "modification" of the decision.  According to this report,
   "[a]lthough the hearing panel clearly recognized that the
28 inmate was convicted of second degree murder, in the decision
   portion of the hearing transcript, the panel inadvertently

6

1   The California Superior Court reviewed the 1996, 1997 and 1998

2   decisions denying parole and reversed those decisions, ordering the

3   BPT to set a parole date. The Superior Court found that the decisions

4   to deny parole were "contrary to the evidence presented at the

5   hearing" and that "[a]ll of the evidence ... indicated that the

6   defendant is not a danger to society."   The Superior Court rejected

7   the BPT's reliance upon statements that the crime was "dispassionate,"

8   "calculated" and "carried out in a manner which exhibits a callous

9   disregard for the life and suffering of another," concluding that no

10  evidence supported such conclusions.[4]

11  _____

12  stated, '... laid in wait.'"   The recommendation was to
    "excise" that language from the decision and replace it with
13  a statement that he "'... waited in his vehicle all night
    outside the victim's condominium complex, until the victim
14  emerged.'" The next day, the Decision Review Committee (with
    Commissioner Ortega serving as one of a committee of three)
15  adopted the recommendation and modified the decision.

16  Rosenkrantz, 80 Cal.App.4th at 419 n.12.

17

18  [4]  As the Superior Court explained:

19  "It is difficult to imagine that any inmate could present a
    better picture than the defendant has in terms of his
20  background, his institutional adjustment, and his parole
    plans. However this court recognizes that no matter how
21  stellar an inmate's adjustment and progress in the institution
    may be, it can be outweighed by the circumstances of the
22  offense. In evaluating the circumstances of the offense, the
    Board must accept the verdict of the jury. In this case, the
23  defendant was Expressly Acquitted of First Degree Murder. The
    jury found the defendant not guilty of premeditation and
24  deliberation. This was after a trial in which the defendant
    himself testified about the circumstances of the offense. In
25  reading the comments of the commissioners at the last three
    hearings and the statements of decision, it is apparent that
26  some commissioners decided on their own that the evidence
    supports a finding of premeditation and lying in wait and have
27  based their decisions denying parole on these findings,
    contrary to the express findings of the jury. The primary
28  reason for denying parole in all three hearings is that the
    offense was 'dispassionate' and 'calculated' and/or was
    'carried out in a manner which exhibits a callous disregard

7

1    Pursuant to the Superior Court's direction, a new hearing was

2

3

      for the life and suffering of another.' "'Dispassionate' means
4    'free from emotion or prejudice; calm and impartial.' ... No
rational person could describe this killing as calm and
5    without emotion.... [¶] 'Calculated' means 'planned.' ... The
verdict expressly rejected that the killing was planned. In
6    finding the defendant not guilty of premeditation and
deliberation, the jury must have accepted the defendant's
7    claim that he did not go to the house planning to murder the
victim. In finding him guilty of second degree murder, they
8    found that he did not form the intent to kill until just
shortly before the killing. The finding that the killing was
9    'dispassionate' and 'calculated' is contrary to the evidence
and contrary to the verdict of the jury.

10   "At the last hearing of the Board of Prison Terms, the
commissioners must have finally realized that this factor,
11   that is, that the killing was 'dispassionate and calculated'
was not applicable to this case. Instead they found that the
12   'offense was carried out in a manner which exhibits a callous
disregard for the life and suffering of another.' (Of course,
13   all second degree murders by their nature involve a disregard
for the life of another.) The regulations word this factor
14   slightly differently: 'The offense was carried out in a manner
which demonstrates an exceptionally callous disregard for
15   human suffering.' [§ 2402, subd. (c)(1)(D).] This appears to
refer to something akin to torture or that the victim suffered
16   much more than that which would be inherent in any killing.
There is no evidence of that in this case. In support of this
17   'callous disregard' finding, the Board stated, 'These
conclusions are drawn from the Statement of Facts where the
18   prisoner laid in wait for the victim to come out.' ... 'Lying
in wait' is a special circumstance which, if found to be true
19   by a jury, requires a sentence of life without the possibility
of parole.... Apparently recognizing that this may seem
20   inconsistent with a verdict of second degree murder, legal
counsel [for the Board] recommended that 'laid in wait for the
21   victim to come out' be deleted and replaced with 'waited in
his vehicle all night outside the victim's condominium
22   complex, until the victim emerged.' There is nothing in this
case to support a finding of an exceptionally callous
23   disregard for the suffering of another."

24   Rosenkrantz, 80 Cal.App.4th at 419 & n.13. The superior court also found
that two commissoners who had participated in several of petitioner's
25   parole hearings were biased against petitioner and precluded them from
sitting on his parole hearings. Rosenkrantz, 80 Cal.App.4th at 420-421.
26

27   The appellate court's suggestion that the BPT could not rely upon
facts that the jury had not found true beyond a reasonable doubt was
28   subsequently rejected by the California Supreme Court. Rosenkrantz, 29
Cal.4th 616, 679 (2002).

1  held in 1999. At the hearing, additional favorable evidence regarding

2  petitioner's performance in prison was submitted, as well as

3  additional letters in support of parole, including the Sheriff's

4  Department's statement of nonopposition to parole. Rosenkrantz, 80

5  Cal.App.4th at 421. Nevertheless, the BPT panel again found

6  petitioner unsuitable for parole, explaining:

> The number one reason, really the only reason, is the
> commitment offense itself. You've done tremendously while
> you've been in the institution, you've made tremendous
> progress. But the nature of the crime itself is the reason
> we found you unsuitable for parole. The Panel found that the
> offense was carried out in especially cruel or callous
> manner and that it was carried out in a dispassionate or
> calculated manner, such as an execution style murder, and
> that the offense was carried out in a manner which
> demonstrates an exceptionally callous disregard for human
> suffering...

18  Rosenkrantz, 80 Cal.App.4th at 422 n.14. [Petitioner's Ex. C at 1].

19  Although it found petitioner unsuitable for parole, the BPT panel

20  nevertheless set a June 30, 2001 parole date in compliance with the

21  Superior Court's decision. [Petitioner's Ex. C]. Former Governor Gray

22  Davis reversed the grant of parole, explaining that the finding of

23  suitability was "based solely on an order from the Los Angeles

24  Superior Court, which order is now on appeal." Rosenkrantz, 80

25  Cal.App.4th 409 at 422.

26      The California Court of Appeal subsequently affirmed the Superior

27  Court's decision, holding that the BPT's 1999 finding of unsuitability

28  was unsupported by any evidence. Rosenkrantz, 80 Cal.App.4th at 427.

9

1 In discussing the appropriate remedy, the appellate court stated that

2         [a]t some point, a failure to follow the law, or

3         the continued application of an arbitrary and

4         irrational standard, will rise to the level of a

5         substantive due process violation. (Cf.

6         Stubblefield Construction Co. v. City of San

7         Bernardino (1995) 32 Cal.App.4th 687, 708-710 [38

8         Cal.Rptr.2d 413]; Pearson v. City of Grand Blanc

9         6th Cir. 1992) 961 F.2d 1211, 1216-1217.)

10 Rosenkrantz, 80 Cal.App.4th at 428-429.

11    On June 30, 2000, a new BPT panel found petitioner suitable for

12 parole, explaining that he "would not pose an unreasonable risk of

13 danger to society or a threat to public safety if released from

14 prison." The panel found that petitioner had committed his crime as

15 the result of "significant stress" in his life, that he showed remorse

16 and had accepted responsibility for his crime, and that his most

17 recent psychological report demonstrated that he was "a very low risk

18 for future violence" and "clearly not a criminally oriented

19 individual." In re Rosenkrantz, 116 Cal.Rptr.2d 69, 74 (2002). The

20 panel set petitioner's parole release date as March 30, 2001.

21 [Petitioner's Ex. D]. Former Governor Davis also reversed that

22 decision. Rosenkrantz, 116 Cal.Rptr.2d at 74.

23    Petitioner challenged former Governor Davis's decision in a state

24 habeas petition. The Superior Court granted the petition after

25 concluding hat there was no evidence supporting the former Governor's

26 decision, ad that the former Governor's decision was based upon an

27 impermissible general policy of automatically denying parole to

28 prisoners convicted of murder. The Court of Appeal affirmed the

1  judgment of the Superior Court. Rosenkrantz, 116 Cal.Rptr.2d at 83-

2  84. The California Supreme Court, however, reversed. Rosenkrantz, 29

3  Cal.4th at 625. It found that while there was no evidence supporting

4  some of former Governor Davis's stated reasons for finding petitioner

5  unsuitable for parole, there was some evidence supporting the former

6  Governor's finding that petitioner's offense was carried out in a

7  dispassionate and calculated manner. Rosenkrantz, 29 Cal.4th at 678-

8  679.[5]

9

10  ─────────────────────

    [5] Justice Moreno wrote separately to emphasize the narrowness of the
    decision.

11

12      Although I agree that evidence of premeditation and
    deliberation supports the conclusion that petitioner's crime
    was particularly egregious for a second degree murder, it is

13  another matter whether any evidence would support the same
    conclusion for a first degree murder. Other than felony

14  murders, first degree murders by definition involve
    premeditation and deliberation. Moreover, there was sufficient

15  doubt over whether premeditation and deliberation existed to
    persuade a jury to acquit petitioner of first degree murder.

16  Furthermore, petitioner's offense did not appear to partake of
    any of those characteristics that make an offense particularly

17  egregious under the Board of Prison Terms' parole eligibility
    matrix for first degree murders, e.g., torture, the infliction

18  of severe trauma not involving immediate death, or murder for
    hire. (Cal. Code Regs., tit. 15, § 2403, subd. (b).) Nor is it

19  certain that petitioner's lack of remorse immediately
    following the crime, by itself, would make the crime

20  exceptional compared to other first degree murders. The
    significance of the above observations is this: there will

21  come a point, which already may have arrived, when petitioner
    would have become eligible for parole if he had been convicted

22  of first degree murder. Once petitioner reaches that point, it
    is appropriate to consider whether his offense would still be

23  considered especially egregious for a first degree murder in
    order to promote the parole statute's goal of proportionality

24  between the length of sentence and the seriousness of the
    offense. (See In re Ramirez (2001) 94 Cal.App.4th 549, 570-571

25  [114 Cal.Rptr.2d 381] [in conducting parole proportionality
    analysis, the court considers the gravity of the offense in

26  relation to the time in prison already served].) Under this
    circumstance, the justification for denying his parole would

27  become less clear, even under the deferential "some evidence"
    standard. Thus, future denials of petitioner's parole may

28  warrant judicial reappraisal.

1   On January 5, 2004, a new BPT panel found petitioner unsuitable

2   for parole based solely upon the gravity of his commitment offense.

3   [Petitioner's Ex. A at 113-114].    Petitioner sought habeas relief in

4   the state courts.   On October 7, 2004, the Superior Court denied

5   petitioner's habeas petition, concluding that there was "some

6   evidence" to support the BPT's decision - namely, "the circumstances

7   of the life crime were such that they could reasonably be considered

8   more aggravated or violent than the minimum necessary to sustain a

9   conviction for second-degree murder." [Petitioner's Ex. G].    On

10  November 15, 2004, the California Court of Appeal denied petitioner's

11  habeas petition without explanation.[6] [Petitioner's Ex. H].    On

12  February 2, 2005, the California Supreme Court also rejected

13  petitioner's claims without explanation. [Petitioner's Ex. I].[7]

14   Petitioner filed this federal habeas corpus petition alleging

15  that the BPT's 2004 decision finding him unsuitable for parole

16  violated due process.   Because the BPT's 2004 decision fails to

17  satisfy even the forgiving "some evidence" test for constitutionality

18  prescribed by the United States Supreme Court, the petition should be

19  granted.

20                          The BPT's decision

21   The BPT began the January 5, 2004 hearing by reciting the facts

22  _____

23  Rosenkrantz, 29 Cal.4th at 689-690 (Moreno, J., concurring).

24   [6] Justice Vogel dissented, explaining that since petitioner had by
    then served the minimum sentence for first degree murder (a crime of
    which he was acquitted), the BPT should consider whether his offense was
25  especially egregious for a first degree murder as opposed to a second
    degree murder.   Justice Vogel also stated that he believed the petition
26  should be granted because there was "no evidence" supporting the Board's
    decision. [Petitioner's Ex. H (emphasis in original)].
27
28   [7] Justices Kennard and Moreno, however, opined that the petition
    should be granted. [Petitioner's Ex. I].

                                  12

surrounding the commitment offense.   Those facts, which are not in

dispute, are as follows:

At the time of the offense, petitioner was 18 years of

age and resided with his parents and two brothers in

Calabasas in Los Angeles County. Petitioner testified that

he knew at an early age that he was gay but also knew that

this circumstance was unacceptable to his family –

particularly to his father, whom he idolized. Petitioner

pretended to be heterosexual but secretly was able to

communicate with and meet other gay teenagers. Petitioner's

brother Joey, then 16 years of age, suspected that

petitioner was gay and shared this suspicion with Steven

Redman, Joey's 17-year-old friend. According to petitioner,

Redman was a bully and was preoccupied with hatred of

homosexuals, and Joey also disliked such individuals.

By eavesdropping on petitioner's telephone

conversations, Joey learned that petitioner planned to meet

another young male at the family's beach house on the

evening petitioner graduated from high school – Friday, June

21, 1985. Redman suggested that he and Joey go to the beach

house that night to investigate and gather information

concerning petitioner's sexual orientation. Upon arriving at

the beach house, Redman and Joey looked through a window and

observed petitioner, two other males, and one female

drinking and watching television.

When petitioner and his male companion entered a

bedroom, and Joey and Redman no longer could view

petitioner's activities, Joey wanted to leave. Redman,

13

however, decided that he would run into the house and take

photographs. Before he did so, Redman and Joey retrieved a

flashlight and a stun gun from Joey's automobile. Joey

unlocked the door to the house and Redman kicked it in,

shouting, "Get the fuck out of here you faggots." A

physical confrontation ensued in which Joey burned

petitioner's hands by firing the stun gun, Redman struck

petitioner several times with the flashlight, petitioner's

companion punched Redman, and petitioner burned Joey on the

face after having gained control of the stun gun.

Petitioner's nose was broken during the altercation.

The fighting ceased when petitioner's other friends

intervened, but petitioner then obtained a BB gun from his

automobile and attempted to prevent Redman and Joey from

leaving the house. Joey stated that he had recorded

telephone calls confirming petitioner's homosexuality, and

that the tapes were in his automobile. Joey managed to

escape when petitioner accompanied him to retrieve the

tapes. Because petitioner had taken the keys to Joey's

automobile, however, Joey telephoned their father, who drove

to the beach house and spoke with petitioner. Petitioner

surrendered Joey's keys to his father. Before Redman and

Joey left, Redman stated to petitioner's father that he and

Joey had observed petitioner with another male who had his

pants down.

The next morning, petitioner insisted to his father

that he was heterosexual and that Redman and Joey had lied.

Petitioner's father, very upset by the possibility that

SCANNED

petitioner might be gay, broke down and cried during the conversation with petitioner. Petitioner and Joey had decided that Joey would inform their father that the entire incident had been a joke, and Joey recanted his story concerning petitioner's homosexual conduct. Redman, having been summoned by the boys' father, modified his story regarding what he had observed the previous evening, but petitioner's father gradually realized that petitioner was gay. He confronted petitioner and angrily questioned him regarding his activities and contacts. Petitioner gathered his possessions and left the house, sleeping in his automobile that night.

On Monday, June 24, petitioner went to a shooting range and rented an Uzi semiautomatic nine-millimeter carbine. Petitioner testified that he had planned to kill himself at the shooting range, but then decided to use the gun to teach Redman a lesson. After shooting the weapon on the firing range for 10 or 15 minutes, petitioner stated to the manager that he wished to purchase an Uzi and did not want to wait for it to be ordered. When the manager refused to sell him the weapon he had rented, petitioner left. Also on Monday, petitioner visited a sporting goods store and arranged to purchase an Uzi that would be available on Wednesday, June 26.

Petitioner was employed at a restaurant and worked there during this period. On Tuesday, June 25, petitioner stated to a coworker that he had purchased a gun and was planning to kill his brother. Petitioner also informed

15

another coworker that Redman and Joey had humiliated petitioner and that he was obtaining a gun.

On Wednesday, June 26, petitioner obtained the Uzi he had ordered and purchased 250 rounds of ammunition. Petitioner testified that he telephoned Redman that night, but Redman hung up on him. Petitioner thought that he might use the Uzi to force Redman to recant what he had told petitioner's father regarding petitioner's sexual activities. On Thursday, having telephoned two individuals who knew Redman, petitioner succeeded in learning where Redman resided. Petitioner again telephoned Redman, who refused to recant his statements regarding petitioner's sexual orientation.

On Thursday night, petitioner traveled to the condominium complex where Redman resided and unsuccessfully attempted to locate Redman's vehicle. Petitioner spent the night in his own automobile near the complex. The next morning, June 28, when Redman was driving away from his home, petitioner used his vehicle to block Redman's vehicle and confronted Redman, who asked petitioner what he wanted. Holding the Uzi, which was loaded and ready to be fired, petitioner responded, "I think you know what I want." According to petitioner, Redman called him a "faggot" and said petitioner was in a lot of trouble. Petitioner twice asked Redman to accompany him to petitioner's home to recant what Redman had said. Redman responded, "I'm not going anywhere with you, you goddam faggot." When Redman asked petitioner what he was going to do with the weapon,

16

1   petitioner stated that he was going to use it to damage

2   Redman's car. Redman reiterated that he would not go

3   anywhere with petitioner. Petitioner then pointed the gun at

4   Redman and began shooting. Redman sustained at least 10

5   gunshot wounds, including six wounds to the head. There was

6   evidence that the Uzi had been fired at very close range.

7   Redman died from the shooting.

8       Petitioner walked away from the body and entered his

9   vehicle, still pointing the weapon at Redman. In a telephone

10  conversation that morning with Joey, petitioner cried and

11  stated that he had done something terrible to Redman. That

12  evening, petitioner telephoned a deputy sheriff who also had

13  been petitioner's teacher at school. In this conversation,

14  which was recorded, petitioner admitted the shooting and

15  expressed attitudes ranging from remorse to defiance.

16      In the weeks following the shooting incident,

17  petitioner traveled to various towns in northern California

18  and Oregon, spending time with friends. Approximately one

19  month after the shooting, petitioner, accompanied by his

20  attorney, surrendered to the investigating deputy sheriff.

21  Rosenkrantz, 29 Cal.4th at 627-629. [See Petitioner's Ex. A at 11-13].

22      The BPT next reviewed petitioner's background, noting that

23  petitioner had no criminal record, a stable social history, and no

24  history of drug or alcohol use. [Petitioner's Ex. A at 33, 38-42].

25  The BPT detailed petitioner's institutional adjustment, noting that

26  petitioner had received a vocational certificate in welding in 2003.

27  [Petitioner's Ex. A at 43-45]. The BPT noted that petitioner had

28  "always done very, very well," and had received "exceptional work

1   reports." [Petitioner's Ex. A at 46].   Petitioner had earned an A.A.

2   degree from Chapman College in 1992, and a B.S. degree is computer

3   science form Columbia Southern University in 1998. [Petitioner's Ex.

4   A at 47].   Petitioner had received proficiency certificates for word

5   processing, data processing, and computer skills. [Petitioner's Ex. A

6   at 48].   Petitioner had participated successfully in numerous self-

7   help programs dating from 1993, including Project Change, Anger

8   Management, Rational Therapy, Self-Esteem, the "ACT" program, Drug and

9   Alcohol Prevention, and HIV Prevention. [Petitioner's Ex. A at 49-50].

10  Petitioner also had "done a tremendous amount of work for the

11  institution in terms of software development." He had received "many

12  laudatory chronos" for his work.   In particular, petitioner developed

13  software programs to track sexually violent predators, INS inmates,

14  disabled inmates, and the prison substance abuse program.   One

15  laudatory chrono petitioner received indicated that "the work

16  [petitioner] did for the inmate trust account activity resulted in the

17  breakup of a ring of inmates bringing narcotics into the institution."

18  [Petitioner's Ex. A at 50].   As the BPT put it, "the institution has

19  greatly benefitted from [petitioner's] education.  And we can see that

20  [petitioner has] tried to give back in this way." [Petitioner's Ex. A

21  at 50].   Petitioner also received a laudatory chrono for his

22  participation in the Literacy Council.   Further, petitioner was

23  involved in the Inmate Peer Educator program. Finally, on December 25,

24  2001, petitioner saved the life of an inmate who was choking on a

25  piece of meat, by performing the Heimlich maneuver. [Petitioner's Ex.

26  A at 51].

27      The BPT commended petitioner for having no record of discipline

28  in prison. [Petitioner's Ex. A at 51].

18

1    The BPT next reviewed petitioner's latest psychological
2  evaluation, which, like every prior evaluation, was favorable. [See
3  Petitioner's Ex. F]. In particular, the evaluation reported that:

4          Mr. Rosenkrantz has developed substantial insight into the
5          factors contributing to the instant offense.  The instant
6          offense appears to be an isolated incident. ... It appears
7          that during this short interval of time lasting less than
8          one week Mr. Rosenkrantz experienced a level of stress which
9          was sufficient to override both his emotional and behavioral
10         control.  It seems very unlikely, given his current level of
11         maturity, that such a sequence of events would likely recur.
12         He continues to express appropriate feelings of remorse for
13         the victim.

14  [Petitioner's Ex. A at 57-58].  In terms of an assessment of future
15  dangerousness, Dr. Rueschenberg opined that petitioner

16         is clearly not a criminally oriented individual and with the
17         exception of the instant offense he does not have a history
18         of violent behavior either within the community or in
19         prison.  His score on the HARE scale places him in a very
20         low range indicating a very low risk for future violence.

21  [Petitioner's Ex. A at 58-59].  As the BPT summarized the medical
22  evidence, petitioner posed "virtually no threat to the public" if
23  released from prison. [Petitioner's Ex. A at 60].

24     The BPT inquired about petitioner's parole plans.  Petitioner's
25  parents had offered to house petitioner in their home in Calabasas,
26  California. [Petitioner's Ex. A, at 61].  Petitioner had a job offer
27  from the Greenspan Company to perform computer work. [Petitioner's Ex.
28  A at 62-63].  Petitioner also had income from property of about $4,500

1    a month, so he had the means to support himself. [Petitioner's Ex. A

2    at 63-64].

3        Petitioner received numerous letters of support, including from

4    members of the public, Assemblywoman Jackie Goldberg, State Senator

5    Sheila James Kuehl, and Superior Court Judge Albracht, who presided

6    over petitioner's trial. [Petitioner's Ex. A at 67-71]. Captain Frank

7    Merriman of the Los Angeles Sheriff's Department sent a letter

8    opposing petitioner's parole. [Petitioner's Ex. A at 71-72]. Finally,

9    a deputy district attorney indicated that the District Attorney of Los

10   Angeles opposed parole. [Petitioner's Ex. A at 88-98].[8]

11       After considering this evidence, the panel found petitioner

12   unsuitable for parole. The panel offered the following explanation

13   for its decision:

14       The offense was carried out in an especially cruel and

15       callous manner. This was a planned assault on the victim.

16       The prisoner lied [sic] in wait, waited outside of his home

17       until the – until the victim, Mr. Redman, came out, and then

18       he shot him, not once, but repeatedly, at least 10 times

19       with an Uzi. The offense was carried out in a dispassionate

20       and a calculated manner such as an execution style murder.

21       And we say that knowing that this was a second degree

22       murder. But the four shots that was [sic] fired into the

23       victim as he laid helpless on the street certainly in the

24       mind of his [sic] Commission indicates that is was an

25       execution style murder. And with that we note the victim

26   _____

27       [8] The Sheriff's Department and the District Attorney's Office
     previously had not opposed granting petitioner parole, but both reversed
28   position. The record reflects no reason for this reversal. [See
     Petitioner's Ex. D at 3-4].

1   was abused.  Any time a victim is shot 10 times certainly we

2   consider that abusive.  The offense was carried out in a

3   manner that demonstrates a total callous disregard for

4   another human being or for the suffering of a human being or

5   a callous disregard for the laws and rules that's [sic]

6   established for an organized - a well ordered society, an

7   Uzi in an urban area.   The motive for the crime is

8   inexplicable.  The conclusions were drawn from the Statement

9   of Facts wherein the prisoner apparently had an altercation

10  with the victim and his brother in which he was eventually

11  - Mr. Rosenkrantz was eventually, for lack of a better word,

12  outed as a homosexual.  And this was - this information was

13  conveyed to the prisoner's father and as a result this

14  caused some turmoil in the home and apparently the prisoner

15  left the home as a result and he was  - in an attempt to get

16  his brother and the victim, Mr. Redman, to recant their

17  statements the prisoner planned this assault.  He went to

18  a firing range, he practiced, he - he attempted to purchase

19  an Uzi.  And the first time he was not successful.  He tried

20  again and he eventually was successful in purchasing an Uzi.

21  He bought numerous rounds of ammunition for this weapon.

22  And on the day of the offense he waited outside the victim's

23  home until the victim came out.  And when he came out, he

24  encountered him and at least 10 rounds was [sic] fired, four

25  of which was [sic] while the victim was laying on the

26  ground, it was in the victim's head.  The prisoner had no

27  previous occasion of inflicting injury on a victim.  He had

28  no record of violent behavior.  In fact, the prisoner had no

1   juvenile record, nor did he have an adult record. He had no

2   history of any kind of criminality. Now in terms of an

3   unstable social history or prior - Prior criminality we

4   already talked about. But in terms of unstable social

5   history, there's no indication that the prisoner had an

6   unstable social history. Quite to the contrary. Everything

7   I can read indicate [sic] that the prisoner had a stable

8   social history. Both parents was [sic] in the home. It

9   appeared that he grew up in a loving home. So there's no

10  indications that - He did well in school. He was accepted

11  to college. So there was no indication of an unstable

12  social history. Now, the prisoner has programmed. The

13  prisoner has programmed in a commendable manner. A recent

14  psychological report - The most recent psychological report,

15  August of '99, by Dr. Rueschenberg, R-U-E-S-C-H-E-N-B-E-R-G,

16  it says that the prisoner's assessment of dangerousness is

17  low. Dr. Lance Portnoff, P-O-R-T-N-O-F-F, completed a

18  report in - on 8-1988, good report, shows that his level of

19  dangerousness in the community is reduced. Certainly we feel

20  that the prisoner has realistic parole plans. He have [sic]

21  a very loving relationship with his parents apparently, and

22  he have [sic] residential plans and he have [sic] means of

23  employment. And certainly we feel that with his welding

24  skill and with his computer skills and with his B.A. Degree

25  in computers that he have [sic] the means of supporting

26  himself. He have [sic] marketable skill should he be

27  released. The hearing Panel notes that in response to Penal

28  Code 3042 Notices indicating opposition to a finding of

SCANNED

1  parole suitability, specifically one, the Deputy District
2  Attorney made a very compelling argument against
3  suitability, from Los Angeles. There's also a letter in the
4  file from the Los Angeles Sheriff's Department – Sheriff
5  Department in opposition of a finding of suitability. The
6  Panel makes the following findings. The Panel finds that
7  the prisoner have [sic] made phenomenal progress. That he
8  needs to continue in the mode that he's in, continue to
9  participate in self-help programs and other kinds of
10 programs, the kinds of programs that would enable him to be
11 able to face, discuss, understand and cope with stressful
12 situations such as the offense, the commitment offense, the
13 kind that brought him to prison, in a nondestructive manner.
14 We feel he's making progress in this area. Undoubtedly he
15 will reach a point sometime in the near future where he will
16 be found suitable again. Until some Panel feels that the
17 prisoner have [sic] made enough progress, the Board still
18 finds that there is a certain amount of unpredictability
19 there and therefore the possibility of threat to others.
20 Nevertheless, we certainly need to commend the prisoner for
21 his outstanding behavior in prison. No disciplinaries, no
22 128 chronos, a B.A. Degree from Columbia in computer
23 science, an A.A. Degree from Chapman, he was already a high
24 school grad when he came to prison, gets good work reports.
25 Apparently he worked as a literacy counsel for the inmates.
26 He works on computer programs for the institutional staff
27 and they've wrote [sic] him good chronos. Somewhere in the
28 file, as it was articulated, he even saved an inmate's life

23

Z3

by using the Heimlich maneuver.  So certainly all of those things point to suitability.  However, those positive aspects of his behavior does not [sic] outweigh the fact of unsuitability.  The prisoner's parole is going to be denied for one year.  And the Panel recommends that he remain disciplinary -free, that he continue to participate in self-help programs.  Now this one year denial, certainly the crime had a lot to do with that, the manner in which the prisoner carried out the crime, the gravity of the offense certainly weighed heavy on the minds of the Panel members.  Certainly - And speaking of the gravity of the offense, the manner in which the prisoner purchased the weapon, trained himself to use the weapon, approached his victim, shot his victim six times, then four more times as he laid [sic] on the street, certainly weighed heavy [sic] on the Board's mind.  Also, the petitioner's rendition of whether or not his brother was in danger certainly weighed heavy on the Panel's mind.  When I say his brother, whether or not the prisoner is actually going to do harm to him.  Now, the prisoner can't change what have [sic] occurred in the past.  It appears that he's doing everything to make himself suitable, but certainly in my mind today there's still some unanswered questions.  And I think the prisoner is making progress.  However, I still think he have [sic] some - some ways to go.

[Petitioner's Ex. A at 113-119].[9]

_____

[9]  It appears that petitioner had a parole hearing after the decision challenged in this petition. [Memorandum in Support of Petition at 22 n.

1  Petitioner's Contentions

2      Petitioner alleges that he was denied due process because (1) the

3  BPT's finding that petitioner poses an unreasonable risk of danger is

4  not supported by any evidence, since all of the evidence shows that

5  petitioner would pose no threat to public safety if released; (2) each

6  ground relied upon by the BPT to deny parole lacked support; (3) the

7  BPT relied solely upon petitioner's commitment offense; (4)

8  petitioner's commitment offense was not particularly egregious for a

9  first-degree murder, and petitioner already has served the minimum

10 term for such offense; (5) there is no nexus between petitioner's

11 offense and petitioner's parole risk; and (6) the BPT failed to base

12 its decision on a preponderance of the evidence or its codified

13 suitability criteria. [Memorandum in Support of Petition at 11-27].

14  Standard of Review

15      This Court may not grant a writ of habeas corpus on behalf of a

16 person in state custody "with respect to any claim that was

17 adjudicated on the merits in State court proceedings unless the

18 adjudication of the claim — (1) resulted in a decision that was

19 contrary to, or involved an unreasonable application of, clearly

20 established Federal law, as determined by the Supreme Court of the

21 United States; or (2) resulted in a decision that was based on an

22

23 11 (noting that petitioner was denied parole on April 25, 2005)].  This
   subsequent parole denial does not render this petition moot.  First,
24 petitioner is still in custody as a result of the 2004 decision, the
   decision he challenges in this petition.  Second, petitioner's claims
25 challenging the denial of parole fall within the "capable of repetition
   yet evading review" exception to mootness. See Hubbart v. Knapp, 379 F.3d
26 773, 777 (9th Cir. 2004) (habeas petition challenging a two-year
   commitment under California's Sexually Violent Predator Act was found to
27 "evade review" because the duration of the commitment was too short to
   be fully litigated prior to its expiration), cert. denied, 543 U.S. 1071
28 (2005).

25

1  unreasonable determination of the facts in light of the evidence

2  presented in the State court proceeding."  28 U.S.C. § 2254(d).

3      The Supreme Court has explained that section "2254(d)(1)'s

4  'contrary to' and 'unreasonable application' clauses have independent

5  meaning."  Bell v. Cone, 535 U.S. 685, 694 (2002).

6              Under the "contrary to" clause, a federal habeas

7              court may grant the writ if the state court arrives

8              at a conclusion opposite to that reached by this

9              Court on a question of law or if the state court

10             decides a case differently than this Court has on a

11             set of materially indistinguishable facts.  Under

12             the "unreasonable application" clause, a federal

13             habeas court may grant the writ if the state court

14             identifies the correct governing legal principle

15             from this Court's decisions but unreasonably

16             applies that principle to the facts of the

17             prisoner's case.

18  Williams v. Taylor, 529 U.S. 362, 412-413 (2000); see Lockyer v.

19  Andrade, 538 U.S. 63, 73-76 (2003).

20     While only Supreme Court precedent is controlling under the

21  AEDPA, other case law is persuasive authority "for purposes of

22  determining whether a particular state court decision is an

23  unreasonable application of Supreme Court law."  Vlasak v. Superior

24  Court of California ex rel. County of Los Angeles, 329 F.3d 683, 687

25  (9th Cir. 2003) (quoting Luna v. Cambra, 306 F.3d 954, 960 (9th Cir.

26  2002) (internal quotation marks and citation omitted), amended, 311

27  F.3d 928 (9th Cir. 2002)); see Bruce v. Terhune, 376 F.3d 950, 956

28  (9th Cir. 2004) ("Although only the Supreme Court's precedents are

26

1  binding on state courts under AEDPA, our precedents may provide

2  guidance as we review state-court determinations.").

3      Where, as here, a higher state court has denied a claim without

4  explanation, federal courts "look through" that denial to the last

5  reasoned state decision. See Ylst v. Nunnemaker, 501 U.S. 797, 803-

6  806 (1991); Shackleford v. Hubbard, 234 F.3d 1072, n.2 (9th Cir.

7  2000), cert. denied, 534 U.S. 944 (2001).

8                              Discussion

9      The Due Process Clause of the Fourteenth Amendment prohibits

10  state action that deprives a person of life, liberty, or property

11  without due process of law. A person alleging a due process violation

12  must first demonstrate that he or she was deprived of a liberty or

13  property interest protected by the Due Process Clause, and then show

14  that the procedures that led to the deprivation were constitutionally

15  insufficient. Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454,

16  459-460 (1989); McQuillion v. Duncan, 306 F.3d 895, 900 (9th Cir.

17  2002).

18      In the parole context, a prisoner alleging a due process claim

19  must demonstrate the existence of a protected liberty interest in

20  parole, and the denial of one or more of the procedural protections

21  that must be afforded when a prisoner has a liberty interest in

22  parole. The Supreme Court held in 1979, and reiterated in 1987, that

23  "a state's statutory scheme, if it uses mandatory language, creates a

24  presumption that parole release will be granted when or unless certain

25  designated findings are made, and thereby gives rise to a

26  constitutional liberty interest." McQuillion, 306 F.3d at 901 (citing

27  Greenholtz v. Inmates of Nebraska Penal, 442 U.S. 1, 7 (1979) and

28

27

1  Board of Pardons v. Allen, 482 U.S. 369, 373 (1987)).[10]

2  The Ninth Circuit has held that California's parole scheme

3  creates a cognizable liberty interest in release on parole because

4  Penal Code § 3041 uses mandatory language and is similar to the

5  Nebraska and Montana statutes addressed in Greenholtz and Allen,

6  respectively. McQuillion, 306 F.3d at 901-902. As the Ninth Circuit

7  has explained, "Section 3041 of the California Penal Code creates in

8  every inmate a cognizable liberty interest in parole which is

9  protected by the procedural safeguards of the Due Process Clause," and

10 that interest arises "upon the incarceration of the inmate." Biggs v.

11 Terhune, 334 F.3d 910, 914-915 (9th Cir. 2003).

12 Respondent contends that McQuillion is no longer good law because

13 of an intervening decision of the California Supreme Court. [Answer at

14 5-8]. It is true, of course, that after the Ninth Circuit's decision

15 in McQuillion, the California Supreme Court addressed a portion of the

16 California parole statute in In re Dannenberg, 34 Cal.4th 1061 (2005),

17 cert. denied, 126 S.Ct. 92 (2005). That decision, however, does not

18 mean what respondent says it means, and it does not undercut

19 McQuillion.

20 In Dannenberg, the California Supreme Court held that the BPT

21 need not engage in a "uniform term" analysis under section 3041(a) if

22 it determines that public safety concerns warrant denial of parole

23 under section 3041(b). Dannenberg, 34 Cal.4th at 1082-1094. The court

24

25 [10] Respondent argues that in Sandin v. Conner, 515 U.S. 472 (1995),
   the Supreme Court criticized the mandatory language methodology described
26 in Greenholtz and Allen, and that under Sandin, California has not
   created a protected liberty interest in parole. [Answer at 8-10]. The
27 Ninth Circuit, however, has rejected that argument, explaining that
   Sandin's holding is limited to internal prison disciplinary regulations.
28 McQuillion, 306 F.3d at 903.

1   did not hold that there is no protected liberty interest in parole

2   whatsoever. It simply held that, at least under some circumstances,

3   the BPT was not required to compare one inmate's parole suitability

4   with the parole suitability determinations given to other inmates who

5   had been convicted of similar crimes. See Dannenberg, 34 Cal.4th at

6   1098 n. 18. Indeed, California courts have continued to analyze claims

7   regarding denial of parole under due process standards, even after

8   Dannenberg. See In re Scott, 133 Cal.App.4th 573, 590-591, 603 (2005)

9   (citing Dannenberg and granting habeas relief because "some evidence"

10  did not support the Governor's finding that the circumstances of the

11  murder made the petitioner unsuitable for parole); In re DeLuna, 126

12  Cal.App.4th 585, 593-598 (2005) (citing Dannenberg and remanding to

13  the BPT to reconsider parole decision in compliance with due process

14  requirements regarding "some evidence"). Moreover, even in Dannenberg

15  itself, the California Supreme Court reached the issue whether there

16  was "some evidence" supporting the parole suitability determination,

17  thus indicating that due process requirements still apply to parole

18  determinations in California. Dannenberg, 34 Cal.4th at 1095-1096.

19       Furthermore, Dannenberg's holding is limited to the uniform term

20  provision of section 3041(a). In reaching its determination that the

21  California parole scheme creates a liberty interest protected by the

22  Due Process Clause, the Ninth Circuit only considered the language of

23  section 3041(b). McQuillion, 306 F.3d at 902. Because the California

24  Supreme Court did not reinterpret section 3041(b), and because the

25  reasoning in McQuillion is based solely on section 3041(b), Dannenberg

26  does not undermine the Ninth Circuit's decision. Therefore, the Ninth

27  Circuit's holding in McQuillion that the mandatory language of section

28  3041(b) creates a liberty interest in parole remains controlling

29

1  precedent. See, e.g., Blankenship v. Kane, 2006 WL 515627, at *3

2  (N.D.Cal. 2006)(stating that "[b]ecause the Ninth Circuit specifically

3  held in McQuillion that California's parole scheme creates a federally

4  protected liberty interest, and because Dannenberg did not address

5  this issue, the Court rejects Respondent's argument that there is no

6  protected liberty interest in parole for California inmates"); Machado

7  v. Kane, 2005 WL 3299885, at *2 (N.D.Cal. 2005) (discussing Dannenberg

8  and concluding that "[t]his Section 3041 requirement to grant parole

9  except under certain circumstances creates a cognizable liberty

10 interest in parole which is protected by the procedural safeguards of

11 the Due Process Clause for every eligible inmate") (citing Biggs, 334

12 F.3d at 913-915); Murillo v. Perez, 2005 WL 2592420, at *3, n.1

13 (C.D.Cal. 2005) (holding that Dannenberg did not undercut the law as

14 set forth in McQuillion); Saif'ullah v. Carey, 2005 WL 1555389, at *8

15 (E.D.Cal. 2005) (finding a liberty interest in parole in California

16 post-Dannenberg); Thompson v. Carey, 2005 WL 3287503, at *4 (E.D.Cal.

17 2005) (same); Devries v. Schwarzenegger, 2005 WL 2604203, at *3-4

18 (E.D.Cal. 2005) (same); but see Sass v. Cal. Bd. of Prison Terms, 376

19 F.Supp.2d 975, 982 (E.D.Cal. 2005) (holding that given the California

20 Supreme Court's decision in Dannenberg, there is no liberty interest

21 in parole in California).[11]

22    Nevertheless, because parole proceedings are not part of the

23 criminal prosecution, the full panoply of rights due a defendant in a

24 criminal proceeding is not constitutionally mandated. Jancsek v.

25 Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987). Instead,

26

27 [11] The district judge who decided Sass may have later repudiated his own decision. See Bair v. Folsom State Prison, 2005 WL 2219220,at *12 n.3 (E.D.Cal. 2005), report and recommendation adopted by,2005 WL 3081634, at *1 (E.D.Cal. 2005).

28

1   the due process rights that flow from a liberty interest in parole are

2   limited: the prisoner must be provided with notice of the hearing, an

3   opportunity to be heard, and if parole is denied, a statement of the

4   reasons for the denial.[12] Greenholtz, 442 U.S. at 16; Jancsek, 833

5   F.2d at 1390 (citing Greenholtz, 442 U.S. at 16); see also Morrissey

6   v. Brewer, 408 U.S. 471, 481 (1972) (describing the procedural

7   protections due in the parole context).  In addition, due process

8   requires that "some evidence" support the parole board's

9   determination, and that the evidence relied upon must possess "some

10  indicia of reliability." Biggs, 334 F.3d at 915; see McQuillion, 306

11  F.3d at 904; Jancsek, 833 F.2d at 1390 (adopting the "some evidence"

12  standard set forth by the Supreme Court in Superintendent v. Hill, 472

13  U.S. 445, 457 (1985));[13] see also Caswell v. Calderon, 363 F.3d 832,

14  839 (9th Cir. 2004).  The "some evidence" standard is satisfied if

15  there is reliable evidence in the record that could support the

16  conclusion reached. Powell v. Gomez, 33 F.3d 39, 40 (9th Cir. 1994)

17

---

18      [12]  Petitioner does not allege that he was denied notice of the
        parole hearing, an opportunity to be heard, or a statement of the reasons
19      for the denial of parole suitability. In fact, the record reflects that
        he received each of these procedural protections.
20

21      [13]  In Hill, the Supreme Court stated that

22          [i]n a variety of contexts, the Court has recognized that a
            governmental decision resulting in the loss of an important
23          liberty interest violates due process if the decision is not
            supported by any evidence. See, e.g., Douglas v. Buder, 412
24          U.S. 430, 432 (1973) (per curiam) (revocation of probation);
            Schware v. Board of Bar Examiners, 353 U.S. 232, 239 (1957)
25          (denial of admission to bar); United States ex rel. Vajtauer
            v. Commissioner of Immigration, 273 U.S. 103, 106 (1927)
26          (deportation).

27      Hill, 472 U.S. at 455. The Supreme Court then held that "the requirements
        of due process are satisfied if some evidence supports the decision by
28      the prison disciplinary board to revoke good time credits." Hill, 472
        U.S. at 455.

31

*31*

1   (citing <u>Hill</u>, 472 U.S. at 455-456 and <u>Cato v. Rushen</u>, 824 F.2d 703,

2   705 (9th Cir. 1987)); <u>see</u> <u>Cass v. Woodford</u>, 2006 WL 1304953, at *9

3   (S.D.Cal. 2006) (explaining that "denial of parole must be based on 1)

4   some evidence that 2) bears some indicia of reliability."). Finally,

5   determining whether the "some evidence" standard was met does not

6   require examination of the entire record, independent assessment of

7   the credibility of witnesses, or the weighing of evidence. <u>Hill</u>, 472

8   U.S. at 455.

9        The BPT offered only one reason for its decision finding

10  petitioner unsuitable for parole: the egregiousness of petitioner's

11  commitment offense.   On that basis, the BPT found that petitioner

12  would pose an unreasonable risk of danger if released.   The BPT

13  characterized petitioner's offense as having been carried out "in an

14  especially cruel and callous manner" and "in a dispassionate and

15  calculated manner such as an execution style murder."  It added that

16  "the victim was abused," and that "the motive for the crime is

17  inexplicable." [Petitioner's Ex. A at 113-114].  The Superior Court,

18  which offered the last reasoned decision on petitioner's claim,

19  concluded that the BPT's finding that his offense was "more aggravated

20  than the minimum necessary to sustain a conviction for second-degree

21  murder" was supported by some evidence.[14]  [Petitioner's Ex. G].  The

22  _____

23      [14]  Respondent argues that the BPT's decision rested upon another
     ground: the opposition of the District Attorney and the Sheriff's
24   Department.  That argument is flawed.  First, the BPT did not purport to
     deny parole on this ground; rather, the BPT simply noted their
25   opposition. [<u>See</u> Petitioner's Ex. A at 116]. Second, the Superior Court
     did not decide that the opposition of these agencies amounted to some
26   evidence supporting the BPT's decision. Third, both the District Attorney
     and the Sheriff's Department opposed parole based solely upon their view
27   of the gravity of the offense, so their opposition is merely cumulative
     of the BPT's own determination regarding the callousness of the crime.
28   [<u>See</u> Petitioner's Ex. A at 72 & Respondent's Lodged Doc. 2, Ex. 3 (letter
     from Captain Merriman of Sheriff's Department reiterating the facts of

32

1   Superior Court did not identify the evidence it considered in reaching

2   that conclusion.  Its decision was at least the fifth time that the

3   BPT (or a state court reversing a BPT panel's grant of parole) had

4   denied  parole  based  upon  the  unchanging  facts  of  petitioner's

5   commitment offense.

6       In <u>Biggs</u>, the Ninth Circuit stated that although reliance on the

7   nature  of  a  prisoner's  offense  may  satisfy  the  "some  evidence"

8   requirement, continued reliance on an unchanging factor such as the

9   circumstances of the offense could result in a due process violation

10  if  the  prisoner  continually  demonstrates  exemplary  behavior  and

11  evidence of rehabilitation. <u>Biggs</u>, 334 F.3d at 916.  Biggs was serving

12  a sentence of twenty-five years to life following a 1985 first degree

13  murder conviction. In what appears to have been Biggs's first parole

14  suitability hearing in 1999, the BPT found him unsuitable for parole

15  despite his record as a model prisoner. <u>Biggs</u>, 334 F.3d at 913.  Biggs

16  claimed  that  the  BPT's  determination  deprived  him  of  due  process

17  because it was not supported by any evidence.  While the Ninth Circuit

18  rejected  several  of  the  reasons  given  by  the  BPT  for  finding  Biggs

19  _____

20  the crime and stating that "[i]t is the opinion of this department that
    parole of inmate Rosenkrantz is inappropriate and should be denied."),
21  Ex. A at 88-98 (Deputy District Attorney arguing that the offense "is a
    cold blooded, execution style killing over a week's time of preparation
22  that shocks the conscience.  And for that reason alone, as supported by
    the Supreme Court, we would ask for a denial of parole.").
23      Finally, both the District Attorney and the Sheriff's Department
    previously had not opposed granting petitioner parole.  Nothing about
24  petitioner's case for release on parole changed for the worse between the
    time when the District Attorney and the Sheriff's Department supported
25  release on parole and the time when they opposed it.  To the contrary,
    the facts of petitioner's crime have been fully developed for more than
26  a decade, while with each passing year additional evidence demonstrating
    his suitability for parole has accumulated, including petitioner's
27  continued perfect performance in prison and additional favorable
    psychological reports indicating that he would pose no danger to the
28  community if he were released on parole. In these circumstances, reliance
    on the opposition of these agencies would be arbitrary.

                                    33

                                                              33

1 unsuitable for parole, it upheld three: (1) Biggs's commitment offense

2 involved the murder of a witness; (2) the murder was carried out in a

3 manner exhibiting a callous disregard for the life and suffering of

4 another; and (3) Biggs could benefit from additional therapy. <u>Biggs</u>,

5 334 F.3d at 913. Nevertheless, the Ninth Circuit cautioned the BPT

6 about continued reliance on the gravity of the commitment offense and

7 Biggs's conduct prior to the commitment offense.

8    As in the present instance, the parole board's sole

9    supportable reliance on the gravity of the offense and

10    conduct prior to imprisonment to justify denial of parole

11    can be initially justified as fulfilling the requirements

12    set forth by state law. Over time, however, should Biggs

13    continue to demonstrate exemplary behavior and evidence of

14    rehabilitation, denying him a parole date simply because of

15    the nature of his offense would raise serious questions

16    involving his liberty interest.

17 <u>Biggs</u>, 334 F.3d at 916. The Ninth Circuit added that "[a] continued

18 reliance in the future on an unchanging factor, the circumstance of

19 the offense and conduct prior to imprisonment, runs contrary to the

20 rehabilitative goals espoused by the prison system and could result in

21 a due process violation." <u>Biggs</u>, 334 F.3d at 917.

22   One district court has explained the rationale underlying this

23 aspect of <u>Biggs</u> as follows:

24    Whether the facts of the crime of conviction, or other

25    unchanged criteria, affect the parole eligibility decision

26    can only be predicated on the "predictive value" of the

27    unchanged circumstance. Otherwise, if the unchanged

28    circumstance per se can be used to deny parole eligibility,

SCANNED

1    sentencing is taken out of the hands of the judge and

2    totally reposited in the hands of the BPT. That is, parole

3    eligibility could be indefinitely and forever delayed based

4    on the nature of the crime even though the sentence given

5    set forth the possibility of parole – a sentence given with

6    the facts of the crime fresh in the mind of the judge. While

7    it would not be a constitutional violation to forego parole

8    altogether for certain crimes, what the state cannot

9    constitutionally do is have a sham system where the judge

10   promises the possibility of parole, but because of the

11   nature of the crime, the BPT effectively deletes such from

12   the system. Nor can a parole system, where parole is

13   mandated to be determined on someone's future potential to

14   harm the community, constitutionally exist where despite 20

15   or more years of prison life which indicates the absence of

16   danger to the community in the future, the BPT commissioners

17   revulsion towards the crime itself, or some other unchanged

18   circumstance, constitutes the alpha and omega of the

19   decision. Nobody elected the BPT commissioners as sentencing

20   judges. Rather, in some realistic way, the facts of the

21   unchanged circumstance must indicate a present danger to the

22   community if released, and this can only be assessed not in

23   a vacuum, after four or five eligibility hearings, but

24   counterpoised against the backdrop of prison events.

25   Bair v. Folsom State Prison, 2005 WL 2219220, *12 n.3 (E.D.Cal. 2005),

26   report and recommendation adopted by, 2005 WL 3081634 (E.D.Cal. 2005).

27       In the circumstances of this case, the BPT's continued reliance

28   upon the nature of petitioner's crime to deny him parole in 2004

35

1   violated due process.  First, continued reliance upon the unchanging

2   facts of petitioner's crime makes a sham of California's parole system

3   and amounts to an arbitrary denial of petitioner's liberty interest.

4   Petitioner had been denied parole on six occasions prior to the

5   determination he now challenges.   Continued reliance upon the

6   unchanging characterization of petitioner's offense amounts to

7   converting petitioner's sentence of seventeen years to life to a term

8   of life without the possibility of parole. As one court has put it:

9       The court asks rhetorically – what is it about the

10      circumstances of petitioner's crime or motivation which are

11      going to change? The answer is nothing. The circumstances of

12      the crimes will always be what they were, and petitioner's

13      motive for committing them will always be trivial.

14      Petitioner has no hope for ever obtaining parole except

15      perhaps that a panel in the future will arbitrarily hold

16      that the circumstances were not that serious or the motive

17      was more than trivial. Given that no one seriously contends

18      lack of seriousness or lack of triviality at the present

19      time, the potential for parole in this case is remote to the

20      point of non-existence. Petitioner's liberty interest should

21      not be determined by such an arbitrary, remote possibility.

22  Irons v. Warden of California State Prison--Solano, 358 F.Supp.2d 936,

23  947 (E.D.Cal. 2005), appeal docketed, No. 05-15275 (9th Cir. Feb. 17,

24  2005).

25      The arbitrariness of the decision in petitioner's case is

26  highlighted by the flip-flopping characterizations of petitioner's

27  crime by different BPT panels and the unexplained reversals in the

28  positions of the District Attorney and the Sheriff's Department

36

1  regarding petitioner's crime and its relation to his suitability for

2  parole. Different hearing panels have used different parts of the

3  regulations to describe petitioner's crime. Some of these

4  characterizations are inaccurate and lack any support in the record.

5  For example, there is no dispute that petitioner was extremely

6  emotionally upset by Redman's attack upon him at the beach house and

7  the subsequent revelation of petitioner's homosexuality to

8  petitioner's father. As the California courts have concluded, an

9  "inexplicable motive" is "one that is unexplained or unintelligible,

10 as where the commitment offense does not appear to be related to the

11 conduct of the victim and has no other discernable purpose." Scott,

12 119 Cal.App.4th at 892-893.    To call petitioner's crime

13 "inexplicable," as the BPT has done [see Petitioner's Ex. A at 113-

14 119], contradicts all of the evidence in the record. In fact, as the

15 first panel granting parole concluded, and as every psychological

16 examination performed on petitioner has confirmed, petitioner's crime

17 was the result of significant emotional stress in his life, a factor

18 that weighs in favor of parole suitability. 15 Cal. Code Regs. §

19 2402(d)(4); see Scott, 133 Cal.App.4th at 595-596 (finding that the

20 Governor erred by failing to consider in petitioner's favor the

21 undisputed evidence that the inmate committed his offense while under

22 emotional stress). Similarly, the statement that the crime was

23 "especially callous" does not fit within the regulations, which

24 provide that one factor to consider is whether "the offense was

25 carried out in a manner which demonstrates an exceptionally callous

26 disregard for human suffering." 15 Cal.Code Regs. §2402(c)(1)(D).

27 According to California appellate courts, this provision contemplates

28 that the victim was made to suffer in some exceptional way. See Scott,

37

1    119 Cal.App.4th at 892 (holding that a determination that the crime
2    had been carried out with "exceptional disregard for human suffering"
3    meant that it was perpetrated in an especially cruel manner with
4    disregard for human suffering and required more than the simple
5    cruelty and callousness necessary to find that a defendant killed with
6    malice); In re Smith, 114 Cal.App.4th 343, 366-367 (2003) (same).[15]
7    There is no evidence in the record supporting such a conclusion.
8    Likewise, the statement that the victim was "abused" because he was
9    shot ten times does not fall within the definition contained in the
10   regulations, which provide that one relevant factor is whether "the
11   victim was abused, defiled or mutilated during or after the offense."

12

13   [15] In Smith, the court reversed a parole denial which had been based,
     in part, on a determination that the inmate's crime had been carried out
14   with "exceptional disregard for human suffering." The appellate court
15   observed that since second degree murder requires express or implied
     malice, all second degree murders by definition involve some degree of
     cruelty and callousness. Since a conviction for second degree murder does
16   not automatically make a person unsuitable for parole, a determination
     that the crime was cruel or callous must mean that it was perpetrated in
17   an especially cruel manner or with exceptionally callous disregard for
     suffering. Smith, 114 Cal.App.4th at 366-367. In Smith, the defendant
18   became enraged at his wife when she told him she no longer wanted to see
     him. He grabbed a gun and shot her three times in the head. The state
19   court rejected the suggestion that the facts provided supported a finding
     that defendant had acted with especially callous disregard for the
20   victim's suffering. Smith, 114 Cal.App.4th at 366-367.
         In Scott, the court reached the same conclusion. It determined that
21   the evidence did not support a finding that the crime was carried out
     with exceptionally callous disregard for human suffering. The defendant
22   in Scott had gone looking for his wife and found her at her lover's house
     affectionately hugging him. When the wife's lover confronted Scott, Scott
23   warned him that he would shoot. Scott then fired two or three rounds,
     which struck the victim in the head and in the thigh. Scott immediately
24   left the scene. Scott, 119 Cal.App.4th at 878. The appellate court
     concluded that there was no evidence that Scott "tormented, terrorized,
25   or injured [his victim] before deciding to shoot [him], or that he
     gratuitously increased or unnecessarily prolonged [his] pain and
26   suffering.... Was the crime callous? Yes. However, are the facts of the
     crime some evidence that [he] acted with exceptionally callous disregard
27   for [the victim's] suffering; or do the facts distinguish this crime from
     other second degree murders as exceptionally callous? No." Scott, 119
28   Cal.App.4th at 892 (citation omitted).

38

1  15 Cal.Code Regs. § 2042(c)(1)(C). Cf. Maurer v. Calderon, 1997 WL

2  446229, *2 (N.D.Cal. 1997) (finding that the record contained some

3  evidence supporting the BPT's finding that the victim had been

4  "abused, defiled or mutilated" during the offense, where the victim

5  was stabbed in the abdomen and the victim's face was slashed with a

6  hunting knife during an attempted robbery but before the victim was

7  fatally shot). Taken together, the shifting characterizations and

8  conflicting decisions of the BPT demonstrate that its determination

9  that petitioner's offense was exceptionally callous, and therefore

10 indicates that petitioner is too dangerous to release on parole, was

11 arbitrary and based entirely on the subjective lay opinions of the

12 panel members.

13      Second, the circumstances of petitioner's crime do not amount to

14 some evidence supporting the conclusion that petitioner poses an

15 unreasonable risk of danger if released. As discussed, "[i]n the

16 parole context, the requirements of due process are met if some

17 evidence supports the decision." Biggs, 334 F.3d at 915. "Some

18 evidence," however, does not mean literally "any" evidence. If it

19 did, the protection afforded by due process would be meaningless. See

20 Gerald L. Neuman, The Constitutional Requirement of "Some Evidence",

21 25 San Diego L.Rev. 631, 663-664 (1988) (noting that "[e]vidence that

22 the respondent was alive at the time in question is usually relevant

23 to any charge against her. The [due process] protection of the 'some

24 evidence' requirement demands more than that - less than legal

25 'sufficiency' of evidence, but more than a trivial charade."). In

26 addition, the evidence underlying the decision must possess some

27 indicia of reliability." Biggs, 334 F.3d at 914 (internal quotations

28 omitted); Caswell, 363 F.3d at 839; see Hill, 472 U.S. at 455-456.

1 Evidence that lacks any real probative value cannot constitute "some

2 evidence." See Cato, 924 F.2d at 705 (holding that a hearsay statement

3 attributed to an inmate whose polygraph examination yielded

4 inconclusive results was "not enough evidence to meet the Hill

5 standard."). Otherwise, the requirement of "some evidence" could be

6 satisfied by baseless speculation, superstition, or stereotyping.

7 That, too, would reduce the requirement of "some evidence" to a sham

8 or a mockery.

9     As it was required to do, the BPT considered whether petitioner

10 was suitable for parole - that is, whether he presented an

11 unreasonable risk of danger to society if released. See Cal.Penal

12 Code §3041(b); 15 Cal.Code Regs. § 2402. It decided that petitioner

13 posed an unreasonable risk of danger (and, therefore, was unsuitable

14 for parole) because his crime was especially heinous.[16] While relying

15 upon the nature of petitioner's crime as an indicator of his

16 dangerousness may be reasonable for some period of time, in this case

17 ――――――――――――――

18     [16] The facts of petitioner's crime also are relevant to the BPT's setting of a parole release date. California law provides that

19     [t]he release date shall be set in a manner that will provide

20 uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue

21 and any sentencing information relevant to the setting of parole release dates. The board shall establish criteria for

22 the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the

23 inmate was sentenced and other factors in mitigation or aggravation of the crime.

24 Cal.Penal Code § 3041(a). Thus, the circumstances of the commitment

25 offense are relevant to two determinations: (a) whether a prisoner is suitable for parole - i.e., whether he or she presents an unreasonable

26 risk of danger to society if released, and (b) the appropriate length of incarceration required to fairly and uniformly punish him or her. As

27 evidenced by the parole dates already given to petitioner (March 30, 2000 and March 30, 2001), the BPT has determined that the severity of

28 petitioner's offense did not warrant punishment of more than 16 years.

40

1 continued reliance on such unchanging circumstances – after nearly two

2 decades of incarceration and half a dozen parole suitability hearings

3 – violates due process because petitioner's commitment offense has

4 become such an unreliable predictor of his present and future

5 dangerousness that it does not satisfy the "some evidence" standard.

6 After nearly twenty years of rehabilitation, the ability to predict a

7 prisoner's future dangerousness based simply on the circumstances of

8 his or her crime is nil. See Irons, 358 F.Supp.2d at 947 n. 2 ("To a

9 point, it is true, the circumstances of the crime and motivation for

10 it may indicate a petitioner's instability, cruelty, impulsiveness,

11 violent tendencies and the like. However, after fifteen or so years in

12 the caldron of prison life, not exactly an ideal therapeutic

13 environment to say the least, and after repeated demonstrations that

14 despite the recognized hardships of prison, this petitioner does not

15 possess those attributes, the predictive ability of the circumstances

16 of the crime is near zero."). Even California courts have said as

17 much. Scott, 133 Cal.App.4th at 595 ("The commitment offense can

18 negate suitability only if circumstances of the crime reliably

19 established by evidence in the record rationally indicate that the

20 offender will present an unreasonable public safety risk if released

21 from prison. Yet, the predictive value of the commitment offense may

22 be very questionable after a long period of time.").

23　　　　The probative value of petitioner's commitment offense as a

24 predictor of his present dangerousness is further diminished by

25 petitioner's age at the time of the offense. Petitioner turned 18 on

26 May 22, 1985 [see Petitioner's Ex. E at 1 (noting petitioner's birth

27 date as 5-22-67)], and committed his offense one month later. While

28

41

petitioner was not legally a minor, he was very close to being one.[17]
As the Supreme Court recently recognized, the predictive value of the
conduct of such a young person is less than that of an adult.

The susceptibility of juveniles to immature and
irresponsible behavior means "their irresponsible conduct is
not as morally reprehensible as that of an adult." Thompson
[v. Oklahoma, 487 U.S. 815, 835 (1988)] (plurality opinion).
Their own vulnerability and comparative lack of control over
their immediate surroundings mean juveniles have a greater
claim than adults to be forgiven for failing to escape
negative influences in their whole environment. See Stanford
[v. Kentucky, 492 U.S. 361, 395 (1989)] (Brennan, J.,
dissenting). The reality that juveniles still struggle to
define their identity means it is less supportable to
conclude that even a heinous crime committed by a juvenile
is evidence of irretrievably depraved character. From a
moral standpoint it would be misguided to equate the
failings of a minor with those of an adult, for a greater
possibility exists that a minor's character deficiencies
will be reformed. Indeed, "[t]he relevance of youth as a
mitigating factor derives from the fact that the signature
qualities of youth are transient; as individuals mature, the
impetuousness and recklessness that may dominate in younger

---

[17] Petitioner was an adolescent at the time he committed the
offense. See Cornelia Pechman, Linda Levine, Sandra Loughlin & Frances
Leslie, Impulsive and Self-Conscious: Adolescents' Vulnerability to
Advertising and Promotion, 24 J. Pub. Policy & Marketing 1 (Fall, 2005)
(explaining that the conventional view is that "adolescence is roughly
synonymous with teenager, or ages 13-19," but that "many scholars argue
that adolescence begins at approximately age 10 and does not end until
early 20s.") (citation omitted).

42

1    years can subside." Johnson [v. Texas, 509 U.S. 350, 368

2    (1993)].

3  Roper v. Simmons, 543 U.S. 551, 561-562 (2005); see also Thompson v.

4  Oklahoma, 487 U.S. 815, 835 (1998) (Stevens, J.) (plurality opinion)

5  ("[L]ess culpability should attach to a crime committed by a juvenile

6  than to a comparable crime committed by an adult.  The basis of this

7  conclusion  is  too  obvious  to  require  extensive  explanation.

8  Inexperience, less intelligence and less education make a teenager

9  less able to evaluate the consequences of his or her conduct while at

10  the same time he or she is more apt to be motivated by mere emotion or

11  peer pressure than as an adult."); Erica Beecher-Monas & Edgar Garcia-

12  Rill, Danger at The Edge of Chaos: Predicting Violent Behavior in a Post-

13  Daubert World, 24 Cardozo L.Rev. 1845, 1898 (2003) ("The decrease in violence

14  and criminal activity with age is a well-established principle of

15  criminology.").

16        Petitioner's case is exactly what Biggs envisioned when it stated

17  that repeated refusals to grant a parole release date to an inmate

18  with an exemplary post-conviction record may violate the prisoner's

19  due process rights.  Biggs, 334 F.3d at 919. The record in this case

20  is replete with evidence of petitioner's remorse and rehabilitation,

21  including glowingly positive psychological reports, extensive self-

22  improvement through completion of educational and vocational programs,

23  as well as therapy, valued service in promoting the penological goals

24  of the prison where he is confined, and nearly two decades of

25  disciplinary-free  incarceration.  The  evidence  of  petitioner's

26  outstanding performance while incarcerated is particularly important.

27  As the Supreme Court has recognized, "[t]he behavior of an inmate

28  during confinement is critical in the sense that it reflects the

43

43

1  degree to which the inmate is prepared to adjust to parole release."

2  *Greenholtz*, 442 U.S. at 15. Further, as detailed above, every

3  psychologist and correctional counselor who has evaluated petitioner

4  has concluded that petitioner would pose no significant risk of danger

5  if released. [Petitioner's Exs. E & F]. Regardless of whether the BPT

6  ever was entitled to rely upon the commitment offense to find that

7  petitioner posed an unreasonable risk of danger and was unsuitable for

8  parole, in the exceptional circumstances presented by this case, the

9  BPT's continued reliance on the commitment offense violates due

10  process because it resulted in an arbitrary decision and because the

11  facts surrounding the offense do not now constitute "some evidence"

12  possessing "some indicia of reliability" that petitioner pose a

13  danger to the community. See *Hill*, 472 U.S. at 455; *Biggs*, 334 F.3d

14  at 917; *Irons*, 358 F.Supp.2d at 947; *Masoner v. State*, 2004 WL

15  1080177, at *1-2 (C.D.Cal. 2004) ("Although the gravity of the

16  commitment offense and other pre-conviction factors alone may be

17  sufficient to justify the denial of a parole date at a prisoner's

18  initial hearing, subsequent BPT decisions to deny a parole date must

19  be supported by some post-conviction evidence that the release of an

20  inmate is against the interest of public safety. Masoner's successful

21  rehabilitation and spotless prison record, in combination with his

22  having served 21 years and the type of crime usually associated with

23  such a sentence under the Universal Terms Matrix, indicate that there

24  is no legitimate post-conviction justification for the BPT's repeated

25  refusal to grant him a parole date.").

26      Because there is no reliable evidence supporting the BPT's

27  conclusion that petitioner is unsuitable for parole, that

28  determination violates due process. See *Hill*, 472 U.S. at 455. The

44

1  state court's determination to the contrary was based upon an
2  unreasonable determination of the facts in light of the evidence
3  presented during the parole hearing, and that determination amounted
4  to an unreasonable application of clearly established Supreme Court
5  precedent. <u>See</u> <u>Hill</u>, 472 U.S. at 455; <u>Taylor v. Maddox</u>, 366 F.3d 992,
6  999-1000 (9th Cir.), <u>cert. denied</u>, 543 U.S. 1038 (2004). Accordingly,
7  petitioner is entitled to relief.[18]  <u>See</u> <u>McQuillion</u>, 306 F.3d at 912
8  (finding that petitioner was entitled to relief where none of the four
9  grounds for recision of petitioner's parole release date was supported
10 by "some evidence," and therefore the decision violated due process);
11 <u>Martin v. Marshall</u>, ___ F.Supp.2d ___, 2006 WL 1344584, *8 (N.D.Cal.
12 2006) (granting habeas relief, noting that the petitioner had served
13 23 years of his 20 year to life sentence and had "demonstrate[d]
14 exemplary behavior and evidence of rehabilitation" for a significant
15 period of time, and holding that "the sole reliance on petitioner's
16 commitment offense in denying him parole impinges on petitioner's
17 constitutional liberty interest in parole."); <u>Irons</u>, 358 F.Supp.2d at
18 947-951 (granting habeas relief where the BPT improperly relied upon
19 the unchanging circumstances of the commitment offense in finding
20 petitioner unsuitable for parole in his fifth parole suitability
21 hearing, and also asserted that petitioner needed more therapy, a
22 conclusion that lacked any support in the record); <u>Saif'ullah</u>, 2005 WL

23
24      [18]   Although it is not clear whether he is doing so, to the extent
25 that petitioner alleges that he was denied his right to a parole release
   date under section 3041(a) or was denied a parole release date that was
26 comparable to parole release dates granted to inmates convicted of
   similar crimes, his claim is foreclosed by <u>Dannenberg</u> and also fails to
27 raise a cognizable federal issue. <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62,
   67-68 (1991). Further, since petitioner is entitled to relief because
28 the BPT's decision violates due process, the Court need not address
   petitioner's other claims.

45

45

1  1555389 at *13-16 (granting habeas relief where the record contained

2  no evidence supporting the BPT's decision that petitioner was a danger

3  to society and unsuitable for parole based upon (a) his commitment

4  offense, (b) his prior criminal history, and (c) a rules violation

5  which resulted when, based upon his religious beliefs, petitioner

6  refused to cut his hair).

### Conclusion

8  For the foregoing reasons, the petition should be granted.

9  Because petitioner's parole date has twice been determined under

10  California law, and because both of those dates (March 30, 2000 and

11  March 30, 2001) have long since passed, respondent should be directed

12  to release petitioner on parole within thirty (30) days of the date of

13  entry of judgment.  McQuillion v. Duncan, 342 F.3d 1012, 1015-1016

14  (9th Cir. 2003) (affirming grant of relief on appeal after remand, and

15  explaining that proper relief is immediate release rather than remand

16  for further parole proceedings where no evidence in the record

17  supported the BPT's determination that the petitioner was not suitable

18  for parole); Saif'ullah, 2005 WL 1555389 at *16 ("In the absence of

19  any evidence in the record supporting the Board's decision, remanding

20  the case for a new hearing is futile, and the appropriate remedy is to

21  grant the release of the petitioner.").

23  DATED: 6.23.2006

25  Andrew J. Wistrich
26  United States Magistrate Judge

46

**EXHIBIT 52**

Orange County Superior Court Denial

1  Mark Titch
   B-89549, F1-04-227
2  P.O. Box 799001
   San Diego, Ca  92179-9001
3
   Petitioner, Pro Se
4

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

FEB 23 2007

ALAN SLATER, Clerk of the Court

BY:_____L. MA_____, DEPUTY

5
6              SUPERIOR COURT OF CALIFORNIA
7               IN AND FOR ORANGE COUNTY
8
9
10  In the matter of:            )
11       MARK TITCH,             )   Case No. M-11226
         Petitioner, Pro Se      )
12                               )
            v.                   )
13                               )
    ROBERT J. HERNANDEZ,         )
14  Warden, RJDCF                )
                                 )
15          and                  )
                                 )
16  JAMES DAVIS,                 )   PETITION FOR WRIT OF HABEAS CORPUS
    Chairperson, BPH             )
17  _____    )
18
19
20
21
22
23
24
25
26
27
28

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

APR 1 6 2007

ALAN SLATER, Clerk of the Court

BY: _____ DEPUTY

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# FOR THE COUNTY OF ORANGE

| | |
|---|---|
| In re MARK WAYNE TITCH, | Orange County Superior Court |
| | Case Number: M-11226 |
| Petitioner, | (C-37693) |
| | |
| | **ORDER DENYING** |
| ON HABEAS CORPUS | **HABEAS CORPUS** |

**TO THE OFFICE OF THE CALIFORNIA ATTORNEY GENERAL AND PETITIONER:**

HAVING REVIEWED THE ABOVE CAPTIONED PETITION FOR WRIT OF HABEAS CORPUS AND EXHIBITS, THE COURT MAKES THE FOLLOWING ORDER:

I.

Petitioner is serving an indeterminate term of life imprisonment with the possibility of parole following his 1978 guilty plea and conviction on two counts of first degree murder [Pen. Code, § 187], five counts of armed first degree robbery [Pen. Code, § 211/§ 12022.5], three counts of second degree burglary [Pen. Code, § 459], and one count of armed kidnapping for robbery [Pen. Code, § 209/§ 12022.5]. Petitioner is also currently serving a concurrent term of life imprisonment with the possibility of parole stemming from a conviction for armed assault with a deadly weapon on a peace officer [Pen. Code, § 245/§ 12022.5] sustained in the San Diego County Superior Court.

The Board of Parole Hearings deemed petitioner unsuitable for parole following an July 19, 2006 subsequent parole consideration hearing. The Board specifically found that:

1.    The commitment offenses were carried out against multiple victims for very
trivial motives in an especially cruel, dispassionate, and calculated manner
demonstrating an exceptionally callous disregard for human suffering.

2.    Petitioner has an escalating pattern of criminal conduct and violence.

3.    Petitioner has a record of institutional misconduct.

4.    Petitioner's psychological assessment is not entirely supportive of his release
on parole.

5.    Opposition to petitioner's release on parole was expressed by both the
Anaheim Police Department and the Orange County District Attorney's Office.

II.

Petitioner seeks to vacate the Board of Parole Hearings' determination claiming:

A.    The Board violated petitioner's right to due process by failing to adhere to
administrative regulations applicable to petitioner's parole suitability hearing.

B.    The Board's decision is without evidentiary support and lacks a rational nexus
between those factors of unsuitability found by the Board and petitioner's
current parole risk.

C.    The Board's continued reliance on the unchanging circumstances of his
commitment offense to find petitioner unsuitable for parole while ignoring
ample evidence supportive of parole improperly converts petitioner's sentence
to life imprisonment without the possibility of parole.

III.

The petition does not set forth a meritorious basis for relief on habeas corpus.  To the
extent petitioner faults the Board for evaluating his suitability for release on parole using

3

1    criteria set forth in § 2281 of Title 15 of the California Code of Regulations rather than

2    criteria applicable to ISL inmates, such contention is without merit.  The parole suitability

3    criteria applicable to inmates convicted of committing murder prior to July 8, 1978, are set

4
5    forth in Cal. Code Regs., tit. 15, §§ 2281.  (See, *Board of Prison Terms v. Superior Court*

6    (2005) 130 Cal.App.4th 1212, 1232, fn. 5; Cal. Code of Regs., tit. 15, § 2292(b).)

7         Equally without merit is petitioner's legal challenge to the sufficiency of the evidence

8    relied upon by the Board to find him unsuitable for parole.  The determination made by the

9    Board concerning petitioner's parole suitability is adequately supported by evidence in the

10
11   record.  In reaching its decision, the Board rationally relied upon the circumstances of the

12   commitment offenses.  (See, Pen. Code, § 3041(b); Cal. Code of Regs., tit. 15, § 2281(b)

13   and (c)(1)(A)(B)(D)(E).)

14         The convictions stem from a violent crime spree carried out by petitioner between

15   November 1976 and January 1977.  On November 19 and December 14, 1976, petitioner

16   awakened unsuspecting victims from their sleep in the middle of the night during two

17   separate incidents, threatened them with a firearm, and robbed them of money and

18   personal belongings.  On December 18, 1976, petitioner, along with a crime partner,

19   perpetrated the same crime against another helpless couple in the same fashion with the

20
21   same result.

22         On December 21, 1976, petitioner robbed a restaurant with a firearm and took $60.

23   On December 27, 1976, January 16, and January 19, 1977, petitioner burglarized three

24   separate homes and stole a pair of automobiles.

25
26         On December 27, 1976, petitioner and a crime partner robbed a liquor store at

27   gunpoint.  While leaving the scene, petitioner was confronted by a peace officer.  Petitioner

28

4

1  fired upon the officer with his firearm striking him five times and causing severe injuries.

2  This offense is the basis for the conviction sustained by petitioner in San Diego County.

3        On January 27, 1977, a motorcycle rider discovered the dead body of a 21 year old

4
5  woman clutching a rosary in a vacant filed in the City of Orange.  The unarmed victim had

6  two gunshot wounds to the mouth area and one wound to the shoulder that were inflicted by

7  the petitioner.

8        On January 29, 1977, petitioner and a crime partner followed their last victim home

9
   from work.  As the unsuspecting victim was attempting to enter his home, he was fatally
10
11  shot several times by petitioner's crime partner with a .22 caliber rifle.  The victim's wife was

12  also shot multiple times as she opened the door.  Petitioner's crime partner shot her again

13  with a shotgun after running out of ammunition for the rifle.  The couple's daughter was

14  fatally shot multiple times during this incident as well.

15        No abuse of discretion is perceived in this instance.  Petitioner engaged in a violent
16
17  crime spree targeting unsuspecting and seemingly random victims for no apparent reason

18  other than to terrorize, harm, and/or kill them and deprive them of their personal belongings.

19  The Board's characterization of the offenses as cruel and callous is warranted as petitioner

20  displayed no concern for his many victims some of which were left to die in a desolate field

21
22  or on the doorstep to their own home.

23        Evidence in the record supports the Board's finding that petitioner has an escalating

24  pattern of criminal conduct and violence.  The record reveals that between 1972 and 1976,

25  petitioner was arrested and/or sustained juvenile adjudications for truancy, malicious

26
27  mischief, escape, threat to assault, burglary, armed robbery, and assault with intent to

28  commit murder.  Notwithstanding petitioner's claim that some of the misconduct did not

-4-

5

1    involve violence or result in formal adjudications, this persistent anti-social behavior is

2    rationally related to causative factors leading up to the commitment offenses and justifies

3    the Board's ongoing concern that petitioner may not behave differently if released on parole.

4    (See, Cal. Code of Regs., tit. 15, § 2281(b).)

5

6            Evidence in the record also supports the Board's reliance on petitioner's record of

7    institutional misconduct.  Prior to 1986, petitioner was disciplined five separate times for

8    major institutional misconduct involving violence and the illegal manufacture of alcohol.

9    Though the serious misconduct is some 20 years removed from the issue presently under

10   review, it is relevant to petitioner's overall pattern of disregard for the law and apparent

11

12   contempt for authority and justifies the Board's lingering concern over petitioner's ability to

13   be safely released into the community on parole.  (See, Cal. Code of Regs., tit. 15, §

14   2281(b) and (c)(6).)

15           The Board's determination that petitioner's most recent psychological assessment is

16

17   not fully supportive of his release on parole is supported by some evidence in the record.

18   While the report does state that petitioner has only a history of antisocial personality

19   disorder and would pose a less than average risk of violent behavior if released on parole,

20   the psychiatrist's assessment is guarded at best.  In his assessment of petitioner's potential

21

22   danger, Dr. John Preston opined petitioner has begun to take those steps necessary which

23   with the passage of time will point toward a diminishing propensity toward criminal behavior.

24   Dr. Preston expressed the view that so long as petitioner continues to program positively

25   and upgrade his parole plans and level of support from the community, he will move towards

26   a point in time in which the risk inherent in his release on parole may be acceptable.  The

27

28

6

1  Board was well within it authority to interpret Dr. Preston's evaluation as not being

2  completely support of petitioner's release on parole at this time.

3  The Board finally relied on opposition to parole expressed by both the Anaheim

4
5  Police Department and the Orange County District Attorney's Office.  No abuse of discretion

6  is evident as the Board is statutorily required to consider these views when considering the

7  parole suitability of a particular inmate.  (See, Pen. Code, § 3042(a), § 3046(c).)

8  The Board acknowledged petitioner's favorable accomplishments while in prison

9  which include a recent discipline free record, extensive educational and vocational

10
11  programming, and realistic parole plans.  The Board nevertheless found that the positive

12  aspects of petitioner's prison record do not outweigh those circumstances pointing to

13  unsuitability for release on parole at this time.  Petitioner does not satisfy his burden of

14  demonstrating arbitrary and capricious action on the part of the Board of Parole Hearings.

15  Due consideration of petitioner's eligibility for parole was given and a proper evidentiary
16
17  foundation exists for the Board's determination finding petitioner currently unsuitable for

18  release on parole.

19  The Board has very broad discretion to identify and weigh the factors relevant to

20  predicting by subjective analysis whether an inmate will be able to live in society without

21
22  committing additional antisocial acts.  (In re Fuentes (2005) 135 Cal.App.4th 152, 160.)  In

23  reviewing a parole suitability determination made by the Board of Parole Hearings, a court

24  views the record in the light most favorable to that determination.  (See, In re Morrall (2002)

25  102 Cal.App.4th 280, 301.)

26  Courts may review the factual basis of a decision of the Board denying parole in

27
28  order to ensure that the decision complies with due process of law.  However, courts may

7

1    only inquire whether some evidence in the record before the Board supports the decision to

2    deny parole, based upon the factors specified by statute and regulation. (*In re Rosenkrantz*

3    (2002) 29 Cal.4th 616, 658.)

4

5    The precise manner in which the specified factors relevant to parole suitability are

6    considered and balanced lies within the discretion of the Board of Parole Hearings, but the

7    decision must reflect an individualized consideration of the specified criteria and cannot be

8    arbitrary or capricious. It is irrelevant that a court might determine that the evidence in the

9    record tending to establish suitability for parole far outweighs evidence demonstrating

10   unsuitability for parole. As long as the decision reflects due consideration of the specified

11   factors as applied to the individual prisoner in accordance with applicable legal standards,

12

13   the court's review is limited to ascertaining whether there is some evidence in the record

14   that supports the decision. (*In re Rosenkrantz, supra,* 29 Cal.4th at 677.)

15   Petitioner's remaining contention is likewise without merit. In evaluating an individual

16   inmate's parole suitability, the Board of Parole Hearings is not precluded from relying on the

17   unchanging circumstances of the commitment offense.

18

19   The panel or board shall set a release date unless it determines that the gravity of the

20   current convicted offense or offenses, is such that consideration of the public safety requires

21   a lengthier period of incarceration for this individual, and that a parole date, therefore,

22   cannot be fixed at this meeting. (Pen. Code, § 3041(b).) The Board of Parole Hearings

23   "may protect public safety in each discrete case by considering the dangerous implications

24   of a life-maximum prisoner's crime individually. While the Board must point to factors

25

26   beyond the minimum elements of the crime for which the inmate was committed, it need

27   engage in no further comparative analysis before concluding that the particular facts of the

28

-7-

8

1   offense make it unsafe, at that time, to fix a date for the prisoner's release." (*In re*

2   *Dannenberg* (2005) 34 Cal.4[th] 1061, 1071.)

3                                                  IV.

4       No prima facie case for relief is established.  An order to show cause will issue only if

5

6   petitioner has established a prima facie case for relief on habeas corpus.  (*People v.*

7   *Romero* (1994) 8 Cal.4th 728, 737; *In re Clark* (1993) 5 Cal.4th 750, 769, fn. 9.)

8       The petition for writ of habeas corpus is DENIED.

9

10

11

12   Dated:   4-16-07

13                                          Judge of the Superior Court

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9



SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF ORANGE

# MINUTE ORDER

**Case Number   M-11226 X A**

<u>**People Vs Titch, Mark**</u>

| Report Request Criteria |  |
| --- | --- |
| 1. Docket Date Range | : Date filter |
| 2. Sequnce Number Range | : Sequence filter |
| 3. Docket Category | : Category filter |

| <u>Docket Dt</u> | <u>Seq</u> | <u>Text</u> |
| --- | --- | --- |
| 4/16/2007 | 1 | **Hearing held on 04/16/2007 at 09:00 AM in Department C5 for Chambers Work.** |
| | 2 | Officiating Judge: Kazuharu Makino, Judge |
| | 3 | Clerk: L. Torres |
| | 4 | No Court Reporter present at proceedings. |
| | 5 | No appearances. |
| | 6 | Order denying Writ of Habeas Corpus filed. |
| | 7 | Petition for Writ of Habeas Corpus is denied for the reasons stated in the order denying writ filed 02/23/2007. |
| | 8 | As ordered, the clerk this date has mailed a copy of this minute order to the Petitioner at<br>MARK TITCH<br>CDC #B-89549<br>F1-04-227L<br>R.J. DONOVAN CORRECTIONAL FACILITY<br>P.O. BOX 799001<br>SAN DIEGO, CA 92179-9001. |
| | 9 | The clerk this date has forwarded a copy of this minute order to Orange County District Attorney's Office. |

- 9 -

| | | |
| --- | --- | --- |
| Name:  Titch, Mark | | Case: M-11226 X A |
| Page 1 of 1 | MINUTE ORDER | Report Date: 04/19/2007 08:43 |

10

**EXHIBIT 53**

California Appellate Court Denial

1  Mark Titch
   B-89549, F1-04-227
2  P.O. Box 799001
   San Diego, Ca  92179-9001
3  Petitioner, Pro Se

   COURT OF APPEAL 4TH DIST DIV 3
4                              F I L E D

5                           MAY 7 - 2007

6          CALIFORNIA COURT OF APPEAL      Deputy Clerk_____

7       FOURTH APPELLATE DISTRICT

8
9                              )
                               )
10  In re MARK TITCH           )
                               )
11          on                 )    Case No.  GO38608
                               )
12    Habeas Corpus            )
                               )
13                             )
                               )    PETITION FOR WRIT OF HABEAS CORPUS
                               )
14  _____)

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

COURT OF APPEAL-4TH DIST DIV 3
F I L E D

JUN 2 8 2007

Deputy Clerk _____

|  |  |
|---|---|
| In re MARK WAYNE TITCH<br><br>on Habeas Corpus. | G038608<br><br>(Super. Ct. No. M11226)<br><br>O R D E R |

THE COURT:*

The petition for a writ of habeas corpus is DENIED.

**RYLAARSDAM, J.**
_____
RYLAARSDAM, ACTING P. J.

\* Before Rylaarsdam, Acting P. J., Fybel, J., and Ikola, J.

☐ **COPY**

2

**EXHIBIT 54**

California Supreme Court Denial

MC-275

"COPY"

Name    **Mark Titch**

Address    **B-89549, Fl-04-227L**

**P.O. Box 799001**

**San Diego, Ca.  92179-9001**

CDC or ID Number    **B-89549**

SUPREME COURT
# FILED

AUG – 6 2007

Frederick K. Ohlrich Clerk

**CALIFORNIA SUPREME COURT**
(Court)

Deputy

PETITION FOR WRIT OF HABEAS CORPUS

**MARK TITCH**
Petitioner, Pro Se

vs.

**ROBERT J. HERNANDEZ**, Warden RJDCF

Respondent(s), et.al.

# S155126

No. _____

(To be supplied by the Clerk of the Court)

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

S155126

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

---

In re MARK TITCH on Habeas Corpus

---

The petition for writ of habeas corpus is denied.

SUPREME COURT
FILED

FEB 2 0 2008

Frederick K. Ohlrich Clerk

_____
Deputy


_____
GEORGE
Chief Justice