Mark Titch
B-89549, F1-04-227
P.O. Box 799001
San Diego, Ca   92179-9001

Petitioner, Pro Se



**FILED**

AUG 2 7 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MARK TITCH,<br>Petitioner, Pro Se | Case No. 08-CV-0654 J (WMc) |
| vs. | |
| ROBERT J. HERNANDEZ,<br>Warden, RJDCF, et.al. | LODGEMENT OF DOCUMENTS IN SUPPORT OF<br>PETITIONER'S TRAVERSE |

Petitioner, Mark Titch, hereby lodges with this court Exhibits A thru E.

These documents are necessary to support the claims petitioner has made in

his traverse and comply with federal and local rules of court.

Dated: _____8/25/08_____

Respectfully Submitted,

Mark Titch, Petitioner

1

**TABLE OF EXHIBITS**

2
Page(s)

3    EXHIBIT A:  Santa Clara Superior Court Case In re Criscione    1-34

4    EXHIBIT B:  Petitioner's Positive Accomplishments (2006-2008)    1-14

5    EXHIBIT C:  Petitioner's 2008 Psychological Evaluation    1-10

6    EXHIBIT D:  BPH Parole Consideration Worksheet & Hearing
                  Decision Face Sheet    1-2

7

8    EXHIBIT E:  Los Angeles Times News Article    1-2

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF RECORDS

I __Mark Titch__ , do hereby declare the following:

The attached documents are true and correct copies of the original

documents.  Where the documents were given to petitioner by another

person, petitioner believe them to be true and correct copies.

I declare under penalty of perjury that the foregoing is true and

correct and that this declaration was executed on __8/25/08__

at San Diego, California.

/s/ _Mark Titch_

Mark Titch, Petitioner

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A**

Santa Clara Superior Court Case <u>In re Criscione</u>

09/12/2007  11:00

**(ENDORSED)**
**F I L E D**

AUG 3 0 2007

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of Santa Clara
By BRET MORROW
DEPUTY

1

2

3          SUPERIOR COURT OF CALIFORNIA

4               COUNTY OF SANTA CLARA

5

6

7   In re                          )     No.: 71614
                                   )
8        ARTHUR CRISCIONE,          )
                                   )     ORDER
9   On Habeas Corpus               )
                                   )

10

11

12                        **INTRODUCTION**

13      Petitioner alleges that he has been denied due process of law

14   because the Board has used standards and criteria which are

15   unconstitutionally vague in order to find him unsuitable for parole.

16   Alternatively, he argues that those standards, even if

17   constitutionally sound, are nonetheless being applied in an arbitrary

18   and meaningless fashion by the Board.  He relies upon evidence that

19   in one hundred percent of 2690 randomly chosen cases, the Board found

20   the commitment offense to be "especially heinous, atrocious or

21   cruel", a factor tending to show unsuitability under Title 15

22   §2402(c)(1).

23   <u>**Are the Board Criteria Unconstitutionally Vague?**</u>

24      Our courts have long recognized that both state and federal due

25   process requirements dictate that the Board must apply detailed

26   standards when evaluating whether an individual inmate is unsuitable

27   for parole on public safety grounds.  (See *In re Dannenberg* (2005) 34

28

1

Cal.4th 1061 at p. 1096, footnote 16.). Those standards are found in 15 CCR §2402(c) (*Dannenberg, supra,* 34 Cal.4th at p. 1080,) and do include detailed criteria to be applied by the Board when considering the commitment offense:

> (c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:
>
> (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
>
> (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
>
> (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
>
> (C) The victim was abused, defiled or mutilated during or after the offense.
>
> (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
>
> (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

In response to Petitioners claim that the regulations are impermissibly vague, Respondent argues that while "especially heinous, atrocious or cruel" might be vague in the abstract it is limited by factors (A)-(E) of §2402(c)(1), and thus provides a 'principled basis' for distinguishing between those cases which are contemplated in that section and those which are not. An examination of cases involving vagueness challenges to death penalty statutes is instructive here and shows that Respondent's position has merit:

> "Our precedents make clear that a State's capital sentencing

1  scheme also must genuinely narrow the class of persons eligible
   for the death penalty.  When the purpose of a statutory
2  aggravating circumstance is to enable the sentencer to
   distinguish those who deserve capital punishment from those who
3  do not, the circumstance must provide a principled basis for
   doing so.  If the sentencer fairly could conclude that an
4  aggravating circumstance applies to every defendant eligible for
   the death penalty, the circumstance is constitutionally infirm."
5      (*Arave v. Creech* (1993) 507 U.S. 463, 474, citing *Maynard v.
   Cartwright* (1988) 486 U.S. 356, 364: "invalidating aggravating
6  circumstance that 'an ordinary person could honestly believe'
   described every murder," and, *Godfrey v. Georgia* (1980) 446 U.S.
7  420, 428-429: "A person of ordinary sensibility could fairly
   characterize almost every murder as 'outrageously or wantonly
8  vile, horrible and inhuman.'")

9

10     It cannot fairly be said that 'every murder' could be

11 categorized as "especially heinous, atrocious or cruel" under the

12 Board regulations, since the defining factors contained in

13 subdivisions (A)-(E) clearly narrow the group of cases to which it

14 applies.  Although Petitioner also argues that the "vague statutory

15 language is not rendered more precise by defining it in terms or

16 synonyms of equal or greater uncertainty"  (*People v. Superior Court

17 (Engert)* (1982) 31 Cal.3d 797, 803, *Pryor v. Municipal Court* (1979)

18 25 Cal.3d 238, 249. *See also Walton v. Arizona* (1990) 497 U.S. 639,

19 654), the factors in those subdivisions are not themselves vague or

20 uncertain.  The mere fact that there may be some subjective component

21 (such as "exceptionally callous" disregard for human suffering) does

22 not render that factor unconstitutionally vague.   The proper degree

23 of definition of such factors is not susceptible of mathematical

24 precision, but will be constitutionally sufficient if it gives

25 meaningful guidance to the Board.

26     A law is void for vagueness if it "fails to provide adequate
       notice to those who must observe its strictures and
27     impermissibly delegates basic policy matters to policemen,
       judges, and juries for resolution on an ad hoc and subjective
28     basis, with the attendant dangers of arbitrary and

                                3

3

1    discriminatory application."  (People v. Rubalcava (2000) 23
     Cal.4th 322, 332, quoting People ex rel. Gallo v. Acuna (1997)
2    14 Cal. 4th 1090, 1116, quoting Grayned v. City of Rockford
     (1972) 408 U.S. 104, 108-109.)

3    A review of cases expressing approval of definitions to limit the

4    application of otherwise vague terms in death penalty statutes leads

5    inextricably to the conclusion that the limiting factors in §2402(c)

6    easily pass constitutional muster.  An Arizona statute was upheld

7    that provided a crime is committed in an 'especially cruel manner'

8    when the perpetrator inflicts mental anguish or physical abuse before

9    the victim's death," and that "mental anguish includes a victim's

10   uncertainty as to his ultimate fate."  (Walton v. Arizona (1990) 497

11   U.S. 639, 654.)  Similarly, the court in Maynard v. Cartwright, 486

12   U.S. at 364-365, approved a definition that would limit Oklahoma's

13   "especially heinous, atrocious, or cruel" aggravating circumstance to

14   murders involving "some kind of torture or physical abuse.  In

15   Florida, the statute authorizing the death penalty if the crime is

16   "especially heinous, atrocious, or cruel," satisfied due process

17   concerns where it was further defined as "the conscienceless or

18   pitiless crime which is unnecessarily torturous to the victim."

19   State v. Dixon (1973) 283 So. 2d 1 at p. 9.

20        Here, the factors in subdivisions (A)-(E) provide equally clear

21   limiting construction to the term "especially heinous, atrocious, or

22   cruel" in §2402(c).

23   Has the Board Engaged in a Pattern of Arbitrary Application of the
24   Criteria?

25        As previously noted, 15 CCR §2402 provides detailed criteria for

26   determining whether a crime is "exceptionally heinous, atrocious or

27   cruel" such that it tends to indicate unsuitability for parole.  Our

28

                                    4

1  courts have held that to fit within those criteria and thus serve as

2  a basis for a finding of unsuitability, the circumstances of the

3  crime must be more aggravated or violent than the minimum necessary

4  to sustain a conviction for that offense.  (*In re Rosenkrantz* (2002)

5  29 Cal.4th 616, 682-683.)  Where that is the case, the nature of the

6  prisoner's offense, *alone*, can constitute a sufficient basis for

7  denying parole.  (*In re Dannenberg, supra,* 34 Cal.4th at p. 1095.)

8       Petitioner claims that those criteria, even if constitutionally

9  sound, have been applied by the Board in an arbitrary and capricious

10  manner rendering them devoid of any meaning whatever.  The role of

11  the reviewing court under these circumstances has been addressed

12  previously in the specific context of Parole Board actions:

13       "[Courts have] an obligation, however, to look beyond the facial
     validity of a statute that is subject to possible
14     unconstitutional administration since a law though fair on its
     face and impartial in appearance may be open to serious abuses
15     in administration and courts may be imposed upon if the
     substantial rights of the persons charged are not adequately
16     safeguarded at every stage of the proceedings.  We have
     recognized that this court's obligation to oversee the execution
17     of the penal laws of California extends not only to judicial
     proceedings, but also to the administration of the Indeterminate
18     Sentence Law."  (*In re Rodriguez* (1975) 14 Cal.3d 639, 648,
     quoting *Minnesota v. Probate Court* (1940) 309 U.S. 270, 277.)

19

20       Similarly, in *In re Minnis* (1972) 7 Cal.3d 639, 645, the case

21  closest on point to the present situation, the California Supreme

22  Court stated: "This court has traditionally accepted its

23  responsibility to prevent an authority vested with discretion from

24  implementing a policy which would defeat the legislative motive for

25  enacting a system of laws."  Where, as here, the question is whether

26  determinations are being made in a manner that is arbitrary and

27  capricious, judicial oversight "must be extensive enough to protect

28

1  limited right of parole applicants 'to be free from an arbitrary

2  parole decision... and to something more than mere pro-forma

3  consideration.'"  (*In re Ramirez* (2001) 94 Cal.App.4th 549 at p. 564,

4  quoting *In re Sturm* (1974) 11 Cal.3d 258 at p. 268.)

5      This Court, therefore, now examines Petitioner's "as applied"

6  void for vagueness challenge.

7

8                    ### The Evidence Presented

9      A similar claim to those raised here, involving allegations of

10  abuse of discretion by the Board in making parole decisions, was

11  presented to the Court of Appeal in *In re Ramirez, supra*.  The court

12  there observed that such a "serious claim of abuse of discretion"

13  must be "adequately supported with evidence" which should be

14  "comprehensive."  (*Ramirez, supra*, 94 Cal.App.4th at p. 564, fn. 5.)

15  The claim was rejected in that case because there was not "a

16  sufficient record to evaluate."  (*Ibid.*)  In these cases, however,

17  there is comprehensive evidence offered in support of Petitioner's

18  claims.

19      Discovery orders were issued in five different cases involving

20  life term inmates (Petitioners) who all presented identical claims.[1]

21

22  [1] This Court takes judicial notice of the several other cases currently
    pending (Lewis #68038, Jameison #71194, Bragg #108543, Ngo #127611.) which

23  raise this same issue and in which proof was presented on this same point.
    (Evidence Code § 452(d).  See specifically, in the habeas corpus context,

24  *In re Vargus* (2000) 83 Cal.App.4th 1125, 1134-1136, 1143, in which judicial
    notice was taken of the evidence in four other cases and in which the court

25  noted: "Facts from other cases may assist petitioner in establishing a
    pattern."  See generally *McKell v. Washington Mutual, Inc.* (2006) 142

26  Cal.App.4th 1457, 1491: "trial and appellate courts ... may properly take
    judicial notice of ... established facts from both the same case and other

27  cases."  And see *AB Group v. Wertin* (1997) 59 Cal.App.4th 1022, 1036:
    Judicial notice taken of other cases when matters are "just as relevant to
    the present [case] as they are to the others.")

28

6

1  The purpose of the discovery was to bring before the Court a

2  comprehensive compilation and examination of Board decisions in a

3  statistically significant number of cases.  The Board decisions under

4  examination consisted of final decisions of the Board for life-term

5  inmates convicted of first or second degree murder and presently

6  eligible for parole.  Included were all such decisions issued in

7  certain months, chosen by virtue of their proximity in time to the

8  parole denials challenged in the pending petitions.  All Board

9  decisions in the months of August, September and October of 2002,

10  July, August, September, October, November, and December of 2003,

11  January and February of 2004, February of 2005, and January of 2006

12  were compiled.  This resulted in a review of 2690 cases decided in a

13  total of 13 months.

14      The purpose of the review was to determine how many inmates had

15  actually been denied parole based in whole or in part on the Board's

16  finding that their commitment offense fits the criteria set forth in

17  Title 15 §2402(c)(1) as "especially heinous, atrocious or cruel."  A

18  member of the research team conducting the review, Karen Rega,

19  testified that in its decisions the Board does not actually cite CCR

20  rule §2402(c), but consistently uses the specific words or phrases

21  ("verbiage from code") contained therein, so that it could easily be

22  determined when that criteria was being applied.  (For example,

23  finding "multiple victims" invokes §2402(c)(1)(A); finding the crime

24  "dispassionate" "calculated" or "execution style" invokes

25  §2402(c).(1)(B); that a victim was "abused" "mutilated" or "defiled"

26  invokes §2402(c)(1)(C);  a crime that is "exceptionally callous" or

27  demonstrated a "disregard for human suffering" fits criteria

28

7

1 | §2402(c)(1)(D); and finding the motive for the crime "inexplicable"

2 | or "trivial" invokes §2402(c)(1)(E).)

3 |    Petitioners provided charts, summaries, declarations, and the

4 | raw data establishing the above in the cases of Lewis #68038,

5 | Jameison #71194, Bragg #108543, and Ngo #127611.  In this case

6 | (Criscione #71614) the evidence was presented somewhat differently.

7 | Both to spread the burden of the exhaustive examination, and to

8 | provide a check on Petitioners' methods, this Court ordered

9 | Respondent to undertake an examination of two randomly chosen months

10 | in the same manner as Petitioner had been doing.  Respondent complied

11 | and provided periodic updates in which they continued to report that

12 | at all "the relevant hearings the Board relied on the commitment

13 | offense as a basis for denying parole."  (See "Respondent's Final

14 | Discovery Update" filed April 5, 2007.)  At the evidentiary hearing

15 | on this matter counsel for Respondents stipulated that "in all of

16 | those cases examined [by Respondent pursuant to the Criscione

17 | discovery orders] the Board relied on the commitment offense as a

18 | basis for denying parole."  (See pages 34-35 of the June 1, 2007,

19 | evidentiary hearing transcript.)

20 |    The result of the initial examination was that in over 90

21 | percent of cases the Board had found the commitment offense to be

22 | "especially heinous, atrocious or cruel" as set forth in Title 15

23 | §2402(c)(1).  In the remaining 10% of cases either parole had been

24 | granted, or it was unclear whether §2402(c)(1) was a reason for the

25 | parole denial.  For all such cases, the decisions in the prior

26 | hearing for the inmate were obtained and examined.  In every case,

27 | the Board had determined at some point in time that every inmates

28 |

8

1  crime was "especially heinous, atrocious or cruel" under Title 15

2  §2402(c)(1).

3        Thus, it was shown that 100% of commitment offenses reviewed by

4  the Board during the 13 months under examination were found to be

5  "especially heinous, atrocious or cruel" under Title 15 §2402(c)(1).

6        A further statistic of significance in this case is that there

7  are only 9,750 inmates total who are eligible for, and who are

8  currently receiving, parole consideration hearings as life term

9  inmates.  (See "Respondent's Evidentiary Hearing Brief," at p. 4,

10  filed April 16, 2007.)

11

12                        USE OF STATISTICS

13        In *International Brotherhood of Teamsters v. United States*

14  (1977) 431 U.S. 324, 338-340, the United States Supreme Court

15  reaffirmed that statistical evidence, of sufficient "proportions,"

16  can be sound and compelling proof.  As noted by the court in *Everett*

17  *v. Superior Court* (2002) 104 Cal.App.4th 388, 393, and the cases cited

18  therein, "courts regularly have employed statistics to support an

19  inference of intentional discrimination."

20        More recently, the United States Supreme Court, in *Miller-El v.*

21  *Cockrell* (2003) 537 U.S. 322, 154 L.Ed.2d 931, when examining a habeas

22  petitioner's allegations that the prosecutor was illegally using his

23  peremptory challenges to exclude African-Americans from the

24  petitioner's jury, noted that "the statistical evidence alone" was

25  compelling.  The high court analyzed the numbers and concluded:

26  "Happenstance is unlikely to produce this disparity." (See also

27  *People v. Hofsheier* (2004) 117 Cal.App.4th 438 in which "statistical

28

                                    9

1 evidence" was noted as possibly being dispositive. And see *People v.*

2 *Flores* (2006) 144 Cal.App.4th 625 in which a statistical survey and

3 analysis, combined into an "actuarial instrument" was substantial

4 proof.)

5     A statistical compilation and examination such as has been

6 presented in these cases is entirely appropriate and sufficient

7 evidence from which to draw sound conclusions about the Board's

8 overall methods and practices.

9

10 **THE EXPERT'S TESTIMONY**

11     Petitioners provided expert testimony from Professor Mohammad

12 Kafai regarding the statistics and the conclusions that necessarily

13 follow from them. Professor Kafai is the director of the statistics

14 program at San Francisco State University, he personally teaches

15 statistics and probabilities, and it was undisputed that he was

16 qualified to give the expert testimony that he did. No evidence was

17 presented that conflicts or contradicts the testimony and conclusions

18 of Professor Kafai. By stipulation of the parties, Professor Kafai's

19 testimony was to be admissible and considered in the cases of all

20 five petitioners. (See page 35 of the June 1, 2007, evidentiary

21 hearing transcript.)

22     Professor Kafai testified that the samples in each case, which

23 consisted of two or three months of Board decisions, are

24 statistically sufficient to draw conclusions about the entire

25 population of life term inmates currently facing parole eligibility

26 hearings. Given that every inmate within the statistically

27 significant samples had his or her crime labeled "'particularly

28

10

1   egregious'" or "especially heinous, atrocious or cruel" under Title

2   15 §2402(c)(1), it can be mathematically concluded that the same

3   finding has been made for every inmate in the entire population of

4   9,750.  Although he testified that statisticians never like to state

5   unequivocally that something is proven to a 100% certainty, (because

6   unforeseen anomalies are always theoretically possible,) he did

7   indicate the evidence he had thus far examined came as close to that

8   conclusion as could be allowed.  Not surprisingly, Professor Kafai

9   also testified that "more than 50% can't by definition constitute an

10  exception."

11         Having found the data provided to the expert to be sound this

12  Court also finds the expert's conclusions to be sound.  In each of

13  the five cases before the Court over 400 inmates were randomly chosen

14  for examination.  That number was statistically significant and was

15  enough for the expert to draw conclusions about the entire population

16  of 9,750 parole eligible inmates.  The fact that the approximately

17  2000 inmates examined in the other cases also had their parole denied

18  based entirely or in part on the crime itself (§2402(c)(1)), both

19  corroborates and validates the expert's conclusion in each individual

20  case and also provides an overwhelming and irrefutable sample size

21  from which even a non expert can confidently draw conclusions.

22

23                              **DISCUSSION**

24         Although the evidence establishes that the Board frequently says

25  parole is denied "first," "foremost," "primarily," or "mainly,"

26  because of the commitment offense, this statement of primacy or

27  weight is not relevant to the question now before the Court.

28

                                    11

1  Petitioners acknowledge that the Board generally also cites other

2  reasons for its decision.  The question before this Court, however,

3  is not whether the commitment offense is the primary or sole reason

4  why parole is denied -- the question is whether the commitment

5  offense is labeled "'particularly egregious'" and thus could be used,

6  under *Dannenberg*, primarily or exclusively to deny parole.

7       The evidence proves that in a relevant and statistically

8  significant period where the Board has considered life term offenses

9  in the context of a parole suitability determination, every such

10 offense has been found to be "particularly egregious" or "especially

11 heinous, atrocious or cruel."[2]  This evidence conclusively

12 demonstrates that the Board completely disregards the detailed

13 standards and criteria of §2402(c).  "Especially" means particularly,

14 or "to a distinctly greater extent or degree than is common."[3]  (EC §

15 451(e).)  By simple definition the term "especially" as contained in

16 section 2402(C)(1) cannot possibly apply in 100% of cases, yet that

17 is precisely how it has been applied by the Board.  As pointed out by

18 the Second District Court of Appeal, not every murder can be found to

19 be "atrocious, heinous, or callous" or the equivalent without "doing

20  [2] In a single case out of the 2690 that were examined Petitioner has conceded that
21  the Board did not invoke §2402(c)(1).  This Court finds that concession to be
    improvidently made and the result of over caution.  When announcing the decision at
    the initial hearing of S. Fletcher (H-10230) on 4/6/06, the commissioner did begin
22  by stating "I don't believe this offense is particularly aggravated..."  However
    the commissioner proceeds to describe the crime as a drug deal to which Fletcher
23  brought a gun so "we could say there was some measure of calculation in that."  The
    commissioner continued by observing that the reason someone would bring a gun to a
24  drug transaction was to make sure things went according to their plan "so I guess
    we can say that that represents calculation and perhaps it's aggravated to that
25  extent."  As is the Board's standard practice, by using the word 'calculated' from
    §2402(c)(1)(b) the Board was invoking that regulation.  Certainly if Mr. Fletcher
26  had brought a habeas petition Respondent's position would be that there is 'some
    evidence' supporting this.  The ambiguity created by the commissioner's initial
27  statement was cleared up several pages later when he announces that "based upon the
    crime coupled with ..." parole was denied for four years.  (See *In re Burns* (2006)
28  136 Cal.App.4th 1318, 1326, holding §2402(c)(1) criteria are necessary for a multi-
    year denial.)

                                       12

violence" to the requirements of due process.   (*In re Lawrence* (2007)

150 Cal.App.4th 1511, 1557.)   This is precisely what has occurred

here, where the evidence shows that the determinations of the Board

in this regard are made not on the basis of detailed guidelines and

individualized consideration, but rather through the use of all

encompassing catch phrases gleaned from the regulations.

### THE BOARD'S METHODS

Because it makes no effort to distinguish the applicability of

the criteria between one case and another, the Board is able to force

every case of murder into one or more of the categories contained in

§2402(c).

For example, if the inmate's actions result in an instant death

the Board finds that it was done in a "dispassionate and calculated

manner, such as an execution-style murder."  At the same time the

Board finds that a murder not resulting in near instant death shows a

"callous disregard for human suffering" without any further analysis

or articulation of facts which justify that conclusion.  If a knife

or blunt object was used, the victim was "abused, defiled, or

mutilated."  If a gun was used the murder was performed in a

"dispassionate and calculated manner, such as an execution-style

murder."  If bare hands were used to extinguish another human life

then the crime is "particularly heinous and atrocious."

Similarly, if several acts, spanning some amount of time, were

necessary for the murder the Board may deny parole because the inmate

had "opportunities to stop" but did not.  However if the murder was

---

[3] Princeton University World Net Dictionary (2006).

13

1   accomplished quickly parole will be denied because it was done in a
2   dispassionate and calculated manner and the victim never had a chance
3   to defend themselves or flee.  If the crime occurred in public, or
4   with other people in the vicinity, it has been said that the inmate
5   "showed a callous disregard" or "lack of respect" for the
6   "community."  However if the crime occurs when the victim is found
7   alone it could be said that the inmate's actions were aggravated
8   because the victim was isolated and more vulnerable.

9       In this manner, under the Board's cursory approach, every murder
10  has been found to fit within the unsuitability criteria.  What this
11  reduces to is nothing less than a denial of parole for the very
12  reason the inmates are present before the Board – i.e. they committed
13  murder.  It is circular reasoning, or in fact no reasoning at all,
14  for the Board to begin each hearing by stating the inmate is before
15  them for parole consideration, having passed the minimum eligible
16  parole date based on a murder conviction, and for the Board to then
17  conclude that parole will be denied because the inmate committed acts
18  that amount to nothing more than the minimum necessary to convict
19  them of that crime.  As stated quite plainly by the Sixth District:
20  "A conviction for murder does not automatically render one unsuitable
21  for parole."  (Smith, supra, 114 Cal.App.4th at p. 366, citing
22  Rosenkrantz, supra, 29 Cal.4th at p. 683.)

23      In summary, when every single inmate is denied parole because
24  his or her crime qualifies as a §2402(c)(1) exception to the rule
25  that a parole date shall normally be set, then the exception has
26  clearly swallowed the rule and the rule is being illegally
27  interpreted and applied.  When every single life crime that the Board
28

14

14

1  examines is "particularly egregious" and "especially heinous,

2  atrocious or cruel" it is obvious that the Board is operating without

3  any limits and with unfettered discretion.

4       Other examples of the failure to 'connect up' the facts of the

5  individual case with the criteria and the ultimate findings abound in

6  the decisions of the reviewing courts.  Some of the state cases to

7  have reversed Parole Board or Governor abuses of discretion in

8  denying parole include *In re Roderick, In re Cooper, In re Lawrence,*

9  *In re Barker, In re Gray, In re Lee, In re Elkins, In re Weider, In*

10  *re Scott, In re Deluna, In re Ernest Smith, In re Mark Smith,* and *In*

11  *re Capistran.*

12       When "the record provides no reasonable grounds to reject, or

13  even challenge, the findings and conclusions of the psychologist and

14  counselor concerning [the inmate's] dangerousness" the Board may not

15  do so.  (*In re Smith* (2003) 114 Cal.App.4th 343, 369.)

16       When an inmate, although only convicted of a second degree

17  murder, has been incarcerated for such time that, with custody

18  credits, he would have reached his MEPD if he had been convicted of a

19  first, the Board must point to evidence that his crime was aggravated

20  or exceptional even for a first degree murder if they are going to

21  use the crime as a basis for denying parole.  (*In re Weider* (2006)

22  145 Cal.App.4th 570, 582-583.)[4]

23

24  _____

   [4] This rule, rooted in Justice Moreno's concurrence in *Rosenkrantz, supra,* is
   particularly applicable in this case. Petitioner was convicted of second degree,
25  but acquitted of first degree, murder over 25 years ago.  (*People v. Criscione*
   (1981) 125 Cal.App.3d 275.)  With his custody credits he is beyond the matrix even
26  had he been convicted of a first.  In a currently pending habeas petition in which
   he challenges his 2007 parole denial the first reason the Board gave was the crime
   itself and the presiding commissioner explained: "His actions go well beyond the
27  minimum necessary for a conviction of murder in the second degree."  (Decision page
   2 of 4/2/07 transcript.)  For the Board to penalize the Petitioner for the fact
28  that he was acquitted of first degree is further proof of their willfulness and

15

1    A "petitioner's young age at the time of the offense" must be

2  considered.  (*In re Elkins* (2006) 144 Cal.App.4th 475, 500, quoting

3  *Rosenkrantz v. Marshall* (C.D.Cal. 2006) 444 F. Supp. 2d 1063, 1065,

4  1085: "The reliability of the facts of the crime as a predictor for

5  his dangerousness was diminished further by his young age of 18, just

6  barely an adult. 'The susceptibility of juveniles to immature and

7  irresponsible behavior means their irresponsible conduct is not as

8  morally reprehensible as that of an adult.'")[5]

9    The Board's formulaic practice of stating §2402(c)(1) phrased in

10  a conclusory fashion, and then stating "this is derived from the

11  facts" without ever linking the two together, is insufficient.  (*In*

12  *re Roderick,* (2007) ___ Cal.App.4th ___ (A113370): "At minimum, the

13  Board is responsible for articulating the grounds for its findings

14  and for citing to evidence supporting those grounds."  (See also *In*

15  *re Barker* (2007) 151 Cal.App.4th 346, 371, disapproving

16  "conclusorily" announced findings.)

17    After two decades, mundane "crimes have little, if any,

18  predictive value for future criminality. Simply from the passing of

19  time, [an inmate's] crimes almost 20 years ago have lost much of

20  their usefulness in foreseeing the likelihood of future offenses than

21  if he had committed them five or ten years ago." (*In re Lee* (2006)

22  143 Cal.App.4th 1400, 1412.)  It should be noted that this rule

23

24  ──────────────────────────────────

bias. The jury had a reasonable doubt that Petitioner committed first degree
murder but under the Board's 'reasoning' and 'analysis' this puts him in a worse
position than if they had not. Had the jury convicted him of the greater offense
Petitioner has served so much time that he would already be having subsequent

25  parole hearings on a first and the Board would not have been able to use the 'some
evidence' of first degree behavior against him. As observed previously, the

26  Board's position in this regard is "so ridiculous that simply to state it is to
refute it." (*Weider, supra,* 145 Cal.App.4th at p. 583.)

27  [5] This point is particularly significant in the case of Mike Ngo. Mr. Ngo was only
18 at the time of his crime. The impetus behind the shooting was youth group or

28

1  applies with even more force when the Board is relying on any

2  criminality that occurred before the crime.  In that situation, just

3  as with the crime itself, the Board must explain why such old events

4  have any relevance and especially when the inmate has spent a decade

5  as a model prisoner.

6      Murders situationally related to intimate relationships are

7  unfortunately commonplace because emotions are strongest in such

8  domestic settings.  When a murder occurs because of "stress unlikely

9  to be reproduced in the future" this is a factor that affirmatively

10  points towards suitability.  (*In re Lawrence* (2007) 150 Cal.App.4th

11  1511 and cases cited therein.)

12      "The evidence must substantiate the ultimate conclusion that the

13  prisoner's release currently poses an unreasonable risk of danger to

14  the public.  It violates a prisoner's right to due process when the

15  Board or Governor attaches significance to evidence that forewarns no

16  danger to the public."  (*In re Tripp* (2007) 150 Cal.App.4th 306,

17  313.)

18      The Board "cannot rely on the fact that the killing could have

19  been avoided to show the killing was especially brutal."  (*In re

20  Cooper* (2007) 153 Cal.App.4th 1043, 1064.)

21      The Board's focus must be upon how the inmate "actually

22  committed his crimes" not the "incorporeal realm of legal

23  constructs."  (*Lee, supra*, 143 Cal.App.4th at p. 1413.)  This is

24  especially significant when the murder conviction is based on the

25  felony murder rule, provocative act doctrine, or accomplice liability

26  such that the inmate did not intend to kill or may not have even been

27  _____

   gang rivalries, posturing, and threats which mature adults would not have been

28

17

1  the actual killer.

2     The Board has ample guidance before it in the decisions of the

3  various reviewing courts to constrain its abuse, but has failed to

4  avail itself of the opportunity to do so.

5

6              SEPARATION OF POWERS DOCTRINE

7     The evidence presented, as discussed above, has established a

8  void for vagueness "as applied" due process violation.  That same

9  evidence also proves a separate but related Constitutional violation

10  -- an as applied separation of powers violation.

11     The separation of powers doctrine provides "that the legislative

12  power is the power to enact statutes, the executive power is the

13  power to execute or enforce statutes, and the judicial power is the

14  power to interpret statutes and to determine their

15  constitutionality."  (Lockyer v. City and County of San Francisco

16  (2004) 33 Cal.4th 1055, 1068.)  Because the evidence has proven the

17  Board is not executing/enforcing the legislature's statutes as

18  intended it is this Court's duty to intervene.  The question here is

19  whether the Board is violating the separation of powers doctrine by

20  appropriating to itself absolute power over parole matters and

21  disregarding the limits and guidelines placed by the statute.[6]

22     "Government Code section 11342.2 provides: 'Whenever by the

23

24  caught up in.
   [6] "It is settled that Administrative regulations that violate acts of the
25  Legislature are void and no protestations that they are merely an exercise of
   administrative discretion can sanctify them.  They must conform to the legislative
   will if we are to preserve an orderly system of government.  Nor is the motivation
26  of the agency relevant: It is fundamental that an administrative agency may not
   usurp the legislative function, no matter how altruistic its motives are."
   (Agricultural Labor Relations Board v. Superior Court of Tulare County (1976) 16
27  Cal.3d 392, 419 quoting Morris v. Williams (1967) 67 Cal.2d 733, 737, and City of
   San Joaquin v. State Bd. of Equalization (1970) 9 Cal.App.3d 365, 374.)

28

                                   18

1  express or implied terms of any statute a state agency has authority

2  to adopt regulations to implement, interpret, make specific or

3  otherwise carry out the provisions of the statute, no regulation

4  adopted is valid or effective unless consistent and not in conflict

5  with the statute and reasonably necessary to effectuate the purpose

6  of the statute.'  Administrative regulations that alter or amend the

7  statute or enlarge or impair its scope are void and courts not only

8  may, but it is their obligation to strike down such regulations."

9  (Pulaski v. Occupational Safety & Health Stds. Bd. (1999) 75

10  Cal.App.4th 1315, 1341, citations omitted.)

11      The vice of overbroad and vague regulations such as are at issue

12  here is that they can be manipulated, or 'interpreted,' by executive

13  agencies as a source of unfettered discretion to apply the law

14  without regard to the intend of the people as expressed by the

15  legislature's enabling statutes.  In short, agencies usurp unlimited

16  authority from vague regulations and become super-legislatures that

17  are unaccountable to the people.  As it has sometimes been framed and

18  addressed in the case law, a vague or all encompassing standard runs

19  the risk of "violat[ing] the separation of powers doctrine by

20  'transforming every [executive decisionmaker] into a "mini-

21  legislature" with the power to determine on an ad hoc basis what

22  types of behavior [satisfy their jurisdiction].'"  (People v. Ellison

23  (1998) 68 Cal.App.4th 203, 211, quoting People v. Superior Court

24  (Caswell) (1988) 46 Cal.3d 381, 402.)

25      "It is concern about 'encroachment and aggrandizement,' the

26  [United States Supreme Court] reiterated, that has animated its

27  separation of powers jurisprudence.  'Accordingly, we have not

28

1  hesitated to strike down provisions of law that either accrete to a
2  single Branch powers more appropriately diffused among separate
3  Branches or that undermine the authority and independence of one or
4  another coordinate Branch.'" (Kasler v. Lockyer (2000) 23 Cal.4th
5  472, 493, quoting Mistretta v. United States (1989) 488 U.S. 361,
6  382.)  This articulation of the principle speaks directly to the
7  situation at hand.  The Board, by its enactment and interpretation of
8  Title 15, §2402, has appropriated to itself absolute power over
9  'lifer' matters.  Overreaching beyond the letter and spirit of the
10  Penal Code provisions, Title 15, §2402(c)(1) has been interpreted by
11  the Board to supply the power to declare every crime enough to deny
12  parole forever.  The fact that Title 15, §2402, has been invoked in
13  every case, but then sometime later not invoked, tends to show either
14  completely arbitrary and capricious behavior or that unwritten
15  standards are what really determine outcomes.  In either event, all
16  pretenses of taking guidance from, or being limited by, the
17  legislature's statutes have been abandoned.  "[I]t is an elementary
18  proposition that statutes control administrative interpretations."
19  (Ohio Casualty Ins. Co. v. Garamendi (2006) 137 Cal.App.4th 64, 78.)
20  Title 15 §2402 as applied, however, has no controls or limitations.
21       The PC § 3041(b) exception to the rule can only be invoked when
22  the "gravity of the current convicted offense or offenses, or the
23  timing and gravity of current or past convicted offense or offenses,
24  is such that consideration of the public safety requires a more
25  lengthy period of incarceration for this individual."  The word
26  "gravity" is a directive for comparison just as "more lengthy"
27  indicates a deviation from the norm.  While Dannenberg held there
28

20

1   does not need to be intra case comparison for the purposes of term

2   uniformity or proportionality, there necessarily has to be some sort

3   of comparison for the purposes of adhering to the legislative mandate

4   that parole is available.  The Board employs no meaningful yardstick

5   in measuring parole suitability.  This is a violation of the

6   separation of powers doctrine.  (*People v. Wright* (1982) 30 Cal.3d

7   705; 712-713.  And see *Terhune v. Superior Court* (1998) 65

8   Cal.App.4th 864, 872-873.  Compare *Whitman v. Am. Trucking Ass'ns*

9   (2001) 531 U.S. 457, 472, describing a delegation challenge as

10  existing when the legislature fails to lay down "an intelligible

11  principle to which the person or body authorized to act is directed

12  to conform.")

13

14                        RESPONDENT'S POSITION

15      The Attorney General has suggested, without pointing to any

16  concrete examples, that it is possible that the Board, when invoking

17  the crime as a reason to deny parole, is not placing it within

18  §2402(c)(1) but instead using is as some sort of 'lesser factor'

19  which, only when combined with other unsuitability criteria, can

20  contribute to a valid parole denial.  The two problems with this

21  position are, first, there is no evidentiary support for this

22  assertion, and second, it would have no impact on the constitutional

23  infirmities outlined and proven above.

24      Even if Respondent had produced evidence that the Board was

25  utilizing the crime as a 'lesser factor' which needs others to fully

26  support a parole denial, the Board would then be admitting it was

27  denying parole, in part, for the very reason that the person is

28

1  before the panel and eligible for parole in the first place – the

2  commitment offense.  Respondent's argument suggests that a crime that

3  only qualified as the *Dannenberg* "minimum necessary" could still be

4  invoked as a reason for denying parole.  Respondent argues that when

5  the crime is invoked 'not in the *Dannenberg* sense,' there must be

6  other reasons for the parole denial and the crime alone would not be

7  enough in this context.  This position is inconsistent with the law

8  and fundamental logic.

9      A crime qualifies under *Dannenberg* when it is "particularly

10  egregious," or one where "no circumstances of the offense reasonably

11  could be considered more aggravated or violent than the minimum

12  necessary to sustain a conviction for that offense." (*Dannenberg*,

13  *supra*, 34 Cal.4th at pp. 1094-1095.)  These are the only two choices.

14  If a crime consists of only the bare elements then it is not

15  aggravated and it cannot, in and of itself, serve as a basis for

16  parole denials once the inmate becomes eligible for parole.  It is

17  the reason an inmate may be incarcerated initially for the equivalent

18  of 15 or 25 years, and then examined to determination rehabilitation

19  efforts when they come before the Board, but a crime that is no more

20  than the bare minimum cannot be factored into the equation pursuant

21  to PC § 3041(b) or any of the case law interpreting it.

22  In oral argument Respondent suggested a second way the

23  commitment offense can be used outside of §2402(c)(1).  If for

24  example a crime had its roots in gang allegiances or rivalries and

25  the inmate continued to associate with gangs while incarcerated, then

26  an aspect of the crime, even if the crime otherwise consisted of no

27  more than the minimum elements, could be combined with other behavior

28

1  to support a parole denial.  Similarly, if a crime was rooted in an

2  inmate's then existing drug addiction, and the Board was to point to

3  a recent 115 involving drugs, the evidence that the inmate's drug

4  issues had not been resolved would justify a parole denial even if

5  the crime itself was not aggravated.  A finding that the inmate is

6  not suitable for release under these circumstances, however, is not

7  based on the facts of the commitment offense as tending to show

8  unsuitability.  It is based on the conclusion that can be drawn about

9  Petitioner's lack of rehabilitation or change since the offense, and

10  thus, his present dangerousness.

11      Respondent has not demonstrated any flaws in Petitioner's

12  methodology or analysis, nor provided any actual evidence of the

13  crime being invoked *other* than pursuant to §2402(c)(1).  Drawing

14  conclusions from the Board's direct statements, or its precise

15  recitations of the §2402(c)(1) language, logically indicates an

16  invocation of §2402(c)(1), and Respondent's suggestion otherwise is

17  insupportable.

18

19                    THE QUESTION OF BIAS

20      Because the issue has been squarely presented, and strenuously

21  argued by Petitioners, this Court is obligated to rule on the charge

22  that the Board's actions prove an overriding bias and deliberate

23  corruption of their lawful duties.

24      In the discrimination and bias case of *USPS Bd. of Governors v.*

25  *Aikens* (1983) 460 U.S. 711, the United States Supreme Court

26  acknowledged "there will seldom be 'eyewitness' testimony as to the

27  [] mental processes" of the allegedly biased decisionmaker.  Instead,

28

                                    23

1   an examination of other cases for trends or patterns can provide the

2   necessary circumstantial evidence. (See *Aikens, supra*, at footnote

3   2.) Reaffirming that such circumstantial evidence will be sufficient

4   the Court stated: "The law often obliges finders of fact to inquire

5   into a person's state of mind. As Lord Justice Bowen said in

6   treating this problem in an action for misrepresentation nearly a

7   century ago, 'The state of a man's mind is as much a fact as the

8   state of his digestion. It is true that it is very difficult to

9   prove what the state of a man's mind at a particular time is, but if

10  it can be ascertained it is as much a fact as anything else.'"

11  (*Aikens*, at pp. 716-717, quoting *Edgington v. Fitzmaurice* (1885) 29

12  Ch. Div. 459, 483.)[7]

13      The discovery in these cases was granted in part due to the

14  Petitioners' prima facie showing of bias and the necessity that it be

15  "adequately supported with evidence" if such evidence is available.

16  (*Ramirez, supra*, 94 Cal.App.4th at p. 564, fn. 5. See also *Nasha v.*

17  *City of Los Angeles* (2004) 125 Cal.App.4th 470, 483: "A party seeking

18  to show bias or prejudice on the part of an administrative decision

19  maker is required to prove the same 'with concrete facts.'" And see

20  *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674,

21  841: "The challenge to the fairness of the adjudicator must set forth

22  concrete facts demonstrating bias or prejudice." See also *Hobson v.*

23

24  [7] As occurred in *Aikens, supra*, and as suggested in prior orders of this Court,
    Respondent should have provided direct evidence from the decisionmakers. While the
    fact that a *Defendant* does not explain his or her actions cannot be held against

25  him, (*Griffin v. California* (1965) 380 U.S. 609, *Doyle v. Ohio* (1976) 426 U.S.
    610,) it is appropriate to give some weight to the consideration that the Board has

26  failed to offer any direct evidence or explanation on its own behalf. While the
    case of *Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095 stands for the

27  proposition that *Petitioner* may not inquire into the Board members mental
    processes, Respondent is not precluded from offering such direct evidence if they
    were able to testify as to their good faith and conscientious efforts.

28

24

1  *Hansen* (1967) 269 F.Supp. 401, 502, the watershed Washington D.C.

2  school desegregation case in which the court determined from a

3  statistical and factual analysis that racial bias was influencing

4  policy.)

5      In the case of *People v. Adams* (2004) 115 Cal.App.4th 243, 255,

6  a similar claim of biased decision making was asserted and it was

7  rejected because, although the defendant clearly articulated it, "he

8  has not demonstrated it. Therefore, he has failed to bear his burden

9  of showing a constitutional violation as a demonstrable reality, not

10  mere speculation." In the present cases Petitioners have provided

11  overwhelming concrete evidence. It is difficult to believe that the

12  Board's universal application of §2402(c)(1) has been an inadvertent

13  mistake or oversight on their part. It is hard to credit the Board's

14  position that it does not know its own patterns and practices reveal

15  a complete lack of standards or constraints on their power.

16  Respondent's protestations ring hollow, and it seems a statistical

17  impossibility, that the Board's use of "detailed" criteria in such a

18  fashion that they are rendered meaningless is a result of good faith

19  efforts on their part. That <u>every</u> murder is "especially heinous,

20  atrocious or cruel," and can therefore be an exception to the rule

21  that a parole date should be set, does not seem to be an accident on

22  their part.

23      Although no court has thus far agreed with the accusation that

24  the Board approaches its duties with a predetermination and a bias,

25  no court has previously been presented the comprehensive evidence

26  outlined herein. While this Court does not turn a blind eye to the

27  reasonable conclusion that the Board's unconstitutional practices are

28

1   willful, there is another possibility.  The pattern of errors

2   demonstrated by the discovery in this case, and the continuously

3   growing body of Court of Appeal opinions finding consistent and

4   persistent abuse of discretion, may instead be caused by the fact

5   that the Board is simply overworked and substantively untrained.  The

6   impossibility of the blanket applicability of §2402(c)(1) may be only

7   the result of sloppy preparation and inadvertent carelessness.

8       The Board must first be given an opportunity to comply with the

9   necessary remedy provided by this court before it is possible to

10  enter a finding of conscious bias and illegal sub rosa policy.  To do

11  otherwise would ignore the complexities and magnitude of the largely

12  discretionary duties with which that Board is vested.

13

14                          CONCLUSION

15      The conclusive nature of the proof in this case, and the

16  suggestion of institutional bias do not preclude formulation of an

17  remedy which will guarantee adequate restrictions on, and guidance

18  for, the Board's exercise of discretion in making parole suitability

19  determinations.  The Board can be made to lawfully perform its duties

20  if given explicit instructions.

21      As noted supra, a reason the proof in this case irrefutably

22  establishes constitutional violations is because the Board does not,

23  in actual fact, operate within the limiting construction of the

24  regulations.  The Board's expansive interpretation allows it to

25  operate without any true standards.  Although numerous rulings of

26  both state and federal courts of appeal have invalidated the Board's

27  application of the §2402(c) criteria to particular facts, the Board

28

                               26

26

1  does not take guidance from these binding precedents and ignores them

2  for all other purposes.  In the most recent of these cases, *In re*

3  *Roderick*, (2007) ___ Cal.App.4th ___ (A113370) the First District

4  held four of five §2402 factors "found" by the Board to be

5  unsupported by any evidence.  At footnote 14 the court took the time

6  to criticize the Board for its repeated use of a "stock phrase"

7  "generically across the state."  The court also clarified that "at

8  minimum, the Board is responsible for articulating the grounds for

9  its findings and for citing to evidence supporting those grounds."

10    There is nothing in the evidence presented that would allow any

11  conclusion but that, without intervention of the Courts, the Board

12  will ignore the lessons of these rulings in the future and continue

13  to employ its formulaic approach of citing a criteria from

14  §2402(c)(1), repeating the facts of the crime, but never

15  demonstrating a logical connection between the two.   This is the

16  core problem with the Board's methodology -- they provide no

17  explanation or rationale for the findings regarding the crime itself.

18    This practice results in violence to the requirements of due

19  process and individualized consideration which are paramount to the

20  appropriate exercise of its broad discretion.

21    The only solution is one that compels the Board to identify the

22  logical connection between the facts upon which it relies and the

23  specific criteria found to apply in the individual case.   For

24  example, the Board often finds that an inmate's motive is "trivial"

25  without ever suggesting why, on these facts, that motive is not just

26  as trivial as the motive behind any other murder.  What motive is not

27  trivial?   By any definition "trivial" is a word of comparison and

28

1  only has meaning when there can be examples that are not "trivial."

2     Similarly, although the Sixth District made it plain four years

3  ago that "all [] murders by definition involve some callousness," (*In*

4  *re Smith* (2003) 114 Cal.App.4th 343, 345,) the Board has continued to

5  deny countless paroles labeling the crime "callous" without ever

6  suggesting what crime would not qualify as "callous" and without

7  consistently explaining why the individual case before it

8  demonstrates "exceptional" callousness.

9     Respondent has consistently refused to suggest what possible

10 instances of murder would not fit the Board's amorphous application

11 of the §2402 criteria.  Citing *Dannenberg*, Respondent insists such

12 comparative analysis is unnecessary.  Respondent fundamentally

13 misunderstands the *Dannenberg* holding.

14     The PC § 3041(b) exception to the rule can only be invoked when

15 the "gravity of the current convicted offense or offenses, or the

16 timing and gravity of current or past convicted offense or offenses,

17 is such that consideration of the public safety requires a more

18 lengthy period of incarceration for this individual."  The word

19 "gravity" is a directive for comparison just as "more lengthy"

20 indicates a deviation from the norm.  While *Dannenberg* held there

21 does not need to be intra case comparison for the purposes of term

22 uniformity or proportionality, there necessarily has to be some sort

23 of comparison for the purposes of adhering to the legislative mandate

24 that parole is available.  This is implicit in §2402 because the

25 qualifier "especially," in "especially heinous atrocious or cruel,"

26 requires that some form of comparison be made.  While the original

27 drafters of §2402 seemed to have recognized this fact, the ongoing

28

1 conduct of the Board has completely ignored it, and this is the

2 essence of the due process violation Petitioners have asserted.

3    As noted in his dissent in the recent case of *In re Roderick,*

4 *supra,* Justice Sepulveda would have deferred to the Board's

5 'exercise' of discretion because "Board members have both training

6 and vast experience in this field.  They conduct literally thousands

7 of parole suitability hearings each year.  The Board therefore has

8 the opportunity to evaluate the egregiousness of the facts of a great

9 number of commitment offenses. ...  The Board's training and

10 experience in evaluating these circumstances far exceeds that of

11 most, if not all, judges."  The evidence in this case, however,

12 suggests a flaw in granting such deference.  Since the Board

13 continues to place every murder in the category of offenses "tending

14 to show unsuitability," something is certainly wrong.  Since the

15 Board's vast experience is undeniable, the problem must be in the

16 Board's training and understanding of the distinguishing features of

17 the guidelines and criteria.  Although Justice Sepulveda presumes

18 that Board members receive substantive training, there is no evidence

19 before this court to suggest that it does, and substantial

20 circumstantial evidence to suggest that it does not.

21    In the vast numbers of Santa Clara County cases reviewed by this

22 Court, the Board's formulaic decisions regarding the commitment

23 offense do not contain any explanation or thoughtful reasoning.

24 Instead, the Board's conclusionary invocation of words from

25 §2402(c)(1) is linked to a repetition of the facts from the Board

26 report by the stock phrase: "These conclusions are drawn from the

27 statement of facts wherein ..."  Thereafter the inmate files a habeas

28

1    corpus petition and Respondent, after requesting an extension of

2    time, files a boilerplate reply asserting the Board's power is

3    "great" and "almost unlimited" and thus any "modicum" of evidence

4    suffices.  Respondent does not cite or distinguish the expanding body

5    of case law that is often directly on point as to specific findings

6    made.  Thereafter, if the writ is granted, the Board is directed to

7    conduct a new hearing "in compliance with due process" and that order

8    is appealed by Respondent.  On appeal the order is usually upheld

9    with modifications and in the end, after countless hours of attorney

10   and judicial time, the Board conducts a new two hour hearing at which

11   they abuse their discretion and violate due process in some different

12   way.

13        This system is malfunctioning and must be repaired.  The

14   solution must begin with the source of the problem.  The Board must

15   make efforts to comply with due process in the first instance.  The

16   case law published over the last five years provides ample and

17   sufficient guidelines and must be followed.  Although the Board

18   methods suggest it believes this to be optional, it is not.

19

20                            THE REMEDY

21        Thus, it is the order of this Court that the Board develop,

22   submit for approval, and then institute a training policy for its

23   members based on the current and expanding body of published state,

24   and federal, case law reviewing parole suitability decisions, and

25   specifically the application of §2402 criteria.  In addition to

26   developing guidelines and further criteria for the substantive

27   application of §2402 the Board must develop rules, policies and

28

30

1 | procedures to ensure that the substantive guidelines are followed.

2 |     This Court finds its authority to impose this remedy to flow

3 | from the fundamental principles of judicial review announced over two

4 | centuries ago in *Marbury v. Madison* (1803) 5 U.S. (1 Cranch) 137.

5 | Citing that landmark case, the California Supreme Court has

6 | recognized "Under time-honored principles of the common law, these

7 | incidents of the parole applicant's right to 'due consideration'

8 | cannot exist in any practical sense unless there also exists a remedy

9 | against their abrogation." (*In re Sturm* (1974) 11 Cal.3d 258, 268.)

10 |     In *Strum* the court directed that the Board modify its rules and

11 | procedures so that thereafter "The Authority will be required [,]

12 | commencing with the finality of this opinion, to support all its

13 | denials of parole with a written, definitive statement of its reasons

14 | therefor and to communicate such statement to the inmate concerned."

15 | (*Sturm* at p. 273.)

16 |     Similarly, in the case of *Minnis, supra,* the California Supreme

17 | Court held the Board's policy of categorically denying parole to drug

18 | dealers was illegal. Based on its analysis the court there was

19 | clearly prepared to order that Board to modify its rules and

20 | procedures however such was unnecessary because the Board

21 | "voluntarily rescinded" the illegal policy. While the remedy in this

22 | case is of greater scope than that necessary in either *Strum* or

23 | *Minnis, supra,* so too has been the showing of a systematic abuse of

24 | discretion and distortion of process.

25 |     The most recent case to address the court's roles and duties in

26 | overseeing the parole suitability process has been *In re Rosenkrantz,*

27 | *supra,* 29 Cal.4th 616. In that case the court explained that

28 |

31

1  judicial review of a Governor's parole determination comports with,
2  and indeed furthers, separation of powers principles because the
3  courts are not exercising "complete power" over the executive branch
4  and do not "defeat or materially impair" the appropriate exercise or
5  scope of executive duties.  (*Rosenkrantz* at p. 662.)  Citing *Strum*,
6  *supra*, the court reaffirmed that a life term inmate's "due process
7  rights cannot exist in any practical sense without a remedy against
8  its abrogation." (*Rosenkrantz* at p. 664.)

9        The *Rosenkrantz* court also put forth what it believed was an
10  extreme example but which, unfortunately, has been shown to exist in
11  this case.  The court stated: "In the present context, for example,
12  judicial review could prevent a Governor from usurping the
13  legislative power, in the event a Governor failed to observe the
14  constitutionally specified limitations upon the parole review
15  authority imposed by the voters and the Legislature."  This is
16  exactly what the evidence in this case has proven.  As noted above,
17  the Board has arrogated to itself absolute authority, despite
18  legislative limitations and presumptions, through the mechanism of a
19  vague and all inclusive, and thus truly meaningless, application of
20  standards.  The remedy this Court is imposing is narrowly tailored to
21  redress this constitutional violation.

22        The consequence of the Board's actions (of giving § 2402(c)(1)
23  such a broadly all encompassing and universal application) is that
24  they have unwittingly invalidated the basis of the California Supreme
25  Court's holding in *Dannenberg*.  The reason the four justice majority
26  in *Dannenberg* upheld the Board's standard operating procedures in the
27  face of the Court of Appeal and dissent position is because "the

28

32

1  Board must apply detailed standards when evaluating whether an
2  individual inmate is unsuitable for parole on public safety grounds."
3  (*Dannenberg* at p. 1096, footnote 16.  See also page 1080: "the
4  regulations do set detailed standards and criteria for determining
5  whether a murderer with an indeterminate life sentence is suitable
6  for parole.")  However, Petitioners in these cases have proven that
7  there are no "detailed standards" at all.  Instead the Board has
8  systematically reduced the "detailed standards" to empty words.  The
9  remedy this Court orders, that there truly be "detailed standards,"
10 requires the promulgation of further rules and procedures to
11 constrain and guide the Board's powers.  This remedy differs in
12 specifics, but not in kind, from what courts have previously imposed
13 and have always had the power to impose.

14     The Board must fashion a training program and further rules,
15 standards and regulations based on the opinions and decisions of the
16 state and federal court cases which provide a limiting construction
17 to the criteria which are applied.[9]  The Board must also make
18 provisions for the continuing education of its commissioners as new
19 case law is published and becomes binding authority.  This Court will
20 not, at this point, outline the requirements and lessons to be taken
21 from the above cases.  It is the Board's duty, in the first instance
22 to undertake this task.  The training program, and associated rules
23 and regulations, shall be served and submitted to this Court, in

24
25  [9]While the showing and analysis in this case was limited to § 2402(c)(1), the
    conclusions that the evidence compelled, that the Board has been carelessly
    distorting and misapplying the regulations, is not so limited.  Accordingly, the
26  training program that is necessary for the Board can not reasonably be limited to
    just § 2402(c)(1).  Thus, to the extent case law recognizes, clarifies and
    establishes remedies for other due process violations they must also be
27  incorporated into the necessary rules and training the Board is required to abide
    by.
28

                                    33

09/12/2007  11:00

1  writing, within 90 days.  Counsel for Petitioners, and any other

2  interested parties, may submit briefs or comments within 30 days

3  thereafter.  After receipt and review of the materials this Court

4  will finalize the training program, and associated rules, and the

5  Petitioners in these cases shall receive a new hearing before a Board

6  that does not operate with the unfettered discretion and caprice

7  demonstrated by the evidence here presented.

8                                  **ORDER**

9       For the above reasons the habeas corpus petition is granted and

10  it is hereby ordered that Petitioner be provide a new hearing which

11  shall comply with due process as outlined above.  Respondent shall

12  provide weekly updates to this Court on the progress of its

13  development of the new rules and regulations outlined above.

14

15

16

17  DATED:  _Aug 30_, 2007     _Linda R. Condron_

18                             LINDA R. CONDRON
                             JUDGE OF THE SUPERIOR COURT

19

20  cc:  Petitioner's Attorney (Jacob Burland)
        Attorney General (Denise Yates, Scott Mather)

21

22

23

24

25

26

27

28

Sep 07 07 11:44a

34

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT B**

Petitioner's Positive Accomplishments (2006-2008)

## WORK SUPERVISOR'S REPORT

STATE OF CALIFORNIA
CDC 101 (1/92)

DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| = EXCEPTIONAL | ✓ | A. DEMONSTRATED SKILL AND KNOWLEDGE | 2 | F. TEAMWORK AND PARTICIPATION |
| = ABOVE AVERAGE | ✓ | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | 2 | G. LEARNING ABILITY |
| = SATISFACTORY | ✓ | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | 2 | H. USE OF TOOLS AND EQUIPMENT |
| = BELOW AVERAGE | ✓ | D. INTEREST IN ASSIGNED WORK | 2 | I. QUALITY OF WORK |
| = UNSATISFACTORY | ✓ | E. EFFORT DISPLAYED IN ASSIGNED WORK | ✓ | J. QUANTITY OF WORK |

PAY STATUS:  FROM: $  TO: $ FROM: JOB NO. TO: JOB NO.

TOTAL # Hours Assigned: TOTAL # Hours Worked:

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| C1DL IDL-1.106 | 06-13-07 | | APRIL/MAY/JUNE 2007 |

RECOMMENDED FOR:  ☐ REASSIGNMENT  ☒ RETAIN  ☐ PAY INCREASE  ☐ PAY DECREASE

INMATE'S INITIALS:

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE)

CODE OF SAFE PRACTICES REVIEWED
SUPV'S INITIALS:
INMATE'S INITIALS:

| SUPERVISOR *R.Snyder* | LENGTH OF SUPERVISION 3 MONTHS | WORK DETAIL IWL YARD -1/s | ETHNICITY W |
|---|---|---|---|
| INMATE'S NAME TITCH | CDC NUMBER B-89549 | INSTITUTION R.J.D.C.F. | DATE JULY 2, 2007 |

---

## WORK SUPERVISOR'S REPORT

STATE OF CALIFORNIA
CDC 101 (1/92)

DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1 = EXCEPTIONAL | ✓ | A. DEMONSTRATED SKILL AND KNOWLEDGE | 2 | F. TEAMWORK AND PARTICIPATION |
| 2 = ABOVE AVERAGE | ✓ | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | 2 | G. LEARNING ABILITY |
| 3 = SATISFACTORY | 2 | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | 2 | H. USE OF TOOLS AND EQUIPMENT |
| 4 = BELOW AVERAGE | ✓ | D. INTEREST IN ASSIGNED WORK | 2 | I. QUALITY OF WORK |
| 5 = UNSATISFACTORY | ✓ | E. EFFORT DISPLAYED IN ASSIGNED WORK | 2 | J. QUANTITY OF WORK |

PAY STATUS:  FROM: $  TO: $ FROM: JOB NO. TO: JOB NO.

TOTAL # Hours Assigned: TOTAL # Hours Worked:

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| C1DL IDL-1.106 | 6/13/07 | Clean for Tool Rm/ Utility Worker | JULY/AUG/SEPT 2007 |

RECOMMENDED FOR:  ☐ REASSIGNMENT  ☒ RETAIN  ☐ PAY INCREASE  ☐ PAY DECREASE

INMATE'S INITIALS:

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE)

CODE OF SAFE PRACTICES REVIEWED
SUPV'S INITIALS:
INMATE'S INITIALS:

| SUPERVISOR *R.Snyder* | LENGTH OF SUPERVISION 3-MONTHS | WORK DETAIL iwl Broadway yard | ETHNICITY W |
|---|---|---|---|
| INMATE'S NAME TITCH | CDC NUMBER B-89549 | INSTITUTION R.J.D.C.F. | DATE OCTOBER 05, 2007 |

---

## WORK SUPERVISOR'S REPORT

STATE OF CALIFORNIA
CDC 101 (1/92)

DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| = EXCEPTIONAL | 2 | A. DEMONSTRATED SKILL AND KNOWLEDGE | 2 | F. TEAMWORK AND PARTICIPATION |
| = ABOVE AVERAGE | 2 | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | 2 | G. LEARNING ABILITY |
| = SATISFACTORY | 2 | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | 2 | H. USE OF TOOLS AND EQUIPMENT |
| = BELOW AVERAGE | 2 | D. INTEREST IN ASSIGNED WORK | 2 | I. QUALITY OF WORK |
| = UNSATISFACTORY | 2 | E. EFFORT DISPLAYED IN ASSIGNED WORK | 2 | J. QUANTITY OF WORK |

PAY STATUS:  FROM: $  TO: $ FROM: JOB NO. TO: JOB NO.

TOTAL # Hours Assigned: TOTAL # Hours Worked:

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| C1DL IDL-1.106 | 6-13-07 | CLERICAL WORK FOR TOOL ROOM / utility WORKER | OCT-NOV-DEC. 2007 |

RECOMMENDED FOR:  ☐ REASSIGNMENT  ☒ RETAIN  ☐ PAY INCREASE  ☐ PAY DECREASE

INMATE'S INITIALS: M.T.

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE)

CODE OF SAFE PRACTICES REVIEWED
SUPV'S INITIALS:
INMATE'S INITIALS: M.T.

| SUPERVISOR *B.Smith* s/o | LENGTH OF SUPERVISION 3-MONTHS | WORK DETAIL IWL BROADWAY YARD | ETHNICITY WHI |
|---|---|---|---|
| INMATE'S NAME TITCH | CDC NUMBER B-89549 | INSTITUTION RJDCF | DATE 01-09-08 |

STATE OF CALIFORNIA  
CDC 101 (1/92)  
**WORK SUPERVISOR'S REPORT**  
DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1 = EXCEPTIONAL | 1 | A. DEMONSTRATED SKILL AND KNOWLEDGE | 1 | F. TEAMWORK AND PARTICIPATION |
| 2 = ABOVE AVERAGE | 2 | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | 1 | G. LEARNING ABILITY |
| 3 = SATISFACTORY | 1 | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | 1 | H. USE OF TOOLS AND EQUIPMENT |
| 4 = BELOW AVERAGE | 1 | D. INTEREST IN ASSIGNED WORK | 1 | I. QUALITY OF WORK |
| 5 = UNSATISFACTORY | 2 | E. EFFORT DISPLAYED IN ASSIGNED WORK | 2 | J. QUANTITY OF WORK |

PAY STATUS:   FROM: $          TO: $          FROM: JOB NO.          TO: JOB NO.

TOTAL # Hours Assigned:          TOTAL # Hours Worked:

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| CIDL IDL-1 105 | 11/06/04 | Construction Work | JAN-FEB-MAR 2005 |

INMATE'S INITIALS:

RECOMMENDED FOR:   ☐ REASSIGNMENT   ☑ RETAIN   ☑ PAY INCREASE   ☐ PAY DECREASE

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE)   CODE OF SAFE PRACTICES REVIEWED   SUP'S INITIALS:   INMATE'S INITIALS:

Outstanding Inmate Needs No Supervision

| SUPERVISOR | LENGTH OF SUPERVISION | WORK DETAIL | ETHNICITY |
|---|---|---|---|
| L.L. GREENLEE | 3 MONTHS | | W |

| INMATE'S NAME | CDC NUMBER | INSTITUTION | DATE |
|---|---|---|---|
| TITCH | B-89549 | RJDCF | APRIL 01, 2005 |

---

STATE OF CALIFORNIA  
CDC 101 (1/92)  
**WORK SUPERVISOR'S REPORT**  
DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1 = EXCEPTIONAL | 2 | A. DEMONSTRATED SKILL AND KNOWLEDGE | 2 | F. TEAMWORK AND PARTICIPATION |
| 2 = ABOVE AVERAGE | 2 | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | 2 | G. LEARNING ABILITY |
| 3 = SATISFACTORY | 2 | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | 2 | H. USE OF TOOLS AND EQUIPMENT |
| 4 = BELOW AVERAGE | 2 | D. INTEREST IN ASSIGNED WORK | 2 | I. QUALITY OF WORK |
| 5 = UNSATISFACTORY | 2 | E. EFFORT DISPLAYED IN ASSIGNED WORK | 2 | J. QUANTITY OF WORK |

PAY STATUS:   FROM: $          TO: $          FROM: JOB NO.          TO: JOB NO.

TOTAL # Hours Assigned:          TOTAL # Hours Worked:

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| S1FO CIK-1.002 | 11-23-05 | TYPING / CLERICAL | JAN-FEB-MAR 2006 |

INMATE'S INITIALS:

RECOMMENDED FOR:   ☐ REASSIGNMENT   ☑ RETAIN   ☐ PAY INCREASE   ☐ PAY DECREASE

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE)   CODE OF SAFE PRACTICES REVIEWED   SUP'S INITIALS: MC   INMATE'S INITIALS: M.T

TITCH IS ON TIME / COMPLIES WITH Job Expectation

| SUPERVISOR | LENGTH OF SUPERVISION | WORK DETAIL | ETHNICITY |
|---|---|---|---|
| M. CAVAZOS | 3 MONTHS | CLERIC | WHI |

| INMATE'S NAME | CDC NUMBER | INSTITUTION | DATE |
|---|---|---|---|
| TITCH | B-89549 | RJDCF | APRIL 01, 2006 |

---

STATE OF CALIFORNIA  
CDC 101 (Rev. 4/82)  
**WORK SUPERVISOR'S REPORT**  
DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1 = Exceptional | 2 | A. Demonstrated Skill and Knowledge | 2 | F. Teamwork and Participation |
| 2 = Above Average | 1 | B. Attitude Toward Fellow Inmates and Workers | 2 | G. Learning Ability |
| 3 = Satisfactory | 1 | C. Attitude To Supervisors and Staff | 2 | H. Use of Tools and Equipment |
| 4 = Below Average | 2 | D. Interest in Assigned Work | 2 | I. Quality of Work |
| 5 = Unsatisfactory | 2 | E. Effort Displayed in Assigned Work | 2 | J. Quantity of Work |

PAY STATUS: From $          To $          From Job No.          To Job No.

| Total No. Hours Assigned | Total No. Hours Worked | LENGTH OF SUPERVISION 9 months |
|---|---|---|

| SUBJECT ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF: | PERIOD COVERED BY REPORT |
|---|---|---|---|
| Program Office | 11/23/05 | CLERICAL | APR-MAY-JUNE |

INMATE'S INITIALS: M.T.

RECOMMEND FOR:   ☐ REASSIGNMENT   XX RETAIN   ☐ PAY INCREASE   ☐ PAY DECREASE

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE)

Inmate TITCH is a good worker.

| SUPERVISOR | WORK DETAIL | ETHNICITY |
|---|---|---|
| W. MITCHELL, Correctional Sergeant | CLK 1.002 | WHITE |

| INMATE'S NAME | NUMBER | INSTITUTION | DATE |
|---|---|---|---|
| TITCH, M. | B-89549 | RJDCF | 7/3/06 |

CDC-128-B Rev. 4/74

NAME and NUMBER     TITCH, M.     B-89549     F1-04-227U     RJDCF

Inmate Titch, M., B-89549, is the Second Watch Lieutenant's Clerk for the Facility 1 Program Office. I have supervised him for nearly a year, and during this time he has always done a consistently good job. His duties consist of typing disciplinaries, disciplinary hearings, investigative Employee Reports, administrative lock-up orders, as well as numerous other forms which are essential to the daily operation of custody on Facility 1. Inmate TITCH has proven himself to be a very reliable, skilled clerk with a good attitude and work ethic and an asset to the program office.

Orig.:  C-File
   cc:  Writer
        Inmate

W. MITCHELL, Correctional Sergeant
Facility 1 Program Office, 2nd Watch

DATE  10/3/06          (Laudatory Chrono)          GENERAL CHRONO

---

CDC-128-B Rev. 4/74

NAME and NUMBER     TITCH, M.     B-89549     F1-04-227L     RJDCF

This chrono is to commend Inmate Titch, M., B-89549, for his excellent work performance as a Lieutenant's Clerk in the Facility 1 Program Office. As a Correctional Sergeant and acting Lieutenant on Facility 1, I have known Inmate Titch for approximately one (1) year. During this time, he has been a very reliable, competent, hard worker who has consistently done a great job for the program office. I've also observed that he maintains a very positive attitude. I, as well as many other staff members, are very appreciative of Inmate Titch's work performance as he has been an asset to the Facility 1 Program Office.

Orig.:  C-File
   cc:  CC-I
        Writer
        Inmate

A.G. SKOG, Correctional Sergeant
PSU Building, 2nd Watch

DATE  8/10/06          (LAUDATORY CHRONO)          GENERAL CHRONO

③

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date    :        March 12, 2008

To :             To Whom It May Concern

Subject:        **LAUDATORY MEMORANDUM FOR I/M TITCH, B-89549, F1-04-227L**

This memorandum is in regards to the employment and skills of Inmate TITCH, B-89549, while assigned to Inmate/Ward Labor (I/WL), at Richard J. Donovan Correctional Facility.

Inmate TITCH was initially hired by I/WL in July of 2000 as a welder/pipe fitter for the Steamline and Heating Hot Water Projects. This position required skills in arc welding (SMAW), which was used in pipe fabrication. Since this time, Inmate TITCH has assisted on several additional construction related projects with I/WL. These include but are not limited to the Fire Alarm Project, the Energy Efficiency Project, the Plaza and Roadway Repavement Project, the Shower Pan Replacement Project, the Remodeling of Psych Services Unit Project, the Mental Health Building Project (Facility 4), the Substance Abuse Treatment Building Project (AMITY/Facility 3), The HHW Manifold Project, the Water Conservation Project, and the Housing Conversion Project on Facility 3.

In commission of these projects, Inmate TITCH has become skilled in the operation of miscellaneous heavy equipment (Skiploader, Bobcat, Pettibone, & Forklift) and acquired his Forklift Operator's License. Inmate TITCH has also attended and completed training in Confined Space Awareness.

It should also be noted that Inmate TITCH is assigned the additional responsibility of being the Toolroom Clerk. This is a position of considerable trust, and is responsible for assisting in the control and inventory of all I/WL tools.

During Inmate TITCH's seven years of employment with I/WL he has proved to be a reliable and quality-conscious worker with an exceptional attention to detail that makes him and integral part of our team. I would like to personally commend Inmate TITCH for his outstanding efforts, hard work, and professionalism.

BRENT YOUNG
Construction Supervisor I
IWL/RJDCF

Orig:    C-File
Cc:      CC-1
         Inmate
         R3 Files





# Certificate Of Completion

On behalf of **Victory Outreach San Diego** it is
with great pleasure that we present

## Mark Fitch

with this Certificate Of Completion for the

## CHARACTER CURRICULUM

At Richard J. Donovan Correctional Facility

JULY 3, 2007–NOVERMBER 15, 2007

Michael Tejeda,
Prison Ministry Minister

Gabriel Felix,
Prison Ministry Minister

Sammy Sanchez,
Prison Ministry Minister

David Garcia,
Prison Ministry Minister

Jesus Garcia,
Prison Ministry Minister

Roberto "Bobby" Reyes
Prison Ministry Minister

5

**NAME**          **NUMBER**          **HOUSING**          CDC-128-B (Rev. 4/74)

TITCH, M.          B89549          F1-04-227

The above named inmate has successfully completed Facility One Chapel's Character Class from July 5, 2007 Thru October 25, 2007. This Christian instructional course taught the value of integrity, honesty, humility wisdom and living a principled centered life. This inmate has learned how to live a principled centered life and is to be commended for his attendance and participation.

ORIG: C-FILE
       CCI
       INMATE

DR. WILLIAM BROWN
State Chaplain
Richard J. Donovan Correctional Facility

DATE: October 28, 2007          LAUDATORY CHRONO          GENERAL CHRONO

**NAME and NUMBER    TITCH, M., B-89549, F1-04-227L**                    CDC-128-B(Rev. 4/74)

Inmate TITCH, M., B-89549, F1-04-227L, is a member of the Richard J. Donovan Correctional Facility, (RJDCF) Alcoholics Anonymous (AA) program.  On Tuesday nights on a semi-weekly basis, he participates with group discussions, shows the desire to improve himself by giving testimonies of his past history character defects.  Inmate TITCH is very supportive of the testimonies in a kind way.  He has attended four meetings out of five meetings offered during the period of January 2008 to March 2008.

J. SARANTOS
Self-Help Sponsor
Facility 1

Original: Records
cc:        CC I
           Inmate

DATE      **March 31, 2008**            **RJDCF**          **GENERAL CHRONO**



NAME and NUMBER    TITCH, M., B-89549, F1-04-227L          CDC-128-B(Rev. 4/74)

Inmate TITCH, M., B-89549, F1-04-227L, is a member of the Richard J. Donovan Correctional Facility, (RJDCF) Alcoholics Anonymous (AA) program. On Tuesday nights on a semi-weekly basis, he participates with group discussions, shows the desire to improve himself by giving testimonies of his past history character defects. Inmate TITCH is very supportive of the testimonies in a kind way. He has attended two meetings out of three meetings offered during the period of October 2007 to December 2007.

J. SARANTOS
Self-Help Sponsor
Facility 1

Original: Records
cc:         CC I
            Inmate

DATE        December 31, 2007              RJDCF          GENERAL CHRONO

NAME and NUMBER    TITCH, M., B-89549, F1-04-227L          CDC-128-B(Rev. 4/74)

Inmate TITCH, M., B-89549, F1-04-227L, is a member of the Richard J. Donovan Correctional Facility, (RJDCF) Alcoholics Anonymous (AA) program. On Monday/Tuesday nights on a semi-weekly basis, he participates with group discussions, shows the desire to improve himself by giving testimonies of his past history character defects. Inmate TITCH is very supportive of the testimonies in a kind way. He has attended five meetings out of six meetings offered during the period of April 2007 to June 2007.

*J. Sarantos* (signature)

J. SARANTOS
Self-Help Sponsor
Facility 1

Original: Records
cc:        CC I
           Inmate

DATE        June 30, 2007            RJDCF          GENERAL CHRONO


NAME and NUMBER    TITCH, M., B-89549, F1-04-227L          CDC-128-B(Rev. 4/74)

Inmate TITCH, M., B-89549, F1-04-227L, is a member of the Richard J. Donovan Correctional Facility, (RJDCF) Alcoholics Anonymous (AA) program. On Tuesday nights on a semi-weekly basis, he participates with group discussions, shows the desire to improve himself by giving testimonies of his past history character defects. Inmate TITCH is very supportive of the testimonies in a kind way. He has attended four meetings out of five meetings offered during the period of July 2007 to September 2007.

*J. Sarantos* (signature)

J. SARANTOS
Self-Help Sponsor
Facility 1

Original: Records
cc:        CC I
           Inmate

DATE        September 30, 2007        RJDCF          GENERAL CHRONO



NAME and NUMBER      TITCH, M., B-89549, F1-04-227L          CDC-128-B(Rev. 4/74)

Inmate TITCH, M., B-89549, F1-04-227L, is a member of the Richard J. Donovan Correctional Facility, (RJDCF) Alcoholics Anonymous (AA) program.  On Monday/Tuesday nights on a semi-weekly basis, he participates with group discussions, shows the desire to improve himself by giving testimonies of his past history character defects.  Inmate TITCH is very supportive of the testimonies in a kind way.  He has attended four meetings out of six meetings offered during the period of July 2006 to September 2006.


*J. Sarantos*

J. SARANTOS
Self-Help Sponsor
Facility 1

Original: Records
cc:          CC I
             Inmate

DATE        September 30, 2006          RJDCF          GENERAL CHRONO



NAME and NUMBER      TITCH, M., B-89549, F1-04-227L          CDC-128-B(Rev. 4/74)

Inmate TITCH, M., B-89549, F1-04-227L, is a member of the Richard J. Donovan Correctional Facility, (RJDCF) Alcoholics Anonymous (AA) program.  On Monday/Tuesday nights on a semi-weekly basis, he participates with group discussions, shows the desire to improve himself by giving testimonies of his past history character defects.  Inmate TITCH is very supportive of the testimonies in a kind way.  He has attended two meetings out of three meetings offered during the period of January 2007 to March 2007.


*J. Sarantos*

J. SARANTOS
Self-Help Sponsor
Facility 1

Original: Records
cc:          CC I
             Inmate



DATE        March 31, 2007          RJDCF          GENERAL CHRONO

NAME and NUMBER    TITCH, M., B-89549, F1-04-227L        CDC-128-B(Rev. 4/74)

BOX

Inmate TITCH, M., B-89549, F1-04-227L, is a member of the Richard J. Donovan Correctional Facility, (RJDCF) Alcoholics Anonymous (AA) program.  On Wednesday nights on a semi-weekly basis, he participates with group discussions, shows the desire to improve himself by giving testimonies of his past history character defects.  Inmate TITCH is very supportive of the testimonies in a kind way.  He has attended four meetings out of six meetings offered during the period of January 2006 to March 2006.


J. SARANTOS
Self-Help Sponsor
Facility 1

Original: Records
cc:        CC I
           Inmate

DATE        March 31, 2006        RJDCF        GENERAL CHRONO



NAME and NUMBER    TITCH, M., B-89549, F1-04-227L        CDC-128-B(Rev. 4/74)


Inmate TITCH, M., B-89549, F1-04-227L, is a member of the Richard J. Donovan Correctional Facility, (RJDCF) Alcoholics Anonymous (AA) program.  On Monday/Tuesday nights on a semi-weekly basis, he participates with group discussions, shows the desire to improve himself by giving testimonies of his past history character defects.  Inmate TITCH is very supportive of the testimonies in a kind way.  He has attended five meetings out of seven meetings offered during the period of April 2006 to June 2006.


J. SARANTOS
Self-Help Sponsor
Facility 1

Original: Records
cc:        CC I
           Inmate

DATE        June 30, 2006        RJDCF        GENERAL CHRONO





# CERTIFICATE OF RECOGNITION

## RECREATION VOLUNTEER

*M. Titch*

HAS BEEN AWARDED THIS CERTIFICATE FOR

### RJDCF 2008 - WALK-A-THON COMPETITION

## ORGANIZER / VOLUNTEER

**April 19, 2008**

Recreation Supervisor
F. CANO

Recreation Clerk
J. CASTRO

NAME and NUMBER    **TITCH, M.**    **B-89549**    **F1-4-227U**    CDC-128-B (4/74)

A special thank you is being given to you for your involvement in the April 19, 2008, Royal Family Kid's Camp Walk-A-Thon.  You are commended for your participation to help make the Walk-A-Thon a successful event.

ORIG:  C-file
Writer
CC-II

E. A. CONTRERAS
Associate Warden
M.A.C. Sponsor

DATE: MAY 15, 2008    LAUDATORY CHRONO    RJDCF    (13)

# CERTIFICATE OF RECOGNITION

## WALK-A-THON 2007

HAS BEEN AWARDED THIS CERTIFICATE FOR

### Mark W. Titch

OFFICIATING RJDCF SPORTS EVENTS

### RUN/WALK ORGANIZER

April 28, 2007

Recreation Supervisor
F. CANO

Recreation Clerk
J. CASTRO

(14)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT C**

Petitioner's 2008 Psychological Evaluation

# PSYCHOLOGICAL EVALUATION
## FOR THE BOARD OF PAROLE HEARINGS
### JULY 2008 CALENDAR
### FORENSIC ASSESSMENT DIVISION
### R J DONOVAN  CORRECTIONAL FACILITY

## I. IDENTIFYING INFORMATION



**INMATE COPY**

| | |
|---|---|
| Inmate Name: | **TITCH, Mark** |
| CDCR Number: | B89549 |
| DOB(current age): | 07/31/1959 (48) |
| Controlling Offense: | First Degree Murder (2 Counts) |
| Date of Offense (Age at time): | 01/21/1977, 01/29/1977 (age 17) |
| Sentence: | Seven Years to Life |
| County of Commitment: | Orange |
| Date Entered into CDCR: | 01/18/1998 |
| Date Received at R J Donovan | 09/11/1998 |
| Placement Score: | 28 |
| CDCR Forensic Evaluator: | Steven V. Renfeldt, Ph.D. |
| Data of Evaluation: | 04/30/2008 |

Mr. Mark Titch is a 48-year-old Caucasian male, serving a Seven-year to Life Sentence for two counts of First Degree Murder. He has served 30 years of his confinement time and currently resides at R J Donovan Correctional Facility. This is his ninth appearance before the Board of Parole Hearings.

## II. SOURCES OF INFORMATION

Mr. Titch's Central File (C-File) and Unit Health Record (UHR) were reviewed. This review also included four prior Board of Parole Hearing psychological evaluations. The most comprehensive evaluation, by Dr John Preston, M.D. dated April 19, 2006 is consistent with both Mr. Titch's self report and information contained in his files.

Mr. Titch was interviewed for the purpose of the current evaluation on April 20, 2008. He was informed that the interview was not confidential and that a report with the results of the evaluation would be submitted to the Board of Parole Hearings (BPH) to assist in determining his suitability for parole. He appeared to understand the nature and purpose of evaluation and the possible consequences of the interview to the best of his ability. Unless otherwise indicated, Mr. Titch agreed to participate in the interview. For reasons not limited to the possibility that an individual may have a mental disability or condition, which may qualify under the Americans with Disabilities Act, the evaluation was conducted by a licensed psychologist. It is the conclusion of the undersigned examiner that it was not necessary to provide auxiliary aids or assistance to achieve effective



5/19/08



communication. This evaluator is not responsible for any inaccurate statements or subsequently changed opinions expressed by the inmate.

Note: If the inmate has any concerns or disagreements about the content of this report, he is free to offer said concerns, either verbally or in writing, at his next board appearance. If the inmate chooses to offer a written rebuttal, it can be attached to the current evaluation for future reference.

## III. QUESTIONS POSED BY THE MOST RECENT BPH

Mr. Titch last appeared before the Board of Parole Hearings (BPH) on July 19, 2006 and was given a two year denial of parole. There were no specific issues or questions requested by the BPH. Recommendations made by the Board were as follows:

1. No More 115's or 128A's
2. Get self help when available
3. Stay discipline free
4. Earn positive chronos

## IV. INTERVIEW INFORMATION

### BACKGROUND INFORMATION/HISTORY
The reader is referred to the report of Dr. John Preston, M.D., for the detailed and relevant aspects of Mr. Titch's developmental and social history. At today's interview Mr. Titch presented as a 48 year old Caucasian male who was tall, of average build, and appeared his stated age. He was dressed in standard prison attire, and displayed appropriate personal hygiene. His demeanor was responsive and cooperative. His affect was full range, and congruent to cognitive content. Cognitive functions and sensorium were intact, and essentially unremarkable. There were no signs of disturbance in thought, mood, affect, ideation, or perception. Although not formally tested in this evaluation Mr. Titch appeared to be of average level of intelligence.

### UNDERSTANDING OF LIFE CRIME
According to Police Reports and Probation Officers' Reports (POR), Mr. Titch and his codefendant were involved in a series of burglaries and robberies in Orange County between December 1976 and January 1977. During one of the robberies, a female victim was kidnapped by Mr. Titch and his crime partner, and taken to a remote area. She was executed by gun shots through her mouth in order to prevent her from identifying them. During another robbery approximately one week later, Mr. Titch and his crime partner followed the victim home, and when the male victim went to unlock the front door of his house Mr. Titch's crime partner shot him several times with a .22 caliber rifle. Upon hearing the gun shots, the victim's wife and daughter came to the front door. As the wife and daughter opened the door they were both shot multiple times. The husband and the daughter both died from the gunshot wounds received from Mr. Titch's crime partner. Sometime prior to theses murders, Mr. Titch was confronted by a San Diego police



officer after exiting a liquor store he had just robbed. When the officer ordered Mr. Titch to stop, Mr. Titch pulled out his handgun and fired at the officer hitting him 5 times. The officer survived the shooting but was permanently disabled from the injuries received. Mr. Titch was subsequently tired and convicted of 2 counts of murder, 3 counts of burglary, 5 counts of robbery, 1 kidnapping, and assault with a deadly weapon.

Mr. Titch admitted to the events and circumstances surrounding his life term offenses. When asked what he thought contributed to his offenses Mr. Titch stated the following:

" I was 17 at the time.  My family life had a great deal to do with why I was being so stupid. I'm not making excuses for my actions or blaming anyone. The thing I see that ended up causing me to commit murder was that I had a terrible childhood. My mother abandoned me when I was 10, and I had to live with my father was very overbearing and an alcoholic.  We always had conflicts which led to my running away at 12. I had a very hard life on the streets.  When I got picked up as a runaway I was always told how bad I was, and asked what was wrong with me to be running away. The process may be very distrustful of adults because no one was really concerned with what was going on at home. This led to a lot of confusion and mistrust on my part because the courts would keep sending me back to the same problems of home.

I eventually met my crime partner at 17 and we started committing crimes together. I had already shot a police officer and thought I killed him, so inside I had the feeling of despair. I took my crime partner to one of my robberies and it turned into a murder. From that point on he kind of took over. In the process of kidnapping the girl, my partner was concerned because he had been photographed by police and needed to prevent her from being a witness. I felt obligated to do what he wanted.  I drove to this area and we shot and killed her. When we saw it on the news we panicked and wanted to leave the area. We didn't have money to leave so we had to commit another robbery, which happened to be a dairy. We had been sitting in the driveway talking about changing our minds. The owner came running out to see what we needed, and my partner panicked and shot him. All of our crimes from then on were blunders. The next one was the same way when we robbed the pool hall. At that point I said no more. There was never any plan to kill anyone. As the robberies unfolded it led to murders. I can't believe I was that stupid to go along. I think I felt so hopeless and full of despair because of my life I went along. I didn't have the knowledge or insight to see how sticking with this guy would lead to what it did. I was young, unfocused, and a runaway. "

## INSIGHT / SELF ASSESMENT
When asked what has changed since coming to prison and over the past 30 years, Mr. Titch responded as follows:

"I'm not 17 anymore.  I'm not dumb, I wasn't educated back then. I've matured and had the good fortune to meet a lot of good people who have taken the time to

TITCH, Mark  B89549                3                R J DONOVAN  July 2008  BPH

③



sit with me and teach me things about life and skills. My self-esteem has improved. My work ethic has helped in getting up and going to work every day. It caused me to see how unjust it was to go out and rob someone, and deprive them of their property. I think my spiritual development has helped. When I first came in I didn't believe in God because I couldn't see how he could let things happen the way they did. Over the years I've received so many blessings to come do believe in God. I know that without him I would have perished along time ago. I can't emphasize enough how much the good people in my life have really helped me, like teachers, supervisors, inmates, and others. The person I am today is 180 degrees different than I was then. I really didn't know who I was then. I think when I took the steps to analyze who I am I realized I'm not stupid or a bad person. I could make something of myself because I can learn. I think I've made some good choices and progress in my life considering the way I grew up."

When asked what he thought his strengths were Mr. Titch said:

"My greatest strength right now would be my ability to communicate with others. I've always started at the bottom, like in my jobs, and then rose up through the ranks to be a lead man. I have the ability to communicate with people and get them motivated. Another strength is I'm a very good friend to those I know. This is what people tell me anyway. I think I'm a person of worth, I don't lie, and I don't steal. It's tough to be here because other inmates judge you when you try to do good. I like the person I've become. "

When asked what his current weaknesses were Mr. Titch stated the following:

"One of the biggest things for me is to not get too relaxed. I've come a long way to better myself, but I think I need to learn to be a little more humble in the way I display myself to others. Sometimes I should be more patient with people who are not as educated or sophisticated or not as far along the path. There's always a reason why people do what they do, and it's better to understand them if you try to."

When asked why he thinks he is ready for parole Mr. Titch said:

"I think the law says parole should normally be granted unless the magnitude of the offense makes me pose a threat to others. I'm not a threat any longer. The evidence is my behavior and positive pursuits. My education and vocations have helped me prepare to accept the responsibilities of the world. I think I've come to terms with my crimes and past life. I don't hate anyone or harbor any resentment to others. I've acknowledged how bad the things I did were. When I was a kid and had problems with someone I never thought about other people like their parents, or brothers and sisters, or their friends. I can empathize with people now. I know everyone has problems in life and they don't need someone coming along making life harder. I'm very conservative now and never thought I would be. I'm around others who aren't, and it bothers me sometimes to see people not care about

TITCH, Mark  B89549                    4              R J DONOVAN  July 2008  BPH





others, or take advantage of others. If we hang around the wrong crowd, go to bars and waste time, we can get into trouble.  If I just continue doing the things I'm doing now, going to work, paying bills, being responsible things work out in life."

## CRIMINAL HISTORY

Mr. Titch's criminal history began in adolescence at age 12 and continued until his arrest for the index offense at age 17. He was arrested at age 12 for Truancy and Malicious Mischief. At age 13 he was arrested as a Runaway, for Burglary, and for Escape from Juvenile Placement. At age 14 he was arrested for Assault, Burglary, and Armed Robbery and committed to the California Youth Authority (CYA). He was released from CYA at age 16 and returned again for Vehicle Theft. At age 17 he was arrested for Burglary, Auto Theft and Escape from Juvenile Hall in the months just prior to committing the index offenses.

## SUBSTANCE ABUSE HISTORY

Mr. Titch denied a history of addiction to alcohol or drugs; however he acknowledged experimenting with alcohol and various hallucinogenic drugs starting at age 12. He reported a history using marijuana, alcohol, PCP, and LSD. Mr. Titch denied that alcohol or drugs played any part in his criminal behavior noting that he was sober during all criminal activities. While incarcerated he has attended both narcotics anonymous and alcoholics anonymous. In 1985 he received a CDC-115 for possession of inmate manufactured alcohol.

## INSTITUTIONAL PROGRAMMING

As of this evaluation Mr. Titch's placement score is 28 which is the lowest score possible for an inmate with a life term offense.  He has not received a significant negative right up or behavior repreot for over 22 years. He has remained incident free since his last evaluation and Board appearance.

Mr. Titch appears to have used his time in prison to improve himself educationally and vocationally. He obtained his Associates Degree in 1995 and has completed the Vocational Certification in Drafting. He currently works in PIA Printing and has worked there for nine years. Previously he worked for 7 years in IDL Prison Construction as the Tool Room Clerk. During that time he   learned welding, concrete finishing, carpentry, and electrical. He also learned to operate heavy equipment, and obtained his forklift operators certificate.  He has held other prison jobs in the laundry, on the yard crew, as a Procurement Clerk, a Lieutenant's Clerk, and as a Teacher's Aid in Vocational Auto-body.

Mr. Titch has participate in numerous personal growth programs such as  Purpose Driven Living, Biblical Self Confrontation Workshop, Creative Conflict Resolution (Basic and Advanced), KAIROS, the Rapha 12-Step Course, and the 40 Days of Purpose Program. He has long term attendance chronos for both AA and NA. He has also participated in the Walkathon for Child Abuse Treatment the past three years, and participates with Victory Outreach programs.

TITCH, Mark B89549                     5            R J DONOVAN  July 2008  BPH



Mr. Titch reported that when he is not working he spends his time in the dayroom talking with the younger inmates about positive living. He stated that he likes to read positive, non fiction books, and watch PBS on television. He said he regularly attends religious services, and writes letters to friends and family.

## PAROLE PLANS

Mr. Titch appears to have realistic and viable parole plans if granted release. He has multiple letters of support in his files.

**Financial vocational plans:** Mr. Titch said that he has a standing job from a friend, Marty Freeman, who owns a marine services business in Chula Vista. He said he also has made numerous contacts with outside contractors while working in the Prison Construction Program.

**Level of support:** Mr. Titch said that he has a friend from El Cajon who has offered assistance with housing when released. He said that he has a back-up offer from a Marty Freeman who owns the marine services business.

**Prior work history:** Mr. Titch has maintained steady employment while incarcerated. He has developed highly marketable skills in both construction trades and printing trades.

**Institutional adjustment:** Mr. Titch appears to have adjusted to prison life and has not received any disciplinary reports for over that past 22 years.

## MEDICAL AND PSYCHIATRIC HISTORY

Mr. Titch reported that he feels like he is currently in good physical health and currently is not taking any medication or being treated for any medical condition. He stated that he tested positive for Hepatitis C – Stage I, but is currently asymptomatic. Mr. Titch denied any psychiatric history prior to, or since coming to prison aside from meeting with psychologists for Board evaluations.

## V. CLINICAL ASSESSMENT

## CURRENT MENTAL STATUS/TREATMENT NEEDS

Mr. Titch presented as a 48 year old Caucasian male of average and stature. He was wearing standard prison attire and displayed appropriate personal hygiene. When asked about being interviewed, he said that he didn't feel well, but would continue as best he could. His demeanor was responsive and cooperative and his affect was full range, and congruent to cognitive content. Cognitive functions and sensorium appeared intact, and essentially unremarkable. He was oriented to time and place and his short memory was adequate. There were no signs of disturbance in thought, mood, affect, ideation, or perception. Although not formally tested in this evaluation Mr. Titch appeared to be of





average level of intelligence. He did not appear to be in need of current mental health treatment.

## DIAGNOSTIC IMPRESSIONS

**Axis I**      No Diagnosis

**Axis II**     Antisocial Personality Disorder (by history, improved)

**Axis III**    Hepatitis C

**Axis IV**     Life Term Incarceration

**Axis V**      GAF 89

Mr. Titch did not demonstrate any current symptoms of mental illness. His history of early conduct disorder, and an adult history of breaking the law, disregard for others, impulsivity, and aggressiveness, are character traits of an Antisocial Personality Disorder. The fact that he has gone over 20 years without demonstration of these traits supports the qualifiers of "by history and improved."

## PREVIOUS EVALUATION SUMMARIES

Mr. Titch's file contains four prior psychological / psychiatric evaluations since his incarceration.  He was first evaluated in April 1978, three months after his arrival at CDCR,  by Leisla Howell, Ph.D. Dr. Howell's diagnostic impression of Mr. Titch was that he had an Antisocial Personality that was severe, had paranoid features, and that he had homicidal potential. She opined that Mr. Titch's behavior was driven by hate and hostility resulting from pathological inadequacy and the lack of acceptance from others. Dr. Howell's prognosis was that, "...persons with this type of character disorder do not respond to treatment nor rehabilitative attempts.

Twenty years later, Mr. Titch was evaluated by Dr. L.W. Berning, Ph.D. on February 26, 1998 for his first appearance before the Board of Prison Terms. Dr. Berning provided a diagnostic impression of Antisocial Personality Disorder but concluded his findings with the follow:
> "During [Mr. Titch's] period of incarceration some indications of maturity are present and [he] has expressed a desire to find some peace in his life to diminish the negative feelings that he has towards others. To the extent that he obtains insight into his angry feelings, his elevated potential for violence in the community is expected to recede with time."

Mr. Titch was evaluated in April of 2000 by Dr. Alvin Chandler II, Ph.D. Dr. Chandler did not find any symptoms of a mental illness but agreed with the previous evaluators that Mr. Titch  has a historical behavior pattern of an Antisocial Personality Disorder. With regards to the offenses, Dr. Chandler noted that Mr. Titch admits to his wrong doings, "...it does not appear that he has dealt with his feelings and the full impact of his

crimes. He seems to intellectualize and emotionally distance himself somewhat from the grievous nature of the crimes and terrible emotional impact that they…have had on others." In spite of this Dr. Chandler assessed Mr. Titch's potential for violence as, "…somewhat less than the average inmate…"

Dr. John Preston, M.D. evaluated Mr. Titch in March of 2006 which was the most recent evaluation in his file. Dr. Preston modified his diagnostic impression of Mr. Titch as "Antisocial Personality Disorder, by hx." Dr. Preston opined that Mr. Titch's risk for violence level as, "…less that average…in the structured setting as compared to other inmates." Dr. Preston provided support for a reduced risk status noting Mr. Titch's pro-social lifestyle in prison, his forming of connections with friends and relatives, and his overall positive programming.

## RISK FOR VIOLENCE

The current research literature indicates that an empirically based approach is the most reliable and valid method for assessing risk of future violence. In the present evaluation the Psychopathy Checklist-Revised (PCL-R), the History-Clincal-Risk-20 (HCR20), and the Level of Service Inventory / Case Management Inventory (LS/CMI) were used to help estimate this individual's risk for future violence in the community. The PCL-R is a standardized ratings scale of psychopathic personality traits that is a reliably associated with risk for future violence. The HCR-20 is a rating for known violent risk factors drawn from research on violence. The LS/CMI is an actuarial instrument designed to evaluate levels of risk to recidivate. This instrument is focused on risk of general recidivism and not violence per se. The data for scoring these instruments was obtained from information derived in both the inmate interview and the files reviewed. These measures have been widely used and are supported by years of research in the risk assessment field. They have been crossed validated with various forensic populations, including United States males in correctional settings.

### PCL-R
Mr. Titch had an early history of juvenile delinquency, poor behavioral controls, impulsivity, and a parasitic lifestyle. His parole was revoked while committed to the CYA. During the interview he did not present as glib or superficial. He appeared to take responsibility for his offense, showed remorse, and insight to his behaviors. The PCL-R rates an individual for characteristics and traits such as superficial charm, grandiosity, pathological lying, lack of remorse, shallow affect, lack of empathy, poor behavior controls, impulsivity, and criminal versatility. Mr. Titch's total score was Low for psychopathy relative to incarcerated adult male offenders.

### HCR-20
Focusing more specifically on the "historical" domain of assessing likelihood of future violence, Mr. Titch's records indicate that he had prior violent offenses at a young age, early maladjustment, and he has been previous diagnosed with a personality disorder. He had early adjustment problems in prison and had failed parole as a juvenile.



Within the "clinical" or more current and dynamic domain of risk assessment, Mr. Titch has an absence of risk factors. He appears to have insight into his own behaviors, has a good attitude, has better self control than he has shown in the past, and has responded to personal growth opportunities.

Within the "management of future risk" domain, Mr. Titch's risk level appears low. He has adapted to prison life after an early adjustment period, he has realistic future plans with support from relatives, he manages stress well, and he is responsive to treatment opportunities.  Overall, Mr. Titch rated low to moderate for future violence on the HCR-20.

### LS/CMI
The LS/CSMI addresses factors that contribute to recidivism. Mr. Titch scored very high in the area of criminal history with numerous prior offenses, institutional misconduct, and parole revoked in the past. He has few acquaintances or friends out side of prison due to being incarcerated for two thirds of this life. He also has a history of antisocial behavior. As a result of these factors Mr. Titch scored medium for risk of recidivism on the LS/CMI. .

### **VIOLENCE RISK**
The factors that contribute to an elevated risk status for Mr. Titch with regards to violence or future offending are historical.  His offenses were impulsive, violent, and resulted in the loss of human life. He came from a family where conflict and emotional abuse were prevalent. He has a long history of criminal behavior beginning at an early age. He spent most of his teenage years as a runaway, in group homes, or incarcerated within the Youth Authority. He has spent all of his adult years incarcerated within the prison system. He had some minor difficulty adapting to prison life and was diagnosed early on with Antisocial Personality Disorder. The objective risk assessment measures rated him as low to moderate for violence and medium for future re-offending.                 —

On the other hand, there are factors that appear to mediate and lesson Mt. Titch's risk status. He appears to have matured and mellowed with age having spent 30 years in prison now.  His early behavior problems in prison have stopped, and he has gone the past 22 years without any rule violations or aggressive behavior. He is no longer impulsive, but presents as reflective and thoughtful in the way he interacts with others. He has taken advantage of all opportunities to improve himself in prison including obtaining a college degree, Vocational Certifications, and having responsible and trusted prison jobs with excellent chronos from his supervisors. He has participated in numerous personal growth programs, and appears to have internalized the things he has learned.  He shows remorse and insight into his past offenses, and the internal and external factors that contributed to his level of participation.  He spends his time trying to make amends by participating in fund raisers for victims and counseling other inmates about making better choices in life. He has viable parole plans, and excellent job skills, that will help him be self-supporting in the community. Mr. Titch, having spent his life incarcerated, has found



a way to grow in a pro social manner while in a negative environment. The prior psychological evaluations have shown slow yet consistent positive progress on Mr. Titch's part. In each case, opinions of his risk status have shown greater confidence in a reduced risk status for both violence and re-offending. In the present evaluation the clinical factors appear to outweigh the historical factors in finding Mr. Titch an overall low risk for psychopathy, low risk for violence, and low to medium risk for future re-offending.

## VI. CONCLUSION

Mr. Titch is a 48 year old man with commitment offenses including two counts of Fist Degree Murder. He has served 30 years of a Seven Year to Life Sentence. His offenses involved burglaries, robberies, kidnapping and murder, all committed at a young age. Mr. Titch has spent the greater part of his life either incarcerated in the Youth Authority or State Prison. His family history was filled with abuse, neglect, and an impoverished home environment. In spite of these historical factors Mr. Titch has improved himself educationally, vocationally, and spiritually while in prison. He has obtained a college degree, Vocational Drafting Certification, and numerous skills in the both the printing and construction trades. He appears to have grown and matured with age in manner that has reduced his risk status for violence or re-offending compared with his risk when entering prison. He has developed positive associations and contacts outside who have offered support for his parole and parole plans. Although one of the objective measures rate his risk status as medium due to historical factors, his present state, and the clinical factors, appear to outweigh them. The current findings, supported by his prior evaluations, suggest that Mr. Titch's current risk level is low for psychopathy, low for violence, and low to medium for future re-offending.

May 9, 2008

_____
Steven V. Renfeldt, Ph.D., CA, License # PSY-11256
Forensic Psychologist / Forensic Assessment Division
Board of Parole Hearings
California Department of Corrections and Rehabilitation

Date Submitted

Reviewed by: _____
Jasmine A. Tehrani, Ph.D., CA Psychologist License# PSY 18932 Senior Psychologist, Supervisor
Board of Parole Hearings
California Department of Corrections and Rehabilitation



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT D**

BPH Parole Consideration Worksheet & Hearing Decision Face Sheet

BOARD OF PRISON TERMS                                              STATE OF CALIFORNIA

# LIFE PRISONER PAROLE CONSIDERATION WORKSHEET

| ☐ INITIAL HEARING | ☒ SUBSEQUENT HEARING #9 |
|---|---|

| PRISONER'S NAME | CDC NUMBER |
|---|---|
| TITCH, MARK | B-89549 |

| DATE OF HEARING | LOCATION |
|---|---|
| 7-07-08 | R. J. Donovan Correctional Facility |

## LEGAL STATUS

| DATE RECEIVED | DATE LIFE TERM STARTS (IF DIFFERENT) | COUNTY |
|---|---|---|
| 1-18-78 | 1-18-78 | ORANGE |

| OFFENSE | CASE NUMBER |
|---|---|
| MURDER 1ST | C 37693 |

| COUNT NUMBER(S) | PENAL CODE SECTION(S) VIOLATED |
|---|---|
| 13 | PC 187 |

| TERMS | MEPD |
|---|---|
| LIFE | 2-4-84 |

## OTHER COMMITMENT OFFENSES OR STAYED COUNTS

| STAYED | OFFENSE | CODE SECTION | COUNTY | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|---|---|
| ☐ | ROBBERY | PC 211 | ORA | C37693 | 2,4,6,7,9 |
| ☐ | BURGLARY | PC 459 | ORA | C37693 | 10,11,15 |
| ☐ | KIDNAP | PC 209 | ORA | C37693 | 12 |
| ☐ | MURDER | PC 187 | ORA | C37693 | 16 |
| ☐ | ADW ON P/O | PC 245(b) | SD | CR42845 | 2 |

## PRESENT AT HEARING

| PANEL MEMBER | PANEL MEMBER | PANEL MEMBER |
|---|---|---|
| | | |

OTHERS PRESENT

☐ PRISONER (IF ABSENT, WHY?) _____

☐ ATTORNEY: _____

☐ DEPUTY   LIFER UNIT         COUNTY OF      ORANGE

☐ OTHERS: _____

## STATEMENT OF FACTS

☐ THE HEARING PANEL INCORPORATES BY REFERENCE FROM THE DECISION OF THE HEARING HELD

ON _____, PAGES _____ THROUGH _____.

☐
THE STATEMENT OF FACT IS

☐ QUOTED FROM THE BOARD REPORT, DATED _____, PAGE(S) _____.

☐ QUOTED FROM THE PROBATION OFFICER'S REPORT, PAGE(S) _____.

☐ QUOTED FROM THE COURT OPINION, PAGE(S) _____.

BOARD OF PAROLE HEARINGS
LIFE PRISONER HEARING DECISION FACE SHEET

**STATE OF CALIFORNIA**

☐ PAROLE GRANTED - (YES)
    CDC: Do not release prisoner before Governor's review.
☒ PAROLE DENIED - (NO)    2 YEAR(S)

| Records Use Only | | | |
|---|---|---|---|
| Parole Release Date | | | _____ |
| | YR | MO | DAY |
| Attach Prison Calculation Sheet | | | |

☐ INMATE SIGNED STIPULATION OF UNSUITABILITY FOR:    YEAR(S)

☐ INMATE SIGNED VOLUNTARY WAIVER FOR:    YEAR(S)

☐ SPLIT DECISION

☐ CONTINUE    MONTH(S)

☐ HEARING POSTPONED  REASON:
    MONTH(S)

## PANEL RECOMMENDATIONS AND REQUESTS

**The Board Recommends:**    As Available

☐ No more 115's or 128A's    ☒ Get self-help
☐ Work to reduce custody level    ☐ Learn a trade
☒ Stay discipline free    ☐ Get therapy
☒ Earn positive chronos    ☐ Get a GED

☐ Recommend transfer to

☐ Other

**Penal Code 3042 Notices**    ☐ Sent

| Commitment Offense(s) | Code(s) | | Crime(s) | |
|---|---|---|---|---|
| | P211 | | ROBBERY | |
| | P459 | | BURGLARY 1ST | |
| | P187 | | MURDER 1ST | |
| | P209 | | KID/ROBB/RAN | |

| Date Inmate came to CDC | Date Life Term Began | Minimum Eligible Parole Date |
|---|---|---|
| January 18, 1978 | | February 4, 1984 |

| ☐ Initial Hearing | ☒ Subsequent (Hearing #) 09 | ☒ Date of Last Hearing 07/19/2006 |
|---|---|---|

CDC Representative

Attorney for Prisoner  SCOTT J. EADIE    Address  5000 BIRCH ST. WEST TOWER SUITE 3000
NEWPORT BEACH, CA 92660

D.A. Representative    County  Orange

This form and the Board's decision at the hearing is only <u>proposed</u> and NOT FINAL.
<u>It will not become final until it is reviewed.</u>

ARCHIE BIGGERS - Commissioner    Date  07/07/2008



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT E**

Los Angeles Times news Article

RECEIVED
JUL 07 2008

## LOS ANGELES EDITION

Sunday, July 6, 2008

latimes.com/california

# State parole board gets a grilling

Some say it too often denies freedom to deserving inmates, and argue over who should sit on the panel.

By Michael Rothfeld
Times Staff Writer

SACRAMENTO — They are trained at putting tough questions to convicted murderers, but the state's powerful parole board commissioners have found themselves on the other side of the table lately, under interrogation in a political conflict that has cost some of them their jobs.

On one side of the dispute is Gov. Arnold Schwarzenegger, a Republican who routinely appoints former law enforcement officials to the Board of Parole Hearings, which decides whether to release the most serious criminals from prison. On the other is state Senate leader Don Perata, a Democrat from Oakland who believes commissioners deny parole to deserving inmates far too often.

Since January, Democratic senators led by Perata have rejected four of the eight commissioners they have grilled at confirmation hearings, ousting a third of the 12-member board and forcing Schwarzenegger to replace them. Members can serve a year after their appointment but must then receive the Senate's blessing to complete their three-year terms.

The upheaval has further disrupted an already problem-plagued board that has postponed thousands of parole hearings in recent years, potentially exposing the state to hefty fines from a Superior Court judge.

Perata has called the board

"a sham" for denying parole to 95% of so-called life inmates, many of whom have been locked up for decades. He has urged the governor to appoint commissioners from outside the law enforcement world to augment the former police officers, sheriffs and probation chief who make up all but one of the current board members.

"It just defies logic to suggest that they can interview or evaluate over 5,000 people [a year] and make only a handful of remands back to the community," Perata said in an interview. "Where are the social scientists, the psychologists?

Where are the people who bring a different dimension to life, a different view on rehabilitation?"

But Schwarzenegger has persisted, last week naming two more commissioners with law enforcement backgrounds. State law says commissioners should have "a broad background in criminal justice."

"We believe that we've been appointing individuals who will follow the law and who have the right background," said Aaron McLear, the governor's spokesman. "We expect these nominees to weigh each case on its

[See Parole, Page 89]

---

California

Upheaval on the state parole board

A battle pits the governor, who routinely appoints former law enforcement officials to the panel, against the state Senate leader, who says commissioners too often deny parole to deserving inmates. Page B1



# Parole board battle pits Perata against Schwarzenegger

[*Parole, from Page B1*]

ments, keeping public safety at the forefront of their decision-making process."

The board's new executive director, Martin Hoshino, is trying to reduce a backlog of 1,400 parole hearings postponed in part, because of unavailable commissioners. Losing members hasn't helped.

"We have hearings ready to go and there's nobody to hear it," Hoshino said.

The inability to conduct hearings dates to before Schwarzenegger took office. A Marin County Superior Court judge overseeing an inmate lawsuit is threatening to impose fines for hearings postponed since February, that could cost the state more than $1 million this year. Keith Wattley, an Oakland attorney in the

suit, said the state is unconcerned about hearings because it doesn't intend to let inmates out anyway.

"Prisoners have no political power," he said.

The board has several functions, including 100,000 proceedings a year conducted by staff and related to parole violations and other matters. But the appointed commissioners, who earn $112,000 a year in the full-time post, oversee the board's highest-profile duty: to decide whether an inmate's risk to public safety is so significant that he should be released. They are scheduled to conduct 16 hearings a week, often traveling to far-flung

state prisons. When they do grant parole, the governor usually reverses the decision.

Advocates for prisoners say the commissioners are predisposed to deny parole. Their rulings are "oftentimes based on what they had for breakfast that morning more than how deserving the inmate is," said Matt Gray, a lobbyist on criminal justice issues whose father is a prisoner. "We could have a monkey in a basement stamping these denials."

Los Angeles County Deputy Dist. Atty. David Dahle said law enforcement officials make good commissioners because they understand the criminal mind and see through inmates' tricks.

"Why isn't the number [of denials] dramatically lower?" Dahle said. "It's obviously because those people are the ones

who have committed the most anti-social acts in society."

Darrel Woods, a former commissioner from Los Angeles, said he was one of the worst experiences of my life," said Stan Kubochi, who was tossed off the commission in March, presided over 2221 hearings in 2007, with eight resulting in grants of parole — an approval rate of 3.6%. Woods acknowledged "a philosophical divide" between Schwarzenegger and Perata but she said she considered only the people of California.

"I have a sincere interest in their safety and their well-being," said Woods, who worked as a parole agent, deputy sheriff and a community college professor teaching criminal justice issues.

At their confirmation hearings, parole commissioners have been harshly questioned by senators and criticized by inmates' attorneys, who have

called them ignorant of the law and verbally abusive.

"Professionally, it was one of my experiences of my regulations. . . .

Eng said her ouster was "political."

"All the commissioners are pawns on a chessboard," she said, referring to the Schwarzenegger-Perata feud.

Some senators cited Kubochi's refusal to disqualify a deputy commissioner from a parole hearing in which her own daughter testified. Kubochi said Perata disregarded his work as a public defender, his friends at dinner parties about the world of parole she had stumbled into. But she won't miss searching for safe accommodations in desolate areas near prisons on a reimbursement rate of $84 a day.

"I didn't want to stay in hotels where they were carrying out dead bodies," she said, "or had shootouts in the parking

*michael.rothfeld@latimes.com*

